UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| VERNON HORN | : | NO.: 3:18-CV-01502 (JAM) |
| | : | |
| v. | : | |
| | : | |
| CITY OF NEW HAVEN, ET AL | : | |

| | | |
|---|---|---|
| MARQUIS JACKSON | : | NO.: 3:19-CV-00388 (JAM) |
| | : | |
| v. | : | |
| | : | |
| CITY OF NEW HAVEN, ET AL | : | NOVEMBER 21, 2109 |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT, CITY OF NEW HAVEN'S MOTION TO RECUSE

On October 31, 2019, this Court entered the following Order in both Vernon Horn

v. City of New Haven, et al and Marquis Jackson v. City of New Haven, et al:

> NOTICE.  On October 23, 2019, Judge Meyer *sua sponte* entered a ruling and order of disqualification in the case of *Johnson v. New Haven*, 17cv1479 (JAM) (Doc. 213).  Although Judge Meyer does not presently conclude that the grounds that he has set forth for his recusal in *Johnson v. New Haven* would warrant his recusal in this case, the Court invites any party to file a motion for recusal by **November 21, 2019**, if they believe that Judge Meyer is mistaken and that there are grounds for Judge Meyer's recusal in this action.  It is so ordered.  Signed by Judge Jeffrey A. Meyer on 10/31/2019.  (Al-Jarani, Y.)

See Order [Doc. 129] in Vernon Horn v. City of New Haven, et al, No. 3:18-cv-01502

(JAM) and Order [Doc. 60] in Marquis Jackson v. City of New Haven, et al, No. 3:19-cv-

00388 (JAM).

The defendant now seeks recusal of this Court, *Meyer, J.*, in the above-captioned

matter, based on (1) the reasons underlying this Court's *sua sponte* recusal in Johnson

v. New Haven; (2) this Court's involvement in a critical evaluation and analysis of the
New Haven Police Department spearheaded by the Police Executive Research Forum,
and (3) this Court's involvement as trial judge in the habeas corpus proceeding filed by
Vernon Horn in the matter captioned Vernon Horn v. Comm'r of Corr., No. 3:17-cv-
01064 (JAM).

In the civil action Johnson v. City of New Haven, et al, No. 3:17-cv-01479, this
Court, *Meyer, J.*, scheduled a *sua sponte* telephonic status conference on October 22,
2019 and indicated that recusal from further involvement was warranted as a result of
the Court's connection to the investigation of the New Haven Police Department
("NHPD") that took place in 2007 by the Police Executive Research Forum ("PERF").
See Tr. of Status Conf., **Ex. A**, in the matter of Johnson v. City of New Haven,et al, No.
3:17-cv-01479.  Therein, citing to 28 U.S.C. § 455 (A) and the Code of Conduct for
United States Judges, this Court noted that, "a judge's duty to recuse extends to
situations where there's even an appearance that a judge would not be impartial, where
the judges impartiality might reasonably be questioned".  See Tr. of Status Conf., **Ex. A**,
at 7.  After referencing the Second Circuit decision in Chase Manhattan Bank v.
Affiliated FM Insurance Company, 343 F.3D 120, this Court stated, "I conclude that
there would be an appearance that I would not be impartial in light of my prior service as
co-chair of the IAP".  See Tr. of Status Conf., **Ex. A**, at 7.  The Court's involvement with
the Independent Accountability Panel ("IAP") and the PERF evaluation of the NHPD
occurred in 2007, which was after the time Bobby Johnson had been investigated and
arrested by the NHPD (2006), but during the time Johnson was prosecuted, pled guilty

and was sentenced (2007).  The PERF evaluators reported directly to the IAP and not to the NHPD or to the City of New Haven.  See PERF Report, **Ex. B**, at 3.

The City of New Haven believes that the same reasons that led to this Court's *sua sponte* recusal in the Johnson case are present in the pending suits by Horn and Jackson.  The Police Executive Research Forum conducted an analysis of the NHPD that looked at past policies and practices, and concluded that some of the problems it found were longstanding requiring a change of the culture of the department.  See PERF Report, **Ex. B**, at 5.  Thus, while the genesis of the PERF evaluation was the arrest of NHPD Detective White in 2007, the review examined past practices, not only of Detective White, but also of the entire NHPD that extended far into the past.  The conduct alleged to have occurred in the Horn and Jackson suits occurred only eight years prior to the PERF evaluation, a period arguably, if not surely, within the scope of the PERF lookback.

The PERF Report was critical of the NHPD in several respects.  The reference to these criticisms in this motion does not mean the City of New Haven agrees with these criticisms as levied, nor does the City of New Haven stipulate to or admit to the accuracy of any of the findings, but they are set forth below as being relevant to this Motion to Recuse.  By design, the PERF Report is an end product following collaboration with and oversight by the IAP, of which this Court was co-chair.  The following findings in the PERF Report are instructive:

1.    The PERF Report states that the State's Attorney's Office (SAO) would rarely call narcotics unit officers to testify in court because their investigation reports were too frequently of poor quality, often lacked essential details and had too many errors.  (See PERF Report, **Ex. B**, at 33-34.)

2.      The PERF Report states that these errors show a need for greater training and/or greater supervisory review.  (See PERF Report, **Ex. B**, at 33-34.)

3.      The PERF Report states that there is also poor case preparation standards at NHPD, requiring correction or questioning by prosecutors.  (See PERF Report, **Ex. B**, at 36.)

4.      The PERF Report states that a concern was raised about the dropping standards by NHPD regarding improving its case development.  (See PERF Report, **Ex. B**, at 36.)

5.      The PERF Report states that when NHPD's Juvenile Crime Investigation Policy was examined, it was found to omit policies as to custody of juveniles, interrogation of juveniles and the policy did not encourage officers to use the least coercive option.  (See PERF Report, **Ex. B**, at 55.)  It bears emphasis that the involved parties in the pending civil actions were either juveniles or barely adults at the relevant times.  As of the time of the Dixwell Deli homicide in January 1999, Vernon Horn was 17 years old, Marquis Jackson was 18 years old, Steve Brown was 16 years old, witness Kendell Thompson was 16 years old and witness Marcus Pearson was 21 years old.

6.      The PERF Report states that training bulletins for investigations were overly broad, only offering basic general knowledge and lacking specific directions.  (See PERF Report, **Ex. B**, at 57-58.)

7.      The PERF Report states that issues were found with the organization of case files at NHPD, and this inadequate organization hampers access to files and necessary information.  (See PERF Report, **Ex. B**, at 58-59.)

8.      The PERF Report states that the Investigative Services division lacks an automated case management system, which interferes with the ability to take prompt corrective action when necessary.  (See PERF Report, **Ex. B**, at 60.)

9.      The PERF Report states that the General Investigations log from 2006 through the beginning of 2007 showed that not all cases were consistently logged and updated by the investigative sergeants.  (See PERF Report, **Ex. B**, at 61-62.)

10.     The PERF Report states that when new assignees report to the Robbery/Burglary unit, they often lack basic investigative skills, including evidence collection, interview techniques and custodial interrogation protocols.  (See PERF Report, **Ex. B**, at 65.)

11.    The PERF Report states that the robbery reports were kept in the Robbery/Burglary Unit, and are not included in reports submitted to the Records Department.  These reports need to be submitted to the Records Department so the actions of these detectives in the course of their investigations can have a permanent record, and maintain the integrity of the department and individual investigations.  (See PERF Report, **Ex. B**, at 66-67.)

12.    The PERF Report states that the procedures in place for the handling of evidence in the Narcotics Unit needs to be strengthened, and a spot check of the drug storage area showed boxes that contained inconsistently packaged narcotics evidence dating back to the 1980s.  (See PERF Report, **Ex. B**, at 78-79.)

The PERF Team also heard concerns from the New Haven community through open forums.  A variety of different focus groups and community sects were represented at these forums.  There were numerous areas of concern identified, but among the most relevant to this motion were:

1.    A concern that the NHPD had a lack of respect for citizens, especially the youth.  (See PERF Report, **Ex. B**, at 98.)

2.    A concern that NHPD seems to be discouraging complaints against police officers, and there needs to be mechanisms in place for citizens to file complaints against officers without fear of retaliation. (See PERF Report, **Ex. B**, at 98.)

3.    A concern that NHPD needs to restore its credibility and accountability, it has an oversight deficiency due to too many supervisor vacancies, and NHPD has a general unresponsiveness by not returning phone calls, having long response times to calls, or generally ignoring complaints.  (See PERF Report, **Ex. B**, at 99.)

4.    A concern that racial divide seems to exist in the NHPD, and this divide is reflected in an external division between the department and the community.  (See PERF Report, **Ex. B**, at 100.)

5.    A concern that interrogations are not videotaped by the police, which creates a lack of general transparency and does not promote trust, which permeates within the community.  (See PERF Report, **Ex. B**, at 100.)

The allegations in the pending suits by Horn and Jackson involve claims of alleged coerced interrogations, failure to record interviews, failure to make adequate records, mishandling of evidence, mishandling of logging of evidence, integrity of investigations, all issues about which the PERF evaluators were critical of the NHPD. Anyone involved in the PERF investigation or evaluation process would surely have unique and special information about the criticisms of the NHPD and its alleged practices not only in 2006 to 2007, but by supposition, analogy or otherwise, in 1999 as well.  Furthermore, the NHPD "culture" that the PERF Report asserts is in need of change is also referenced in the lawsuits brought by Johnson, Horn and Jackson as a basis for civil rights liability under Monell.  Specifically, the plaintiffs in the Johnson, Horn and Jackson cases allege improper policies and practices dating back to the 1990s.  See Vernon Horn Compl.,**Ex. G**, at ¶¶ 84-92, 94-95; Marquis Jackson Compl., **Ex. H**, at ¶¶ 50-57, 59-61, 63-64; and Bobby Johnson Compl., **Ex.** F, at ¶¶ 67-69, 71-75, 78, 81, 83.  Accordingly, the "culture" that was explored in the PERF evaluation is a centerpiece of the pending civil lawsuits.  The danger exists that this Court has specialized knowledge about the alleged NHPD culture, or at a minimum, has sufficient connection to the NHPD "culture" to warrant a recusal based on it appearing that impartiality might reasonably be questioned.

The similarity between the criticisms levied against the NHPD in 2006 and 1999 is seen in the complaints filed in Johnson, Horn and Jackson.  In his complaint, Bobby Johnson alleges that during his interrogation by the NHPD in 2006, the questioning detectives conducted an unrecorded pre-interview where they allegedly fed Johnson false information about the investigation, claimed they had evidence against him that did

not exist, threatened him with the death penalty if he did not confess and told him that he would never see his family again.  See Bobby Johnson Am. Compl., **Ex. F**, at ¶ 26. Johnson further alleges that the detectives then scripted the information they wanted him to state during the recorded interrogation, and kept no record of the pre-interview, which was in accord with established policy and practice at NHPD.  See Bobby Johnson Am. Compl., **Ex. F**, at ¶¶ 27-29.  Johnson further alleges that about two weeks after securing his first confession, the NHPD was presented with ballistics evidence that would have exonerated Johnson from the murder he had confessed to, but instead of following that lead, the detectives brought Johnson back in for another interrogation, where he was fed new information they wanted him to admit regarding how he came into possession of the murder weapon, in order to further tie Johnson to the murder he did not commit.  See Bobby Johnson Am. Compl., **Ex. F**, at ¶¶ 32-35, 37-41.

The parallels in investigative techniques alleged by Bobby Johnson and what has been alleged by Vernon Horn are strikingly similar.  In his Complaint, Vernon Horn alleges that NHPD detectives told Crystal Sykes to report that she received a phone call from Marcus Pearson in order to support the allegedly manufactured scenario that Pearson borrowed a cell phone from Vernon Horn the day after the Dixwell Deli homicide.  See Vernon Horn Compl., **Ex. G**, at ¶¶ 101-104.  The cell phone in question was taken from the homicide scene and would tie whomever was in possession to the crime.  The detectives allegedly then told Pearson that they were going to conclude that Pearson either received the cell phone from Vernon Horn, thus placing Horn at the crime scene, or Pearson took the phone from the crime scene himself, making him a suspect for participating in the robbery-murder.  See Vernon Horn Compl., **Ex. G**, at

¶ 114.  Furthermore, Horn alleges the detectives threatened Pearson that he would be found in violation of probation, lose custody of his children and be charged with murder in connection with the robbery.  Horn alleges this motivated Pearson to lie by telling them that Horn had loaned him the subject cell phone, thereby implicating Horn in the Dixwell Deli homicide.  See Vernon Horn Compl., **Ex. G**, at ¶¶ 116-118.

Horn further alleges that as the investigation proceeded, the investigating detectives had gathered information pointing to Steve Brown, whose latent fingerprint was lifted from the crime scene, and allegedly further pointed to associates of his in Bridgeport being responsible for the robbery-murder, not Vernon Horn and Marquis Jackson; the detectives, however, allegedly clung to their theory that Horn and Jackson were involved with the murder-robbery.  See Vernon Horn Compl., **Ex. G**, at ¶¶ 129, 131-134.  Horn further alleges it was highly questionable that Brown could have then identified both Horn and Jackson in a photo array unless the detectives told Brown which photos to pick.  See Vernon Horn Compl., **Ex. G**, at ¶ 139.  Brown allegedly provided a false statement about Horn being in possession of the stolen cell phone after a long unrecorded pre-interview.  See Vernon Horn Compl., **Ex. G**, at ¶¶ 141-142.  Brown's statement implicating Horn, coupled with his positive photo identification, were the basis for an arrest warrant to be issued for Horn.  See Vernon Horn Compl., **Ex. G**, at ¶ 145.

Similar to what was alleged in the Johnson case, NHPD detectives in Horn allegedly coached and coerced a witness about what to say in order to secure an arrest, kept no records of the coaching and coercion, per NHPD practice, and allegedly used the false evidence to secure arrests of innocent men.

Further, Horn alleges that, in 2018 as the result of an investigation, 137 pages of alleged potentially exculpatory phone records and other documents were found in NHPD Detective Adger's basement, who was involved with the Horn criminal investigation.  Allegedly, these recently uncovered records strongly suggested that Horn and Jackson were not involved with the murder-robbery, and for that reason, the NHPD detectives allegedly hid these records from the State's Attorney's office so they could not interfere with the cases against Horn and Jackson.  See Vernon Horn Compl., **Ex. G**, at ¶¶ 201-211.  These records were acquired pursuant to search warrants from February and March 1999, but the warrants allegedly were not recorded by the Connecticut Superior Court until September 2014.  See Vernon Horn Compl., **Ex. G**, at ¶¶ 212-217.

The complaint filed by Marquis Jackson alleges much of the same misconduct by the NHPD as Vernon Horn alleged in his complaint.  Specifically, Jackson alleges that the same detectives manufactured a statement from Crystal Sykes concerning a cell phone call from Horn the day after the homicide.  See Marquis Jackson Compl., **Ex. H**, at ¶¶ 72-75.  The same alleged practice of conducting a "pre-interview", not keeping notes or destroying them, and "losing" the tape-recorded interview were all allegedly used during Sykes' interview.  See Marquis Jackson Compl., **Ex. H**, at ¶¶ 69-70.  The detectives then allegedly turned their attention to Marcus Pearson, claiming falsely that Pearson made a call on the stolen cell phone to Sykes on January 25, 1999.  See Marquis Jackson Compl., **Ex. H**, at ¶¶ 81-82.  Pearson was allegedly threatened by the detectives that if he did not state that he received the cell phone from Horn, he would be charged with the murder at the Dixwell Deli.  See Marquis Jackson Compl., **Ex. H**, at

¶¶ 82-83.  The detectives also allegedly had other pieces of evidence that incriminated Brown and his associates from Bridgeport, not Horn and Jackson, but the detectives ignored that information and continued forward in their pursuit of Horn and Jackson. See Marquis Jackson Compl., **Ex. H**, at ¶¶ 100-103.  After arresting Brown, who did not know Horn and/or Jackson or know what they looked like, the detectives allegedly fed Brown information about Horn and Jackson so that Brown could identify them as the other two participants in the Dixwell Deli murder-robbery.  See Marquis Jackson Compl., **Ex. H**, at ¶¶ 105-108.

It is clear from reading the above complaints by Horn and Jackson that the same improper tactics and methods allegedly used in the Johnson case, and which the PERF Report criticized, are alleged to have been utilized in the subject suits brought by Horn and Jackson.  Given this Court's association with the PERF investigation and report, it would not be unreasonable for an objective individual to question whether this Court could be impartial when presiding over another case of alleged NHPD misconduct resulting in the alleged wrongful conviction of two innocent individuals.  This is particularly so given the Court's *sua sponte* recusal from the Bobby Johnson case.   The Horn and Jackson complaints, if accepted as factual, demonstrate that the same type of alleged misconduct that led to the arrest of Vernon Horn and Marcus Jackson in 1999 was alleged by Bobby Johnson to be occurring in 2006.  The defendant believes that the constellation of reasons that motivated this Court to recuse itself *sua sponte* from the Johnson case due to the appearance of possible impartiality are present and applicable to the Horn and Jackson suits.  With all of the common themes between Johnson, and Horn and Jackson, and this Court's personal involvement in the numerous

criticisms of the NHPD, it would not be unreasonable for an objective individual to question whether this Court could be impartial, thus resulting in an appearance that warrants recusal.

Additional grounds exist for recusal.  First, the City has a right to be judged based on its conduct as of 1999 when the plaintiffs, Horn and Jackson, were arrested. The fact that the Court knows the information and events uncovered in the PERF evaluation in 2007 regarding conduct that might not be admitted into evidence in the pending cases, particularly conduct that post-dates 1999, raises a reasonable question about impartiality.

Moreover, this Court, *Meyer, J.*, was the assigned trial judge in Vernon Horn's habeas corpus proceeding.  From that proceeding, the Court acquired knowledge about this case that it otherwise would not likely have.  The habeas petition, *inter alia,* alleges that certain cell phone data demonstrates that witnesses lied, and that the NHPD withheld exculpatory information.  See Vernon Horn Habeas Pet., **Ex. C**.  That is a hotly contested issue in the current suit.  The colloquy between the Court and counsel in April 2018 is set forth in the transcript of status conference proceedings in the habeas action, and is incorporated by reference herein.  See Vernon Horn Habeas Status Conf. Tr., **Ex. D**.  As this Court knows, the securing and maintaining of cell phone records, as well as their disclosure as Brady material and use at trial are issues at the heart of the pending civil actions by Vernon Horn and Marquis Jackson.  This Court's comments appearing on page 17 of the Status Conference transcript demonstrates how the Court has information about the cell phones and records that would not otherwise be made known to the Court.  See Vernon Horn Habeas Status Conf. Tr., **Ex. D**, at 17.  The

Court expressed its opinion that the NHPD not knowing the significance of the data on the phone bill as a means of locating the origin of the call "strains credulity".  See Vernon Horn Habeas Status Conf. Tr., **Ex. D**, at 17.  Such an opinion would be justified today, but in 1999, law enforcement was not using cell phone data to track locations of callers.  The expert testimony the parties have obtained in the pending cases is undisputed that it was not the standard of care for any municipal police department to use cell phone records data to trace the origin of cell calls.  FBI agent Jim Wines, who has expertise in the cellular communications field, testified in a deposition taken in the pending cases that even he did not use data to trace origin of cell calls until the early 2000s.  See Agent Wines Dep., **Ex. E**, at 42-45.

In addition to the cell phone issue, the allegations and presentations by the attorneys related to the Horn habeas petition has resulted in this Court having far greater knowledge of allegations and issues in dispute than any trial judge would normally have.  As seen in the transcript of the status conference proceedings in the habeas action, this Court has specialized information about claims of alleged wrongdoing advanced by the plaintiff.  See Vernon Horn Habeas Status Conf. Tr., **Ex. D**.  The defendant represents that issues such as fabrication of evidence, and withholding of exculpatory information are hotly contested in the present cases; but the defendant sees no evidence that these issues were contested at all in the habeas proceeding.  As a result, the information imparted to this Court on April 5, 2017 about the conduct of the NHPD, and the Horn conviction lacking integrity, was one sided.  Furthermore, this Court was exposed to the same kind of information that would be disclosed/advanced in a mediation setting about the plaintiffs' arrest and conviction

lacking integrity.  In our district, trial judges deliberately decline to have any communication with a U.S. Magistrate Judge who has held a Settlement Conference about what was discussed, so that the Court has no information about the parties' theories and claims made against each other in the settlement forum.  It bears repeating that all defendants emphatically dispute the plaintiffs' claim that the NHPD acted improperly with respect to its investigation and arrest of Vernon Horn and Marquis Jackson, and the State's subsequent prosecution.  Reviewing the transcript of the April 5, 2017 status conference in the habeas proceedings, causes the defendant concern that Court might not be impartial in the pending matters.  After hearing chapter and verse about misconduct by the NHPD, all parties (State's Attorney and Horn attorneys) jointly represented to this Court in the habeas action that justice would be served by vacating Vernon Horn's conviction.  Such history reasonably leaves the defendant with a question as to whether this Court can be impartial.  As this Court noted in its statement to the parties on October 23, 2019, "a judge's duty to recuse extends to situations where there's even an appearance that a judge would not be impartial, where the judges impartiality might reasonably be questioned".  See Tr. of Status Conf., **Ex. A**, at 7.  The defendant believes that standard for recusal has been met.

 In sum, the defendant believes that the grounds for recusal in the Johnson case are nearly all present in the Horn and Jackson cases.  The same police department policies and practices are at issue, only about seven years earlier.  The plaintiffs in the Johnson and the Horn and Jackson cases allege improper policies and practices dating back to the 1980s.  See Vernon Horn Compl.,**Ex. G**, at ¶¶ 84-92, 94-95; Marquis Jackson Compl., **Ex. H**, at ¶¶ 50-57, 59-61, 63-64; and compare, Bobby Johnson

Compl., **Ex.** F, at ¶¶ 67-69, 71-75, 78, 81, 83.  The defendant acknowledges that in the

Johnson case, the Court had involvement as co-chair of the IAP which had substantial

involvement in the PERF investigation roughly at the time Bobby Johnson was arrested

and pled guilty; and also was in the same room during a meeting regarding the PERF

investigations and findings with two defendants in Johnson, namely Francisco Ortiz and

Herman Badger.  Those features are not part of the recusal analysis in the Horn and

Jackson cases, but also does not appear that there was any direct communication with

Chief Ortiz or Assistant Chief Badger that lead to recusal in Johnson.  The defendant

believes that if it was the appearance created by the connection to PERF and being in

the same room as Chef Ortiz and Assistant Chief Badger that led to recusal in Johnson,

then that appearance has not diminished simply because we are now dealing with 1999

criminal investigations instead of 2006 criminal investigations.  In addition, the

appearance of a potential issue as to impartiality is enhanced by this Court's

involvement in the Horn habeas proceeding, a feature not present in Johnson.  This

Court's involvement in the Horn habeas proceeding is an alternate source of specialized

knowledge that was very negative to the NHPD, which was not present in that

proceeding to defend itself.  Finally, the City of New Haven has a right to be judged

based on its policies, practices and conduct as of 1999, and the fact that this Court has

had so much in-depth information about the City's practices in 2006 and 2007 leads the

City to reasonably question impartiality, resulting in an appearance that warrants

recusal.  The defendant appreciates this Court's *sua sponte* recusal in the Johnson

case, and the opportunity to raise the issue regarding the same appearance being

present in the Horn and Jackson suits.   The defendant accordingly seeks recusal and

14

transfer to another Court who has no prior information regarding Vernon Horn, Marquis

Jackson or involvement with the PERF evaluation of the NHPD.

WHEREFORE, the defendant, City of New Haven, requests the Court grant its

Motion for Recusal.

DEFENDANT,
CITY OF NEW HAVEN


By_____/s/ Thomas R. Gerarde_____
    Thomas R. Gerarde (ct05640)
    Beatrice S. Jordan (ct22001)
    Howd & Ludorf, LLC
    65 Wethersfield Avenue
    Hartford, CT  06114-11921
    Ph:  (860) 249-1361
    Fax:  (860) 249-7665
    E-mail: tgerarde@hl-law.com
    E-mail: bjordan@hl-law.com

## CERTIFICATION

This is to certify that on November 21, 2019, a copy of the foregoing
Memorandum of Law in Support of Motion to Recuse was filed electronically and served
by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by
e-mail to all parties by operation of the Court's electronic filing system or by mail to
anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.
Parties may access this filing through the Court's CM/ECF System.


_____/s/ Thomas R. Gerarde_____
Thomas R. Gerarde