UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---

VERNON HORN,

                              Plaintiff,

    -against-

CITY OF NEW HAVEN; and LEROY
DEASE, PETISIA ADGER, DARYLE
BRELAND, and JAMES STEPHENSON, in
their individual capacities

                              Defendants.

No. 3:18-CV-1502 (RNC)

**FIRST AMENDED COMPLAINT
AND JURY TRIAL DEMAND**

---

Plaintiff Vernon Horn, by and through his attorneys Emery Celli Brinckerhoff &

Abady LLP, and Parrett, Porto, Parese & Colwell, P.C., for his First Amended Complaint alleges

as follows:

**PRELIMINARY STATEMENT**

1.      Vernon Horn spent 17 years in prison for a murder he did not commit.

How could this happen?  The answer:  The New Haven Police Department hid 137 pages of

exculpatory phone records in a Detective's basement for nearly two decades.  They coerced and

threatened witnesses.  They fabricated evidence.  They destroyed evidence.  They failed to

investigate evidence that would have exonerated an innocent man.

2.      In addition, a forensic examiner with the Connecticut State Police secretly

manipulated his report to fit the testimony of the State's key witness.  Then he failed to disclose

the manipulation or the new report to the defense.

3.      Law enforcement is supposed to follow the evidence until they find the suspect, not manipulate an entire investigation to fit a pre-determined suspect.  But such manipulation is exactly what happened here.

4.      Last month, after years of resistance and obfuscation, Vernon's conviction was thrown out.  This happened only through the Federal Public Defender's dogged reinvestigation of the case.

5.      Vernon spent more than 17 years of his life in prison: from ages 18 to 33, and then 35 to 37.  During that time, he missed many of life's most precious moments, and suffered great cruelty.  His daughter formed her earliest memories without him.  His grandmother passed away.  While time passed by outside, Vernon was held in 24-hour lockdown, assaulted by inmates, strip-searched by guards, and denied essential medical care.  All the while, he maintained his innocence.

6.      The State of Connecticut has finally acknowledged that Vernon's conviction was wrongful.  But this is little comfort: he can never get back the freedom and time he lost.  He cannot erase the scars inflicted by more than 17 years of unjust imprisonment.  It is time for the people who stole Vernon's life to be held accountable.

## PARTIES

7.      Plaintiff **Vernon Horn** is a 37-year-old man who is a citizen of the United

States.  At the time of his wrongful arrest, he resided in New Haven, Connecticut.[1]

8.      Defendant City of New Haven (the "City") is a municipal corporation

organized under the laws of the State of Connecticut.  The New Haven Police Department (the

"NHPD") is an agency of the City.

9.      Defendant **Leroy Dease** was formerly a Detective in the NHPD.  He is

now retired from the NHPD and, on information and belief, works as an investigator for the State

of Connecticut.  At all relevant times, he was acting within the scope of his employment with the

NHPD and under color of state law.  He is sued in his individual capacity.

10.     Defendant **Petisia Adger** was formerly a Detective in the NHPD.  She

was later promoted to Assistant Police Chief.  She is now retired from the NHPD.  At all relevant

times, she was acting within the scope of her employment with the NHPD and under color of

state law.  She is sued in her individual capacity.

11.     Defendant **Daryle Breland** was formerly a Detective in the NHPD.  He is

now retired from the NHPD.  At all relevant times, he was acting within the scope of his

employment with the NHPD and under color of state law.  He is sued in his individual capacity.

12.     Defendant **James Stephenson** is a firearms examiner who was formerly

employed by the Connecticut State Police Forensic Science Laboratory.  At all relevant times, he

was acting within the scope of his employment with the State of Connecticut and under color of

---

[1]      All persons whose names are bolded are listed in the glossary in Appendix A for convenience.  A timeline
of events is attached as Appendix B.

3

state law.  On information and belief, he is now retired from government employment and runs a consulting business.

## **JURISDICTION AND VENUE**

13.   This action arises under the Fourth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §§ 1983 and 1988.

14.   This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and 1367(a).

15.   Venue is proper in this Court under 28 U.S.C. § 1391(b) because the acts complained of occurred in the District of Connecticut.

## **JURY DEMAND**

16.   Plaintiff demands trial by jury.

## FACTUAL ALLEGATIONS

**The Night of January 23-24, 1999: An Ordinary Teenage Saturday Night for Vernon Horn**



3. 13 So. Genesee St. - 2:30 am
Vernon and Jackson pick up
Zaneta Berryman.

4. Dixwell Deli - 2:45 am
Vernon buys items and
talks to Marcus Pearson,
Jackson uses phone,
Zaneta stays in car.

6. Dixwell Deli - 3:35 am
Vernon and Zaneta return
to meet Pearson,
encounter police.

2. Athenian Diner - 2:20 am
Vernon and Jackson briefly
stop in the parking lot.

5. 245 W. Ivy St. - 2:50-3:30 am
Vernon and Zaneta go to Jackson's
room upstairs. He borrows phone
for her to call Pearson.

1. Alley Cat Club - 2:10 am
Vernon and Marquis Jackson
are there until it closes at 2:00
am and leave shortly after.

17.     On January 23, 1999, Vernon Horn was 17 years old.

18.     Vernon grew up in New Haven.  He faced significant challenges in his early life.  His father died when he was five years old.  His mother struggled with drug addiction and died when he was 13.

19.     The night of January 23-24, 1999, was a Saturday night.  Vernon, his friend **Marquis Jackson**, and a third friend went out to have a good time.  They were driving a grey Honda Civic hatchback which Jackson had borrowed from his brother.

5

20.     Around 11:00 PM, Vernon, Jackson, and the other friend went to the Alley Cat Club in downtown New Haven.

21.     Vernon and Jackson saw several people they knew at the club, including a young woman named **Tesha Smith**, with whom Jackson wanted to spend the night.  Vernon and Jackson stayed at the club until it closed at 2:00 AM.

22.     After the club closed, it took a while for everyone to disperse.  Vernon and Jackson then decided to go to the Athenian Diner, a popular late-night food spot about ten minutes away.  Vernon drove; Jackson was in the passenger's seat.  Ultimately, when they arrived, they decided not to go into the diner.  Instead, they started driving around the neighborhood.

23.     They soon drove past a young woman named **Zaneta Berryman.**  Vernon knew Zaneta from growing up in the same neighborhood.  They saw each other periodically.

24.     When Vernon and Marquis drove by, Zaneta was standing outside her sister-in-law's house, a block from the Athenian Diner.  Inside the house, there was a party going on.  Zaneta was taking a break outside, smoking a cigarette.

25.     When Vernon saw Zaneta, he stopped the car to talk to her.  He asked if she wanted to come with them.  She said yes.  She went inside to get her coat and say goodbye.  Eventually, she exited the house.  Jackson moved to the back seat to make way for Zaneta, who sat next to Vernon in the front passenger seat.

26.     Vernon then drove to the Dixwell Deli, a 24-hour store in Newhallville, the neighborhood in New Haven where he and Jackson both lived.  The drive took about ten minutes.

6

27.     While Vernon went into the Deli and bought a soda, a couple of loose cigarettes, and some condoms, Marquis Jackson went across the street to use a pay phone. Zaneta stayed in the car.  It was around 2:45 AM.

28.     While Vernon was outside the deli, he saw **Marcus Pearson**, a man he knew, in the back seat of a green SUV outside, about to get a ride home after buying some food at the Deli.  Vernon and Marcus chatted briefly while Pearson sat in the green SUV.  Pearson and Zaneta Berryman were also friends and had an ongoing sexual relationship at the time.

29.     When Vernon and Marquis Jackson were done at the Deli, they got back in the Honda.  Vernon, Jackson, and Zaneta drove to a rooming house where Marquis was renting a room.  It was located at 235 West Ivy Street, a few blocks from the Deli.

30.     Vernon and Zaneta went into the house; Jackson stayed outside in the car. Vernon and Zaneta walked by the owner of the house, who was hosting a card game on the first floor.  They briefly waved hello to the cardplayers.  Then they went upstairs to Jackson's room.

31.     Meanwhile, Jackson drove off in the Honda.  He went to see Tesha Smith, the young woman from the club.

32.     In Jackson's room, Vernon and Zaneta had sex.  Shortly before 3:30 AM, still with Vernon at the house on West Ivy Street, Zaneta received a page from Marcus Pearson, her friend who had been in the green SUV outside the Deli a little while before.  She wanted to call him back but did not have a phone.

33.     Zaneta asked Vernon if he could find a phone.  Vernon borrowed a cordless phone from the owner of the house, who was still playing cards downstairs.  At 3:30 AM, Zaneta called Marcus Pearson on the cordless phone.

7

34.     After the phone call, Vernon agreed to walk Zaneta back to the Dixwell Deli, where she planned to meet up with Pearson.  Vernon and Zaneta left the house and started walking.

35.     At around 3:35 AM on January 24, Vernon and Zaneta arrived at the Dixwell Deli.  They found police already outside.  Vernon and Zaneta learned there had just been a shooting at the store.

### *While Vernon is at the Rooming House with Zaneta, Three Masked Men Rob the Dixwell Deli and Kill Caprice Hardy*

36.     While Vernon was just about to leave the West Ivy Street house with Zaneta, a robbery was happening at the Dixwell Deli.

37.     **Caprice Hardy** worked at a TGI Friday's restaurant in Hamden, about three miles up Dixwell Avenue from the Deli.  Hardy lived in the Newhallville neighborhood of New Haven near the Deli.

38.     On the night of January 23–24, 1999, the manager called a taxi for Hardy and another employee, **Shaquan Pallet**, to take them home when they finished closing down the restaurant.  At 3:18 AM on January 24, the taxi picked up Hardy and Pallet at TGI Friday's and drove down Dixwell Avenue.

39.     Hardy asked to be dropped off at the Dixwell Deli.  He wanted to buy some cigarettes before going home.  At 3:26 AM, the taxi arrived at the Deli.  After taking a couple of minutes to pay the driver, Hardy got out.  Pallet, the other passenger, stayed in the taxi.  Around 3:28 am, the taxi drove off.  Hardy went into the Deli to buy a pack of Newports.

40.     Around 3:30 AM, **Abby Yousif**, the co-owner of the Deli, was behind the counter, about to give Hardy his change.  Hardy was facing the counter with his back to the door.  Hardy's pack of Newports was still sitting on the counter.

41.     Suddenly, three armed, masked men burst into the Deli.  One of them immediately opened fire.  Hardy was shot in the middle of the back.  Yousif was shot in the shoulder.

42.     Yousif's injuries were not life-threatening; he played dead.  But Hardy was gravely wounded.  He would die of his injuries a short time later.

43.     At the time the robbers entered, there were three other people in the Deli.  An employee of the Deli was in the counter area, further toward the back of the store.  He fled to the basement storeroom and tripped and fell down the steps.  A homeless man who hung around the store and sometimes did odd jobs was near the back of the store.  **Vernon Butler**, an associate of Yousif's, was asleep in a chair in the back office.

44.     The robbers could not open the cash register.  "Get the nigga in the back," one said, and two of them went to the back of the store and entered the office.  One of the robbers pistol-whipped Butler and brought him to the front of the store to open the register.  He was unable to do so because it was jammed.

45.     The robbers took about $2,000 from Yousif's person.  They also took Butler's cell phone and pager from the back office.

46.     While the robbery was in progress, two customers each separately happened to enter the Deli.

47.     First, **Kendall Thompson**, a young man from the neighborhood, came into the store with one dollar to buy something.  When he walked into the Deli, a masked robber

9

standing near the door pointed a gun at him and told him to get down on the floor.  Thompson complied.  The robber took his dollar from him.

48.     Around the same time, a woman named **Regina Wolfinger** and a man named **Howard Roberts** drove up to the Deli.  They had been drinking and smoking crack together for most of the night.  They parked their car at a bus stop about 50 feet from the Deli.

49.     Wolfinger waited in the car while Roberts went into the Deli to buy cigarettes.  He was carrying five dollars.  When Roberts walked in, a masked robber standing near the door pointed a gun at Roberts and told him to get down.  Initially, Roberts refused.  But eventually, he complied and gave the robber his five dollars.

50.     The robbers were in the Deli for no more than a few minutes.  While they were still trying to get the cash register open, they heard an ambulance siren.  Mistakenly believing that the police were approaching, they fled the scene.  Once he was sure the robbers were gone, Butler (the associate of Yousif's who had originally been sleeping in the back office) called 911.  It was 3:32 AM.

51.     While all of this happened, Vernon Horn was in the rooming house with Zaneta.  Marquis Jackson was at Tesha Smith's house.  Neither of them was among the three men who robbed the Dixwell Deli and killed Caprice Hardy.  Vernon and Marquis had nothing whatsoever to do with this crime.

### *The Investigation Immediately Focuses on Vernon Horn*

52.     When Vernon and Zaneta got to the Deli around 3:35 AM, the police told them to wait there to be interviewed.  Around 4:00 AM, an NHPD officer spoke to Vernon outside the Deli.  Vernon was reluctant to talk to the police or give his name because he did not want to get involved.

10

53.     Detective Dease was the lead NHPD detective assigned to the case.  This was his last homicide investigation.  Dease had already put in his retirement papers when the murder happened.  His retirement was scheduled to take effect in April 1999.

54.     Detective Adger was also heavily involved in every step of the investigation.  She had recently been promoted, and this was her first homicide case.  On information and belief, Adger was paired with Dease so that he could show her the ropes.

55.     Detective Breland worked closely with Dease and Adger and interviewed critical witnesses during the investigation.

56.     Dease had a working theory that people who committed homicides often returned to the scene shortly afterwards.  This theory has little basis in fact.  However, the investigation focused on Vernon almost immediately as a result.  The investigation also quickly focused on Marquis Jackson because he and Vernon had been together earlier in the night.

57.     In the days following the murder, two eyewitnesses gave incomplete, tentative photo identifications of Vernon as a perpetrator of the crime, under questionable circumstances.  Neither identification was reliable.

58.     The first identification was by Regina Wolfinger, the woman who waited outside in the car 50 feet away while her friend Howard Roberts went into the deli during the robbery.  Wolfinger was a crack addict who had been drinking and using drugs heavily that night.

59.     Wolfinger told police that she saw two unmasked men walk out of the Deli and spend a couple of minutes standing outside before leaving.  She described the men as light-skinned.

11

60.     In fact, as all other witnesses agreed, there were three robbers, not two; the men were masked, not unmasked; and they fled hastily after hearing sirens, rather than hanging outside the scene of a murder.

61.     On January 24, Detective Dease showed Wolfinger a set of eight photos that included Vernon and seven other men.  Wolfinger picked out Vernon as one of the light-skinned men she saw outside the Deli.  Vernon's skin is dark.

62.     When asked whether she was "pretty positive" she had seen Vernon outside the Deli, she said "possibly, yes, he looks pretty familiar."

63.     On January 26, Detectives Dease, Adger, and Breland showed Kendall Thompson, who had walked into the Deli with a dollar while the robbery was in progress, two sets of photos. Both contained photos of Vernon and Marquis Jackson.

64.     Thompson explained that he could not identify the robbers' faces because they were wearing masks the entire time.

65.     Nonetheless, he said that Vernon's eyes and mouth looked like the eyes and mouth of one of the robbers—through a face mask!  Thompson also picked out a photo of Marquis Jackson as resembling the general appearance of one of the other masked robbers.

66.     The NHPD interviewed Vernon two more times during the first week of the investigation.  He told them what he had done on the night of the murder: going to the Alley Cat club, driving to the Athenian Diner, picking up Zaneta Berryman, stopping at the Deli, going to the West Ivy Street house with Zaneta, borrowing the cordless phone in the house, and walking Zaneta back to the Deli.

12

67.     The NHPD did not seek to arrest Vernon or Marquis Jackson at this point in the investigation.  Dease, Adger, and Breland knew that Wolfinger and Thompson's unreliable, incomplete identifications were not enough to form the basis for an arrest.

68.     They also knew that there was critical evidence still outstanding.  The police had lifted latent fingerprints from the scene, including from a cigar box in the back office of the Deli that the robbers had rummaged through.  They did not yet have any fingerprint matches.

69.     The police were also trying to get the records of Butler's cell phone that was stolen from the Deli.  If the robbers had used the phone after stealing it, the records would lead right to the perpetrators.

### *The Stolen Cell Phone Records Point to Robbers in Bridgeport, Not New Haven*

70.     On February 1, 1999, a week after the murder, the NHPD obtained the records from Butler's stolen cell phone.  There was nothing special about the phone.  It was an ordinary prepaid cell phone purchased from a store in the mall.

71.     The phone had made five calls between the time it was stolen from the Deli and the time when Butler contacted the phone company to cut off service.  The records of these calls would play a crucial role in the case against Vernon—and its unraveling.

72.    This is what the records of the stolen phone call showed:



```
                              ON-LINE CALL DETAIL INQUIRY
                                                    SRVA/SLOC 0001 0001 84/NEW YORK
COMPANY 0840 OMNIPOINT COMMUNICATIONS,
IMSI/MOBILE # 310160100400239 DATE RANGE FROM 01 / 12 / 99  THRU 01 / 25 /
                                                                        TOTAL CHARGES      0
TOTAL CALLS 00047              TOTAL MINUTES 00093
=====================================================================================
DATE  TIME  CALLED PLACE   CALLED NUMBER  MINS   AMOUNT TYP ORIG    ESN
01-24 04:14A BRIDGEPORTCT   203-395-6641    1     .00 H/A 61923    0203435
01-24 10:48P BRIDGEPORTCT   203-375-4651    1     .00 H/A 61922    0203435
01-25 10:40A BRIDGEPORTCT   203-696-1495    1     .00 H/A 61923    0203435
01-25 11:07A NEW HAVEN CT   203-933-5833    4     .00 H/A 60153    0203435
01-25 02:32P BRIDGEPORTCT   203-395-6641    1     .00 H/A 60141    0203435
```

73.    The first and fifth calls were both to the same number, registered to a
Bridgeport man named **Willie Sadler**.  The first call happened just 45 minutes after the murder-
robbery at the Dixwell Deli, at 4:14 AM.

74.    The NHPD repeatedly interviewed Sadler in February and early March of
1999, but he was uncooperative and said he did not remember who called him.

75.    The second call, made on the evening of January 24, was to a young
woman who lived in Stratford, named Adrienne Younger.  She denied recalling who had called
her.

76.    The third call, at 10:40 AM on January 25, was placed to a woman named
**Tamika Fuller** at her house in Bridgeport.  Fuller told Detectives Dease, Adger, and Breland
that she did not know who called her.  However, she also noted that her boyfriend **Marlo
Macklin** might have been at her house at that time.  Macklin told Dease, Adger, and Breland that
he was not Tamika Fuller's boyfriend and was not at her house, and that Tamika Fuller was a
drug-dealing associate of Willie Sadler, who had received the first and fifth calls from the phone.

14

77.     The fourth call from the stolen cell phone came 27 minutes after the third. The call was made to a house in West Haven where a woman named **Crystal Sykes** worked as a live-in nurse's aide for an incapacitated elderly couple.

78.     This fourth call from the stolen cell phone would prove to be perhaps the single most important detail in the case against Vernon Horn.  Without the fourth call, there would have been no way to reconcile Vernon's supposed role in the murder-robbery with the objective evidence.

79.     But the story that the state and its witnesses would tell to tie Vernon to the fourth phone call was a fabrication, conjured up by the NHPD detectives.

80.     Having committed to that fiction, the detectives would take increasingly drastic measures to preserve it, even as it became more and more outlandish.

81.     In fact, when the NHPD identified one of the three actual robbers with a fingerprint, the detectives would feed him a fabricated nonsense story to implicate Vernon. Later, the detectives obtained phone records making plain that Vernon had nothing to do with the fourth phone call.  They hid them from prosecutors and buried them in a basement.

82.     The NHPD's misconduct in investigating the Dixwell Deli robbery-murder was enabled by, and was a product of, its troubling practice of coercing scripted witness statements in off-the-record "pre-interviews."

### The NHPD's Practice of Coercing Scripted Witness Statements in Off-the-Record "Pre-Interviews"

83.     At the time of the investigation of the Dixwell Deli robbery-murder, the NHPD had a policy and custom of conducting lengthy, unrecorded, undocumented "pre-interviews" with witnesses.  After the "pre-interview" coaching session, the officer or detective

15

conducting the interview would turn on an audio tape recorder and record a brief formal

interview with the witness.  Afterwards, the formal interview would be memorialized in a typed

statement.  On information and belief, the typed statement was not always an exact transcription

of the formal taped interview, but rather a selective paraphrase that presented the information in

the manner the police wanted it to be presented.

84.     The NHPD also had a policy and custom of not maintaining any notes

from the "pre-interviews," and of "losing" or destroying the audio recordings of the formal

interviews if they were unhelpful.

85.     Connecticut courts have exhaustively documented this practice.[2]

86.     NHPD officers consistently used this witness interview procedure to

coerce witnesses into producing fabricated testimony.  These coercive practices were pervasive

throughout the NHPD during the 1990s.

87.     For instance, a witness in the investigation of the 1990 murder of Terrance

Gamble testified that two NHPD detectives coerced her into providing a statement, stopping the

tape several times to feed her details.  At the time of the murder trial, one of the detectives was a

defendant in three pending federal civil rights cases involving alleged coercion and intimidation

of witnesses.

88.     In 1994, two witnesses at the trial of Daryl Valentine, accused of murder

at a New Haven diner, testified that they had been coerced and bribed by the same NHPD

---

[2]     *See, e.g.*, *State v. Williamson*, 212 Conn. 6, 7 (1989) ("This case presents us with no less than our sixth occasion since 1981 to consider whether the New Haven police department's destruction or loss of a witness' statements requires striking the witness' testimony in an ensuing criminal trial."); *State v. Myers*, 193 Conn. 457, 467-68 (1984) ("[A] statement of the state's principal witness was deliberately destroyed according to a long-standing policy of the New Haven police department . . . ."); *State v. Jones*, 29 Conn. App. 304, 310 (1992); *State v. Reddick*, 36 Conn. App. 774 (1995); *State v. Woodard*, 27 Conn. App. 786 (1992).

detectives into making false inculpatory statements against Valentine.  The witnesses testified that they made clear they had no relevant knowledge, but that the detectives had threatened them with jail time if they did not inculpate Valentine.

89.     In 1996, two New Haven detectives, including Chief of Detectives Brian Sullivan, destroyed a tape recording of an interview in a murder investigation, apparently for the purpose of protecting a drug dealer in the City.

90.     At the time of the Dixwell Deli investigation, Sullivan was still in charge of NHPD detectives.  His conduct was under investigation by the City and by a grand jury at the time.  Sullivan was later charged with felony evidence tampering.

91.     In 1999, on the advice of the City's Corporation Counsel, the Mayor of New Haven requested that the NHPD reopen its investigation into a murder for which a man named Scott Lewis had been convicted several years earlier.[3]  The Mayor made this request after receiving the findings of an FBI investigation into the NHPD detective in charge of the case.

92.     The FBI investigation had found that the NHPD detective, Vincent Raucci, had coerced and improperly coached several witnesses into providing false statements implicating Lewis.  During the unrecorded pre-interviews, Raucci had browbeaten witnesses into falsely implicating Lewis by threatening to bring false charges against them.  He had also fed the witnesses specific details that they could not otherwise have known.  Then, after turning the recording on, he had coaxed carefully scripted statements inculpating Lewis from the witnesses.

_____

[3]     Lewis was later exonerated.  His complaint in his § 1983 action in this Court sets forth Raucci's misconduct in detail.  *See* Dkt. #1, *Lewis v. City of New Haven*, No. 3:16-CV-1382 (D. Conn. Aug. 15, 2016).

17

93.     Notwithstanding the Mayor's request, in 1999, the NHPD refused to reopen the Lewis investigation.

94.     The NHPD continued these practices for years.  In 2005, two witnesses against murder defendant J'Veil Outing recanted their taped statements, testifying that NHPD detectives had coerced their statements during unrecorded off-the-record sessions beforehand.

95.     Witnesses were also coerced to provide testimony the police wanted in off-the-record pre-interviews during the 2006 investigation and arrest of Bobby Johnson. Johnson was later convicted of murder.  He has since been exonerated.[4]

96.     All of these troubling NHPD practices—coerced witness statements, spoon-feeding witnesses false information during pre-interviews for repetition in official statements, missing tapes—infected the investigation of Vernon Horn and its aftermath.

### The Detectives Invent a Phone Call from Marcus Pearson to Crystal Sykes

97.     On February 2, 1999, just over a week after the murder at the Dixwell Deli, Detectives Dease, Adger, and Breland had just gotten the records of the stolen cell phone. They went to the house in West Haven that received the fourth phone call.  Crystal Sykes, the live-in nurse's aide, answered the door.

98.     The police showed Sykes photos of people who had been seen around the Dixwell Deli on the night of the robbery-murder and asked if she recognized any of them.

99.     As it so happened, she did recognize one of them: Marcus Pearson, who had been sitting in the green SUV outside the Deli when Vernon first stopped there at 2:45 AM,

_____

[4]     Johnson's § 1983 action, *Johnson v. City of New Haven*, No. 3:17-CV-1479 (D. Conn.), is pending in this Court.

and who Zaneta Berryman was going to meet at the Deli when she and Vernon returned there shortly after 3:30 AM.  Coincidentally, Pearson was Sykes's marijuana dealer.

100.    Sykes did not want to talk to police at the house but agreed to come to the police station.  There, she spoke with Detectives Dease, Adger, and Breland.

101.    It is unknown exactly what was discussed in Sykes's "pre-interview."  The detectives apparently destroyed their notes.  The NHPD also claims to have lost Sykes's tape-recorded interview.  The typed statement, however, includes the following exchange between Sykes and Detective Dease concerning the fourth call from the stolen cell phone:[5]

> Q.    Ms. Sykes I'm gonna refer you back to January [25th, 1999].  Was you working at 59 West Ivy Street in West Haven?
>
> A.    Yes.
>
> Q.    Ms. Sykes, do you recall receiving a telephone call at that location?
>
> A.    No I don't recall taking or receiving a phone call from Marcus [Pearson] but the paper said that he called.  Like I explained to them if I was sleeping, knowing that I'm up all through the hours of the night.  I get wake up calls in the morning, I don't recall a man calling me or whoever called me at that particular time.  I don't know even from yesterday who called me so . . .
>
> Q.    Ms. Sykes, so you're telling me that it's a good possibility that Marcus Pearson may have called you around [11:00] on 1/25/99?
>
> A.    Yes.

102.    But that "it's a good possibility that Marcus Pearson may have called" was not what Crystal Sykes had told Detective Dease at all.  In fact, as she specifically stated, Sykes had no recollection of receiving a call from Pearson.  She was confused about the time of the call the detectives were referring to.  She told Detective Dease during the same interview that she did

---

[5]    Punctuation edited for clarity.

not usually answer the phone during the day because the elderly woman she cared for, who was paralyzed but mentally competent, would usually do so.

103.    The detectives showed Sykes the record of the stolen cell phone and, falsely, told her that it showed Pearson had called her on January 25.  (That is what Sykes meant when she said, "the paper said that he called.")  In fact, the detectives had invented that Pearson was the caller and that she was the recipient: all they knew was that the stolen cell phone had made a call to the house where Sykes worked.

104.    Even though she was (a) coached in the unrecorded "pre-interview" and (b) falsely told that there was documentary evidence that Pearson had called her, Sykes was still unwilling to say that such a call had happened.  She only acknowledged that it "may" have been "possible" when Detective Dease pressed her to say so.

105.    In fact, when asked in her written statement (which in this instance appears to have been faithfully transcribed) why she was at the police station, Sykes responded: "*I was told* I had a phone call, right, phone call stating that I was talking to—*say his name*—Marcus Pearson."[6]

106.    Even in her official statement, after being coached off the record, Sykes had to ask her interrogators to "say his name"—that is, to tell her that Pearson was the person she was supposed to be talking about.

***The Detectives Coerce Marcus Pearson Into Saying that He Made the Fourth Phone Call***

107.    Having extracted only a vague answer about the fourth phone call from Sykes, the detectives tried to coerce Marcus Pearson to confirm it.

_____

[6]      Punctuation edited for clarity, and emphasis added.

108.     Pearson had already been once interviewed by police two days after the murder.  During that initial interview, he told Detective Breland that Vernon had come over to his house in New Haven on January 25—the day of the pivotal fourth call from the stolen cell phone.

109.     This was true.  Vernon and his cousin had gone to Pearson's house in New Haven on the morning of January 25 to buy a small amount of marijuana.  They had socialized with Pearson for a while on Pearson's porch.  Pearson's infant twins, for whom he was caring while their mother was incarcerated, were inside the house.

110.     No one made any phone calls during this visit on Pearson's porch.  Vernon was not in possession of the stolen cell phone and did not lend it to Pearson.  Pearson did not need to borrow a phone anyway—he had a cordless phone in the house.  As a result, during his initial interview with police, Pearson never said anything about a phone call.

111.     After speaking with Crystal Sykes, however, the NHPD repeatedly pressured Pearson to admit that he had placed the fourth call from the stolen cell phone from his porch to Sykes on January 25.

112.     Detectives came to see Pearson again on multiple occasions.  He told them to leave, but they came back.

113.     Pearson was on probation at the time, and his probation officer threatened to charge him with violating his probation because he had become a suspect in a murder investigation.  His probation officer told him that his children would be taken away from him.

114.     On February 3, Detectives Dease and Breland interviewed Pearson.  They falsely told Pearson that phone records showed he had called Crystal Sykes from the stolen cell

phone on the morning of January 25.  They told Pearson that he must have either gotten the

stolen phone from Vernon Horn or taken it from the Deli himself.

115.    Detectives Dease and Breland told Pearson that he had a choice: he could

either say that he had used the phone, or face charges for participating in the robbery-murder

himself.  Detectives Dease and Breland threatened to take away Pearson's children.

116.    Afraid of being found to have violated his probation, losing his children,

and being charged with murder, Pearson gave in to Dease and Breland.  At their direction,

Pearson falsely told them what they told him to say: that Vernon had lent him a cell phone while

they were on his porch on the morning of January 25, and that he had used it to call Crystal

Sykes.

117.    Even after Pearson made this statement, the NHPD continued to pressure

him.  Apparently unsatisfied that Pearson would stick to their fabricated story, Detectives Dease

and Breland interviewed Pearson again on February 5, and Dease interviewed him yet again on

February 9.

118.    The detectives again told Pearson either to confirm that Vernon lent him

the stolen cell phone on January 25 or to face charges himself.  Pearson continued to believe he

had no choice and again told the detectives that he had borrowed the phone from Vernon.

119.    Even after fabricating a connection between Vernon Horn and the stolen

cell phone, the detectives did not arrest Vernon or Marquis Jackson.

120.    They still had only two suspects in a three-man crime.  They still did not

have a fingerprint match.  And they still needed to figure out who had called Willie Sadler from

the stolen phone about 45 minutes after the robbery.  That person would be a prime suspect if

they could find him.

### *Willie Sadler and William Newkirk Give Up Steve Brown*

121.    Crystal Sykes's boyfriend was a man named **William Newkirk**.  Newkirk was the leader of a Bridgeport gang.  He and Willie Sadler, the recipient of the first and fifth calls from the stolen cell phone, were close friends and dealt drugs together.

122.    Newkirk worked an overnight shift at a beverage distributor and often spent time with Crystal Sykes at the house in West Haven, where Crystal worked, during the day.  He often made and received calls on the land line phone at that West Haven house—the land line that got the fourth call from the phone stolen from the Dixwell Deli.

123.    The NHPD became aware that Newkirk might have information relevant to the case in February 1999.  NHPD reports are oddly vague about Newkirk, stating only that his name "surfaced" "during the course of the investigation."

124.    The likeliest explanation is that Sykes told detectives on February 2 that Newkirk was her boyfriend and often spent time with her at the West Haven house.  On information and belief, that is what happened.

125.    In February 1999, the police repeatedly contacted Willie Sadler.  He refused to tell them who had called him from the stolen cell phone.  On information and belief, they also contacted Newkirk.

126.    At some point, Sadler and Newkirk got frustrated with the attention they were drawing from the NHPD.  To get the police off their back, Newkirk told Sadler to give up the name of the actual person who called him after the Dixwell Deli robbery.

127.    On March 4, Detectives Dease and Adger met with Sadler and Newkirk in Bridgeport.  Sadler told the detectives that the person who called him was named Steve.  Sadler said that he did not know Steve's last name, but that Steve was Marlo Macklin's brother-in-law.

23

Sadler also told the police that Steve was good friends with Tamika Fuller, the woman who received the third phone call from the stolen phone.

128.    The detectives then went to see Macklin, who identified Steve as **Steve Brown**.

129.    The next day, NHPD got Steve Brown's fingerprints from the Bridgeport Police Department.  Brown's prints matched a latent print lifted from the cigar box in the back office of the Deli.

130.    On March 9, Dease got a warrant for Brown's arrest.  Brown was arrested at his house in Bridgeport the next day.

### *Detectives Dease and Adger Fabricate an Identification of Vernon Horn by Steve Brown*

131.    When Steve Brown was arrested, Detectives Dease, Adger, and Breland knew that Brown, who lived and sold drugs in Bridgeport, had participated in the murder-robbery at the Dixwell Deli.  They also knew four additional pieces of information that strongly indicated Sadler and Newkirk's involvement in the crime:

a.    They knew that, about 45 minutes after the crime, Brown called Sadler, another Bridgeport drug dealer, on the phone stolen from the Deli.

b.    They knew that Brown was good friends with Tamika Fuller, the woman who got the third phone call from the stolen cell phone, and that Fuller knew Sadler and his associates.

c.    They knew that William Newkirk, a close associate of Sadler's, often spent time at the West Haven house that got the fourth call from the stolen phone call 27 minutes after Fuller got the third.

24

d.      Finally, they knew that Brown had called Sadler from the stolen

phone again later that day.

132.    In short, the available evidence strongly suggested that Brown was one of

the killers, and his confederates were likely associated with his Bridgeport drug crew: William

Newkirk, Willie Sadler, and Marlo Macklin. All of these people were tied to the stolen cell

phone.

133.    Neither Vernon Horn nor Marquis Jackson had anything to do with Brown

or his Bridgeport crew.

134.    The truth was beginning to emerge.  But rather than pursue the truth, the

detectives doubled down on a lie.

135.    After his March 10 arrest, Brown agreed to speak with Dease and Adger

and confessed to participating in the robbery at the Dixwell Deli.

136.    Brown had never met Vernon Horn or Marquis Jackson, let alone robbed

the Dixwell Deli with them.  Brown did not know them at all.  Brown did not know what they

looked like.  Neither did Sadler, Newkirk, Macklin, or any of Brown's other Bridgeport

associates.

137.    At the time of Brown's interview with police, Vernon and Marquis

Jackson had not been publicly identified as suspects in this case.  On information and belief, their

photographs had not been published in any newspaper or on any posters.

138.    Yet, somehow, when Dease and Adger gave Brown a set of eight photos

on March 10, Brown picked out Vernon Horn and Marquis Jackson as the other two men who

robbed the Dixwell Deli—the two men Dease and Adger already suspected of the crime.

139.     There is only one way this could have happened: Detectives Dease and Adger told Brown which photos to pick.  They told Brown to say that Vernon Horn and Marquis Jackson robbed the Dixwell Deli with him, even though this was not true—and they knew it was not true.

140.     Had Brown been randomly guessing, the chances that he would have picked out both Vernon and Jackson would have been *less than four percent*.[7]

141.     Brown also somehow managed to lie about the stolen cell phone in a way that matched the detectives' fabricated account of the fourth phone call to the West Haven house. Brown told Detectives Dease and Adger that he and Vernon rode around in Bridgeport until the next morning, and then Vernon took the phone back and left.  That did not happen.  (Brown later changed his story on this point.)

142.     Brown spent an hour and a half talking to Dease and Adger in the unrecorded "pre-interview" between the time he signed a *Miranda* waiver and the time he gave his formal statement.

143.     Detectives Dease and Adger either did not take notes of this coaching session or, more likely, destroyed the notes.

144.     During this hour-and-a-half interaction, Detectives Dease and Adger fed Brown the false story he needed to tell to get favorable treatment for himself and let them close out their investigation.  Brown repeated this false story back to the detectives in his official statement.

---

[7]     Had Brown been randomly guessing, he would have had a two-in-eight chance of picking out either Horn or Jackson from the full set of photos, and a one-in-seven chance of picking out the other man from the seven remaining photos.  The probability of both these events occurring is (2/8 x 1/7), or 3.57 percent.

145.    On March 12, 1999, based on Brown's fabricated photo identification and his statement implicating Vernon, Adger applied for a warrant to arrest Vernon.

146.    On March 22, 1999, Vernon was arrested and held on bail.

***Shaquan Pallet Lies to Implicate Vernon and Secure Favorable Treatment for Himself***

147.    The day after Vernon was arrested, Shaquan Pallet—the other TGI Friday's employee who rode home in the taxi with murder victim Caprice Hardy—was arrested by the NHPD for a string of unrelated armed robberies.

148.    Pallet confessed to the unrelated robberies.  Detective Dease was informed that Pallet was at the police station and came to speak with him about the Dixwell Deli robbery-murder.  Assistant State's Attorney **Gary Nicholson**, who would be the lead prosecutor on the case, also participated in that interview.[8]

149.    Pallet claimed that he got out of the taxi with Caprice Hardy at the Dixwell Deli.  He saw three men on the side of the Deli smoking "wet," or marijuana soaked in embalming fluid.  He went into the store with Caprice Hardy.  After Hardy bought cigarettes, he gave some of them to Pallet.  Pallet then said good night to Hardy and walked out of the Deli.

150.    Pallet claimed that, as he walked out, two of the three men he had seen smoking "wet" were outside the door pulling masks down on to their faces.  Pallet then got back in the taxi and left.

151.    During his March 23 interview, Pallet identified photos of Vernon and Marquis Jackson as two of the three men smoking "wet" outside the Deli.

---

[8]    Detectives later claimed to have met with Pallet once beforehand three weeks earlier, during which Pallet viewed a set of photos and set Vernon and Marquis Jackson's photos to one side, implicitly identifying them as the perpetrators.  But there is no contemporaneous documentation of the earlier meeting and no official record of Pallet's purported photo identification there.  On information and belief, the earlier meeting did not happen.

152.     This entire story was false.  Pallet never left the taxi on the night of the murder, never entered the Deli, never saw anyone standing alongside it, and never passed by anyone putting on a mask.

153.     In May 1999, Pallet told his robbery co-defendant that his story was a lie, designed to get favorable treatment in his robbery case.

154.     Pallet's gambit worked.  He faced the possibility of a 180-year sentence for the armed robberies he committed.  As a result of his cooperation against Vernon and Marquis Jackson, he received a two-year sentence with the possibility of parole.

### The State's Ballistics Expert Manipulates Results on the Prosecution's Behalf and Hides the Exculpatory Report

155.     Steve Brown was one of the killers and a key prosecution witness against Vernon.  When the NHPD interviewed Brown in March 1999, Brown said the murder weapon fired by Vernon was a Beretta.

156.     Shortly after the robbery, the NHPD sent shell casings and bullet fragments recovered from the Dixwell Deli to the State Police Forensic Science Laboratory.

157.     By statute, the role of the State Police Forensic Science Laboratory was to provide "technical assistance to law enforcement agencies in the various area of scientific investigation."  Conn. Gen. Stat. § 29-7b (1999).  The Laboratory was authorized to investigate physical evidence upon request of state or local law enforcement agencies.  *See id.*

158.     According to the Laboratory, its "primary function" was to "examine physical evidence for the purpose of determining, for example: (1) [t]hat a crime was committed [or] (2) [t]hat the crime is connected to the victim or perpetrator(s)."[9]

159.     On February 4, 1999, Forensic Examiner James Stephenson produced a two-page report on his examination of the shell casings and bullet fragments.  The report was addressed to Sergeant John Pleckaitis of the NHPD.

160.     The report said: "The bullets and bullet fragments are consistent with being 9mm caliber.  They may have been fired from but not limited to a self loading pistol manufactured by Calico, FEG, Browning, Heckler & Koch, Hungarian, Kassnar, Norinco, or Walther."

161.     This two-page report written report was disclosed to Vernon's lawyer.

162.     The basis for Stephenson's written conclusion was a more detailed "General Rifling Characteristics" Report that he generated on February 3, 1999.  This report listed various gun models that could match the characteristics of the shell casings and bullet fragments recovered from the scene.

163.     All of the manufacturers in Stephenson's written report were listed on the General Rifling Characteristics Report.  Beretta was *not* among them.  The margin of error on the February 1999 General Rifling Characteristics Report was +/- 2:

---

[9] State of Conn. Dep't of Pub. Safety, *Connecticut State Police Forensic Science Laboratory*, https://www.ncjrs.gov/pdffiles1/Digitization/143821NCJRS.pdf.

```
Key to FT - Firearm Type and Description                           Search Criteria

First Letter - Firearm Type      Second Letter - Firearm Description    All Records Where:

B: Submachine Gun/Machine Pistol  A: Automatic                            Caliber is: '38' and
C: Rifle/Shotgun Combination      B: Bolt Action                          Rifling is: 'Cut' and
M: Machine Gun                    C: Carbine                      Direction of Twist is: 'Right' and
P: Pistol                         D: Derringer            Number of Lands and Grooves is: '6' and
R: Rifle                          E: Double Barrel Side/Side              Land Width is: 069 +/- 2 (SAE) and
S: Shotgun                        O: Over & Under                        Groove Width is: 105 +/- 2 (SAE)
Z: All Others                     P: Pump
                                  I: Semiautomatic
```

164.    The February 1999 Rifling Characteristics Report was not disclosed to the defense.  Nor, on information and belief, did Stephenson give it to the State's Attorney's Office.

165.    As he was preparing for trial in early 2000, Assistant State's Attorney Gary Nicholson realized he had a problem.  His star witness said the murder weapon was a Beretta.  But his forensic examiner's report did not list a Beretta as even a possible murder weapon.

166.    Assistant State's Attorney Nicholson called Forensic Examiner Stephenson shortly before the start of jury selection.  Nicholson asked Stephenson whether it was possible the murder weapon could have been a Beretta.

167.    On February 15, 2000, Stephenson generated a new General Rifling Characteristics Report, this time manipulating the report to increase the margin of error to +/- 4.

```
Key to FT - Firearm Type and Description                           Search Criteria

First Letter - Firearm Type      Second Letter - Firearm Description    All Records Where:

B: Submachine Gun/Machine Pistol  A: Automatic                            Caliber is: '38' and
C: Rifle/Shotgun Combination      B: Bolt Action                          Cartridge is: '9MM LUGER' and
M: Machine Gun                    C: Carbine                           Firearm Type is: 'Pistol' and
P: Pistol                         D: Derringer                            Rifling is: 'Cut' and
R: Rifle                          E: Double Barrel Side/Side      Direction of Twist is: 'Right' and
S: Shotgun                        O: Over & Under         Number of Lands and Grooves is: '6' and
Z: All Others                     P: Pump                                 Land Width is: 069 +/- 4 (SAE) and
                                  I: Semiautomatic                       Groove Width is: 105 +/- 4 (SAE)
                                  L: Lever Action
```

168.    This time, the February 2000 General Rifling Characteristics Report listed multiple Beretta models as a potential match for the shell casings and bullet fragments recovered from the Deli.

169.    The February 2000 General Rifling Characteristics Report was never disclosed to the defense.  On information and belief, Stephenson never provided the report to the State's Attorney's Office.

170.    Stephenson later testified at trial that, based upon "new information" he got from Assistant State's Attorney Nicholson, he had concluded that the murder weapon could have been a Beretta.

171.    But the only "new information" was that the original report contradicted the State's cooperating witness. Steve Brown said the gun was a Beretta. The report said that was not possible. So Stephenson changed the report.  He manipulated his findings by changing the margin of error.  This manipulation allowed the report to include a make of murder weapon not supported by his findings, and thereby made those findings fit the testimony of the State's key witness.

172.    At trial, Vernon never knew how or why Stephenson changed his conclusion because, on information and belief, Stephenson withheld the General Rifling Characteristics Reports from the State's Attorney's Office.

173.    Stephenson testified that he had not created any new reports when he had gotten the new information from the State's Attorney's Office.  That testimony was false.

174.    Had the State's Attorney's Office been in possession of the February 2000 General Rifling Characteristics Report, it would presumably not have allowed Stephenson to testify falsely that he did not create any new reports.

175.    Vernon did not discover either of the General Rifling Characteristics Reports until they were produced in response to a subpoena on *February 28, 2018*—more than 18 years later.

31

***The State Proceeds to Trial on a Nonsense Theory***

176.    Vernon and Marquis Jackson were tried together.

177.    Vernon was charged with ten counts and, if convicted, faced a mandatory minimum sentence of 25 years and a maximum sentence of life.

178.    Steve Brown pleaded guilty to manslaughter and testified against Vernon and Marquis Jackson.  His sentence exposure was capped at 25 years, the prosecution agreed to recommend 18 years, and he ultimately received a 10-year sentence.

179.    The case against Vernon Horn never made sense.  The State's theory was:

a.    On the night of January 23, 1999, Vernon Horn and Marquis Jackson met Steve Brown at the White Eagle Club in Bridgeport—a private Polish social club with no black members.  (All three men are black.)  Vernon and Marquis Jackson never gave their real names, but introduced themselves as "Sun" and "Tae."

b.    After hanging out at the club for some time, they all drove up to New Haven in the early morning of January 24.  They went to the Dixwell Deli.  Without any prior discussion or agreement, Horn and Jackson handed Brown a gun and a red bandana to cover his face.  They all ran into the Deli and committed the robbery.  Vernon was the shooter.

c.    After fleeing the Deli, Steve Brown and Marquis Jackson retreated to a car around the corner.  But Vernon stayed outside the Deli, waiting to have a chat with the police about the murder he just committed.

d.    After the police interviewed Vernon, Vernon, Jackson, and Brown, drove back to Bridgeport.  On I-95 on the way back to Bridgeport, Brown made the first call from the stolen cell phone.  He did not want Vernon and Jackson to know where he

32

lived, so he called Willie Sadler and asked Sadler to pick him up at a central location in Bridgeport.

e.     The next day, Vernon for some reason went back to Bridgeport to retrieve the cell phone from Steve Brown.  At 10:40 AM on January 25, Steve Brown used the phone to make the third call to his drug-dealing associate Tamika Fuller.  He then met up with Vernon and gave him the phone.

f.     Vernon proceeded immediately to Marcus Pearson's house in New Haven.  There, just 27 minutes after Steve Brown used the stolen phone to make the third call in Bridgeport, Pearson borrowed the stolen phone from Vernon and used it to call Crystal Sykes.

g.     Vernon then took the phone *back* to Bridgeport so that Brown could use it to call Willie Sadler again later that day.

180.     The logical flaws in this story are obvious.  How would Brown have met Vernon and Jackson at a private, Polish, all-white social club?  Why would Brown go to New Haven with two virtual strangers and rob a store without even discussing it first?  Why, rather than fleeing, would one of three perpetrators stay at the scene for police to interview him?  How did Vernon find Brown to get the phone back?  How could the phone get from Brown's hands in Bridgeport to Pearson's porch in New Haven within 27 minutes?  If the phone was so important to Vernon, why did he lend it to Pearson?  And, perhaps most important, why would anyone go to such lengths to ferry any phone back and forth between Bridgeport and New Haven—much less a phone that was *evidence of murder*?

181.     Years later, Detective Dease would testify under oath that he chose not to scrutinize the details of this story too carefully because he knew the whole case might fall apart:

Q.     Were you concerned that if you pushed Mr. Brown he might back away from some of these statements and your case would unravel?

A.     *I believe so.*

182.    The state's other evidence also had serious flaws.  For example:

a.     Regina Wolfinger, the crack addict, identified Vernon as one of two unmasked men lingering outside the Deli, while everyone else saw three masked men flee in haste.

b.     Shaquan Pallet claimed that he got out of the taxi with Caprice Hardy and bummed some cigarettes from the pack that Hardy bought.  But the taxi driver testified that only one person got out of the taxi, and crime scene photos show Hardy's pack of Newports was sitting unopened on the counter, seal intact, when he was shot.

c.     The prosecution emphasized that Vernon was a regular customer and that the robbers were clearly familiar with the Deli because they knew to "Get the nigga in the back."  But Abby Yousif, who was behind the counter that night, and Butler, who was in the back, were both very familiar with Vernon's appearance, voice and mannerisms.  Neither thought he committed the robbery.

183.    Notwithstanding the serious deficiencies in the State's case, the jury convicted Vernon on all counts.  Years later, a juror explained: "the evidence of [Vernon] using the cell phone was pretty convincing."

184.    At his sentencing, Vernon asserted his innocence, stating: "I never touched that phone; I never had made a call on that phone. . . . I'm being falsely accused. . . . I hope that the truth come[s] out."

185.    Nonetheless, the trial judge sentenced Vernon to 70 years in prison for what he called a "savage crime," noting that "credible evidence" established Vernon's possession of the stolen cell phone the day after the murder.

186.    Marquis Jackson was convicted on eight of ten counts and sentenced to 40 years in prison.  Jackson also professed his innocence at sentencing.

187.    Detective Dease retired as planned.

### *Vernon Fights to Prove His Innocence*

188.    Throughout his years in prison, Vernon consistently maintained his innocence, as did Marquis Jackson.

189.    In August 2008, Vernon requested "any and all records related to the homicide that took place on January 24, 1999" from the NHPD under the Connecticut Freedom of Information Act.

190.    The Corporation Counsel of the City of New Haven refused the FOIA request without any proper basis, requiring Vernon to litigate before the Connecticut FOI Commission.  Vernon won his FOIA appeal *pro se*.

191.    On August 29, 2009, the FOI Commission ordered the City to produce all responsive records, with some limited redactions, "forthwith."

192.    More than three months later, the City mailed Vernon an incomplete file containing only some of the responsive records relating to his case.  The City mailed the file to the wrong address.

193.    The City's 2009 FOIA production is missing critical evidence.  It does not include impressions of bloody footprints seized from the crime scene.  It does not include any

audio recordings of witness statements.  It does not include any screenshots from the NHPD's computer system used for logging and tracking evidence.

194.    Most notably, the City's 2009 FOIA production does not contain any phone records, or any search warrants for phone records—the most critical evidence in a case centered around a stolen phone.

### Vernon Is Briefly Released and Then Re-Incarcerated

195.    In 2014, the Connecticut Superior Court granted Vernon's petition for a writ of habeas corpus on the basis that he had been denied the effective assistance of counsel at his trial.  Vernon was released from prison on bond in July 2014 while the State appealed.

196.    While out of prison, Vernon had a daughter who is now three years old.

197.    In May 2016, Vernon was riding as a passenger in a car that got into a serious car accident.  He suffered severe neck, spinal, and internal injuries that continue to cause him debilitating nerve pain.

198.    In June 2016, the Connecticut Supreme Court reversed the Superior Court's grant of habeas relief and reinstated Vernon's convictions.  Vernon was re-arrested and sent back to prison.  He did not receive adequate medical care for his injuries in prison.

### An Investigation Uncovers 137 Pages of Exculpatory Phone Records in Detective Adger's Basement

199.    After being sent back to prison, Vernon filed a federal habeas petition, and the Connecticut Federal Defender Office was appointed to represent him in those proceedings. The Federal Defender Office conducted a thorough investigation of the case.

200.    In January 2018, an investigator from the Federal Defender Office spoke with Detective Adger.  Adger said that Dease had given her a "binder" of documents relating to

the Dixwell Deli case when he retired from the NHPD.  She said she had kept the binder in her *basement*, along with "boxes" of other documents she had taken with her when she retired.

201.    On January 31, *2018*, Detective Adger gave the investigator 137 pages of phone records and related documents that she had stored in her basement.  The detectives had never turned over these records to the State's Attorney's Office and, as a result, the State never disclosed them to Vernon or his attorneys.

202.    The contents of the hidden records are exculpatory and astonishing.  They contradict the already dubious idea that Vernon had any connection to the fourth call from the stolen cell phone to the house in West Haven.

203.    The hidden records reveal that, two minutes before receiving the fourth phone call from the stolen cell phone, the land line at the West Haven house called a Bridgeport pager:[10]

```
Total Monthly Charges                                    21.23
SNET All Distance Calls
 1 JAN 22  827PM TO BRIDGEPORT CT 203 331-9010    OF    0 31   .06   8102 T
 2 JAN 25 1105AM TO BRIDGEPORT CT 203 696-4316    OP    0 18   .05   8102 T
 3 JAN 26  643PM TO BRIDGEPORT CT 203 696-4316    OF    0 18   .03   8102 T
```

204.    The hidden records also show that the West Haven land line called that pager very often in the weeks surrounding the robbery-murder at the Dixwell Deli.  The West Haven land line called the pager twice on January 3, once on January 4, once on January 8, once on January 25, twice on January 26, and twice on January 28.

_____

[10]    Calling a pager number allows the caller to leave a message for the recipient that is displayed on the pager screen.  Often, the message prompts the recipient to call back the person who called him.  It used to be very common for drug dealers to use pagers to conduct business.  *See, e.g.*, *Hanging Up a Hallmark of the Trade, Doctors Swap Pagers for Smart Phones*, WNYC (June 4, 2012), https://www.wnyc.org/story/213967-pager/ ("It used to be that the only people who still used pagers were doctors and drug dealers.").

205. The hidden records strongly suggest that these calls were made by William Newkirk. Newkirk was the Bridgeport gang leader and drug dealer who dated Crystal Sykes, the nurse's aide who lived at the West Haven house, and often spent time at the house.

206. The hidden records also show that Willie Sadler, who received Steve Brown's first and fifth calls from the stolen cell phone, also called the same pager seven times in January and February 1999.

207. In short, two minutes before the fourth phone call from the stolen cell phone, the recipient of the call paged a Bridgeport pager closely associated with the Bridgeport drug crew of Newkirk, Sadler, and Brown. This critical fact was never disclosed to the State's Attorney's Office or to Vernon Horn or Marquis Jackson.

208. The obvious inference from the hidden phone records is that Marcus Pearson did not make the fourth call on the stolen cell phone to Crystal Sykes from his porch in New Haven. The fourth call was to William Newkirk from one of his Bridgeport drug-dealing associates, in response to his page.

209. More generally, the phone records document a dense web of connections among Brown, Sadler, Newkirk, and Marlo Macklin (Brown's brother-in-law). Sadler called phone numbers associated with Newkirk *96 times* between January 17 and February 16, 1999. He called Macklin 30 times during the same period.

210. The 137 pages of phone records also include records of phones associated with Vernon, Marquis Jackson, and Marcus Pearson. None of those phones *ever* called Brown, Sadler, Macklin, Newkirk, or anyone else associated with their Bridgeport crew.

211. Detectives Dease, Adger, and Breland understood the significance of the 137 pages of phone records at the time of the investigation and prosecution of Vernon. They

38

reviewed the records carefully, as the records contain highlighting and detailed marginal notes about certain calls.  The detectives even made a chart of all of Willie Sadler's calls to New Haven County from January 21 through February 5, 1999.

212.   Despite their understanding of the records' importance, and their knowledge that the records pointed to the Bridgeport crew as the perpetrators of the Dixwell Deli robbery-murder, Detectives Dease, Adger, and Breland *did not disclose* the exculpatory records to the State's Attorney's Office.  Instead, they hid them.

213.   The records had been obtained pursuant to two search warrants in February and March 1999.  As a matter of common practice, the fact that a search warrant has been issued and the fact that a return has been received are contemporaneously docketed in the New Haven Clerk's Office.

214.   These two warrants, however, were not docketed until *September 2014*. This was after Vernon had initially won his state habeas and had been released on bond.

215.   Evidence obtained pursuant to a search warrant (or in any other fashion) is supposed to be logged into the NHPD evidence file.

216.   But the NHPD has no record of these 137 pages of hidden phone records ever being logged into evidence.

217.   In other words, for 15 years, the NHPD mysteriously failed to record search warrants that generated striking exculpatory evidence.  the NHPD has still *never* logged the existence of the evidence itself.

218.   On information and belief, there may be other previously undisclosed records relating to this case still sitting in Detective Adger's basement.

***Cell-Site Evidence Conclusively Disproves the State's Theory and Exonerates Vernon***

219.     The Federal Defender Office's investigation also established that clear, objective evidence of Vernon's innocence had been available to the NHPD and the State's Attorney's Office all along.

220.     The stolen cell phone's call record contains a column labeled "ORIG":



221.     Unsurprisingly, "ORIG" stands for "origin."  The numbers in this column indicate the "cell site" from which each listed call originated.  The first four digits correspond to a particular cell tower, and the fifth digit—a 1, 2, or 3—indicates where the caller was in relation to the tower.

222.     In February 2018, the Federal Defender Office and the State's Attorney's Office jointly issued a subpoena to the cell phone carrier for information about the five cell sites listed on the record of the stolen cell phone.

223.     In response, the carrier provided the location of the cell sites.  All of them were in Bridgeport.

224.     None was in New Haven, where Vernon supposedly lent the stolen cell phone to Marcus Pearson to make a call from Pearson's porch.

225.    The Federal Defender Office and the State's Attorney's Office jointly requested that FBI Special Agent Jim Wines analyze the cell site data.

226.    According to Special Agent Wines, it is physically impossible for the fourth call on the stolen cell phone to have come from Pearson's porch in New Haven.  Cell site 6015 is in Bridgeport.  Sector 3 of cell site 6015 is to the north*west* of the tower.  The fourth phone call must have come from Bridgeport:



227.    The cell-site data shows that Marcus Pearson did not call Crystal Sykes at 11:07 AM on January 25.  Steve Brown, or another of his Bridgeport drug-dealing associates, called William Newkirk at the West Haven house in response to Newkirk's page two minutes earlier.  The data also proves there was never any connection between Vernon Horn and the stolen cell phone.

41

228.    The cell-site data also shows that Steve Brown could not have been on I-95 on the way back to Bridgeport, as he claimed, when he made the first phone call to Willie Sadler shortly after the robbery.  That call originated from cell sector 61923, which is *in* Bridgeport, north of I-95:



229.    Steve Brown was already back in Bridgeport by the time he made the first phone call.  That means that he could not have possibly driven back to Bridgeport with Vernon Horn and Marquis Jackson: there was not enough time.  Vernon was speaking with the police outside the Deli around 4:00 AM.  It would have been impossible for Vernon to wait around at the Dixwell Deli, be interviewed by police, and get Brown all the way to Bridgeport by 4:14 AM.

230.    The call record of the stolen cell phone was a critical document—perhaps *the* critical document—in the investigation of the murder-robbery at the Dixwell Deli.

Detectives Dease, Adger, and Breland must have looked at it dozens, if not hundreds, of times. They also showed it to multiple witnesses.

231.     Dease, Adger, and Breland surely noticed the "ORIG" column.  And, on information and belief, they must have known or at least inferred the obvious: that "ORIG" meant "origin."  Any remotely reasonable investigation of the document would have revealed this critical fact.

232.     At any time after they got the records of the stolen cell phone on February 1, 1999, Detectives Dease, Adger, and Breland could have gotten the cell-site information by simply asking (or subpoenaing) the carrier for it.

233.     At this point, it is unknown whether Dease, Adger, and Breland did not bother to get the cell-site information, or whether they got it but failed to act on it, log it into evidence, or disclose it to the State's Attorney's office.

234.     What is clear is that Detectives Dease, Adger, and Breland allowed Vernon Horn to be wrongfully arrested, tried, convicted, and imprisoned for 17 years while failing to disclose evidence that they knew to be critical, that was readily available to them, and that would ultimately prove his innocence.

### *The State Dismisses the Charges in the Interest of Justice*

235.     On April 20, 2018, the State's Attorney's Office moved the Superior Court to vacate the judgment of conviction in the interest of justice, stating:  "The totality of the information developed to date has sufficiently undermined the state's confidence in the judgment of conviction such that justice is done by setting the judgment aside."

236.    On April 25, 2018, Vernon was produced in Superior Court in New Haven.  At an off-the-record pretrial conference, the State's Attorney's Office admitted that there had been a *Brady* violation.

237.    The State's motion to vacate the conviction was granted.  The case was dismissed with prejudice, and Vernon walked out of the courthouse a free man.

238.    The following week, Marquis Jackson's conviction was also vacated on motion of the State through a similar procedure, and he was also released from prison.

### *Vernon Suffered Severe Damages During His 17 Years in Prison*

239.    Vernon's time in prison was emotionally and physically scarring.  Prison made it difficult for Vernon to trust people and to form close relationships with others he cares about.

240.    Life in prison was dehumanizing.  Vernon was routinely strip-searched by guards.  He was assaulted on several occasions by other inmates and at least once by a captain who was later fired from the Department of Correction.  Vernon spent periods of time in 24-hour lockdown.

241.    While he was in prison, Vernon's grandmother passed away.  He was unable to say goodbye to her or spend time with his grandfather.  Two of Vernon's cousins also died.

242.    After being forced to go back to prison in 2016, Vernon became even more determined to prove his innocence.  He went on a hunger strike for 40 days, leading to thyroid complications.

243.    Vernon's daughter was only one year old when he was forced to go back to prison.  He missed almost two full years of her life at a critical time in her development.

244.    Vernon is grateful that he is finally out of prison for good and is delighting in his freedom.  But the immense challenge of readjusting to the free world is just beginning, and it is made all the more difficult by the pain and physical limitations that Vernon continues to experience from his injuries in the car accident, which were not treated adequately in prison.

245.    Vernon now seeks compensation for the deprivation of 17 years of his freedom, for the physical and emotional pain he suffered in prison and will suffer for the rest of his life, and for the joys of life that he missed.

### FIRST CAUSE OF ACTION
42 U.S.C. § 1983 – *Brady* – Withholding Material Exculpatory Evidence
(Against Defendants Dease, Adger, and Breland)

246.    Plaintiff realleges the above paragraphs as if they were fully set forth here.

247.    The 137 pages of phone records found in Adger's basement were and are material exculpatory evidence.  Had they been disclosed to Plaintiff, there would have been at least a reasonable probability of a different outcome at his trial.

248.    Dease, Adger, and Breland were all aware of the records, reviewed them, and understood their contents.  All three of them had a duty to give material exculpatory evidence to the prosecutor so it could be disclosed to the defense.

249.    Dease, Adger, and Breland did not provide the phone records to the State's Attorney's Office.  Instead, they concealed the records, including by not logging them into evidence and not ensuring that the search warrant returns were docketed.

250.    On information and belief, Dease, Adger, and Breland failed to disclose other *Brady* material to the State's Attorney's Office as well.

45

251.   Dease, Adger and Breland acted under pretense and color of state law. Their acts were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers.  They acted with the specific intent to deprive Plaintiff of his constitutional rights.

252.   As a direct and proximate result of their misconduct and abuse of authority, Plaintiff suffered the damages alleged herein.

**SECOND CAUSE OF ACTION**
42 U.S.C. § 1983 – Denial of Due Process – Fabrication of Evidence
(Against Defendants Dease, Adger, and Breland)

253.   Plaintiff realleges the above paragraphs as if they were fully set forth here.

254.   Dease, Adger, and Breland caused the initiation of criminal proceedings against Plaintiff.

255.   As set forth above, Dease, Adger, and Breland created false information and fabricated evidence likely to influence the jury, including:

a.      Steve Brown's photo identification of Plaintiff, his statement implicating Plaintiff in the robbery-murder at the Dixwell Deli, and his statements relating to Plaintiff's possession of the cell phone stolen from the Deli;

b.      Crystal Sykes's statement that she may have received the fourth phone call from the stolen cell phone from Marcus Pearson; and

c.      Marcus Pearson's statement that he borrowed the stolen cell phone from Plaintiff to place the fourth phone call on January 25, 1999; and

d.      Shaquan Pallet's statement that he got out of the taxi at the Deli and observed Plaintiff standing outside.

256.   Dease, Adger, and Breland fabricated evidence by, among other things:

46

a.    Inventing "evidence," planting it into the mouths of witnesses during coaching sessions, and destroying evidence of those coaching sessions;

b.    Telling witnesses which photographs to select; and

c.    Coercing witnesses by threatening to charge them with crimes in which they knew the witnesses played no role.

257.    This fabrication of evidence by Dease, Adger, and Breland proximately caused Plaintiff's detention and loss of liberty.

258.    Dease, Adger and Breland acted under pretense and color of state law. Their acts were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers. They acted with the specific intent to deprive Plaintiff of his constitutional rights.

259.    As a direct and proximate result of their misconduct and abuse of authority, Plaintiff suffered the damages alleged herein.

## THIRD CAUSE OF ACTION
42 U.S.C. § 1983 – Fourth and Fourteenth Amendments – Unreasonably Prolonged Detention
(Against Defendants Dease, Adger, and Breland)

260.    Plaintiff realleges the above paragraphs as if they were fully set forth here.

261.    Dease, Adger, and Breland knew that "ORIG" referred to the origin of the calls from the stolen cell phone. They either did obtain, or in the alternative could have obtained with a single fax or phone call, information about the specific location from which all of the calls from the stolen phone originated.

262.    This evidence conclusively establishes Plaintiff's innocence.

263.    Once Dease, Adger, and Breland obtained the records of the stolen cell phone, Plaintiff had a right to be free from continued detention stemming from their mishandling or suppression of exculpatory evidence.

47

264.    By failing to get the readily available exculpatory information from the phone company, or in the alternative by getting and suppressing it, Defendants Dease, Adger, and Breland violated Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution.

265.    Dease, Adger, and Breland acted with deliberate indifference to Plaintiff's constitutional rights.  Their conduct shocks the conscience.

266.    Dease, Adger and Breland acted under pretense and color of state law. Their acts were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers.

267.    As a direct and proximate result of their misconduct and abuse of authority, Plaintiff suffered the damages alleged herein.

### FOURTH CAUSE OF ACTION
42 U.S.C. § 1983 – Failure To Intervene
(Against Defendants Dease, Adger, and Breland)

268.    Plaintiff realleges the above paragraphs as if they were fully set forth here.

269.    To the extent that they were not directly responsible for the withholding of exculpatory evidence, fabrication of evidence, and unreasonably prolonged detention despite readily available evidence of innocence, Dease, Adger and Breland had a realistic opportunity to intervene and prevent misconduct by others that caused preventable harm to Plaintiff.

270.    A reasonable detective in the position of Dease, Adger, and Breland would have known that Plaintiff's constitutional rights were being violated.

271.    Dease, Adger, and Breland failed to take reasonable steps to intervene.

48

272.     Dease, Adger and Breland acted under pretense and color of state law. Their acts were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers.

273.     As a direct and proximate result of their misconduct and abuse of authority, Plaintiff suffered the damages alleged herein.

## FIFTH CAUSE OF ACTION
42 U.S.C. § 1983 – *Brady* – Withholding Material Exculpatory Evidence
(Against Defendant Stephenson)

274.     Plaintiff realleges the above paragraphs as if they were fully set forth here.

275.     The February 1999 and February 2000 General Rifling Characteristics Reports are material exculpatory evidence.  Had they been disclosed to Plaintiff, there would have been at least a reasonable probability of a different outcome at his trial.

276.     At all relevant times, including when creating the February 2000 General Rifling Characteristics Report in response to an inquiry from the prosecutor, Stephenson was acting on behalf of law enforcement and as an arm of the prosecution team.  He had a duty to give material exculpatory evidence to the prosecutor so it could be disclosed to the defense.

277.     Stephenson did not provide the February 1999 or February 2000 General Rifling Characteristics Reports to the State's Attorney's Office.  Instead, he withheld them and falsely testified that he did not create any report when he revisited his findings in 2000.

278.     As a result of Stephenson's failure to disclose the reports, Plaintiff was unaware during his trial that Stephenson manipulated the margin of error to make his conclusions fit the testimony of the State's key witness.

279.     Stephenson acted under pretense and color of state law.  His acts were beyond the scope of his jurisdiction, without authority of law, and in abuse of his powers.  He acted with the specific intent to deprive Plaintiff of his constitutional rights.

280.     As a direct and proximate result of Stephenson's misconduct and abuse of authority, Plaintiff suffered the damages alleged herein.

**SIXTH CAUSE OF ACTION**
42 U.S.C. § 1983 – Municipal Liability – Fourth and Fourteenth Amendments –
Policy and Custom of Coercive Police Interrogation and Fabricated Witness Statements
(Against Defendant City of New Haven)

281.     Plaintiff realleges the above paragraphs as if they were fully set forth here.

282.     Before, during, and after the violation of Plaintiff's constitutional rights, the City of New Haven had a policy or custom of unconstitutional investigative techniques, including coercion of witnesses, the fabrication of inculpatory evidence, the destruction of evidence, and the suppression of exculpatory evidence.

283.     The City was aware of, permitted, tolerated, and was deliberately indifferent to NHPD officers' and detectives' coercive techniques, fabrication of evidence, and withholding and destruction of evidence.

284.     Dease, Adger, and Breland acted consistently with and pursuant to the City's policy or custom when they engaged in their conduct set forth above.

285.     The City, acting under color of state law, violated Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution.

286.     As a direct and proximate result of the City's policy or custom, Plaintiff suffered the damages alleged herein.

**SEVENTH CAUSE OF ACTION**
Negligence
(Against Defendants Dease, Adger, and Breland)

287.    Plaintiff realleges the above paragraphs as if they were fully set forth here.

288.    Dease, Adger, and Breland owed Plaintiff a duty to exercise reasonable care in their investigation of crimes, to reasonably pursue and disclose exculpatory evidence, and to refrain from fabricating evidence.

289.    Dease, Adger, and Breland breached these duties by their conduct set forth above.

290.    As a direct and proximate result of their negligent acts and omissions, Plaintiff suffered the damages alleged herein.

**EIGHTH CAUSE OF ACTION**
Article First, §§ 7, 8, and 9 of the Connecticut Constitution
(Against Defendants Dease, Adger, and Breland)

291.    Plaintiff realleges the above paragraphs as if they were fully set forth here.

292.    Dease, Adger, and Breland caused Plaintiff to be wrongfully arrested, charged, prosecuted, convicted, and incarcerated.  By their conduct set forth above, they coerced witnesses, fabricated evidence, withheld exculpatory evidence, and failed to conduct an adequate investigation.

293.    As a direct and proximate result of their unlawful acts and omissions, Plaintiff suffered the damages alleged herein.

**NINTH CAUSE OF ACTION**
Indemnification – Conn. Gen. Stat. § 7-465
(Against Defendant City of New Haven)

294.    Plaintiff realleges the above paragraphs as if they were fully set forth here.

51

295.    Defendants Dease, Adger, and Breland were police detectives acting in performance of their duties within the scope of their employment with Defendant City of New Haven and under color of law.

296.    As set forth above, Dease, Adger, and Breland infringed Plaintiff's civil rights and caused him physical damages to his person and property while performing their duties and acting within the scope of their employment.

297.    As a direct and proximate result of their conduct, Plaintiff suffered the damages alleged herein.

298.    On July 27, 2018, which was within six months after the foregoing causes of action had accrued, pursuant to Conn. Gen. Stat. § 7-465, Plaintiff filed with the clerk of the City of New Haven written notice of his intention to commence this action and of the time when and the place where the damages were incurred or sustained.

299.    Pursuant to one or more Causes of Action One through Eight, Defendant City of New Haven is liable for those damages under Conn. Gen. Stat. § 7-465.

### TENTH CAUSE OF ACTION
Direct Action – Conn. Gen. Stat § 52-557n
(Against Defendant City of New Haven)

300.    Plaintiff realleges the above paragraphs as if they were fully set forth here.

301.    Defendants Dease, Adger, and Breland were police detectives acting within the scope of their employment and official duties with Defendant City of New Haven and under color of law.

302.    Dease, Adger, and Breland owed Plaintiff a duty to exercise reasonable care in their investigation of crimes, to reasonably pursue and disclose exculpatory evidence, and to refrain from fabricating evidence.

303.     Dease, Adger, and Breland breached these duties by their conduct set forth above.

304.     Even to the extent that Dease, Adger, and Breland were performing discretionary functions, they disregarded the risk of imminent harm to Plaintiff, an identifiable person.  Dease, Adger, and Breland were obligated before and during Plaintiff's trial to disclose exculpatory evidence to him.

305.     In the alternative, Dease, Adger, and Breland's acts involved malice, malicious intent to vex or trouble, and/or intent to injure.

306.     As a direct and proximate result of Dease, Adger, and Breland's acts and omissions, Plaintiff suffered the damages alleged herein.

307.     Defendant City of New Haven is liable for those damages under Conn. Gen. Stat. § 52-557n.

### ELEVENTH CAUSE OF ACTION
Negligence
(Against Defendants Dease and Adger)

308.     Plaintiff realleges the above paragraphs as if they were fully set forth here.

309.     The aforementioned phone record evidence was exculpatory with respect to the criminal case against Plaintiff and his co-defendant, Marquis Jackson, for the alleged perpetration of the Dixwell Deli robbery-murder.

310.     The exculpatory phone records instead implicated Bridgeport drug dealer Steven Brown, whose fingerprints had been found at the scene of the murder, and Brown's associates in Bridgeport—none of whom had any connection with Plaintiff or Mr. Jackson.

311.     The exculpatory phone records directly contradicted the prosecution's central premise and sole item of purported physical evidence used to charge Plaintiff and Mr.

Jackson: a claimed connection between Plaintiff and Mr. Jackson and the West Haven land line that received one of the stole cell phone calls, to which the hidden phone records put the lie.

312.    The exculpatory phone record were never reported or disclosed to Plaintiff or his counsel, or to the prosecution, until shortly before the vacating of Plaintiff's conviction in 2018, and release after over 19 years of wrongful incarceration.

313.    The non-reporting and non-disclosure of the exculpatory phone records in 1999, and on a continuing basis for nearly two decades thereafter, while Plaintiff languished in prison year after year for a crime he did not commit, was due to the negligence of Defendants Dease and Adger, who, among other things:

a.     Knew or should have known of the exculpatory significance of the phone record evidence, and should have communicated their knowledge of that evidence and its exculpatory content to the prosecution, but failed to do so on a continuing basis for more than 19 years.

b.     Knew or should have known of the exculpatory significance of the phone record evidence, and should have communicated their knowledge of that evidence and its exculpatory contents to the NHPD, but failed to do so on a continuing basis for more than 19 years;

c.     Knew or should have known of the exculpatory significance of the phone record evidence, and should have communicated their knowledge of that evidence and its exculpatory contents to the City of New Haven Office of Corporation Counsel, but failed to do so on a continuing basis for more than 19 years until in or about March 2018, when Corporation Counsel contacted Defendant Adger in connection with a subpoena of that evidence;

d.     Knew or should have known of the exculpatory significance of the phone record evidence, and should have communicated their knowledge of that evidence and its exculpatory contents to Plaintiff and/or his counsel; but failed to do so on a continuing basis for more than 19 years;

e.     Should not have continually maintained the phone record evidence and their written analysis thereof in their personal possession and outside the official NHPD files and records, as they did for over 19 years, until produced from the basement of Defendant Adger's home in 2018, where she had kept the evidence following Defendant Dease's delivery of it to her personal custody;

f.     Should have complied with the requirements of Conn. Gen. Stat. § 54-86c(c), but failed to do so on a continuing basis for more than 19 years; and

g.      Should have complied with the requirements of Conn. Gen. Stat. §54-36a(b)(1), but failed to do so on a continuing basis for more than 15 years, and thereafter continually failed to inform the prosecution, the NHPD, the City, the City Corporation Counsel, or Plaintiff and his counsel of the existence of documents purporting to comply therewith.

314.    Defendants Dease and Adger owed Plaintiff a duty to exercise reasonable care in their investigation and arrest of Plaintiff for the Dixwell Deli robbery-murder, in their investigation, analysis, reporting, and disclosure of evidence related thereto, and in the disclosure of exculpatory evidence and information of which they were continually aware.

315.    Defendants Dease and Adger breached those duties by their conduct set forth above.

316.    It was and should have been apparent to Defendants Dease and Adger that their negligent misconduct as aforesaid was likely to subject Plaintiff, a specifically identifiable victim of their misconduct, to severe and imminent harm.

317.    As the direct and proximate result of the negligence and breach of duty of said Defendants as aforesaid, Plaintiff suffered the damages alleged herein.

## TWELFTH CAUSE OF ACTION
Indemnification – Conn. Gen. Stat. § 7-465
(Against Defendant City of New Haven)

318.    Plaintiff realleges the above paragraphs as if they were fully set forth here.

319.    Defendants Dease and Asger were police detectives acting in performance of their duties within the scope of their employment with Defendant City of New Haven and under color of law.

320.    As set forth above, Defendants Dease and Adger's negligent misconduct subjected Plaintiff, a specifically identifiable victim of their misconduct, to severe and imminent harm.

321.     As a direct and proximate result of their conduct, Plaintiff suffered the damages alleged herein.

322.     On July 27, 2018, which was within six months after the foregoing causes of action had accrued, pursuant to Conn. Gen. Stat. § 7-465, Plaintiff filed with the clerk of the City of New Haven written notice of his intention to commence this action and of the time when and the place where the damages were incurred or sustained.

323.     Pursuant to Conn. Gen. Stat. § 7-465, Defendant City of New Haven is liable for those damages by way of indemnification.

## THIRTEENTH CAUSE OF ACTION
Indemnification – Conn. Gen. Stat. § 52-577n
(Against Defendant City of New Haven)

324.     Plaintiff realleges the above paragraphs as if they were fully set forth here.

325.     The non-disclosure and non-reporting of the phone record evidence in 1999, and on a continuing basis for nearly two decades thereafter while Plaintiff languished in prison year after year for a crime he did not commit, was due to the negligence of Defendant City of New Haven, in that, among other things:

a.     The City should have established and implemented effective procedures for the identification and reporting of exculpatory information by the officers of the NHPD, and for communication of such information to the prosecution, but failed to do so;

b.     The City should have established and implemented effective procedures for ensuring that evidence in homicide and other serious felony investigations was securely maintained in the NHPD's investigative and property files and not kept in the personal files of NHPD officers, but it failed to do so;

c.     The City should have established and implemented effective procedures for monitoring and maintaining accurate and complete records concerning the execution and returns of search warrants and the preservation and disclosure of evidence seized thereunder, but failed to do so;

56

d.      The City should have established and implemented effective procedures for ensuring compliance with the requirements of Conn. Gen. State. § 54-86c(c), but failed to do so on a continuing basis for more than 19 years;

e.      The City should have established and implemented effective procedures for ensuring compliance with the requirements of Conn. Gen. Stat. § 54-36a(b)(1), but failed to do so on a continuing basis for more than 19 years;

f.      The City should have established and implemented effective procedures for protecting against the arrest and wrongful incarceration of innocent persons, but it failed to do so on a continuing basis for more than 19 years;

g.      The City should have established and implemented, but continually failed to establish and implement, effective training of NHPD officers concerning (i) the identification and reporting of exculpatory information and communication of such information to the prosecution; (ii) the secure maintenance of records and evidence in homicide and other serious felony investigations in the NHPD's investigative and property files and not the personal files of NHPD officers; (iii) the monitoring and maintenance of complete and accurate records concerning the execution and returns of search warrants, and the preservation and disclosure of evidence seized thereunder; (iv) compliance with the requirements of Conn. Gen. Stat. § 54- 86c(c); (v) compliance with the requirements of Conn. Gen. Stat. § 54-36a(b)(1); and (vi) the paramount importance of protecting against the arrest and wrongful incarceration of innocent persons, including the adverse effects of tunnel vision and precipitous case closure in lieu of thorough investigation of all leads.

h.      The City should have established and implemented, but continually failed to establish and implement, effective supervision of NHPD officers concerning: (i) the identification and reporting of exculpatory information and communication of such information to the prosecution; (ii) the maintenance of records and evidence in homicide and other serious felony investigations in the NHPD's investigative and property files and not the personal files of NHPD officers; (iii) the monitoring and maintenance of complete and accurate records concerning the execution and returns of search warrants, and the preservation and disclosure of evidence seized thereunder; (iv) compliance with the requirements of Conn. Gen. Stat. § 54- 86c(c); (v) compliance with the requirements of Conn. Gen. Stat. § 54-36a(b)(1); and (vi) the paramount importance of protecting against the arrest and incarceration of innocent persons, including the adverse effects of tunnel vision and precipitous case closure in lieu of thorough investigation of all leads.

326.    Defendant City of New Haven owed Plaintiff a duty to exercise reasonable

care in the foregoing respects in its investigation of crimes; in the preservation and disclosure of

evidence related thereto; in the secure maintenance of evidence in NHPD investigative and

property files and not the personal files of current and retired NHPD officers; in the

identification and disclosure of exculpatory evidence; in promoting the paramount importance of

protecting against the arrest and incarceration of innocent persons; in protecting against the

adverse effects of tunnel vision and precipitous case closure in lieu of through investigation of all

leads; in training and supervising its police officers as set forth above; and in reviewing and

rectifying the adverse consequences of its failures to have done so in the past.

327.    Defendant City of New Haven breached those duties by its conduct as set

forth above.

328.    It was and should have been apparent to Defendant City of New Haven

that its negligent misconduct as set forth above was likely to subject Plaintiff, a specifically

identifiable victim of its misconduct, to severe and imminent harm.

329.    As the direct and proximate result of the negligence and breach of duty of

Defendant City of New Haven on a continuing basis as aforesaid, Plaintiff suffered the damages

alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

a.      Compensatory damages against all Defendants in an amount to be determined at trial;

b.      Punitive damages against Defendants Dease, Adger, Breland, and Stephenson in an amount to be determined at trial;

c.      Reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

d.      Such other and further relief as this Court may deem just and proper.

Dated:  New Haven, Connecticut
        May 6, 2020

                                    EMERY CELLI BRINCKERHOFF &
                                    ABADY LLP

                                    _____/s/_____
                                    **Ilann M. Maazel***
                                    **Nick Bourland***
                                    600 Fifth Avenue, 10th Floor
                                    New York, New York 10020
                                    (212) 763-5000
                                    imaazel@ecbalaw.com
                                    nbourland@ecbalaw.com
                                    * *Admitted pro hac vice*


                                    PARRETT, PORTO, PARESE &
                                    COLWELL, P.C.

                                    **Tamar R. Birckhead**
                                    2139 Whitney Avenue, Suite 1-D
                                    Hamden, Connecticut 06518
                                    (203) 281-2700
                                    tbirckhead@pppclaw.com

                                    *Attorneys for Plaintiff Vernon Horn*

## APPENDIX A – PEOPLE DISCUSSED IN COMPLAINT

| | |
|---|---|
| **Vernon Horn** | Wrongfully convicted of robbery-homicide he did not commit; spent 17 years in prison. |

### Vernon's New Haven Friends and Associates

| | |
|---|---|
| Marquis Jackson | Friend and co-defendant.  Socialized with Vernon night of murder. |
| Marcus Pearson | Saw Vernon at Deli around 2:50 AM on January 24; hosted Vernon on porch morning of January 25; coerced by police into claiming Vernon lent him phone to make fourth call.  Had relationship with Zaneta Berryman. |
| Zaneta Berryman | Had sexual encounter with Vernon in Jackson's room on night of murder. |
| Tesha Smith | Saw Vernon and Jackson at club on night of murder. |

### Law Enforcement

| | |
|---|---|
| Det. Leroy Dease | Lead detective on investigation.  Last homicide case. |
| Det. Petisia Adger | Second-in-command on investigation.  First homicide case. |
| Det. Daryle Breland | Participated in critical witness interviews. |
| James Stephenson | Connecticut State Police Forensic Science Laboratory firearms examiner.  Manipulated report to fit Steve Brown's testimony and did not disclose it. |
| Gary Nicholson | Assistant State's Attorney.  Lead prosecutor on the case. |

### People at the Dixwell Deli at the Time of the Robbery-Murder

| | |
|---|---|
| Caprice Hardy | Shot and killed while buying cigarettes at deli after shift at TGI Friday's. |
| Abby Yousif | Co-owner of deli.  Behind counter during murder.  Shot in shoulder. |
| Vernon Butler | Associate of Yousif sleeping in back office.  Cell phone stolen. |
| Howard Roberts | Drove to Deli with Regina Wolfinger.  Walked in while robbery in progress. |

### Witnesses in the Investigation and Prosecution of Vernon Horn

| | |
|---|---|
| Crystal Sykes | Live-in aide at West Haven house that got fourth call from stolen phone.  Bought marijuana from Marcus Pearson. |
| Regina Wolfinger | Crack addict who drove to Deli with Roberts and stayed in car.  ID'd Vernon as one of two light-skinned unmasked men who left store at leisurely pace. |
| Kendall Thompson | Entered store while robbery in progress.  Identified Vernon and Jackson through facemasks based upon their eyes. |

| | |
|---|---|
| Shaquan Pallet | Came with Hardy in taxi from TGI Friday's.  After unrelated arrest for multiple armed robberies, police fabricated ID of Vernon and Jackson. |

**The Bridgeport Crew**

| | |
|---|---|
| Steve Brown | Confessed participant in crime; made phone calls from stolen phone.  Told by police to identify Vernon and Marquis Jackson as co-perpetrators. |
| Willie Sadler | Recipient of first and last phone calls on stolen phone. |
| William Newkirk | Sykes's boyfriend; likely recipient of fourth call on stolen phone. |
| Marlo Macklin | Brown's brother-in-law.  Tamika Fuller's boyfriend.  Helped to identify Brown at Sadler and Newkirk's insistence. |
| Tamika Fuller | Recipient of third phone call.  Sadler's associate.  Macklin's girlfriend. |

## APPENDIX B – TIMELINE OF EVENTS DISCUSSED IN COMPLAINT

**January 24, 1999**

| | |
|---|---|
| About 2:10 AM | Vernon Horn and Marquis Jackson leave Alley Cat Club |
| About 2:20 AM | Vernon and Jackson stop at Athenian Diner |
| About 2:30 AM | Vernon and Jackson pick up Zaneta Berryman |
| About 2:45 AM | Vernon, Jackson, and Berryman go to Dixwell Deli; Vernon has conversation with Marcus Pearson in green SUV outside |
| About 2:50 AM | Vernon and Berryman go to Jackson's room at 235 W. Ivy Street |
| About 3:00 AM | Pearson pages Berryman |
| 3:18 AM | Taxi picks up Caprice Hardy and Shaquan Pallet at TGI Friday's |
| 3:26 AM | Taxi shuts off meter at Dixwell Deli |
| 3:28 AM | Caprice Hardy enters Deli |
| About 3:28-3:31 AM | Robbery of the Dixwell Deli: Hardy killed, Abby Yousif shot, Vernon Butler's cell phone stolen, Kendall Thompson and Howard Roberts come into store separately mid-robbery, Regina Wolfinger parks outside |
| About 3:30 AM | Berryman calls Pearson back from cordless phone at 235 W. Ivy Street |
| 3:32 AM | Butler calls 911 |
| About 3:35 AM | Vernon and Berryman arrive at Dixwell Deli on foot |
| About 4:00 AM | Police interview Vernon and Berryman |
| 4:14 AM | Stolen cell phone makes Call #1 from Bridgeport to Willie Sadler |
| Afternoon | Regina Wolfinger ID's Vernon as one of two light-skinned black men she saw walk out of the deli and stand outside after the robbery |
| 10:48 PM | Stolen cell phone makes Call #2 to woman in Stratford (personal call) |

**January 25, 1999**

| | |
|---|---|
| Morning | Vernon and his cousin go to Marcus Pearson's house |
| 10:40 AM | Stolen cell phone makes Call #3 from Bridgeport to Tamika Fuller |
| 11:05 AM | William Newkirk calls Bridgeport pager from land line at West Haven house where girlfriend Crystal Sykes works as live-in nurse's aide |
| 11:07 AM | Stolen cell phone makes Call #4 from Bridgeport to West Haven house |
| 2:32 PM | Stolen cell phone makes Call #5 from Bridgeport to Willie Sadler |

| | |
|---|---|
| **January 26, 1999** | NHPD interviews Pearson, who tells them that he saw Vernon outside the Deli and then again at his house the next morning |
| | Kendall Thompson ID's Vernon and Marquis Jackson as having similar physical characteristics to masked men he saw in Deli |

| | |
|---|---|
| **February 1, 1999** | NHPD gets records of stolen cell phone |

| | |
|---|---|
| **February 2, 1999** | NHPD interviews Sadler, who refuses to disclose who called him |
| | NHPD interviews Sykes, coerces her to say that she "may have" gotten Call #4 from Marcus Pearson |

| | |
|---|---|
| **February 3, 1999** | NHPD interviews Pearson, coerces him to say that he borrowed phone from Vernon and made Call #4 to Sykes from his porch in New Haven Forensic Examiner Stephenson generates undisclosed General Rifling Characteristics Report with +/- 2 margin of error |
| **February 4, 1999** | Stephenson sends written report to NHPD |
| **February 5, 1999** | NHPD interviews Pearson again, re-confirms fabricated story re Call #4 |
| **February 9, 1999** | NHPD interviews Pearson again, re-confirms fabricated story re Call #4 |
| **February 25, 1999** | NHPD obtains search warrants for phone records, including Sadler cell phone, West Haven land line, and Horn, Jackson, and Pearson phones |
| **Late February–Early March 1999** | NHPD obtains and reviews, but does not disclose, phone records |
| **March 4, 1999** | Newkirk and Sadler identify "Steve" as person who called Sadler from stolen phone; Marlo Macklin identifies "Steve" as Steve Brown |
| **March 5, 1999** | NHPD gets Brown's prints from Bridgeport PD; match to latent from Deli |
| **March 9, 1999** | Warrant issued for Brown's arrest |
| **March 10, 1999** | Brown arrested; confesses; falsely IDs and implicates Vernon and Jackson |
| **March 12, 1999** | Warrant issued for Vernon's arrest |
| **March 22, 1999** | Vernon Horn arrested |
| **March 23, 1999** | Pallet arrested for unrelated robberies; falsely IDs Vernon and Jackson |
| **February 15, 2000** | Stephenson generates undisclosed General Rifling Characteristics Report with +/- 4 margin of error |
| **March 2000** | Trial and conviction of Vernon |
| **July 2014** | State habeas granted; Vernon released on bond |
| **September 17, 2014** | Search warrants for phone records docketed for first time |
| **May 2016** | Vernon suffers severe injuries in serious car accident |
| **June 2016** | Grant of state habeas reversed; Vernon re-arrested and remanded |

| | |
|---|---|
| **January 31, 2018** | 137 pages of previously undisclosed phone records produced from Detective Adger's basement |
| **February 8, 2018** | Federal Defender Office and State's Attorney's Office jointly subpoena "ORIG" cell site evidence |
| **February 10, 2018** | "ORIG" cell site evidence produced |
| **April 20, 2018** | State's Attorney's Office moves to vacate conviction |
| **April 25, 2018** | Conviction vacated; Vernon Horn released from prison |