UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| VERNON HORN | : | NO.: 3:18-CV-01502 (RNC) |
| | : | |
| v. | : | |
| | : | |
| CITY OF NEW HAVEN, ET AL | : | JUNE 7, 2021 |

**MEMORANDUM OF LAW IN SUPPORT OF THE CITY OF NEW HAVEN'S MOTION
FOR SUMMARY JUDGMENT**

**I.    FACTUAL BACKGROUND**

On January 24, 1999 at approximately 3:32 a.m., the New Haven Police

Department ("NHPD") responded to the Dixwell Deli on a report of an armed robbery

wherein Caprice Hardy was fatally shot.  See Vernon Horn Arrest Warrant Application,

**Ex. 1**, at 1; Marquis Jackson Arrest Warrant Application, **Ex. 2**, at 1; Steve Brown Arrest

Warrant Application, **Ex. 3**, at 1.  During the course of the robbery, a cell phone was

stolen from deli employee, Vernon Butler.  See Vernon Horn Arrest Warrant Application,

**Ex. 1**, at 3; Marquis Jackson Arrest Warran Application, **Ex. 2**, at 3; Steve Brown Arrest

Warrant Application, **Ex. 3**, at 3.

NHPD Detectives Petisia Adger, Leroy Dease and Daryle Breland worked on the

Caprice Hardy homicide investigation.  See Petisia Adger 12/11/19 Dep., **Ex. 4**, at 9:23–

10:1; Daryle Breland 12/16/19 Dep., **Ex. 5**, at 36:8-10.  During the course of their

investigation, witnesses Regina Wolfinger and Kendall Thompson gave recorded

statements to the detectives wherein they identified Vernon Horn and Marquis Jackson

from photo arrays as having been involved in the robbery/homicide.  See Regina

Wolfinger Transcribed Statement, **Ex. 6**; Kendall Thompson Transcribed Statement,

**Ex. 7**.

Thereafter, on February 2, 1999, the NHPD received a fax from Omnipoint Communications with the call detail record from Vernon Butler's stolen cell phone in response to a request for said records pursuant to a signed consent.  See Omnipoint Phone Records, **Ex. 8**.  The stolen cell phone call detail record disclosed five calls as having been made following the robbery, from 4:14 a.m. on 1/24/99 through 2:32 p.m. on 1/25/99.  Id.  The first and fourth phone calls were identified as having been made to a Bridgeport number registered to Willie Sadler.  See Vernon Horn Arrest Warrant Application, **Ex. 1**, at 4; Marquis Jackson Arrest Warrant Application, **Ex. 2**, at 4; Steve Brown Arrest Warrant Application, **Ex. 3**, at 4.  The second phone call was identified as having been made to a Stratford number registered to Sandra Moore.  Id.  The third phone call was identified as having been made to a Bridgeport number registered to Floyd Jackson.  Id.  The fourth phone call was identified as having been made to a West Haven number registered to Stanley Cheronzy.  Id.

On February 5, 1999, Marcus Pearson gave a recorded statement to Detective Breland.  See Marcus Pearson 2/5/99 Transcribed Statement, **Ex. 9**.  In his transcribed statement, Pearson stated that Vernon Horn came to his house on January 25, 1999, morning after murder, and he used a cell phone give to him by Horn to make the fourth phone call to Crystal Sykes who worked at the Cheronzy residence.  See Marcus Pearson 2/5/99 Transcribed Statement, **Ex. 9**, at 3-5.

On March 6, 1999, NHPD detectives traveled to the Bridgeport Police Department and matched fingerprints found at the scene of the Dixwell Deli to the fingerprints of Steve Brown that were on file with the Bridgeport police.  See Steve Brown Arrest Warrant Application, **Ex. 3**, at 7.  Detective Dease applied for an Arrest

Warrant Application for the arrest of Steve Brown, on March 9, 1999.  Id.  On March 10, 1999, following his arrest, Steve Brown gave a recorded statement to Detectives Dease and Adger.  See Steve Brown Transcribed Statement, **Ex. 15**.  In his transcribed statement, Brown confessed to being involved in the Dixwell Deli robbery/murder.  Id., at 3.  Brown further viewed a photo array and identified Vernon Horn and Marquis Jackson as his accomplices in the crime.  Id., at 4-5.

Thereafter, on March 12, 1999, Detective Adger applied for an Arrest Warrant Application for the arrest of Vernon Horn and Marquis Jackson, which were granted on the same date.  See Vernon Horn Arrest Warrant Application, **Ex. 1**; Marquis Jackson Arrest Warrant Application, **Ex. 2**.  Vernon Horn was arrested on March 22, 1999.  See Horn Criminal Case Defendant Look-up Information, **Ex. 16**.  Marquis Jackson was arrested on March 24, 1999.  See Jackson Uniform Arrest Report, **Ex. 17**.

Following a jury trial, Horn and Jackson were convicted on felony murder, robbery and related charges.  Both Horn and Jackson filed direct appeals of their convictions.  See State v. Jackson et al, 73 Conn. App. 338 (2002).  Therein, Horn and Jackson alleged, in part, that the trial court had erred in failing to suppress the identifications made by witnesses Regina Wolfinger, Shaquan Pallet and Steve Brown. Id. at 372-73.  The Appellate Court affirmed the trial court's decision denying the motion to suppress Wolfinger's identification, finding that the photo array presented to Wolfinger was not unnecessarily suggestive.  Id. at 374-76.  The Appellate Court further affirmed the trial court's decision denying the motion to suppress Pallet's identification, finding that Pallet had identified them, that the photo arrays were no unnecessarily suggestive, and that Detective Dease's comments to Pallet did not taint the identification.  Id. at 376-

79.  Finally, the Appellate Court affirmed the trial court's decision denying the motion to suppress Brown's identification, finding that the photo array was not suggestive and that Brown's identification was reliable.  Id. at 379-83.

Thereafter, both Vernon Horn and Marquis Jackson each filed habeas petitions alleging ineffective assistance of counsel and actual innocence.  See Jackson v. Commissioner of Correction, 149 Conn. App. 681 (2014); Horn v. Commissioner of Correction, 321 Conn. 767 (2016).  Their habeas petitions were, ultimately, unsuccessful.  See id.

On April 20, 2020, the State filed a Motion to Set Aside the Judgement of Conviction and Restore the Case to the Superior Court Docket as to Vernon Horn, and filed an identical Motion to Set Aside as to Marquis Jackson on May 1, 2020.  See Horn Motion to Set Aside, **Ex. 50**; Jackson Motion to Set Aside, **Ex. 51**.  The Motions to Set Aside were not based upon a finding of actual innocence but, rather, on the basis that, "The totality of the information developed to date ha[d] sufficiently undermined the state's confidence in the judgment of conviction such that justice is done by setting the judgment aside and restoring the case to the superior court docket."  Id. at 2.

Following his release, Horn brought the instant action by way of Complaint filed on September 7, 2018.  Horn, thereafter, filed the operative First Amended Complaint [Doc. 153] on May 6, 2020.  In his First Amended Complaint, the plaintiff alleges the following five claims directed to the City of New Haven:

- Count Six alleges a § 1983 Municipal Liability based upon a policy and custom of coercive police interrogation and fabricated witness statements;

- Count Nine alleges claims for indemnification pursuant to Conn. Gen. Stat. § 7-465 as to the claims alleged against the individual defendants in Counts One through Eight[1];

- Count Ten alleges a direct action against the City pursuant to Conn. Gen. Stat. § 52-557n;

- Count Twelve alleges a claim for indemnification pursuant to Conn. Gen. Stat. § 7-465 as to the claim alleged against the individual defendants in Count Eleven; and

- Count Thirteen alleges a direct action against the City pursuant to Conn. Gen. Stat. § 52-557n.

As to the remaining claims, Counts One through Four, Seven and Eight are directed to the co-defendants, Leroy Dease, Petisia Adger and Daryle Breland, allege claims for withholding of material exculpatory evidence, fabrication of evidence, unreasonably prolonged detention, failure to intervene, negligence, and violation of the Connecticut Constitution, respectively.  Count Six is directed to the co-defendant James Stephenson, and alleges a claim for withholding of material exculpatory evidence.

In his First Amended Complaint, Horn alleges that Detectives Dease, Adger and Breland hid 137 pages of exculpatory phone records in Adger's basement for nearly two decades, and that the detectives coerced and threatened witnesses, fabricated evidence, destroyed evidence and failed to investigate evidence that would have exonerated him.  Even accepting, solely for purposes of summary judgment, Horn's version of events as to Detectives Dease, Adger and Breland's conduct, which is expressly denied by the co-defendants, the City of New Haven is entitled to judgment as

---

[1]     Count Five is directed to the co-defendant James Stephenson, a firearms examiner who was employed by the Connecticut State Police Forensic Science Laboratory.  See First Amended Complaint, ¶ 12.  Stephenson is not an employee of the City of New Haven and, as such, the City of New Haven cannot be held liable for his alleged misconduct as a matter of law. Thus, to the extent that Count Nine seeks indemnification by the City as to Stephenson's conduct in Count Five as alleged, said claim is legally deficient.

a matter of law as to each claim against it for the reasons more fully set forth herein as: (1) the plaintiff cannot demonstrate a basis for <u>Monell</u> liability pursuant to an official policy of unconstitutional conduct, a pervasive pattern or practice of unconstitutional conduct, nor an affirmative link to the plaintiff's claimed injury; (2) the plaintiff's state law claims are substantively and procedurally barred by the applicable statute of limitations; (3) the plaintiff's state law claims are barred by the Doctrine of Governmental Immunity; and (4) the City cannot be held liable for the criminal, intentional, willful, wanton, reckless or malicious conduct of its employees.

The City hereby incorporates the facts set forth in its Rule 56(a)1 Statement as if more fully set forth herein.

The City now moves for summary judgment as to the counts against it in their entirety.

## II.   <u>STANDARD OF REVIEW ON SUMMARY JUDGMENT</u>

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). "The substantive law governing the case will identify those facts that are material, and 'only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Bouboulis v. Transp. Workers Union of Am.</u>, 442 F.3d 55, 59 (2d Cir. 2006), <u>quoting</u> <u>Anderson</u> 477 U.S. at 248.

The moving party bears the burden of demonstrating the absence of a genuine issue as to any material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323-25 (1986).  In determining whether a material issue of fact exists, the Court must resolve all ambiguities and draw all inferences against the moving party.  See Anderson, 477 U.S. at 255.  The party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  Anderson, 477 U.S. at 256.  Thus, once the moving party has satisfied its burden of identifying evidence which demonstrates the absence of a genuine issue of material fact, the non-moving party is required to go beyond the pleadings by way of affidavits, depositions, and answers to interrogatories in order to demonstrate specific material facts which give rise to a genuine issue.  See Celotex, 477 U.S. at 324.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matasushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

The moving party seeking summary judgment satisfies their burden of demonstrating that there exists no genuine issue of material fact in dispute where they point to the absence of evidence to support an essential element of the non-moving party's claim.  See Celotex Corp. v. Catrett, 477 U.S. at 322-23.  "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial.  It need only point to an absence of proof on the plaintiff's part, and, at that point, plaintiff must designate specific facts showing that there is a genuine issue for trial."  Parker v. Sony Pictures Entertainment, Inc., 260 F.3d 100, 111 (2d Cir. 2001) (internal quotation marks omitted), citing Celotex, 477 U.S. at 324.

III.   **THE PLAINTIFF'S MONELL CLAIM AGAINST THE CITY OF NEW HAVEN FAILS AS A MATTER OF LAW**

The United States Supreme Court first recognized a direct claim against a municipal entity itself as a "person" within the meaning of § 1983 in Monell v. Dept. of Social Services, 436 U.S. 658, 690, 98 S. Ct. 2427, 56 L. Ed. 2d 611 (1978).  In so recognizing, the Court held that a municipality may be held liable under § 1983 where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers."  Monell, 436 U.S. at 690.  "[T]he touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution."  Id.; see also, Oklahoma v. Tuttle, 471 U.S. 808, 810, 105 S. Ct. 2018, 56 L. Ed. 2d 791 (1985).  A municipality may not, therefore, be held liable under § 1983 on a *respondeat superior* theory solely for injuries inflicted by its employees or agents.  See Monell, 436 U.S. 691, 694.  Rather, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  Id. at 694.

Consistent with the foregoing, in order to state a cognizable claim against a municipality pursuant to § 1983, a plaintiff must:  (1) prove the existence of a municipal policy or custom, the exercise of which caused a deprivation of the plaintiff's constitutional rights; and (2) establish an affirmative link between the policy and the alleged constitutional violation.  See Oklahoma v. Tuttle, 471 U.S. at 817, 823.  Stated differently, "a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury."  Roe v. City of Waterbury,

542 F.3d 31, 37 (2d Cir. 2008); <u>Simms v. City of New York</u>, 480 Fed. App'x 627, 629 (2d Cir. 2012); <u>Bd. of Comm'rs of Bryan Cty. v. Brown</u>, 520 U.S. 397, 404, 117 S. Ct. 1382, 1388, 137 L. Ed. 2d 626 (1997) ("it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality.  The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged.").

A plaintiff may satisfy the policy, custom or practice requirement in one of four ways, namely by demonstrating:

> (1) a formal policy endorsed by the municipality, … (2) actions directed by the government's "authorized decisionmakers" or "those who establish governmental policy," … (3) a persistent and widespread practice that amounts to a custom of which policymakers must have been aware, … or (4) a constitutional violation resulting from [policymakers'] failure to train municipal employees . . . .

<u>Deferio v. City of Syracuse</u>, 770 F. App'x 587, 589–90 (2d Cir. 2019) (internal citations omitted).  "Once a plaintiff has demonstrated the existence of a municipal policy, a plaintiff must then establish a causal connection, or an "affirmative link," between the policy and the deprivation of his constitutional rights."  <u>Id.</u>

In the instant matter, Horn invokes the first and third components of <u>Monell</u> liability, namely the existence of a policy or custom of unconstitutional conduct.  More specifically, in the Sixth Count of his Amended Complaint, Horn alleges that the City of New Haven "had a policy or custom of unconstitutional investigative techniques, including coercion of witnesses, the fabrication of inculpatory evidence, the destruction of evidence, and the suppression of exculpatory evidence."  (<u>See</u> Am. Compl., Count Six, ¶ 282.)  Horn further alleges that the City was aware of, permitted, tolerated, and was deliberately indifferent to said conduct.  (<u>Id.</u> at ¶ 283.)  In addition, Horn alleges that

the NHPD had a pervasive practice of not maintaining notes, of losing or destroying audio recordings of interviews, and of coercive witness interviews.  (Id. at ¶¶ 84-86.)

Preliminarily, while Horn alleges that the NHPD failed to record the entirety of interviews, and specifically "pre-interviews," he points to no precedent mandating that officers were constitutionally required to record the entirety of their interactions with witnesses or suspects.  On the contrary, the undisputed evidence establishes that the practice of recording statements by witnesses and suspects was not a common or generally accepted practice in 1999.  See Joseph Stine Expert Report, **Ex. 42**, at 16; Elliot Spector Expert Report, **Ex. 45**, at 22.  It further establishes that it was a commonly accepted practice to conduct an informal conversation with a witness or suspect prior to beginning a formal recorded interview.  See Joseph Stine Expert Report, **Ex. 42**, at 16-17; Elliot Spector Expert Report, **Ex. 45**, at 1, 22; Brian Donnelly Dep., **Ex. 49**, at 112:4-8.  In fact, FBI Agent Brain Donnelly confirmed that up to 2006, the FBI itself was not recording witness interviews, either by way of audio tape or videotape, as it was their policy not to do so.  See Brian Donnelly Dep., **Ex. 49**, at 132:17–133:2, 159:15-21.  Likewise, he confirmed that it was not uncommon to start a conversation with an individual to see if they will give a signed statement.  See id., at 112:4-8.  Additionally, both Connecticut and the Second Circuit have recognized that there is no affirmative duty to take notes or to record statements.  See e.g., U.S. v. Lopez, 112 Fed. Appx. 774, 776 (2004) (rejecting the plaintiff's argument that an affirmative duty existed to create notes and preserve statements made in witness interviews, finding that there was affirmative duty on the government to create written or recorded statements); State

v. Lockhart, 298 Conn. 537, 540-60 (2010) (noting that the Connecticut Constitution does not require the electronic recording of confessions or statements).

Notwithstanding the foregoing, as set forth below, Horn cannot, as a matter of law, prove either an unconstitutional policy or pervasive practice on the part of the NHPD for purposes of Monell liability.

## A.    OFFICIAL POLICY

In order for tortious conduct to be the basis for municipal liability under § 1983, it must be undertaken pursuant to a municipality's "official policy."  Pembaur v. City of Cincinnati, 475 U.S. 469, 479–80, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986).    More specifically,

> [t]he "official policy" requirement was intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality actually responsible.  Monell reasoned that recovery from a municipality is limited to acts that are, properly speaking, acts "of the municipality"—that is, acts which the municipality has officially sanctioned or ordered.

Id.  Accordingly, "'official policy' often refers to formal rules or understandings—often but not always committed to writing—that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time." Pembaur, 475 U.S. at 480–81.  Stated differently, "municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."  Pembaur, 475 U.S. at 483–84, citing Tuttle, 471 U.S. at 823 ("'policy' generally implies a course of action consciously chosen from among various alternatives").

In the instant matter, Horn points to no official policy of the City of New Haven which provides for, or otherwise authorizes, unconstitutional investigative techniques, coercion of witnesses, fabrication of evidence, destruction of evidence, or the suppression of evidence.  On the contrary, the New Haven Police Department's policies, procedures and training bulletins do not direct or condone such unconstitutional conduct.

By way of example, General Order 76-3 governs Case Incident Reports and explicitly provides that Case Incident Reports, "when completed, shall accurately reflect the information concerning the episode and shall indicate specifically what actions were taken by each involved police officer." See NHPD General Order 76-3, **Ex. 38**.  In addition, Training Bulletin 4-26, is directed to Report Writing and addresses the content of information to be included in detective reports, including bases for probable cause, and interrogations of suspects and witnesses.  See NHPD Training Bulletin 4-26, **Ex. 52**.

General Order 87-6 governs the Possession of Evidence and Other Property, and provides, in pertinent part, that, "Whenever any member of this Department, who during the course of his duty, or under color of law, takes possession of any evidence or property . . . he shall as expeditiously as possible deliver or cause to be delivered such evidence or property to the Property Room."  See NHPD General Order 87-6, **Ex. 39**.  It further explicitly provides that, "THE RETETION OF EVIDENCE OR PROPERTY BY A MEMBER OF THIS DEPARTMENT IS EXPRESSLY PROHIBITED."  Id., emphasis in original.

Training Bulletin 8-3 governs the Preservation of 911 Tapes and Tapes of Statements, and provides that, "tapes of incoming calls by a defendant, victim (or both), an eye witness or a non-eye witness who may later testify at a trial should be preserved. Also tapes of statements of such persons should be preserved as evidence even if such are transcribed." See NHPD Training Bulletin 8-3, **Ex. 41**. Training Bulletin 8-3 further provides that, "All field notes of police officers should be preserved for at least three years since they may be discoverable as a statement of a witness or in the alternative, as a statement of the officer if he or she is called to testify." Id.

In addition, the NHPD had in place General Orders governing the questioning of arrestees, including General Order 88-4 governing an arrestee's right to counsel, a Homicides Procedures Checklist regarding the investigation, processing of evidence, and interrogation of homicide suspects, among other aspects of such an investigation. See NHPD General Order 88-4, **Ex. 53**; NHPD Homicides Procedures, **Ex. 54**.

Finally, the NHPD's Code of Conduct explicitly provided that PD employees are required to observe and follow the Code of Conduct, the failure of which could result in punishment by way of reprimand, suspension, reduction in rank or by dismissal upon conviction. See NHPD Code of Conduct, **Ex. 40**. The Code of Conduct further provides that:

> 15. No employee of the Department shall make false official reports knowingly or willingly enter or cause to be entered into any department books, records or reports any inaccurate, false or improper information of material matter.
> …
> 23. Employees of the Department shall not fabricate, withhold or destroy any evidence of any kind.

Id.

As the foregoing demonstrates, the New Haven Police Department's policies, procedures and training bulletins do not direct or condone unconstitutional investigative techniques, coercion of witnesses, fabrication of evidence, destruction of evidence, or the suppression of evidence.  In fact, the NHPD policies, practices, procedures and training in place at the time of the Caprice Hardy investigation were in accordance with generally accepted police policies, procedures, training and practices in 1999.  See Joseph Stine Expert Report, **Ex. 42**, at 21–23.  Thus, Horn wholly fails to demonstrate that the City of New Haven made a deliberate choice to follow a course of action to engage in the unconstitutional conduct alleged, or that any policy by the City caused his conviction and claimed damages.  The City of New Haven is, therefore, entitled to judgment as a matter of law.

**B.   PERVASIVE PRACTICE**

Pursuant to Monell, an "official municipal policy includes . . . practices so persistent and widespread as to practically have the force of law." Lucente v. Cty. of Suffolk, 980 F.3d 284, 297 (2d Cir. 2020), quoting Connick v. Thompson, 563 U.S. 51, 61, 131 S. Ct. 1350, 179 L. Ed. 2d 417 (2011).  In order for liability to attach, there must be acquiescence by the municipal entity to "a longstanding practice or custom which constitutes the 'standard operating procedure' of the [municipality]."  See Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737, 109 S. Ct. 2702, 105 L. Ed. 2d 598 (1989).  More specifically,

> In order to establish Monell liability based upon a 'persistent and widespread' practice by a subordinate municipal employee (or employees) other than a policymaker, the employee's unconstitutional conduct must be so manifest as to imply the constructive acquiescence of senior policy-making officials. . . .  In other words, there must be sufficient instances of tolerant awareness by supervisors of abusive conduct to support an inference that they had a policy, custom or usage of acquiescence in such

abuse. . . .  It is only at that point that, although not expressly authorized, the unconstitutional conduct is so persistent and widespread that it can constitute a custom or usage of which a supervising policymaker must have been aware.

Lucente, 980 F.3d at 297–98 (internal quotations omitted; internal citations omitted); see also, Valdiviezo v. Boyer, 752 F. App'x 29, 31 (2d Cir. 2018) (holding that, "a plaintiff must show either that the challenged practice "was so persistent or widespread as to constitute a custom or usage with the force of law," or that the "practice of subordinate employees was so manifest as to imply the constructive acquiescence of senior policy-making officials.").

The Second Circuit's decision in Jones v. Town of East Haven, 691 F.3d 72 (2d Cir. 2012) is instructive.  In Jones the plaintiff attempted to demonstrate Monell liability through specific incidences of isolated conduct by non-decision making police officers, and attribute those to a custom of the municipality.  The trial court entered judgment in favor of the Town of East Haven and the Court of Appeals affirmed.  The Second Circuit held that, while the evidence at issue therein demonstrated instances of reprehensible and unconstitutional conduct by individual officers, "such a showing is not a sufficient basis for imposing liability on the municipality."  Jones, 691 F.3d at 82.  Rather, in order to justify the imposition of liability upon the municipality, a plaintiff must show that the loss alleged was attributable to a custom, policy or usage of the municipality or its supervisory officials by way of evidence establishing

a pattern of abusive conduct (or expressions of inclination toward such abusive conduct) among officers, so widespread as to support an inference that it must have been known and tolerated by superiors.  [Or] sufficient instances of tolerant awareness by supervisors of abusive conduct to support an inference that they had a policy, custom or usage of acquiescence in such abuse.  [Or] evidence that supervisors communicated to officers an attitude of indifference to abuse so as to give the officers a sense of liberty to abuse rights.

15

Id.  In concluding that the plaintiff failed to establish Monell liability, the Second Circuit held that, although the incidents relied upon would have justified imposition of liability under §1983 against the individual officers, they "fail[ed] individually and in the aggregate to satisfy plaintiff's burden of showing municipal liability."  Id., 82–83.  In so holding, the Second Circuit reasoned that the plaintiff's evidence of at most three instances over a period of several years in which a small number of officers abused the rights of black citizens, and one instance in which an officer indicated a predisposition to abuse such rights,

> fell far short of showing a policy, custom, or usage of officers to abuse the rights of [citizens], and far short of showing abusive conduct among officers so persistent that it must have been known to supervisory authorities.  It showed no instances in which supervisors were aware of abuse, or of a high probability of abuse, but failed to take corrective or preventive action.  And it showed no instance in which supervisory personnel exhibited indifference to [constitutional rights].

Id., at 85; see also, Hu v. City of New York, 927 F.3d 81, 106 (2d Cir. 2019) (finding that four instances of alleged unconstitutional conduct failed to allege sufficient facts suggesting a larger pattern of misconduct that qualifies as widespread, persistent or otherwise manifest behavior).

In sum, consistent with the foregoing precedent, in order to establish a persistent or widespread practice that would rise to the level of a custom for purposes of Monell liability, a plaintiff must "demonstrate that officers habitually or customarily" engaged in the alleged unconstitutional conduct.  See Deferio v. City of Syracuse, 770 F. App'x 587, 591 (2d Cir. 2019).

As is more fully set forth below, an examination of the cases cited by Horn in his Amended Complaint as purported evidence of a pervasive practice by the NHPD of failing to maintain notes, destroying audio recordings, and coercive interrogation

practices fail individually and in the aggregate to satisfy Horn's burden of showing municipal liability.  Consequently, Horn cannot establish an affirmative link between the practices and custom of the City, his conviction and claimed damages.

### 1.    Alleged Destruction of Notes and Audio Recordings

In his Amended Complaint, Horn alleges that the NHPD "had a policy and custom of not maintaining any notes from the 'pre-interviews,' and or 'losing' or destroying the audio recordings of the formal interviews if they were unhelpful."  See Am. Compl., Count Six, ¶ 84.  In support of this allegation, Horn goes on to allege that, "Connecticut courts have exhaustively documented this practice," while footnoting the case law relied upon for this proposition.  Id. at ¶ 85.  A fair reading of the rulings relied upon, however, demonstrates that not one of them address, let alone refer to, a policy or custom with regard to "pre-interview" notes, or losing or destroying audio recordings if they were unhelpful.  On the contrary, in each instance cited, the courts specifically noted that the tape erasures referenced were not done in bad faith nor with intent to deprive the criminal defendants of the notes or recordings at issue.  Indeed, as set forth below upon closer examination of the state court rulings relied upon, each ruling concluded that the destructions/erasures were not nefarious and/or were otherwise made upon a reasonable, albeit incorrect, interpretation of the courts' prior rulings.

The first case in the chronology cited by the plaintiff, namely State v. Meyers, 193 Conn. 457, 479 A.2d 199 (1984), addressed the erasure of a 911 call recording of the victim's March 23, 1981 anonymous call to police shortly after the crime.  In its ruling, the Court noted that the NHPD had a practice of recording all in-coming 911 calls, retaining the cassette tapes for 30-60 days, and then erasing and reusing them irrespective or whether a tape contained 911 calls related to pending prosecution.  Id. at

466-67.  Although the Court concluded that the destruction of the 911 call recording was unexcused, it noted that the "destruction was motivated by insensitivity to the policies underlying the [Connecticut] Practice Book disclosure requirements, rather than by ill will toward [the] defendant."  Id. at 468.

The next case, State v. Williamson, 212 Conn. 6, 562 A.2d 470 (1989), also involved a 911 recording, as well as a recorded statement.  In Williamson, the detective made a taped recording of a statement by the victim of a robbery, after which he gave the tape recorded statement to the police department stenographer.  Id. at 10.  The stenographer prepared a transcription of the recording, after which the stenographer erased the tape.  Id.  The detective testified that, although he was aware that the NHPD policy had recently changed to require the preservation of such tape recordings, he neglected to ask the stenographer to save the tape.  Id.  The victim ultimately reviewed the transcription at the time of the criminal trial and testified that it was accurate.  Id. at 11.  The trial court denied the defendant's motion to strike the victim's testimony due to the destruction of the tape, "finding that the police had no intention to thwart justice or to violate any rights of the defendant in destroying the tapes."  Id.  On appeal, the Appellate Court reversed, finding that the NHPD had exhibited bad faith in intentionally destroying the tape.  The Connecticut Supreme Court disagreed, finding that the conduct in Williamson did not exhibit bad faith.[2]  Id at 16.  In so finding, the Court noted that it was undisputed that the tape had been deliberately destroyed, there was

---

[2]      The Connecticut Supreme Court further noted that, with regard to certain prior claims of tape destruction, the NHPD could have reasonably interpreted the Court's prior decisions to permit erasure of a tape where a transcript had been made of the recording.  See Williamson, 212 Conn. at 14.

testimony that the NHPD had adopted a policy of preserving such tapes just prior to the destruction of the tape and the stenographer either had not been apprised of the new policy or chose to disregard it.  Id. at 15.  However, the Court reasoned that the destruction of the tape could not support a finding of bad faith given that the trial court expressly found that the NHPD had not acted with intent to thwart the defendant's defense, the Appellate Court did not impugn that finding, and the defendant himself did not claim that the police had destroyed the tape with the intent to deprive him of information.  Id. at 16.

Notably, following the Williamson ruling, the NHPD took further responsive action and implemented Training Bulletin 8-3 to address the preservation of 911 tapes and tapes of statements, regardless of whether they may be subsequently transcribed, as well as the preservation of officer field notes.  See NHPD Training Bulletin 8-3, **Ex. 41**.

The next case cited by the plaintiff, State v. Woodard, 27 Conn. App. 786, 609 A.2d 1027 (1992), also involved a 911 call recording.  In Woodard, the crime at issue occurred on the evening of September 25, 1989, resulting in a request by the state that the NHPD preserve any tape from September 25th.  Id. at 792.  The NHPD complied with the request and preserved the tape.  Id.  A later examination of the tape revealed that it contained no pertinent information regarding the case.  Id.  At an evidentiary hearing, the witness who made the 911 call testified that she had actually made the 911 call at issue on September 26, 1989.  Id.  Neither the state nor defendant were aware that the pertinent phone call had been made on September 26th rather than September 25th.  Id.  Consequently, the state did not seek to preserve the September 26th tape, and it was ultimately erased and reused by the NHPD.  In affirming the decision of the trial

court that the destruction of the tape had not been done in bad faith, the Court noted that the facts established that whatever statement of substance had been made by the witness had been made to the officer arriving on scene rather than through the 911 call, and that "the intentional destruction of the tape did not involve bad faith and was more in the form of a mistake or negligence." Id. at 792-93.

The next case relied upon, State v. Jones, 29 Conn. App. 304, 615 A.2d 149 (1992), involved the erasure of a tape containing dictated notes by a police officer. More specifically, an officer dictated his police report using his notes for reference with regard to an undercover sting operation earlier in the day. Id. at 307-08. After dictating his report, the officer gave the tape to his secretary to be transcribed. Id. at 308. The officer made two corrections to the transcription, after which he signed and dated the report. Id. Following the arrest of the defendant, the officer threw away his notes because the sting operation had concluded, and he erased his dictation tape so that it could be reused. Id. In evaluating the erasure, the Court noted that the trial court had determined "that the New Haven police destroyed the tape intentionally, although not maliciously or with the intent to deprive the defendant of the evidence contained therein…." Id. at 310.

The final case relied upon is that of State v. Reddick, 36 Conn. App. 774, 654 A.2d 761 (1995). However, Reddick, did not involve conduct by any New Haven police officer, but involved the presumed destruction of a taped statement and the destruction of officer field notes by Hamden police detective Andy Polzella. Id. at 776, 781, 783. Thus, the Reddick case is inapplicable to the claims against the City of New Haven.

Thus, in not one of the cases relied upon by the plaintiff was there any finding that the NHPD acted in bad faith or otherwise with the intent to deprive a criminal defendant of evidence.  What is further notable about the foregoing decisions beyond the fact that not one of them involved any finding of bad faith or otherwise nefarious conduct by the NHPD, is the fact that they each involved the erasure and/or destruction of audio recordings prior to the criminal trials at issue.  In this matter, however, there is no claim that the missing recordings of the witness statements were not available prior to or at the time of the criminal trial in this matter.  On the contrary, State's Attorney Nicholson, the prosecutor in this case, requested that his investigator, Mel Cartocetti, retrieve and make copies of any audio tapes of witness statements for this case.  See Gary Nicholson Dep., **Ex. 21**, at 289:22-25.  On February 16, 2000, Cartocetti signed out several audio/cassette tapes of witness statements from the NHPD Property/Evidence Room, only two of which were signed back in as having been returned on April 24, 2000.  See NHPD Evidence Sign-out Log, **Ex. 24**.  Additionally, at the time of the criminal trial in 2000, defense counsel admittedly had possession of audiotaped recordings of witness statements, and transcriptions of the same.  See Michael Moscowitz Dep., **Ex. 25**, at 110:10-15.  It was not until the habeas proceedings some thirteen years later, namely in March of 2013, that the State's Attorney's office had difficulty obtaining various items.  See Eugene Calistro Dep. **Ex. 33**, at 11:19-25, 17:1-7, 21:7-21, 22:1-13.  At that time, the original audio tapes of witness statements could not be located other than two audio tapes of statements by Marcus Pearson.  Id., at 24:10-20, 64:4-7.

Notwithstanding the foregoing, Horn's reliance upon a handful of cases over a roughly 18 year time period wherein not one Court found bad faith in the erasure or loss of audio recordings by the NHPD is insufficient, as a matter of law, to demonstrate that the City of New Haven had a policy, custom or pervasive practice of unconstitutional misconduct in failing to maintain notes and losing/destroying the audio recordings of witness interviews.  Moreover, only two of the cases cited post-date the responsive measures implemented by the NHPD in 1989 after the Williamson ruling, and no instances of erasure/destruction of audio recordings have been proffered post-dating 1992 or during the seven years thereafter leading up to the Caprice Hardy homicide investigation.  This factor is telling considering the thousands of audio recordings made by the NHPD following Williamson, and demonstrates that the City's policy changes and training/training bulletin were largely successful.  The City is, therefore, entitled to judgment as a matter of law as to Horn's Monell claim premised upon a purported pervasive practice or custom of failing to maintain notes and loss of audio recordings.

**2.  Alleged Coercive Witness Interviews and Unconstitutional Investigative Techniques**

Horn next relies upon nine instances of claimed misconduct involving alleged coercive techniques and/or unconstitutional investigative techniques which pre-date the 1999 Caprice Hardy homicide investigation and which occurred over a period of roughly 17 years in a police department with 35-45 detectives handling around 2000 major felonies each year.  See Melvin Wearing Dep., **Ex. 18**, at 268:1-19; Connecticut Uniform Crime Reports for City of New Haven, **Ex. 19**.  This falls well short of the criteria for establishing the existence of a pervasive practice of unconstitutional conduct.  In this regard, the Second Circuit has counseled for an analysis of relevant statistical data

when determining whether municipal liability under § 1983 can be based on a theory of

pervasive practice by the municipality.  See Sorlucco v. New York City Police Dept., 971

F.2d 864, 872 (2d Cir. 1992) (finding that the District Court erred in discounting the

import of statistical evidence in determining whether a widespread pattern or practice of

unconstitutional conduct existed).  Pursuant to Sorlucco, such statistical evidence is

highly relevant in determining whether a plaintiff has established the existence of a

widespread and persistent practice of unconstitutional conduct as alleged.  Nine

instances of alleged misconduct, spread out over a 17 year time period, in a police

department of 35-45 detectives handling over 20,000 cases during that same time

frame cannot, as a matter of law, constitute a pervasive practice that is so widespread

that it has become the policy of the City of New Haven to violate its citizens' civil rights.

See Jones, 691 F.3d at 82-85 (concluding that three instances over a period of several

years in which a small number of officers abused the rights of citizens, and one instance

in which an officer indicated a predisposition to abuse such rights failed to demonstrate

the existence of a policy, custom, or usage of misconduct among officers); Hu, 927 F.3d

at 106 (finding that four instances of alleged unconstitutional conduct failed to allege

sufficient facts suggesting a larger pattern of misconduct that qualifies as widespread,

persistent or otherwise manifest behavior).

Moreover, "citation to various lawsuits is not probative of the existence of an

underlying policy . . . ."  Jean-Laurent v. Wilkerson, 461 F. App'x 18, 22–23 (2d Cir.

2012).  Additionally, "[a]s the Supreme Court has made clear, contemporaneous or

subsequent conduct cannot establish a pattern of violations that would provide notice to

the City and an opportunity to conform to constitutional dictates."  Simms v. City of New

York, 480 Fed. App'x 627, 631 (2d Cir. 2012), quoting Connick v. Thompson, 563 U.S. 51, 62 n. 7, 131 S. Ct. 1350, 179 L. Ed. 2d 417 (2011).  The Second Circuit recently reaffirmed this principle in McGreir v. City of New York, ___ Fed. Appx. ___, 2021 WL 716993 (2d Cir. 2021).  In McGreir, the plaintiff sought to establish a pattern and practice of unconstitutional use of force by way of testimony as to his personal experiences at a deposition postdating his assault, which was the subject of his lawsuit, as well as by way of other on-going litigation involving similar allegations.  Id. at *4.  In rejecting the plaintiff's proffered evidence the Court held that the incidents and on-going other litigation post-dated his assault and "thus cannot establish a pattern that the City was aware of [prior to the plaintiff's assault]."  Id.  The Court went on to hold that the plaintiff's proffered evidence lacked sufficient evidence that would permit a reasonable jury to conclude the City on notice of a widespread and persistent practice of unconstitutional use of force in the time period leading up to the plaintiff's assault.  Id. The Court, therefore, affirmed the District Court's grant of summary judgment as to the Monell claim.  Id.  Claims of contemporaneous or subsequent misconduct are, thus, insufficient to establish Monell liability.

Horn's claim of a widespread pattern and practice of alleged coercive practices in the instant matter further relies upon five instances of alleged misconduct which postdate the 1999 Caprice Hardy homicide investigation.  Consistent with the foregoing precedent recently reaffirmed by the Second Circuit, the five instances relied upon, which postdate Horn's arrest by some two to eight years, constitute insufficient evidence that would permit a reasonable jury to conclude that the City was on notice of a widespread and persistent practice of coercive practices in the time period leading up to

the investigation and arrest of Horn in 1999.  See Simms, 480 Fed. App'x at 631;

Connick, 563 U.S. at 62 n. 7; McGreir, 2021 WL 716993 at *4.

Nevertheless, the incidents identified by Horn, even if demonstrative of

unconstitutional conduct by officers identified therein, cannot possibly have the force of

law under Monell as they would represent merely nine instances over a period of 17

years predating Horn's 1999 arrest, in a department with 35-45 detectives handling over

20,000 major crimes during that same time period.  As a matter of law, these sporadic

events would not establish a pattern or practice within the NHPD that is so pervasive as

to have the effect of formal municipal policy.

Notwithstanding the foregoing, it is notable that none of the instances of alleged

misconduct involved any finding by a judge or jury that the City of New Haven employed

harmful and/or unconstitutional practices or policies in the lawsuits identified, let alone

that the alleged misconduct in fact occurred.  At best, the lawsuits referenced establish

no more than the fact that other individuals have alleged that they experienced similar

violations of their constitutional rights as the plaintiff, but not that those violations

actually occurred.  See Simms, 480 Fed. App'x at 630.  Moreover, there exists no

evidence that any of the individuals who purportedly claimed to have been subjected to

the alleged coercive conduct ever filed or otherwise made any complaint with the City or

NHPD as to such alleged misconduct.  On the contrary, Horn's reliance on these

instances of alleged misconduct as support for his claim of notice to the City of these

alleged practices derives solely from subsequent witness recantations.  However, as the

Second Circuit itself has repeatedly noted, "traditionally the recantation of testimony

given on trial is 'looked upon with the utmost suspicion.'"  Sanders v. Sullivan, 863 F.2d

218, 225 (2d Cir. 1988), quoting U. S. ex rel. Sostre v. Festa, 513 F.2d 1313, 1318 (2d

Cir. 1975); Ortega v. Duncan, 333 F.3d 102, 107 (2d Cir. 2003) (noting that a witness'

recantation must be looked upon with the great suspicion).  Indeed, the Supreme Court,

likewise, has recognized the specious nature of recanted testimony, noting that,

"[r]ecantation testimony is properly viewed with great suspicion.  It upsets society's

interest in the finality of convictions, is very often unreliable and given for suspect

motives . . . ."  Dobbert v. Wainwright, 468 U.S. 1231, 1233–34, 105 S. Ct. 34, 36, 82 L.

Ed. 2d 925 (1984).  Thus, there mere fact that a few witnesses subsequently recanted

their testimony over a 16 year time period fails to meet the threshold of widespread

unconstitutional conduct which was so manifest so as to imply the constructive

acquiescence of senior policy-making officials sufficient to impart liability upon the City

of New Haven pursuant to Monell.

Nevertheless, a closer examination of the incidents relied upon further dispels

their probative value in establishing sufficient instances of tolerant awareness by

supervisors of coercive conduct so as to support an inference that the City had a policy,

custom or usage of acquiescence to such misconduct.

### Alleged Misconduct Pre-dating the 1999 Caprice Hardy Investigation

1)   Anthony Golino

Horn's first case relied upon relates to the 1984 arrest and subsequent

prosecution of Anthony Golino after an eleven year investigation for a murder occurring

in 1973.  See Golino v. New Haven, 950 F.2d 864, 866 (2d Cir. 1991).  Specifically,

Horn relies upon the portion of the decision which notes that the detective who prepared

the arrest warrant, Detective Dilullo, testified at his deposition that, "it was his general

26

practice to omit exculpatory information from affidavits submitted in support of applications for warrants." Id. at 867.  Notably, however, nothing in the record establishes that the testimony of Detective Dilullo evidenced anything other than the actions of a rogue officer.  Indeed, the evidence in Golino was quite the contrary.  The underlying decision of the District Court made clear that Detective Dilullo's conduct was deemed not have been the result of any policy or custom of the City of New Haven. More specifically, the District Court granted summary judgment in favor of the City of New Haven and Chief Farrell on the Monell claims pending therein, finding that there was no evidence that would give rise to any inference of a policy or custom of constitutional deprivations, that would otherwise establish a policy or custom of unconstitutional conduct, or that established that officers were not adequately trained. See Golino v. New Haven, 761 F.Supp. 962, 973 (D. Conn. 1991).

Accordingly, Golino establishes no more that the fact that Dilullo acted based on his own personal practice, and that the City of New Haven did not have any policy or custom that approved or otherwise condoned Dilullo's conduct.

2)    Leroy Harris

The next case relied upon by Horn is that involving the September 18, 1984 arrest, subsequent prosecution and conviction of Leroy Harris on charges of robbery and sexual assault.  See State v. Harris, 22 Conn. App. 329, 330, 577 A.2d 1077 (1990).  In Harris, a co-perpetrator, Jerome Downing, identified Harris as one of three participants in the crime.  Id.  Specifically, on August 27, 1985, following his arrest, Downing gave a tape-recorded and transcribed statement to the police where he claimed that Harris was involved in the crime.  Id. at 331.  The police, thereafter,

obtained an arrest warrant and subsequently arrested Harris.  Id.  At the time of Harris'

criminal trial, Downing testified that he had not read his statement before he signed it,

and that he "had given it in order to obtain a better disposition of the outstanding

charges against him."  Id. at 332.  Downing also testified that "the police had suggested

to him that Harris was involved in the crimes and that he agreed in order to 'beat the

system'."  Id.  Following Downing's testimony, the state called Detective John Datillo,

who testified that Downing was not coerced into making his statement.  Id.  Following

the testimonies of Downing and Datillo, the trial court permitted the introduction of

Downing's written and audio-recorded statement into evidence.  Id.  Harris was

ultimately convicted by the jury.  In Harris' direct appeal challenging his conviction, he

claimed that the trial court had erred in allowing Downing's written and audio-recorded

statement into evidence.  Id. at 331.  The Connecticut Appellate Court disagreed and

affirmed the decision of the trial court, noting that, while Downing had testified that he

was coerced into making his statement implicating Harris, Detective Datillo testified that

the police did not coerce Downing into making that statement, and the jury was able to

observe and examine Downing's demeanor at trial.  Id. at 334.

Following his conviction, Harris filed several habeas petitions, all of which were

denied.  One of Harris' habeas petitions, filed in 2003, alleged that his conviction was

based upon police misconduct.  See Harris v. Warden, No. CV000439473, 2003 WL

22133419, *1 (Conn. Super. Ct. Aug. 25, 2003).  Harris' habeas petition was dismissed

based upon his failure to prove his claim of officer misconduct.  Id.  On November 21,

2017, Harris entered a guilty plea following a plea agreement on reduced charges.  See

Connecticut Judicial Branch Conviction Detail re Leroy Harris, **Ex. 55**.

Based upon the foregoing, <u>Harris</u> establishes no more than the fact that a co-perpetrator recanted his identification of Harris as being involved in the crime for his own personal gain, namely to secure a better disposition for himself and to "beat the system," while claiming that his statement was coerced, a claim expressly refuted by testimony of the detective involved.  Moreover, as the Appellate Court noted, the jury had the opportunity to observe and examine Downing's testimony and demeanor at trial, after which they convicted Harris of the charges.  Thus, nothing in Downing's recantation sets forth any admissible evidence establishing that Downing was coerced as he later claimed, whether the City was aware of and/or acquiesced to any such unconstitutional conduct, let alone the existence of any policy, practice or custom by the City of New Haven that approved or otherwise condoned coercive conduct by its officers.  Indeed, the jury rejected Downing's recantation at Harris' criminal trial, and the subsequent 2003 habeas ruling found that there existed no evidence proving any misconduct by the NHPD.

　　　　3)　　Maceo Streater

The next case relied upon is that of Maceo Streater.  Streater was arrested and charged for the 1990 murder of Terrance Gamble.  Streater's first jury trial ended in a mistrial on August 13, 1991.  <u>See</u> <u>Streater v. Comm'r of Correction</u>, No. CV 960389147S, 1998 WL 918141, *1 (Conn. Super. Ct. Dec. 17, 1998).  Streater was retried and ultimately convicted of murder on February 9, 1993.  <u>Id.</u>  In the direct appeal of his conviction, the Appellate Court noted that the jury could have found the following facts with regard to witness Carol Cheek:  On May 8, 1990, the evening of the murder, Detective Joseph Howard was conducting a neighborhood canvass for possible

witnesses when Cheek motioned to him and provided him with information that led him to check outside Streater's home for a faded red compact car.  See State v. Streater, 36 Conn. App. 345, 348, 650 A.2d 632 (1994).  Detectives Anthony DiLullo and John Green were also dispatched to the scene and spoke with Cheek.  Id.  At that time, Cheek told the officers that she heard the gunshots and had seen four young black men, one of whom she identified as Streater, running from the area of the shots and enter a faded red or maroon vehicle.  Id.  Cheek further told officers at the scene that Streater lived across the street from her, that she had known him for about twenty years, and that she had seen him with a maroon vehicle on other occasions.  Id.  Two days later, on May 10, 1990, Cheek provided Detectives DiLullo and Green with a tape-recorded statement while at her apartment.  Id.  Cheek then met with the detectives on May 16th to read and review her transcribed statement, at which time she made corrections, initialed each correction and signed the last page.  Id. at 348-349.  Cheek's transcribed statement was consistent with what she reported to officers as the scene on the evening of the murder.  Id. at 349 n. 4.

During an evidentiary hearing at Streater's first criminal trial, Cheek testified that officers had come to her home, at which time she told them that she had heard the gunshots and saw people running from the area including Streater.  Id. at 361.  She was shown three to four black and white photos of the same size, and she identified Streater, signing the photograph after she did so.  Id. at 361-62.  Later, during her trial testimony, Cheek recanted her transcribed statement, claiming that "the police were chasing her following the incident," that Detective Green had come to her home several

times, that Green had stopped the tape several times during her statement to tell her what to say, and that her statement was not true.  Id. at 349 n. 4.

At Streater's second criminal trial, Cheek gave conflicting testimony.  In particular, Cheek testified that she did not remember being outside of her home on the date of the murder, but on re-direct testified that she remembered trying to get herself and her children out of the way of the gunshots.  Id. at 349.  Cheek also testified that she did not remember whether she had provided a taped statement to police and, after listening to the tape recording, she denied that the voice was hers.  Id.  Cheek also testified that she did not recall signing the transcript of her statement, but conceded that the signature on the statement was hers.  Id.  With regard to her interactions with officers, Cheek testified on cross-examination that two officers were putting pressure on her for information about the shooting.  Id.

Thereafter, at Streater's habeas trial in 1998, Cheek failed to appear to testify regarding her purported repudiation of her testimony against Streater.  See Streater v. Comm'r of Correction, 1998 WL 918141 at *1.

As demonstrated above, Streater wholly fails to establish, let alone give rise to probative evidence sufficient to support any inference as to a policy, practice or custom by the City of New Haven that approved or otherwise condoned coercive conduct by its officers.  In fact, Cheek's recantation presents no more than a classic example as to the specious nature of recanted testimony as counseled by the Second Circuit and Supreme Court.  Indeed, Cheek's recantation and claim of coercion is directly contrary to her unrefuted statements to police at the scene which the Appellate Court found that the jury could have reasonably found.  Her recantation was further inconsistent with her

31

own testimony at the evidentiary hearing during Streater's first trial, and her testimony during the second criminal trial.  It is not surprising, therefore, that at the time of the second trial Cheek claimed to not recall even being in the area of the shooting, giving her taped statement, recognizing her own voice thereon or signing the transcribed statement, and failed to appear at the subsequent habeas trial to testify regarding her repudiation of her trial testimony.  In any event, Cheek's specious recantation provides no admissible evidence establishing that she was coerced as she later claimed, let alone whether the City was aware of and/or acquiesced to any such unconstitutional conduct.

       4)      <u>Scott Lewis & Stefan Morant</u>

The next case identified is the 1996-1997 FBI investigation of a former NHPD detective Vincent Raucci, who conducted a homicide investigation resulting in the arrest of Scott Lewis.  The FBI investigation into Detective Vincent Raucci began sometime after March 1995 and ended sometime in early 1997, and involved solely an investigation into Raucci with regard to the Turner/Fields homicide.  <u>See</u> Brian Donnelly Dep., **Ex. 49**, at 134:4–135:6, 164:5-12.  During the FBI investigation in 1996, three witnesses indicated Raucci coerced them into fabricating statements when Raucci investigated the subject homicide in 1992.  There is no evidence any claim of coercion of these three statements was made by these witnesses prior to the FBI interviews in 1996.   Moreover, Agent Donnelly, the agent investigating the matter for the FBI, did not conduct any independent investigation into whether any of the witnesses had any motivation to give a false statement when recanting their testimony.  <u>Id.</u>, at 137:19–138:7.  Ovil Rodriguez, the key witness in the investigation, gave agent Donnelly a

statement recanting his prior statement under oath to the New Haven Police Department and his trial testimony, but at the end of Agent Donnelly's investigation Rodriguez recanted his recantation. Id., at 139:17–140:5. In fact, by the end of Agent Donnelly's investigation into Vincent Raucci, the FBI elected to stop speaking with Rodriguez because they concluded that they could not believe anything Rodriguez said. Id., at 196:23–198:9, 264:8-13.

When Agent Donnelly completed his investigation and report, he submitted it to U.S. Attorney Len Boyle, who declined to prosecute Raucci. Id., at 135:23–136:9, 170:20–172:2. Nothing in Agent Donnelly's investigation established a sufficient criminal link between Detective Raucci and any criminal activity with Mr. Parese. Id., at 210:14–211:13.

Agent Donnelly never presented his report regarding the Raucci investigation to the NHPD. Id., at 101:9-16. No one else at the FBI ever presented the FBI's investigation into Raucci with the NHPD or in communications with the Chief of Police. Id., at 102:1-15. No one from the FBI contacted then NHPD Chief Pastore during the course of their investigation into Vincent Raucci. Id., at 74: 7-10. Agent Donnelly's report was shared with the U.S. Attorney's Office, who then shared it with the State's Attorney's office, but that is as far as his report went. Id., at 124:6-10.

Notably, Agent Donnelly testified that, during the times that he worked with Detective Raucci from 1985 to 1990, he never saw Detective Raucci doing anything illegal, causing a witness to testify falsely, or securing false testimony in any fashion, including by way of promises favors. Id., at 140:24–142:25. Agent further testified that he had been present during interviews conducted by NHPD officers where he observed

them stop and start the tape and speak to witnesses to determine what information they had prior to beginning the recording, however, he found nothing improper about the detectives doing so during those times.  Id., at 160:13-24.  Finally, Agent Donnelly testified that he never observed any NHPD officer feed a witness information, or stop the tape to coach a witness during any of the interviews he was present for.  Id., at 161:1-16.

Thus, the FBI investigation into Raucci fails to establish any finding that coercive interrogation techniques were in fact utilized.  Indeed, Agent Donnelly was clear that he never looked into verifying the veracity of the claimed coercion, merely summarized what the witnesses were saying and, ultimately could not believe the word of the prime witness given his constantly changing stories.  Agent Donnelly was further clear that the investigation developed insufficient information demonstrating criminal conduct such that the FBI elected not to pursue criminal action against Raucci.  Accordingly, the Lewis/Morant case provides no admissible evidence establishing that the witnesses were coerced as later claimed, let alone whether the City was aware of and/or acquiesced to any such unconstitutional conduct.

5)    Derrick Hamilton

Horn next relies on the summary judgment ruling in Hamilton v. City of New York, No. 15-CV-4574, 2019 WL 1452013 (E.D.N.Y. March 19, 2019).  Hamilton involved the 1991 murder of Nathaniel Cash in Brooklyn, New York.  Id. at *2.  Derrick Hamilton was convicted of the murder on July 17, 1992 based primarily on the testimony of the government's sole eyewitness. Id. at *1.  Hamilton's conviction was vacated in 2015, after which he brought an action against the City of New York and certain of its officers, as well

34

as the City of New Haven and then Lieutenant Billy White alleging violation of various constitutional rights in securing his conviction.  Id.  In denying White's summary judgment motion, the Court concluded that the evidence at the summary judgment stage presented evidence from which a jury could infer that White had threatened Alphonso Dixon from testifying as an alibi witness giving rise to a factual issue precluding summary judgment. Id. at *19.  The Court went on to explicitly note that "the record is devoid of any evidence that White intimidated any other witness from testifying, including Mattie Dixon, Freeman, Turner, Mahan, and Watson," and granted summary judgment as to the claims that White had intimidated any other witnesses.  Id. at *22.

Notably, the Court's ruling made no finding as to whether the alleged intimidation in fact occurred, but only that sufficient evidence was presented at the summary judgment stage to preclude summary judgment.  Indeed, the Court expressly declined to decide the Monell claims against the Cities of New York and New Haven, concluding that, "unless Hamilton can prove that one or more named Defendants violated his constitutional rights, he has no claim against either the City of New York or the City of New Haven."  Id. at *31.

Although Horn attempts to bolster the alleged claim of witness intimidation by White as evidence of constitutional violation by reference to a settlement of the claim, the Stipulation of Settlement expressly notes that the defendants denied liability, including an express denial that they violated Hamilton's rights in any manner and the existence of any unconstitutional policy or practice by the Cities.  See Hamilton Stipulation of Dismissal and Settlement, **Ex. 56**, at 3, 5-6.

Accordingly, the Hamilton case provides no admissible evidence establishing that Dixon was intimidated by White as claimed, let alone whether the City was aware of and/or acquiesced to any such unconstitutional conduct.

6)   Eric Hamm

The next case relied upon by Horn is the decision in Ham v. Greene, 248 Conn. 508, 729 A.2d 740 (1999).  Ham involved a determination of whether the trial court properly refused to set aside the jury verdict against two NHPD detectives for common law malicious prosecution, false arrest and federal civil rights claims.  At issue before the Court was whether certain information left out of an arrest warrant application impacted the probable cause finding.  The Court ultimately concluded that the trial court did not abuse its discretion in concluding that, "although this was a "close case," it could not decide as a matter of law that there existed "no genuine dispute that a magistrate would have issued the warrant on the basis of the 'corrected affidavits….'"  Id. at 526. The decision further contained a footnoted reference to the fact that the prosecution of the plaintiff was nolled after two witnesses recanted their statements implicating the plaintiff.  Id. at 516 n. 4.  However, there was no analysis or finding as to whether any improper interrogation techniques were utilized or whether the statements were coerced in any manner.

Accordingly, the Ham decision provides no admissible evidence establishing that a pattern or practice of unconstitutional conduct led to the violation of Ham's rights therein, let alone that the City was aware of and/or acquiesced to any such unconstitutional conduct.

7)     Daryl Valentine

Horn's next cited case involves the prosecution of Daryl Valentine.  See State v. Valentine, 255 Conn. 61, 762 A.2d 1278 (2000).  In 1994, a jury convicted Valentine of the murders of Andrew Paisley and Hury Poole.  Id. at 63-64.  Valentine's conviction was reversed and remanded for a new trial based upon an evidentiary error.  Id. at 64. In 1998, Valentine was retried and he was once again convicted of the murders.  Id.  At the time of the homicide investigation in 1991, two witnesses, Regina Coleman and Kristina Higgins, provided tape-recorded statements to the police wherein they each identified Valentine as the shooter.  Id. at 65.  At the time of Valentine's first criminal trial in 1994, Higgins and Coleman both recanted their statements, claiming that Detective Joseph Green had coerced and pressured them into making the statements.  Id. at 65-66.  Thereafter, at Valentine's second trial in 1998, Higgins maintained that her statement was coerced, while Coleman testified that she did not recall saying that her statement was untrue or whether the detective had told her what to say or pressured her in any way.  Id. at 66.

The Valentine ruling contains no analysis or finding as to whether any improper interrogation techniques were utilized or whether the statements were coerced in any manner, or whether Valentine's constitutional rights were violated in any manner.  On the contrary, Valentine's conviction was upheld.  Accordingly, the decision does not provide any admissible evidence establishing that a pattern or practice of unconstitutional conduct led to the violation of Ham's rights therein, let alone that the City was aware of and/or acquiesced to any such unconstitutional conduct.

8)    <u>George Gould and Ronald Taylor</u>

Horn's last case relied upon which pre-dates the Hardy homicide investigation involves the recantation by witness Doreen Stiles.  More specifically, on February 1, 1995, George Gould, and Ronald Taylor were convicted by a jury of felony murder, robbery first degree, attempted robbery first degree, and conspiracy to commit robbery first degree.  <u>See</u> <u>Gould v. Warden</u>, 2012 WL 4901023, *1 (Conn. Super. Ct. Sept. 18, 2012).  At the criminal trial, the State's primary witness, Doreen Stiles, identified the defendants as having been involved in the murder.  <u>Id.</u>  Gould filed a habeas petition in 2004 in part based upon the recantation by Doreen Stiles wherein Stiles claimed that her statement had been fabricated and had been coerced.  <u>Id.</u>  The habeas court granted relief finding actual innocence based upon Stiles' recantation.  <u>Id.</u>  The Connecticut Supreme Court reversed, finding that Stiles' recantation failed to establish actual innocence.  <u>Id.</u>  On remand, the habeas court heard testimony from the investigating detectives Detectives Leroy Dease, Perry Gethers, and Daniel Gleason. regarding Stiles' recantation.  <u>Id.</u> at *14.  All three officers denied fabricating Stiles' statement and coercing her into giving false statements.  <u>Id.</u>  The habeas court ultimately held that it found their testimony credible.  <u>Id.</u>

With regard to the credibility of Stiles' recantation, the Court noted as follows:

Since that trial, Doreen Stiles has uttered more commentary on her inculpatory testimony at the petitioner's criminal trial.  On July 6, 2011, Stiles recanted the recantation. She told Detective Sergeant Tony Reyes, in a recorded statement, that [Gerry] O'Donnell [the public defender's investigator] managed to locate her while she was recovering in a nursing home from extensive treatment for her leg. O'Donnell visited her on several occasions and repeatedly accused her of lying about having seen the petitioner and Taylor at the crime scene. He admonished her that she would be arrested for giving false testimony and go to jail unless she abnegated her identification of the petitioner and Taylor.

O'Donnell persisted in this approach for over three years. He usually visited Stiles on Thursday and would treat her to pizza and give her gifts. He bought her a stereo and a television set.

He also indicated that, if she recanted, she would get a share of any sums that the petitioner and Taylor received from the state as compensation for wrongful incarceration.

Stiles enjoyed the gifts and attention and felt, in some way, responsible for the lengthy prison sentences imposed. Eventually, she capitulated to O'Donnell's entreaties and gave him a statement that she was never at or near LaCasa Green when the victim was killed. She reiterated this falsehood at the first habeas trial by denying any knowledge of the crime.

However, after the petitioner and Taylor prevailed on their actual innocence claim at the previous habeas trial, O'Donnell ceased contact with Stiles. Stiles resented this perceived slight and decided to tell the truth to Sgt. Reyes; the truth being that she was outside LaCasa Green when the murder happened and did actually hear the shooting and see the petitioner engage in the acts about which she testified at his criminal trial.

Id. at *12-13.  The Court further noted that both Stiles and O'Donnell had invoked their right against self-incrimination and refused to testify at the habeas trial.  Id. at 16. Additionally, "[i]n a statement, Stiles has alleged that, through his private investigator, the petitioner has exerted control over her by means of gifts, attention, and a promise of future monetary reward."  Id. at *17.  The habeas court ultimately found that Stiles' original criminal trial testimony implicating Gould was not perjurious.  Id. at *19.  On appeal, the Appellate Court, "agree[d] with the habeas court's conclusion that Stiles' recantation, and by extension, testimony at the first habeas trial, lacked credibility…." Gould v. Commissioner of Correction, 159 Conn. App. 860, 871, 123 A.3d 1259 (2015).

As found by the habeas court, Stiles' recantation lacked credibility and was, by her own statement, the result of control exerted over her by Gould's investigator. Accordingly, the Gould case provides no admissible evidence establishing that Stiles' statement was fabricated or coerced, let along that pattern or practice of

unconstitutional conduct led to the violation of Gould's rights, let alone that the City was aware of and/or acquiesced to the same.

      9)   <u>Adam Carmon</u>

Lastly, Horn relies upon the currently pending federal habeas petition filed by Adam Carmon in the matter of <u>Carmon v. Mulligan</u>, Case No. 3:18-cv-l 794(JCH). Horn's claims as to Carmon derive soley from allegations contained in Carmon's Second Amended Petition filed therein on July 12, 2019.  Notably, Carmon has filed several state court habeas petitions, all of which have been denied and his conviction has been repeatedly upheld by Connecticut appellate courts.  <u>See</u> <u>e.g.</u>, <u>Carmon v. Commissioner of Correction</u>, 176 Conn. App. 356 (2017); <u>Carmon v. Commissioner of Correction</u>, 114 Conn. App. 484 (2009); 47 Conn. App. 813 (1998).

Moreover, as the Second Circuit has recently held, on-going litigation post-dating a plaintiff's claim is insufficient to establish a pattern of unconstitutional conduct of which the municipality was aware.  <u>See</u> <u>McGreir</u>, 2021 WL 716993, at *3.

**<u>Alleged Misconduct Post-dating the 1999 Caprice Hardy Investigation</u>**

As previously noted, consistent with precedent of the Second Circuit and it's most recent reaffirmation of the same, the five instances relied upon, which postdate Horn's arrest by some two to eight years, constitute insufficient evidence that would permit a reasonable jury to conclude that the City was on notice of a widespread and persistent practice of coercive practices in the time period leading up to the investigation and arrest of Horn in 1999.  <u>See</u> <u>Simms</u>, 480 Fed. App'x at 631; <u>Connick</u>, 563 U.S. at 62 n. 7; <u>McGreir</u>, 2021 WL 716993 at *4.  Nevertheless, as with the cases predating Horn's arrest, a closer examination of the postdated incidents similarly dispels their probative

value in establishing sufficient instances of tolerant awareness by supervisors of coercive conduct so as to support an inference that the City had a policy, custom or usage of acquiescence to such misconduct prior to and at the time of Horn's arrest in 1999.

      1)   <u>Carvaughn Johnson</u>

      The first postdated incident relied upon by Horn involves the recantation of Ralph Ford, the State's key witness against Carvaughn Johnson.  Johnson was convicted on February 23, 2004 of the murder of Markeith Strong on October 10, 2001.  <u>See</u> <u>State v. Johnson</u>, No. CR233996, 2004 WL 1558110, *1 (Conn. Super. Ct. June 22, 2004). Ford had given statements to New Haven Police shortly after the shooting wherein he implicated Johnson in the murder.  <u>Id.</u>  At Johnson's first trial which ended in a mistrial, Ford had testified consistent with his statements to the police.  <u>Id.</u>  At the second trial resulting in Johnson's conviction, Ford recanted his prior statements and testified that his statements and prior testimony were not truthful.  <u>Id.</u>  The Court noted that there were a number of instances where Ford testified that he was in fear of Johnson and/or Johnson's friends to the point where he moved out of the neighborhood.  <u>Id.</u> at *3. Additionally, the Court noted that, on the day of Ford's testimony, a number of individuals appeared in the courtroom and sat on Johnson's side of the courtroom, and that individuals appeared only on that one day.  <u>Id.</u> at *1.  Two of the jurors later stated that "it *seemed* [that the spectators] were altering Ford's testimony and [m]aybe that … Ford was afraid, intimidated."  <u>See</u> <u>State v. Johnson</u>, 288 Conn. 236, 267, 951 A.2d 1257 (2008).  Thus, Johnson provides no probative evidence that Ford was coerced by

police misconduct as opposed to the fear he had of retaliation by Johnson and/or his friends.

      2)    J'Viel Outing

Horn next cites to the 2005 arrest of J'Veil Outing as evidence of a widespread practice to violate constitutional rights. In the Outing case, two witnesses indicated they saw the person who had committed a homicide and could identify him. See State v. Outing, 298 Conn. 34, 3 A.3d 1 (2010). They were shown separate photo arrays, and both identified the defendant J'Veil Outing as the person who committed the homicide, and provided sworn statements to that effect. Prior to trial, both recanted their identifications and stated they had been pressured into making the identifications by NHPD detectives Cuppola and Vazquez. The trial court ultimately found that the testimony of Crimley and Caple that they had been pressured to give false statements and to falsely identify the defendant as the shooter was not credible. See Id., at 40. Upon review on appeal, the Court agreed that the recantation testimony by Crimley and Caple was not credible. Id. at 53.

      3)    Bobby Johnson

Bobby Johnson was arrested on September 15, 2006 pursuant to a lawfully issued arrest warrant charging him with murder and possession of a firearm without a permit in connection with the robbery and shooting death of Herbert Fields on August 1, 2006. See Johnson v. Warden, No. CV-11-403874, 2013 WL 5878921, *1 (Conn. Super. Ct. Oct. 7, 2013). Thereafter, on July 19, 2007, Johnson entered into a voluntary plea agreement wherein he entered an unconditional plea of guilty to the charge of murder in exchange for a sentence of 38 years. See Bobby Johnson Plea Hrg.

Transcript, **Ex. 57**.  At the time of his plea, the Court conducted a thorough canvass to confirm Johnson's plea was being made voluntarily and intelligently.  Id.  Johnson further confirmed that he committed the murder of Herbert Fields consistent with the facts stated by the prosecutor.  Id.

At the time of his sentencing on October 26, 2007, Johnson was given an opportunity to change his plea, as the judge indicated would be afforded to him at the time of his initial plea.  See Bobby Johnson Sentencing Hrg. Transcript, **Ex. 58**.  At that time, Johnson reaffirmed his guilty plea.  Id.

Some six months later, at the criminal trial of his friend and co-perpetrator, Kwame Wells-Jordan, Johnson claimed, for the first time, that his confessions to the police were coerced.  In this regard, Johnson had provided two recorded statements to the NHPD wherein he confessed to the robbery and murder of Herbert Fields, stating multiple times therein the he committed the murder.  See Bobby Johnson 9/3/06 Transcribed Stmt, **Ex. 59**; Bobby Johnson 9/15/06 Transcribed Stmt, **Ex. 60**.  Larry Hopkins, Johnson's criminal defense attorney confirmed that Johnson never indicated that his confessions had been coerced in any manner prior to or at the time of his guilty plea.  See Larry Hopkins Aff., **Ex. 61**, at ¶¶ 17-20.

Approximately five years after his second guilty plea and sentencing, Johnson filed a habeas petition alleging actual innocence, due process violations and an ineffective assistance of counsel claim.  See Johnson v. Warden, 2013 WL 5878921, at *1.  Johnson's habeas petition was denied in its entirety.

Thereafter, on September 2, 2015, the State of Connecticut moved to vacate the charges against Johnson.  See Johnson Motion to Set Aside Judgment of Conviction,

**Ex. 62**.  In moving to vacate the charges against Johnson, the State of Connecticut explicitly noted that the motion was being made solely in the interests of justice and not upon a finding of actual innocence.  Id.  The motion was granted on September 4, 2015, after which the Court dismissed the charges against Johnson.

Following the dismissal of the charges against him, Johnson initiated a civil rights action alleging, in part, that he was wrongfully convicted as a result of a municipal policy, custom and/or practice of coercive interrogation techniques and fabrication of evidence.  On May 12, 2021, Johnson filed a Stipulation of Dismissal as to his claims against the City of New Haven and its supervisory officials, wherein he expressly "stipulate[d] that [he] did not prove that he suffered any injury or violation of his constitutional rights as a result of either an unconstitutional policy or practice of the City of New Haven Police Department, or any conduct by any of its supervisory officers …."  See Johnson Stipulation of Dismissal, **Ex. 63**.

4)  Errie McClendon

On April 9, 2007, prosecutor Stacey Haupt contacted the NHPD about its investigation of the Robert Bennett homicide, which occurred on November 27, 2006. See Lisa Dadio Memo, **Ex. 64**, at 1; Lisa Dadio Dep., **Ex. 65**, at 111–112; Racheal Cain Affidavit, **Ex. 66**, at 2.  At that time, Attorney Haupt came to the police department along with her investigator, Robert Lawlor, and met with Sergeant Lisa Dadio and Lieutenant Patrick Redding.  See Lisa Dadio Memo, **Ex. 64**, at 1; Lisa Dadio Dep., **Ex. 65**, at 111–113.  Attorney Haupt indicated that she had concerns about the quality of witness statements, that statements were contradictory, that some of the witnesses were recanting, and that there was a possibility that the wrong person was in jail.  See Lisa

Dadio Memo, **Ex. 64**, at 1; Lisa Dadio Dep., **Ex. 65**, at 114, 116.  Attorney Haupt asked

them to have Detective Willoughby, who had been the lead investigator, conduct

additional investigation by speaking with some witnesses again, and by investigating

another potential suspect.  See Lisa Dadio Memo, **Ex. 64**, at 1; Lisa Dadio Dep., **Ex. 65**,

at 117–119; Patrick Redding Dep., **Ex. 67**, at 108–109.  After the meeting, the additional

investigation requested by Attorney Haupt was begun.  See Lisa Dadio Memo, **Ex. 64**,

at 1; Patrick Redding Dep., **Ex. 67**, at 109.  On April 30, 2007, Dadio left a voice

message for Attorney Haupt notifying her that Willoughby was unable to get statements

from two witnesses.  See Lisa Dadio Memo, **Ex. 64**, at 2.

On June 13, 2007, while working on registering a confidential informant ("CI") in

another unrelated matter, Dadio came across a CI packet pertaining to the Bennett

homicide.  See Lisa Dadio Memo, **Ex. 64**, at 2.  The packet contained a CI Payment

Request Form indicating that Willoughby had paid an informant, identified as "01-02,"

the sum of $1,500 for information leading to the arrest of Errie McClendon for the

Bennett murder.  Id.  The incident reports and arrest warrant affidavit prepared by

Willoughby did not contain any reference to information having been obtained by a

confidential informant during the course of the investigation, but only mentioned

information received from a "concerned citizen."  See Lisa Dadio Affidavit, **Ex. 68**, at 3.

Dadio then attempted to look at the file for CI "01-02," but the file was missing.  See

Lisa Dadio Memo, **Ex. 64**, at 2.  Dadio next reviewed the CI database and discovered

that the CI was registered as an informant for a different officer.  Id.  Dadio and Redding

decided that they would discuss the issue further after Redding's vacation.  Id.

On July 3, 2007, Dadio and Redding met with Willoughby and inquired about the identity of the "concerned citizen" and whether he had paid the individual any money for the information received.  See Lisa Dadio Affidavit, **Ex. 68**, at 3; Lisa Dadio Memo, **Ex. 64**, at 2. Willoughby stated that he had not paid the individual any money.  Id.  Willoughby was then asked if had paid a CI in the Bennett case, and Willoughby confirmed that he had done so. See Lisa Dadio Affidavit, **Ex. 68**, at 4.

On or about August 13, 2007, Redding instituted a new policy regarding the use of confidential informants that required that all confidential informants be re-registered under the new policy, including the confidential informant allegedly used by Willoughby in the Bennett homicide case.  See Lisa Dadio Affidavit, **Ex. 68**, at 4; Bennett IA Report, **Ex. 69**, at 3.  Additionally, Redding requested that Dadio follow up with Willoughby to make sure he registered the Bennett informant.  Id.  Dadio provided Willoughby with the registration packet and instructed him to register the CI he used in the Bennett investigation.  Id. Bennett IA Report, **Ex. 69**, at 3.

On or about September 13, 2007, Willoughby had completed and submitted the CI registration packet, at which time the identity of the CI he utilized in the Bennett investigation became known.  See Lisa Dadio Memo, **Ex. 64**, at 1; Bennett IA Report, **Ex. 69**, at 3-4.  The name provided by Willoughby on the registration packet as informant he used in the Bennett investigation did not match the name of informant contained in the CI Payment Request Form Willoughby had prepared.  Id.

On December 20, 2007, Chief Francisco Ortiz ordered an Internal Affairs Investigation of the Robert Bennett homicide following an allegation by State's Attorney Haupt that Willoughby had withheld CI information.  See Bennett IA Report, **Ex. 69**, at 1.

Attorney Haupt indicated that she learned of the CI information after requesting a copy of the investigation file following a request by defense counsel for all CI information during discovery in the Bennett case.  Id.  Attorney Haupt had discovered the CI Payment Request Form upon receipt of the investigation file.  Id.

During the course of the IA investigation, it was discovered that Willoughby had made CI Payment Requests in three other cases in which none of the reports or affidavits for those investigations contained any documentation that information was obtained from a confidential informant.  See Bennett IA Report, **Ex. 69**.  As a result of the IA investigation, Willoughby was arrested and criminally charged pursuant to four arrest warrants containing charges of forgery, larceny and making a false statement.  See Bennett IA Report, **Ex. 69**; Francisco Ortiz Affidavit, **Ex. 70**, at ¶ 29.  Willoughby was ultimately acquitted of all criminal charges.  See Francisco Ortiz Affidavit, **Ex. 70**, at ¶ 29.

As the foregoing establishes, the NHPD undertook steps in response to the concerns raised in the Bennett investigation, initiated an internal investigation, and ultimately brought criminal charges against Detective Willoughby arising out of the same.  Thus, the NHPD did not act with deliberate indifference to, nor did it condone officer misconduct in the Bennett investigation.  Moreover, nothing in the Bennett internal affairs investigation resulted in a finding that NHPD officers utilized any improper or coercive interrogation tactics.

5)    Lt. Bill White

The final instance relied upon by the plaintiff arises out of a 2007 FBI investigation into Billy White, and his subsequent prosecution for theft of funds and

bribery related charges.  Such misconduct is wholly unrelated to the claims in the instant matter and are, therefore, irrelevant to the alleged <u>Monell</u> claim against the City predicated upon purported coercive interrogation tactics.

In sum, each of the cases relied upon by Horn wholly fail to establish, individually or in the aggregate, that there was a tolerant awareness by supervisors of coercive conduct so as to support an inference that the City of New Haven had a policy, custom or usage of acquiescence to such misconduct, let alone that a persistent or widespread practice of unconstitutional conduct existed such that NHPD officers habitually or customarily engaged in the alleged unconstitutional conduct.  <u>See</u> <u>Deferio</u>, 770 F. App'x at 591.  On the contrary, the incidents alleged, even viewed in the light most favorable to the plaintiff represent merely a few sporadic incidents over a 17 year time period in a police department of 35-45 detectives handling over 20,000 cases during that same time frame.  The City is, therefore, entitled to judgement as a matter of law as to Horn's <u>Monell</u> claim.

## IV.    <u>THE PLAINTIFF'S STATE LAW CLAIMS ARE BARRED BY THE APPLICABLE STATUTE OF LIMITATIONS</u>

In Counts Nine, Ten, Twelve and Thirteen of his Amended Complaint, Horn alleges a variety of claims sounding in negligence and statutory indemnification against the City of New Haven.  As is more fully set forth below, these claims are barred by the statute of limitations set forth in Connecticut General Statutes §§ 52-584 and 52-577, as well as the express statute of limitations set forth in §§ 52-557n and 7-465.

A. **THE PLAINTIFF'S CLAIMS OF NEGLIGENCE AND INDEMINIFCATION AGAINST THE CITY OF NEW HAVEN ARE BARRED BY THE APPLICABLE STATUTE OF LIMITATIONS**

Horn's claims state law claims are subject to the statute of limitations set forth in Connecticut General Statutes §§ 52-584 and 52-577, both of which bar the claims in this matter.

1. **Connecticut General Statutes § 52-584 Statute Of Limitations Applicable To Negligence Claims**

Connecticut General Statutes § 52-584 provides, in pertinent part, that

No action to recover damages for injury . . . to real or personal property, caused by negligence . . . shall be brought but within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered, and except that no such action may be brought more than three years from the date of the act or omission complained of . . . .

The statute, by its very language "makes it applicable to actions to recover damages to real or personal property, caused by negligence." Sinotte v. Waterbury, 121 Conn. App. 420, 429, 995 A.2d 131 (2010) (internal quotations omitted).

Section 52-584 imposes two distinct time restrictions upon prospective plaintiffs bringing causes of action sounding in negligence. The first time restriction, known as the discovery portion, requires that a plaintiff bring an action within two years from the date on which the injury alleged is first sustained, discovered or, in the exercise of reasonable care, should have been discovered. See Johnson v. North Branford, 64 Conn. App. 643, 648, 781 A.2d 346 (2001); Rosato v. Mascardo, 82 Conn. App. 396, 401, 844 A.2d 893 (2004). The second time restriction, known as the statute of repose, provides an absolute bar to any cause of action brought more than three years from the date of the act of omission complained of. Id.; McDonald v. Haynes Medical Laboratory, Inc., 192 Conn. 327, 334, 471 A.2d 646 (1984). The determination of whether a

plaintiff's claim is barred by the statute of limitations is a question of law for the Court.

See Lindsay v. Pierre, 90 Conn. App. 696, 699 (2005).

In ascertaining whether a cause of action has been timely commenced in

accordance with § 52-584, Connecticut appellate courts have consistently held that,

> an injury occurs when a party suffers some form of actionable harm…. Actionable harm occurs when the plaintiff discovers … that he or she has been injured and that the defendant's conduct caused such injury…. The statute begins to run when the plaintiff discovers some form of actionable harm, not the fullest manifestation thereof…. The focus is on the plaintiff's knowledge of facts rather than on discovery of applicable legal theories.

Rosato, 82 Conn. App. at 404-05 (alteration in original), quoting Mountaindale

Condominium Assoc. v. Zappone, 59 Conn. App. 311, 323 (2000).

"[T]he accrual of a cause of action is a singular moment in time."  Rosato, 82

Conn. App. at 405; Lindsay, 90 Conn. App. at 701.  Connecticut appellate courts have

stressed that, "[a]llowing that point in time to be pushed forward so long as it is claimed

that the negligence conduct continued would eviscerate the policies underlying the

statute of limitations."  Id.  Accordingly, any claim under "the continuing course of

conduct doctrine has no application after a plaintiff has discovered the harm."  Rosato,

82 Conn. App. at 405.

Under the discovery portion of § 52–584, Horn was required  to bring his action

on or before March 22, 2001, two years from the date of his arrest for the Caprice Hardy

homicide on March 22, 1999.  See NHPD Case Incident Report by Ofc. J. Greene,

dated March 22, 1999, **Ex. 71**.  Horn undisputedly knew of his alleged injuries as of the

date on which he was arrested for a murder he claims he did not commit.  More

specifically, Horn knew of the alleged falsity of the confessions offered by Steve Brown

given his contention that he has never met Brown, as well as that of Marcus Pearson

given that Pearson's statements implicated him in a crime he contends that he did not commit.  Finally, Horn knew of his alleged wrongful arrest, prosecution and conviction as of the time of his arrest on March 22, 1999, given that he maintains that he was and is innocent of the charges against him.  The fact that Horn may not have been aware of the fullest manifestations of the harms allegedly suffered does not alter the analysis.  See Rosato, 82 Conn. App. at 405; Mountaindale Condominium Assoc., 59 Conn. App. at 323; Lindsay, 90 Conn. App. at 701.

Additionally, Horn knew that phone records were the subject of search and seizure warrants at the time of his criminal trial in 2000.  Specifically, it is undisputed that Horn's trial counsel was in possession of the search warrant applications for both the AT&T and SNET phone records prior to his criminal trial.  In fact, Horn has disclosed copies of the same in his designations of his public defender's file materials.  See Horn Rule 26(a)1 Initial Disclosures, **Ex. 26**, at § (ii)(10); Warrants and JDCR-20 Index Cards, **Ex. 27**.  Horn was further aware of the phone records in November of 2017, as expressly noted by his federal public defender in his correspondence to the New Haven Corporation Counsel.  See Letter from Terrence Ward to Corporation Counsel, dated February 18, 2018, **Ex. 72**, at NH000513.  However, Horn did not bring his negligence claim as to the post-conviction misconduct alleged regarding the phone records until he raised the same for the first time in Counts Eleven, Twelve and Thirteen of his First Amended Complaint, which was filed on May 6, 2020, well beyond the two year statute of limitations applicable to his claim.

Accordingly, consistent with well-established Connecticut precedent, the statute of limitations on Horn's state law negligence claims began to run on March 22, 1999.

Horn was required, therefore, to bring his state law negligence claims on of before March 22, 2001 at the latest.  Horn, however, did not file the instant negligence claims until September 7, 2018, over 17 years beyond the statute of limitations for bringing said claims.  Horn's state law negligence claims are, thus, barred by the two year statute of limitations set forth in Conn. Gen. Stat. § 52-584.  Likewise, Horn's amended claims directed to the phone records and alleged post-conviction conduct related to the same began to run during the course of discovery in his criminal trial in 2000, and at the latest, in November 2017 when his federal public defender acknowledged awareness of the existence of the phone records.  Horn, however, did not bring his negligence claims related to the phone records until May 6, 2020, some six months beyond the two year statute of limitations.

Notwithstanding the foregoing, Horn's action would, nevertheless, be barred pursuant to the statute of repose set forth in § 52-584.  The three year statute of repose set forth in § 52-584 specifies the time beyond which a cause of action under § 52-584 is *absolutely barred*.  See Rosato, 82 Conn. App. 396; McDonald v. Haynes Medical Laboratory, Inc., 192 Conn. 327, 334 (1984).  "The statutory clock on this three year time limit **begins to run when the negligent conduct** of the defendant **occurs**." Johnson, 64 Conn. App. at 648 (emphasis added).  A cause of action may, therefore, be time barred even where no injury occurs within the three years following defendant's alleged negligent act or omission.  Id.  As set forth above, the City' investigation of the Hardy homicide, interview of witnesses, preparation of the arrest warrants, and his subsequent arrest, prosecution and conviction which underlie Horn's negligence claims occurred on or before March 22, 1999.  Horn's claims related to his arrest, prosecution

and conviction are, therefore, absolutely barred by the three year statute of repose set forth in Conn. Gen. Stat. § 52-584.  Moreover, the negligence claims regarding to the phone records are also barred by the statute of repose.  In this regard, on February 25, 1999, a warrant for the phone records had been issued, the records were seized pursuant to the warrants on February 26, 1999 and March 2, 1999, and co-defendant Adger completed and signed the Returns of Inventory on March 4, 1999.  See Search Warrants and Returns, **Ex. 73**.  Moreover, as previously noted, the executed warrants and returns had been filed with Barbara Thigpen of the New Haven Superior Court Clerk's office on March 5, 1999, at which time she issued a JDCR-20 Index Card receipt as per her deposition testimony.  See Barbara Thigpen Dep., **Ex. 22**, at 31–36; Warrants and JD-CR20 Index Card, **Ex. 32**.  Thus, the alleged acts and/or omissions as to the phone records had already occurred by the time of Horn's arrest on March 12, 1999.  Horn's negligence claims related to the phone records are, therefore, absolutely barred by the three year statute of repose set forth in Conn. Gen. Stat. § 52-584.

Accordingly, the City is entitled to summary judgment as a matter of law as Horn's state law negligence claims are expressly barred by the applicable statute of limitations set forth in Conn.  Gen. Stat. § 52-584.

### 2. Connecticut General Statutes § 52-577 Statute of Limitations Applicable to Connecticut Constitutional Claims

In the Ninth Count of his Amended Complaint, Horn seeks indemnification against the City for the co-defendants' alleged violation of his rights under the Connecticut Constitution.  Horn's Connecticut Constitutional claims are governed by the general tort statute of limitations set forth in Conn. Gen. Stat. § 52-577.  See Tagliaferi v. Town of Hamden, No. 3:10cv1759 (JGM), 2014 WL 129223, at *9 n. 12 (D. Conn.

Jan. 14, 2014); Spencer v. Connecticut, 560 F. Supp. 2d 153, 158 (D. Conn. June 18, 2008); In re State Police Litigation, 888 F. Supp. 1235, 1249 (D. Conn. May 16, 1995).

Connecticut General Statutes § 52-577 provides that, "No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."  By its very language, § 52–577 "is a statute of repose that sets a fixed limit after which the tortfeasor will not be held liable...."  Pagan v. Gonzalez, 113 Conn. App. 135, 139, 965 A.2d 582 (2009), quoting LaBow v. Rubin, 95 Conn. App. 454, 468, 897 A.2d 136 (2006).

"Section 52–577 is an occurrence statute, meaning that the time period within which a plaintiff must commence an action begins to run at the moment the act or omission complained of occurs."  Pagan, 113 Conn. at 139; Farnsworth v. O'Doherty, 85 Conn. App. 145, 149, 856 A.2d 518 (2004).  In construing the language of § 52-577n, which permits a cause of action to be brought within three years from the date of the act or omission complained of, the Connecticut Supreme Court "ha[s] concluded that the history of that legislative choice of language precludes any construction thereof delaying the start of the limitation period until the cause of action has accrued or the injury has occurred."  Fichera v. Mine Hill Corp., 207 Conn. 204, 212, 541 A.2d 472 (1988).

"When conducting an analysis under § 52–577, the only facts material to the trial court's decision on a motion for summary judgment are the date of the wrongful conduct alleged in the complaint and the date the action was filed."  Pagan, 113 Conn. at 139, quoting Farnsworth, 85 Conn. App. at 149–50.  More specifically,

> The relevant date of the act or omission complained of, as that phrase is
> used in § 52-577, is the date when the negligent conduct of the defendant

occurs and not the date when the plaintiffs first sustain damage.  When
conducting an analysis under § 52-577, the only facts material to the trial
court's decision on a motion for summary judgment are the date of the
wrongful conduct alleged in the complaint and the date the action was filed
. . . .  The three year limitation period of § 52-577 begins with the date of the
act or omission complained of, not the date when the plaintiff first discovers
an injury.

Farnsworth, 85 Conn. App. at 149–50.

In the instant matter, Horn alleges that the City is liable for the co-defendants'

violation of his rights under the Connecticut Constitution.  Horn, however, did not file his

Connecticut Constitutional claims and corresponding indemnification claims until

September 7, 2018, well beyond three years from the date on which the alleged conduct

occurred.  Accordingly, Horn's indemnification claims and Connecticut Constitutional

claims are barred by Conn. Gen. Stat. § 52-577.

### 3.    The Continuing Course of Conduct Doctrine Does Not Apply

The continuing course of conduct doctrine may be used to toll the statue of

limitations in certain circumstances.  See Blanchette v. Barrett, 229 Conn. 256, 275

(1994).  In order for the continuing course of conduct doctrine to apply to toll the statute

of limitations in a matter, "there must be evidence of the breach of a duty that remained

in existence after the commission of the original wrong related thereto.  That duty must

not have terminated prior to commencement of the period allowed for bringing an action

for such a wrong."  Id.  A finding that a duty continued to exist after the act or omission

relied upon may be made only where "there has been evidence of either a special

relationship between the parties giving rise to such a continuing duty or some later

wrongful conduct of a defendant related to the prior act."  Id.

Connecticut appellate courts have consistently refused to apply the continuing

course of conduct doctrine after a plaintiff has discovered the harm.  See Rosato, 82

Conn. App. at 405; Connell v. Colwell, 214 Conn. 242, 255 (1990).  In this regard, any purported continuing duty by a defendant terminates when the plaintiff's cause of action accrues, i.e., when the plaintiff discovers that he or she has been injured and that the defendant's conduct caused such injury.  See Rosato, 82 Conn. App. at 405; Connell, 214 Conn. at 255.  Consistent with the foregoing, the Court in Rosato expressly held that "the continuing course of conduct doctrine has no application after the plaintiff has discovered the harm."  Rosato, 82 Conn. App. at 405.  In so holding, the Rosato Court cited, with approval, the reasoning set forth in Rivera v. Fairbank Management Properties, Inc., 45 Conn. Supp. 154, 160 (1997), that "[u]pon discovery of actionable harm, the policy behind the continuing course of conduct doctrine, to preserve the ongoing relationship with the hope that any potential harm from a negligent act or omission may yet be remedied, no longer has any force."  Id.

In the instant matter, it is undisputed that well more than three years have lapsed since Horn's arrest and conviction in this matter, and Horn undoubtedly had knowledge of the harm at the moment of his arrest, and again upon his conviction and sentencing. The continuing course of conduct doctrine, therefore, is inapplicable to toll Horn's state law claims in this matter.  See Rosato, 82 Conn. App. at 405; Connell, 214 Conn. at 255.

Nevertheless, the continuing course of conduct doctrine is further inapplicable to Horn's claim as no special relationship exists between Horn and the City.  The Connecticut Appellate Court's ruling in Sinotte is instructive in this regard.  In Sinotte, the plaintiffs brought a cause of action against the City of Waterbury alleging, in part, a nuisance claim as a result of a sewage backup in their residence.  The Court held that

the trial court properly found that the continuing course of conduct doctrine was *inapplicable* to their claim.  In so finding, the Court expressly held that "there was *no special relationship* between the plaintiff and the defendant such as exists between an attorney and his client or a doctor and her patient."  <u>Sinotte</u>, 121 Conn. App. at 440-41 (emphasis added).  Explicit in the Court's ruling is that the "special relationship" contemplated by the continuing course of action doctrine is one which is either fiduciary in nature, such as that of an attorney and client or that of a doctor and patient.  <u>Id.</u>; <u>see also</u> <u>Saint Bernard Sch. of Montville, Inc. v. Bank of Am.</u>, 312 Conn. 811, 835, 95 A.3d 1063, 1077 (2014) ("Usually, such a special relationship is one that is built upon a fiduciary or otherwise confidential foundation.").

In the instant matter, there was no on-going relationship between the parties, and any special relationship between Horn and City, to the extent one existed, terminated at the latest once Horn was convicted and sentenced, bringing him within the jurisdiction of the State of Connecticut Department of Corrections.  There is no dispute that this occurred on April 19, 2000 and June 2, 2000, respectively, well more than three years prior to Horn's instant action.  The continuing course of action doctrine is, thus, inapplicable pursuant to the special relationship prong of the doctrine.

Finally, Horn does not contend that the City engaged in any later wrongful conduct related to the initial wrong, namely his arrest and conviction.  In fact, Horn does not contend, nor is there any evidence, that the City engaged in any wrongful conduct within the three years prior to the commencement of his action.  The continuing course of conduct doctrine is, therefore, inapplicable to Horn's claim in this matter.

**4.    The Doctrine of Equitable Tolling is Inapplicable in This Matter**

Equitable tolling is a doctrine grounded in federal law.  It applies in certain situations to excuse untimeliness in filing a complaint.  Gager v. Sanger, 95 Conn. App. 632, 638, 897 A.2d 704 (2006).  It has been defined as ". . . The doctrine that the statute of limitations will not bar a claim if the plaintiff, despite diligent efforts, did not discover the injury until after the limitations period had expired."  Richardson v. Hierholzer, Docket No. CV-17-6072031-S, 2018 WL 2709425, at *4 (Conn. Super. Ct. May 17, 2018); Connecticut Ins. Guar. Ass'n v. Yocum, Docket No. CV-94-0539691-S, 1996 WL 367726, at *4-5 (Conn. Super. Ct. June 6, 1996).

> Equitable tolling permits a plaintiff to avoid the bar of the statute of limitations *if despite all due diligence* he is unable to obtain vital information bearing on the existence of his claim . . . This doctrine embraces . . . what is sometimes called the 'discovery rule,' which holds that the statute begins to run only after discovery of the facts constituting the violation . . . and the related rule that the statute does not begin to run when the plaintiff knows that he has been injured but he cannot obtain information necessary to decide whether the injury is due to wrongdoing and, if so, wrongdoing by the defendant . . .

Richardson at *4 (emphasis in original).

Connecticut courts have recognized that equitable tolling does not apply to General Statutes § 52-584 or 52-577.  More specifically, Connecticut courts have held that "the equitable tolling doctrine is inapplicable to § 52–584 because this statute incorporates the 'discovery rule' on which the equitable tolling doctrine is based . . . . Because the equitable tolling doctrine does not apply to statutes of repose, the doctrine is also inapplicable to § 52–577." Lopez v. Travelers Companies, Inc., No. AAN-CV-15-6019474S, 2016 WL 2890477, at *6 (Conn. Super. Ct. Apr. 26, 2016); see also Saperstein v. Danbury Hosp., No. X06-CV-07-5007185S, 2010 WL 760402, at *13 (Conn. Super. Ct. Jan. 27, 2010) ("Because the equitable tolling doctrine is based on a

"discovery rule," this doctrine would appear to be inapplicable to a statute such as § 52-584 which itself incorporates a discovery rule as part of the statutory limitation. Additionally, the law is well established that equitable tolling does not apply to statutes of repose.").

As noted above, Horn's state law claims against the City are governed by Conn. Gen. Stat. § 52-584 and/or § 52-577.  Both statutes function as statutes of repose. Accordingly, the doctrine of equitable tolling is inapplicable to Horn's claims.

**B.** **THE PLAINTIFF'S CLAIMS PURSUANT TO CONNECTICUT GENERAL STATUTES §§ 52-557N AND 7-465 ARE SUBSTANTIVELY BARRED BY THE APPLICABLE STATUTES OF LIMITATIONS**

A statute of limitations is generally considered procedural where it contains merely a limitation as to the time within which to commence a cause of action and does not itself create a cause of action.  See Ecker v. West Hartford, 205 Conn. 219, 231-32, 530 A.2d 1056 (1987).  "Where, however, a specific time limitation is contained within a statute that creates a right of action that did not exist at common law, then *the remedy exists only during the prescribed period and not thereafter*."  Id. at 232; Ambroise v. William Raveis Real Estate, Inc., 226 Conn. 757, 766–67, 628 A.2d 1303 (1993) (emphasis added).  Accordingly,

> [i]n such cases, the time limitation is not to be treated as an ordinary statute of limitation, but rather is a limitation on the liability itself, and not of the remedy alone . . . .  The courts of Connecticut have repeatedly held that, under such circumstances, *the time limitation is a substantive and jurisdictional prerequisite*, which may be raised at any time, even by the court sua sponte, and may not be waived.

Ecker, 205 Conn. at 232 (internal citations omitted; emphasis added); Amborise, 226 Conn. at 766-67; see also Moore v. McNamara, 201 Conn. 16, 22-23, 513 A.2d 660 (1986); Orticelli v. Powers, 197 Conn. 9, 15, 495 A.2d 1023 (1985); L.G. DeFelice &

Son, Inc. v. Wethersfield, 167 Conn. 509, 511, 356 A.2d 144 (1975); Hillier v. East
Hartford, 167 Conn. 100, 106, 355 A.2d 1 (1974); Diamond National Corporation v.
Dwelle, 164 Conn. 540, 547, 325 A.2d 259 (1973); Vecchio v. Sewer Authority, 176
Conn. 497, 504-505, 408 A.2d 254 (1979); Wilburn v. Mount Sinai Medical Center, 3
Conn. App. 284, 288, 487 A.2d 568 (1985).

Pursuant to Connecticut's common law, a municipality is immune from liability for
negligence in the absence of a statute abrogating such immunity." Grady v. Town of
Somers, 294 Conn. 324, 334, 984 A.2d 684 (2009), quoting Williams v. New Haven,
243 Conn. 763, 766–67, 707 A.2d 1251 (1998).  Connecticut General Statutes § 52-
557n abrogates Connecticut's traditional common-law doctrine that a municipality is
immune from suit for torts committed by their employees and agents.  See Spears v.
Garcia, 263 Conn. 22, 29, 818 A.2d 37 (2003).  Similarly, Connecticut General Statutes
§ 7-465 abrogates a municipality's common law immunity and provides for
indemnification of municipal officers, agents or employees under certain prescribed
circumstances.  See Williams, 243 Conn. at 768.  Accordingly, §§ 52-557n and 7-465 of
the Connecticut General Statutes each create a right of action that did not exist at
common law, the remedy for which exists only during the statutorily prescribed time
period and not thereafter.  See Ambroise, 226 Conn. at 766–67; Ecker, 205 Conn. at
232.

## 1.    Connecticut General Statutes § 52-557n Claim

Horn's statutory negligence claim pursuant to Connecticut General Statutes § 52-
557n against the City of New Haven is governed by the limitations period set forth in
Connecticut General Statutes § 52-584.  See Brusby v. Metro. Dist., 160 Conn. App.
638, 661–62, 127 A.3d 257 (2015) (applying Conn. Gen. Stat. § 52-584 statute of

limitations to the § 52-557n claim at issue therein); DeWolf v. Town of Newington, No. CV-12-6014544-S, 2014 WL 1013334, at *4 (Conn. Super. Ct. Feb. 11, 2014) (noting that Connecticut courts have found that "the statute of limitations for actions brought pursuant to § 52–557n is set out in General Statutes § 52–584 and is two years."); Tagliaferi, 2014 WL 129223, at *9, 10-11.

As set forth previously, the limitations period under § 52-584 begins to run upon a plaintiff's knowledge of the facts giving rise to the injuries claimed.  See Rosato, 82 Conn. App. at 404-05; Mountaindale Condo. Assoc, 59 Conn. App. at 323.  The limitations period commences regardless of whether a plaintiff's claimed injuries have reached their fullest manifestation, and regardless of whether a plaintiff has discovered all applicable legal theories.  Id.  Consistent with the foregoing well established precedent, the limitations period applicable to Horn's claims pursuant to Conn. Gen. Stat. § 52-557n began to run on March 22, 1999.  Horn was, therefore, required to bring his § 52-557n claim against the City of New Haven on of before March 22, 2001 at the latest.  However, Horn did not file his § 52-557n claims until September 7, 2018, over 17 years beyond the statute of limitations for bringing said claim.   Horn's claim against the City of New Haven pursuant to Conn. Gen. Stat. § 52-557n is, therefore, barred as a matter of law.  In addition, as set forth herein, the statute of repose contained in § 52-584 is an absolute bar to Horn's cause of action brought under § 52-557n.

### 2.    Connecticut General Statutes § 7-465 Claim

Horn's indemnification claim against the City of New Haven, brought pursuant to Connecticut General Statutes § 7-465, is governed by the express limitations period set forth therein.  Specifically, § 7-465 provides, in pertinent part, as follows:

> No action for personal physical injuries or damages to real or personal property shall be maintained against such municipality and employee jointly ***unless such action is commenced within two years after the cause of action therefor arose and written notice of the intention to commence such action*** and of the time when and the place where the damages were incurred or sustained ***has been filed with the clerk of such municipality within six months after such cause of action has accrued*** . . . .

Conn. Gen. Stat. § 7-465(a) (emphasis added).

In the instant matter, Horn did not file his § 7-465 Notice of Suit with the Clerk for the City of New Haven until July 27, 2018.  See Horn's Statutory Notice of Intent to Sue, **Ex. 74**.  Therein, Horn acknowledges that his claims arise out of his alleged wrongful arrest and imprisonment for the murder of Carpice Hardy on March 22, 1999, and subsequent conviction for the same.  Yet, Horn filed his statutory notice well beyond the requisite six-month notice period.   Additionally, Horn filed the instant suit well beyond the requisite two-year limitation period within which he was required to commence his action for indemnification against the City of New Haven.  Horn's claims against the City of New Haven pursuant to Conn. Gen. Stat. § 7-465 are, therefore, barred as a matter of law.  Accordingly, the City of New Haven is entitled to judgment as to Horn's claims pursuant to Conn. Gen. Stat. § 7-465 (Counts Nine and Twelve) and Conn. Gen. Stat. § 52-557n (Counts Ten and Thirteen).

**V.**    **THE PLAINTIFF'S CLAIMS OF NEGLIGENCE AGAINST HE CITY OF NEW HAVEN ARE BARRED BY THE DOCTRINE OF GOVERNMENTAL IMMUNITY**

Notwithstanding the fact that the plaintiff's claims of negligence against the City pursuant to Conn. Gen. Stat. § 52-557n are barred by the applicable statute of limitations, the plaintiff's claims are, nevertheless, expressly barred pursuant to the doctrine of governmental immunity.

Under Connecticut common law, municipal entities and their employees are provided with immunity from liability for their tortious acts.  See Williams v. City of New Haven, 243 Conn. 763, 766 (1998); Heigl v. Bd. of Ed., 218 Conn. 1, 4 (1991); Ryszkiewicz v. New Britain, 193 Conn. 589, 593 (1994); Burns v. Board of Education, 228 Conn. 640, 645, 638 A.2d 1 (1994); Evon v. Andrews, 211 Conn. 501, 505, 559 A.2d 1131 (1989).  "The issue of governmental immunity is simply a question of the existence of a duty of care, and [the Connecticut Supreme Court] has approved the practice of deciding the issue of governmental immunity as a matter of law."  Doe v. Petersen, 279 Conn. 607, 613, 903 A.2d 191 (Conn. 2006) (internal quotation marks omitted) quoting Gordon v. Bridgeport Housing Auth., 208 Conn. 161, 170, 544 A.2d 1185 (1988).

A.    THE ACTIONS OF THE CITY OF NEW HAVEN ARE PUBLIC DUTIES

The first step in determining the applicability of the doctrine of governmental immunity is to ascertain whether the defendant employees were engaged in a public or private duty.  See Gordon, 208 Conn. at 167-70.  If the duty imposed upon the employee is such that its performance or omission affects an individual in a manner different in kind than the general public, then the action is private in nature, and an action may be maintained against the public official.  Roman v. Stamford, 16 Conn. App. 213, 220, aff'd, 211 Conn. 396 (1989).  Conversely, an act that affects an individual in the same manner as it would the general public is public in nature.  See Roman, 16 Conn. App. at 220.  A public duty serves and affects the public generally.  The issue of whether an employee was engaged in a public or private duty is a question of law for the Court to decide.  See id.

The determination of what constitutes a governmental function involves a two-part analysis.  The analysis first involves a determination as to whether the conduct complained of involves a private duty or a public duty.  See Roman, 16 Conn. App. at 219; Gordon, 208 Conn. at 170.  The evaluation of whether a duty owed by a public official is public or private in nature turns on whether the duty owed "is of such a nature that the performance of it will affect an individual in a manner different in kind from the way it affects the public at large . . . ."  Roman, 16 Conn. App. at 220.

The law is well-established in Connecticut that, "the operation of a police department is a governmental function, and that acts or omissions in connection therewith ordinarily do not give rise to liability on the part of the municipality."  Gordon, 208 Conn. at 179-80.  Accordingly, the City of New Haven and its servants, agents and/or employees were engaged in a governmental function in the operation of the NHPD.  Id.

**B.    IT IS APPARENT FROM THE COMPLAINT THAT THE PLAINTIFF ALLEGES SOLELY THE FAILURE TO PERFORM DISCRETIONARY DUTIES**

Connecticut law is well-established that, although the determination of whether governmental acts or omissions are discretionary versus ministerial in nature is normally a question of fact for the fact-finder, the determination may be made as a matter of law where it is apparent from the complaint.  See Martel v. Metropolitan Dist. Comm'n, 275 Conn. 38, 49, 881 A.2d 194 (2005); Violano v. Fernandez, 280 Conn. 310, 321, 907 A.2d 1188 (2006); Evon, 211 Conn. at 505-07; Lombard v. Edward J. Peters, Jr., P.C., 252 Conn. 623, 628, 749 A.2d 630 (2000); see also, Gordon, 208 Conn. at 170; Grignano v. Milford, 106 Conn. App. 648, 654-55, 943 A.2d 507 (2008); Soderlund v. Merrigan, 110 Conn. App. 389, 394, 955 A.2d 107 (2008); Segreto v. Bristol, 71 Conn.

App. 844, 855, 804 A.2d 928 (2002); <u>Colon v. Board of Education</u>, 60 Conn. App. 178,

181-82, 758 A.2d 900 (2000).  More specifically,

> [t]he determination of whether an act or omission is discretionary in nature and, thus, whether governmental immunity may be successfully invoked pursuant to § 52-557n (a)(2)(B), turns on the character of the act or omission complained of in the complaint….  Accordingly, where it is apparent from the complaint that the defendants' allegedly negligent acts or omissions *necessarily* involved the exercise of judgment, and thus, necessarily were discretionary in nature, summary judgment is proper.

<u>Grignano</u>, 106 Conn. App. at 655 (emphasis in original), <u>quoting</u> <u>Martel</u>, 275 Conn. at

51, n.8; <u>see</u> <u>also</u>, <u>Violano</u>, 280 Conn. at 321-22.

The Connecticut Supreme Court has noted that, "municipal acts that would

otherwise be considered discretionary will only be deemed ministerial if a *policy or rule*

limiting discretion in the completion of such acts exists."  <u>Benedict v. Norfolk</u>, 296 Conn.

518, 520 n. 4 (2010) (emphasis added).  Accordingly, in order to establish the existence

of a ministerial duty, a plaintiff must allege and prove that the defendant was required,

by way of city charter provision, ordinance, regulation, rule, policy, or other directive, to

perform the action alleged in a prescribed manner and failed to do so.  <u>See</u> <u>Violano</u>, 280

Conn. at 323 (holding that the Court correctly determined that governmental immunity

applied to bar the plaintiff's claim where the plaintiffs failed to allege that there was any

rule, policy or directive that prescribed the manner in which the defendant was to act);

<u>Segreto</u>, 71 Conn. App. at 857-58 (holding that the Court correctly concluded, as a

matter of law, that the complaint alleged the failure to perform a discretionary duty in the

absence of an allegation that the city had some policy or directive in place regarding

those duties with which it or its employees failed to comply); <u>Colon</u>, 60 Conn. App. at

182-83 (affirming the trial court's finding of a discretionary duty where the complaint was

devoid of any allegation that the defendant was required to perform in a proscribed

manner and failed to do so); Martel, 275 Conn. at 50 (holding that summary judgment was appropriate where the plaintiff failed to present any evidence demonstrating that a policy or directive existed which required the defendant to perform its duty in a specified manner).

In the instant matter, the very allegations of the Amended Complaint allege that the City failed to perform duties which inherently require the exercise of judgment and discretion.  Specifically, the plaintiff alleges that the City of New Haven "should have established and implemented effective procedures" as to identification and reporting of exculpatory information, ensuring secure maintenance of evidence, monitoring and maintaining accurate and complete records, ensuring compliance with Connecticut statutory provisions, protecting against arrest and wrongful incarceration, effective training of NHPD officers, and effective supervision of NHPD officers.  (See Pl.'s Am. Compl., Count Thirteen, ¶ 325.)

Where a plaintiff's allegations relate to whether a municipal defendant acted in a reasonable, proper or adequate manner, or whether its conduct was reasonable and proper under the circumstances, Connecticut courts have consistently held that such determinations are discretionary as a matter of law.  See Martel, 275 Conn. at 49-50; Segreto, 71 Conn. App. at 856-58; Evon, 211 Conn. at 506-507.  Specifically, "[d]eterminations as to what is reasonable or proper under a particular set of circumstances necessarily involve the exercise of judgment and are, therefore, discretionary in nature."  Segreto, 71 Conn. App. at 854; Martel, 275 Conn. at 49-50; Violano, 280 Conn. at 323-24; Grignano, 106 Conn. App. at 656-57; Evon, 211 Conn. at

506-507.  Thus, it is apparent from the very language of the Amended Complaint that the conduct alleged are discretionary actions as a matter of law.  Id.

Notwithstanding the foregoing, the Amended Complaint makes absolutely no reference to any city charter provision, ordinance, regulation, rule, policy, or any other directive which required the City and/or its employees to act in any specified manner with regard to the investigation of this incident and/or supervision of employees, and which they failed to do.  In the absence of an allegation or evidence that the City and/or its employees were required to act in a specified manner and failed to do so, the conduct of the City and/or its employees are deemed discretionary as a matter of law.  See Benedict, 296 Conn. at 520 n. 4; Violano, 280 Conn. at 323-24; Segreto, 71 Conn. App. at 855-57; Colon, 60 Conn. App. at 182; Martel, 275 Conn. at 50.

## C.   THE ACTS OR OMISSIONS OF POLICE OFFICERS IN THE EXERCISE OF THEIR DUTIES ARE DISCRETIONARY ACTS AS A MATTER OF LAW

The prevailing law also unequivocally establishes that the duties of a police officer are discretionary as a matter of law.  Specifically, policing the community and investigating those who break the law is a governmental function that requires the exercise of discretion.  See Gordon, 208 Conn. at 180-181.  Consistent with Gordon, "The [Connecticut] Superior Court has consistently held that acts or omissions of police officers in the exercise of their duties are discretionary in nature ...  The Superior Court has also determined that [t]he investigation of crimes and the decisions to make arrests for them is clearly a discretionary rather than a ministerial function."  Escobales v. City of New Britain, 2006 WL 1461072, *2 (Conn. Super., May 5, 2006), quoting Skrobacz v. Sweeney, 49 Conn. Supp. 15, 32, 858 A.2d 899 (2003); see also, Washington v. Blackmore, 2008 WL 5156436, *5 (Conn. Super., Nov. 10, 2008); Elinsky v. Marlene,

1997 WL 729102 (Conn. Super., November 14, 1997) (officer's alleged actions were discretionary because the arrest of the plaintiff, submission of false statements in an arrest warrant affidavit, and improperly interviewing witnesses and investigation requires the exercise of judgment by the officer); Gonzalez v. City of Bridgeport, 1993 WL 197874, *2 (Conn. Super., June 2, 1993) (holding that the investigation of crimes and decisions to make and arrest is clearly discretionary).

As demonstrated above, Connecticut law is well-established that the process by which a police officer investigates an offense is a governmental function which requires the exercise of discretion.  The defendants' conduct in the instant matter is the very type of discretionary governmental acts which Connecticut law has held is afforded governmental immunity.  As the Connecticut Supreme Court has noted, "we do not think that the public interest is served by allowing a jury of laymen with the benefit of 20/20 hindsight to second-guess the exercise of a policeman's discretionary professional duty. Such discretion is no discretion at all."  Shore v. Stonington, 197 Conn. 147, 157 (1982).

The City is, therefore, immune from liability pursuant to the doctrine of governmental immunity.

### D. THE ACTIONS OF HIRING, RETAINING, SUPERVISING, TRAINING AND/OR DISCIPLINING EMPLOYEES ARE DISCRETIONARY ACTS AS A MATTER OF LAW

Connecticut law is, similarly, explicitly clear that the manner in which employees are hired, trained, supervised and disciplined are discretionary acts as a matter of law. Specifically, the Connecticut Supreme Court has expressly held that a municipal entity's "[c]onsiderations of who to hire, how to train such people, and how to supervise employees are decisions requiring the use of judgment and discretion."  Gordon v. Bridgeport Housing Auth., 208 Conn. 161, 179 (1988).

In fact, the Connecticut Supreme Court has repeatedly held that the duties related to the hiring, retention, supervision, discipline and removal of *police officers* are discretionary acts as a matter of law.  In particular, in <u>Stiebitz v. Mahoney</u>, 144 Conn. 443, 446, 134 A.2d 71 (1957), the Court expressly held that one of the duties of a police chief "was to appoint individuals to the police force and, when necessary, to suspend or remove them.  The discharge of that duty required the use of sound discretion."  The Supreme Court again reiterated the discretionary nature of such duties in <u>Gordon</u>, holding that,

> The deployment of officers is particularly a governmental function. Considerable latitude must be allowed to [a police chief] in the deployment of his officers, or in enforcing discipline.  Indeed, because a police chief's authority to assign his officers to particular duties is deemed a matter that concerns the public safety, he may not be deprived of his power to exercise his own discretion and judgment as to the number, qualifications and identity of officers needed for particular situations at any given time ....  We conclude that the general deployment of police officers is a discretionary governmental action as a matter of law.

<u>Gordon</u>, 208 Conn. at 180 (internal quotations and citations omitted; alteration in original).

In keeping with the above Supreme Court precedent, Connecticut courts have consistently held that the screening, hiring, training, supervision and discipline of police officers are discretionary acts as a matter of law.  See <u>e.g.</u>, <u>Brooks v. Sweeney</u>, No. CV06-5005224S, 2008 WL 5481203, *8 (Conn. Super. Ct., Nov. 28, 2008) (holding that, "[i]t is well settled in Connecticut that decisions involving municipal employee hiring, training, supervision and discipline are discretionary acts as a matter of law."); <u>Foster v. Branford</u>, No. X10 UWY CV05-4010120, 2007 WL 575461, at *5 (Conn. Super. Ct., Jan. 30, 2007) (holding that the manner in which the duty to train and supervise police officers is discharged is discretionary); <u>Feliciano v. Hartford</u>, No. CV01-0806525S, 2003

WL 1090275, at *3 (Conn. Super. Ct., Feb. 21, 2003); Peters v. Greenwich, No. CV95-0147192S, 2001 WL 51671, at *9 (Conn. Super. Ct., Jan. 2, 2001); Celotesh v. Hartford, No. CV 97-0573462S, 1999 WL 259656, at *1 (Conn. Super. Ct., April 13, 1999) (finding that the failure to instruct, supervise, control and discipline police officers are discretionary acts as a matter of law); Hubbard v. New Britain, No. CV 95-469207S, 1996 WL 66238, at *2 (Conn. Super. Ct., Jan. 30, 1996); McKenney v. Sydoriak, No. CV 94-56247S, 1995 WL 217014, at *2 (Conn. Super. Ct., April 5, 1995) (holding that "[t]he supervision of a police force … is discretionary in nature and involves the exercise of judgment, particularly as to what training ought to be pursued, how often such training should take place, and which officers ought to receive that training."); Doe v. Nunes, No. CV 94-0463832S, 1995 WL 137143, at *2 (Conn. Super. Ct., March 15, 1995); Cook v. Hartford, No. CV89-0362482, 1992 WL 220102, at *2 (Conn. Super. Ct., Aug. 31, 1992) ("The act of training and supervising police officers is clearly a discretionary governmental function.  Considerations of who to hire, how to train such people, and how to supervise police officers on the job are decisions requiring the use of judgment and discretion.  A municipality cannot employ a standard list of actions which must be taken in utilizing its police department."); Hughes v. Hartford, 96 F.Supp.2d 114, 119 (D. Conn. 2000) ("extensive and near-unanimous precedent in Connecticut clearly demonstrates that the acts or omissions alleged in plaintiff's complaint – the failure to screen, hire, train, supervise, control and discipline – are discretionary acts as a matter of law.").

Moreover, as previously stated, Connecticut appellate courts have consistently held that what is reasonable and proper under a particular set of circumstances

necessarily involves the exercise of judgment and discretion.  See e.g. Segreto, 71

Conn. App. at 857; Martel, 275 Conn. at 49-51; Violano, 280 Conn. at 323-24;

Grignano, 106 Conn. App. at 656-57.  Thus, whether the City and its agents, servants

and employees reasonably, properly and/or adequately screened, trained, supervised,

retained, investigated and/or disciplined police officers necessarily involves their

judgment and discretion.  Id.  These are the very types of actions and/or omissions

which are afforded the protections of governmental immunity.  Id.

Accordingly, Horn's claims of negligence on the part of the City fail as a matter of

law as he necessarily alleges that the City was engaged in discretionary acts which are

afforded governmental immunity.

E. **THE CREATION AND ENFORCEMENT OF POLICIES ARE DISCRETIONARY ACTS AS A MATTER OF LAW**

Finally, the City's function in creating, adopting and enforcing policies are,

likewise, discretionary acts as a matter of law.  Specifically, "[t]he act of promulgating a

policy . . . is a discretionary activity.  A policy, by definition, is 'a definite course or

method of action selected from among alternatives to guide in a legislative, and

therefore discretionary, activity." Heigl, 218 Conn. at 7 (internal citations omitted).

Accordingly, the conduct of the City at to promulgating and/or instituting practices

and procedures involve discretionary acts as a matter of law that are afforded

governmental immunity.

F. **NO EXCEPTIONS TO THE DOCTRINE OF GOVERNMENTAL IMMUNITY APPLY TO THIS MATTER**

The plaintiff bears the burden of establishing that his claims are within the

identifiable victim at imminent harm exception.  In order for the "identifiable person at

imminent harm" exception to apply, the plaintiffs must prove the following three

elements:  (1) an imminent harm; (2) an identifiable victim; **and** (3) a public official to whom it is apparent that his or her conduct is likely to subject that victim to that harm. See Doe v. Petersen, 279 Conn. 607, 616, 621 (2006).  Demonstration of less than all three elements is insufficient for the exception to apply.  Id.; Edgerton v. Clinton, 311 Conn. 217, 230, 86 A.3d 437 (2014) (reaffirming that "[a]ll three [requirements] must be proven in order for the exception to apply.").  The "identifiable person" and "imminent harm" elements must be evaluated with reference to each other.  Id. at 620-21.  An allegedly identifiable person must be identifiable as a potential victim of a specific imminent harm.  Id.  Likewise, the alleged imminent harm must be imminent in terms of its impact on a specific identifiable person.  Id.  It is impossible to be an identifiable person in the absence of any corresponding imminent harm.  Id.  In expounding on the imminent harm prong, the Supreme Court has held that

> [f]or the harm to be deemed imminent, the potential for harm must be sufficiently immediate.  In fact, the criteria of identifiable person and imminent harm must be evaluated with reference to each other.  An allegedly identifiable person must be identifiable as a potential victim of specific imminent harm.  Likewise, the alleged imminent harm must be imminent in terms of its impact on a specific identifiable person . . .  For the purposes of the imminent harm exception … it is impossible to be an identifiable person in the absence of any corresponding imminent harm . . . .  Indeed, we have found imminent harm only in the clearest of cases.

Cotto v. Bd. of Ed., 294 Conn. 265, 276 (2009) (internal quotation marks omitted; internal citations omitted).

Even assuming for purposes of this motion that the plaintiff was considered "identifiable" or known to the defendants as a suspect and/or arrestee in the Hardy homicide investigation, this fact alone does not render the plaintiff identifiable as a potential victim of the specific harm he alleges to have occurred as required in order for the exception to apply.  Rather, in order for the exception to apply, "[a]n allegedly

identifiable person must be identifiable as a potential victim of a specific imminent harm."  Thivierge v. Witham, 150 Conn. App. 769, 779, 93 A.3d 608 (2014), quoting Cotto v. Board of Education, 294 Conn. 265, 276, 984 A.2d 58 (2009).

Notwithstanding the plaintiff's express burden to establish these elements, he wholly fails to demonstrate that he was subject to imminent harm, or that it was apparent to the City that he was a potential victim of the specific harm he alleges.  With regard to the imminence element, "if a harm is not so likely to happen that it gives rise to a clear duty to correct the dangerous condition creating the risk of harm immediately upon discovering it, the harm is not imminent."  Haynes v. Middletown, 314 Conn. 303, 317, 101 A.3d 249 (2014).  "[T]he proper standard for determining whether a harm was imminent is whether it was apparent to the municipal defendant that the dangerous condition was so likely to cause harm that the defendant had a clear and unequivocal duty to act immediately to prevent harm."  Id. at 322-23.  The Connecticut Supreme Court further explained the parameters for establishing the apparentness element in its recent decision in Edgerton v. Clinton, 311 Conn. 217, 86 A.3d 437 (2014), as follows:

> [i]mposing liability when a municipal officer deviated from an ordinary negligence standard of care would render a municipality's liability under § 52–557n no different from what it would be under ordinary negligence.  This would run counter to the purpose of governmental immunity, which is to protect a municipality from liability arising from a municipal officer's negligent, discretionary acts unless the officer's duty to act is clear and unequivocal . . . .  This policy is especially relevant in cases such as the present one, in which the government officer is called on to make split second, discretionary decisions on the basis of limited information . . . .  Therefore, unlike under an ordinary negligence standard of care, under the apparentness requirement of the identifiable person-imminent harm exception, there is no inquiry into the ideal course of action for the government officer under the circumstances.  Rather, the apparentness requirement contemplates an examination of the circumstances of which the government officer could be aware, thereby ensuring that liability is not imposed solely on the basis of hindsight, and calls for a determination of

whether those circumstances would have revealed a likelihood of imminent harm to an identifiable person.

Edgerton, 311 Conn. at 228 n.10.  Against this backdrop, the Court went on to hold that:

In order to meet the apparentness requirement, the plaintiff must show that the circumstances would have made the government agent aware that his or her acts or omissions would likely have subjected the victim to imminent harm . . . .  This is an objective test pursuant to which we consider the information available to the government agent at the time of her discretionary act or omission . . . .  We do not consider what the government agent could have discovered after engaging in additional inquiry.

Id. at 231-32.  Stated differently, the "inquiry is not whether it is apparent to the government official that an action is useful, optimal, or even adequate.  Rather, we determine whether it would have been apparent to the government official that her actions likely would have subjected an identifiable person to imminent harm."  Id. at 238-39.

In the instant matter, the plaintiff's claim against the City are premised upon the City's alleged failure to properly train and/or supervise the co-defendants, and to establish and implement policies.  Moreover, as indicated previously, there exists no evidence that the City knew of the co-defendants' alleged misconduct.  Thus, the plaintiffs seek no more than to impose liability upon the City for deviating from an ordinary negligence standard of care which the Connecticut Supreme Court has expressly rejected as rendering liability under § 52–557n no different from what it would be under ordinary negligence and, thus, counter to the purpose of governmental immunity.  See Edgerton, 311 Conn. at 228 n.10.  As noted by the Court in Edgerton, however, the proper inquiry is whether it was objectively apparent to the City that conduct of the co-defendants under the circumstances presented and known to the City would have subjected the plaintiff to the injuries alleged.  Id. at 238-39.

As previously stated, the plaintiff has proffered no evidence or proof establishing the required three elements necessary in order for the exception to be deemed applicable to his claims.  "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial.  It need only point to an absence of proof on the plaintiff's part, and, at that point, plaintiff must designate specific facts showing that there is a genuine issue for trial."  Parker v. Sony Pictures Entertainment, Inc., 260 F.3d 100, 111 (2d Cir. 2001) (internal quotation marks omitted). The plaintiff has, thus, failed to demonstrate that his claims are within the identifiable victim at imminent harm exception to governmental immunity.  Accordingly, the City is entitled to judgment as a matter of law as to the plaintiff's negligence claims are barred by the doctrine of governmental immunity.

## VI.   THE PLAINTIFF'S CLAIM FOR INDEMNIFICATION PURSUANT TO CONNECTICUT GENERAL STATUTES § 7-465 FAILS AS A MATTER OF LAW AS THE PLAINTIFF IS UNABLE TO ESTABLISH THE REQUISITE UNDERLYING LIABILITY OF A MUNICIPAL EMPLOYEE WHICH IS SUBJECT TO INDEMNIFICATION

Even if the Court were to conclude that Horn's claims pursuant to Connecticut General Statutes § 7-465 are not barred by the express statute of limitations set forth therein, Horn's claims would, nevertheless, fail as a matter of law as indemnification is not available for the conduct and/or claims alleged in this matter.

Connecticut General Statutes § 7-465 is a municipal employee indemnification statute.  Pratt v. Old Saybrook, 225 Conn. 177, 179 (1993); Viebert v. Board of Education, 260 Conn. 167, 173-74 (2002).  Accordingly, the statute "imposes no liability upon a municipality for breach of any statutory duty of its own.  The obligation imposed by this statute is indemnification for the legal liability arising out of certain tortious

conduct of the municipal employee.  The municipality's liability is derivative." <u>Ahern v.</u>
<u>New Haven</u>, 190 Conn. 77, 82 (1983) (citation omitted).

In order to sustain a cause of action pursuant to § 7-465, "***there must be a***
***judgment against the employee*** under certain prescribed conditions." <u>Ahern v. New</u>
<u>Haven</u>, 190 Conn. at 81 (emphasis added).  Connecticut General Statutes § 7-465
operates only to "[provide] for indemnification by municipalities of municipal officers,
agents or employees who incur liability for certain of their official conduct." <u>Williams v.</u>
<u>New Haven</u>, 243 Conn. 763, 768 (1998).

Accordingly, in bringing suit under Conn. Gen. Stat. § 7-465, the plaintiff "first
must allege in a separate count and prove the employee's duty to the individual injured
and the breach thereof.  Only then may the plaintiff go on to allege and prove the town's
liability by indemnification." <u>Sestito v. Groton</u>, 178 Conn. 520, 527 (1979).  Pursuant to
§ 7-465, "any municipal liability which may attach is predicated on prior findings of
individual negligence on the part of the employee and the municipality's employment
relationship with that individual." <u>Wu v. Town of Fairfield</u>, 204 Conn. 435, 438 (1987).

A.   <u>I<small>NDEMNIFICATION</small> I<small>S</small> N<small>OT</small> A<small>VAILABLE</small> A<small>S</small> T<small>HE</small> U<small>NDERLYING</small> C<small>LAIMS</small> A<small>RE</small>
B<small>ARRED</small> B<small>Y</small> T<small>HE</small> A<small>PPLICABLE</small> S<small>TATUTE</small> O<small>F</small> L<small>IMITATIONS</small> A<small>ND</small> T<small>HE</small>
D<small>OCTRINE</small> O<small>F</small> G<small>OVERNMENTAL</small> I<small>MMUNITY</small></u>

Pursuant to the foregoing well-established precedent, the City of New Haven
cannot be held liable absent judgment against the named individual defendants.  As
indicated previously, Horn's state law negligence claims (Counts Seven and Eleven)
and Connecticut Constitutional claims (Count Eight) against the co-defendants are
barred by the applicable statute of limitations.  Moreover, the plaintiff's state law
negligence claims against co-defendants Dease, Adger and Breland are barred by the
doctrine of governmental immunity as the conduct alleged involve discretionary acts as

a matter of law.  The derivative claims for indemnification as to Counts 7, 8 and 11, thus, fail as a matter of law.

**B.** **INDEMNIFICATION IS NOT AVAILABLE AS TO THE REMAINING CLAIMS AS A MUNICIPALITY MAY NOT BE HELD LIABLE FOR THE INTENTIONAL, WILFUL, WANTON, RECKLESS OR MALICIOUS CONDUCT OF ITS EMPLOYEES**

The City of New Haven may not be held liable for the intentional, wilful, wanton, reckless or malicious acts of its employees.  It is axiomatic that a municipality can act only through natural persons as its agents or employees.  See Shay v. Rossi, 253 Conn. 134, 168, 749 A.2d 1147 (2000); Miller v. Eagan, 265 Conn. 301, 325, 828 A.2d 549 (2003).  A municipality may not, however, be held vicariously liable for the intentional torts of its employees.  See Sanzone v. Bd. Of Police Commissioners, 219 Conn. 179, 193, 592 A.2d 912 (1991).

Consistent with the foregoing, Connecticut General Statutes § 7-465 expressly precludes indemnification liability for intentional misconduct.  More specifically, § 7-465 provides, in pertinent part, that a municipality:

> shall pay on behalf of any employee of such municipality, . . . all sums which such employee becomes obligated to pay by reason of the liability imposed upon such employee by law for damages awarded for infringement of any person's civil rights or for physical damages to person or property . . . if the employee, at the time of the occurrence, accident, physical injury or damages complained of, was acting in the performance of his duties and within the scope of his employment, and if such occurrence, accident, physical injury or damage was not the result of any wilful or wanton act of such employee in the discharge of such duty.

Conn. Gen. Stat. § 7-465(a).  "The plain and unambiguous language of § 7-465 provides that a municipality is not obligated to pay damages if the employee was acting in a wilful or wanton manner."  City of West Haven v. Hartford Ins. Co., 221 Conn. 149, 156, 602 A.2d 988 (1992).

Claims of wilful, intentional and malicious misconduct are indistinguishable and evaluated under the same standard.  See Elliott v. City of Waterbury, 245 Conn. 385, 415, 715 A.2d 27, 42 (1998).  Wilful misconduct may either be "intentional or committed under circumstances exhibiting a reckless disregard for the safety of others."  See BLACKS LAW DICTIONARY, Fifth Edition (1979).  The terms wilful, wanton and reckless have been treated as interchangeable with one another.  See Pane, 267 Conn. at 685; Bauer v. Waste Management of Connecticut, Inc., 239 Conn. 515, 527 (1996); Dubay v. Irish, 207 Conn. 518, 533, 542 A.2d 711 (1988); West Haven v. Hartford Insur. Co., 221 Conn. 149, 161 n.3, 2 A.2d 988 (1992).  "A wilful act is one done intentionally or with reckless disregard of the consequences of one's conduct."  Bauer, 239 Conn. at 527. Additionally, gross negligence is interchangeable with deliberate indifference, and often equated with recklessness.  See Poe, 282 F.3d at 140 n. 14.

In Counts 1-4, 7-8, and 11 of the Amended Complaint, Horn explicitly alleges that co-defendants Dease, Adger and Breland intentionally coerced witnesses, fabricated evidence, destroyed records, suppressed exculpatory evidence, understood the import of phone records and hid/concealed them, acted without authority of law and in the abuse of their powers, acted unlawfully, acted with the specific intent to deprive Horn of his constitutional rights, acted with deliberate indifference, and acted with malice, malicious intent to vex or trouble and/or with intent to injure.  Horn cannot transform the intentional conduct he expressly alleges the co-defendants engaged in by merely labeling the same conduct as negligent.  As the Connecticut Supreme Court has observed,

> the same conduct [cannot] reasonably be determined to have been both intentionally and negligently tortious. . . . Intentional conduct and negligent

conduct, although differing only by a matter of degree . . . are separate and mutually exclusive.... Although in a given case there may be doubt about whether one acted intentionally or negligently, the difference in meaning is clear.   As [Oliver Wendell] Holmes observed, even a dog knows the difference between being tripped over and being kicked.

DaCruz v. State Farm Fire and Cas. Co., 268 Conn. 675, 693, 846 A.2d 849 (2004)

(alteration in original); see also, American National Fire Ins. Co. v. Schuss, 221 Conn.

768, 775-76, 607 A.2d 418 (1992).

As noted above, in the instant matter, Horn explicitly incorporates and alleges

that the co-defendants acted intentionally and willfully rather than negligently.  Indeed,

Horn does not claim that the co-defendants violated his constitutional rights, threatened

and coerced witnesses, fabricated evidence or withheld exculpatory evidence by way of

accident.  Rather, he expressly alleges that the co-defendants acted unlawfully, acted

with malice, and acted with the specific intent to deprive him of his constitutional rights.

The language of Connecticut General Statutes § 7-465 is unequivocal, a

municipality may not be held liable for indemnification for the criminal, intentional, wilful,

wanton, or malicious acts of its employees.  Accordingly, the City of New Haven is

entitled to judgment as a matter of law as to Counts Nine and Twelve of the Amended

Complaint.

## VII.   **CONCLUSION**

For the foregoing reasons, the City of New Haven respectfully requests that

summary judgment enter in its favor as to Counts Six, Nine, Ten, Twelve and Thirteen

of the plaintiff's Amended Complaint [Doc. 153].

DEFENDANT,
CITY OF NEW HAVEN


By_____/s/ Beatrice S. Jordan_____
   Thomas R. Gerarde (ct05640)
   Beatrice S. Jordan (ct22001)
   Howd & Ludorf, LLC
   65 Wethersfield Avenue
   Hartford, CT  06114-11921
   Ph:  (860) 249-1361
   Fax:  (860) 249-7665
   E-mail: tgerarde@hl-law.com
   E-mail: bjordan@hl-law.com