VERNON HORN,

                Plaintiff,

    -against-

CITY OF NEW HAVEN; and LEROY DEASE,
PETISIA ADGER, DARYLE BRELAND, and
JAMES STEPHENSON, in their individual
capacities,

                Defendants.

No. 3:18 Civ. 1502 (RNC)

# PLAINTIFF VERNON HORN'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

**Emery Celli Brinckerhoff Abady Ward & Maazel LLP**
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

**Parret, Porto, Parese & Colwell, P.C.**
2139 Whitney Avenue, Suite 1-D
Hamden, Connecticut 06518

**Kaufman Lieb Lebowitz & Frick LLP**
10 East 40th Street, Suite 3307
New York, New York 10016

# TABLE OF CONTENTS

PAGE NO.

TABLE OF CONTENTS..........................................................................................I

TABLE OF AUTHORITIES ..........................................................................VIII

DEFENDANTS FRAME TWO INNOCENT MEN ....................................................1

FACTS ..............................................................................................................2

I.     DETECTIVES DEASE, BRELAND, AND ADGER FABRICATE A CASE
AGAINST TWO INNOCENT MEN, SERIALLY HIDE *BRADY* MATERIAL,
AND IGNORE CLEAR EVIDENCE OF INNOCENCE ............................................2

     A.    Vernon Horn and Marquis Jackson Are Entirely Innocent................................2

          1.    Vernon Horn and Marquis Jackson Have a Normal Teenage
Saturday Night Until Learning of a Homicide.......................................2

          2.    Witnesses Repeatedly Confirm Vernon and Marquis's
Whereabouts .........................................................................................6

          3.    Three Masked Perpetrators Unknown to Regular Employees of
the Dixwell Deli Commit a Brutal Crime ..............................................7

          4.    Despite Their Innocence, Vernon and Marquis Immediately
Become Prime Suspects .........................................................................9

     B.    The Stolen Cell Phone Drives the Detectives' Investigation...........................11

     C.    The Detectives Manipulate Crystal Sykes into Giving a Fabricated
Statement, then Submit a Fraudulent Warrant Application for Horn's
Arrest..............................................................................................................12

     D.    The Detectives Coerce Marcus Pearson into Giving a Fabricated
Statement.........................................................................................................15

     E.    The Detectives Coerce Kendell Thompson into Identifying Horn and
Jackson and Withhold *Brady* Material from Thompson's Interrogation ........22

     F.    The Detectives Fabricate Steve Brown's Incredible Story .............................28

          1.    Brown Tells a Nonsense Tale ...............................................................28

          2.    The Detectives Willfully Ignore a Mountain of Evidence
Contradicting Brown.............................................................................29

          3.    Brown's Story Is Fabricated by Detectives .........................................32

G.      The Prosecution Relies Heavily on Pearson, Thompson, and Brown to Convict Vernon Horn and Marquis Jackson .................................................. 34

H.      In 2018, Exculpatory Phone Records Never Before Disclosed to the Defense Are Found in the Basement of Detective Adger's House ................. 34

     1.      The Suppressed Phone Records Were Highly Favorable to Vernon Horn's Defense ...................................................... 36

     2.      The Detectives Hid the Phone Records in 1999 ................................. 38

     3.      Alternatively, the NHPD Lost the Records ......................................... 41

     4.      The City of New Haven Continued Not to Disclose the Phone Records ............................................................................ 41

     5.      The Detectives Suppressed the Details of their Feeble Investigation of the Bridgeport Crew ................................... 42

I.      Cell Site Information Known to the Detectives All Along Exonerates Horn and Jackson ..................................................................... 43

     1.      The FBI Concludes that Pearson and Brown's Fabricated Accounts are "Impossible" ................................. 43

     2.      Based on the FBI's Findings, the State Exonerates Horn and Jackson ............................................................... 46

II.      DETECTIVES DEASE, BRELAND, AND ADGER ACTED PURSUANT TO CITY POLICY, CUSTOM, AND PRACTICE .......................................... 47

A.      The City's Written Policies Did Not Require Officers to Preserve or Disclose  Exculpatory Evidence ................................................... 47

B.      The City Failed to Train its Officers Not to Use Coercive Witness Interrogation Techniques ............................................................... 47

C.      Pursuant to NHPD Practice, NHPD Officers Routinely Destroyed or Secreted their Field Notes, and all the *Brady* Material in the Notes, and Failed to Turn Them Over to Prosecutors ........................................ 48

D.      The City's Longstanding Practice of Conducting Off-the-Record Witness Interrogation Sessions, Known as "Pre-Interviews" ........................ 50

     1.      Witness Pre-Interviews Were Not Recorded on Tape ........................ 50

     2.      The NHPD Did Not Train or Require Detectives to Take Notes During Off-the-Record Witness Pre-Interviews ................................. 51

3.    Off-the-Record Pre-Interviews Often Took Hours and Revealed Exculpatory Information .......................................51

4.    The NHPD Is Unable to Explain *Why* Pre-Interviews Were Not Recorded ........................................................................53

5.    The Real Purpose of Off-the-Record Pre-Interviews: to Prejudice Criminal Defendants ...........................................54

6.    NHPD Written Policy Instructed Officers to Avoid Recording Detailed Statements in Certain Situations............................55

E.    The NHPD's Long History of Officers Coercing Witnesses, Fabricating Witness Statements, and Suppressing or Destroying Evidence, Including Witness Statements ...........................................................................................55

1.    In the Decades Leading Up to the Dixwell Deli Homicide Investigation, Officers Routinely Lost or Destroyed Taped and Written Witness Statements Pursuant to Established NHPD Practice...............................................................................................55

2.    In 1984, NHPD Detectives Include False Statements and Exclude Exculpatory Information from Sworn Arrest Warrant in the Anthony Golino Case................................................................59

3.    In 1985, the State's Own Witness Testifies that an NHPD Officer Coerced Him into Giving a False Inculpatory Statement........60

4.    In 1991, NHPD Detectives Coerce a Juvenile Witness into Giving a False Inculpatory Statement in the Eric Ham Case..............60

5.    Also in 1991, NHPD Detective Greene Coerces Two Witnesses into Giving Fabricated Statements Inculpating Daryl Valentine in a Double Homicide .......................................................................61

6.    In 1992, NHPD Detective Billy White Coerces and Threatens the Sole Alibi Witness in a Murder Case, Causing the Wrongful Conviction of Derrick Hamilton in New York...................62

7.    From 1991-92, NHPD Detective Vincent Raucci, in the Presence of Other NHPD Officers, Repeatedly Coerces Witnesses and Fabricates False Inculpatory Witness Statements in the Scott Lewis Case .......................................................................64

8.    In 2001, Detectives Breland and Coppola Coerce a Juvenile Witness into Giving an Inculpatory Witness Statement in the Carvaughn Johnson Case ...................................................................68

9. In 2006, NHPD Detectives Coerce Witnesses and Withhold Exculpatory Evidence in the Bobby Johnson Case ............................ 68

F. Despite Numerous Cases Involving Officer Misconduct and Thirteen Exonerations, The NHPD Failed to Change its Training, Policies, or Practices ................................................................................................ 72

ARGUMENT ................................................................................................................ 73

III. VIEWING THE FACTS IN THE LIGHT MOST FAVORABLE TO PLAINTIFF, DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT SHOULD BE DENIED ................................................................................ 73

A. The Defense Experts Defeat the Defendants' Motions .................... 73

B. The Detectives Repeatedly Violated *Brady* ................................... 74

1. Pearson-Related *Brady* Violations ...................................... 76

a. As Defendants' Experts and the Prosecutor Admit, Pearson's Statements that He Did not Make the Fourth Call Are *Brady* Material ................ 76

b. As Defendants' Experts and the Prosecutor Admit, the Detectives' Coercion of Pearson is *Brady* Material ................ 77

c. The Suppression of This Evidence Was Material to the Outcome of the Criminal Case as a Matter of Law ................ 79

2. Thompson-Related *Brady* Violations .................................. 80

a. As Defendants' Experts and the Prosecutor Admit, Thompson's Statements that He Could Not Identify Horn and Jackson is *Brady* Material ................ 80

b. As Defendants' Experts and the Prosecutor Admit, the Detectives' Coercion is *Brady* Material ................ 81

3. *Brady* Violations Related to the Phone Records ................. 82

a. A Genuine Dispute of Material Fact Exists as to Whether Adger and Dease Intentionally Suppressed the Phone Records ................ 82

4. A Genuine Dispute of Material Fact Exists as to the Materiality of the Phone Records Hidden in Adger's Basement ............................ 85

C. The Detectives Repeatedly Fabricated Evidence ............................. 89

1. The Detectives Fabricated Evidence from Pearson ............................89

    a.     Drawing All Reasonable Inferences in Plaintiff's favor, the Detectives Coerced Pearson and Fabricated His Testimony .. 89

    b.     The Detectives' Fabrication of Pearson's Statement Was Unconstitutional Even Absent Coercion of the Witness......... 90

    c.     Pearson's Fabricated Statement Was Forwarded to Prosecutors ............................................................................ 91

    d.     As a Matter of Law, the Fabricated Evidence Was of the Kind Likely to Influence a Jury's Verdict ............................. 92

2. The Detectives Fabricated Evidence from Thompson........................92

3. The Detectives Fabricated Evidence from Brown ..............................94

4. The Detectives Fabricated Evidence from Sykes ...............................97

D.     A Genuine Dispute of Material Fact Exists as to Whether the Detectives Mishandled "Specific, Readily-Verifiable, Exculpatory Evidence" in a Conscience-Shocking Manner .......................................................................98

E.     The Detectives' Argument Against Plaintiff's Failure to Intervene Claim is Entirely Derivative of their Meritless Argument that No Constitutional Violations Occurred ......................................................................................103

IV.     MATERIAL QUESTIONS OF FACT PRECLUDE SUMMARY JUDGMENT ON PLAINTIFF'S *MONELL* CLAIM ..................................................................104

A.     The City Had a Pervasive Practice of Suppressing Exculpatory Evidence and Coercing Witnesses......................................................................................105

1. The Testimony of Defendants' Own Expert Witnesses Create Material Issues of Fact as to Whether the City Had a Pervasive Practice of Suppressing Exculpatory Evidence and Coercing Witnesses ..........................................................................................106

2. The Jury Could Otherwise Reasonably Find a Custom, Policy, or Practice of Coercing Witnesses and Suppressing Exculpatory Evidence ......................................................................108

B.     The Jury Could Conclude that the City was Deliberately Indifferent to its Police Officers' Recurrent Suppression of Exculpatory Evidence and Coercion of Witnesses ..................................................................................111

1.      A Jury Could Find that the City was Deliberately Indifferent Because It Failed to Discipline Officers Who Coerced Witnesses and Suppressed Exculpatory Evidence ............................111

2.      The City's Failure to Train its Officers in the Proper Handling of Witness Interviews and Exculpatory Evidence Also Demonstrates its Deliberate Indifference ............................................113

     a.      *Walker* Element 1: The City Knew "To a Moral Certainty" that its Police Officers Would Conduct Witness Interviews and Handle Exculpatory Evidence ......................................... 114

     b.      *Walker* Element 2: There is a Lengthy, Documented History of NHPD Officers Mishandling Witness Interviews and Suppressing Exculpatory Evidence—Situations that Also Present Officers with a Difficult Choice ...................... 116

          i.      NHPD Officers Have a History of Suppressing Exculpatory Evidence and Coercing Witnesses ....... 116

          ii.      Handling Exculpatory Evidence and Witness Interviews are Situations that Present Officers with Difficult Choices that Training Will Make Less Difficult .................................................................... 123

     c.      Walker Element 3: Police Officers' Wrong Choices While Handling Exculpatory Evidence and Witness Interviews Will Frequently Cause the Deprivation of Citizens' Constitutional Rights ............................................. 124

     d.      The City's Deficient Training on Handling Exculpatory Evidence and Witness Interviews Is "Closely Related" to Plaintiff's Injuries ................................................ 125

          i.      The City's Lack of Written Policy on the Proper Handling of Exculpatory Evidence is Closely Related to the Detectives' Brady Violations in this Case ...................................................................... 126

          ii.      The City's Practice of Suppressing 'Unhelpful' Information Shared by Witnesses During Off-the-Record Pre-Interviews All But Guaranteed Detectives Would Commit Routine Brady Violations .................................................................. 127

V.      MR. HORN'S STATE-LAW CLAIMS ARE TIMELY AND, AS TO COMMON-LAW CLAIMS, ARE NOT BARRED BY GOVERNMENTAL IMMUNITY ..........................................................................................130

A. The Jury Must Decide the Timeliness of the State-Law Claims ................131

 1. A Rational Jury Could Find that Mr. Horn Brought His Claims Within Two Years of Accrual ...........................................133

  a. Questions of Fact About When Mr. Horn Suffered "Actionable Harm" .............................................. 133

  b. Deferred Accrual Rule under *Heck* ...................................... 134

  c. Some of Defendants' Challenged Acts and Omissions Occurred Within Two Years of Filing ................................. 136

 2. Some of Defendants' Challenged Conduct Is Timely Under the Repose Provisions of § 52-584 and § 52-577, and a Genuine Dispute of Fact Exists as to Whether Defendants' Conduct Tolled the Statute ...........................................................137

  a. Continuing Course of Conduct ............................................ 138

  b. Unripeness Under *Heck* ...................................... 140

  c. Fraudulent Concealment ...................................... 141

B. With Respect to the Common-Law Claims, There Is No Governmental Immunity As to Certain Conduct, and an Exception Applies Regardless .....142

 1. At Least Some of Defendants' Misconduct was Nondiscretionary and Thus Not Immune...........................................142

 2. A Genuine Issue of Fact Exists as to Whether the "Identifiable Victim, Imminent Harm" Exception to Immunity Applies to Any Otherwise Misconduct that Would Otherwise Be Immune .......145

C. Mr. Horn Is Entitled to Proceed to the Jury on Alternative Theories of Intentional Misconduct and Negligence ......................................................148

CONCLUSION.................................................................................................................150

**CASES**

*Amnesty Am. v. Town of W. Hartford*,
    361 F.3d 113 (2d Cir. 2004)..................................................................... 104, 111

*Babi-Ali v. City of New York*,
    979 F. Supp. 268 (S.D.N.Y. 1997) ................................................................. 114

*Batista v. Rodriguez*,
    702 F.2d 393 (2d Cir. 1983).............................................................................. 104

*Bd. of Cnty. Com'rs of Bryan Cnty., Okl. v. Brown*,
    520 U.S. 397 (1997)........................................................................................... 127

*Bd. Of the Cnty. Comm'rs v. Brown*,
    520 U.S. 397 (1997)........................................................................................... 109

*Belanger v. City of Hartford*,
    578 F. Supp. 2d 360 (D. Conn. 2008)................................................................ 146

*Bellamy v. City of New York*,
    914 F.3d 727 (2d Cir. 2019)......................................................................... 75, 96

*Bellsouth Telecommc'ns, Inc. v. W.R. Grace & Co.*,
    77 F.3d 603 (2d Cir. 1996)............................................................................... 132

*Bertuglia v. City of New York*,
    839 F. Supp. 2d 703 (S.D.N.Y. 2012)............................................................... 115

*Blake v. Race*,
    487 F. Supp. 2d 187 (E.D.N.Y. 2007) ........................................................ 78, 91

*Bound Brook Ass'n v. City of Norwalk*,
    198 Conn. 660 (1986) ...................................................................................... 141

*Burai v. City of New York*,
    No. 18 Civ. 12299, 2021 WL 1198371 (S.D.N.Y. Mar. 30, 2021) ............... *passim*

*Bussolari v. City of Hartford*,
    No. 14 Civ. 149, 2016 WL 4272419 (D. Conn. Aug. 12, 2016)........................ 148

*Cafasso v. Nappe*,
    No. 15 Civ. 920, 2017 WL 4167746 (D. Conn. Sept. 20, 2017) ....................... 100

*Cambiasca v. Ruhe*,
    No. 17 Civ. 87, 2019 WL 2866072 (S.D.N.Y. July 3, 2019) ............................ 103

*Carrillo v. Cty. of Los Angeles*,
No. 11 Civ. 10310, 2012 WL 12850128 (C.D. Cal. Nov. 14, 2012) ...................................... 78

*Chamberlain v. City of White Plains*,
986 F. Supp. 2d 363 (S.D.N.Y. 2013) ................................................................................. 116

*Champagne v. Raybestos-Manhattan, Inc.*,
212 Conn. 509 (1989) ................................................................................................. 131, 132

*Chapman v. Sikorski Aircraft Corp.*,
No. 13 Civ. 518, 2015 WL 75493 (D. Conn. Jan. 6, 2015) ................................................. 141

*City of Canton v. Harris*,
489 U.S. 378 (1989) ...................................................................................................... 105, 116

*Collins v. City of New York*,
923 F. Supp. 2d 462 (E.D.N.Y. 2013) ........................................................................ 123, 139

*Connell v. Colwell*,
214 Conn. 242 (1990) .......................................................................................................... 141

*Connick v. Thompson*,
563 U.S. 51 (2011) ............................................................................... 114, 116, 124, 125

*Cooke v. Williams*,
No. 185041290, 2018 WL 4865688 (Conn. Super. Ct. Sept. 17, 2018) .............................. 135

*Cristini v. City of Warren*,
No. 07 Civ. 11141, 2012 WL 5508369 (E.D. Mich. Nov. 14, 2012) ................... 115, 116, 125

*DaCruz v. State Farm Fire & Cas. Co.*,
268 Conn. 675 (2004) .......................................................................................................... 149

*Davis v. Comm'r of Corr.*,
186 Conn. App. 366 (2018) ................................................................................................... 86

*Demers v. State*,
209 Conn. 143 (1988) .......................................................................................................... 147

*Dipane-Saleem v. Gallagher*,
No. 15 Civ. 596, 2016 WL 1060190 (D. Conn. Mar. 15, 2016) .......................................... 146

*Doe #1 v. Boy Scouts of Am. Corp.*,
No. X08FSTCV155015023S, 2018 WL 2207892 (Conn. Super. Ct. Apr. 20, 2018) ......... 141

*Doe v. Petersen*,
279 Conn. 607 (2006) .......................................................................................................... 145

*Dowd v. Conn. Children's Med. Ctr.*,
No. CV116026149S, 2016 WL 7638201 (Conn. Super. Ct. Sept. 27, 2016) ...................... 133

*E.g.*, *Neuhaus v. DeCholnoky*,
280 Conn. 190 (2006) ............................................................................................ 138

*Essex Ins. Co. v. William Kramer & Assocs.*,
331 Conn. 493 (2019) ............................................................................................ 139

*Felix v. City of New York*,
344 F. Supp. 3d 644 (S.D.N.Y. 2018) .................................................................... 112

*Felix v. City of New York*,
No. 16 Civ. 5845, 2020 WL 6048153 (S.D.N.Y. Oct. 13, 2020) ................ 108, 117, 120, 121

*Fiacco v. City of Rensselaer*,
783 F.2d 319 (2d Cir. 1986) ........................................................... 112, 117, 120

*Fincher v. Depository Tr. & Clearing Corp.*,
604 F.3d 712 (2d Cir. 2010) ................................................................................. 107

*Fleming v. City of Bridgeport*,
284 Conn. 502 (2007) ............................................................................................ 145

*Floyd v. City of New York*,
959 F. Supp. 2d 540 (S.D.N.Y. 2013) ..................................................................... 74

*Fontanella v. Marcucci*,
89 Conn. App. 690 (2005) ...................................................................................... 140

*Galindez v. Miller*,
285 F. Supp. 2d 190 (D. Conn. 2003) .................................................................... 146

*Garnett v. Undercover Officer C0039*,
838 F.3d 265 (2d Cir. 2016) .............................................................................. 89, 92

*Gentile v. Cnty. of Suffolk*,
926 F.2d 142 (2d Cir. 1991) ................................................................................. 120

*Geter v. Fortenberry*,
849 F.2d 1550 (5th Cir. 1988) ................................................................................ 78

*Giglio v. United States*,
405 U.S. 150 (1972) ................................................................................................ 78

*Gnazzo v. G.D. Searle & Co.*,
973 F.3d 136 (2d Cir. 1992) .................................................................................. 132

*Golino v. City of New Haven*,
   761 F. Supp. 962 (D. Conn.) ............................................................ 59

*Golino v. City of New Haven*,
   950 F.2d 864 (2d Cir. 1991) ............................................... 59, 60, 78, 119

*Gordon v. Bridgeport Hous. Auth.*,
   208 Conn. 161 (1988) ...................................................................... 142

*Gregory v. City of Louisville*,
   444 F.3d 725 (6th Cir. 2006) ..................................................... 115, 125

*Gugliemi v. Willowbrook Condo. Ass'n*,
   151 Conn. App. 806 (2014) .............................................................. 133

*Ham v. Greene*,
   248 Conn. 508 (1999) ............................................................ 60, 61, 119

*Ham v. Greene*,
   No. CV 91032275S, 1997 WL 252274 (Conn. Super. Ct. May 8, 1997) ............... 61

*Hamilton v. City of New York*,
   No. 15 Civ. 4574, 2019 WL 1452013 (E.D.N.Y. Mar. 19, 2019) ................... 62, 64

*Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*,
   970 F.2d 1138 (2d Cir. 1992) ........................................................... 101

*Haynes v. City of Middletown*,
   314 Conn. 303 (2014) .............................................................. 146, 147

*Heck v. Humphrey*,
   512 U.S. 477 (1994) ............................................................... 134, 140

*Henry v. Cnty. of Shasta*,
   132 F.3d 512 (9th Cir. 1997) ........................................................... 123

*Hicks v. Marchman*,
   719 F. App'x 61 (2d Cir. 2018) .......................................................... 94

*Horn v. Chief of Police*,
   No. FIC 2008 (Ct. FOI Comm'n. Aug. 26, 2009) .......................................... 41

*Horn v. Comm'r of Corr.*,
   321 Conn. 767 (2016) ................................................................... 101

*Horn v. Stephenson*,
   No. 19 Civ. 2418, 2021 WL 3776318 (2d Cir. Aug. 26, 2021) ............................ 76

*Howard v. City of Chicago*,
  No. 03 Civ. 8481, 2004 WL 2397281 (N.D. Ill. Oct. 25, 2004) ............................................. 78

*In re Jesus C.*,
  21 Conn. App. 645 (1990) ................................................................................................... 57

*Jackson v. City of Cleveland*,
  925 F.3d 793 (6th Cir. 2019) ................................................................................ 78, 81, 108

*Johnson v. City of New Haven*,
  No. 17 Civ. 1479 (D. Conn. Apr. 13, 2020) ........................................................................ 68

*Johnson v. Town of North Branford*,
  64 Conn. App. 643 (2001) ................................................................................................. 139

*Johnson v. Warden*,
  No. CV 443442, 2002 WL 31928624 (Conn. Super. Ct. Dec. 20, 2002) ...................... 58, 118

*Jones v. Town of East Haven*,
  691 F.3d 72 (2d Cir. 2012) ............................................................................................... 104

*Jones v. Westchester Cnty.*,
  182 F. Supp. 3d 134 (S.D.N.Y. 2016) ............................................................................... 104

*Kampshoff v. Smith*,
  698 F.2d 581 (2d Cir. 1983) ............................................................................................... 81

*Kern v. City of Rochester*,
  93 F.3d 38 (2d Cir. 1996) ................................................................................................. 109

*Kyles v. Whitley*,
  514 U.S. 419 (1995) ..................................................................................................... 75, 87

*Lagassey v. State*,
  268 Conn. 723 (2004) .............................................................................................. 131, 133

*Lavoie v. Pac. Press & Shear Co.*,
  975 F.2d 48 (2d Cir. 1992) ............................................................................................... 148

*Leka v. Portuondo*,
  257 F.3d 89 (2d Cir. 2001) ..................................................................................... 75, 79, 147

*Lewis v. City of New Haven*,
  No. 16 Civ. 1382, 2017 WL 101304 (D. Conn. Jan. 10, 2017) ...................................... 67, 76

*Lewis v. Comm'r of Corr.*,
  975 F. Supp. 2d 169 (D. Conn. 2013) ................................................................................. 64

*Loeber v. Spargo*,
   391 F. App'x 55 (2d Cir. 2010) ................................................................... 86

*Mandell v. Cnty. of Suffolk*,
   316 F.3d 368 (2d Cir. 2003)....................................................................... 94

*McDonough v. Smith*,
   139 S. Ct. 2149 (2019)............................................................................... 136

*McKay v. Jelly*,
   No. 185051372S, 2018 WL 7046619 (Conn. Super. Ct. Dec. 13, 2018) ............ 135

*Mendez v. Artuz*,
   No. 98 Civ. 2652, 2000 WL 722613 (S.D.N.Y. June 6, 2000)......................... 86, 87

*Mikita v. Barre*,
   No. CV990430564, 2001 WL 651171 (Conn. Super. Ct. May 22, 2001) ................. 146, 147

*Miller v. Cnty. of Nassau*,
   467 F. Supp. 3d 308 (E.D.N.Y. 2006) .................................................. 109

*Miller v. United States*,
   14 A.3d 1094 (D.C. 2011) ............................................................. 79, 81

*Mollica v. Toohey*,
   134 Conn. App. 607 (2012) .................................................................. 140

*Mozell v. Wezner*,
   No. CV 970406002S, 2003 WL 21498956 (Conn. Super. Ct. June 10, 2003)....................... 58

*Nealy v. State*,
   No. CV 950128398, 1997 WL 600159 (Conn. Super. Ct. Sept. 18, 1997) ................. 146, 147

*Nnodimele v. Derienzo*,
   No. 13 Civ. 3461, 2016 WL 3561708 (E.D.N.Y. June 27, 2016) .......................... 75, 79, 92

*Nzegwu v. Friedman*,
   605 F. App'x 27 (2d Cir. 2015) ......................................................... 103

*Nzegwu v. Friedman*,
   No. 10 Civ. 2994, 2014 WL 1311428 (E.D.N.Y. Mar. 31, 2014) ....................... 103

*Odom v. Matteo*,
   08 Civ. 1569, 2010 WL 466000 (D. Conn. Feb. 3, 2010) ................................. 146

*Olschafskie v. Town of Enfield*,
   No. 15 Civ. 67, 2017 WL 4286374 (D. Conn. Sept. 27, 2017) ........................... 149

*Pappas v. New Haven Police Dep't,*
    175 F. Supp. 2d 288 (D. Conn. 2001) ........................................ 123, 126

*People v. Hamilton,*
    115 A.D.3d 12 (N.Y. App. Div., 2d Dep't 2014) ................................. 63

*Pines v. Bailey,*
    No. 10 Civ. 866, 2012 WL 2958213 (D. Conn. July 12, 2012).................. 146, 147

*Poventud v. City of New York,*
    750 F.3d 121 (2d Cir. 2014)............................................ 75, 79, 125

*Poventud v. City of New York,*
    No. 07 Civ. 3998, 2015 WL 1062186 (S.D.N.Y. Mar. 9, 2015) ........ 115, 117, 125

*Purzycki v. Town of Fairfield,*
    244 Conn. 101 (1998) ...................................................... 145

*Quezada v. Smith,*
    624 F.3d 514 (2d Cir. 2010).................................................. 78

*Rabinovitz v. City of Los Angeles,*
    287 F. Supp. 3d 933 (C.D. Cal. 2018) ...................................... 115

*Ramos v. Town of East Hartford,*
    No. 16 Civ. 166, 2019 WL 2785594 (D. Conn. July 2, 2019)................... 149

*Ravalese v. Town of East Hartford,*
    No. 16 Civ. 1642, 2019 WL 2491657 (D. Conn. June 14, 2019) ................ 149

*Ricciuti v. N.Y.C. Transit Auth.,*
    124 F.3d 123 (2d Cir. 1997)................................................. 89

*Riccuiti v. N.Y.C. Transit Auth.,*
    124 F.3d 123 (2d Cir. 1997)................................................ 136

*Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.,*
    30 F.3d 339 (2d Cir. 1994).................................................. 148

*Rosato v. Mascardo,*
    82 Conn. App. 396 (2004) .................................................. 131

*Rosenfield v. Rogin, Nassau, Caplan, Lassman & Hirtle, LLC,*
    69 Conn. App. 151 (2002) .................................................. 138

*Russo v. City of Bridgeport,*
    479 F.3d (2d Cir. 2007).................................................. 98, 102

*Russo v. City of Bridgeport*,
   No. 03 Civ. 1792, 2008 WL 2167881 (D. Conn. May 21, 2008) ................ 105, 106, 117, 121

*Seri v. Town of Newtown*,
   573 F. Supp. 2d 661 (D. Conn. 2008) .................................................................... 145

*Sestito v. City of Groton,*
   178 Conn. 520 (1979) ......................................................................................... 146

*Shirley P. v. Norman P.*,
   329 Conn. 648 (2018) ......................................................................................... 101

*Smith v. Sec'y of N.M. Dep't of Corr.*,
   50 F.3d 801 (10th Cir. 1995) ................................................................................ 88

*Smith v. Town of E. Haven*,
   No. 01 Civ. 1375, 2005 WL 677284 (D. Conn. Mar. 22, 2005) ................................. 146

*Soderlund v. Merrigan*,
   110 Conn. App. 389 (2008) ................................................................................. 143

*Sorlucco v. N.Y.C. Police Dep't*,
   971 F.2d 864 (2d Cir. 1992) ....................................................................... 104, 109

*State v. Belle*,
   215 Conn. 257 (1990) ........................................................................................... 57

*State v. Biller*,
   5 Conn. App. 616 (1985) ....................................................................................... 58

*State v. Carter*,
   34 Conn. App. 58 (1994) ....................................................................................... 58

*State v. Cerrilli*,
   222 Conn. 556 (1992) ........................................................................................... 58

*State v. Coleman*,
   38 Conn. App. 531 (1995) ..................................................................................... 58

*State v. Coriano*,
   12 Conn. App. 196 (1987) ..................................................................................... 58

*State v. Harris*,
   22 Conn. App. 329 (1990) ............................................................................... 60, 119

*State v. Hedge*,
   297 Conn. 621 (2010) ........................................................................................... 86

*State v. Johnson*,
  214 Conn. 161 (1990) ................................................................. 57

*State v. Jones*,
  29 Conn. App. 304 (1992) ................................................ 55, 56, 118

*State v. Kelly*,
  208 Conn. 365 (1988) ................................................................. 57

*State v. Mullings*,
  202 Conn. 1 (1987) .................................................................... 56

*State v. Myers*,
  193 Conn. 457 (1984) ................................................................. 56

*State v. Rosado*,
  134 Conn. App. 505 (2012) ................................................ 50, 58, 118

*State v. Santangelo*,
  205 Conn. 578 (1987) ................................................................. 56

*State v. Shaw*,
  185 Conn. 372 (1981) ................................................................. 56

*State v. Sims*,
  12 Conn. App. 239 (1987) ........................................................... 57

*State v. Tyson*,
  23 Conn. App. 28 (1990) ............................................................ 58

*State v. Valentine*,
  255 Conn. 61 (2000) .................................................................. 62

*State v. Williamson*,
  212 Conn. 6 (1989) .................................................................... 57

*State v. Woodard*,
  279 Conn. App. 786 (1992) .......................................................... 58

*Steidl v. Fermon*,
  494 F.3d 623 (7th Cir. 2007) ....................................................... 139

*Stevelman v. Alias Research Inc.*,
  174 F.3d 79 (2d Cir. 1999)..................................................... 137, 138

*Tanner v. Walters*,
  No. 10 Civ. 849, 2021 WL 320940 (W.D. Mich. Feb. 1, 2021)..................... 124

*Tarnowsky v. Socci*,
    271 Conn. 284 (2004) ................................................................. 133

*Taylor v. Wallace*,
    184 Conn. App. 43 (2018) ...................................................... 134, 135

*Tierinni v. Town of Vernon*,
    No. TTDCV145005870S, 2015 WL 3798181 (Conn. Super. Ct. May 21, 2015) ........ 134, 135

*United States v. Cody*,
    722 F.2d 1052 (2d Cir. 1983) ........................................................... 78

*United States v. Gil*,
    297 F.3d 93 (2d Cir. 2002) ............................................................... 86

*United States v. MacPherson*,
    424 F.3d 183 (2d Cir. 2005) ............................................................ 94

*United States v. Mahaffy*,
    693 F.3d 113 (2d Cir. 2012) ........................................................ 79, 81

*United States v. Martoma*,
    No. 12 CR. 973, 2014 WL 31704 (S.D.N.Y. Jan. 6, 2014) ................................. 78

*Vann v. City of New York*,
    72 F.3d 1040 (2d Cir. 1995) ....................................................... 111, 123

*Ventura v. Town of East Haven*,
    330 Conn. 613 (2019) .................................................................. 142

*W.R. Grace & Co., Conn. v. Zotos Intern., Inc.*,
    No. 98 Civ. 838S, 2004 WL 5669337 (W.D.N.Y. May 14, 2004) ....................... 123

*Walker v. City of New York*,
    974 F.2d 293 (2d Cir. 1992) .................................................... *passim*

*Washington v. Baltimore Police Dep't*,
    457 F. Supp. 3d 520 (D. Md. 2020) .............................................. 125, 126

*Witt v. St. Vincent's Med. CDep.*,
    252 Conn. 363 (2000) ......................................................... 138, 139, 140

*Wray v. City of New York*,
    490 F.3d 189 (2d Cir. 2007) ............................................................. 114

*Wright v. Brown*,
    167 Conn. 464 (1975) .................................................................. 142

*Zahrey v. City of New York*,
   No. 98 Civ. 4546, 2009 WL 54495 (S.D.N.Y. Jan. 7, 2009) ................................................ 91

**STATUTES**

Conn. Gen. Stat. § 52 ............................................................................................. 131, 132

Conn. Gen. Stat. § 54 ....................................................................................... 143, 144, 147

Conn. Gen. Stat. § 7 ...................................................................................................... 148

**RULES**

Fed. R. Civ. P. 15 ........................................................................................................ 149

Fed. R. Civ. P. 30 ......................................................................................................... 74

Fed. R. Civ. P. 42 ........................................................................................................ 165

# DEFENDANTS FRAME TWO INNOCENT MEN

Defendants declare their intent to flagrantly defy the summary judgment standard from the very first words of the Detectives' brief: "On January 24, 1999, at approximately 3:26 am . . . Vernon Horn . . . and Marquis Jackson . . . set out to rob the Dixwell Deli . . . ."

Wrong. In the light most favorable to Plaintiff—and in reality, which Defendants stubbornly insist upon ignoring—Vernon Horn and Marquis Jackson are innocent.

To secure the murder convictions of these two innocent men, three detectives in the New Haven Police Department coerced witnesses, fabricated evidence, and destroyed *Brady* material.

The Detectives threatened to charge a witness with murder, imprison him and his mother, and remove his children, all to link Horn to a phone stolen from the crime scene. The Detectives threatened a crime victim to fabricate identifications of Horn and Jackson. The Detectives filed a fraudulent warrant application. They planted a fictional story for a key State's witness. They hid more than 100 pages of exculpatory phone records in a basement, along with a "whole bunch of . . . junk,"[1] for eighteen years.

The Detectives succeeded in their crooked scheme, and as a result, Horn and Jackson spent almost two decades behind bars. Only the FBI ended this tragic charade when it proved Horn had no link to the stolen phone and the prosecution was a sham.

But these were no rogue police. The Detectives followed their training, supervisors, and NHPD policy, custom, and practice: to (i) coerce, manipulate, and threaten witnesses in unrecorded pre-interviews; (ii) fail to record, preserve, or disclose *Brady* material in

---

[1]     Ex. 3 at 113:19-22

1

pre-interviews; (iii) destroy all *Brady* material in police notes; and (iv) destroy tapes of witness interviews, an NHPD practice Connecticut courts have lambasted at least 14 times.

It is little wonder the Detectives admit they "acted in accordance with policies, procedures, custom and practice at the New Haven Police Department."[2] Violating the Constitution is what the NHPD does.

The NHPD's illegal practices have led to multimillion dollar settlements, scandals, FBI investigations, and hundreds of years of wrongful convictions. Here, even the *defense* experts and Horn and Jackson's prosecutor agree: NHPD detectives violated the Constitution, yet again.

Defendants are undeterred by the testimony of their experts, the witnesses, or themselves. They are indifferent to the facts, the record, and the law. Since 1999, they have treated Mr. Horn and Mr. Jackson like the exonerating evidence in that basement: "junk."

The motions should be denied.

## FACTS

**I.     DETECTIVES DEASE, BRELAND, AND ADGER FABRICATE A CASE AGAINST TWO INNOCENT MEN, SERIALLY HIDE *BRADY* MATERIAL, AND IGNORE CLEAR EVIDENCE OF INNOCENCE**

### A.     Vernon Horn and Marquis Jackson Are Entirely Innocent

#### 1.     Vernon Horn and Marquis Jackson Have a Normal Teenage Saturday Night Until Learning of a Homicide

Vernon Horn and Marquis Jackson were not involved in any way in the robbery of the Dixwell Deli, the shooting of Abby Yousif, or the murder of Caprice Hardy in the early morning of January 24, 1999. They are completely innocent of this crime.

---

[2]     Ex. 74 (Detectives' Responses to RFA No. 1). References to "Ex." are to the exhibits filed by Plaintiff Horn in opposition to Defendants' motions for summary judgment and in support of Plaintiff's partial cross-motion for summary judgment.

On the night of January 23-24, 1999, Vernon, Marquis, and Imar Robinson went to the Alley Cat Club in downtown New Haven. Ex. 1 (Horn Dep.) at 141:21-142:9. They drove there in a Honda Civic hatchback borrowed from Marquis's friend. Ex. 2 (Jackson Dep.) at 80. Vernon and Marquis stayed at the Alley Cat Club until it closed. Ex. 1 at 148:20-149:11. Closing time was 2:00 am. Ex. 9 (Cooper (Berryman) Dep.) at 17:7-8; Ex. 8 (Butler Dep.) at 15:1-3.

After leaving the Alley Cat Club, Vernon and Marquis drove to the Athenian Diner, where young people typically went to meet up after clubs closed. Ex. 1 at 150:4-151:9. The diner was located at 1426 Whalley Avenue in New Haven. Ex. 78 (Adger Jan. 31, 1999 Rep.) at DET01279. Vernon and Marquis drove to the diner in the Honda hatchback. Ex. 1 at 149:12-18. They spent a short time in the parking lot of the diner and did not go inside. *Id.* at 151:2-9; Ex. 2 at 156:6-157:19. They heard there was a party in the Westville neighborhood, near the diner, so they started driving around the area. Ex. 1 at 151:10-25.

That night, Zaneta Berryman was attending a party on South Genessee Street in New Haven. Ex. 9 at 14:19-15:1.[3] Vernon and Zaneta were childhood acquaintances. Ex. 1 at 87:8-17; Cooper (Berryman) Dep. 9:4-13. South Genessee Street is a few blocks from the Athenian Diner. Ex. 76 (Google Maps).

As Zaneta was standing outside the party smoking a cigarette, Vernon Horn and Marquis Jackson drove by. Ex. 1 at 151:20-152:6; Ex. 9 at 15:25-18:1. Vernon stopped the car, and he and Zaneta had a conversation. Ex. 1 at 151:20-152:23; Ex. 9 at 17:24-19:5. Zaneta went inside and got her coat, then got in the car with Vernon and Marquis. Ex. 9 at 19:6-9. Vernon was driving, Zaneta was in the front passenger seat, and Marquis was in the back. Ex. 1 at

---

[3]     Berryman later took the married last name Cooper. Citations to her testimony are in the form of Cooper (Berryman) for clarity.

153:18-21; Ex. 9 at 19:10-19. No one else was in the car. Ex. 9 at 20:10-14. There were no masks, guns, or weapons in the car. Ex. 9 at 19:17-20:4.

Vernon drove to the Dixwell Deli in the Newhallville neighborhood. Ex. 1 at 153:18-24; Ex. 9 at 24:20-22; Ex. 2 at 159:20-160:12. While driving, Vernon's demeanor was "chill;" there was nothing unusual about it, and he did not appear upset, agitated, or nervous. Ex. 9 at 23:14-24:6. Vernon went inside the deli and purchased some items. Ex. 1 at 153:22-154:12; Ex. 9 at 24:12-25:22; Ex. 2 at 323:21-24. Marquis went to use a nearby pay phone. Ex. 9 at 24:23-25; Ex. 2 at 163:21-164:19.

At this time, Marcus Pearson was outside the deli in the vehicle of a man named Earl Reddick, along with Reddick and Saliem al-Dubai. Ex. 6 at 28:18-33:11; Ex. 40 (Al-Dubai Statement). Vernon and Pearson had a brief conversation while Pearson was in the vehicle. Ex. 1 at 175:8-18; Ex. 40.

Vernon and Marquis got back into the Honda with Zaneta. Ex. 1 at 176:18-21; Ex. 9 at 27:9-17; Ex. 2 at 170:18-172:14. When he got back to the car, Vernon was still "chill"; he did not appear agitated or angry, and there was nothing unusual about his demeanor. Ex. 9 at 26:9-27:5.

Vernon drove to a rooming house on West Ivy Street, where Marquis had a room. *Id.* at 27:18-20. Again, no one else was in the car on the way to West Ivy Street. *Id.* at 28:6-16. Vernon and Zaneta went into the house; Marquis drove off to his mother's apartment. Ex. 1 at 186:19-25; Ex. 9 at 29:25-30:4; Ex. 2 at 173:20-174:3, 179:4-12. Vernon and Zaneta had sex in Marquis Jackson's room at the West Ivy Street rooming house. Ex. 1 at 95:12-19.

While at the West Ivy Street house, Zaneta got a page from Marcus Pearson, whom she was dating at the time. Ex. 9 at 31:15-19, 10:5-12. Zaneta asked Vernon to get her a

phone. Ex. 1 at 157:18-158:14; Ex. 9 at 65:23-66:3. At this point in time, Vernon was still "cool, calm, and collected." Ex. 9 at 36:7:37-16. His demeanor "didn't seem strange at all," and he did not appear to be agitated, angry, or out of breath. *Id.* at 36:6-37:7. Vernon went downstairs, got a phone, and brought it upstairs to Zaneta. Ex. 1 at 158:12-22; Ex. 9 at 66:4-10.

At 3:30 am, Zaneta called Pearson. Ex. 1 at 160:21-161:17; Ex. 9 at 67:19-25; Ex. 6 at 34:9-35:13. Vernon interrupted the call and hung up the phone. Ex. 1 at 160:21-161:22; Ex. 9 at 67:19-25. Zaneta called Pearson back and arranged to meet Pearson halfway between the West Ivy Street house and Pearson's house. Ex. 9 at 35:2-25. In the course of these phone conversations, Mr. Horn also spoke briefly with Pearson at about 3:30. Ex. 6 at 37:7-23. Mr. Horn sounded "totally normal": not out of breath, agitated, or upset. *Id.* at 38:6-39:18.

Vernon walked with Zaneta back to the Dixwell Deli. Ex. 9 at 38:3-19; Ex. 1 at 192:5-16. When they got back to the deli, police were on the scene. Ex. 9 at 38:25-39:5.

Police instructed Vernon and Zaneta to wait on the scene to be interviewed. *Id.* at 39:18-40:22. When police first encountered Vernon outside the deli, he was not wearing a mask, he did not have any weapons, and he did not appear out of breath. Ex. 3 (Adger. Dep.) at 36:21-37:17. He was not doing anything out of the ordinary. *Id.* at 38:15-19.

NHPD Officer Michael Ferraro spoke with Vernon and Zaneta outside the deli on the morning of January 24, 1999. Ex. 29 (*State v. Horn* Trial Testimony) at TT-116:2-18. Ferraro did not even arrive at the deli until approximately 20 minutes after hearing over the police radio that a shooting had occurred there. *Id.* at TT-114:7-14. By the time Ferraro arrived at the scene, the victims had already been transported to the hospital. *Id.* at TT-114:22-27. The first person with whom Ferraro spoke after arriving on scene was a civilian witness with whom Ferraro spoke for "quite a long time." *id.* at TT-115:11-20. Ferraro spoke with Vernon and Zaneta maybe

"somewhere in the area of ten minutes or twenty minutes after" Ferraro arrived at the scene. *Id.* at TT-121:11-18. Vernon and Zaneta were outside the deli "a very long time," "maybe 30 minutes." Ex. 9 at 40:4-7.

Outside the deli, Vernon also spoke with Pearson for a few minutes. Ex. 6 at 40:19-41:25, 44:1-4. Again, Vernon seemed perfectly normal: not out of breath, angry, upset, or agitated in any way. *Id.* at 42:19-43:25. Vernon had no mask or weapon "anywhere on him or near him." *Id.* at 44:10-17. Pearson went home with Zaneta. *Id.* at 41:21-25. Vernon left the deli, walked to a friend's house, and went to sleep. Ex. 1 at 179:19-181:12.

### 2. Witnesses Repeatedly Confirm Vernon and Marquis's Whereabouts

During the course of the NHPD's investigation, civilian witnesses not suspected of any wrongdoing repeatedly confirmed Vernon and Marquis's whereabouts.

Imar Robinson confirmed to the NHPD that he went with Vernon and Marquis to the Alley Cat Club in New Haven that night. Ex. 3 at 201:15-18. Shamar Madden confirmed to the NHPD that Vernon and Marquis were at the Alley Cat Club in New Haven that night. *Id.* at 201:19-21. Tesha Smith told the NHPD that she spoke with Marquis Jackson and Vernon Horn outside the club after it closed. *Id.* at 201:11-14; Ex. 39 (Smith Jan. 25, 199 Statement).

Saliem Al-Dubai confirmed to the NHPD that Mr. Horn spoke with Marcus Pearson outside the deli while Pearson was sitting in Earl Reddick's vehicle. Ex. 40; Ex. 53 (Dease Jan. 29, 1999 Rep.); Ex. 3 at 242:14-244:14. Reddick and Pearson also both confirmed to the NHPD that this conversation outside the deli occurred. Ex. 41 (Breland Jan. 31, 1999 Reddick Rep.); Ex. 36 (Pearson Jan. 26, 1999 Statement).

Zaneta Berryman confirmed to the NHPD that Vernon picked her up outside a party on South Genessee Street after 2:00 am, drove to the Dixwell Deli, bought items there, brought her to the West Ivy Street rooming house, got her a phone to use from downstairs, and

walked her to the deli, where they encountered police. Ex. 42 (Breland Jan. 31, 1999 Berryman Rep.). She told the NHPD that the calls occurred around 3:30 am. Ex. 4 (Breland Dep.) at 208:6-9.

Pearson confirmed to the NHPD that he heard Vernon hang up the phone while speaking to Zaneta. *Id.* at 208:13-17.

John Crenshaw, the owner of the West Ivy Street house, confirmed to the NHPD that Vernon came to the house with a woman on the night of January 23-24, 1999, and borrowed the cordless phone in the house. Ex. 3 at 201:22-202:4.

In short, numerous uninvolved, disinterested witnesses confirmed to the NHPD that Vernon and Marquis were in New Haven the whole night, from the time they went to the Alley Cat Club until after the homicide.

### 3. Three Masked Perpetrators Unknown to Regular Employees of the Dixwell Deli Commit a Brutal Crime

At 3:18 am on January 24, 1999, a taxi picked up Caprice Hardy and Shaquan Pallet at the TGI Friday's restaurant in Hamden, where they worked. Ex. 10 (Worsley Dep.) at 18:7-19:2, 36:25-38:9. At 3:26 am, the taxi pulled up at the Dixwell Deli, and the driver shut off the meter. *Id.* at 18:7-19:2, 27:19-28:8. Hardy paid the fare and got out of the taxi. *Id.* at 19:3-20:2. The process of stopping the taxi outside the deli, Hardy paying the fare, and Hardy getting out of the taxi took two minutes. *Id.* at 20:2-7. At 3:28, the taxi made a U-turn and drove off with the second passenger, Pallet, still inside. *Id.* at 38:17-19. While the taxi was outside the deli, no one was standing in front of the deli or on the side of the deli, and no one was running to the deli. *Id.* at 32:3-21. While the taxi was outside the deli, there were no gunshots. *Id.* at 34:9-11.

Pallet never got out of the taxi. *Id.* at 31:10-16. The taxi driver told the NHPD that only "one person"—Caprice Hardy—got out of the taxi. *Id.* at 31:17-19; Ex. 3 at 250:23-25.

Abby Yousif, the owner of the deli who was working behind the counter at the time of the robbery, confirmed to the NHPD that only "one person" got out of the taxi. Ex. 3 at 250:20-22.

Hardy went inside and bought a pack of cigarettes from Yousif at the counter. Ex. 30 (Yousif Prelim. Tr.) at 6. As Yousif was giving Hardy his change, three young black men entered the store, and at least one immediately opened fire. *Id.* at 6-7. Hardy was fatally shot in the back. *Id.* at 8. Yousif was shot in the shoulder and played dead. *Id.* at 8-9. Hardy's unopened pack of cigarettes was still on the counter. Ex. 54 (crime scene photo); Ex. 11 (Shelton Dep.) at 16:4-20, 19:3-21:8. The robbers could not open the cash register. Defs.' SMF ¶ 7.[4]

Vernon Butler, an employee of the deli, was waiting for Yousif to arrive at the deli to ask Yousif for an advance on his pay. Ex. 8 (Butler Dep.) at 19:19-20:7. While waiting for Yousif, Butler fell asleep in the back room of the deli. *Id.* at 20:10-13. The gunshots woke Butler up. *Id.* at 20:19-24. Two men kicked in the door to the back room. *Id.* at 23:1-9. A heavyset robber hit Butler on the head with the butt of a gun, threw him on the floor, and asked him where the money was. *Id.* at 24:2-18. A tall, skinny robber was also in the back room and also armed. *Id.* at 26:10-28:2. The robbers stole Butler's prepaid Omnipoint cellular phone. *Id.* at 30:8-11.

After the door to the back room was open, and two armed robbers were already in the back room, the third robber called, "Get the nigga in the back." *Id.* at 32:17-23. The heavyset robber put his gun at Butler's back and walked Butler up front to the cash register. *Id.* at 34:16-35:3. Butler tried to open the cash register but could not. *Id.* at 41:1-12. The robbers heard a siren and "ran off" out of the store in a hurry. *Id.* at 42:5-9, 70:12-16 (ambulance siren); Ex. 3 at 36:9-12; Ex. 4 at 92:11-14.

---

[4]     References to "Defs.' SMF" are to the Detectives' Local Rule 56(a)(1) Statement of Facts, Dkt. 221-1.

After the robbers left, Yousif got up off the floor and told Butler to call 911. Ex. 30 at 16:18-21. Butler called 911 at 3:32 am. Ex. 4 at 208:25-209:1. By the time the 911 call occurred, the robbers had already left the store. Ex. 30 at 16:18-17:7.

All three robbers were wearing black masks over their faces during the robbery. Ex. 8 at 48:5-50:5; Ex. 30 at 6:21-7:14. There was no way to see their faces underneath the masks. *Id.* at 50:2-5; Ex. 30 at 7:8-12.

Yousif and Butler were both familiar with Mr. Horn, who regularly patronized the deli. Ex. 30 at 13-17; Ex. 8 at 13:24-18:3. Neither identified him as a perpetrator of the crime. *See generally* Ex. 8; Ex. 30. Butler "did not believe" and "had no reason to think" Vernon was a perpetrator of the crime. Ex. 8 at 56:15-22. Butler had "frequent conversations" with Vernon during Vernon's visits to the deli. *Id*. at 18:2-3. Butler did not recognize any of the robbers' voices. *Id.* at 45:1-17.

### 4. Despite Their Innocence, Vernon and Marquis Immediately Become Prime Suspects

Three NHPD detectives led the investigation: lead Detective Dease, Ex. 4 at 40:13-15, a 30-year NHPD veteran; Detective Breland, a veteran of ten years at the NHPD, *id.* at 29:13-14; and Detective Adger. Adger had been at the NHPD for seven years, had been a detective for six, and was later promoted to sergeant, lieutenant, and Assistant Chief, the second-highest-ranking member of the department. Ex. 3 at 6:23-8:14.

No physical evidence tied Mr. Horn or Mr. Jackson to the crime: no DNA, fingerprint, hair, footprint, video, audio, nothing. Ex. 4 at 85:21-86:23, 391:10-12, 399:6-400:9; Ex. 3 at 28-29; Ex. 25 (Stine Dep.) 103:11-18 (defense expert); Ex. 26 (Spector Dep.) 122:9-19 (defense expert). Yet, on January 24, mere hours after the homicide, the Detectives had already identified Mr. Horn and Mr. Jackson as suspects and had started showing their photographs to

witnesses. Ex. 12 (Graham Dep.) at 31:19-32:25 (describing being shown photographs of Horn and Jackson, and no one else, on January 24, 1999).

A woman named Regina Wolfinger was parked outside the deli in a car during the robbery. At the time, Wolfinger habitually smoked 20 bags of crack a day. Ex. 29 at TT-1108:4-5. Before going to the Dixwell Deli on the night in question, Wolfinger had consumed five beers in an hour and a half, *id.* at TT-1105:20-22, then smoked eight bags of crack over the course of two hours, *id.* at TT-1106:15-25. On January 24, 1999, Wolfinger told Dease that two men came out of the deli, lingered outside talking in front of the ice machine for "maybe two minutes," and then left. *Id.* at TT-1074:3-6; *see also id.* at TT-1095:26-1096:10. She said the men she saw were "light skinned." Detectives' Ex. 25 at NH000197; Ex. 29 at TT-1077:8, TT-1091:27-1092:1.

When shown a photo of Vernon Horn and asked if she was "pretty positive" she had seen him outside the deli, Wolfinger responded: "possibly, yes, he looks pretty familiar." Ex. 79 (Wolfinger Statement). But Mr. Horn is dark skinned, not light skinned. Ex. 47 (Horn 1999 mugshot).

Marcus Pearson lived at 31 Elizabeth Street in New Haven. Ex. 6 (Pearson Dep.) at 48:10-15. On the morning of January 25, Mr. Horn and his cousin Sholanda Jenkins visited Pearson at his house and smoked together on Pearson's porch. *Id.* at 47:14-49:14. Mr. Horn did not have a cell phone and did not give Pearson a cell phone. *Id.* at 50:4-11. Pearson had no reason to use a cell phone on his own porch: he had two cordless phones in his house, which he had used on his porch "many times." *Id.* at 36:4-16, 50:15-51:8.

The Detectives interviewed Marcus Pearson a number of times, first on January 26, Ex. 4 at 205:11-209:15, then on January 28, *id.* at 211:7-217:20, then on multiple other occasions, as set forth below. The Detectives' field notes from January 28, Pearson's alleged

taped statement, and the alleged transcription of that taped statement have all disappeared. *Id.* at 216:24-217:20. Nevertheless, Breland admits that on January 28, Pearson told him that Pearson had met Horn on the morning of January 25. *Id*. at 225:19-226:7.

### B.    The Stolen Cell Phone Drives the Detectives' Investigation

A week after the murder, the NHPD got a call detail record for Vernon Butler's stolen cell phone from Omnipoint. Ex. 3 at 34:21-25; Ex. 46 (Omnipoint Call Records). The call detail record showed five outgoing calls from the stolen phone in the 36 hours after it was stolen, including one just 45 minutes after the robbery:



```
                              ON-LINE CALL DETAIL INQUIRY
               COMPANY 0840 OMNIPOINT COMMUNICATIONS,  SRVA/SLOC 0001 0001 84/NEW YORK
               IMSI/MOBILE # 310160100400239 DATE RANGE FROM 01 / 12 / 99  THRU 01 / 25 /
               TOTAL CALLS 00047            TOTAL MINUTES 00093         TOTAL CHARGES      0
               ========================================================================
               DATE   TIME   CALLED PLACE   CALLED NUMBER  MINS     AMOUNT TYP ORIG   ESN
               01-24 04:14A BRIDGEPORTCT    203-395-6641     1       .00 H/A 61923   0203435
               01-24 10:48P BRIDGEPORTCT    203-375-4651     1       .00 H/A 61922   0203435
               01-25 10:40A BRIDGEPORTCT    203-696-1495     1       .00 H/A 61923   0203435
               01-25 11:07A NEW HAVEN CT    203-933-5833     4       .00 H/A 60153   0203435
               01-25 02:32P BRIDGEPORTCT    203-395-6641     1       .00 H/A 60141   0203435
```

*Id*. The stolen cell phone was "critical to the investigation." Ex. 32 (Dease Habeas Tr.) at 96:16-18. It was "critical evidence to the case." Ex. 21 (Nicholson Dep.) at 78:13-14.

None of the calls from the stolen cell phone were made to Vernon Horn or Marquis Jackson. Ex. 3 at 35:1-6; Ex. 4 at 89:24-90:5. None of the phone numbers called by the stolen cell phone "had any connection with Mr. Horn or Mr. Jackson." Ex. 4 at 90:15-20.

The Detectives determined that the first and fifth calls were received by a Nextel cell phone registered to a Bridgeport man named Willie Sadler. Ex. 3 at 106:9-11. Sadler denied any recollection of receiving the calls and refused to tell the NHPD who called him. Ex. 44 (Dease Feb. 5, 1999 Rep.) at DET237.

The Detectives determined that the third call was received by a phone line used by a Bridgeport woman named Tamika Fuller. Ex. 3 at 102:3-25. Fuller told the Detectives that she did not remember receiving the call, but that her boyfriend, Marlo Macklin, "very often" spent time at her Bridgeport house. Ex. 44 at DET237; Ex. 3 at 103:1-7.

The Detectives determined that the second call was received by a young woman named Adrienne Younger, who told them she believed the call came from "Steve." Ex. 43 (Adger Mar. 5, 1999 Rep.) at DET411. Younger recognized a photograph of Marlo Macklin and told the Detectives that she believed "Steve" was Marlo Macklin's brother. *Id.*

The Detectives interviewed Macklin at his home in Bridgeport. Macklin told them that Sadler was his first cousin and that Willie Sadler and Tamika Fuller sold drugs together. Ex. 44 at DET237.

As of February 4, 1999, the Detectives knew that Sadler received the first and fifth calls; that Macklin may have received the third; that "Steve" placed the second call; that "Steve" was related to Macklin; and that Macklin was related to Sadler. In short, the people involved in four of the five calls were all connected to each other, and to Bridgeport.

C.    **The Detectives Manipulate Crystal Sykes into Giving a Fabricated Statement, then Submit a Fraudulent Warrant Application for Horn's Arrest**

On February 2, 1999, knowing that (i) Pearson and Horn met on Pearson's porch on the morning of January 25, Ex. 4 at 226:2-7; (ii) the NHPD had "no connection between [Horn and Jackson] to the stolen phone," *Id*. at 172:15-19; and (iii) they had somehow to connect Horn to the stolen phone in order to begin to make a credible case, Detectives Dease, Breland, and Adger went to 59 Ivy Street in West Haven. *Id.* at 166:11-14. That was the location the stolen phone called on January 25 at 11:07 am (the fourth phone call). Ex. 46; Ex. 4 at 166:14-17, 168:25-169:12.

The Detectives met a woman named Crystal Sykes, a nurse's aide who took care of a husband and wife who lived there. Ex. 4 at 166:18-24. They questioned her about the fourth phone call. Sykes had no memory of "receiving a telephone call from anyone at that time." *Id.* at 169:22-170:7; Ex. 44 at DET-236.

Undeterred, the Detectives took Sykes to the police station, Ex. 32 at 70:10-12, and into the interrogation room, *id.* at 76:5; Ex. 4 at 176:8-12. Dease and Breland interrogated her and closed the door to the room. Ex. 4 at 177:14-16, 178:3-5.

Dease and Breland did a classic NHPD unrecorded interview. They had a tape recorder but did not record. *Id.* at 178:6-8. Dease took notes in his notebook but did not disclose them. *Id.* at 178:11-16. The Detectives showed Sykes the stolen phone record. *Id.* at 178:24-179:1. Dease again "introduced the idea that Marcus Pearson called Ms. Sykes." *Id.* at 180:1-4. Once again, Sykes said "I don't remember." *Id.* at 180:9.

After at least ten minutes, *id.* at 176:16-19, Dease and Breland decided to turn the recorder on, *id.* at 180:12-14. The recording of Sykes' statement, like virtually every recording in this case, has disappeared. *Id.* at 78:12-14, 180:21-25. The transcription of the recording nevertheless reveals two detectives desperate to manipulate Sykes into a false statement. *See* Ex. 52 (Sykes Feb. 2, 1999 Statement). Dease asked: "Ms. Sykes, do you know the reason you are the New Haven Police Department?" Sykes responded: "I was told I had a phone call, right, phone call stating that I was talking to say his name Marcus Pearson." *Id.* at DET00200-011; Ex. 4 at 182:2-183:16. As Breland admits, "the people who told Crystal Sykes that she had a phone call were [Breland] and Detective Dease." Ex. 4 at 183:17-20.

Dease tried again: "Ms. Sykes do you recall receiving a telephone call at that location?" For the third time, Sykes said: "No, I don't recall talking or receiving a phone call

from Marcus." Ex. 52 at DET00203; Ex. 4 at 184:11-14. This time, Sykes added "but the paper said that he called." Ex. 52 at DET00203. The paper was the stolen phone record the Detectives had shown Sykes in the unrecorded interview. Ex. 4 at 185:7-18. But the paper said nothing about who called 59 Ivy Street, and nothing about Pearson. *Id*. at 186:14-187:5. The plain inference is that the Detectives told Sykes, in the unrecorded interview, that the stolen phone record showed that Pearson called her, when it did not.

For a fourth time, Sykes said she had no knowledge of a call from Pearson: "I get wake up calls in the morning. I don't recall a man calling me or whoever called me at that particular time. I don't even know from yesterday who called me." Ex. 52 at DET00203; Ex. 4 at 187:10-25. "[O]ver and over," Sykes told the Detectives she had no knowledge of such a call. Ex. 4 at 187:21-188:6.

Having heard these repeated denials, and as if "up" meant "down," Dease then said: "so you're telling me that it's a good possibility that Marcus Pearson may have called you around eleven o'clock on 1:25:99," and Sykes responded "yes." Ex. 52 at DET00204; Ex. 4 at 188:7-24. Breland called this witness manipulation "good police work." Ex. 4 at 189:15-16.

Dease then made the mistake of asking Sykes again "the last time you spoke with Marcus on the telephone at your job" on Ivy Street. Sykes responded, for the fifth time: "I don't know what day it could have been the twenty-fifth, I don't know, I can't recall when the last time I talk to [Pearson]." Ex. 52 at DET00204; Ex. 4 at 190:3-11. Frustrated, Dease asked a more pointed question: "Ms. Sykes is it a fact that you told me that you believe Marcus could have called you to ask something about your birthday party which is going to be February 24, 1999." Ex. 4 at 190:12-16. Sykes' response in the transcript: "No response heard." Ex. 52 at DET00204. The recording has conveniently disappeared. Again, Dease pressed her: "Ms. Sykes, would you

14

tell me the last time you called him at his house." *Id.* at DET00205. Sykes answered: "Oh God. .

. I don't know. What do you want me to say?" *Id.* Dease pressed again: "[W]ould it be fair to say

it would of[sic] been a week ago?" *Id.* at DET00206. Sykes: "That I called him? Could have

been. I don't know. . . I can't specifically say what day and time and, you know, was it last

week? I don't know." *Id.*; Ex. 4 at 191:18-192:5.

On March 12, 1999, Detective Adger filled out a sworn warrant application for

Horn's arrest. Ex. 48 (Mar. 12, 1999 Warrant Application). Adger filed this with the court:

"Sykes stated that she believed Marcus Pearson, a New Haven resident, telephoned her on

1:25:99 at 11:07 a.m. at telephone number (203) 933-4833." *Id.* at DET399. This was a fraud.

Sykes never told any detective she believed Pearson called her on that date or time. "Over and

over," Sykes told the Detectives she had no knowledge of such a call. She told them at home.

She told them in the interrogation room. She told them in the unrecorded interview. She told

them repeatedly in her recorded statement. But over and over, the Detectives told Sykes that

Pearson had called her at that number at that time. In the warrant application, the Detectives

failed to disclose what Sykes actually said. Ex. 4 at 196:14-198:3. That warrant application led to

a warrant for Vernon Horn's arrest on March 22, 1999. Ex. 3 at 247:11-18. To this day, Breland

calls this "good police work." Ex. 4 at 198:5-6.

Sykes had no knowledge of a call from Pearson because no such call happened.

See *infra* § I.I.1; Ex. 4 at 193:24-25. The Detectives invented it.

### D. The Detectives Coerce Marcus Pearson into Giving a Fabricated Statement

Having lied to Sykes that Pearson called Sykes on January 25, the Detectives had

to persuade Pearson to corroborate the lie. Pearson was the loving father and sole caregiver of

seven-month-old baby twins, Ex. 6 (Pearson Dep.) at 17:4-15, 45:3-14. The twins' mother was in

prison. *Id.* at 45:12-14. Pearson also had more than a year left of probation, which the Detectives

knew. *Id.* at 45:24-46:16; Ex. 4 at 199:8-18. In short, Pearson was vulnerable to coercion and threats by the police, and the Detectives knew it.

Though Horn and Pearson spent time together on Pearson's porch on the morning of January 25, Horn did **not** have a cell phone. Ex. 6 at 50:4-6. Horn did not give Pearson a cell phone. *Id.* at 50:7-8. Pearson did not borrow or use a cell phone from Horn. *Id.* at 50:9-11.

None of that mattered to Detectives Dease or Breland. Unless Pearson tied Horn to the phone, the Detectives could not connect Horn (or Jackson) to the phone, or pin Horn (or Jackson) to *any* physical evidence in the case. The key connection between Horn and the stolen cell phone would be an "alleged fourth phone call by Marcus Pearson." Ex. 4 at 108:18-21; *see* Ex. 25 at 104:14-20 (defense expert); Ex. 26 at 126:7-13 (defense expert).

On February 3, the day after the Sykes interrogation, Dease and Breland interviewed Pearson a third time. Ex. 4 at 218:21-219:4. This time they took Pearson "down to the police station," "[i]nto the interrogation room." *Id.* at 219:5-9.

Rather than gather evidence, Dease and Breland *told* Pearson that Horn had a cell phone, that Pearson borrowed the phone, and that Pearson used Horn's phone to call Sykes. "[T]he whole idea of Vernon Horn giving you a cell phone and you calling Crystal Sykes, that whole idea came from the detectives, right? A: Yes." Ex. 6 at 72:5-8; *id.* at 57:9-10 (same); *id.* at 67:1-15 (same); *id.* at 71:19-22 (same); *id.* at 109:1-4 (Detectives gave Pearson the number; "they told me I called Crystal Sykes"). The Detectives did this "over and over again." *Id.* at 67:6-11.

Pearson repeatedly told Dease and Breland it was a lie: Horn had no phone and gave him no phone. "I kept telling them there was no phone." *Id.* at 52:19-20; *id.* at 56:1-2 ("I kept telling Dease and Breland there was no phone."); *id.* at 66:14-21 (same); *id.* at 73:19-21

(told them "on five different occasions"); *id.* at 70:5-13 (same); *id.* at 83:20-22 (same). But as Pearson testified, "They told me what to say. They didn't want to hear what I had to say." *Id.* at 80:4-5. "They came back, they came back again, came back again, they came more, they kept coming back, sir, because they didn't get the answers they wanted. They wanted the answers they wanted to hear." *Id.* at 85:4-86:3.

To get what they wanted, Dease and Breland used every pressure technique short of beating Pearson. Without any probable cause or legal basis, the Detectives took Pearson into custody, into a six by twelve-foot interrogation room on the third floor of the police precinct. *Id.* at 59:12-63:5. "[T]hey told me if I ain't telling them what they wanted to hear I wouldn't be walking out of there, that I would be charged." *Id.* at 62:2-4; *id.* at 83:1-23 ("they told me if I didn't say what I need, if I didn't tell them what they wanted to hear it depended on if I walked out of there that day"). "[T]hey basically told me to say I used the phone or I was facing charges [for robbery and murder]. That's what they told me." *Id.* at 67:23-68:7; *id.* at 65-66 (told Pearson he was a suspect and fit the description of one of the robbers); *id.* at 74:5-11 ("if I didn't say I used the cell phone, I was being charged they told me"); *id.* at 79:6-9 (threatened conspiracy charge as well); *id.* at 56:22 ("They were going to choose one of us [Pearson or Horn].") As Pearson testified:

> Q:     So Dease and Breland threatened to charge you with
>        robbery, murder and conspiracy, right?
>
> A:     Yeah.
>
> Q:     If you didn't lie for them?
>
> A:     Yeah, lying, going on what they wanted.

*Id.* at 79:13-19. But as Breland admitted, the Detectives had no "reason to arrest" Pearson. Ex. 4 at 287:18-19. The Detectives' threat to charge Pearson with murder was no more than a pressure tactic to fabricate evidence and force Pearson to lie.

The Detectives did not stop there. They threatened to take away Pearson's *children* if he failed to go along with the phony phone story. Ex. 6 at 75:5-24 ("Q: So Dease and Breland were saying if you don't lie for us, you're going to lose your kids? A: Yeah."). Dease and Breland even (successfully) instructed Pearson's probation officer to tell Pearson, "if you don't cooperate, then I'm going to violate your probation and let DCF know they have custody of your children." *Id.* at 76:9-23. The Detectives told Pearson he "might as well just put [him]self in jail and give the kids to the State to take the children" if he did not lie for them. *Id.* at 87:5-12.

Dease and Breland also threatened to charge Pearson's *mother* with perjury if Pearson did not go along with the phone story. *Id.* at 78:11-18.

The Detectives also pretended they had phone records proving the stolen cell phone was used on Pearson's front porch. *Id.* at 67:18-21; *id.* at 53:1-2. That, too, was a fabrication. *See* Ex. 46 (phone records, which say nothing about who made phone calls). The Detectives also "told Pearson that Sykes said that Pearson called her," Ex. 4 at 277:17-19, when Sykes repeatedly said she had no knowledge of such a call, *see supra*.

As Pearson testified, Dease and Breland were "dirty cops" who "didn't care [about the truth] as long as they got a conviction, no matter whose life they destroyed in the middle of it." Ex. 6 at 80:6-20.

Dease and Breland used the NHPD's unrecorded "pre-interview" policy to its intended and maximum effect. Their threats, coercion, pressure, and fabrication occurred in the "pre-interview" interviews, "*before* they hit the record button." *Id.* at 54:24-55:4; *id.* at 57:22-

58:4 (same). These unrecorded interviews lasted "for hours." *Id.* at 130:23-131:17. Even worse, the Detectives stopped the tape when Pearson said something that contradicted the Detectives' phony story connecting Horn to the stolen phone:

> Q: You told them there was no phone, and they would not put that on the tape, correct?
>
> A: Correct.
>
> Q: And then when they'd start the tape when you said something they didn't want to hear, they would rewind the tape; is that what they did?
>
> A: Yes.
>
> Q: And then they would start over until they got what they wanted?
>
> A: Yes.

*Id.* at 58:23-59:10; *id.* at 105:23-106:3 (same); *id.* at 124:21-127:11 (detailing fabrication when the recorder was off). At his deposition, Pearson was able to identify a number of suspicious clicks and splices where the Detectives likely stopped, rewound, and recorded over Pearson's oral statement to ensure their fabrication succeeded. *Id.* at 135:4-148:25. For his part, Breland testified that his thumb went in the "wrong direction" and therefore pressed the pause button of the cassette tape during the recording. Ex. 4 at 303:23-305:5.

Pearson finally caved to the Detectives' pressure, principally to save his children. "I believe I did a good job with my children. They was good where I was. I couldn't let them go to the State." Ex. 6 at 77:8-16. "It was either my friend or my children. I chose my children over my friend which any father would do who was taking care of his kids by himself." *Id.* at 86:18-25. By coercing, pressuring, and threatening Pearson, threatening Pearson's mother and children, and lying to Pearson, the Detectives fabricated Pearson's statement about the cell phone. *Id.* at 88:18-90:8. Everything Pearson said connecting Horn to the stolen phone, in pretrial statements

and at trial, was fabricated by Dease and Breland. *Id.* at 88:18-89:7; *id.* at 151:13-152:4 (same). As a result, Pearson became the crucial "link between Mr. Horn and the stolen cell phone." Ex. 4 at 294:18-25, 296:14-18.

As Breland admits, Pearson somehow told the NHPD about (1) a call that never happened; (2) using a phone he never saw; (3) borrowed from someone who just happened to be the Detectives' suspect (Horn); (4) at a time and to a number that just happened to match the stolen phone call record. *Id.* at 411:9-415:15. Breland admitted that "[i]t is suspicious" and "[i]t worked out." *Id.* at 415:16-416:20. "It worked out" only because the Detectives coerced Pearson, fabricated evidence, and framed Vernon Horn.

The police records of these repeated interrogations are, predictably, sketchy. The recording of Pearson's January 28 statement was "messed up" and "garbled," Breland now claims, *id.* at 416:21-417:8, even though Breland wrote no report saying so at the time, *id.* at 417:6-15. That recording vanished. In the February 3 pre-interview, no one took notes. *Id.* at 223:19-23. Pearson's alleged recorded statement from February 3 also vanished: Breland "couldn't find it." *Id.* at 299:11-14. "[T]he tape went missing," *Id.* at 301:1-2. But Breland never noted that in 1999, because he "forgot." *Id.* at 418:19-420:7. On February 5, Breland tracked Pearson down *again,* had yet another unrecorded interview, and again did not take notes. *Id.* at 302:5-303:10. Det. Adger's warrant application for Horn's arrest falsely represented that Pearson was first interviewed on February 5, ignoring the February 3rd and previous interviews. Ex. 48 at DET399.

After Dease and Breland successfully fabricated Pearson's statements and testimony, "they never bothered [Pearson] again." *Id.* at 91:23-25.

## 2. The Detectives Undisputedly Fail to Disclose *Brady* Material

*Everyone* agrees that Pearson initially told Dease and Breland that he did **not** call

Sykes. Pearson so testified. *See supra. And so did Breland:*

> Q. So in the pre-interview on February 3rd you discussed the stolen cell phone with Mr. Pearson?
>
> A. Yes.
>
> Q. And you discussed the fourth phone call?
>
> A. Well -- yes.
>
> Q. And you discussed --
>
> A. The phone call, yes.
>
> Q. -- Pearson allegedly calling Sykes?
>
> A. Yes.
>
> Q. And you told Pearson we think you called Sykes at that phone number, in the fourth phone call. Correct?
>
> A. Yes.
>
> Q. **And he denied it. Right?**
>
> A. **Yes.**

Ex. 4 at 227:2-17. There is no ambiguity about this testimony. Breland was represented by

multiple lawyers, *id.* at 222:15-25, met three times with counsel to prepare for his deposition for

a number of hours. *id.* at 9:15-10:5, and a month after the above testimony, declined an

opportunity to change it, *id.* at 252:21-253:2.

Neither Breland nor anyone else in the NHPD ever disclosed this exculpatory

evidence to the prosecutor. That is also undisputed. Breland never spoke with the prosecutor's

office about the Dixwell Deli case, *id.* at 350:3-14, and did not "share what happened in [his]

pre-interviews with the prosecutor's office," *id.* at 351:10-13. Pearson's denial that he called Sykes is in no police report or document. Ex. 26 at 138:5-9.

The prosecutor, Nicholson, confirms that neither Breland nor anyone in the NHPD ever disclosed this exculpatory evidence to the prosecution. Nicholson relied on the NHPD to provide all the evidence in the case. Ex. 21 at 52:7-16. But the police hid this information from the State Attorney: "Q: The very first time in your entire life you're finding out that Mr. Pearson told Dease and Breland that he never used the cell phone is today in 2020. Correct? A: It's the first time I hear of it." *Id.* at 118:12-18; *see id.* at 111:8-9 (same); *id.* at 120:2-7 ("Q: Did Dease or Breland ever tell you that Pearson told them that Vernon Horn never gave him the cell phone? A: No. Q: Did Detective Adger ever tell you that? A: Nobody ever told me that.").

### E. The Detectives Coerce Kendell Thompson into Identifying Horn and Jackson and Withhold *Brady* Material from Thompson's Interrogation

Det. Breland was 6' 5" and 200 pounds in 1999. Ex. 4 at. 98:7-13. Dease was six feet tall. *Id*. at 127:5. Kendell Thompson was nineteen years old, about 5' 9", considerably smaller than the Detectives. *Id.* at 99:1-7; Ex. 7 (Thompson Dep.) at 9:11.

Thompson was in the Dixwell Deli when the three people robbed the store, one put a gun to his head, ordered him to get on the floor, and threatened to shoot him. Ex. 7 at 9:10-11, 15:1-18:13. The robbers wore masks "covering their whole face." *Id*. at 22:17-24. The entire episode took three to four minutes. *Id*. at 24:15-18. Thompson had no idea who any of the robbers were. *Id*. at 46:4-48:9, 71:2-10. He never saw Horn in his life, except in the courtroom. *Id*. at 46:4-15.

"Thompson was the only witness in the deli who identified Horn and Jackson" at trial. Ex. 25 at 144:19-23; Ex. 26 at 177:20-22 (same). But Thompson's identification was tainted by the Detective's threats, coercion, and *Brady* violations.

On January 26, 1999, Dease and Breland tracked Thompson to his home. Thompson "didn't want to talk . . . didn't want to have nothing to do with it." Ex. 4 at 121:21-24; Ex. 7 at 30:18-23. Dease and Breland told Thompson he "wasn't going anywhere until [Thompson] c[a]me to the police station," and "threatened to come back with a warrant" for his arrest. Ex. 7 at 28:18-29:9.

Dease and Breland "put him in the back of the car," and "brought him down" to the police station, Ex. 4 123:9-13, because "[i]t was more conducive for him to be down there," and "[m]ade things a lot easier." *Id*. at 123:25, 124:16. They took Thompson to a room on an upper floor, closed the door, and told him to "have a seat." *Id.* at 128-131:13; Ex. 7 at 39:8. It was a "very small room, bright lights." Ex. 7 at 38:3-4. They gave Thompson no food or drink and did not tell him he could contact an adult or a lawyer or that he could leave. Ex. 4 at 144:20-145:6; Ex. 7 at 50:6-17. They kept him there about two hours. Ex. 7 at 50:5. Thompson was "scared." *Id.* at 42:2-20.

Dease and Breland then did another classic NHPD unrecorded "pre-interview." They had a tape recorder but did not record. Ex. 4 at 131:20-133:10; Ex. 7 at 73:6-11. Dease took notes in his notebook but did not disclose them. Ex. 4. at 132:20-133:17. Dease and Breland showed photos of Horn and Jackson to Thompson, to get an identification with the recorder off. *Id.* at 135:9-15. Then the Detectives pressured Thompson to make a fabricated statement.

As to the photos, before they turned the recording on, the Detectives repeatedly showed Thompson two photographs of Horn and Jackson. Ex. 7 at 45:7-8; Ex. 47 (mugshots).

The Detectives "kept on putting [the two photographs] in front of [Thompson]" and said "Do[] these eyes match the eyes that you seen?" Thompson said "no." Ex. 7 at 49:5-15. The Detectives kept the two photographs in front of Thompson for "[t]he whole interview," *i.e.*, about two hours. *Id*. at 87:19-21.

Thompson (like Butler and Yousif) told Dease and Breland that the robbers were wearing face masks, Ex. 4 at 151:18-152:1, and that he could not describe their appearance, Ex. 7 at 86:3-11. Thompson repeatedly told Dease and Breland he could not identify the robbers:

> Q: How many times did you tell Detective Dease and the other detective that you couldn't identify anyone through those ski masks?
>
> A: I told them about 18 times. I kept on repeating myself.
>
> Q: And when you kept saying that, what did Detective Dease say?
>
> A: He kept on stopping the tape and putting these pictures [of Horn and Jackson] in front of me. Are you sure? Are you sure? Look at the eyes. Look at the eyes. And they start the tape over and they stop it. They start the tape over, they stop it. They kept on doing it.

*Id.* at 57:20-58:10, 90:9-17 (did not identify Horn or Jackson), 227:17-20, 233:4-11 (same).

Frustrated, Dease "said that he would call [Thompson's] probation officer and have [Thompson] violated" if he "didn't cooperate." *Id.* at 56:6-17, 59:8-11. Breland admits Dease told Thompson "that he'll notify Mr. Thompson's probation officer if he didn't cooperate." Ex. 4 at 157:21-24. "Cooperate" meant "[t]o take out these two defendants." Ex. 7 at 57:3-12. But as Thompson testified, "I couldn't because I didn't see who did the crime. That's what I kept on telling them." *Id.* at 57:12-14.

The Detectives had a theory that Horn's eyes had "a yellow shade." Ex. 4 at 115:17-116:3. They repeatedly told Thompson that Horn's eyes had a "yellow shade." Ex. 7 at

65:9-16, 66:1-14, 227:21-228:2. Horn's eyes had no "yellow shade." Ex. 47 (photo of Horn); Ex. 7 at. 68:9-10. But Dease "didn't want to take no for an answer." Ex. 7 at 68:2-3. Through their relentless pressure, the Detective manipulated Thompson to say at trial that one of the robbers had "yellow" eyes. *Id.* at 110:5-111:4.

The Detectives created a written statement for Thompson to sign. Thompson would not "sign[] anything." *Id.* at 62:21-63:17. Dease and Breland then told Thompson "All you gotta do is put your initials" on the Horn and Jackson photos, without explaining why. *Id.*at 62:24-63:8. Thompson did not understand why, then initialed them but told the Detectives he did not "mean anything by it." *Id.* at 62:3-63:8.

Dease and Breland then turned the recorder on and got a statement. They "kept starting and stopping recording" during the interview, more than ten times. *Id.* at 36:14-37:4, 84:1-13. They also rewound the tape during the statement, "[a]bout ten times." *Id.* at 81:16-82:6. "They kept on rewinding it, playing it again; rewinding it and recording again, not playing, but recording it." *Id.* at 82:6-8. The recording has disappeared. Ex. 4 at 76:24-77:3 ("Q: Any idea where that recording is today? [Breland]: No, I do not."); *id.* at 78:1-3 (same).

Thompson describes Dease and Breland as "dirty cops" who "were looking for a fall guy," *i.e.*, "Horn and Jackson." Ex. 7 at 77:8-78:18. After two hours, the Detectives finally let Thompson call his aunt, who picked him up at the station. *Id.* at 79:13-21.

Thompson refused to sign the alleged transcript of the lost recording: "[h]e didn't want to be involved with the police department any longer." Ex. 4 at 140:15-141:2.

## 2. The Detectives' Undisputed *Brady* Violations

Everyone agrees that Thompson told Dease and Breland in the police precinct that he could not identify Horn or Jackson. Thompson so testified. Ex. 7 at 57:20-58:10, 90:9-17 227:17-20, 233:4-11. *And so did Breland*:

> Q. Mr. Thompson repeatedly said he couldn't identify anyone through his ski mask?
>
> A. Yes. In this statement said that.
>
> Q. And that's what he said in that room in Union Avenue in 1999. Right?
>
> A. No. No.
>
> Q. So your testimony is what exactly about Mr. Thompson?
>
> A. **He did say he couldn't identify them**, but he wasn't asked 18 times.
>
> Q. **So Mr. Thompson said he couldn't identify Horn or Jackson. Right?**
>
> A. **Yes.**
>
> Q. **How many times did Mr. Thompson say that in the room?**
>
> A. **Maybe twice.**
>
> Q. **And when Mr. Thompson said he couldn't identify Horn and Jackson, what did you or Dease say in response?**
>
> A. **There is nothing you can say. He couldn't identify them.**

Ex. 4 at. 159:13-160:9 (emphasis added). The Detectives never disclosed this information to the prosecution. Consider this remarkable testimony from the prosecutor, Nicholson:

> Q: Did Breland ever tell you what he told us under oath in this civil case -- that Thompson said he could not identify Horn or Jackson? Breland never told you that?
>
> A. **No.**

Q.    You're a hundred percent sure about that. Right?

A.    **To the best of my recollection, he did not. If he had told me that, I would have disclosed to that counsel.**

Q.    And that is Mr. Breland's failure to disclose *Brady* material. Right?

A.    **Yes.**

Q.    And it's a pretty dramatic failure, isn't it?

A.    **It's certainly important.**

Q.    Are you disturbed by this?

A.    **I never knew about it.**

Q.    But now that you know that Mr. Breland is admitting that Thompson gave him Brady material that Breland never told you about it, are you disturbed at Mr. Breland's conduct?

A.    **I'm not happy.**

Q.    Why aren't you happy?

A.    **Because if that happened, I should have been informed.**

Q.    By Breland and Dease?

A.    **If they were both there when that took place, yes.**

Q.    Has this ever happened in your career, that decades after a conviction, you learned that detectives in your case had Brady material that they never disclosed had to you?

A.    **I can't recall specifically if it's happened. It's not a common event, I'll say that.**

Ex. 21 at 136:17-138:18. Similarly, neither Dease nor Breland disclosed to Nicholson that—as is also undisputed—Dease threatened to call Thompson's probation officer. *Id.* at 141:5-142:17.

*Everyone* agrees that this is *Brady* material. *Id.* at 72:13-16; Ex. 25 at 93:10-12 (defense expert).

**F.     The Detectives Fabricate Steve Brown's Incredible Story**

**1.     Brown Tells a Nonsense Tale**

On March 4, 1999, Willie Sadler identified "Steve," Marlo Macklin's brother-in-law, as the person who had called him from the stolen cell phone on the night of the homicide. Ex. 3 at 178:17-20. Macklin then told Adger and Dease that Steve's last name was Brown. *Id.* at 179:5-7. Dease and Adger got Brown's fingerprints from the Bridgeport police, which matched one of the latent fingerprints taken from the back room of the Dixwell Deli. *Id.* at 179:19-180:1. They got a warrant for Brown's arrest, arrested him in Bridgeport on March 10, 1999, and brought him back to NHPD headquarters to interrogate him. *Id.* at 180:2-11.

Dease and Adger began speaking with Brown at 7:10 pm after they Mirandized him. *Id.* at 181:9-11 (time); 181:21-24 (started talking after Mirandizing). Steve Brown's taped statement began at 8:10 pm. *Id.* at 181:12-14. Dease or Adger took notes during this *hour-long* unrecorded pre-interview. *Id.* at 182:25-183:4. They destroyed the notes. *Id.* at 183:5-9.

After 60 minutes off the record with the Detectives, Brown told this story: He met Vernon and Marquis at the White Eagle Club in Bridgeport. *Id.* at 193:18-20. They introduced themselves only as "Son" and "Tai." *Id*. at 199:14-16. He was with them in Bridgeport for approximately two hours, driving around and "smoking and chilling." *Id*. at 314:25-315:16. They drove to New Haven. The robbery at the Dixwell Deli began without any prior discussion or agreement and Brown had to be coerced into participating at gunpoint. *Id.* at 188:16-24. After the robbery was over, Brown, Horn, and Jackson "got some more weed" and "were smoking and riding the round." Ex. 55 (Brown Mar. 10, 1999 Statement) at NH000110.

On I-95 "on [the] way back to Bridgeport," Horn let Brown use the stolen cell phone to make the first phone call to Willie Sadler. *Id.* at NH000121. Brown acknowledged making the second and third phone calls from the stolen cell phone to Adrienne Younger and

28

Tamika Fuller. *Id.* at NH000123-124. He also claimed that Horn and Jackson "rode around" with him "till the next morning" and took the phone back with them—which would have to mean the morning of *January 25*, since that is when the Fuller call occurred. *Id.* at NH000124; Ex. 46.

The Detectives already knew, however, that Brown had placed the fifth call to Willie Sadler. So they concocted a theory that Vernon lent the phone to Brown on the way home to Bridgeport; drove back to Bridgeport on the morning of January 25 to retrieve the phone; lent the phone to Marcus Pearson on Pearson's porch in New Haven; and then brought the stolen cell phone back to Bridgeport, enabling Brown to make the last call. Ex. 3 at 203:20-204:17.

This story is absurd on its face. Why would two complete strangers drive Steve Brown from Bridgeport to New Haven and dragoon him into a robbery without any prior discussion or agreement? Why would anyone ferry a cell phone back and forth between Bridgeport and New Haven, particularly one stolen from a murder scene? It makes no sense.

## 2. The Detectives Willfully Ignore a Mountain of Evidence Contradicting Brown

A wealth of other evidence—nearly all of it known to Dease and Adger at the time—directly contradicted Brown's story.

*First* and most important, Vernon Horn and Marquis Jackson were in New Haven all night. They were outside the Alley Cat Club (in New Haven) after the 2:00 closing time, on South Genessee Street (in New Haven) shortly thereafter, and then at the Dixwell Deli (in New Haven) around 3:00 am. *Supra.* Multiple civilian witnesses suspected of no wrongdoing confirmed their whereabouts at each New Haven location. They cannot have spent two hours driving around *Bridgeport* before driving to the Dixwell Deli to rob it (as Brown claims), since they were in *New Haven* at the relevant time (as many witnesses confirm). The Detectives did not investigate that discrepancy or confront Brown about it. Ex. 3 at 303-05.

*Second*, Brown claimed to have met up with Vernon and Marquis at the White Eagle Club in Bridgeport. Brown, Horn, and Jackson are all Black. *Id.* at 197:2-4. The White Eagle Club was a private social club. Ex. 29 at TT-1812:22-1813:2. It was a "white club" with no Black members. *Id.* at TT-1815:21-24. There were no Black people—"none"—at the dinner dance held at the club on the night of January 23, 1999. *Id.* at TT-1813:12-18, TT-1815:12-16. The Detectives did not investigate anything about the White Eagle Club or talk to any witnesses who could have debunked Brown's tale. Ex. 3 at 193:24-194:25.

*Third*, Brown claimed that Vernon and Marquis called themselves "Son" and "Tai." The Detectives had no evidence that Vernon and Marquis or anyone else had ever referred to them by those nicknames before. *Id.* at 199:17-200:2. The Detectives did not investigate that discrepancy or confront Brown about it. *Id.*

*Fourth*, Brown claimed that the car in which Vernon and Marquis brought him to New Haven was a "long four door." Ex. 55 at NH000119. The Honda Civic hatchback that Vernon and Marquis were driving on the night of January 23-24, 1999, is not long. Ex. 45 (photo of car); Ex. 3 at 200:3-22. It is notably short. Ex. 45; *see* Ex. 33 (Dease Horn Habeas Test.) at HHT-0845:7-11 (Brown's description "entirely inconsistent" with Dease's own "physical observations" of the car).

*Fifth*, Brown claimed that he was coerced into participating in the robbery when Vernon Horn turned the gun on him after the crime was already in progress. Ex. 3 at 188:20-24. None of the victims or witnesses inside the deli saw any such event. *Id*. at 189:4-190:23. The Detectives did not investigate that discrepancy or confront Brown about it. *Id.* at 192:8-193:1.

*Sixth*, Brown claimed he was unarmed. *Id.* at 190:24-191:1. But the victims said all three robbers were armed. *Id.* at 191:2-8. The Detectives did not investigate that discrepancy or confront Brown about it. *Id.* at 193:2-11.

*Seventh*, Brown said he covered his face with a colorful scarf. *Id.* at 191:12-14. The victims and eyewitnesses inside the deli said the robbers were wearing black masks. *Id*. at 191:21-24. The Detectives did not investigate this discrepancy or confront Brown about it. *Id.* at 193:12-17.

Dease did not believe Steve Brown's story. Dease did not "believe . . . for a second" that Brown was unarmed. Ex. 33 at HHT-0844:1-15. Dease "did not believe . . . for a second" Brown's description of the getaway car. *Id.* at HHT-0845:12-15. Dease "didn't believe . . . for a second" that Brown had no prior knowledge of the plan to rob the deli. *Id.* at HHT-0845:17-24.

Dease chose not to confront Brown about his obvious lies, because at the time of Brown's statement, Dease had already chosen Vernon Horn and Marquis Jackson as "[his] two guys." *Id.* at HHT-0847:10-11. There was "no question" in Dease's mind, *before* interviewing Brown, that "Horn and Jackson were the guys that . . . had committed the Dixwell Deli robbery with someone else." *Id.* at HHT-0847:12-17. Dease chose not to challenge Steve Brown on his obvious lies because he was "concerned that if [he] pushed Mr. Brown he might back away from some of these statements and [the] case would unravel." *Id.* at HHT-0847:23-26.

Even Breland (in 2020) admitted the whole Brown tale was a fraud:

Q:     Did you have any evidence whatsoever that Vernon Horn
       or Marquis Jackson had any connection to Steve Brown?

A:     **No**.

> Q: Did you have any evidence whatsoever that Vernon Horn or Marquis Jackson were with Steve Brown at the Dixwell Deli?
>
> A: **No**.

Ex. 4 at 341:4-11.

### 3. Brown's Story Is Fabricated by Detectives

Worse than merely acquiescing in Brown's lies, the Detectives fabricated Steve Brown's false identification of Vernon Horn and Marquis Jackson as the other two perpetrators of this crime.

Up to and including January 24, 1999, Vernon Horn had never met Steve Brown. Ex. 1 at 106:3-109:20. He had never heard of Steve Brown. *Id.* He had never seen Steve Brown. *Id.* He did not know Steve Brown. *Id.* To this day, Vernon has only seen Steve Brown when Brown testified in court, and from a distance in passing in prison. *Id.* They have never spoken. *Id.*

Up to and including January 24, 1999, Marquis Jackson had never met or spoken with Steve Brown. Ex. 2 at 116:23-117:13 (they first spoke in jail in late 1999). The only time he has ever had spoken with Steve Brown was by coincidence, while both were in the bullpen in court while in pretrial custody after their arrests for the Dixwell Deli robbery-homicide. *Id.* at 116:21-117:18. Jackson "didn't know" who Brown was at the time until Brown revealed to someone else in the bullpen what he was locked up for. *Id.* at 117:4-118:10. Jackson has never spoken to Brown at any other time in his life. *Id.* at 118:20-22.

Other than Brown's say-so, the NHPD had zero evidence that Brown had ever met Horn or Jackson. Ex. 3 at 206:18-207:19; Ex. 4 at 341:4-11. So how did Brown falsely identify as his co-conspirators two people he did not know and had never met?

One remote possibility is that he randomly guessed from the set of eight photos he was shown. Ex. 55 at NH000108 ("photo array of eight black male subjects"). But there is less than a four percent chance that Brown picked Vernon and Marquis out of the photo array at random.[5]

The far more obvious possibility is the truth: the Detectives told Brown who to identify. We know that is so because Brown said impossible things that matched the Detectives' other fabrications and matched information privately known only to the NHPD.

By the time Dease and Adger interviewed Brown, they had already fabricated the idea that Vernon Horn lent the stolen phone to Marcus Pearson to call Crystal Sykes. *See supra*. This was "impossible." *See infra*; Ex. 27 (Moledor Dep.) at 16:23-17:1 (defense expert); Ex. 28 (Wines Dep.) at 31:24-32:3. All the calls from the stolen phone came from Bridgeport. *See infra*. Somehow, Brown falsely told Dease and Adger that he gave the phone back to Vernon Horn after making the first three calls. Ex. 55 at NH000123-124; Ex. 3 at 203:20-204:17. That lie fit with the Detectives' preexisting fabrication that Horn lent the phone to Pearson, but it never happened. How did Brown know to tell Dease and Adger an impossible lie that was consistent with the story they had already invented? Dease and Adger told him what to say.

Similarly, by the time the Detectives interviewed Brown, they knew that Vernon Horn had waited outside the deli for an extended period to be interviewed by police after the murder. Ex. 3 at 185:1-9. The interview did not start until 30-40 minutes after the 911 dispatch—

---

[5] The probability that Brown would have randomly picked *either* Horn *or* Jackson from a set of eight photos is 2:8, or 25 percent. The probability that Brown would have randomly picked the *other* of Horn or Jackson from the remaining seven photos is 1:7, or approximately 14.3 percent. The probability that Brown would have randomly picked either Horn or Jackson on his first guess, and then the other of Horn or Jackson on his second guess, is (2:8) x (1:7), or approximately 3.57 percent. Put differently, out of a set of 8 items (A, B, C, D, E, F, G, H), there are 28 unique combinations of two items (AB, AC, AD, AE, AF, AG, AH, BC, BD, BE, BF, BG, BH, CD, CE, CF, CG, CH, DE, DF, DG, DH, EF, EG, EH, FG, FH, GH). The chances of choosing (Horn + Jackson) out of a set of eight photos (Horn + Jackson + 6 others) is one in 28, or approximately 3.57 percent.

no earlier than 4:02 am. Ex. 29 at TT-114:7-15, 121:11-18. The first call from the stolen phone occurred at 4:14 am. Ex. 46. It came from the north side of Bridgeport. *Infra*. It was impossible for Vernon Horn to make it all the way to Bridgeport by 4:14 am after starting an interview with police outside the Dixwell Deli no earlier than 4:02. Ex. 77. Given what the Detectives already knew about the timeline, the only way they could put Vernon Horn in the getaway car with Steve Brown is if Brown said the first call happened *on the way* to Bridgeport. Somehow, conveniently, that is what Brown did. How did Brown know to tell Dease and Adger an impossible lie about the location of the first call, in a way that falsely inculpated Vernon Horn and matched the police timeline? Dease and Adger told him what to say.

> **G.** **The Prosecution Relies Heavily on Pearson, Thompson, and Brown to Convict Vernon Horn and Marquis Jackson**

No DNA evidence connected Horn or Jackson to the crime. Ex. 3 at 28:21-25. None of the latent fingerprints lifted from the crime scene matched Horn's or Jackson's fingerprints. *Id.* at 29:1-4. No hair or footprint evidence connected them to the crime. *Id.* at 29:5-12. There was no video depicting the crime or the perpetrators. *Id.* at 29:13-15. Everyone agrees that Pearson, Thompson, and Brown were critical witnesses for the State. Brown was plainly "an important witness." Ex. 26 at 223:4-6 (defense expert).

The prosecutor, Nicholson, relied heavily on Pearson and Horn's alleged possession of the stolen phone, which he considered "critical" and "highly incriminating" evidence, and referred to some fifteen times in his closing arguments. Ex. 21 at 78:13-14, 96:17; *see generally* Ex. 31 (Nicholson closing argument).

> **H.** **In 2018, Exculpatory Phone Records Never Before Disclosed to the Defense Are Found in the Basement of Detective Adger's House**

In early 2018, more than 100 pages of phone records never before seen by Horn, Jackson, or their counsel were discovered in the basement of Adger's house.

As part of the Dixwell Deli homicide investigation, in February 1999, Adger seized the phone records of Willie Sadler, Tamika Fuller, and the house in West Haven where Crystal Sykes worked. Ex. 3 at 101:10-103:10, 106:3-107:3; *see generally* Ex. 50 (phone records). Adger marked up the phone records line-by-line and made handwritten notes. Ex. 3 at 136:11-14. Dease also had a copy of all the phone records that Adger seized. *Id.* at 136:15-17. The Detectives were required to ensure that originals of the phone records were filed within the NHPD. Ex. 26 at 213:8-11.

On January 30, 2018, an investigator working on behalf of Vernon Horn contacted Adger and asked if she had any record of phone records pursuant to search warrants in the Dixwell Deli case. Ex. 23 (Caporale Dep.) at 100:18-21. Adger said that she would check her basement for relevant records. *Id.* at 100:22-101:10. Just after the investigator came to her door asking about phone records, Adger called Dease. *Id*. at 103:6-10. She asked Dease: "Did we arrest the right people[?]" *Id.* at 104:2-5. Dease responded by reminding Adger of the "hard work" they had put into the case. *Id*. at 104:24-105:3.

On January 31, 2018, Adger provided Horn's investigator with the records. From approximately 2000 to 2018, Adger had kept them in the partially finished basement of her house with "[a] whole bunch of . . . junk." Ex. 3 at 113:19-22. In early 2018, the basement flooded. *Id.* at 115:5-6. Some of the material in the box with the records got wet, and Adger threw it away. *Id.* at 115:12-24. The records fortunately survived. *Id*. at 115:2-11.

Even Breland admitted there was no reason for Adger to store the phone records in her basement. Ex. 4 at 328:21-329:1, that he would never do so, *id.* at 329:22, and that doing so would be a *Brady* violation, *id.* at 330:9-23. Defense expert Spector also testified that it would

be improper for her to take originals of the phone records to her basement after she retired. Ex. 25 at 228:5-8, 229:14-20.

1. **The Suppressed Phone Records Were Highly Favorable to Vernon Horn's Defense**

The phone records hidden in Adger's basement were highly favorable to Vernon Horn and Marquis Jackson's defense. They showed all along what we now know is the truth: Marcus Pearson did not call Crystal Sykes from the stolen cell phone. The fourth phone call from the stolen cell phone came from Willie Sadler in response to a page from his criminal associate William Newkirk, who was Crystal Sykes's boyfriend.

Two minutes before receiving the fourth call, the house in West Haven called a Tri-State Pager. Ex. 50 at PL0008714 (outgoing call), PL0008763 (establishing "Tri-State Pager"). The West Haven house called the Tri-State Pager seven times in January 1999. *Id.* at PL8763-64. Willie Sadler also called the Tri-State Pager at least seven times in January and February of 1999. *Id.* at PL0008727-37. Sadler called the West Haven house ten times between January 21 and February 5, 1999. *Id.* at PL0008728-37.

Pagers allowed a person to call them, leave a message, and have the pager holder call them back. Ex. 3 at 156:7-11; Ex. 22 (Griffin Dep.) at 117:2-6. The obvious explanation for the fourth phone call from the stolen cell phone is that it was in response to the page two minutes earlier. According to the State's Attorney, that is at minimum a "reasonable inference" that Horn's criminal counsel could have used the phone records to argue, had they been disclosed in 1999. Ex. 22 at 122:8-25.

The *reason* for these frequent calls between and among Sadler, the West Haven house, and the Tri-State Pager was that Newkirk, their friend and partner in the drug trade, was dating Crystal Sykes. Newkirk frequently spent time at the house in West Haven with Sykes. Ex.

34 (Sadler Habeas Tr.) at HHT-0483:4-23; Ex. 35 (Newkirk Habeas Tr.) at HHT-0692:17-20. Newkirk did not get cell phone service there. Ex. 35 at HHT-0709:4-11. When Sadler wanted to reach him there, Sadler would call the land line. *Id*. It was *Newkirk*, not Sykes, who got the fourth call in response to the outgoing page he sent two minutes earlier. Newkirk testified in 2013 that Sadler called him at the West Haven house from the stolen cell phone. *Id.* at HHT-0700:7-9 ("My only involvement was Willie Sadler called my cell phone from that cell phone . . . ."), HHT-0701:3-5 ("Q. [D]id you learn that Willie Sadler call you from a cell phone that was not his? A. Yes.").

The phone records hidden in Adger's basement show that the Detectives knew of the connection between Newkirk and Sykes back in 1999 but never disclosed it. *See* Ex. 50 at PL0008728 line 73 (call between Sadler's phone number and Newkirk's phone number with notation "Sykes"); Ex. 3 at 142:8-143:14; Ex. 50 at PL0008727 line 17 (Newkirk's and Sykes's names both noted next to same call); Ex. 3 at 137:12-140:19 (no other explanation for these notations). The Detectives *admit on this motion* that they knew Sykes was Newkirk's girlfriend. *See* Defs.' SMF ¶ 100 ("Detectives learned that Sykes's boyfriend, William Newkirk, was a close friend and dealt drugs with Sadler."). The Detectives hid this knowledge. They did not document the connection between Newkirk and Sykes, or Newkirk and the West Haven house, in any report. *See generally* Entire police record. They did not disclose it to the State's Attorney's Office or to the defense. *Id.*

The phone records also show that the Detectives considered Sadler an alternative suspect but failed to adequately investigate him. Adger made a typewritten chart of Sadler's calls to New Haven County. Ex. 50 at 8761; Ex. 3 at 151:24-152:1. The obvious reason—indeed, the only reason—to make a chart of Sadler's calls to New Haven is that the Detectives suspected

him of involvement in the crime that took place there. *See* Ex. 3 at 152:2-153:9 (unable to provide any other explanation). Sadler lied to the Detectives about his connection to New Haven. When the Detectives first interviewed him on February 3, 1999, Sadler "stated that he does not know anyone in New Haven." Ex. 44 at DET237. This was false: Sadler repeatedly called a "J. Smith" and "Shirley and James Smith" in New Haven. Ex. 50 at PL0008761. The Detectives did not investigate who these people were or why Sadler contacted them. Ex. 3 at 149:17-18 ("Q. Who is Jamie Smith? A. I don't know."). No police report memorializes the Detectives' knowledge that Sadler lied about not knowing anyone in New Haven. *See* Entire police record. That fact was never disclosed. *Id.*

More generally, the phone records reflect extensive connections between Sadler, Newkirk, and Fuller/Macklin—and none with Horn or Jackson. Sadler called phone numbers associated with Newkirk *96 times* between January 17 and February 16, 1999. Ex. 50 at PL0008727-0008737. Sadler called Fuller/Macklin 30 times during the same period. *Id*. There were zero calls between Sadler, Newkirk, or Fuller/Macklin, on the one hand, and Horn or Jackson, on the other. *See generally* Ex. 50.

### 2.     The Detectives Hid the Phone Records in 1999

Despite Adger's self-serving claims to the contrary, a reasonable jury could find that she never put the records found in her basement in 2018 in the NHPD records room in 1999. Instead, she hid them, or (alternatively) forgot to file them.

In 1999-2000, it was the practice of the trial prosecutor, Assistant State's Attorney Gary Nicholson, to "turn over all the documents [he] had to the defense." Ex. 21 at 62:7-10. In the Dixwell Deli case, Nicholson turned over "everything" he had. *Id.* at 62:14-16. Defense counsel confirmed that Nicholson did give them "copies of everything in his file." Ex. 24 (Moscowitz Dep.) at 99:11-100:2. Criminal defense counsel did not receive copies of any phone

records other than the Omnipoint call detail log. *Id.* at 102:3-108:17, 234:16-235:4. The State's Attorney's Office never had them—because the Detectives never provided them.

In 2018, NHPD Assistant Chief Rachael Cain directed and supervised an extensive search for records concerning the Dixwell Deli case. *See* Ex. 13 (Cain Dep.) at 46:7-51:8. It was "a Herculean effort to find every scrap of paper anywhere in the world related to Horn." Ex. 19 (Foster Dep) at 29:6-7. The phone records of Willie Sadler, Tamika Fuller, Marcus Pearson, and the house in West Haven were not found anywhere in NHPD custody. Ex. 13 at 46:7-51:8, 118:3-120:2. These phone records were not found anywhere except Adger's basement. *Id.* at 48:2-51:8, 118:3-120:2. The NHPD found nothing to suggest that these phone records had ever been logged into evidence or into the records room. *Id.* at 118:3-120:2. "Never" during its herculean efforts did the NHPD "learn anything" to suggest that the phone records had previously been disclosed to Horn, Jackson, or their defense counsel. Ex. 19 at 29:19-30:2.

In 1999, after seizing property without a warrant, New Haven police personnel were required to fill out a standard Connecticut Judicial Department inventory form (a "JD-18") to document the seizure. Ex. 13 at 130:18-133:1. JD-18s are filed with the court clerk, which creates an official record of materials seized during an investigation called the Journal of Seized Property. Ex. 20 (Thigpen Dep.) at 71:1-72:12. Adger seized Willie Sadler's phone records without a search warrant. Ex. 3 at 122:11-13. Those phone records were "evidence." Ex. 13 at 120:3-16. Adger was required to complete a JD-18 for Sadler's phone records but did not. Ex. 3 at123:2-5; Ex. 4 at 338:15-18. This violated basic police procedure. Ex. 4 at 339:4-10. Nor did she document her seizure of Sadler's phone records in a police report. Ex. 3 at 108:15-23. No entry in the Journal of Seized Property references Sadler's phone records. Ex. 57 (Journal of Seized Property).

In 1999, after seizing property pursuant to a search warrant, members of the NHPD were required to complete the "return" of the search warrant, also known as "page 6," to "itemize what was seized after the search warrant was executed." Ex. 13 at 11:13-24. The seizure of property pursuant to a warrant was supposed to be noted in the NHPD evidence log. *Id.* at 54:9-18. The seized materials were supposed to be stored in the NHPD property room with a completed "page 6." *Id.* at 54:25-55:9. And the completed "page 6" was supposed to be filed with the court, *id.* at 12:14-16, which would record its contents in the Journal of Seized Property, Ex. 20 at 71:1-72:12. Adger seized the phone records of the West Haven house, Tamika Fuller, and Marcus Pearson pursuant to a search warrant. Ex. 49 (Feb. 25, 1999 Warrant Application). The "page 6" return for that search warrant was not filed with the Court until September of *2014*. *Id.*; Ex. 22 at 155:13-157:20. No entry in the NHPD evidence log reflects the seizure of the West Haven, Fuller, or Pearson phone records. Ex. 13 at 119:8-11, 50:18-51:17. No entry in the Journal of Seized Property reflects the seizure of those phone records. Ex. 57.

Adger did not put the Sadler, Fuller, Pearson, or West Haven phone records in the NHPD record room in 1999. She did not log them into evidence in 1999. She did not complete the required paperwork or otherwise document their seizure in 1999. She did not give them to the State's Attorney's Office in 1999. Instead, she kept them in her basement for 18 years. Adger took these actions because she wanted to hide the phone records from Vernon Horn, Marquis Jackson, and their counsel.

Dease also did not put them in the records room, log them into evidence, document their seizure as required, or give them to the State's Attorney's Office. He also did not do so because he also wanted to hide the phone records from Vernon Horn, Marquis Jackson, and their counsel.

### 3. Alternatively, the NHPD Lost the Records

Adger testified that she did deposit the original phone records with the NHPD. Ex. 3 at 424:5-11. If she is telling the truth, then the NHPD lost the records and failed to make them available to the State Attorney or the defense.

Defendants speculate that State's Attorney's Office Inspector Mel Cartoceti, who was tasked with retrieving and copying NHPD records for the prosecutor's use in this case, may have simply failed to take the phone records. But when retrieving materials from the NHPD on behalf of the State's Attorney's Office, Cartoceti was required to retrieve all investigative materials that the State's Attorney's Office did not already possess. Ex. 21 at 279:24-280:12. He only had discretion not to duplicate materials already in the prosecution's possession. *Id*. at 279:24-280:12. He was a "reliable," "conscientious," "professional" employee. *Id.* at 322:9-17. He never lost or destroyed evidence in any other case. *Id.* at 322:18-323:11. Had Adger actually put the original phone records in the record room in 1999, and had Cartoceti actually failed to retrieve them, they still would have been there in 2018. But they were not.

### 4. The City of New Haven Continued Not to Disclose the Phone Records

While incarcerated, on August 21, 2008, Vernon Horn requested "any and all records" related to the Dixwell Deli homicide investigation from the NHPD pursuant to the Connecticut Freedom of Information (FOI) Act. Order ¶ 1, *Horn v. Chief of Police*, No. FIC 2008-573 (Ct. FOI Comm'n. Aug. 26, 2009). The NHPD "violated the promptness provisions of [the FOI]" by failing to timely provide copies of responsive records. *Id.* ¶ 10. The NHPD improperly redacted records not subject to redaction. *Id.* ¶ 20. The NHPD did not produce any phone records—including those of Sadler or the West Haven house—in response to Vernon's FOI request. *See id.*

### 5. The Detectives Suppressed the Details of their Feeble Investigation of the Bridgeport Crew

The phone records were not the only part of their Bridgeport investigation that Detectives Dease and Adger deliberately suppressed. Detectives Dease and Adger intentionally concealed almost their entire investigation into the Bridgeport suspects, failing to memorialize virtually any of the feeble investigative steps they took.

Adger never documented how she discovered the existence of the Tri-State Pager, what a Tri-State Pager is, or what else she may have learned about the pager. Ex. 3 at 153:22-155:16.

Dease and Adger conducted "several" interviews with Willie Sadler. *Id.* at 170:12-22. During each of those "several" interviews with Dease and Adger, Sadler denied knowing who called him from the stolen cell phone. *Id.* at 170:23-171:12. Either Dease or Detective Adger took notes during each of these several interviews. *Id.* at 172:3-9. They destroyed the notes. *Id.* at 172:12-13. They did not document the substance of any of these "several" interviews in which Sadler denied knowing who called him from the stolen phone, except the first one on February 3. *Id.* at 171:18-172:2; Ex. 44 at DET237.

Dease and Adger also concealed virtually everything they learned about or from William Newkirk. The police reports in the Dixwell Deli case generally indicate how the detectives first learned of witnesses with potentially relevant knowledge. Ex. 3 at 174:21-23. But their only explanation of how they became aware of Newkirk is: "During the course of this investigation, Willie Newkir[k]'s name surfaced regarding this investigation." Ex. 51 (Dease Mar. 8, 1999 Rep.) at 2. This statement is meaningless. Ex. 3 at 175:4-13. Nothing in any police record explains how the NHPD learned of Newkirk's existence or contacted him. *Id.* at 174:8-177:1.

Newkirk eventually told Sadler to give up Steve Brown's name because he was "tired" of the NHPD coming down to Bridgeport to meet with him. Ex. 51; Ex. 3 at 177:10-19. Nowhere did Dease, Adger, or Breland document any of these prior meetings with Newkirk that made him "tired" of them, or what Newkirk said during these meetings. Ex. 3 at 177:21-178:16.

The Detectives never checked the alibis of Sadler, Newkirk, and Marlo Macklin for the night of January 23-24, 1999. *Id.* at 172:14-173:17, 179:8-18; Ex. 26 at 233:3-18; Ex. 25 at 178:11-20.

**I.     Cell Site Information Known to the Detectives All Along Exonerates Horn and Jackson**

**1.     The FBI Concludes that Pearson and Brown's Fabricated Accounts are "Impossible"**

The call detail record that the Detectives got from Omnipoint in early February 1999 showed all along that Vernon Horn never had the stolen cell phone. All the Detectives had to do to find out was ask Omnipoint, the cell phone company, one question.

In 2018, at the joint request of Vernon Horn's habeas counsel and the State's Attorney's Office, FBI Special Agent James Wines analyzed the origin of the five outgoing calls from the stolen cell phone after the Dixwell Deli homicide. Ex. 28 at 14:21-21:10. The column on the call detail record labeled "ORIG" shows the cell site from which each of the five calls originated:

ON-LINE CALL DETAIL INQUIRY

COMPANY 0840 OMNIPOINT COMMUNICATIONS, SRVA/SLOC 0001 0001 84/NEW YORK

IMSI/MOBILE # 310160100400239 DATE RANGE FROM 01 / 12 / 99 THRU 01 / 25 /

TOTAL MINUTES 00093          TOTAL CHARGES       0

TOTAL CALLS 00047

| DATE | TIME | CALLED PLACE | CALLED NUMBER | MINS | AMOUNT | TYP | ORIG | ESN |
|------|------|--------------|---------------|------|--------|-----|------|-----|
| 01-24 | 04:14A | BRIDGEPORTCT | 203-395-6641 | 1 | .00 | H/A | 61923 | 0203435 |
| 01-24 | 10:48P | BRIDGEPORTCT | 203-375-4651 | 1 | .00 | H/A | 61922 | 0203435 |
| 01-25 | 10:40A | BRIDGEPORTCT | 203-696-1495 | 1 | .00 | H/A | 61923 | 0203435 |
| 01-25 | 11:07A | NEW HAVEN CT | 203-933-5833 | 4 | .00 | H/A | 60153 | 0203435 |
| 01-25 | 02:32P | BRIDGEPORTCT | 203-395-6641 | 1 | .00 | H/A | 60141 | 0203435 |

Ex. 46.

Based on this cell site information, the FBI concluded that "all of the calls" made

from the stolen after the murder "were made in Bridgeport." Ex. 28 at 55:19-20. It is "not

possible" for the stolen cell phone to have been on I-95 between New Haven and Bridgeport at

the time of the first call. Ex. 27 at 13:11-16 (defense expert); Ex. 28 31:3-7. The cell tower from

which the call originated was in Bridgeport, "located well north of Interstate 95." Ex. 28 at 31:8-

15. The call originated to the northwest of the tower. *Id.* at 31:8-15.

Since the 911 call occurred at 3:32 am, and Vernon did not start speaking with

Officer Ferraro outside the Dixwell Deli until about 30-40 minutes after Officer Ferraro heard

the radio dispatch, Vernon could not possibly have been in the northern part of Bridgeport by

4:14 am. *Supra*. He could not have one of the other two perpetrators of the crime who drove back

to Bridgeport with Steve Brown.

It is also "impossible for the stolen cell phone to have been in New Haven at the

time the fourth phone call was placed." Ex. 27 at 16:23-17:1; *see* Ex. 28 at 30:2-33:1. It is

impossible for the fourth phone call to have come from Marcus Pearson's porch in New Haven.

Ex. 28 at 27:17-28:7; Ex. 27 at 16:23-17:1. "The phone had to be somewhere on the east side of

Bridgeport in order to use that cell site sector." Ex. 28 at 27:24-25. It is impossible for the stolen cell phone to have been in Vernon Horn's possession at the time of the fourth call, as Vernon was in New Haven and the phone was in Bridgeport. Ex. 28 at 27:24-25; *see* Ex. 4 at 226:2-7 (Horn was in New Haven at the time).

This truth was staring the Detectives in the face in 1999. The "ORIG" column on the Omnipoint call detail record obviously refers to the calls' place of origin. Every commonly used English word that begins with the letters "ORIG"—with the single, comically irrelevant exception of "origami"—pertains to *origination*. Ex. 27 at 19:12-20:12 (defense expert).[6] As a "practical common sense matter," a phone company would be expected to have information about the "date, time, phone or number, and place" at which phone calls originated. Ex. 27 at 17:19-19:11. The originating date, time, and phone number are self-evident from the Omnipoint call detail record. Ex. 46; Ex. 27 at 25:10-22. The "ORIG" column could not reasonably have referred to anything other than the calls' place of origin. Ex. 27 at 30:10-21.

Knowing that "ORIG" meant "origin," the Detectives could have learned back in 1999 that all the calls came from Bridgeport by just asking Omnipoint. The location from which the calls originated was "within the knowledge of Omnipoint" in 1999. *Id.* at 38:24-39:12. Had the Detectives asked, Omnipoint could have simply told them where the calls originated from. *Id.* at 42:2-10. In short, the calls' origin was "knowable back in 1999." Ex. 28 at 33:14-18.

The Detectives either knew that "ORIG" revealed the calls' origin but did not care to find out, or were grossly negligent in failing to understand that "ORIG" meant origin.

---

[6]      *See* Definition of *orig*, Merriam-Webster, https://www.merriam-webster.com/dictionary/orig (defining "orig" as an abbreviation for "origin; original; originally") (last visited September 20, 2021); *id.* (follow "See More Nearby Entries" link) (listing dictionary entries before and after "orig," including "origami" (the art of paper folding), "Origen" (an early Christian scholar), and "origan" (a type of aromatic mint), followed by over a dozen entries stemming from the word "origin").

### 2. Based on the FBI's Findings, the State Exonerates Horn and Jackson

In 2018, based upon the FBI's findings, the State of Connecticut agreed to vacate Vernon Horn and Marquis Jackson's convictions, consented to the dismissal of the charges against them, and allowed them to walk free from prison. Ex. 22 at 56:9-58:10, 90:16-91:8. State's Attorney Patrick Griffin, who made the decision, concluded that he could not prove the case beyond a reasonable doubt and was obligated to dismiss it. *Id*. at 115:7-116:7 ("I would not have the ability to prove this case beyond a reasonable doubt.").

This was "an extraordinary step." *Id.* at 130:9, 130:17-18. Griffin felt this decision was "sufficiently important" to make a public presentation to "the entire command staff of the New Haven Police Department" in which he explained "why I believed it was in the interest of justice" to vacate the convictions and consent to dismissal of the charges. *Id.* at 87:8-25.

State's Attorney Griffin based his decision "in large measure" on the FBI's finding that it was impossible for Marcus Pearson to have made the fourth call. *Id.* at 119:7-13. The fourth call was "crucial evidence." *Id.* at 105:3-10. It was "crucial to the case." *Id.* at 121:16-18. The conclusive proof that the fourth call came from Bridgeport "broke . . . the tangible . . . link between Vernon Horn and the stolen cell phone." *Id.* at 97:9-15.

Knowing that the first phone call from the stolen cell phone came from Bridgeport, Griffin "would not have put [Steve] Brown back on the stand." *Id.* at 93:19-20. The FBI report "discredited" Brown. *Id.* at 59:25. It would be "very difficult to detangle" Brown's discredited testimony about the first call from the rest of Brown's testimony. *Id.* at 92:6-7.

Once the Wines report revealed that all the calls came from Bridgeport, a State's Attorney could only have continued to pursue the case Vernon Horn and Marquis Jackson "if that State's Attorney chose to ignore his or her ethical obligations." *Id.* at 142:14-22.

## II. DETECTIVES DEASE, BRELAND, AND ADGER ACTED PURSUANT TO CITY POLICY, CUSTOM, AND PRACTICE

### A. The City's Written Policies Did Not Require Officers to Preserve or Disclose Exculpatory Evidence

At the time of the Dixwell Deli homicide investigation, there was no general order, rule, regulation, special order, or training bulletin of any kind that required NHPD officers to turn over exculpatory information to prosecutors. Ex. 5 (City 30(b)(6) Dep.) at 166:16-167:6. Nor was there any written policy or training document at any time concerning officers' obligations under Connecticut General Statute 54-86c, which requires all police officers in the state to disclose in writing any exculpatory information to the prosecutor. *Id.* at 167:7-22. The City has not produced any written policy, training, or rule concerning exculpatory evidence, officers' *Brady* obligations, or General Statute 54-86c in this case.

### B. The City Failed to Train its Officers Not to Use Coercive Witness Interrogation Techniques

Despite a long history of NHPD officers inappropriately pressuring and threatening witnesses, *see* § II.E, *infra*, the City did not train its officers not to use coercive interrogation techniques. In Breland's *sixteen years* at the NHPD, the Department never trained him that it would be improper for an officer to threaten to arrest a witness without any basis to arrest them. Ex. 4 at 290:22-291:1. The NHPD also never trained Breland that it would be improper to threaten a witness's family if the witness did not cooperate with the police, *id.* at 291:2-7, or threaten to take a witness's children away if the witness refused to cooperate, *id.* at 291:2-7, or threaten to violate someone's probation if they did not cooperate, *id.* at 291:13-17.

Veteran Detective Stephen Coppola testified about his personal experience with witness coercion at the NHPD in the late 1990s. In 1998, Coppola interviewed a key witness during his investigation of the Philip Cusick homicide. Ex. 17 (Coppola Dep.) at 30:14-17.

Coppola picked up the witness on an outstanding arrest warrant and then proceeded to interrogate him. *Id.* at 30:21-33:18. In an effort to "try to get [the witness] to talk," Coppola threatened to arrest the witness as a conspirator in the murder and told him that "if he didn't help [Coppola], someday he'd be locked up for that murder." *Id.* In response to Coppola's threats, the witness cried in the interrogation room. *Id.* at 31:25-32:25. Detective Coppola's coercion of the witness happened off the record, while the tape recorder was off. *Id.* at 33:19-34:13. Coppola testified in this case that his coercion of the witness in 1998 was "good police work," "*consistent with [his] training at the New Haven Police Department*," and consistent with his observations of his NHPD colleagues. *Id.* at 33:8-22 (emphasis added).

### C. Pursuant to NHPD Practice, NHPD Officers Routinely Destroyed or Secreted their Field Notes, and all the *Brady* Material in the Notes, and Failed to Turn Them Over to Prosecutors

NHPD policy did not require officers to take notes at all, and did not instruct officers *how* to take notes, *when* to take notes, or *where* to put or store them. Ex. 5 at 171:9-173:5; Ex. 15 (Sullivan Dep.) at 39:3-5. NHPD policy also did not require officers to log their field notes in evidence, Ex. 5 at 174:9-14; Ex. 14 (Wearing Dep.) at 114:17-22, and did not prohibit officers from taking their field notes home with them, Ex. 15 at 190:3-11.

Consistent with the NHPD's lack of written policy concerning exculpatory evidence, the NHPD had no policy, practice, training, or procedure requiring detectives to give their notes to prosecutors. Ex. 5 at 173:6-13. In Breland's sixteen years on the force, nobody ever trained him to preserve his notebooks. Ex. 4 at 70:12-20; *id.* at 72:6-8 ("Q: Did anyone in the department ever tell you 'Don't destroy your notebook'? A: No."). It was "left up to the discretion of each individual detective." *Id.* at 72:9-13; Ex. 14 at 115:2-10 (Chief Wearing: "It's up to the detective").

The Detectives' own experiences at the NHPD illustrate how these practices effectively guaranteed that exculpatory information stored in officers' notebooks would be suppressed. Captain Sullivan, who was in charge of all investigative officers during the late 1990s, testified that detectives would write down exculpatory information they learned from witnesses in their notebooks. Ex. 15 at 59:16-21. For example, during his sixteen years at the NHPD, Breland's practice was to record exculpatory information in his notebooks, Ex. 4 at 65:21-24, but he never gave any of his notes to any prosecutor, including in the Dixwell Deli case, *id.* at 64:18-23.

Detective Breland "never heard of the department training *any* detective to give the notebooks to prosecutors." *Id.* at 65:2-5 (emphasis added). In sixteen years, Breland never gave his notes to the NHPD records room or evidence room. *Id.* at 260:21-261:1. Instead, throughout the entirety of his career, Breland kept his notes from hundreds of criminal cases, including the Dixwell Deli case, to himself, stored in a drawer in his desk. *Id.* at 67:18-68:16, 261:2-3. When he retired in 2010—eleven years after the Dixwell Deli homicide investigation— Breland left his sixteen years of notebooks, filled with *Brady* material, unseen by anyone, in his drawer, "in the custody of the New Haven Police Department." *Id.* at 68:20-69:23. His notebooks have since disappeared; the City has failed to produce a single field note from Breland or any other detective in this case. *Id.* at 69:14-70:3, 78:25-79:8.

Breland was not alone. Adger's practice was to throw away her notes from witness pre-interviews, Ex. 3 at 69:3-5, 82:6-18; in part because there was no designated storage location for detectives' notes, *id.* at 69:21-23. Even the City's 30(b)(6) witness, Assistant Chief Cain, followed this same general practice. Assistant Chief Cain "[doesn't] really consider notes to really be evidence." Ex. 5 at 189:5-14. Throughout her career at the Department, Cain would

"[s]ometimes take [her notes] home and retain them." *Id.* at 188:9-24. After she retired, she

brought her notebooks home. *Id.*[7]

### D. The City's Longstanding Practice of Conducting Off-the-Record Witness Interrogation Sessions, Known as "Pre-Interviews"

In 1999, it was standard practice at the NHPD for detectives to interrogate

witnesses in two stages: first, in an off-the-record "pre-interview," and then, if the detective

wanted to record the witness's formal statement in evidence, in a subsequent tape-recorded

witness statement. Ex. 16 (Kendall Dep.) at 96:4-11; Ex. 3 at 64:17-25; Ex. 15 at 34:22-35:5.

The practice of conducting off-the-record witness pre-interviews existed at the NHPD at least as

early as the 1970s—decades before the Dixwell Deli homicide investigation. Ex. 16 at 17:4-8.

The NHPD did not have a formal or written pre-interview policy. Ex. 5 at 200:12-201:16.

Instead, NHPD detectives learned how to conduct witness interviews, including pre-interviews,

through on-the-ground training by shadowing more senior detectives. Ex. 4 at 380:19-25 (noting

that "[s]easoned detectives" provided training on pre-interviews); Ex. 14 at 56:15-57:2; Ex. 16 at

97:2-5; Ex. 15 at 36:3-5.

### 1. Witness Pre-Interviews Were Not Recorded on Tape

At the NHPD, the standard practice was—without exception—not to record

witness pre-interviews on tape. Ex. 14 at 80:24-83:5; Ex. 4 at 45:14-46:16, 382:7-383:4; Ex. 5 at

200:12-201:16; Ex. 16 at 114:4-115:8; Ex. 3 at 64:17-65:3, 72:12-73:4; Ex. 17 at 28:14-21; *see*

Ex. 14 at 73:2-20 (Chief Wearing: unrecorded pre-interviews are "not against [NHPD] general

---

[7] This practice of losing or destroying field notes, including notes documenting witness interviews, continued at the NHPD well after 1999. For example, in a 2006 murder investigation, NHPD detectives interviewed an informant witness and the suspected perpetrator and documented the interviews in their field notes. *State v. Rosado*, 134 Conn. App. 505, 513-14 (2012). NHPD Detective Hunter was "unable to locate" his field notes documenting the interview with the informant, and his partner also lost the notes he took during the suspect's off-the-record pre-interview. *Id.* As a result, the state was unable to provide to the defense any documentation of the NHPD's interviews of the informant and suspect.

orders or anything"). The NHPD trained its detectives not to tape record pre-interviews. Ex. 4 at 381:21-382:3; Ex. 3 at 64:17-65:9. Breland, for example, personally trained new detectives and officers not to tape record witness pre-interviews. Ex. 4 at 382:19-22.

Off-the-record pre-interviews were standard practice at the NHPD, even though every detective had a Department-issued portable tape recorder handy. Ex. 4 at 46:22-24, 49:6-10; Ex. 16 at 77:15-24; Ex. 3 at 307:19-23. It was technologically and logistically easy to record complete witness interviews on tape. Ex. 5 at 207:2-7.

### 2. The NHPD Did Not Train or Require Detectives to Take Notes During Off-the-Record Witness Pre-Interviews

In 1999, "[t]here was no policy in place mandating the detectives take notes" at any point during an investigation. *Id.* at 171:9-15. The NHPD also "didn't have any policy and procedure" on how or whether to take notes contemporaneously during witness interviews. *Id.* at 172:3-13; 168:22-169:2; Ex. 16 at 106:10-15 ("Some people did [take notes]; some people didn't."). For example, though Adger usually took notes during pre-interviews, she observed that Dease often did not. Ex. 3 at 68:10-24.

Breland testified that it was not unusual for detectives not to take notes during a pre-interview. Ex. 4 at 223:21-224:2. In the Dixwell Deli case, for example, Breland and Dease failed to take notes during their critical pre-interview of Marcus Pearson on February 3, *id.* at 221:14-17, 223:21-23, 226:9-15.

### 3. Off-the-Record Pre-Interviews Often Took Hours and Revealed Exculpatory Information

Pre-interviews varied in length. Breland claimed that they would be "maybe 20 minutes at the most." Ex. 4 at 52:16-23. In contrast, Adger confirmed that pre-interviews could last longer than the formal recorded interview, Ex. 3 at 71:14-17, and might even go on for hours, *id.* at 71:10-13. Sergeant Kendall agreed that pre-interviews could go on for "hours." Ex.

16 at 111:18-112:1. Adger's pre-interview of Steve Brown in this case lasted for approximately one hour. *Id.* at 181:9-182:22, 289:11-15.

Pre-interviews covered a wide range of information pertinent to the investigation. Breland routinely showed photo boards to witnesses and asked them to make an identification during these unrecorded pre-interview sessions. Ex. 4 at 56:5-21, 135:9-22. The NHPD trained him that way. *Id.* at 135:20-137:17. Breland testified that recording the photo identification on tape "hinders the flow of the interview," though he could not explain why. *Id.* at 136:15-137:17. The former supervisor who "oversaw all units in the department" in the late 1990s and reported directly to the chief, Captain Sullivan, also testified in this case that during unrecorded pre-interviews, detectives would show witnesses photos of suspects in photo arrays. Ex. 15 at 16:11-17:24; 37:19-38:17.

Pre-interviews often revealed information, including exculpatory information, that did not end up in the recorded witness statement—"it could be anything." Ex. 16 at 109:17-110:14. A witness "might say something inculpatory when the recording is on, but exculpatory when the recording is off." Ex. 5 at 221:1-14.

Detective Coppola's off-the-record pre-interviews of multiple witnesses in a 1998 homicide investigation—a year before the Dixwell Deli homicide—demonstrates how the NHPD's practice caused officers to fail to record pertinent or potentially exculpatory evidence. Detective Coppola detailed how he elicited "breakthrough" evidence and exculpatory information during off-the-record pre-interviews of witnesses during his investigation of the Philip Cusick homicide—a cold case that "[n]obody could solve." Ex. 17 at 20:23-22:1, 58:9-17. During his unrecorded pre-interview of a witness named Reynaldo Martinez, the witness identified the alleged shooter and picked his photo out of a photo array. *Id.* at 25:24-28:21.

Martinez also drew a map of the scene of the shooting and used it to show Detective Coppola where people were standing when the crime occurred. *Id.* at 29:2-8. These "breakthrough" moments in a stale case happened while the tape recorder was off, pursuant to the Department's "standard practice of doing unrecorded interviews with witnesses and afterwards taping statements." *Id.* at 29:10-25, 28:14-18.

As described in Section II.B, *supra*, after speaking with Martinez, Detective Coppola interviewed witness Demetrius Cox. *Id.* at 30:14-17. Detective Coppola picked up Cox on an outstanding arrest warrant and then proceeded to interrogate him. *Id.* at 30:21-33:2. In an effort to "try to get [Cox] to talk," Detective Coppola threatened to arrest Cox as a conspirator in the Cusick murder and told Cox that "if he didn't help [Coppola], someday he'd be locked up for that murder." *Id.* In response to Coppola's threats, Cox cried in the interrogation room. *Id.* at 31:25-32:25. Detective Coppola testified that his coercion of Cox was "good police work," "consistent with [his] training at the New Haven Police Department," and consistent with his observations of his NHPD colleagues. *Id.* at 33:8-22. Detective Coppola's coercion of Cox happened off the record, when the tape recorder was off. *Id.* at 33:19-34:13.

### 4.    The NHPD Is Unable to Explain *Why* Pre-Interviews Were Not Recorded

The Detectives cannot explain why the City never recorded witness pre-interviews. Breland "[j]ust didn't." Ex. 4 at 56:22-57:13. Adger also had no explanation. Ex. 3. 72:12-73:4. Chief Wearing could only say that recording pre-interviews "just wasn't a practice. They didn't do it that way," Ex. 14 at 100:8-18. Sergeant Kendall, who supervised all NHPD detectives from 1995 to 1999, Ex. 16 at 20:3-7, 22:19-23:14, also had no explanation, and claimed he "[n]ever thought about it" until his deposition, *id.* at 113:23-115:8.

Finally, the City itself failed to provide a concrete explanation. It said that officers talk to "a lot of people" and that recording pre-interviews "would be excessive." Ex. 5 at 207:11-208:13. Even so, the City admitted that tape-recording witness pre-interviews would have produced better evidence of what the witness said than an officer's paraphrasing or summarizing the same in a subsequent written report. *Id.* at 224:15-225:12.

### 5. The Real Purpose of Off-the-Record Pre-Interviews: to Prejudice Criminal Defendants

Off-the-record pre-interviews became a widespread standard practice at the NHPD because they allowed detectives to memorialize the inculpatory information they wanted and suppress the exculpatory information they found unhelpful.

Chief Wearing explained that the purpose of witness pre-interviews was to "figure out what they have to offer a detective," and if the information "[was] of any value to the case." Ex. 14 at 92:1-13*; id.* at 85:3-16*; id.* at 86:14-23; Ex. 15 at 43:2-5 (Capt. Sullivan: pre-interviews were conducted off-tape "[t]o see if the statement was worth taking"). If the witness had "*valuable information that would aid the detective in the case*, then the detective . . . would take the [witness's] statement." Ex. 14 at 85:17-86:4; *id.* at 56:22-57:3; *id.* at 89:16-19 (emphasis added).

The inverse was also true: NHPD detectives would *not* record a witness's statement if it was *unhelpful*. Chief Wearing explained: **"If you have something to offer us, we'll take a statement. *If you do not, then, you know, we'll send you home*,"** *Id.* at 94:5-21 (emphasis added), and **"[i]f the witness can help you in the case, fine. If he can't help you, then so be it. *You let that person go and see if you can find other witness*es."** *Id.* at 79:9-15 (emphasis added).

6. **NHPD Written Policy Instructed Officers to Avoid Recording Detailed Statements in Certain Situations**

The NHPD's formal written policy similarly instructed officers to only record information provided by witnesses in detail in specific situations. "If the witness seems friendly to the suspect, record his exact words, in detail, whenever possible," the official policy explains. Ex. 5 at 215:11-216:5. However, "[f]or all other witnesses, including victims, be cautious about recording direct quotes and minute details in their statements." *Id.* at 216:12-217:17. This specific NHPD training was followed by detectives, *id.* at 217:15-23, and applied with equal force to officers' reports on what witnesses said during both pre-interviews and formal witness interviews. *Id.* at 220:5-25.

E. **The NHPD's Long History of Officers Coercing Witnesses, Fabricating Witness Statements, and Suppressing or Destroying Evidence, Including Witness Statements**

1. **In the Decades Leading Up to the Dixwell Deli Homicide Investigation, Officers Routinely Lost or Destroyed Taped and Written Witness Statements Pursuant to Established NHPD Practice**

From 1980 to 1992, Connecticut appellate courts reviewed at least fourteen cases where the NHPD erased, destroyed, or lost taped statements pursuant to what the Appellate Court of Connecticut called "the New Haven police department's policy of destruction of taped statements." *State v. Jones*, 29 Conn. App. 304, 310 (1992). In *Jones*, Officer Frank Roberts, a member of the NHPD street crime narcotics task force, testified that after the suspect in a narcotics sting operation was arrested, Roberts "threw away his notes" documenting a description of the suspect obtained from a confidential informant because the operation had concluded, and "pursuant to department policy," he erased a taped statement "so [the tape] could be used for other dictation." *Id.* at 307-08.

A judge of the Appellate Court wrote that "the seemingly intractable behavior of the New Haven police department with respect to witness[es]' statements is deeply disturbing," *id.* at 325 (Norcott, J., concurring), and noted that the *Jones* case "present[ed] no less than the *fourteenth* occasion since 1980 that [the Appellate Court] or [Connecticut] Supreme Court has had to consider a matter involving the loss or destruction of a witness' statement by members of what is rapidly becoming the bete noire of Connecticut police departments," the NHPD. *Id.* at 325 n.9 (emphasis added). Those cases included the following:

- In *State v. Shaw*, the NHPD interviewed an eyewitness one day after a shooting. 185 Conn. 372, 384-85 (1981), *cert. denied*, 454 U.S. 1155 (1982). "Th[e] statement was not properly recorded, or not transcribed, or, if transcribed, was lost" by the NHPD. *Id.* at 385.

- In *State v. Myers*, the NHPD "deliberately destroyed" a sexual assault victim's tape-recorded telephone call to police. 193 Conn. 457, 466-68 (1984). The state was unable to produce the recording to the defendant because "it had been erased pursuant to the standard practice of the [NHPD]." *Id.*

- In *State v. Santangelo*, the NHPD erased a tape of a call made by a murder victim's husband to the NHPD to report the victim's disappearance. 205 Conn. 578, 586-87 (1987). The Supreme Court noted that the destroyed tape, which was made "less than three months after the release of [the Court's] decision in [*Myers*, *supra*] . . . was erased *pursuant to a long-standing practice of the [NHPD]* to erase and reuse tapes utilized in recording incoming calls for assistance." *Id.* at 587 (emphasis added). The Supreme Court cautioned that, following *Myers*, the NHPD's destruction of the tape in *Santangelo* was inexcusable. *Id.* In *Santangelo*, the NHPD also "erased or destroyed" the recorded statement of the victim's daughter which, as a result, "was not available to the defendant at the time of trial." *Id.* at 589.

- In *State v. Mullings*, the state's key witness went to the NHPD station and recounted a robbery and provided a description of the robbery suspect to Detective Donna Amato, who tape recorded the statements. 202 Conn. 1, 6 (1987). Prior to the criminal trial, the Department destroyed the taped statements and lost the written transcript of the recordings. *Id.* Detective Amato testified that the Department had erased the taped statements "pursuant to routine police procedure," *id.*, and further noted that she was unaware of any policy directives at the NHPD directing the police not to erase tapes of witness statements. *Id.* at 8 n.5. The Supreme Court wrote that, in its prior decisions, it had "repeatedly emphasized [its] disapproval of the routine destruction of discoverable material." *Id.* at 8.

- In *State v. Sims*, a witness to a robbery called the NHPD and gave a description of the suspects to the dispatcher, who broadcast the description over the police radio. 12 Conn. App. 239, 214 (1987), *cert. denied*, 206 Conn. 801 (1987). The radio broadcast was tape-recorded but the tapes were never disclosed to the defense "due to their erasure for reuse . . . by the [NHPD]." *Id.* at 248.

- In *State v. Kelly*, an NHPD officer took two witness statements of a sexual assault and kidnapping victim. 208 Conn. 365, 382 (1988). The second witness statement, which was taped, was never forwarded by the NHPD to the State's Attorney's Office, and, prior to trial, the "assistant state's attorney also learned that neither the tape nor the transcript [of the second statement] could be found despite a diligent search by the police." *Id.*

- In *State v. Williamson*, the Supreme Court of Connecticut reversed the defendant's robbery conviction because, *inter alia*, NHPD officers erased tape recordings of the robbery victim's initial 911 call and subsequent interview by an NHPD detective. 212 Conn. 6, 8 (1989). The Supreme Court noted that the *Williamson* case "presented [the Court] with no less than [its] sixth occasion since 1981 to consider whether the [NHPD's] destruction or loss of a witness' statements requires the striking of the witness' testimony in an ensuing criminal trial." *Id.* at 7. One justice observed in *Williamson* that the NHPD had a "cavalier attitude" towards the Supreme Court's "decisions relating to the preservation of the statements of witnesses." *Id.* at 28 (Shea, J., dissenting).

- In *State v. Johnson*, NHPD officers taped the statements of five witnesses during the Department's investigation of a 1987 murder in New Haven. 214 Conn. 161, 164 (1990). The officers erased each of the five recorded statements prior to trial, "render[ing] impossible the state's compliance" with state laws that required production of the witnesses' complete statements to police. *Id.* at 164-65.

- In *In re Jesus C.*, an NHPD officer suspected that three individuals had stolen a car. 21 Conn. App. 645, 646 (1990). While chasing the suspects on foot, the officer used his radio to transmit a description of the suspects. *Id.* Only 37 days after the defendant's arrest and prior to trial, the NHPD erased and reused the tapes containing the officer's description of the suspects. *Id.* The Appellate Court noted that the case was "not the first occasion where, on appeal, Connecticut courts have been required to consider the implications of the [NHPD's] failure to preserve tapes of witness statements." *Id.* at 647-48. The defendant's conviction was set aside and the case was remanded for a new trial. *Id.* at 653.

- In *State v. Belle*, NHPD Detective Robert Coffey interviewed two witnesses to an assault and wrote down his notes from the interview on a piece of scrap paper. 215 Conn. 257, 263-64 (1990). After writing up a police report, Detective Coffey threw away his notes from the interview. *Id.* Days later, Detective Coffey took tape-recorded statements from the same two witnesses. *Id.* at 264. The NHPD then "deliberately destroyed the tape recorded statements of [both witnesses]

pursuant to a *routine department procedure* of erasing and reusing such tapes." *Id.*
at 271 (emphasis added).

- In *State v. Tyson*, six days after an assault, NHPD Detective Nicholas Franco
taped the oral statement of the victim at the hospital. 23 Conn. App. 28, 38
(1990). The NHPD later destroyed the taped statement "pursuant to routine police
policy." *Id.* at 39. The Appellate Court stressed that it was "discouraged to find
before [the court] yet another instance of the deliberate destruction of evidence by
the New Haven police." *Id.*

- In *State v. Woodard*, a woman called the NHPD concerning an assault and
kidnapping she had witnessed. 279 Conn. App. 786, 792-93 (1992). The NHPD
recorded the call but later erased and reused the tape. *Id.* The Appellate Court of
Connecticut, writing in *Woodard*, noted that it had heard at least a dozen cases in
as many years involving "the destruction or loss of a witness' statement" by the
NHPD." *Id.* at 792 n.2.

- In *State v. Cerrilli*, NHPD officers erased two taped statements by a kidnapping
victim. 222 Conn. 556, 579-80 (1992). According to the testimony of NHPD
Lieutenant Stephen Janokowski, the tape was "erased and reused in its regular
rotation, in accordance with the police department's practice in 1987." *Id.* at 575.[8]

Despite repeat admonishments from Connecticut's highest court, the NHPD's

practice of erasing, destroying, or losing original evidence of witness statements continued

unabated well after the 1992 *Jones* decision and the 1999 Dixwell Deli homicide investigation.

*See Johnson v. Warden*, No. CV 443442, 2002 WL 31928624, at *2 (Conn. Super. Ct. Dec. 20,

2002) (in 1998, pursuant to "the normal procedures of the department," the NHPD erased tape

recording of officer's radio broadcasts during pursuit of defendant); *Rosado*, 134 Conn. App. at

513 (in 2006, an NHPD detective lost his notes documenting his initial interview of an informant

---

[8]        In addition to the fourteen instances identified in *Jones*, the NHPD also destroyed taped statements or other
original evidence in at least five additional known cases from 1980-1992. *See State v. Biller*, 5 Conn. App. 616, 624
(1985) (in 1981, the NHPD erased a taped witness statement "in accord with [NHPD] policy"); *See State v. Coriano*,
12 Conn. App. 196, 199 (1987) (in 1984, the NHPD "erased a tape recording of the victim's emergency call
reporting the burglary"); *State v. Coleman*, 38 Conn. App. 531, 533-34 (1995) (in 1990, the NHPD "erroneously
destroyed" a sex crime kit containing "physical evidence pertinent to the sexual assault" allegedly committed by
defendant); *State v. Carter*, 34 Conn. App. 58, 84 (1994)*, rev'd on other grounds*, 232 Conn. 537 (1995) (according
to witness's trial testimony, NHPD erased portion of witness's taped statement in 1990); *Mozell v. Wezner*, No. CV
970406002S, 2003 WL 21498956, at *10 (Conn. Super. Ct. June 10, 2003) (in 1991 NHPD erased taped statement
of witness in narcotics case prior to trial).

during a homicide investigation, while another detective lost the notes he took documenting the pre-interview of the same witness).

The City confirmed that, prior to 2016, there was no Department-wide training on how long officers were supposed to retain evidence. Ex. 5 at 281:15-21. Nor was there any NHPD policy or procedure instructing officers to not erase or reuse tapes of recorded witness statements. *Id.* at 280:21-281:1. The City could not identify any change the NHPD made to its policies, practices, or training regarding the destruction or erasing of recorded witness statements in response to the fourteen instances of evidence destruction criticized by the court in *Jones*. *See id.* at 279:8-281:21.

> **2.    In 1984, NHPD Detectives Include False Statements and Exclude Exculpatory Information from Sworn Arrest Warrant in the Anthony Golino Case**

From 1973 to 1984, the NHPD investigated the murder of Concetta Serra in New Haven. *Golino v. City of New Haven*, 950 F.2d 864, 866 (2d Cir. 1991) (affirming denial of summary judgment to defendant NHPD officers). NHPD Sergeant Robert Lillis and Detectives Anthony DiLullo and Leonard Pastore oversaw the investigation. *Id.* In July 1984, Anthony Golino was arrested and charged with the murder. *Id.* However, after a 1987 blood test revealed that Golino's blood type did not match the killer's, the charges were dismissed. *Id.*

In January 1988, Golino filed a civil rights action in this court against several NHPD officers. *Id.* at 866-67. The district court found that it was undisputed that the sworn arrest warrant affidavit completed by the NHPD detectives "contained false statements and made numerous material omissions." *Id.* at 867; *see also Golino v. City of New Haven*, 761 F. Supp. 962, 969 n.2 (D. Conn.), *aff'd*, 950 F.2d 864 (2d Cir. 1991). Among other things, the arrest affidavit omitted inconsistent prior witness statements, descriptions of the suspect provided by

four witnesses, evidence that fingerprints recovered at the murder scene did not match Golino's, and the fact that the detectives had not verified Golino's blood type. *Golino*, 761 F. Supp. at 969 n.2. At his deposition in the civil case, Detective DiLullo testified that "it was his general practice to omit exculpatory information from affidavits submitted in support of applications for warrants." *Golino*, 950 F.2d at 867.

### 3. In 1985, the State's Own Witness Testifies that an NHPD Officer Coerced Him into Giving a False Inculpatory Statement

During the NHPD's 1985 investigation of a robbery and sexual assault of three individuals, the state called cooperating witness Jerome Downing to testify against the defendant, Leroy Harris. *See State v. Harris*, 22 Conn. App. 329, 330-32 (1990). At trial, Downing testified that NHPD officers "had suggested to him that Harris was involved in the crimes," *id.* at 332, that he was "coerced into making the statement implicating [Harris]," and that he never read the witness statement that he eventually signed, *id.* at 334.

### 4. In 1991, NHPD Detectives Coerce a Juvenile Witness into Giving a False Inculpatory Statement in the Eric Ham Case

On January 20, 1991, a man stepped out of a car and fired several gunshots into a crowd of people in New Haven, killing a fourteen-year-old boy. *Ham v. Greene*, 248 Conn. 508, 509 (1999), *cert. denied*, 120 S.Ct. 326 (1999). Detectives Joseph Greene and Michael Sweeney were in charge of the NHPD's investigation of the shooting. *Id.* On February 13, 1991, Detectives Greene and Sweeney prepared and submitted an affidavit in support of a request for a warrant for the arrest of Eric Ham for the January 20 murder. *Id.* at 514-15. A warrant was issued and executed that same day, and Ham was jailed until May 9, 1999, when the state *nolled* the prosecution because the state's two key witnesses, including teenager Timothy Davis, recanted. *Id.* at 515.

In August 1991, *id.* at 517, Ham filed a civil rights suit against Detectives Greene and Sweeney in Connecticut Superior Court, and the case was tried before a jury, which returned a verdict in Ham's favor and awarded him nearly $1 million in compensatory and punitive damages. *Id.* at 517-18. The trial court's verdict and damages award were upheld by the trial court and the Supreme Court of Connecticut. *See generally Ham v. Greene*, No. CV 91032275S, 1997 WL 252274 (Conn. Super. Ct. May 8, 1997) (affirming award of damages and denying defendants' post-trial motions); *Ham*, 248 Conn. 508 (affirming same).

At the civil trial, Davis testified about what happened when he was taken to the NHPD police station and interrogated by Detective Greene. *See id.* at 516 n.4; Ex. 59 (Davis Testimony) at 3-15. Davis was only seventeen years old and weighed approximately 100 pounds at the time. *Id.* at 11, 16. During Davis's interrogation at the station, Detective Greene and two or three other NHPD officers "were doing a lot of yelling, slamming their hands all up in [Davis's] face, slamming them on the table . . . [t]hey just kept on coming up on [him]." *Id.* at 11. Detective Greene threatened Davis and told him that if he "didn't cooperate that [he] would receive forty to sixty years in jail." *Id.* at 12. Detective Greene's threats happened off-the-record—the tape recorder was not on at the time. *Id.* at 13. Davis asked for a lawyer during his interrogation and Detective Greene responded, "if you didn't do nothing why should you need a lawyer?" *Id.* at 13-14. Detective Greene suggested a motive for the shooting and also told Davis to say that he had been the getaway driver, even though Davis had told Greene that he could not drive. *Id.* at 5, 39-40.

### 5. Also in 1991, NHPD Detective Greene Coerces Two Witnesses into Giving Fabricated Statements Inculpating Daryl Valentine in a Double Homicide

Detective Greene, the same NHPD detective who coerced juvenile witness Timothy Davis in the Eric Ham case in 1991, also coerced two witnesses into giving false

fabricated statements inculpating a man named Daryl Valentine in another homicide investigation that same year. *State v. Valentine*, 255 Conn. 61, 65-67 (2000). During his investigation of a New Haven double homicide, Detective Greene interrogated a witness named Kristina Higgins. *Id.* Detective Greene threatened Higgins with jail time and gave her alcohol, cigarettes, and money to buy cocaine—all while another NHPD officer, Detective DiLullo, was also present. Ex. 60 (Higgins Testimony) at 116-118, 127-37. In addition, before turning on the tape recorder to record Higgins' witness statement, Greene repeatedly told Higgins Valentine's name and "told [Higgins] the things to say on [the] tape." *Id.* at 118. Higgins testified about Detective Greene's coercive interrogation at Valentine's criminal trials in 1994 and 1998. *See Valentine*, 255 Conn. at 63-67. Another witness in the Valentine case, Coleman, also testified at the 1994 trial that her witness statement had also been fabricated due to Detective Greene's coercion and bribes. *Id.*

6. **In 1992, NHPD Detective Billy White Coerces and Threatens the Sole Alibi Witness in a Murder Case, Causing the Wrongful Conviction of Derrick Hamilton in New York**

From 1991 to 1992, NHPD Detective Billy White assisted New York City police officers in their investigation of a New Haven resident, Derrick Hamilton, for the murder of Nathaniel Cash, who was shot to death in front of his home in Brooklyn, New York. *Hamilton v. City of New York*, No. 15 Civ. 4574, 2019 WL 1452013, at *2, *4 (E.D.N.Y. Mar. 19, 2019). Hamilton had an alibi witness, Alphonso Dixon, who threw a party the day of the murder that Hamilton attended. *Id.* at *8. Early one morning in 1992, White arrived at the home of Alphonso Dixon and his wife Mattie, and, according to Mattie Dixon's sworn affidavit, "was very angry with [Alphonso] for being [Hamilton's] alibi. Detective White became forceful by handcuffing Alphonso and searched his pockets finding drugs and threatened Alphonso with jail. Detective White calmed down after [Alphonso] agreed not to be [Hamilton's] alibi." *Id.* At a deposition in

Hamilton's later civil rights case, Mattie Dixon further testified that she saw her husband "start crying when [White] went to put the handcuffs on" and said that Alphonso was "scared of [White]. Very scared." *Id.* She explained that, in her presence, White threatened Alphonso and told him, "If you go to court [to testify at Hamilton's criminal trial], I've got the handcuffs as soon as you walk out the courthouse." *Id.* She witnessed White dangle handcuffs before her husband while the detective was threatening him. *Id.*

White went to great lengths to ensure that Alphonso Dixon would not testify as an alibi witness at Hamilton's criminal trial. When Alphonso told White that Hamilton's lawyer could subpoena him to testify as an alibi witness, "Detective White instructed [Alphonso] to call his doctor for a letter about his heart condition and began drafting an affidavit for [him] to send to [Hamilton's] lawyer." *Id.* White eventually saw this plan through: Hamilton later confirmed that he received the doctor's letter from Alphonso, "as well as a telephone call from [him] indicating that he was in the hospital." *Id.*

In 2014, a New York appellate court vacated Hamilton's conviction on actual innocence grounds because, *inter alia*, Hamilton was not able to call Alphonso Dixon as his alibi witness. *People v. Hamilton*, 115 A.D.3d 12, 18, 29 (N.Y. App. Div., 2d Dep't 2014). In its decision vacating Hamilton's conviction, the New York court specifically noted that "prior to [Hamilton's] trial, Detective Billy White, from the New Haven Police Department, threatened Alphonso Dixon with arrest if he testified as an alibi witness on behalf of [Hamilton]." *Id.* at 18.

Following Hamilton's conviction in 1992, White continued to climb the ladder at the NHPD, and eventually rose to the rank of lieutenant, ran the narcotics unit, and reported directly to an assistant chief. Ex. 71 (White Arrest Aff.) at 2-4. His career at the NHPD ended in 2007, when he was arrested after a lengthy FBI and Connecticut State Police investigation

revealed that he was stealing government funds and accepting bribes from local bail bondsmen in exchange for help capturing fugitives. *Id.* at 4-5, 47.

The Brooklyn District Attorney later joined Hamilton's motion to vacate his conviction and dismiss his indictment. *Hamilton*. 2019 WL 1452013, at *9.

### 7. From 1991-92, NHPD Detective Vincent Raucci, in the Presence of Other NHPD Officers, Repeatedly Coerces Witnesses and Fabricates False Inculpatory Witness Statements in the Scott Lewis Case

On October 11, 1990, Lamont Fields and Ricardo Turner were shot to death inside their apartment in New Haven. *Lewis v. Comm'r of Corr.*, 975 F. Supp. 2d 169, 171 (D. Conn. 2013). Scott Lewis and Stefon Morant were later convicted of the murders. *Id.* NHPD Detective Vincent Raucci was heavily involved in the Fields/Turner homicide investigation and interviewed several witnesses while building the NHPD's case against Lewis and Morant for the murders. *See id.* at 176-96.

After his conviction, Scott Lewis contacted the FBI, proclaimed his innocence, and told the FBI that Raucci was a corrupt police officer. Ex. 18 (Donnelly Dep.) at 15:16-16:2; Ex. 58 (FBI Jan. 24, 1997 Raucci Report) at SM012206. The FBI then investigated Detective Raucci from 1995 to 1997. Ex. 18 at 19:11-18. Special Agent Brian Donnelly was the FBI's lead investigator. *Id.* at 18:18-20.

The FBI interviewed various witnesses during its investigation of Raucci's corruption, including the witnesses who inculpated Lewis and Morant in the 1990 double homicide. One such witness, Jose Roque, told the FBI that the taped and signed inculpatory witness statement he had provided to the NHPD was false, and that he "was threatened by Detective Raucci prior to giving the false statement." Ex. 58 at SM012282. Raucci "threatened to arrest Roque for the [two] homicides, if he, Roque did not give the false statement implicating Scott Lewis and Stephan Morant." *Id.* Raucci "provided all of the information in the signed

statement" and provided Roque the answers he wanted, and that Roque "would in turn parrot the answer on to the tape." *Id.* In reality, Roque did not have any information connecting Lewis and Morant to the double homicide. *Id.*

Another witness, Milly Martinez, "was forced by Detective Raucci" to make a witness statement falsely inculpating Lewis and Morant. *Id.* at SM012321. She "was pressured by Raucci into giving [her] sworn oral statement" and, while Raucci took the statement, he "started and stopped the tape recorder he used to take the statement in order to tell [Martinez] what to say on the tape." *Id.* Raucci similarly fabricated an inculpatory witness statement and photo identification of Lewis by yet another witness, Hector Ortiz. *Id.* at SM012369. Raucci told Ortiz that he had to provide a statement inculpating Lewis, and then proceeded to tell Ortiz what to say prior to tape recording the statement. *Id.* Raucci frequently stopped the tape to instruct Ortiz what to say on the recording. *Id.*

Raucci also fabricated a statement from Ovil Ruiz. Ex. 61 (Sweeney Testimony) at 14-16. Late one evening, Ruiz was arrested and brought to the NHPD Detective Division for an interrogation. *Id.* at 12-13. NHPD Sergeant Sweeney, who was Detective Raucci's supervisor at the time, interviewed Ruiz alone for over an hour and a half during which Ruiz insisted he knew nothing about the double homicide. *Id.* at 11, 13-14, 17. Raucci then joined the interrogation and—in front of Sergeant Sweeney, his supervisor—provided Ruiz with facts about the double homicide contrary to police protocol. *Id.* at 14-16, 21-22, 43-44, 73. Raucci promised Ruiz that he would be let go if he provided a statement inculpating Lewis and Morant. *Id.* at 16, 18. Sergeant Sweeney took Raucci aside twice to scold him for crossing the line with Ruiz, but nevertheless permitted Raucci to continue interrogating Ruiz. *Id.* at 14-19. Raucci eventually

finished taking Ruiz's witness statement in the presence of another NHPD detective, but without Sergeant Sweeney in the room. *Id.* at 17-20.

Sergeant Sweeney later found out that someone had been arrested for the double homicide and that the warrant for the arrest was predicated on Ruiz's bogus witness statements. *Id.* at 32-33, 67. In response, Sweeney told his own supervisor: "Are you crazy? You should tell [State's Attorney] Dearington about this" because Ruiz's statement was false. *Id.* at 67. However, even though Sweeney personally witnessed Raucci coerce Ruiz into providing a false inculpatory witness statement, Sweeney never formally documented or reported Raucci's misconduct. *Id.* at 20, 49, 54-55.

Melvin Wearing, who was Chief of Police during the Dixwell Deli investigation, was Assistant Chief throughout the FBI's investigation of Raucci. Ex. 14 at 132:20-133:1. According to Wearing, then-Chief of Police Nicholas Pastore "worked with the FBI" on their investigation of Detective Raucci and "knew all about" the investigation. *Id.* at 133:2-7; *see also id.* at 125:25-126:9 (Chief Pastore discussed the FBI's ongoing investigation of Detective Raucci with then-Assistant Chief Wearing).

Throughout the FBI's investigation of Raucci, NHPD Sergeant John Minardi, an Internal Affairs officer, assisted the FBI and was present at the FBI's interview of various witnesses, including Ovil Ruiz. Ex. 58 at SM012380. In addition, then-Lieutenant Sullivan, the supervisor of the NHPD Detective Division, met with the FBI and State's Attorney Michael Dearington to discuss Raucci's misconduct. Ex. 15 at 83:8-84:14. Sergeant Kendall, then second in command of the Detective Division, was also aware of the FBI's investigation of Raucci in 1996. Ex. 16 at 120:2-121:7. The investigation was "a big deal" and there was "scuttlebutt" about it at the Department at the time. *Id.*

In 1997, Wearing replaced Pastore as Chief of Police at the NHPD after Chief Pastore resigned due to a personal scandal. Ex. 14 at 29:22-30:8. When Chief Wearing took the helm at the NHPD, the FBI's investigation of Raucci had recently concluded. *Id.* at 133:8-11. As the new Chief in 1997, Chief Wearing became aware of Raucci's misconduct in the Turner/Fields homicide investigation. *Id.* at 152:25-153:7. In response to the Raucci investigation, the NHPD, under Chief Wearing's leadership, did not change any NHPD practices or policies, or order a single NHPD officer to undergo any new training, because he believed "there was no need to change policies or to change practices." *Id.* at 153:8-154:7, 155:19-24; *see also* Ex. 16 at 132:23-133:11; Ex. 5 at 241:22-242:12. The NHPD also did not discipline any officers as a result of what the FBI uncovered during its investigation of Raucci. Ex. 14 at 155:25-156:15 (Chief Wearing: "I can't think of anyone being disciplined on that."); *id.* at 158:12-15; Ex. 16 at 133:10-16. Instead, Raucci "was able to retire and le[ave] the department." Ex. 14 at 154:16-155:4; *see* Ex. 15 at 85:11-15 (noting that Detective Raucci retired and was not fired by the NHPD).

In 1999, Wearing reviewed the Turner/Fields homicide investigation and concluded that it was handled properly by the NHPD. *Id.* at 151:13-152:17; Ex. 72 (2003 *New Haven Register* article). In 2013, Judge Haight granted Scott Lewis's writ of habeas corpus on the basis that, among other things, the state failed to disclose to Lewis evidence of Raucci's coercion of witnesses. *Lewis*, 975 F. Supp. 2d at 199. The court stressed that "since there was no written record" of Detective Raucci's witness coercion, Lewis could not have known what transpired during the interrogations. *Id.* at 179. All charges against Lewis were later formally dismissed, *see Lewis v. City of New Haven*, No. 16 Civ. 1382, 2017 WL 101304, at *2 (D. Conn. Jan. 10, 2017), and Lewis brought a federal civil rights suit against the City in August 2016, *see*

*generally id.* The City settled Lewis's lawsuit in 2017 for $9.5 million. Ex. 73 (2017 *New Haven Register* article).

### 8.     In 2001, Detectives Breland and Coppola Coerce a Juvenile Witness into Giving an Inculpatory Witness Statement in the Carvaughn Johnson Case

In 2001, Detectives Breland and Stephen Coppola were investigating the murder of Markeith Strong when they picked up juvenile Ralph Ford and brought him to the police station for an interrogation. Ex. 62 (Ford Testimony) at 121:1, 157:2-159:25, 162:14-167:23. During an off-the-record pre-interview, Detectives Breland and Coppola coerced Ford into giving a statement inculpating Johnson by threatening Ford with 30 years in prison. *Id.* At 164:1-20, 165:17-166:19, 171:16-23. Ford's parents were not present in the interrogation room when he gave his statement. *Id.* At 165:20-23. Detectives Breland and Coppola later coerced a second, corrected statement from Ford that included additional details about the murder weapon. *Id.* At 172:5-174:17.

At Johnson's first criminal trial in 2003, Ford testified consistently with his coerced statement but also confirmed that the detectives had pressured him into giving the statement. *Id.* at 121:6-8, 175:3-26. At Johnson's second criminal trial in 2004, Ford recanted, truthfully testified that he had not seen Johnson with a gun at the murder scene, and explained how the detectives coerced his fabricated statement. *Id.* at 121:3-8, 174:5-175:26.

### 9.     In 2006, NHPD Detectives Coerce Witnesses and Withhold Exculpatory Evidence in the Bobby Johnson Case

Herbert Fields was shot and killed in his car in New Haven on August 1, 2006. Order, Dkt. 227, *Johnson v. City of New Haven*, No. 17 Civ. 1479 (D. Conn. Apr. 13, 2020) ("Johnson SJ Order") at 4. NHPD Detectives Michael Quinn and Clarence Willoughby, a 24-year veteran of the NHPD, investigated the Fields homicide. *Id.* at 2, 4-5. Quinn and Willoughby

interrogated Bobby Johnson, who was only 16 years old at the time and had cognitive limitations and limited education, without a parent or lawyer present. Ex. 63 (B. Johnson 2012 Testimony) at BJ03154:13-18; Johnson SJ Order at 6. During Johnson's interrogation, the detectives threatened Johnson that if he did not cooperate and give the detectives the statement they wanted he could get the death penalty, and that he would never see his family again. Ex. 63 at BJ03124:14-16, BJ03153:12-21; Johnson SJ Order at 5-6. The detectives then told Johnson that if he cooperated and gave the statement they wanted he would only get ten years' probation. Ex. 63 at BJ03124:13-19, BJ03129:17-27.

As a result of the detectives harassing and threatening Johnson, telling him that they would not let him leave until he confessed, and promising that he would only get parole if he cooperated, Johnson capitulated and gave the detectives an inculpatory recorded witness statement. *Id.* at BJ03153:12-25, 3126:20-27. Before they turned on the tape to record Johnson's statement, the detectives rehearsed the statement with Johnson and corrected him along the way. *Id.* at BJ03126:14-19, BJ03127:8-12. The detectives also showed Johnson photos of the victim, *id.* at BJ03124:20-03125:6, and Johnson's description of the victim in his witness statement matched the specific details in the photograph, Ex. 85 (B. Johnson Sept. 3, 2006 Statement) at BJ01459. After Johnson gave the statement the detectives wanted, they told him that if he ever told anyone about what happened during the interrogation, his probation deal would be off. Ex. 63 at BJ03132:27-3133:7.

After the detectives obtained a confession from Johnson, they interrogated his cousin, Michael Holmes. Ex. 64 (Holmes 2012 Testimony) at BJ03316:16-03318:1. Holmes denied having any knowledge of the homicide, but Quinn and Willoughby told him that if he did not give a statement, they would arrest him. Ex. 67 (Holmes 2008 Testimony) at BJ01788:3-

01789:4. The detectives then had Holmes record a fabricated statement that was consistent with Johnson's statement. Ex. 64 at BJ03320:1-14 (Holmes, testifying that his statement was "not true" and that the detectives "put [their] own type of words in it").

Willoughby, Quinn, and two other NHPD officers, including a supervising sergeant, threw Johnson into the back of a police car and brought him back to the police station for another interrogation. Ex. 68 (B. Johnson 2008 Testimony) at BJ02019:8-27, BJ02070:26-02071:22; Ex. 63 at BJ03136:5-26. Willoughby and Quinn questioned Johnson once again without any parent or attorney present. *Id.* at BJ02014:19–24, BJ02017:23–02018:12, BJ02020:4–02021:2; Ex. 63 at BJ03154:13–18. Even though Johnson kept telling the detectives that he was not involved in the homicide, Willoughby told him that he needed to "fix [his] statement, or the deal was going to be off." Ex. 63 at BJ03136:25-03137:13, 03138:4-9, 03151:10-27. Willoughby became aggressive and yelled at Johnson, *id.* at 03151:10-27, and the detectives told him that he was going to face the death penalty if he did not provide the statement they wanted, Ex. 68 at BJ02014:12-18. Johnson caved and gave the officers a new statement because he believed that if he didn't, he would get the death penalty. Ex. 68 at BJ02014:12-02015:13, BJ02024:8-02025:26.

Quinn and Willoughby then coerced another confession from another juvenile witness: 14-year-old Kwame Wells-Jordan. During the detectives' initial interview of Wells-Jordan, he denied any involvement in the homicide and gave the detectives an alibi that corroborated Johnson's initial story. Ex. 70 (J. Sykes 2007 Aff.) ¶ 9. Three days later, Wells-Jordan was arrested at his middle school and brought to the police station for an interrogation. *Id.* ¶ 10. Detectives Willoughby and Quinn interrogated Wells-Jordan with his aunt present and told Wells-Jordan that if he didn't tell them what they wanted him to say, they were going to arrest

him. Ex. 69 (J. Sykes Dep) at 128:10-129:10, 130:11-131:2. Eventually, the detectives'

supervisor entered the interrogation room and falsely told Wells-Jordan's aunt that they had his

fingerprints and that he should just implicate himself in the murder to make the interrogation

easier on everyone. Ex. 65 (J. Sykes 2012 Testimony) at BJ03283:4-11, 3277:19-26. Wells-

Jordan's aunt gave in to the pressure and told her nephew to say that he was at the scene of the

crime. Ex. 69 at 137:9-20. She later explained: "At this point and being interrogated by

somebody over and over and over again and you continuing to tell them no and they're

continuing to tell you that you were there, you're getting frustrated and you're trying to figure

out what to do, how to do and you're alone, just you and your child, what would you do?" *Id.*

  While taking Wells-Jordan's coerced statement, Quinn and Willoughby followed

the same playbook once again. They fed Wells-Jordan the details he provided in his statement,

showed him photos of the murder weapon and the victim's car, and told him how the shooting

happened. Ex. 66 (J. Sykes 2008 Testimony) at BJ2781:5-2782:16, 2785:15-2786:20; Ex. 69 at

116:1-15, 112:25-114:13, 121:7-122:2. Wells-Jordan then provided a tape-recorded statement

repeating the detectives' story. Ex. 66 at 2820:14-2821:1; Ex. 69 at 139:22-140:24.

  Johnson eventually pled guilty to murdering Fields. Johnson SJ Order at 12. Prior

to pleading guilty, he told his attorney that his confession was coerced and that he had nothing to

do with Fields' murder. *Id.* The state went on to prosecute Wells-Jordan for his purported

involvement in the Fields homicide. *Id.* at 13. During that trial, Holmes and Johnson both

recanted their statements, which they testified were made up and coerced by the detectives. *Id.*

Wells-Jordan was acquitted of all charges. *Id.*

  The State's Attorney later conducted a conviction integrity review of Johnson's

case. *Id.* at 14. Following the review, the State's Attorney filed a motion to set aside Johnson's

judgment of conviction in 2015 because the information developed during the review "sufficiently undermined the state's confidence in the judgment of conviction." *Id.* The court then entered a *nolle* and the charges were dismissed. *Id.*

F.  **Despite Numerous Cases Involving Officer Misconduct and Thirteen Exonerations, The NHPD Failed to Change its Training, Policies, or Practices**

According to the National Registry of Exonerations ("NRE"), 29 people have been exonerated in the State of Connecticut since 1989, including Vernon Horn and Marquis Jackson.[9] Ten—or 34 percent—of the total exonerations in Connecticut have come from the City of New Haven, a municipality whose population accounts for only 3.6 percent of the state. Of these ten exonerations, four—Vernon Horn, Marquis Jackson, Bobby Johnson, and Scott Lewis—included both *Brady* violations and improper coercion of witnesses by NHPD officers. *See* §§ II.E.7, II.E.9, *supra*. The City was unaware that such an outsized proportion of Connecticut's exonerees were from New Haven and did not know how many New Haven exonerations involved *Brady* violations or witness coercion. Ex. 5 at 284:13-285:16.

The City—whose Rule 30(b)(6) designee worked at the NHPD when Derrick Hamilton, Scott Lewis, and Bobby Johnson were exonerated, *id.* at 155:8-11—was unable to identify any practice the NHPD changed as a result of any of New Haven's exonerations. *Id.* at 285:17-18. There is no "general order, policy, or practice that had been revised [by the NHPD] as a result of an exoneration or information received later from [an] exoneration." *Id.* at 286:718.

---

[9]  A project of the University of Michigan Law school and two other universities, the NRE "collects, analyzes and disseminates information about all known exonerations of innocent criminal defendants in the United States." The National Registry of Exonerations, https://www.law.umich.edu:special:exoneration/Pages/mission.aspx (last accessed Sept. 20, 2021). A case is listed as an "exoneration" by the NRE where a person was "convicted of a crime and, following a post-conviction re-examination of evidence in the case, was either: (1) declared to be factually innocent by a government official or agency . . . ; or (2) relieved of all the consequences of the criminal conviction." Glossary, The National Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/glossary.aspx (last accessed Sept. 20, 2021).

Departmental leadership never even discussed changing policy in response to New Haven's many exonerations. *Id.* at 287:2-9. Likewise, the City's and the Detectives' retained police practices experts were both unable to point to a single change the NHPD made to its policies, practices, procedures, supervisory practices, training, hiring practices, or disciplinary practices as a result of Horn's and Jackson's exonerations. Ex. 25 at 63:7-64:22; Ex. 26 at 27:2-32:12.

ARGUMENT

**III.    VIEWING THE FACTS IN THE LIGHT MOST FAVORABLE TO PLAINTIFF, DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT SHOULD BE DENIED**

   **A.    The Defense Experts Defeat the Defendants' Motions**

The City of New Haven and the Detectives hired, at great expense, two separate experts to opine on this case.

The City hired Joseph Stine as its police practices expert. Stine has given opinion testimony in over one thousand civil cases, has represented defendants in 80 percent of those cases, and has only testified against a police department in court "15 or 20" times. Ex. 25 at 16:25-17:1, 17:22-18:13. As of August of this year, Stine spent over 240 hours on this case. Ex. 25 at 13:13-21. At the time of his deposition, Stine already billed $84,000 to the City of New Haven for his work. *Id.* at 15:10-18.

The Detectives hired Elliot Spector. If anyone in the United States of America should support the defendants in this case, it is the Detectives' expert witness, the ultimate police advocate: Elliot Spector. Spector has spent his career (i) testifying as an expert for police and police departments, never against, Ex. 26 at 10:1-18, and (ii) representing police as a lawyer in police misconduct and wrongful conviction cases, *id*. at 46:15-48:5. Spector has represented "[s]everal hundred" police and "the majority of the police departments in Connecticut." *Id*. at 50:10-25. Spector's policy is to "believe police officers" in all cases. *Id*. at 206:9-23. Spector

believes "there has been a war on police for many years," which "gained momentum 10 or 11 years ago," and sees his role as defending police in that war. *Id*. at 53:18-54:18. Spector will appear on just about any television program or podcast to defend police. *See, e.g.*, *id.* at 52:15-53:17, 56:12-15, 60:6-18. Spector believes New York City's stop and frisk program, which a federal judge found unconstitutional, and which led millions of New Yorkers to be stopped and frisked without reasonable suspicion,[10] was "incredibly successful." *Id*. at 60:15-64:4. Spector asked, "How really bad are police officers?" given that medical malpractice leads to many more deaths than police shootings. *Id*. at 60:9-14. Spector cannot think of a single high-profile police misconduct case in the country that was racially motivated. *Id*. at 55:8-12. Spector has never supported a police accountability bill. *Id*. at 65:1-4. Spector spent "hundreds of hours on this case" and has already billed over $80,000. *Id*. at 23:7-16.

Yet as set forth below, taking the facts in the light most favorable to Vernon Horn, both Stine and Spector believe the Detectives violated the Constitution. *See infra*. This is the unusual case where the defense experts' own testimony (as well as the facts and the law) defeats the defendants' motion.

The prosecutor in this case, Gary Nicholson, *also* believes that the Detectives violated the Constitution, in multiple respects. *See infra*. Under these circumstances, it is startling that the Detectives filed their motion at all.

### B. The Detectives Repeatedly Violated *Brady*

Under Second Circuit law, police must "turn exculpatory evidence over to the prosecutors." *Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir. 1992). "When police

---

[10]     *See generally Floyd v. City of New York*, 959 F. Supp. 2d 540 (S.D.N.Y. 2013).

officers withhold exculpatory or impeaching evidence from prosecutors, they may be held liable under § 1983." *Bellamy v. City of New York*, 914 F.3d 727, 751 (2d Cir. 2019).

Contrary to the Detectives' assumption, *see* Detectives' Br. at 35, the withholding need not be intentional.[11] *See id.* at 751 n.23 (noting that the Second Circuit has not decided whether a civil *Brady* claim requires intentional suppression); *Poventud v. City of New York*, 750 F.3d 121, 133 (2d Cir. 2014) (en banc) (*Brady* claim requires that evidence "must have been suppressed . . . either willfully *or inadvertently*" (emphasis added) (cleaned up)); *Nnodimele v. Derienzo*, No. 13 Civ. 3461, 2016 WL 3561708, at *5 (E.D.N.Y. June 27, 2016) ("bad faith is not a required element of a *Brady* claim under § 1983," but rather "deliberate indifference to or reckless disregard for an accused's rights can sustain such a claim").

To prevail at trial, Vernon Horn need only show that the suppressed evidence was material, which requires only a "reasonable probability" of a different outcome in the criminal case had the evidence been disclosed. *Poventud*, 750 F.3d at 134 (quoting *Leka v. Portuondo*, 257 F.3d 89, 104 (2d Cir. 2001)). For example, suppressed evidence is material if its disclosure "would have significantly increased the defense's chances of sowing a reasonable doubt in the jury's mind." *Bellamy*, 914 F.3d at 752. This is a far lesser burden than showing that the criminal case "would more likely than not" have resulted in an acquittal. *Poventud*, 750 F.3d at 133 (quoting *Leka*, 257 F.3d at 104). "The materiality test is 'not a sufficiency of evidence test," and Mr. Horn "'need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict.'" *Leka*, 257 F.3d at 104 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434-35 (1995)).

---

[11] Nonetheless, for efficiency's sake and given the overwhelming evidence of intentional misconduct in this case, this brief will analyze the record as though the *Brady* claims required intentional suppression. All of the analysis in this section applies *a fortiori* to reckless or deliberately indifferent suppression of *Brady* material by the Detectives.

Defendants cannot escape *Brady* liability by arguing that criminal defense counsel should have discovered the exculpatory information themselves. The Second Circuit has squarely held—in vacating Scott Lewis's New Haven wrongful conviction on *Brady* grounds—that *Brady* has no "affirmative 'due diligence' requirement." *Lewis*, 790 F.3d at 121. Mr. Horn and his counsel had no "duty . . . to take affirmative steps to seek out and discover" exculpatory information. *Id.* Rather, Dease, Breland, and Adger had the affirmative duty to disclose to the prosecutor all information favorable to the defense. *Walker*, 974 F.2d at 299; *Horn v. Stephenson*, No. 19 Civ. 2418, 2021 WL 3776318, at *4 (2d Cir. Aug. 26, 2021) (citing *Walker*, 974 F.2d at 299).

### 1.    Pearson-Related *Brady* Violations

#### a.    As Defendants' Experts and the Prosecutor Admit, Pearson's Statements that He Did not Make the Fourth Call Are *Brady* Material

Horn's alleged possession of the stolen phone was "critical evidence," and "highly incriminating." Ex. 21 at 78:14, 96:17. Nicholson referred to the phone some fifteen times in his closing arguments. *See generally* Ex. 31. As noted, Pearson linked Horn and the phone. The defense experts in this case and the prosecutor admit: Pearson's denial to the police that he used the phone was "obviously *Brady* material." Ex. 21 at 111:11-17; Ex. 25 at 107:13-24, 109:17-110:14, 111:2-7. It impeached Pearson's trial testimony and was a prior inconsistent statement. Ex. 21 at 111:11-113:14. Pearson's denial to the police that Horn gave him the stolen phone was also "obviously *Brady* material." *Id.* at 114:13. It is "exculpatory," "impeaching of Mr. Pearson," "material," and "information the police should disclose" to the prosecution. *Id.* at 114:14-23, 109:17-110:14; Ex. 26 at 131:22-132:10 (defense expert: "exculpatory," "impeachment evidence of Mr. Pearson"); Ex. 25 at 133:5-22 (defense expert: "inconsistent statement"; "If the police have that information, they should give it to the prosecutors."); Ex. 26

at 137:2-13 (same). As defense expert Stine put it, Pearson's denials of having made the fourth call are *Brady* material "[b]ecause it's two versions of the same event coming from the same witness." Ex. 25 at 107:25-108:2.

It is undisputed that, accepting Pearson's testimony as true, the Detectives suppressed evidence favorable to the defense. It is undisputed that "[i]n 1999, police were supposed to turn over *Brady* material." *Id*. at 80:22-23; *Walker*, 974 F.2d at 299. It is undisputed that the Detectives failed to disclose Pearson's denials to the State's Attorney, who was therefore unable to disclose the evidence to the defense. Ex. 21 at 118:12-18, 111:8-9, 120:2-7; Ex. 26 at 138:5-9.

> **b.** **As Defendants' Experts and the Prosecutor Admit, the Detectives' Coercion of Pearson is *Brady* Material**

Defendants' experts and the prosecutor similarly admit that all of the Detectives' threats to Pearson are *Brady* material. "[A]ny threat against a state's witness is [] *Brady* material." Ex. 25 at 93:1-12; Ex. 21 at 72:14-16 ("[A]ny kind of threat made to a witness to induce him to give information . . . is *Brady*."). That includes a threat to imprison a witness, take the witness' children away, take away of the liberty of a witness' mother, or threaten to contact the witness' probation officer. Ex. 21 at 72:21-73:23, 121:5-15; Ex. 25 at 93:13-24; Ex. 26 at 92:25-93:5, 95:24-96:5. This is in part because threats "could give the witness a motive not to tell the truth." Ex. 25 at 94:12-16; Ex. 26 at 96:1-5 ("someone would say something that otherwise may not be true"). Defense expert Stine reviewed Pearson's deposition testimony and concluded that, if he told the truth, the Detectives' threats were *Brady* material. *Id.* at 111:8-23. Defense expert Spector admitted that if "Dease and Breland told [Pearson] to lie about a phone call that never happened . . . that is *Brady* material Dease and Breland should have disclosed to the prosecutors." Ex. 26 at 156:11-16.

All such threats must be disclosed to the defense. Ex. 21 at 72:21-73:23, 121:5-15. As a crucial witness connecting Horn to the one piece of physical evidence (the stolen phone), Pearson's testimony was key, and "his motivation for saying Vernon Horn gave him a cell phone was important." *Id*. at 05:1-17. All of the threats and coercion Pearson endured was *Brady* material: the Detectives' threat to contact his probation officer, to charge Pearson with conspiracy, to take his children away, and to arrest his mother. *Id*. at 121:5-122:19, 124:10-14; Ex. 25 at 93:13-24.

Evidence of a police officer's threat to a witness is textbook *Brady* material. *See Giglio v. United States*, 405 U.S. 150, 153-55 (1972) (evidence that the government obtained a witness's testimony by suggesting he could escape prosecution through cooperating was "material" evidence "affecting credibility" of the witness that should have been disclosed under *Brady*); *Blake v. Race*, 487 F. Supp. 2d 187, 215 (E.D.N.Y. 2007) (a police officers' failure to advise prosecutors that they had coerced a witness into falsely implicating the criminal defendant, "if proven, would [] support a *Brady* claim under Section 1983"); *Jackson v. City of Cleveland*, 925 F.3d 793, 814-15 (6th Cir. 2019) (police officer's knowledge that a key witness was "coerced into signing [an] allegedly false statement . . . [is] exculpatory evidence"); *Geter v. Fortenberry*, 849 F.2d 1550, 1559 (5th Cir. 1988) (failure to disclose that photo identifications were procured by "unlawful means" was exculpatory under *Brady*).[12]

---

[12]    *See also Quezada v. Smith*, 624 F.3d 514, 522 (2d Cir. 2010) (state's alleged nondisclosure of evidence of police coercion of witness is "constitutional error" under *Brady/Giglio*); *United States v. Cody*, 722 F.2d 1052, 1061-63 (2d Cir. 1983) (FBI agent's threats to witness should have been disclosed to defense under *Brady/Giglio*); *United States v. Martoma*, No. 12 CR. 973, 2014 WL 31704, at *4 (S.D.N.Y. Jan. 6, 2014) (evidence of government's threats to prosecution witnesses is *Brady* and *Giglio* material that must be disclosed to the defense); *Carrillo v. Cty. of Los Angeles*, No. 11 Civ. 10310, 2012 WL 12850128, at *6-*7 (C.D. Cal. Nov. 14, 2012), *aff'd*, 798 F.3d 1210 (9th Cir. 2015) (evidence of police officer's threats to witness exculpatory under *Brady*); *Howard v. City of Chicago*, No. 03 Civ. 8481, 2004 WL 2397281, at *10 (N.D. Ill. Oct. 25, 2004) (evidence of police officers' coercion of witness exculpatory under *Brady*).

It is undisputed that, accepting Pearson's testimony as true, the Detectives threatened Pearson, and those threats are *Brady* material. It is undisputed that the Detectives failed to disclose their threats to the State's Attorney, who then failed to disclose the evidence to the defense. It is also undisputed that Pearson was a critical witness and "his motivation for saying Vernon Horn gave him a cell phone was important." Ex. 21 at 105:1-17. The Detectives' motion is again frivolous.

### c. The Suppression of This Evidence Was Material to the Outcome of the Criminal Case as a Matter of Law

Evidence contradicting the fourth Pearson call was unquestionably material as a matter of law. *United States v. Mahaffy*, 693 F.3d 113, 132 (2d Cir. 2012) (information that "called squarely into question the credibility of [] the government's key cooperating witness" material as a matter of law); *Miller v. United States*, 14 A.3d 1094, 1115-17 (D.C. 2011) (where eyewitness testified at trial that shooter used right hand, his suppressed prior testimony that the shooter was left-handed was material as a matter of law); *Nnodimele*, 2016 WL 3561708, at *6-7 (holding fabricated evidence material as a matter of law).

To be material, suppressed evidence need only have led to a "reasonable probability" of a different outcome in the criminal case. *Poventud*, 750 F.3d at 134. This is a low bar. It does not require showing that the suppressed evidence would "more likely than not" have resulted in an acquittal, or that the remaining evidence is legally insufficient to support a conviction. *Id.* at 133; *Leka*, 257 F.3d at 104.

Here, there is no need to wonder whether evidence contradicting the fourth Pearson call would have led to a "reasonable probability" of a different outcome. It *did* lead to a different outcome. Once it became clear that Pearson did not make the fourth call, the State of Connecticut moved to vacate Vernon's and Marquis's convictions in the interests of justice,

consented to dismissal of the charges, and allowed them to walk out of prison as free men. State's Attorney Griffin took this "extraordinary step," Ex. 22 at 130:9, based "in large measure" on the FBI's finding that Pearson did not make the fourth call, *id*. at 119:7-13. Evidence that Pearson did not make the call "broke . . . the tangible . . . link between Vernon Horn and the stolen cell phone." *Id*. at 97:9-15.

Everyone agrees the fourth Pearson call was extremely important to the criminal case. According to the trial prosecutor, Pearson's testimony about the fourth call was "critical evidence" and "highly incriminating." Ex. 21 at 78:14, 96:17. The exonerating prosecutor agrees: Pearson's testimony about the fourth call was "crucial evidence," Ex. 22 at 105:3-10, and "crucial to the case," *id.* at 121:16-18. Even Dease acknowledges it was "critical to the investigation." Ex. 32 at 96:16-18.

Pearson's testimony put the phone stolen from the murder scene in Vernon Horn's hands less than 36 hours after the crime. There can be no question that Pearson's prior denials, and the coercion necessary to get him to tell the lie the NHPD wanted, were material.

### 2. Thompson-Related *Brady* Violations

#### a. As Defendants' Experts and the Prosecutor Admit, Thompson's Statements that He Could Not Identify Horn and Jackson is *Brady* Material

Thompson was the only person in the Dixwell Deli who identified Horn and Jackson at trial. As the defense experts and Nicholson admit, Thompson's undisputed pre-trial statements to Dease and Breland that he could not identify Horn and Jackson are "*Brady* material." Ex. 21 at 135:1-7; Ex. 25 at 146:15-147:14. "It's exculpatory," "inconsistent with what he apparently told the police in his statement," "impeachment material," and "weakens whatever identification Thompson made at trial." Ex. 21 at 135:11-136:14; Ex. 25 at 194:21-195:7 ("that would amount to exculpatory evidence" that "should be disclosed to prosecutors").

The Detectives should have shared this information with the prosecution. Ex. 25 at 153:15-19; *see Mahaffy*, 693 F.3d at 132; *Miller*, 14 A.3d at 1115-17.

It is undisputed that Thompson told the Detectives he could not identify Horn or Jackson, and that such information is *Brady* material. It is undisputed that the Detectives failed to disclose Thompson's statements to the State's Attorney, who therefore was unable to disclose the evidence to the defense. It is also undisputed that Thompson was the one and only person in the deli who testified that Horn and Jackson were the robbers. *See Kampshoff v. Smith*, 698 F.2d 581, 587 (2d Cir. 1983) ("Whenever [eyewitness testimony] is admitted, there is a genuine likelihood that the jury will base its decision on it.").

Defendants' motion is frivolous. As set forth in Horn's cross-motion brief, the undisputed evidence requires summary judgment for *Plaintiff*.

**b.    As Defendants' Experts and the Prosecutor Admit, the Detectives' Coercion is *Brady* Material**

The Detectives' threat to seek a warrant for Thompson's arrest, and their undisputed threat to call Thompson's parole officer if he did not cooperate was also (i) undisclosed, Ex. 21 at 141:5-142:17, and (ii) *Brady* material. "[A]ny threat against a state's witness is [] *Brady* material," Ex. 25 at 93:1-12; Ex. 21 at 72:14-16 (same), including a threat to contact the witness' probation officer, Ex. 21 at 124:10-14; Ex. 25 at 161:8-16.

"Because [Thompson's] coerced statement formed the core of the prosecution's case, there is a reasonable likelihood that, had the juries in Plaintiffs' trial known that that statement was fabricated and coerced . . . the juries would not have convicted Plaintiffs. Therefore, a reasonable jury could find all three elements of a *Brady* claim satisfied." *Jackson*, 925 F.3d at 815.

Again, the Detectives' threats were (i) *Brady* material; (ii) undisclosed to the State's Attorney or the defense; and (ii) impacted the motivations of the only witness in the deli who identified Horn or Jackson. Defendants' motion is frivolous.

### 3. *Brady* Violations Related to the Phone Records

#### a. A Genuine Dispute of Material Fact Exists as to Whether Adger and Dease Intentionally Suppressed the Phone Records

Viewing the evidence in the light most favorable to Vernon Horn and drawing all reasonable inferences in his favor, Adger and Dease intentionally suppressed the phone records of Willie Sadler, Tamika Fuller, Marlo Macklin, and the West Haven house that got the fourth call from the stolen cell phone.[13] The jury could easily discredit Adger's self-serving claim that she put the records in the NHPD records room, *cf.* Detectives' Br. at 36-37, and credit the powerful evidence of intentional misconduct.

The strong evidence of intentional suppression begins with the place the phone records were found: the unfinished basement of Adger's private home. Ex. 3 at 113:19-22. The phone records seized in this case were evidence. Ex. 13 at 120:3-16. Under no circumstances should a detective *ever* store evidence in her house. No one involved in this case had ever heard of a detective storing evidence in her basement. No one could think of any legitimate reason to do so. Ex. 4 at 328:21-329:1; Ex. 26 at 228:5-8, 229:14-20. A reasonable jury could infer intentional misconduct from this single highly unusual fact alone.

The circumstances under which the suppressed records were discovered in Adger's basement in 2018 were also highly incriminating. Immediately after an investigator working on behalf of Vernon Horn asked her about phone records, Adger called Dease and asked

---

[13] While the Detectives limit their briefing about the suppressed phone records to Adger, it is undisputed that Dease also possessed the phone records, Ex. 3 at 136:15-17, and thus the *Brady* claim concerning the phone records should proceed to trial against both.

him: "Did we arrest the right people"? Ex. 23 at 103:6-10. Dease responded by reminding Adger of the "hard work" they had put into the case. *Id*. at 104:24-105:3. A reasonable jury could easily construe these party admissions by Adger and Dease as evidence of their consciousness of guilt. That Adger chose to hand over the records after talking to Dease and be "cordial" while doing so is at least as consistent with a belated pang of conscience or a realization that the jig was up as it is with never having suppressed the records at all. *Cf.* Detectives' Br. at 24. Her polite demeanor in 2018 certainly does not establish the lack of intentional suppression in 1999 *as a matter of law*, as would be necessary to grant Defendants' motion for summary judgment on this issue.

The strong evidence of intentional suppression by Adger and Dease continues with the places where the records were *not* found: the State's Attorney's Office or the NHPD Records Room. In 2018, the NHPD made a "herculean" effort to locate the suppressed phone records, among other items. Ex. 19 at 29:6-7. The NHPD did not find the phone records of Sadler, Fuller/Macklin, or the West Haven house in the Records Room. Ex. 13 at 46:7-51:8, 118:3-120:2. The NHPD did not find any evidence that these materials had ever been logged into the Records Room. *Id*. at 118:3-120:2. Nor did the State's Attorney's Office or the Court have custody of the records. *Id.*

The State's Attorney's Office never received the suppressed records in 1999-2000. Nicholson undisputedly turned over everything he got from the NHPD to defense counsel. Ex. 21 at 62:6-16; 129:21-23. Defense counsel never got the phone records of Sadler, Fuller/Macklin, and the West Haven house. Ex. 24 at 102:3-108:17, 234:16-235:4. That is because Adger and Dease never disclosed them to Nicholson. Ex. 21 at 223:11-16, 227:5-8. The Detectives claim it is "possible" that Inspector Mel Cartoceti, a deceased former employee of the State's Attorney's Office, "may have" mishandled the records. Detectives' Br. at 20. But on their

motion for summary judgment, Adger and Dease must do more than speculate about the "possib[ility]" that their conveniently dead scapegoat may be to blame. They must prove there is no genuine dispute of material fact that they did not suppress the records, which they have plainly failed to do.

That a handful of other phone-related records *were* found in the Records Room merely confirms the selective and intentional nature of what Dease and Adger suppressed. *Cf.* Detectives' Br. at 21-22, 36-37. Defendants assert that, because phone records for Marquis Jackson and Adrienne Younger were found in the Records Room, "the remaining missing records must have been filed" there as well. Detectives' Br. at 37. But a rational jury would more likely conclude the opposite: that any records not found in the Records Room were *not* filed there. Not coincidentally, Jackson's and Younger's phone records have no exculpatory value. Jackson already knew who he called from his own phone, and Younger was a young woman with whom Steve Brown had a sexual relationship and who had no potential connection to the crime. The jury could easily conclude from the presence of these innocuous phone records in the NHPD Records Room that the *absence* of the exculpatory records was deliberate. Either way, it is for the jury to decide.

Adger's and Dease's suppression of other details concerning their investigation into Sadler, Newkirk, and Macklin further confirms that they intentionally suppressed the phone records. For example, Adger and Dease did not document anywhere how they learned of William Newkirk's existence or what happened in numerous encounters with Newkirk and Sadler. Ex. 51; Ex. 3 at 174:8-177:1, 175:4-13. So, too, do numerous paperwork irregularities. In a violation of basic police procedure, Adger never completed a required inventory form documenting her seizure of Sadler's phone records without a warrant. Ex. 3 at 123:2-5; Ex. 4 at 338:15-18. Rather

than being contemporaneously filed with the court, as required, the inventory form reflecting the seizure of phone records by warrant was not filed until *2014*. Ex. 49; Ex. 22 at 155:13-157:20.

In sum, whether Adger and Dease intentionally suppressed the phone records—or whether the NHPD lost the records and failed to disclose them after Adger deposited them in the NHPD Records Room—is a quintessential issue of fact.[14] The jury must decide it at trial.

### 4. A Genuine Dispute of Material Fact Exists as to the Materiality of the Phone Records Hidden in Adger's Basement

The Detectives do not dispute that the suppressed phone records were favorable to Vernon Horn's defense. *See* Detectives' Br. at 35-46 (nowhere so arguing). They argue only that the records cannot have been material to the outcome of the criminal trial because the records do not "prove" or "establish" that Sadler, Newkirk, and/or Macklin committed the crime. *E.g.*, *id.* at 41, 42. In focusing exclusively on whether the records alone would support a third-party culpability charge, the Detectives ignore the numerous other reasons why the suppressed phone records were plainly material to the criminal case against Vernon Horn. *See id.* at 41-46.

*First* and most important, the suppressed phone records utterly discredit the fabrication that Marcus Pearson made the crucial fourth call from the stolen cell phone after borrowing it from Vernon Horn. The phone records show that the house in West Haven paged a pager *two minutes* before receiving the fourth call from the stolen phone. The West Haven house frequently paged that pager, as did Sadler. Ex. 50 at PL8714, PL8763. The obvious inference is that the fourth call from the stolen cell phone was a response to the page two minutes earlier. As explained above, the fabricated Pearson call was "crucial" to the prosecution of Vernon Horn.

---

[14] The Detectives' claim that they had no motive to intentionally suppress exculpatory evidence because they "had no previous contact" with Horn or Jackson and "no racial motive," Detectives' Br. at 41, is obviously a jury argument. It also ignores that they had at least the same motive to commit misconduct as everyone who commits a *Brady* violation: to win a conviction against their preferred suspects and close the case.

*Supra*. Any evidence showing that this call did not occur was material as a matter of law. *Supra*. The Detectives ignore this highly exculpatory information in the suppressed phone records. *See* Detectives' Br. They do not discuss it even once, and have therefore forfeited any challenge to this theory of the records' materiality.[15] *See, e.g.*, *Loeber v. Spargo*, 391 F. App'x 55, 57 (2d Cir. 2010).

        *Second*, regardless of whether the phone records themselves amounted to third-party guilt evidence, their timely disclosure would have *led* to compelling third-party guilt evidence: Willie Sadler's possession of the stolen phone. *See, e.g.*, *United States v. Gil*, 297 F.3d 93, 104 (2d Cir. 2002) (suppressed evidence that *leads* to the discovery of admissible exculpatory evidence may be material under *Brady*); *Mendez v. Artuz*, No. 98 Civ. 2652, 2000 WL 722613, at *18 (S.D.N.Y. June 6, 2000) (collecting cases), *aff'd*, 303 F.3d 411 (2d Cir. 2002). In 1999, Newkirk was Crystal Sykes's boyfriend. Ex. 35 at HHT-0691:2-21. He regularly spent time with her at the house in West Haven where she worked. Ex. 34 at HHT-0483:4-23; Ex. 35 at HHT-0692:17-20. He did not get cellular service there, so Sadler regularly called him on the land line, including from the stolen phone on January 25, 1999. Ex. 35 at HHT-0709:4-11.

        Sadler's possession of an item stolen from the murder scene fewer than 36 hours after the murder is a "direct connection" between Sadler and the crime—more than enough for a third-party culpability instruction. *See, e.g.*, *State v. Hedge*, 297 Conn. 621, 630 (2010) (trial court's exclusion of evidence that convicted drug dealer drove defendant's vehicle within 24 hours of defendant's use of the vehicle, in which drugs were found, constituted abuse of discretion); *Davis v. Comm'r of Corr.*, 186 Conn. App. 366, 568-69 (2018) (trial counsel

---

[15]      This theory is not a secret. It is expressly pleaded in Plaintiff's complaint: "The obvious inference from the hidden phone records is that Marcus Pearson did not make the fourth call on the stolen cell phone . . . ." Compl., Dkt. 1 ¶ 208; *see also id.* ¶¶ 203-08 (setting forth this argument in detail).

properly admitted evidence of third party's possession of duffel bag of property potentially including murder weapon in months after homicide).

Had the phone records not been suppressed, there is at least a "reasonable probability" that Vernon Horn's defense team would have learned this information before trial, instead of during habeas proceedings years later. The phone records document the connection between Newkirk and Sykes in Adger's own handwriting. *See* Ex. 50 at PL8728 line 73 (call between Sadler's phone number and Newkirk's phone number with notation "Sykes"); Ex. 3 at 142:8-143:14; Ex. 50 at PL8727 line 17 (Newkirk's and Sykes's names both noted next to same call); Ex. 3 at 137:12-140:19 (no other explanation for these notations). They also show repeated calls between Sadler and the West Haven house—calls that even the most cursory inquiry would have shown to involve Newkirk. Ex. 50 at PL8728-37. No police report provides any reason at all to think that Newkirk knew Sykes. No police report suggests any connection between Newkirk and the West Haven house. Only the suppressed phone records point to the truth: Newkirk (not Sykes) received the fourth call from the stolen cell phone, and Sadler (not Pearson) was the caller.

*Third*, a reasonable jury in this case could conclude that competent criminal defense counsel could have used the phone records to undermine jurors' confidence in the police investigation—specifically, the inadequate investigation of Sadler and his associates. It is well settled that information that can be "used to challenge the thoroughness and adequacy of the police investigation" can be material to the outcome of a criminal case. *Mendez*, 303 F.3d at 416; *accord Kyles*, 514 U.S. at 446 n.15 ("[I]ndications of conscientious police work will enhance probative force and slovenly work will diminish it . . . .").

The records hidden in Adger's basement show that the Detectives were suspicious enough of Sadler to go line-by-line through his telephone calls. Adger even charted all his calls to New Haven County. Ex. 50 at PL8761; Ex. 3 at 151:24-152:1. The only conceivable explanation for doing so is that Adger suspected Sadler of involvement in this New Haven crime. Ex. 3 at 152:2-153:9 (no other explanation provided). The phone records show that Sadler lied to the Detectives when he denied knowing anyone in New Haven. *Compare* Ex. 44 at DET237 (Sadler's denial), *with* Ex. 50 at PL8761 (Sadler's repeat calls to Smith in New Haven). He also lied to the Detectives about not knowing who called him from the stolen phone. Yet, the Detectives never confronted Sadler about these lies. Despite being obviously suspicious of him, they never even checked his alibi. Ex. 3 at 172:14-173:17, 179:8-18; Ex. 25 at 178:11-20; Ex. 26 at 233:3-18. Nor did they check Newkirk's or Macklin's alibis.[16] *Id.* A rational jury in this case could conclude that this information would have discredited the police investigation enough to create a reasonable probability of a different outcome in the criminal proceedings against Vernon Horn. *See Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 830 (10th Cir. 1995) ("[W]hile the knowledge that the police were investigating [an alternative suspect] would arguably carry significant weight with the jury in and of itself, that fact would also have been useful in discrediting the caliber of the investigation or the decision to charge the defendant." (cleaned up)).

---

[16]    The Detectives' assertion that Sadler and his associates had "no motive" to rob the Deli is wrong. Detectives' Br. at 43. The prosecution never presented—and the Detectives never developed—a shred of evidence that Vernon Horn or Marquis Jackson had any particularized motive to rob the Deli either. The only motive that has ever been postulated for this crime is the generic one most robbers share: money. The Detectives' assertion that the Bridgeport crew had no connection to New Haven is equally wrong. *See id.* Sadler testified that he made deliveries to New Haven for a liquor distributing company, that he was "familiar with a place by the name of Dixwell Deli," and that he delivered liquor on Dixwell Avenue "near there." Ex. 34 at HHT-0511-0512.

### C. The Detectives Repeatedly Fabricated Evidence

"Where a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages . . . ." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997). To prevail, Mr. Horn need only show that the Detectives fabricated information and forwarded it to prosecutors, and that the evidence was of the kind likely to influence a jury's verdict. *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016). Viewing the facts in the light most favorable to Vernon, the Detectives plainly did so here.

#### 1. The Detectives Fabricated Evidence from Pearson

##### a. Drawing All Reasonable Inferences in Plaintiff's favor, the Detectives Coerced Pearson and Fabricated His Testimony

As Assistant State's Attorney Nicholson admitted, it is both "improper" and "unlawful for a police officer to threaten a witness in order to fabricate testimony." Ex. 21 at 122:23-123:4. "[Y]ou don't threaten people." Ex. 25 at 114:17-21; Ex. 26 at 81:3-5 ("not allowed to coerce witnesses"). Coercing a witness, *i.e.*, "in some way threatening a witness" so that "the witness would communicate something untrue," is unlawful, unconstitutional, and an "unacceptable police practice." Ex. 25 at 102:18-103:4.

All of the Detectives' threats against Pearson were "improper threats to fabricate testimony," *according to the prosecutor in the case*. Ex. 21 at 123:9-19; Ex. 25 at 69:18-70:4 ("way out of bounds"). Defense expert Spector testified that, if Pearson's testimony is true, then Dease and Breland repeatedly coerced Pearson's pretrial statements and testimony. Threatening Pearson with criminal charges if he failed to support the phone story was "nefarious," "improper and illegal." Ex. 26 at 143:1-10. Holding Pearson against his will violated "his Fourth

89

Amendment rights." *Id*. at 145:22-146:12. Over and over, when confronted with Pearson's testimony, the Detectives' own expert admitted that the Detectives coerced Pearson, fabricated evidence, violated the Constitution, and fell "well below acceptable police practice in 1999." *Id*. at 147:10-149:21 (threats to arrest Pearson); *id.* at 150:9-151:8 (threat to call probation and take children away), *id.* at 150:9-22, 152:11-153:3 (threat to charge with a crime). Spector would never train officers to act the way Dease and Breland did. *Id.* at 196:5-12.

      **b.**      **The Detectives' Fabrication of Pearson's Statement Was Unconstitutional Even Absent Coercion of the Witness**

Even absent threats or coercion, police fabricate evidence when they tell a witness to give false information. Take the testimony of defense expert Spector, a lawyer who regularly defends police in police misconduct cases:

> Q:     If a witness says 'X' did not happen and the detective then tells the witness to say 'X' did happen, that's a classic example of police fabricating evidence, correct?
>
> A:     That should not be done.
>
> Q:     Why should that not be done?
>
> A:     Because you take what the witness says, whether it's true or not and your record that. **You don't tell a witness to say facts that aren't true.**
>
> Q:     Why not?
>
> A:     **Because that would be a violation of the law.**
>
> Q:     All right. That would be an example of fabricating evidence?
>
> A:     Yes. Okay. I would agree with that. **If you're creating evidence by telling someone to say something, give a statement that's not true, I think that would be a form of fabricating evidence, yes.**

Ex. 26 at 101:23-102:15; *see Vazquez v. City of New York*, No. 10 Civ. 6277, 2014 WL 4388497, at *4, *8 (S.D.N.Y. Sept. 5, 2014) (denying summary judgment on evidence fabrication claim to

officers where witness testified "that 'most of' her testimony came from the police and that [officers] showed her pictures and told her how [the victim] got killed"); *Zahrey v. City of New York*, No. 98 Civ. 4546, 2009 WL 54495, at *10-12 (S.D.N.Y. Jan. 7, 2009) (denying defense motion for summary judgment on fabrication claims arising from inculpatory statements of unreliable jailhouse informant that were "elicited . . . in bad faith"); *Blake v. Race*, 487 F. Supp. 2d 187, 207-08, 213 (E.D.N.Y. 2007) (denying defense motion for summary judgment arising from false "feeding of facts" to witness).

That is exactly what the Detectives did here. Pearson "kept telling them there was no phone." Ex. 6 at 52:19-20, 56:1-2, 66:14-21, 72:19-21, 70:5-13, 83:20-22. But the Detectives kept telling Pearson to say Horn gave him the phone. *See, e.g.*, *id*. at 80:4-5 ("They told me what to say. They didn't want to hear what I had to say."); *id.* at 85:4-86:3 ("They came back, they came back again, came back again, they came more, they kept coming back, sir, because they didn't get the answers they wanted. They wanted the answers they wanted to hear."); *id.* at 109:1-4 ("they told me I called Crystal Sykes").

Defense expert Spector testified that, if Pearson's testimony is true, then Dease and Breland repeatedly fabricated Pearson's pretrial statements and testimony. When the Detectives told Pearson what to say, that was "illegal," "fabricating evidence," and "wrongful," "[b]ecause police officers are not supposed to tell witnesses to say certain things." Ex. 26 at 141:6-23. When they planted the idea that Horn gave a phone to Pearson and Pearson called Sykes, that was "wrong." *Id.* at 144:1:11.

### c. Pearson's Fabricated Statement Was Forwarded to Prosecutors

The State's Attorney's office obtained Pearson's fabricated statement from the NHPD. The prosecutor, Nicholson, questioned Pearson about it at trial. *See, e.g.*, Ex. 29 (Horn

Trial Tr.) at TT-716:23-26 ("Q: . . . And did you tell Detective Breland and Detective Dease that this person, the picture that you signed, was the person who gave you that cell phone? A: Yes."); *id.* at TT-817:5-818:6 (Nicholson questioning Pearson about his Feb. 3, 1999 statement); *id.* at TT-830:27-831:13 (same).

> ### d. As a Matter of Law, the Fabricated Evidence Was of the Kind Likely to Influence a Jury's Verdict

There can be no question that Pearson's statement was the kind of evidence "likely to influence a jury's verdict." *Garnett*, 838 F.3d at 279; *see Nnodimele*, 2016 WL 3561708, at *6-7 (ruling on materiality of fabricated evidence as a matter of law). It was indisputably "crucial" and "highly incriminating." Ex. 21 at 78:14, 96:17; *accord* Ex. 22 at 105:3-10, 121:16-18.

> ## 2. The Detectives Fabricated Evidence from Thompson

The Detectives' misconduct vis-a-vis Thompson was similar to Pearson. Their threats to get a warrant for Thompson's arrest and to call his probation officer if he did not cooperate; their decision to haul him in a police car; take to him to an interrogation room at the police station; close the door; deny him access to a lawyer, to his family, to food or drink; and keep him incommunicado for two hours until he identified Horn and Jackson—all of this coercive conduct was intended to and did fabricate Thompson's identification before and during trial. Ex. 21 at 69:18-70:4, 122:23-123:4, 123:9-19; Ex. 25 at 114:17-21; Ex. 26 at 81:3-5, 102:18-103:4, 180:13-181:7, 190:24-191:9. The Detectives' repeated placement of Horn's and Jackson's photos in front of Thompson was "poor practice" and inappropriate. Ex. 26 at 183:6-8, 186:19-25.

Even absent the coercion, the Detectives' repeated insistence that Thompson could identify Horn and Jackson, after he told them "18 times" that he could not, was itself

fabrication of evidence. Ex. 7 at 57:20-58:10, 90:9-17, 227:17-20, 233:4-11, 57:12-14 ("I kept on telling them."). "You don't tell a witness to say facts that aren't true," Ex. 26 at 102:5-6 (defense expert), but that is what Dease and Breland did, over and over. They "didn't want to take no for an answer." Ex. 7 at 68:2-3. As even Spector admits, that is "a form of fabricating evidence." Ex. 26 at 102:14.

Dease and Breland also "kept starting and stopping recording" during the interview, Ex. 7 at 36:14-37:4., 84:1-13, and "kept on rewinding it, playing it again; rewinding it and recording again, not playing, but recording it." *Id.* at 82:6-8, all to manipulate the statement and get the identification they wanted. Spector admitted this was "improper." Ex. 26 at 197:14-15, 200:1-21.

Spector has trained police officers since 1980-81. *Id.* at 196:13-14. Spector himself "would not train officers to do th[e] things" the Detectives did: would never "train police officers . . . to bring a teenager down to the station or face a warrant when there's no basis to arrest him"; or "detain [a witness] when there's no basis to detain him"; or "show photos only of the suspects to a witness"; or "threaten to call probation on a witness if the witness didn't cooperate." *Id.* at 195:15-196:4. "All of those things would be wrong." *Id.* at 196:22.

Finally, the State's Attorney's office obtained Thompson's fabricated identification from the NHPD. At the criminal trial, Nicholson questioned Dease and Thompson about Thompson's identification of Horn and Jackson and Thompson's January 26, 1999 statement. *See* Ex. 29 at TT-521:24-524:18 (Nicholson questioning Dease about Thompson's statement and identification of Horn and Jackson as the perpetrators); *id.* at TT-584:25-585:27 (Nicholson questioning Thompson about his January 26, 1999 police statement); *id.* at TT-592:12-593:27 (Nicholson questioning Thompson about his January 26, 1999 identification of

Horn and Jackson as the robbers); *id.* at 599:22-604:27 (same); *id.* at 608:14-27 (Nicholson using Thompson's January 26, 1999 statement to refresh his recollection); *id.* at 612:5-27 (same).

### 3. The Detectives Fabricated Evidence from Brown

At the time Steve Brown identified them to Dease and Adger as his co-conspirators in the Dixwell Deli robbery/murder, Vernon Horn and Marquis Jackson did not know Steve Brown. Ex. 1 at 106:3-109:20; Ex. 2 at 116:23-118:22. They had never met Steve Brown. They had never talked to Steve Brown. They had never seen Steve Brown. They certainly did not shoot up a deli with him. They were not involved in the crime in any way. *See* § I.A.1, *supra*. *Someone* fabricated Brown's identification of Horn and Jackson as his co-conspirators. The only question is whether it was Brown, the Detectives, or some unidentified third party. *See Hicks v. Marchman*, 719 F. App'x 61, 64 (2d Cir. 2018) (concluding that allegations of fabrication were plausible "in view of [plaintiff's] ultimate exoneration").

Compelling evidence points to Dease and Adger as the fabricators.[17] The evidence begins with Dease's own sworn admissions that he was determined to use Brown's statements to pin the crime on Vernon Horn and Marquis Jackson, regardless of whether Brown's statements were true. Before interviewing Brown, Dease had already decided that Vernon Horn and Marquis Jackson were "[his] two guys." Ex. 33 at HHT-0847:10-11. Dease did not believe much of what Brown said. *Id.* at HHT-0844-0845. But Dease did not care because he did not want the truth to get in the way of his preconceived determination of guilt:

---

[17]     That this evidence is circumstantial rather than "direct" is irrelevant. *Cf.* Detectives' Br. at 50 (arguing without any authority that the Detectives should win summary judgment on this point due to a lack of "direct evidence"). "[T]he law draws no distinction between direct and circumstantial evidence . . . ." *United States v. MacPherson*, 424 F.3d 183, 190 (2d Cir. 2005). Circumstantial evidence can be enough to win a criminal conviction beyond a reasonable doubt, *see id.*, and is of course sufficient to create a genuine issue of fact compelling the denial of summary judgment in a civil case, *see, e.g.*, *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003) ("In discrimination cases where state of mind is at issue, we affirm a grant of summary judgment in favor of an employer sparingly because careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination." (cleaned up)).

> Q.     [A]t the time you're interviewing Mr. Brown, a sixteen-year-old kid, you're in the process where you already have prepared arrest warrant affidavits for Vernon Horn and Marquis Jackson, correct?
>
> A.     No, we could prepare it after, um – after.
>
> Q.     After Brown?
>
> A.     After Brown.
>
> Q.     But *those were your two guys*, the other two guys?
>
> A.     *Yes*.
>
> Q.     All right. No question in your mind at that point you had – you had done this investigation and . . . *Horn and Jackson were the guys that you concluded had committed the Dixwell Deli robbery with someone else*?
>
> A.     *Yes*.
>
> Q.     All right. And now you had strong physical evidence with respect to this third guy who hopped up on your radar screen on March 4th -- or March 3rd or early March of the -- of the year 1999, correct?
>
> A.     That's correct.
>
> Q.     *Were you concerned that if you pushed Mr. Brown he might back away from some of these statements and your case would unravel?*
>
> A.     *I believe so.*

*Id.* at HHT-0847 (emphasis added).

These admissions are astonishing. Dease had already decided Horn and Jackson were guilty. He did not care if Brown was lying, and he did not try to find out because he did not want his "case" against his "two guys" to "unravel"—even at the expense of the truth. That is obviously improper. Ex. 25 at 124:24-125:1 (defense expert). Since Dease was admittedly willing to *use* false evidence from Brown to get the people he had already decided were guilty, a rational jury could infer that Dease was willing to help Brown *create* false evidence as well. The

jury could also reasonably infer that it was not coincidental that Brown falsely incriminated the two men the Detectives were already convinced had committed the crime.

The content of Brown's statements further confirms that Dease and Adger told him what to say. Brown told the Detectives that he gave the phone back to Vernon Horn after making the first three calls. Ex. 55 at NH000123-124; Ex. 3 at 203:20-204:17. As we now know, that is impossible. It did not happen. The phone stayed in Bridgeport, *supra* § I.I.1, and Vernon Horn was in New Haven all night, *supra* § I.A.1. But it is consistent with the story that the Detectives had already fabricated: that Horn gave Pearson the stolen phone on the porch in New Haven to place the fourth call. How did Brown know to lie about giving the stolen phone back to Vernon Horn—which did not happen—in a manner consistent with what Detectives had already invented? There is only one reasonable answer: Adger and Dease told him what to say.

Brown also told the Detectives that he made the first call from the stolen phone while on I-95 on the way back to Bridgeport. As we now know, that is also impossible. It did not happen. The call came from Bridgeport. Ex. 28 at 55:19-20. Based on the time at which the NHPD interviewed him outside the deli, Horn could not possibly have made it all the way to Bridgeport by the time of the first call. *See* § I.F.3, *supra*. He could, however, have made it to I-95. *Id.* Brown told an impossible lie about the location of the first call that falsely inculpated Horn, in a manner consistent with the Detectives' private knowledge of Horn's whereabouts. How did Brown know to do that? Again, there is only one logical answer: Adger and Dease told him what to say.

Circumstantial or not, this evidence would allow a rational jury to infer that Adger and Dease fabricated Brown's identification. *See Bellamy*, 914 F.3d at 747 (denying summary judgment on fabrication claim where "the evidence compiled at summary judgment, viewed in

the light most favorable to [the plaintiff], *cannot rule out the inference* that [detectives] fabricated the . . . statement" (emphasis added)). Fabrication is certainly a more plausible explanation of how Brown falsely incriminated the Detectives' two prime suspects, whom he had never met, than Brown randomly guessing or somehow making a mistake about the identities of people with whom he claimed to have spent an entire night. The jury must decide whether Dease and Adger fabricated Brown's identification of Horn and Jackson.

### 4. The Detectives Fabricated Evidence from Sykes

An officer "should not modify what the witness states," "should not intentionally mischaracterize evidence," and "should not misrepresent facts," whether in a warrant application, in any police paperwork, or in court. Ex. 26 at 107:1-108:15 (defense expert). Police knew or should reasonably have known all of this in 1999; it was "the standard." *Id.* at 107:23-108:1. In addition, police should "insert material exculpatory evidence" into a warrant application. *Id.* at 108:19-109:1.

In the case of Crystal Sykes, however, the Detectives modified what she said, mischaracterized facts, and deliberately excluded exculpatory evidence in the warrant application. Sykes repeatedly told the Detectives she had no memory or knowledge of a call from Pearson. Yet the Detectives (1) told Sykes that Pearson called her (a complete fabrication), Ex. 52 at 1-2, Ex. 4 at 183:17-20; (2) falsely told her that the phone record said Pearson called her, Ex. 52 at 4; Ex. 4 at 184:11-14; (3) hauled her to the police station for one of the NHPD's famous unrecorded pre-interviews without notes; (4) repeatedly pressed Sykes to say Pearson called her, notwithstanding her repeated denials; (5) conveniently lost the recording of Sykes' statement; then (6) converted "I don't recall a man calling me or whoever called me at that particular time. I don't even know from yesterday who called me" to "so you're telling me that

it's a good possibility that Marcus Pearson may have called you around eleven o'clock on 1:25:99." Ex. 52 at 4-5.

Even worse, Detective Adger swore in a warrant application that "Sykes stated that she believed Marcus Pearson, a New Haven resident, telephoned her on 1:25:99 at 11:07 a.m. at telephone number (203) 933-4833." Ex. 48 at DET399. This was perjury and fraud. Even the City's own expert testified: "[S]he made a mistake. She shouldn't have done it." Ex. 26 at 173:8-9. Nowhere did Adger disclose Sykes' repeated statements that she had no knowledge of Pearson calling her. Nowhere did Adger disclose how the Detectives repeatedly manipulated her to say something, *anything* to tie Pearson to that phone call.

At one point, Sykes pleaded with the Detectives: "What do you want me to say?" Ex. 52 at 7. Ironically, no matter what Sykes said, the Detectives were determined to misrepresent her statement to the Court (to arrest Horn), and to Pearson (to fabricate his testimony as well).

### D. A Genuine Dispute of Material Fact Exists as to Whether the Detectives Mishandled "Specific, Readily-Verifiable, Exculpatory Evidence" in a Conscience-Shocking Manner

To prevail on his claim for unreasonably prolonged detention in violation of the Fourth Amendment, arising under *Russo v. City of Bridgeport*, 479 F.3d 196 (2d Cir. 2007), Mr. Horn must prove: (1) he had a right to be free from continued detention stemming from the Detectives' mishandling or suppression of exculpatory evidence; (2) the Detectives' actions violated that right; and (3) the Detectives' conduct shocked the conscience. *Id.* at 205.

The "ORIG" column on the call detail log from Vernon Butler's cell phone lists a series of five-digit numbers. Each number corresponds with a specific cell site, with a specific physical location, from which each call originated. All of those cell sites are in Bridgeport. Ex. 28 at 31:8-15. All five calls came from Bridgeport. *Id.* at 55:19-20. It is therefore impossible for

Vernon Horn to have possessed the stolen cell phone at the time of the fourth call: Horn was on Pearson's porch in New Haven, and the phone was in Bridgeport. And it is impossible for Vernon Horn to have been with Steve Brown in the getaway car on the way back to Bridgeport after the homicide: Horn was still being interviewed by police outside the Deli in New Haven at 4:02 am, Ex. 29 at TT-114:7-14, 121:11-18, and the phone was in Bridgeport "well north of I-95" by 4:14 am, Ex. 28 at 31:8-15. Thus, the "ORIG" information proves that Vernon Horn was not one of the two other perpetrators in the getaway car with Steve Brown. It proves that Vernon Horn is innocent.

The Detectives would have learned that Vernon Horn could not possibly have been one of the two other perpetrators in the getaway car with Steve Brown if had they simply asked Omnipoint for the "ORIG" information. The Detectives had to have been aware of the "ORIG" column. The call detail log provided the road map for their investigation. They looked at it repeatedly. Ex. 3 at 52:5-8. They showed it to witnesses. Ex. 4 at 178:24-179:1. Realizing that "ORIG" referred to the calls' physical origin, they could have learned that all the calls came from Bridgeport simply by asking. The location from which the calls originated was "within the knowledge of Omnipoint" in 1999. Ex. 27 at 38:24-39:12. Had the Detectives just asked Omnipoint for the "ORIG" information, Vernon Horn would have been exculpated.

The Detectives' three arguments for summary judgment on this claim fail.

*First*, a factual dispute exists as to whether the detectives understood or should have understood the meaning of "ORIG." The call detail log is full of information that does not require any specialized knowledge or training to understand. *See* Ex. 46; Ex. 27 at 20:20-24:2. Anyone can understand, as a "practical common-sense matter," that a phone company will have information about the date, time, location, and phone from which any given call on its network

originates. Ex. 27 at 17:19-19:11. The call detail record self-evidently displays the date, time, and phone from which each of the five calls originated. Ex. 46. It has a column labeled "ORIG" that can only reasonably mean the location where each call originated. Ex. 27 at 30:10-21. No specialized knowledge or training is necessary to reach the obvious conclusion that "ORIG," on this piece of paper, refers to the calls' place of origin. In fact, there *is no other word in the English language* that "ORIG" could possibly stand for. *See* § I.I.1, *supra*. Viewing the facts in the light most favorable to Vernon Horn and drawing all reasonable inferences in his favor, the Detectives *did* know that "ORIG" referred to physical origin. A rational jury could certainly so find at trial.

      *Second*, viewing the facts in the light most favorable to Mr. Horn and drawing all reasonable inferences in his favor, the "ORIG" evidence *does* "affirmatively establish [his] innocence." *Cafasso v. Nappe*, No. 15 Civ. 920, 2017 WL 4167746, at *7 (D. Conn. Sept. 20, 2017); *cf.* Detectives' Br. at 77-78. The two other perpetrators of this crime drove Steve Brown back to Bridgeport after it occurred. As detailed *supra*, it is impossible for Vernon Horn to have been speaking with police outside the deli at 4:02 am and be in Bridgeport well north of I-95—the location specified by the "ORIG" information—at 4:14 am. It is therefore impossible for him to have been one of the two other perpetrators in the getaway car with Brown. A rational jury could easily conclude that the "ORIG" information "affirmatively establish[es]" Vernon Horn's innocence, since the information makes it physically impossible for him to have been among the perpetrators who undisputedly left the scene in the getaway car.

      The Detectives provide no evidentiary support whatsoever for their bald assertion that "Plaintiffs would not have been exonerated" had the "ORIG" information been available in 1999. Detectives' Br. at 78. To the contrary, Vernon Horn and Marquis Jackson *were* exonerated

based upon the "ORIG" information in 2018. *See* § I.I.2, *supra*. The fact that all five calls originated in Bridgeport is precisely what led the State of Connecticut to vacate the convictions in the interest of justice. While State's Attorney Griffin did not reach any formal determination of innocence, he acknowledged that the "ORIG" information gave him "concerns" about whether Mr. Horn was in the getaway car traveling to Bridgeport and made him "suspicious" that Mr. Horn was not. Ex. 22 at 99:23-25.

The mere fact that some inculpatory evidence exists provides no basis to grant summary judgment for the Detectives on this claim. *Cf.* Detectives' Br. at 78. The whole point of the *Russo* cause of action is that it provides redress for unreasonably prolonged detention in the face of exculpatory evidence even where probable cause may have existed. *See, e.g.*, 479 F.3d at 203-05 & n.9 (affirming dismissal of Russo's false imprisonment claims and noting that probable cause did exist). Russo himself had been identified as the perpetrator of a Bridgeport armed robbery by the cashier, who said he was "one hundred percent sure" of the identification. 479 F.3d at 199. He was lawfully arrested and prosecuted on that basis but spent an extra 68 days in pretrial detention because the police ignored surveillance video showing that the perpetrator had no tattoos and the plaintiff did. *Id.* at 202-03.

Nor can the Detectives rely on prior state court decisions from the criminal proceedings to usurp the factfinding role of the jury in this case. *Cf.* Detectives' Br. at 78 (citing *Horn v. Comm'r of Corr.*, 321 Conn. 767 (2016)). No state court decision in this matter has any preclusive effect under either Connecticut law or federal law because Vernon Horn's conviction has been vacated and is a legal nullity. *See, e.g.*, *Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 970 F.2d 1138, 1146 (2d Cir. 1992) ("It is well-settled in this circuit that a vacated order has no collateral estoppel effect."); *Shirley P. v. Norman P.*, 329 Conn. 648, 655-56 (2018)

(collecting cases). It is for the jury in this case to decide whether the "ORIG" information conclusively established innocence.

Third, a rational jury could conclude that the Detectives' mishandling of the "ORIG" information shocked the conscience. *Cf.* Detectives' Br. at 78-79. Ample evidence supports a finding that the Detectives acted with "deliberate indifference toward [Mr. Horn's] due process rights," which is sufficient to satisfy this element of the claim. *Russo*, 479 F.3d at 210. The Detectives intentionally fabricated inculpatory evidence and hid exculpatory evidence to railroad Vernon Horn and Marquis Jackson. *See supra* §§ III.B, III.C. With respect to the call detail record in particular, the Detectives repeatedly lied about its contents to witnesses, falsely telling witnesses that "the paper" established the existence of a phone call between Pearson and Sykes when it did not. Ex. 52 at 4 (Sykes: "the paper said that he called"); Ex. 4 at 183:21-187:25 (Breland discussing misrepresentations to Sykes); Ex. 6 at 109:1-4 (Pearson: "they told me I called Crystal Sykes"); *id.* at 57:9-10, 67:1-15, 71:19-22, 72:5-8 (same substance). Such willful misrepresentations designed to elicit false inculpatory evidence, coupled with a willful "failure to investigate" the exculpatory "ORIG" information, are precisely the conduct that the Second Circuit held unlawful in *Russo. See* 479 F.3d at 210 (false descriptions of exculpatory evidence designed to elicit a confession, "combined with [the officers'] failure to investigate the [evidence] to see if it was in fact exculpatory, would readily support a jury finding of either intentional violation of, or deliberate indifference to, [the plaintiff's] constitutional rights").

The Detectives' argument that their behavior cannot have been conscience-shocking because the call detail record was not in their "exclusive possession" fails for two reasons. Detectives' Br. at 79. *First*, the governing law imposes no "exclusive possession" requirement under the law. In *Nzegwu v. Friedman*, No. 10 Civ. 2994, 2014 WL 1311428, at *13

(E.D.N.Y. Mar. 31, 2014), the district court granted summary judgment to the defendant on the basis that the evidence in question was "*either* not in the exclusive possession of [the defendant], was not exculpatory, or . . . both" (emphasis added). The Second Circuit affirmed, holding merely that the record contained no proof of either "suppression" or "mishandling" of the evidence at issue. *Nzegwu v. Friedman*, 605 F. App'x 27, 32 (2d Cir. 2015). Here, in contrast, the evidence was both exculpatory and mishandled for the reasons set forth above. *Second*, the call detail record *was* in the Detectives' exclusive possession until it was produced to Horn and Jackson's criminal defense counsel in discovery. *See Cambiasca v. Ruhe*, No. 17 Civ. 87, 2019 WL 2866072, at *10 (S.D.N.Y. July 3, 2019) (noting that the video in *Russo*, like the call detail record here, was under the detectives' exclusive possession *at the time of their misrepresentations* about it). The record adduced by Defendants on summary judgment does not establish when exactly the call detail record containing the "ORIG" column was produced to the defense, although it may have been as late as February 22, 2000, when Nicholson provided "copies of all police reports and statements which constitute[] all of the documents in the possession of the state." Ex. 79 (Nicholson Feb. 22, 2000 Disclosure). Thus, by the Detectives' own logic, a *Russo* claim for unreasonably prolonged detention would exist against them for (at minimum) the approximately eleven-month period between Vernon Horn and Marquis Jackson's arrests and this disclosure.

### E. The Detectives' Argument Against Plaintiff's Failure to Intervene Claim is Entirely Derivative of their Meritless Argument that No Constitutional Violations Occurred

Plainly the Detectives had the opportunity, but not the will, to stop their colleagues' coercion of Pearson and Thompson; their fabrication of statements by Pearson, Thompson, Sykes, and Brown; and their *Brady* violations set forth *supra*. The Detectives' motion for summary judgment as to Plaintiff's failure to intervene claim should be denied for the

same reasons set forth above. In addition, we incorporate the arguments on the failure to intervene claim set forth in Jackson's brief in opposition to Defendants' motions for summary judgment.

## IV.  MATERIAL QUESTIONS OF FACT PRECLUDE SUMMARY JUDGMENT ON PLAINTIFF'S *MONELL* CLAIM

In *Monell*, the Supreme Court held that a municipality may be held liable under Section 1983 for either violating constitutional rights itself or for causing a constitutional violation. 463 U.S. 658, 690-91 (1978); *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 124-25 (2d Cir. 2004) (Sotomayor, J.). "To hold a city liable under Section 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official municipal policy[,] custom[, or practice] (2) cause[d] the plaintiff to be subjected to (3) a denial of a constitutional right." *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983).

"The policy or custom used to anchor liability need not be contained in an explicitly adopted rule or regulation." *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870 (2d Cir. 1992). Instead, a plaintiff may satisfy the "policy, custom, or practice" requirement in one of four ways by demonstrating:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Jones v. Westchester Cnty.*, 182 F. Supp. 3d 134, 158 (S.D.N.Y. 2016) (cleaned up); *see Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012). In addition, a plaintiff must also show "a

direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

In deciding the City's motion for summary judgment, "any evidence in the record that tends to support the *Monell* claim must be credited; evidence opposed to the claim, on the other hand, must be disregarded unless it is undisputed or comes from a neutral source and is uncontradicted and unimpeached." *Russo v. City of Bridgeport*, No. 03 Civ. 1792, 2008 WL 2167881, at *1 (D. Conn. May 21, 2008) (Chatigny, J.).

Construing the record accordingly, a reasonable jury could conclude that the City: (1) had practices of suppressing exculpatory information and coercing witnesses that were so widespread as to constitute a custom or usage of which a policymaker must have been aware; and (2) was deliberately indifferent by (i) failing to discipline its officers for suppressing exculpatory information and coercing witnesses, and (ii) failing to adequately train its officers to properly handle witness interrogations and exculpatory evidence. Each of these is a separate and independent ground for denying the City's motion. Finally, a jury could easily find that a causal link existed between the City's policies and practices and Mr. Horn's constitutional injuries. The City's motion for summary judgment on the *Monell* claim should be denied.

A. **The City Had a Pervasive Practice of Suppressing Exculpatory Evidence and Coercing Witnesses**

Based on the testimony of the Detectives, the City, various NHPD officers, and Defendants' own expert witnesses, a jury could find that the City had a practice of suppressing exculpatory evidence and coercing witnesses that was so widespread as to put supervising policymakers on notice.

1. **The Testimony of Defendants' Own Expert Witnesses Create Material Issues of Fact as to Whether the City Had a Pervasive Practice of Suppressing Exculpatory Evidence and Coercing Witnesses**

A reasonable jury could credit the City's and the Detectives' own expert witnesses' testimony and conclude that the Detectives violated Plaintiff's constitutional rights in accordance with the City's widespread policy, practice, or custom. The City's motion should be denied as to Plaintiff's *Monell* claim on this basis alone.

*Russo* is particularly instructive on this point. In that case, the City of Bridgeport "admitted, in response to requests for admissions, that at all relevant times the officers acted in accordance with municipal custom, policy and practice." *Russo*, 2008 WL 2167881, at *8. "Given this admission," this Court denied Bridgeport's motion for summary judgment on plaintiff's *Monell* claim and explained:

> [I]f a jury were to find one [or all three] of the officers liable for violating plaintiff's constitutional rights, the jury could go on to find that the violation was caused by municipal custom, policy and practice. Such a finding could result in a jury verdict against the City on the *Monell* claim, which would have a legally sufficient evidentiary basis to withstand a post-trial motion for judgment as a matter of law under Rule 50.

*Id.* at *1.

Similarly, here, according to the police practice expert witnesses retained by both the City and the Detectives, at all relevant times the Detectives acted in accordance with the City's custom, policy, and practice.

The City's expert, Joseph Stine, spent over 240 hours reviewing evidence in this case, Ex. 25 at 13:19-14:21, including Pearson's and Thompson's deposition transcripts, *id.* at 110:15-22. Stine made clear that in forming his opinions in this case, he did not judge the credibility of any witness. *Id.* at 40:22-25. Notwithstanding Pearson's and Thompson's testimony that they were coerced by the Detectives into giving false statements incriminating Plaintiff, the

Detectives' manipulation of Sykes and fabrication of facts in Mr. Horn's warrant application, and their obvious fabrication of Brown's statement and testimony, *see* §§ I.C-F, *supra*, Stine ultimately opined that throughout the Dixwell Deli homicide investigation, Breland, Dease, and Adger acted in accordance with NHPD policy, practice, and procedure. Ex. 25 at 65:23-66:11.

A reasonable jury could credit Pearson's, Thompson's, and *the City's own expert's testimony*, and conclude that the Detectives (i) did coerce Thompson and Pearson into giving false inculpatory witness statements and suppress their exculpatory statements, fabricate Brown's story, and manipulate and misrepresent Sykes's evidence, and (ii) did so pursuant to the City's policy, custom, or practice. In any event, only the jury is capable of untangling any contradictions in Stine's testimony and making such a determination. *See Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010) ("[A]s a general rule, a district court may not discredit a witness's deposition testimony on a motion for summary judgment, because the assessment of a witness's credibility is a function reserved for the jury.").

The Detectives' police practices expert, Elliot Spector, also spent "hundreds of hours" conducting a "thorough review" of the evidence produced in this case, Ex. 26 at 23:4-9, including Pearson's and Thompson's depositions, *id.* at 35:2-13, 178:21-24. Spector "take[s] the facts as presented" and does not make witness credibility determinations, *id.* at 72:4-18, and conceded that if Pearson and Thompson testified truthfully, there were "certain things" the Detectives did "that were unconstitutional, things that were improper," *id.* at 201:10-17. Spector also concluded that, "throughout the entire tenure of the Dixwell Deli case," "[e]verything [the Detectives] did would be in conformance with policy and procedure" of the NHPD. *Id.* at 24:2-16. "I didn't see *anything* [the Detectives] did that violated any [NHPD] policy or procedure," Mr. Spector explained. *Id.* (emphasis added); *Id.* at 24:22-25:1 (Detectives followed NHPD

policy, procedure, or practice when interviewing witnesses). Once again, a reasonable jury could concurrently credit the testimony of Mr. Pearson, Mr. Thompson, other witnesses, and Mr. Spector and find that the Detectives committed "improper" and "unconstitutional" acts while still acting "in conformance with [NHPD] policy and procedure."

The Detectives also admitted outright that "[a]t all relevant times [they] acted in accordance with policy, procedure, custom and practice of the City of New Haven." *See* Ex. 74 (Detectives' responses to RFA No. 1). Each detective made this admission. *Id.* As in *Russo*, this admission *alone* defeats the City's motion. The City's RFA response, in contrast, and disputing the City's own expert, claims the Detectives did *not* act in accordance with the City's custom, policy, and practice to the extent that they coerced witnesses, fabricated evidence, or suppressed exculpatory evidence. Ex. 75 at 2 (City's Response to RFA #116). We therefore have disputes (i) between the Detectives and the City; (ii) between the City's lawyers who responded to the RFA, and the City's police practices expert; and (iii) between the Plaintiffs and the City. All of these disputes create material issues of fact for the jury to decide. *See Felix v. City of New York*, No. 16 Civ. 5845, 2020 WL 6048153, at *3 (S.D.N.Y. Oct. 13, 2020) (denying city's motion for summary judgment on *Monell* claim where "there [was] a genuine dispute as to whether [the individual police officers] violated the [city's] policy"); *Jackson*, 925 F.3d at 834 (reversing grant of summary judgment to city on *Monell* claim and noting that "[i]t is for a jury to consider [the city's formal written policy] in light of [the city's] actual practices and determine whether [the city] had a policy of permitting *Brady* violations.").

### 2. The Jury Could Otherwise Reasonably Find a Custom, Policy, or Practice of Coercing Witnesses and Suppressing Exculpatory Evidence

Even leaving aside the admissions of the City's expert, the Detectives' expert, and the Detectives themselves in their RFA responses, a jury could easily conclude that the

Detectives' act of suppressing exculpatory evidence, fabricating inculpatory evidence, and coercing witnesses during off-the-record pre-interviews was performed pursuant to a *de facto* custom or policy "that has not been formally approved by an appropriate decisionmaker" but is "so widespread as to have the force of law." *Bd. Of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997); *see Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996) (noting that "persistent and widespread" practices of city employees may constitute a municipal custom sufficient to establish municipal liability). Under this category of *Monell* liability, "a policy maker indirectly cause[s] the misconduct of a subordinate municipal employee by acquiescing in a longstanding practice or custom which may fairly be said to represent the official policy." *Miller v. Cnty. of Nassau*, 467 F. Supp. 3d 308, 314 (E.D.N.Y. 2006); *Sorlucco*, 971 F.2d at 870-71 (stating that *Monell* liability lies where the officers' misconduct is "so manifest as to imply the constructive acquiescence of senior policy-making officials").

It was the NHPD's widespread practice (i) not to record "pre-interviews"; (ii) to destroy or discard all police notes of pre-interviews, including all *Brady* material within those notes; (iii) not to produce any *Brady* material in any police notes to prosecutors, ever; (iv) often not even to take notes of pre-interviews, including pre-interviews that generated *Brady* material; and (v) to destroy and re-record over tapes of witness interviews, for which Connecticut courts excoriated the NHPD at least fourteen times. *See* §§ II.A, II.C, II.D, II.E, *supra*. In addition, as Detective Breland admitted, the NHPD freely permitted detectives to coerce and threaten witnesses and fabricate evidence, providing them no training at all to prevent such illegal conduct. Ex. 4 at 290:22-291:17.

The Detectives followed these widespread practices in this case: they did not record pre-interviews of Pearson, Thompson, Brown, Sykes, or others; they either failed to take

notes or destroyed whatever notes they did take of those interviews, including all *Brady* material in those notes; they did not produce *any* of the *Brady* material from *any* of their interviews to the prosecutors—whether it was notes, oral information they received in the interviews, or their coercion of the witnesses; and they coerced, threatened, and manipulated Pearson, Thompson, Sykes, and others, generating fabricated evidence that helped send Mr. Horn to prison. It is little wonder that the Detectives, in their RFA responses and through their expert, admit they "acted in accordance with policies, procedures, custom and practice at the New Haven Police Department." Ex. 74 (Detectives' responses to RFA No. 1); Ex. 26 at 24:2-16. They did so to the tee.

This is more than sufficient to deny the City's frivolous motion. The jury, though, will *also* hear evidence that NHPD policymakers constructively ratified their officers' suppression of exculpatory evidence during off-the-record pre-interviews. During his deposition in this case, Melvin Wearing, the former Chief of Police who ran the Department in 1999, testified that NHPD detectives conducted off-the-record pre-interviews to find out if a witness had "something of value" for the detective or "valuable information that would aid the detective in the case," and, if they did, *then* the detective would take the witness's recorded statement. Ex. 14 at 85:17-86:4, 88:20-89:9. Chief Wearing also explained that if a witness is unable to help detectives, "then so be it. *You let that person go and see if you can find other witnesses.*" *Id.* at 79:9-15 (emphasis added). Based on Chief Wearing's testimony alone, a jury could conclude that the City's most senior police policymaker was aware of and ratified officers' suppression of exculpatory evidence obtained from witnesses during off-the-record pre-interviews.

**B.** **The Jury Could Conclude that the City was Deliberately Indifferent to its Police Officers' Recurrent Suppression of Exculpatory Evidence and Coercion of Witnesses**

In the alternative, the jury could also conclude that the City is liable because it was deliberately indifferent to its officers coercing witnesses and fabricating evidence, which are "recurring situation[s] likely to result in a constitutional violation." *Burai v. City of New York*, No. 18 Civ. 12299, 2021 WL 1198371, at *23 (S.D.N.Y. Mar. 30, 2021). In its nearly 100-page brief, the City does not even address deliberate indifference.

A municipality's liability for deliberate indifference can be based upon: (1) its failure to discipline or supervise its employees, or (2) its failure to adequately train them. *Id.* (citing *Amnesty Am.*, 361 F.3d at 127). Here, there is ample evidence that (1) the City failed to discipline its officers for suppressing exculpatory evidence and coercing witnesses, and instead promoted them or let them retire with their pensions; and (2) the City failed to adequately train its officers to properly handle exculpatory evidence and witness interviews, and that these failures caused Mr. Horn's injuries.

**1.** **A Jury Could Find that the City was Deliberately Indifferent Because It Failed to Discipline Officers Who Coerced Witnesses and Suppressed Exculpatory Evidence**

"Under the failure to supervise or discipline theory, a plaintiff must show that the municipality failed to adequately supervise or discipline its employees . . . and that such a failure of supervision or discipline was tantamount to deliberate indifference." *Burai*, 2021 WL 1198371, at *23 (cleaned up). The need for "more or better supervision to protect against constitutional violations" must have been "obvious" to the municipality. *Vann*, 72 F.3d at 1049. "An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents."

*Id.* (citations omitted). Complaints of civil rights violations may support a finding of a failure to supervise even if there is no "formal finding of misconduct." *Felix v. City of New York*, 344 F. Supp. 3d 644, 662 (S.D.N.Y. 2018); *accord Fiacco*, 783 F.2d at 328 ("The fact that none of the claims had yet been adjudicated in favor of the claimant was not material; if the City's efforts to evaluate the claims were so superficial as to suggest that its official attitude was one of indifference to the truth of the claim, such an attitude would bespeak an indifference to the rights asserted in those claims.").

*Monell* liability lies when a city fails to discipline its officers because such a failure "implicitly encourag[es] or ratif[ies] [officers'] unlawful conduct." *Burai*, 2021 WL 1198371, at *23. As the City's expert explained: "Discipline is a very important part of training. . . . [I]t helps to teach [officers] things they may have missed in training or may not have followed in training. So it encourages people to do the right thing." Ex. 25 at 72:1-123. Discipline, according to Stine, can also be used to deter officers from committing misconduct, and to help them "learn what they're supposed to do." *Id.*

Here, a jury could conclude that time and time again, the City failed to discipline its officers for destroying evidence, suppressing exculpatory information, and coercing witnesses. It could also find that, in many instances, the City instead *rewarded* such misconduct by not only leaving officers unpunished, but also promoting them and/or letting them retire with a pension.

For example, the NHPD did not discipline a single officer after the FBI concluded its investigation into Detective Raucci. Ex. 14 at 155:25-156:15. Detective Raucci himself was allowed to retire to New Mexico with his "$28,000-a-year pension from the [NHPD]." Ex. 83 (2000 *Hartford Courant* article); *see* Ex. 14 at 154:16-155:4; Ex. 15 at 85:11-15. In his entire

career at the NHPD, Breland was not disciplined once. Ex. 4 at 34:20-24. Neither was Adger—to the contrary, she was promoted to the second-highest command at the Department. Ex. 3 at 8:8-14. Detective Coppola, who worked in the Detective Division before, during, and after the Dixwell Deli investigation, could only think of one instance when a detective was disciplined for storing original evidence in their desk, which was a widespread practice at the Department. Ex. 17 at 73:9-14. When Coppola failed to properly maintain evidence in a homicide case, his discipline was "[s]omething real minimal." *Id.* at 60:12-20. Coppola described his discipline like a vacation, noting that he "got a day or two off." *Id.* The NHPD's failure to discipline its officers has continued to this day. According to Defendants' police practices experts, the NHPD made no changes to its disciplinary practices as a result of Horn's and Jackson's exonerations. Ex. 25 at 63:7-64:22; Ex. 26 at 27:2-32:12.

Finally, as detailed in § II.F, *supra*, a grossly disproportionate amount of Connecticut's exonerations have come from the City of New Haven. Yet, in this case, the City did not change any hiring or disciplinary policies or practices as a result of any of these overturned, *nolled*, or dismissed convictions. Ex. 5 at 286:7-18 (The City is "not familiar with a general order, policy, or practice that has been revised as a result of an exoneration or information received later from the exoneration."). Time and time again, the City has refused to hold its officers accountable.

### 2. The City's Failure to Train its Officers in the Proper Handling of Witness Interviews and Exculpatory Evidence Also Demonstrates its Deliberate Indifference

Under the failure to train theory, a municipality is liable "when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights . . . [but] the policymakers choose to retain that program." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Then, the plaintiff must

"identify a specific deficiency in the city's training program and establish that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." *Burai*, 2021 WL 1198371, at *23 (cleaned up); *see Wray v. City of New York*, 490 F.3d 189, 196 (2d Cir. 2007).

Deliberate indifference exists where the plaintiff establishes that (1) "a policymaker knows 'to a moral certainty' that [municipal] employees will confront a particular situation"; (2) "the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult" *or* "there is a history of employees mishandling the situation"; and (3) "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker*, 947 F.2d at 297-98. At the summary judgment stage, plaintiffs must also identify a deficiency in the city's training and show that the deficiency is "closely related to the ultimate injury." *Id.* at 297. A reasonable jury will easily find these requirements met with respect to multiple deficiencies and omissions in the NHPD's training program, with respect to both the *Brady* and the fabrication claims.

### a. *Walker* Element 1: The City Knew "To a Moral Certainty" that its Police Officers Would Conduct Witness Interviews and Handle Exculpatory Evidence

The first *Walker* element requires the plaintiff to "show that the policymaker knows 'to a moral certainty that her employees will confront a given situation. Thus, a policymaker does not exhibit deliberate indifference by failing to train employees for rare or unforeseen events.'" *Babi-Ali v. City of New York*, 979 F. Supp. 268, 273 (S.D.N.Y. 1997) (quoting *Walker*, 974 F.2d at 297).

The first prong of the *Walker* test is easily met here. City policymakers, including NHPD leadership, knew "to a moral certainty" that its police officers (and detectives in particular) would interview witnesses and come across exculpatory evidence both during those

interviews and generally while conducting investigations. *See Burai*, 2021 WL 1198371, at *25 (denying city's motion to dismiss *Monell* claim and noting that "[police] officials clearly knew that police officers would initiate arrests and prosecutions, speak with witnesses, and possess *Brady* material because these are basic aspects of a police officer's job"); *Poventud v. City of New York*, No. 07 Civ. 3998, 2015 WL 1062186, at *15 (S.D.N.Y. Mar. 9, 2015) (denying city's summary judgment motion on plaintiff's *Monell* claim where "[a] reasonable jury could find that the City knows 'to a moral certainty' that police officers will discover exculpatory evidence"); *Bertuglia v. City of New York*, 839 F. Supp. 2d 703, 738-39 (S.D.N.Y. 2012) (denying city's motion to dismiss *Monell* claim and noting that the city "plainly know[s], to a moral certainty" that its prosecutors will interview witnesses and handle *Brady* material, "because these are basic facets of an ADA's job").[18]

Conducting witness interviews and handling exculpatory evidence are not "rare or unforeseen events." *Walker*, 974 F.2d at 297. They are routine parts of a police officer's job and, accordingly, any competent police department should know "to a moral certainty" that its officers will require adequate training in these areas.

---

[18]     *See also Gregory v. City of Louisville*, 444 F.3d 725, 753 (6th Cir. 2006) (reversing grant of summary judgment to city on plaintiff's *Monell* claim for failure to train on the handling of exculpatory evidence and noting that "[i]n their investigative capacities, police officers regularly uncover exculpatory materials"); *Cristini v. City of Warren*, No. 07 Civ. 11141, 2012 WL 5508369, at *13 (E.D. Mich. Nov. 14, 2012) (denying city's motion for summary judgment on *Monell* claim regarding mishandling of exculpatory evidence and concluding that "city policymakers know to a 'moral certainty' that at some point, their investigating officers will be confronted with evidence that contradicts a working investigative theory and tends to exonerate a prime suspect"); *Rabinovitz v. City of Los Angeles*, 287 F. Supp. 3d 933, 966-67 (C.D. Cal. 2018) (denying city's motion for summary judgment and granting summary judgment to plaintiffs on *Monell* claim regarding unconstitutional juvenile witness interview practices and explaining that "it is reasonable to infer that City policymakers here know 'to a moral certainty' that their juvenile division officers will be required to interview children to investigate child abuse allegations").

b. ***Walker* Element 2**: There is a Lengthy, Documented History of NHPD Officers Mishandling Witness Interviews and Suppressing Exculpatory Evidence—Situations that Also Present Officers with a Difficult Choice

The second *Walker* element requires that there is either "a history of employees mishandling the situation" at issue, or that the situation "presents the employee with a difficult choice of the sort that training or supervision will make less difficult." *Walker*, 974 F.2d at 297. Here, a reasonable jury could conclude that either of these standards is met.

i. **NHPD Officers Have a History of Suppressing Exculpatory Evidence and Coercing Witnesses**

"Under the failure to train theory, a municipality may be liable when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights but the policymakers choose to retain that program." *Burai*, 2021 WL 1198371, at *23 (quoting *Connick*, 563 U.S. at 61) (cleaned up).[19] Accordingly, the second *Walker* element requires plaintiffs to show that a municipality has "a history of employees mishandling" the particular situation at issue. *Walker*, 974 F.2d at 297. A reasonable jury could find that the second *Walker* element is met here, where NHPD officers have a lengthy, documented history of mishandling witness interviews and exculpatory evidence.

---

[19]     Although "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train," *Connick*, 563 U.S. at 52, proof of such a pattern is not necessary where "the unconstitutional consequences of failing to train [are] so patently obvious that a city should be liable under § 1983 without proof of a pre-existing pattern of violations" *id.* at 64. Thus, even if the City of New Haven did not have a long history of coercing witnesses, fabricating witness statements, and mishandling exculpatory evidence (as explained here, it does), the need to provide training on these subjects "can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *Canton*, 489 U.S. at 390 n.10; *see Cristini*, 2012 WL 5508369, at *12-*13 (failure to train based on "single-incident theory" sustained where police officers were given no training as to handling exculpatory evidence); *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 391-92 (S.D.N.Y. 2013) (discussing same).

A "history of employees mishandling" a given situation can be established using prior civil rights complaints and court decisions involving the same type of misconduct by a city's police officers. *Burai*, 2021 WL 1198371, at *23 ("Recurring civil rights complaints, can put a municipality on notice of deficiencies in its training program."); *Poventud*, 2015 WL 1062186, at *13 (in support of *Monell* claim related to the city's alleged policy of failing to disclose exculpatory evidence, plaintiff met his burden under *Walker* when he cited to eight state criminal court decisions preceding plaintiff's conviction "involv[ing] police officers destroying or failing to disclose potentially exculpatory material"). Moreover, "claims of officer misconduct may put a municipality on notice of training deficiencies even if those claims do not result in a formal finding that misconduct resulted from a failure to train." *Felix*, 2020 WL 6048153, at *3; *accord Fiacco v. City of Rensselaer*, 783 F.2d 319, 328 (2d Cir. 1986) ("Whether or not the claims had validity, the very assertion of a number of such claims put the City on notice that there was a possibility that its police officers had used excessive force.").

For example, in *Russo*, the City of Bridgeport's moved for summary judgment on a *Monell* claim related to Bridgeport's "fail[ure] to adequately train and supervise its officers with regard to the proper handling of exculpatory evidence." *Russo*, 2008 WL 2167881, at *1. Your Honor denied Bridgeport's motion in part because the plaintiff "point[ed] to million dollar jury verdicts, returned before the events at issue [in *Russo*], in cases against Bridgeport and New Haven, in which police officers withheld exculpatory evidence leading to false imprisonment." *Id.* at *2. These prior cases, Your Honor explained, "plausibly . . . put the City on notice of a need to provide its police officers with better training and supervision regarding the proper handling of exculpatory evidence." *Id.*

The population of the City of New Haven accounts for only 3.6 percent of the state. *See* § II.F, *supra*. Yet 34 percent of the total exonerations in Connecticut have come from New Haven. *Id.* Unsurprisingly, as a city with so many overturned convictions, New Haven has repeatedly been the subject of claims of officer misconduct, including cases like this where officers destroyed evidence, suppressed exculpatory evidence, or coerced witnesses.

As detailed in § II.E, *supra*, in the decades leading up to the Dixwell Deli investigation, Connecticut appellate courts reviewed at least *fourteen* cases where NHPD officers erased, destroyed, or lost taped witness statements. *Jones*, 29 Conn. App. at 310. Contrary to the City's claim that the NHPD did not continue erasing or destroying evidence of witness statements after the 1992 *Jones* decision, City Br. at 22, even after the Appellate Court of Connecticut reprimanded the NHPD in *Jones* for its "department policy" of destroying documentary evidence of witness' statements, *id.* at 307-08, a reasonable jury could find that the NHPD continued its practice. Tapes and notes documenting witness' statements were universally destroyed or lost in this case, *see, e.g.*, Ex. 3 at 183:5-9 (Adger and Dease notes from Brown pre-interview destroyed); *id.* at 172:12-13 (Detectives' notes from Sadler pre-interview destroyed); Ex. 4 at 76:24-77:3 (Thompson tape missing); *id.* at 299:11-14, 301:1-2 (Pearson tape missing; Breland "couldn't find it"), and were destroyed or lost in at least two other cases post-dating *Jones*, *see Johnson*, 2002 WL 31928624, at *2 (1998 erasure of taped statements of police officer witness); *Rosado*, 134 Conn. App. at 513 (in 2006, two NHPD detectives lost their notes documenting witness interviews). At a bare minimum, a jury could reasonably infer that these cases, which spanned decades and included stern admonishments from Connecticut's appellate courts, should have raised red flags for the City and caused its policymakers to question the sufficiency of its training regarding the proper handling of evidence.

Plaintiff can also point to civil rights actions, high-profile criminal cases, and a well-publicized FBI investigation into NHPD misconduct pre-dating the Dixwell Deli investigation, which further put the City on notice of deficiencies in its training programs with regards to the proper handling of exculpatory evidence and witness interviews. In 1985, the State's own witness in a robbery case testified at trial that NHPD officers had fabricated and coerced his inculpatory witness statement. *Harris*, 22 Conn. App. at 330-34. In a 1988 civil rights suit filed against the City, the plaintiff alleged that NHPD detectives omitted exculpatory information from a warrant application. *Golino*, 950 F.2d at 867. An NHPD detective admitted under oath in that case that it his practice was to "omit exculpatory information from affidavits submitted in support of applications from warrants." *Id*. In criminal trials in 1994 and 1998, two witnesses in a homicide case testified at trial that NHPD Detective Greene coerced and bribed them into giving fabricated inculpatory witness statements. *See* § II.E.5, *supra*. In a 1991 civil rights suit filed against two NHPD detectives, *Ham v. Greene*, the plaintiff, Eric Ham, alleged that the detectives threatened and coerced a teenage witness into giving a false witness statement inculpating Ham. *See* § II.E.4, *supra*. The case was tried before a jury, which found for Ham and awarded him nearly $1 million in damages. *Ham*, 248 Conn. at 517-18. The case received considerable press at the time: the *Hartford Courant* described the damages award as "what may be the state's largest verdict in a false-arrest lawsuit" and noted that the New Haven Assistant Corporation Counsel who defended the case was "shocked" by the verdict. Ex. 82 (1996 *Hartford Courant* article).

In 1997, the FBI completed its report of its two-year-long investigation into the conduct of veteran NHPD Detective Vincent Raucci.[20] *See* § II.E.7, *supra*. According to the witness interviews detailed in the FBI report, throughout the course of his investigation of a New Haven double homicide, Detective Raucci coerced witnesses Jose Roque, Milly Martinez, Ovil Ruiz, and Hector Ortiz during pre-interviews and had them give fabricated witness statements inculpating two suspects. In addition, the FBI report details how Raucci started and stopped the tape recorder to coach witnesses and tell them what to say on tape. The FBI report describes how Raucci's coercion of Ruiz took place in front of Raucci's superior, Sergeant Sweeney, who never formally documented or reported Raucci's misconduct.

The FBI's Raucci investigation and findings were common knowledge among the rank and file and top brass at the NHPD in the years prior to the Dixwell Deli investigation. Then-Chief Pastore worked with the FBI on the investigation, "knew all about" it, and discussed it with his successor, then-Assistant Chief Wearing. Ex. 14 at 125:25-126:9, 133:2-7. Sergeant Minardi, an Internal Affairs officer at the NHPD, also assisted with the investigation and, alongside FBI agents, conducted interviews of various witnesses, including Ruiz. Ex. 58 at SM012380. The supervisor of the NHPD Detective Division, Kendall, also met with the FBI and State's Attorney Dearington to discuss Raucci's misconduct. Ex. 16 at 120:2-121:7.

A reasonable jury could conclude that these cases, "[w]hether or not the claims had validity," *Fiacco*, 783 F.2d at 328; *see Felix*, 2020 WL 6048153, at *3, repeatedly put the

---

[20]     "[W]here a report evidences a policy or custom directly related to the constitutional deprivation alleged by the plaintiff, reliance on that report is proper" when determining a municipality's policy. *Buari*, 2021 WL 1198371, at *24; *accord Gentile v. Cnty. of Suffolk*, 926 F.2d 142, 153 (2d Cir. 1991) (affirming district court's reliance on investigative report as evidence of municipal policy). Here, the FBI report repeatedly describes an NHPD detective coercing witnesses and fabricating inculpatory witness statements during off-the-record pre-interviews—the same misconduct at issue in this case.

City on notice of deficiencies in its training programs on the handling of evidence and witness interviews throughout the two decades leading up to the Dixwell Deli investigation.

The City insists that the misconduct described in the FBI report, combined with the prior civil and criminal cases detailed *supra* involving NHPD officers mishandling and suppressing exculpatory evidence and coercing witnesses are insignificant for the purposes of Plaintiff's *Monell* claim because the NHPD was tasked with handling "around 2000 major felonies each year." City Br. at 22. However, under the failure to train theory, "[t]here is no bright-line rule for how many civil rights complaints there must be, or how recent the complaints must be, to put a municipality on notice." *Buari*, 2021 WL 1198371, at *23; *accord Lewis*, 2017 WL 101304, at *5; *see Russo*, 2008 WL 2167881, at *2 (dismissing city's motion for summary judgment because jury could reasonably conclude that prior cases put city on notice of deficient training regarding *Brady*).

*Felix* is illustrative. The plaintiffs brought a *Monell* claim against the City of New York on the basis that the city failed to train and supervise its police officers in the treatment of mentally ill and emotionally disturbed persons ("EDPs"). *Felix*, 2020 WL 6048153, at *1. In support of their claim, the plaintiffs pointed to various "prior civil rights suits related to fatal shootings" of EDPs. *Id.* at *3. Like the City of New Haven, the City of New York (a much larger and busier police department) moved for summary judgment and argued that its police officers "*respond to over 100,000 calls involving [EDPs] each year*, often hundreds each day" and the prior civil rights suits cited by plaintiffs "did not suffice to put the City on notice that the training it provided to officers was inadequate." *Id.* at *2-*3 (emphasis added). "Resolving all factual ambiguities in favor of the Plaintiffs," the court rejected the city's argument, determined that there was "at least a genuine dispute of material fact" as to whether there was a history of

employees mishandling interactions with EDPs, and denied the city's motion for summary judgment. *Id.* at *2. The Court should do the same here, where a reasonable jury could easily find that the number of prior cases involving suppression of evidence and coercion of witness cited by Plaintiff sufficed to put the City on notice that the training it provided to its officers was inadequate.

Finally, the fact that NHPD officers continued to mishandle and suppress exculpatory evidence well after Plaintiff's conviction makes it even *more* likely that a reasonable jury would find that NHPD officers committed such misconduct pursuant to a City policy, custom, or practice.

In 2001, defendant Breland and his colleague, Detective Coppola, coerced a juvenile witness into giving a fabricated inculpatory statement by threatening him with 30 years in prison. *See* § II.E.8, *supra*. In 2006, two NHPD detectives coerced a juvenile suspect, Bobby Johnson, and rehearsed a fabricated statement with him during an off-the-record pre-interview. *See* § II.E.9, *supra*. As detailed above, during the interrogation, the detectives threatened that if he did not provide the statement they wanted, Johnson would get the death penalty. In the same case, the detectives interrogated his cousin and told him that if he did not give them a witness statement, he would be arrested. Finally, the detectives coerced yet another juvenile witness in the Johnson case, 14-year-old Kwame Wells-Jordan, into giving them a fabricated inculpatory statement. The detectives fed Wells-Jordan all of the details in his statement and even showed him photos of the murder weapon and the crime scene.

In their briefing on the pervasive practice theory of *Monell* liability, the City asks the Court to ignore all of these relevant post-1999 cases. City Br. at 23-24. However, evidence of continuing or subsequent officer misconduct is admissible to prove a municipality's deliberate

indifference. *See Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995) ("[D]eliberate indifference may be inferred if the complaints [of wrongdoing] are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents."); *Pappas v. New Haven Police Dep't*, 175 F. Supp. 2d 288, 294-95 (D. Conn. 2001) (noting that it is "plausible" that subsequent instances of municipal employee misconduct "would support a finding of continued inadequate training" for purposes of the second *Walker* prong'"); *Henry v. Cnty. of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997) (reversing grant of summary judgment to county on *Monell* claim and noting that "post-event evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but it is highly probative with respect to that inquiry"). A city's later failure "to correct a blatantly unconstitutional course of treatment . . . *is even more persuasive evidence* of deliberate indifference or of a policy encouraging such official misconduct." *Id.* at 120 (emphasis added).[21] A jury could reasonably conclude here that the City's ongoing failure to correct its training after 1999 further establishes the City's deliberate indifference.

> **ii.     Handling Exculpatory Evidence and Witness Interviews are Situations that Present Officers with Difficult Choices that Training Will Make Less Difficult**

In the alternative, the second *Walker* element is met here because interviewing witnesses and handling exculpatory evidence "present[] the employee with a difficult choice of the sort that training or supervision will make less difficult." *Walker*, 974 F.2d at 297.

---

[21]     "The Second Circuit's holdings are consistent with [this] rule recognized by the Ninth Circuit in [*Henry*]." *W.R. Grace & Co., Conn. v. Zotos Intern., Inc.*, No. 98 Civ. 838S, 2004 WL 5669337, at *2 (W.D.N.Y. May 14, 2004); *see also Collins v. City of New York*, 923 F. Supp. 2d 462, 477 (E.D.N.Y. 2013) (citing *Henry* and noting that the "lack of any corrective action might also reflect a tacit policy on [the district attorney's] part to condone whatever his subordinates deemed necessary to secure a conviction").

The Supreme Court has instructed that "[t]here is no reason to assume that police academy applicants are familiar with the constitutional constraints on the use of deadly force." *Connick*, 563 U.S. at 64. "If the police require training on when it is constitutionally appropriate to shoot a fleeing suspect, then surely training is also needed regarding when the state must, or need not, disclose exculpatory evidence to criminal defendants." *Tanner v. Walters*, No. 10 Civ. 849, 2021 WL 320940, at *3 (W.D. Mich. Feb. 1, 2021) (denying city's motion to dismiss *Monell* claim based on failure to train on officers' *Brady* obligations). Thus, for the purposes of a *Monell* claim based on a failure to train theory, "*Brady* violations are not necessarily obvious violations of the law." *Id.*

The same is true for witness interviews and interrogations. Given NHPD detectives' history of coercing and threatening witnesses, *see supra* § II.E, and Breland's testimony that he was never trained not to coerce or threaten witnesses, Ex. 4 at 290:22-291:13, a jury could reasonably conclude that witness interviews are situations where officers face a "difficult choice of the sort training or supervision will make less difficult." *Walker*, 974 F.2d at 297. Veteran NHPD Detective Coppola's testimony in this case that his coercion of a witness in the 1998 Cusick homicide investigation was "good police work" and "consistent with [his] training at the [NHPD]," Ex. 17 at 33:8-22, is one illustrative example of how poor training on witness interviews results in egregious officer misconduct.

> c. ***Walker* Element 3**: Police Officers' Wrong Choices While Handling Exculpatory Evidence and Witness Interviews Will Frequently Cause the Deprivation of Citizens' Constitutional Rights

The third *Walker* element requires plaintiffs to show that "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker*, 974 F.2 at 298.

Where, as here, a police officer makes "the wrong choice" while handling exculpatory evidence—*i.e.*, by suppressing, losing, or destroying exculpatory evidence or coercing witnesses during interrogations—such a choice will frequently, if not always violate a criminal defendant's constitutional rights. *See, e.g.*, *Burai*, 2021 WL 1198371, at *25 ("[I]t is reasonable to infer that the alleged failure to train . . . officers with respect to [witness interviews and *Brady* material] could cause frequent constitutional deprivations."); *Poventud*, 2015 WL 1062186, at *15 (concluding that a police officer's wrong choice not to disclose exculpatory evidence "frequently will cause the deprivation of a criminal defendant's liberty"); *Gregory*, 444 F.3d at 753 ("Widespread officer ignorance on the proper handling of exculpatory materials would have the 'highly predictable consequence' of due process violations.").[22]

### d.   The City's Deficient Training on Handling Exculpatory Evidence and Witness Interviews Is "Closely Related" to Plaintiff's Injuries

"Because Plaintiff has met his burden under the *Walker* standard, the next inquiry is whether Plaintiff has raised a triable issue of fact as to the existence of obvious and severe deficiencies" in the City's relevant training. *Poventud*, 2015 WL 1062186, at *15. Here, a reasonable jury could conclude that specific deficiencies in the City's training are "closely related to the ultimate injur[ies]," such that they "actually caused the constitutional deprivation[s]" Plaintiff experienced. *Burai*, 2021 WL 1198371, at *23. As detailed below, a reasonable jury could find that deficiencies in the City's training on the handling of exculpatory evidence and witness interviews meet this standard.

---

[22]     *See also Cristini*, 2012 WL 5508369, at *13 (noting that "the failure to disclose exculpatory information could have serious consequences, such as the conviction of an innocent person"); c*f. Washington v. Baltimore Police Dep't*, 457 F. Supp. 3d 520, 525 (D. Md. 2020) (quoting *Connick*, 563 U.S. at 73 (Scalia, J., concurring)) ("Of course, as has been recognized, 'the Law of Large Numbers' makes it likely that, at some point, *Brady* violations may occur.").

### i. The City's Lack of Written Policy on the Proper Handling of Exculpatory Evidence is Closely Related to the Detectives' Brady Violations in this Case

The Second Circuit has instructed that where a "police department had no policy on the proper handling of exculpatory evidence," it may, "in the proper case, provide the basis for a deliberate indifference claim." *Walker*, 974 F.2d at 298; *see Washington*, 457 F. Supp. 3d at 535 ("Plainly, a deficient *Brady* training program has a 'close fit' to a due process violation stemming from unlawfully withheld exculpatory evidence."). This is such a case. The City had no general order, rule or regulation, special order, or training bulletin of any kind that required NHPD officers to turn over exculpatory information to prosecutors. Ex. 5 at 166:16-167:6 (City 30(b)(6)). Nor was there any policy referencing Connecticut General Statute 54-86c, which requires police officers to disclose in writing any exculpatory information to the prosecutor. *Id.* at 167:19-22. This complete absence of NHPD training on officers' *Brady* obligations, alone, raises an issue of material fact sufficient to defeat the City's summary judgment motion.

In *Pappas v. New Haven Police Department*, for example, the plaintiff served discovery requests on the City of New Haven seeking evidence of NHPD policies or training on the specific situation in that case: "where a judge has denied a warrant to search or seize an individual from whom [ ] police officers subjectively believe probable cause to exist." 175 F. Supp. 2d 288, 294 (D. Conn. 2001). In response, the City produced "at least seventy-eight 'General Orders' that do not address this issue." *Id.* The court denied the City's motion for summary judgment on the *Monell* claim and explained that "[b]ecause a reasonable jury could be convinced that the current *absence* of documentary evidence actually supports [plaintiff's] position with respect to the three *Walker* prongs, [plaintiff] may be able to show that the City's policymakers should have known that inadequate training or supervision was so likely to result in the violation of constitutional rights, that the policymakers of the City can reasonably be said

to have been indifferent to the need." *Id.* at 295 (cleaned up) (emphasis supplied). Like the plaintiff in *Pappas*, Horn has shown "that he is entitled to present this issue before a jury." *Id.*

### ii. The City's Practice of Suppressing 'Unhelpful' Information Shared by Witnesses During Off-the-Record Pre-Interviews All But Guaranteed Detectives Would Commit Routine Brady Violations

The City's longstanding off-the-record "pre-interview" practice—which the Detectives followed while interrogating witnesses in this case, including Pearson and Thompson—had the highly predictable consequence of constitutional violations. *See Bd. of Cnty. Com'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 409-10 (1997) ("[T]he predictability that an officer lacking specific tools to handle [a] situation will violate citizens' rights . . . may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable."). The testimony of former NHPD supervisors in this case, including Chief Wearing, creates material issues of fact that preclude summary judgment on the issue of whether the City had a policy, custom, or practice of violating *Brady* by failing to adequately train its officers not to suppress exculpatory witness statements.

Chief Wearing joined the NHPD in 1968, Ex. 14 at 23:12-13, and rose up the ranks, eventually becoming the Chief of Detectives at the Department in 1990, *Id.* at 27:8-15, Assistant Chief shortly after, *id.*, and finally the Chief of Police from 1997 until his retirement in 2003, *id.* at 17:16-19, 29:22-24. Wearing testified at length in this case about the process and purpose of the "pre-interviews" NHPD officers routinely conducted during and before his tenure as Chief. The practice of conducting off-the-record pre-interviews existed at the NHPD since at least as early as the 1970s, Ex. 16 at 17:4-12, 96:25-97:1, and was taught to new detectives by more senior detectives on the force, *id.* at 97:2-6; Ex. 4 at 380:19-25. According to Chief Wearing, these pre-interview sessions were, without exception, never recorded on tape. Ex. 14 at

82:8-83:5, 88:6-89:1, and, in his view, recording pre-interviews would have been "a waste of time," *id.* at 88:6-89:1. However, Chief Wearing also noted that if the witness had "*something of value*," then recording that witness's pre-interview would have been "not a waste of time." *Id.* at 89:2-9 (emphasis added).

Chief Wearing testified that the purpose of witness pre-interviews was to "talk to a witness and figure out what they have to offer a detective," Ex. 14 at 92:1-9, and to determine if the information a witness had "[was] of any value to the case," *id.* at 85:3-16; *see also id.* at 86:14-23 (NHPD officers would talk to the witness during pre-interviews "to find out if they [had] something of value for [the detective]"). If the detective learned during the off-the-record pre-interview that "the witness had valuable information that would aid the detective in the case, then the detective . . . would take the [witness's] statement." *Id.* at 85:17-86:4. In short, the NHPD's practice was to first find out what the witness had to say, and then record the information the witness gave the officer if it was helpful or valuable to the case. *Id.* at 89:16-19 ("Q: So it's important [for an NHPD officer] to first assess whether someone has something valuable to say and then record it if they do? [Chief Wearing]: Yes.").

Chief Wearing also made clear that the NHPD's practice was not to record a witness's statement if he or she could not "help" or "offer something" to the police. He explained the NHPD's practice of suppressing unhelpful witness statements as follows: "If you have something to offer us, we'll take a statement. If you do not, then, you know, we'll send you home." *Id.* at 94:13-21. Similarly, Chief Wearing noted that "[i]f the witness can help you in the case, fine. If he can't help you, then so be it. You let that person go and see if you can find other witnesses." *Id.* at 79:10-15.

Although there was no written pre-interview policy at the NHPD, the practice of conducting off-the-record witness pre-interviews was widespread at the NHPD, Ex. 5 at 200:12-201:8, and the practice was in no way forbidden by written NHPD policy, Ex. 14 at 73:10-20. To the contrary, the scant written training material the City had regarding witness interviews and witness statements further corroborates Chief Wearing's testimony and paints a damning picture of how the City formally taught its officers to *avoid* precisely documenting witness's statements in certain situations. Specifically, NHPD Training Bulletin 4-26 instructed officers: "If the witness seems friendly to the suspect, record his exact words, in detail, whenever possible." Ex. 80 (Training Bulletin 4-26) at NH5670; Ex. 5 at 215:11-216:19. However, "[f]or all other witnesses, including victims, be cautious about recording direct quotes and minute details in their statements." Ex. 80 at NH5670; Ex. 5 at 215:11-216:19. This NHPD training applied with equal force to officers' reports on what witnesses said during both pre-interviews and formal witness interviews. Ex. 5 at 220:5-25. Training Bulletin 4-26 was formal NHPD policy at the time of the Dixwell Deli investigation, it was taught in the NHPD's basic training, and detectives followed the policy when writing their reports on what witnesses said. *Id.* at 214:11-18, 217:15-17.

Similarly, "there was no policy in place mandating the detectives take notes" whatsoever, including during witness interviews—"the [NHPD] didn't have any policy and procedure on how to do that," Assistant Chief Cain testified. *Id.* at 168:22-172:25. Thus, in the event that a witness shared exculpatory information with an NHPD officer during a pre-interview, NHPD policy and training did not direct or mandate that officer to write that information down in their notes.

There was also no policy specifying where police officers' notes from witness interviews should be stored. *Id.* at 169:22-170:4, and NHPD formal policy allowed officers to

destroy their notes after three years. *Id.* at 194:14-195:13. However, the record demonstrates that, in practice, this policy was not taught to or followed by officers. According to Chief Wearing, NHPD policy did not require officers to preserve their notes for a certain amount of time. Ex. 14 at 114:23-115:1. In his sixteen-year career, Breland was never told not to destroy his notes. Ex. 4 at 72:6-8. Adger, who went on to become Assistant Chief, also "wasn't familiar with a department policy" about throwing away notes. Ex. 3 at 69:6-8. Adger's personal practice was to throw away her notes from witness pre-interviews, *id.* at 68:10-18, 69:3-12, 82:6-18, just as she and Dease did on multiple occasions in this case, *id.* at 172:12-13, 183:5-9. Adger believed this practice conformed with NHPD policy. *Id.* at 69:9-12. As a result, even if an officer did happen to take notes documenting exculpatory information provided by an unhelpful witness, such notes could be secreted away in an officer's desk, lost, or destroyed without running afoul of NHPD custom and practice.

## V. MR. HORN'S STATE-LAW CLAIMS ARE TIMELY AND, AS TO COMMON-LAW CLAIMS, ARE NOT BARRED BY GOVERNMENTAL IMMUNITY

Before discussing the Detectives' and the City's arguments against Mr. Horn's claims under Connecticut law, it is important to note what the Defendants do *not* argue: the merits of those claims. At no point does either set of Defendants suggest that Mr. Horn has failed to raise a triable issue of fact as to whether the Detectives committed negligence (seventh and eleventh causes of action) or violated Article First, sections 7, 8, and 9 of the Connecticut Constitution (eighth cause of action). *See* City Br. at 48-79 (nowhere so arguing); Detectives' Br. at 81-95 (same). Both sets of Defendants have forfeited any such challenge.

None of Defendants' collateral arguments for summary judgment on the state-law claims has merit. The claims are timely because some of the Detectives' wrongful conduct occurred within the limitations period; the claims did not accrue until Horn's exoneration; and

genuine issues of material fact exist as to whether the Defendants engaged in a continuing course of unlawful conduct and/or fraudulent concealment. With respect to at least certain negligence claims, the doctrine of governmental immunity does not apply at all because the Detectives breached their mandatory legal duties to inventory all seized property, *see* Conn. Gen. Stat.§54-36a(b)(1), and disclose all known exculpatory information to the prosecutor in writing, *id*. § 54-86c(c). To the extent the doctrine of governmental immunity does apply, a genuine issue of fact exists as to whether the "identifiable victim, imminent harm" exception is satisfied. And Mr. Horn is entitled to proceed to the jury on alternative theories of intentional misconduct and negligence.

### A.      The Jury Must Decide the Timeliness of the State-Law Claims

Mr. Horn's common-law negligence claims against the Detectives (claims 7 and 11) and direct statutory negligence claims against the City (claims 10 and 13) are governed by General Statutes § 52-584. Section 52-584 has two parts. The first is a "discovery" provision, or accrual rule, which provides that an action must be brought within two years of when the injury was discovered or should have been discovered with reasonable diligence. The Connecticut Supreme Court has construed the term "injury" to mean "actionable harm." Actionable harm "occurs when the plaintiff discovers, or in the exercise of reasonable care, should have discovered the essential elements of a possible cause of action," meaning that he "has knowledge of facts which would put a reasonable person on notice of the nature and extent of an injury *and that the injury was caused by the wrongful conduct of another* . . . ." *Lagassey v. State*, 268 Conn. 723, 743 (2004) (emphasis in original); *accord Champagne v. Raybestos-Manhattan, Inc.*, 212 Conn. 509, 521 (1989). The second part of § 52-584 is a "repose" provision, which provides no action may be brought except within three years of the relevant act or omission. C.G.S. § 52-584; *see Rosato v. Mascardo*, 82 Conn. App. 396, 401-02 (2004).

Mr. Horn's Connecticut constitutional claims (claim 8) are governed by § 52-577, the general statewide tort statute of limitations. In substance, § 52-577 simply replicates the "repose" provision of § 52-584 and provides that no tort action may be brought except within three years of the relevant act or omission. C.G.S. § 52-577.

Finally, Mr. Horn's indemnification claims against the City (claims 9 and 12) are governed by § 7-465, which requires that a cause of action be "commenced within two years" after it arose, and that a notice of claim be served within six months after accrual. C.G.S. 7-465(a). The accrual inquiry under § 7-465 is the same as the "discovery rule" inquiry under § 52-584. A cause of action "accrues" under Connecticut law when the plaintiff suffers "actionable harm." *E.g.*, *Bellsouth Telecommc'ns, Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 611 (2d Cir. 1996); *Gnazzo v. G.D. Searle & Co.*, 973 F.3d 136, 138 (2d Cir. 1992); *Champagne*, 212 Conn. At 521.

Thus, despite the seeming complexity of these three overlapping statutes, there are really just two timeliness questions before the Court:

*First*, for purposes of § 7-465 and the "discovery" provision of § 52-584, could a rational jury conclude that Mr. Horn filed suit within two years of suffering "actionable harm"—that is, within two years of accrual?

*Second*, for purposes of § 52-577 and the "repose" provision of § 52-584, could a rational jury conclude that Mr. Horn filed suit within three years of the relevant act or omission by Defendants, or that an applicable doctrine like a continuing course of conduct or fraudulent concealment permits filing beyond three years?

Because the answer to both questions is "yes," Defendants are not entitled to summary judgment on statute-of-limitations grounds.

1.	**A Rational Jury Could Find that Mr. Horn Brought His Claims Within Two Years of Accrual**

For three reasons, the jury could reasonably find that Mr. Horn brought his claims within two years after he suffered "actionable harm" and that his claims are therefore timely.

a.	**Questions of Fact About When Mr. Horn Suffered "Actionable Harm"**

"Determining when a plaintiff suffers actionable harm . . . is ordinarily a *question of fact*" for the jury to resolve. *Gugliemi v. Willowbrook Condo. Ass'n*, 151 Conn. App. 806, 810 (2014) (emphasis added). Here, a rational jury could conclude that Mr. Horn did not learn that his "*injury was caused by the wrongful conduct of another*," and thus did not suffer actionable harm, until within two years of filing. *Lagassey*, 268 Conn. at 743 (emphasis in original). Defendants' arguments to the contrary simply ignore this crucial aspect of Connecticut Supreme Court precedent. *See* City Br. at 50-51; Detectives' Br. at 89-90.

In focusing exclusively on Mr. Horn's awareness that he had been arrested and convicted for a crime he did not commit, Defendants ignore that these injuries did not become "actionable" under Connecticut law unless and until Mr. Horn understood how Defendants caused them. *See, e.g.*, *Lagassey*, 268 Conn. at 751-52 (holding, in negligence action brought by decedent's estate, that jury could reasonably find that estate did not suffer actionable harm until learning about causation from a medical expert years after death); *Dowd v. Conn. Children's Med. Ctr.*, No. CV116026149S, 2016 WL 7638201, at *4 (Conn. Super. Ct. Sept. 27, 2016) (denying defense motion for summary judgment and holding that jury could reasonably find that blind plaintiff did not suffer "actionable harm" until she learned about causation from a medical expert approximately 2.5 years after onset of blindness); *Tarnowsky v. Socci*, 271 Conn. 284, 287-88 (2004) (plaintiff injured by slipping on icy sidewalk did not suffer "actionable harm"

with respect to snow removal company, until learning of snow removal company's identity in discovery in action against property owner years later).

Defendants have failed to meet their burden on this motion to prove that there is no genuine dispute of material fact that all the actionable harm suffered by Mr. Horn occurred prior to September 7, 2016. Most obviously, Mr. Horn did not learn of the injury caused by the Detectives' withholding the phone records in Adger's basement until his investigator got the records in January 2018.

### b.  Deferred Accrual Rule under *Heck*

Regardless of when Mr. Horn first learned of the information necessary to give rise to actionable harm, his state-law claims did not accrue under well-settled Connecticut law until his conviction was vacated on April 25, 2018.

Under Connecticut law, "if success in a tort action would necessarily imply the invalidity of a conviction, the action is to be dismissed unless the underlying conviction has been invalidated." *Taylor v. Wallace*, 184 Conn. App. 43, 51 (2018). Thus, any civil claim alleging "that the police defendants failed to conduct a proper investigation, falsified reports, obtained evidence by illegal means, provided false testimony or evidence at his criminal trial," or other similar police misconduct, does not ripen until the plaintiff has obtained relief from his conviction. *Tierinni v. Town of Vernon*, No. TTDCV145005870S, 2015 WL 3798181, at *3 (Conn. Super. Ct. May 21, 2015).

Connecticut's bar to bringing claims that would impugn a conviction is based on the analogous federal rule established by the U.S. Supreme Court in *Heck v. Humphrey*, 512 U.S. 477 (1994). Based on "the strong judicial policy against the creation of two conflicting resolutions arising out of the same or identical transaction," *Heck* held that a civil claim that would imply the invalidity of a criminal conviction does not accrue "unless and until the

conviction or sentence is reversed, expunged, invalidated, or impugned by the grant of a writ of habeas corpus." *Id.* at 484-85, 489. As a result, a § 1983 claim "for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated." *Id.* at 489-90.

Although *Heck* itself arguably applies only to federal civil rights claims,[23] Connecticut has applied the same rule to bar state-law tort claims arising from a criminal conviction. *See Taylor*, 184 Conn. App. at 51 ("We agree with the policy enunciated in *Heck* . . . ."). Connecticut law does not permit a prisoner to sue his criminal defense attorney for malpractice unless and until he has obtained relief from his underlying conviction. *See, e.g.*, *Cooke v. Williams*, No. 185041290, 2018 WL 4865688, at *2 (Conn. Super. Ct. Sept. 17, 2018); *McKay v. Jelly*, No. 185051372S, 2018 WL 7046619, at *2 (Conn. Super. Ct. Dec. 13, 2018). Like the *Heck* bar, this rule exists to avoid the possibility of conflicting judgments in parallel civil and criminal litigation. *See, e.g.*, *Tierinni*, 2015 WL 3798179, at *4. Accordingly, Connecticut law provides that until a prisoner has won relief from his conviction, his negligence claim "has not yet accrued and the statute of limitations has not yet begun to run." *Id.* at *5.

As Judge Bolden recently held in denying a defense motion on statute of limitations grounds in another wrongful conviction case, the same logic applies with full force to Mr. Horn's claims here. *See* Ruling and Order on Motion to Dismiss at 40-41, Dkt. 70, *Birch v. Town of New Milford*, No. 20 Civ. 1790 (D. Conn. Sept. 24, 2021) (holding that "[t]he principle articulated in *Taylor* . . . applies" to defer the accrual of negligence claims against police while a conviction is pending). The substance of his negligence claims is that Defendants' improper investigation led to his wrongful conviction for a crime of which he is innocent. Had he sued for

---

[23]     *But see, e.g., Kelley v. Reyes*, No. 19 Civ. 17911, 2020 WL 3567285, at *6 (D.N.J. July 1, 2020) (applying *Heck* rule to delay accrual of state-law claims relating to wrongful conviction).

negligence on these grounds before the State moved to vacate his conviction, those claims—just like a prisoner's legal malpractice claim—would have been (correctly) dismissed as unripe because his conviction was still in effect. Only after his conviction was "invalidated within the meaning of *Heck*" did the harm he suffered become *actionable*, the claims accrue, and "the statute of limitations begin to run." *McDonough v. Smith*, 139 S. Ct. 2149, 2158 (2019).[24]

### c. Some of Defendants' Challenged Acts and Omissions Occurred Within Two Years of Filing

Finally, the jury could reasonably conclude that Horn brought some of his claims within two years of suffering actionable harm for the simple reason that some of Defendants' misconduct occurred within two years of filing. Defendants' naked assertion that Mr. Horn does not identify any negligent conduct occurring after his arrest is simply wrong. *See* City Br. at 57. To the contrary, the operative pleading expressly alleges that Adger and Dease were continuously negligent for 19 years by failing to disclose the exculpatory phone records found in Adger's basement or the substance thereof. *See* Dkt. 153, Am. Compl. ¶¶ 313(a)-(g). Defendants have conspicuously declined to challenge the merits of this claim on this motion. Thus, for present purposes, Adger and Dease committed negligence on an ongoing basis by failing to disclose the exculpatory phone records up until the moment the defense obtained them.

The records were disclosed on or about January 30, 2018. Ex. 23 at 103:3-17. Mr. Horn filed this case on September 7, 2018. *See* Compl., Dkt. 1. On May 6, 2020, Horn amended

---

[24]    Importantly, for purposes of Horn's indemnification claim under § 7-465, it is undisputed that his federal constitutional claims did not accrue under *Heck* until his exoneration. Horn seeks indemnification from the City with respect to the Detectives' "infringement of [his] civil rights," C.G.S. § 7-465, and his claim for indemnification based upon his federal constitutional claims is undisputedly timely. At least some of Horn's federal constitutional claims plainly require indemnification by the City. *See, e.g., Riccuiti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 129 (2d Cir. 1997) (failure to intervene requires only objectively unreasonable failure to act in manner that permits other officers to violate clearly established rights, not "wanton or willful" misconduct). Irrespective of how the Court rules on the timeliness of the other state-law claims, Horn's indemnification claim under § 7-465 against the City with respect to his underlying federal claims must proceed to the jury.

his complaint to add, among other things, his eleventh cause of action specifically pertaining to the continuous negligent suppression of the exculpatory phone records. Am. Compl. ¶¶ 308-17. That cause of action unquestionably relates back to the filing of the original complaint under Federal Rule of Civil Procedure 15 because the original complaint gave the Defendants more than "adequate notice . . . within the limitations period" that Horn would seek to hold them liable for mishandling the phone records found in the basement. *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 86-87 (2d Cir. 1999). Horn's original complaint discussed both the suppression and the importance of the phone records in exhaustive detail and asserted a *Brady* claim arising from their suppression. *See* Compl. ¶¶ 199-218, 246-52. It also alleged misconduct concerning the records that continued well past the criminal trial in 2000, including the failure to provide them in response to a 2008 Freedom of Information Act Request and suspicious docketing with the court clerk in 2014. *Id.* ¶¶ 194, 214. The negligence claim concerning the phone records thus plainly "ar[ises] out of the conduct, transaction, or occurrence . . . in the original pleading," Fed. R. Civ. P. 15(c)(1)(B), and is deemed to have been asserted on the original filing date.

Thus, at a bare minimum, claims concerning Adger and Dease's continued failure to disclose the phone records from September 7, 2016 onward were brought within two years of accrual and are timely.

> **2.** **Some of Defendants' Challenged Conduct Is Timely Under the Repose Provisions of § 52-584 and § 52-577, and a Genuine Dispute of Fact Exists as to Whether Defendants' Conduct Tolled the Statute**

With respect to the repose provisions of § 52-584 and § 52-577, a genuine issue of fact exists for the jury as to whether Mr. Horn has complied with those provisions by filing within three years of the relevant act or omission, and/or whether the provisions were tolled by operation of law.

As an initial matter, as noted above, the amended complaint alleges that Adger and Dease were continuously negligent in failing to disclose the exculpatory phone records up to and until their disclosure on or about January 30, 2018. Am. Compl. ¶¶ 308-17. Defendants do not challenge the merits of this claim. Mr. Horn filed this lawsuit on September 7, 2018, and his 2020 amendment of his pleadings relates back to the original under Federal Rule of Civil Procedure 15. *See, e.g.*, *Stevelman*, 174 F.3d at 86-87. Thus, at a bare minimum, Mr. Horn's negligence claim arising from the ongoing suppression of the phone records from September 7, 2015 onwards is within the three-year statute of repose and is timely.

On the existing factual record, a rational jury could find that any of three independent doctrines tolled or otherwise barred the application of these statutes of repose until 2018, such that all of Mr. Horn's state-law claims are timely.

### a.    Continuing Course of Conduct

First, under well-established Connecticut law, the repose provisions of § 52-584 and § 52-577 are tolled throughout the duration of a continuing course of wrongful conduct by the defendant. *See, e.g.*, *Neuhaus v. DeCholnoky*, 280 Conn. 190, 202-03 (2006). Where the continuing course of conduct doctrine is at issue on a motion for summary judgment, the court "must assess whether 'there is a genuine issue of material fact with respect to whether the defendant: (1) committed an initial wrong upon the plaintiff; (2) owed a continuing duty to the plaintiff that was related to the alleged original wrong; and (3) continually breached that duty." *Id.* at 202 (quoting *Witt v. St. Vincent's Med. CDep.*, 252 Conn. 363, 370 (2000)). "The continuing course of conduct doctrine is conspicuously fact-bound . . . ." *Rosenfield v. Rogin, Nassau, Caplan, Lassman & Hirtle, LLC*, 69 Conn. App. 151, 161 (2002).

Here, with respect to the exculpatory phone records, Defendants do not even attempt to raise an issue as to whether Adger and Dease were initially negligent, and as to

whether they remained negligent in continuing to suppress the record for nineteen years.

Defendants only contest the existence of a continuing duty to Horn because there was no "special relationship" between Horn and the detectives. *See* City Br. at 56-57. But a continuing duty relating to the original wrong may exist where there is a "continuing special relationship" *or* "a subsequent wrongful act that is related to the prior negligence." *Witt*, 252 Conn. at 371; *accord Essex Ins. Co. v. William Kramer & Assocs*., 331 Conn. 493, 504 (2019); *Johnson v. Town of North Branford*, 64 Conn. App. 643, 648 n.11 (2001). In *Witt*, for example, the plaintiff had long ago stopped treatment with the defendant physician and thus had no ongoing "special relationship" with him. *Id.* The court nonetheless held that a genuine dispute of material fact existed as to whether the defendant had a continuing duty to accurately report his medical findings to the plaintiff, which the defendant had continuously violated by omission for 11 years by failing to disclose his concerns about the plaintiff's possible cancer. *See id*. at 658.

The jury could reasonably conclude that such continuing wrongful acts occurred here, giving rise to a continuing duty to Horn.

A defendant's concealment of information he is legally obligated to disclose and of which he has actual knowledge constitutes a "subsequent wrongful act" giving rise to a continuing duty. *See, e.g.*, *Essex Ins. Co.*, 331 Conn. at 515 ("Such a duty will continue . . . as long as there remains an opportunity to cure, or at least mitigate, the injury from the initial breach that gave rise to the cause of action."); *Witt,* 252 Conn. at 375 (subsequent wrongful omission of continuing not to provide accurate diagnosis information). Here, any negligent failure by the Detectives to disclose the exculpatory phone records or other *Brady* material would satisfy this requirement. The Detectives' constitutional obligations of disclosure never abated while Vernon Horn's conviction remained in effect. *See Steidl v. Fermon*, 494 F.3d 623, 630 (7th

Cir. 2007) ("For evidence known to the state at the time of the trial, the [*Brady*] duty to disclose extends throughout the legal proceedings that may affect either guilt or punishment, including post-conviction proceedings."); *Collins*, 923 F. Supp. 2d at 473 (same). The Detectives' ongoing wrongdoing, related to their initial suppression of the exculpatory information, thus tolled the statute of limitations on Horn's claims, rendering them timely. At the very least, the scope of the Detectives' continuing duty is a question of fact that cannot properly be resolved on a motion for summary judgment. *See Witt*, 252 Conn. at 376. Defendants therefore cannot meet their burden on this motion to establish as a matter of law that Horn's claims were *not* tolled.

Defendants' additional argument that the continuing course of conduct cannot apply because Horn had already "discovered the harm" of his arrest and prosecution fares no better. City Br. at 55-56. The continuing course of conduct doctrine ceases to apply only after a plaintiff has suffered *actionable* harm. *See, e.g.*, *Mollica v. Toohey*, 134 Conn. App. 607, 614 (2012) ("[A]fter the discovery of actionable harm, the policy [behind the continuing course of conduct doctrine] is no longer served." (alteration in original)). As explained above, actionable harm requires factual knowledge of how the defendant caused the injury. With respect to the phone records especially, the jury could easily conclude that Horn suffered no actionable harm until he learned of the records' contents and exculpatory value in January 2018. *See supra* § III.A.1.

### b. Unripeness Under *Heck*

Second, under Connecticut law, Mr. Horn's claims implying the invalidity of his criminal convictions were unripe for adjudication while his conviction was in place. Under the principle of *Heck*, that means that Mr. Horn's claims did not accrue—that is, he did not suffer actionable harm under the "discovery" provision of 52-584 and under § 7-465—until his exoneration. *See supra* III.A.1.ii.

The unripeness of Mr. Horn's claims until the vacatur of his convictions also tolls the repose provisions of § 52-577 and § 52-584. In *Fontanella v. Marcucci*, 89 Conn. App. 690 (2005), the plaintiffs brought legal malpractice claims against lawyers who had originally represented them in a products liability action for failing to preserve the defective vehicle at issue in the case. The alleged malpractice occurred before the plaintiffs fired the lawyers in 1993. The products liability case reached final judgment in 2000. The plaintiffs brought their malpractice claims in 2001. The court held that the claims were timely even though they were brought well more than three years since the "occurrence." That was so because the legal malpractice claim "was not ripe until there was a final adjudication on the underlying case," so the pendency of the underlying products liability litigation tolled the statute of repose under § 52-577 until 2000. *Id.* at 702-03. Though Mr. Horn's claims were unripe for a slightly different reason—the pendency of a conviction, rather than a civil suit—*Fontanella* establishes that statutes of repose are tolled while claims are unripe and nonjusticiable by operation of law. That is precisely the situation here under *Heck* and its Connecticut analogue.

### c.    Fraudulent Concealment

Third, a defendant's fraudulent concealment of a cause of action, *see* C.G.S. § 52-595, will toll the statutes of repose under § 52-577 and § 52-584. *See Connell v. Colwell*, 214 Conn. 242, 246 n.4 (1990) (finding "no merit" to the argument that the fraudulent concealment exception *did not* toll the statute of repose); *accord Doe #1 v. Boy Scouts of Am. Corp.*, No. X08FSTCV155015023S, 2018 WL 2207892, at *4 (Conn. Super. Ct. Apr. 20, 2018) (applying fraudulent concealment exception to statutes of repose). Fraudulent concealment requires the defendant's (1) actual awareness of facts necessary to establish the cause of action, and (2) intentional concealment of those facts from the plaintiff. *Chapman v. Sikorski Aircraft Corp*., No. 13 Civ. 518, 2015 WL 75493, at *4 (D. Conn. Jan. 6, 2015) (citing *Bound Brook Ass'n v.*

*City of Norwalk*, 198 Conn. 660, 665 (1986)). Here, since a rational jury could conclude that

Adger and Dease knowingly and intentionally suppressed the exculpatory phone records for

purposes of a *Brady* claim, *see supra* I.A.3. it follows for the same reasons that the same jury

could conclude that they had actual knowledge of the records' nondisclosure and exculpatory

value and intentionally concealed those facts from Mr. Horn.

### B.     With Respect to the Common-Law Claims, There Is No Governmental Immunity As to Certain Conduct, and an Exception Applies Regardless

Both sets of Defendants claim that Mr. Horn's common-law claims are barred by

the doctrine of governmental immunity. This argument fails for two reasons. *First*, the

Detectives had mandatory, ministerial duties to disclose exculpatory information in writing to the

prosecutor, file inventory forms for the exculpatory phone records with the Clerk of Court, and

lodge all property seized by warrant in the NHPD property room. The Detectives violated each

of these duties here, so no immunity exists for common-law claims arising from any of that

misconduct. *Second*, even to the extent immunity would otherwise exist, a genuine dispute of

material fact exists as to whether Mr. Horn satisfies the "identifiable victim, imminent harm"

exception to the immunity doctrine.

### 1.     At Least Some of Defendants' Misconduct was Nondiscretionary and Thus Not Immune

A municipal employee is not entitled to governmental act immunity for the

misperformance of ministerial acts, which are those "performed in a prescribed manner without

the exercise of judgment or discretion." *Wright v. Brown*, 167 Conn. 464, 471 (1975); *Gordon v.

Bridgeport Hous. Auth.*, 208 Conn. 161, 165-66 (1988). Though the ultimate determination

whether governmental immunity applies may be a question of law for the court, where there are

"disputed factual issues material to the applicability of the defense, the resolution of [such facts]

are properly left to the trier of fact." *Cole*, 337 Conn. at 341-44 (citing *Ventura v. Town of East*

*Haven*, 330 Conn. 613, 636 n.11 (2019)). Even though the "typical functions" of a police officer are often classified as discretionary, *Gordon*, 208 Conn. at 182, "the mere status of a defendant as a police officer does not itself impart a cloak of immunity," *Soderlund v. Merrigan*, 110 Conn. App. 389, 399 (2008). *But see* City Br. at 64-68 (erroneously arguing that policing is discretionary *per se*).

      Just last year in *Cole*, for example, the Connecticut Supreme Court reversed the grant of summary judgment in favor of the City of New Haven and remanded for further factual development to determine whether an NHPD officer's use of a roadblock to stop a dirt biker was discretionary or ministerial in light of applicable statutes and NHPD policies concerning roadblocks and high-speed pursuits.[25] *See Cole*, 2020 WL 6106465, at *6-9. The Connecticut Supreme Court held, among other things: "When the facts are viewed in the light most favorable to the plaintiff, we conclude that [an NHPD supervisor]'s testimony, in combination with the General Order and the Statewide Policy, establishes the existence of a ministerial duty as a matter of law not to use a complete roadblock maneuver to stop the plaintiff simply for violating the city's dirt bike ordinance, and also provides evidence from which a reasonable fact finder could conclude that Curry violated that ministerial duty." *Id.* at 342.

      Defendants have one thing right: a ministerial duty can be established by a statute, regulation, rule, policy, or other directive "which required the City and/or its employees to act in a[] specified manner." City Br. at 67. But Defendants' assertion that Mr. Horn "makes absolutely no reference" to any such statute or directive seems to be copy-and-pasted from a brief in a different case. *Id.* The Amended Complaint identifies two such applicable statutes, *see* Am.

---

[25]     Counsel for the Detectives here represented the City of New Haven in *Cole*.

Compl. ¶ 325, both of which Defendants ignore because they so obviously establish ministerial, nondiscretionary duties that were violated in this case.

*First*, General Statutes § 54-86c(c) provided (and continues to provide): "Each peace officer, as defined in subdivision (9) of section 53a-3, ***shall disclose in writing any exculpatory information or material which he may have*** with respect to any criminal investigation to the prosecutorial official in charge of such case." The definition of a "peace officer," in turn, includes "a member of . . . an organized local police department." C.G.S. § 53-a3(9). The Detectives were "peace officers." They had a mandatory, ministerial legal duty to "disclose in writing ***any*** exculpatory information or material" in their possession to the prosecutor. The Detectives failed to do so in the innumerable ways described above. *See supra §* I.A.

*Second*, General Statutes § 54-36a(b)(1) provided (and continues to provide):

> "Whenever property is seized in connection with a criminal arrest or seized pursuant to a search warrant without an arrest, the law enforcement agency seizing such property ***shall file***, on forms provided for this purpose by the Office of the Chief Court Administrator, an inventory of the property seized. . . . In the case of property seized in connection with a search warrant without an arrest, the inventory shall be attached to the warrant and shall be filed with the clerk of the court for the geographical area in which the search warrant was issued."

C.G.S. § 54-36a(b)(1). These statutory provisions mandate the inventory process that Adger and Dease failed to follow here. They were required by law to file a "JD-18" inventory form for the warrantless seizure of Sadler's phone records and did not. Ex. 13 at 130:18-133:1. And they were required to prepare and file with the Court an inventory form for the records seized pursuant to the SNET search warrant, which they did not do until 2014. Ex. 49; Ex. 22 at 155:13-157:20.

Finally, as a matter of NHPD policy, evidence was supposed to be stored in the NHPD property room with a completed inventory form. Ex. 13 at 54:9-55:9. The seized phone

records in this case were "evidence." *Id.* at 120:3-16. At the very least, everything seized pursuant to a warrant was "evidence." *Id.* at 133:21-25. Adger and Dease violated nondiscretionary departmental policy by not storing these materials in the property room.

The written nondisclosure of all known exculpatory information, the proper inventorying of seized property with the clerk of court, and the proper storage of evidence at the NHPD were all ministerial duties that the Detectives had no choice but to perform. *See, e.g.*, *Cole*, 337 Conn. at 342. But they violated these ministerial duties. Defendants are not entitled to discretionary governmental act immunity for any of Mr. Horn's common-law claims arising from this misconduct.

2.  **A Genuine Issue of Fact Exists as to Whether the "Identifiable Victim, Imminent Harm" Exception to Immunity Applies to Any Otherwise Misconduct that Would Otherwise Be Immune**

Regardless, the jury could reasonably find that an exception to governmental immunity applies. No governmental immunity exists "where the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to an imminent harm." *Seri v. Town of Newtown*, 573 F. Supp. 2d 661, 672 (D. Conn. 2008) (citing *Purzycki v. Town of Fairfield*, 244 Conn. 101, 108 (1998)). Viewing the facts in the light most favorable to Mr. Horn, the Detectives' conduct falls squarely within this exception.

The "identifiable victim, imminent harm" exception to governmental immunity has three requirements: "(1) an imminent harm; (2) an identifiable victim; and (3) a public official to whom it is apparent that his or her conduct is likely to subject that victim to that harm." *Doe v. Petersen*, 279 Conn. 607, 616 (2006). The critical question in determining the applicability of the exception is the foreseeability of the harm the plaintiff suffered. *See Fleming v. City of Bridgeport*, 284 Conn. 502, 533 (2007) ("Foreseeability is the touchstone of our analysis in determining whether a public officer can be liable for his discretionary acts under this

exception."). In delineating the scope of a foreseeable class of victims, courts "consider[]
numerous criteria, including the imminency of any potential harm, the likelihood that harm will
result from a failure to act with reasonable care, and the identifiability of a particular victim."
*Dipane-Saleem v. Gallagher*, No. 15 Civ. 596, 2016 WL 1060190, at *8 (D. Conn. Mar. 15,
2016) (cleaned up). Questions of imminence and identifiability are often fact-bound inquiries
appropriately resolved by the trier of fact. *See, e.g., Haynes v. City of Middletown,* 314 Conn.
303, 331 (2014) (remanding for finding on whether plaintiff was identifiable person facing
imminent harm); *Sestito v. City of Groton,* 178 Conn. 520, 521 (1979) (similar); *Galindez v.
Miller*, 285 F. Supp. 2d 190, 195 (D. Conn. 2003) (similar).

   Connecticut courts routinely find this exception applicable in the context of police
officers' affirmative acts, *see Belanger v. City of Hartford*, 578 F. Supp. 2d 360, 397 (D. Conn.
2008) (collecting cases), and omissions and failures to intervene, *see, e.g., Sestito,* 178 Conn. at
521 (1979); *Smith v. Town of E. Haven*, No. 01 Civ. 1375, 2005 WL 677284, at *8 (D. Conn.
Mar. 22, 2005). These cases include negligence claims arising from arrests and prosecutions. *See*
Ruling and Order on Motion to Dismiss at 44-45, *Birch*, No 20 Civ. 1790 (holding that
identifiable victim, imminent harm exception to discretionary immunity applied to wrongfully
convicted plaintiff's claims arising from withholding of exculpatory evidence); *Pines v. Bailey*,
No. 10 Civ. 866, 2012 WL 2958213, at *6 (D. Conn. July 12, 2012), *rev'd in part on other
grounds*, 563 F. App'x 814 (2d Cir. 2014); *Nealy v. State*, No. CV 950128398, 1997 WL
600159, at *2-3 (Conn. Super. Ct. Sept. 18, 1997) (triable issue of fact as to applicability of
exception on claim concerning failure to arrest); *Mikita v. Barre*, No. CV990430564, 2001 WL
651171, at *4 (Conn. Super. Ct. May 22, 2001) (triable issue of fact as to applicability of
exception on claim concerning wrongful arrest).

Here, Mr. Horn is plainly an identifiable victim. The suspects in a police investigation are a "narrowly defined class of foreseeable victims" who would likely be harmed by negligent police conduct in the course of that investigation. *See, e.g.*, *Odom v. Matteo*, 08 Civ. 1569, 2010 WL 466000, at *5 (D. Conn. Feb. 3, 2010) (persons with neurological issues identifiable victims for purposes of claim arising from police use of tasers); *Haynes*, 314 Conn. at 311, 325 (students who used a locker room were identifiable victims for purposes of claim concerning negligent maintenance of locker room). Mr. Horn was a primary suspect in this murder investigation from literally day one. *See* § I.A.4, *supra*. He and Marquis Jackson were the Detectives' "two guys." Ex. 33 at HHT-0847:10-11. By the time Horn and Jackson were eventually arrested for the crime, they were the singular identifiable victims of negligent police work in connection with this case. *See Mikita*, 2001 WL 651171, at *4 (wrongful arrestee was identifiable victim).

A harm is imminent if the risk of harm to the plaintiff is so likely that the defendant has a "clear and unequivocal duty to act immediately to prevent the harm." *Haynes*, 314 Conn. at 323. Throughout the investigation, there was an imminent likelihood that Mr. Horn might be harmed by a wrongful deprivation of his liberty as soon as the Detectives arrested him. Moreover, the Detectives continued to have a "clear and unequivocal duty" to disclose any and all exculpatory evidence in their possession at least through the time of trial. *See, e.g.*, C.G.S. § 54-86c(c); *Leka*, 257 F.3d at 100-01 (*Brady* material must be disclosed in a manner that enables use at trial, and disclosure duty encompasses evidence obtained by prosecution during trial); *Demers v. State*, 209 Conn. 143, 153-54 (1988) (*Brady* duty extends to material possessed by police but not disclosed by police to prosecutor).

The wrongful arrest and prosecution of an identifiable person constitute imminent harm. *See, e.g.*, *Pines*, 2012 WL 2958213, at *6; *Nealy*, 1997 WL 600159, at *2-3; *Mikita*, 2001 WL 651171, at *4. Imminent harm may exist in situations far less grave than a wrongful murder prosecution. In *Haynes*, for instance, the Connecticut Supreme Court held that a reasonable juror could have found an imminent risk of harm from the presence of a broken locker with a sharp edge in a locker room where students were known to roughhouse. *See* 314 Conn. at 325-26.

For all these reasons, the jury could reasonably find that Mr. Horn was an identifiable victim subject to imminent harm.

### C.    Mr. Horn Is Entitled to Proceed to the Jury on Alternative Theories of Intentional Misconduct and Negligence

Finally, the Court must reject the City's suggestion that it cannot be held liable under Connecticut General Statute § 7-465 as a matter of law because Mr. Horn's complaint alleges intentional misconduct by the Detectives. *See* Detectives' Br. at 77-79. Though § 7-465 does not obligate a municipality to indemnify its employees for injuries caused by "willful or wanton acts," C.G.S. § 7-465, Mr. Horn is plainly entitled to proceed to the jury on alternative theories that the Detectives engaged in intentional and negligent misconduct. Should Mr. Horn establish the latter at trial, the City *would* be required by law to indemnify the Detectives. *See id*.

It is well and long established that "a party may properly submit a case [to the jury] on alternative theories." *See, e.g.*, *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 343 (2d Cir. 1994); *accord Lavoie v. Pac. Press & Shear Co.*, 975 F.2d 48, 54 (2d Cir. 1992). Police misconduct cases arising under both 42 U.S.C. § 1983 and Connecticut law are certainly no exception. *See Bussolari v. City of Hartford*, No. 14 Civ. 149, 2016 WL 4272419, at *4 (D. Conn. Aug. 12, 2016) (applying "baseline rule that a plaintiff is generally permitted to plead and prove his or her case on alternative and sometimes inconsistent theories of

liability," and holding that plaintiff in excessive force case could proceed to jury on both constitutional claims alleging intentional misconduct and Connecticut state-law negligence claims); *accord Ramos v. Town of East Hartford*, No. 16 Civ. 166, 2019 WL 2785594, at \*20-21 (D. Conn. July 2, 2019) (denying defense motion for summary judgment in relevant part and allowing claims against police to proceed on alternative theories of intentional misconduct and negligence); *Ravalese v. Town of East Hartford*, No. 16 Civ. 1642, 2019 WL 2491657, at \*19 (D. Conn. June 14, 2019) (same); *Olschafskie v. Town of Enfield*, No. 15 Civ. 67, 2017 WL 4286374, at \*7 (D. Conn. Sept. 27, 2017) (same). The authority on which the City relies holds only that the factfinder cannot "*determine*[]" the same conduct "to have been intentionally and negligently tortious." City Br. at 78-79 (quoting *DaCruz v. State Farm Fire & Cas. Co.*, 268 Conn. 675, 693 (2004)) (emphasis added). But the question on this motion is not whether the jury can make mutually exclusive *findings* about the same conduct, but whether Mr. Horn can *proceed* to the jury on alternative theories. He plainly can.

Proceeding on alternative theories is particularly appropriate in this case, where the jury will be asked to weigh numerous discrete instances of misconduct by multiple Detectives over the course of a weeks-long homicide investigation. A rational jury could conclude on this record that some of the Detectives' bad acts were intentional while others were negligent. For example, the jury could find that Dease and Breland intentionally fabricated the nonexistent fourth phone call from Pearson to Sykes and intentionally withheld *Brady* material about that (non-)call, while Adger and Dease negligently failed to put the suppressed phone records in the NHPD Records Room or otherwise disclose them.

**CONCLUSION**

For the foregoing reasons, Defendants' motions for summary judgment should be denied in their entirety.

Dated: September 27, 2021

New York, New York

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

_____/s/_____
Ilann M. Maazel
Nick Bourland

600 Fifth Avenue, 10th Floor
New York, N.Y. 10020
(212) 763-5000
imaazel@ecbawm.com
nbourland@ecbawm.com

PARRETT, PORTO, PARESE
& COLWELL, P.C.

Tamar R. Birckhead
2139 Whitney Avenue, Suite 1-D
Hamden, Connecticut 06518
(203) 281-2700

KAUFMAN LIEB LEBOWITZ
& FRICK LLP

Douglas E. Lieb
10 East 40th Street, Suite 3307
New York, NY 10016
(212) 660-2332
dlieb@kllf-law.com

*Attorneys for Plaintiff Vernon Horn*