UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---

VERNON HORN,

                Plaintiff,

    -against-

CITY OF NEW HAVEN; and LEROY
DEASE, PETISIA ADGER, DARYLE
BRELAND, and JAMES STEPHENSON, in
their individual capacities,

             Defendants.

Civ. No. 3:18-CV-01502 (RNC)

---

## PLAINTIFF VERNON HORN'S LOCAL RULE 56(a)2 STATEMENT OF FACTS IN OPPOSITION TO THE DETECTIVES' MOTION FOR SUMMARY JUDGMENT

Plaintiff Vernon Horn, by and through his undersigned counsel, hereby responds to the Statement of Undisputed Material Facts Pursuant to D. Conn. L. Civ. R. 56(a)(1) filed by Defendants Leroy Dease, Petisia Adger, and Daryle Breland (collectively, "the Detectives").[1]

*The Robbery/Murder*

1.      The victim of the robbery and murder, Caprice Hardy, worked at a TGI Friday's restaurant in Hamden about three miles from the Dixwell Deli ("Deli") located on Dixwell Avenue in New Haven. (Ex. 1, Horn Am. Compl. ¶37, May 6, 2020).

**RESPONSE:** Undisputed.

---

[1]      By responding that a particular fact is undisputed, Plaintiff indicates only that it is undisputed for purposes of this motion, not that it is undisputed for all purposes, and Plaintiff does not concede that the fact in question is material. That facts are in a particular numerical order in the Detectives' Local Rule 56(a)(1) statement and are undisputed by Plaintiff is not, and should not be construed as, an agreement by Plaintiff that those facts occurred in a particular chronological order. The Detectives' statement does not purport to be a strict chronology, and Plaintiff's responses do not concern the timing or sequence of events except where the Detectives' numbered factual statements expressly address the timing or sequence of events. Finally, Plaintiff does not respond to the Detectives' section headings because they are not part of any statement of material fact and are not substantiated by evidence. Plaintiff's non-response to the section headings is not a concession of their accuracy.

2.      On January 24, 1999, the manager of TGI Friday's called a taxi for Hardy and his friend and fellow employee, Shaquan Pallet, and they were picked up at 3:18 a.m. At Hardy's request, the taxi stopped at the Deli at approximately 3:26 a.m. so he could buy cigarettes. (Ex. 1, Horn Am. Compl. ¶¶38-39; *admitted in* Ex. 2, Def. Adger's Answer ¶¶38-39, May 20, 2020; Ex. 3, Def. Dease's Answer ¶¶38-39, May 20, 2020).

**RESPONSE**: Undisputed.

3.      While Hardy was at the counter making a purchase from Abby Yousif, a co-owner of the Deli, three armed, masked men burst into the Deli. The first gunman immediately opened fire. Hardy was shot and killed and Yousif was wounded in the shoulder but played dead throughout the robbery. (Ex. 1, Horn Am. Compl. ¶¶39-42; *admitted in* Ex. 2, Def. Adger's Answer ¶¶39-42; Ex. 4, Def. Breland's Answer ¶¶39-42, May 20, 2020; Ex. 3, Def. Dease's Answer ¶¶39-42; Ex. 5, Yousif Statement 4-6, NH000242-244, Jan. 26, 1999).

**RESPONSE**: Undisputed.

4.      At the time the robbers entered, three other people were in the Deli. One was an employee of the Deli, who fled to the basement storeroom and tripped and fell down the stairs. The second was a homeless man, who hung around the store and sometimes did odd jobs and was near the back of the store. The third was Vernon Butler, an associate of Yousif, who was asleep in a chair in the office located at the back of the store. (Ex. 1, Horn Am. Compl. ¶43; *admitted in* Ex. 2, Def. Adger's Answer ¶43; Ex. 4, Def. Breland's Answer ¶43; Ex. 3, Def. Dease's Answer ¶43).

**RESPONSE**: Undisputed.

5.      Two customers entered the store during the robbery. The first, Kendall Thompson, a young man from the neighborhood, entered with a dollar in his hand. The masked gunman standing near the door, pointed a gun at him and ordered him on the floor, taking the

2

dollar. (Ex. 1, Horn Am. Compl. ¶¶46-47; *admitted in* Ex. 2, Def. Adger's Answer ¶¶46-47; Ex. 4, Def. Breland's Answer ¶¶46-47; Ex. 3, Def. Dease's Answer ¶¶46-47).

**RESPONSE**: Undisputed.

6.     Around the same time, a woman named Regina Wolfinger and a man named Howard Roberts, drove up to the Deli, parking approximately 50 feet from the front of the Deli. Roberts entered the Deli to buy cigarettes with five dollars. When he walked in, the same gunman told Roberts to get down on the floor. Roberts initially refused but eventually complied and gave the gunman his five dollars. (Ex. 1, Horn Am. Compl. ¶¶48-49; *admitted in* Ex. 2, Def. Adger's Answer ¶¶48-49; Ex. 4, Def. Breland's Answer ¶¶48-49; Ex. 3, Def. Dease's Answer ¶¶48-49).

**RESPONSE**: Undisputed.

7.     The robbers could not open the cash register. One of the robbers said, "Get the nigga in the back," and two of the robbers went to the office at the back of the store. One of the robbers pistol-whipped Butler and brought him to the front to open the register. However, Butler was unable to because it was jammed. (Ex. 1, Horn Am. Compl. ¶44; *admitted in* Ex. 2, Def. Adger's Answer ¶44; Ex. 4, Def. Breland's Answer ¶44; Ex. 3, Def. Dease's Answer ¶44; Ex. 6, Jackson Am. Compl. ¶15, Apr. 24, 2020; *admitted in* Ex. 7, Def. Adger's Answer ¶15, May 20, 2020; Ex. 8, Def. Breland's Answer ¶15, May 20, 2020; Ex. 9, Def. Dease's Answer ¶15, May 20, 2020).

**RESPONSE**: Undisputed, except to the extent Defendants intend to imply that the statement "Get the nigga in the back" occurred before two of the robbers went to the back. The third robber called "Get the nigga in the back" after the door to the back room was open and the two armed robbers were already in the back room. Ex. 8 (Butler Dep.) at 32:17-23.

3

8.    The robbers took Butler's cell phone and pager from the back office. They also took approximately $2,000 from Yousif's person. (Ex. 1, Horn Am. Compl. ¶45; *admitted in* Ex. 2, Def. Adger's Answer ¶45; Ex. 4, Def. Breland's Answer ¶45; Ex. 3, Def. Dease's Answer ¶45; Ex. 6, Jackson Am. Compl. ¶14; *admitted in* Ex. 7, Def. Adger's Answer ¶14; Ex. 8, Def. Breland's Answer ¶14; Ex. 9, Def. Dease's Answer ¶14).

**RESPONSE**: Undisputed.

9.    During this time, the third robber searched the homeless man who had fled to the back office to hide. While in the office, the robber rifled through cigar boxes on the desk, looking for money. (Ex. 1, Horn Am. Compl. ¶68; *admitted in* Ex. 2, Def. Adger's Answer ¶68; Ex. 4, Def. Breland's Answer ¶68; Ex. 3, Def. Dease's Answer ¶68; Ex. 6, Jackson Am. Compl. ¶14; *admitted in* Ex. 7, Def. Adger's Answer ¶14; Ex. 8, Def. Breland's Answer ¶14; Ex. 9, Def. Dease's Answer ¶14; Ex. 10, Dease Report 2, NH000065, Mar. 11, 1999; Ex. 11, Brown Statement 12-13, DET00863-864, Mar. 10, 1999).

**RESPONSE**: Undisputed.

10.    The gunman near the door was wearing a black hoodie and ski mask. The gunman behind the counter wore a hoodie and black mask. (Ex. 12, Crim. Trial Tr., 72, 135-137, Apr. 4, 2000; Ex. 13, Thompson Statement 3-5, NH000216-218, Jan. 26, 1999).

**RESPONSE**: Disputed. One of these two men—the one who had previously pistol-whipped Butler—was wearing a "big, puffy ski coat." Ex. 8 at 50:8-52:1.[2]

11.    Before Butler could get the cash register open, the gunmen heard an ambulance siren. Believing the police were approaching, the three gunmen fled the scene. Butler then called

---

[2]    All references to "Detectives' Ex." in Plaintiff's responses are to the exhibits filed by the Detectives in support of their June 6, 2021 motion for summary judgment. "Ex." refers to the exhibits filed by Plaintiff Horn in opposition to Defendants' motions for summary judgment and in support of Plaintiff's partial cross-motion for summary judgment.

911 at 3:32 a.m. (Ex. 1, Horn Am. Compl. ¶50; *admitted in* Ex. 2, Def. Adger's Answer ¶50; Ex. 4, Def. Breland's Answer ¶50; Ex. 3, Def. Dease's Answer ¶50; Ex. 6, Jackson Am. Compl. ¶15; *admitted in* Ex. 7, Def. Adger's Answer ¶15; Ex. 8, Def. Breland's Answer ¶15; Ex. 9, Def. Dease's Answer ¶15).

**RESPONSE**: Undisputed.

***The Police Investigation***

12.     The investigation into the Deli robbery/homicide was assigned to Leroy Dease. Dease had been a New Haven police officer for 31 years and a detective in the Investigative Services Unit for approximately 20 years. Dease retired from the New Haven Police Department (NHPD) in April 1999 and was thereafter employed as an investigator with the State's Attorney's Office in New Haven. (Ex. 14, *Habeas* Trial Tr., 48:18-49:23, Mar. 18, 2013).

**RESPONSE**: Undisputed.

13.     Assisting Dease with the investigation was Petisia Adger. Adger had been a detective since 1993. She worked on six homicide investigations prior to January 1999. (Ex. 15, Adger Dep. 6:25-8:6, Dec. 11, 2019). She was promoted to Sergeant in 2000, Lieutenant in 2008, and Assistant Chief of Police in 2011. (Ex. 15, Adger Dep. 6:25-8:16, Dec. 11, 2019).

**RESPONSE**: Undisputed.

14.     Daryle Breland was also assigned to the investigation. Breland had been a New Haven police officer for 21 years and a detective for 16 years. Breland assisted with witness interviews during the Dixwell Deli investigation. (Ex. 16, Breland Dep. 31:12-33:8, 38:24-41:12, Dec. 16, 2019).

**RESPONSE**: Undisputed.

5

15.    At all relevant times to the events set forth in Plaintiffs' Amended Complaints, I, Leroy Dease, and Daryle Breland performed typical and customary law enforcement functions during our investigation of the Deli robbery-homicide. (Ex. 17, Adger Aff. ¶¶3-4).

**RESPONSE**: Disputed. As set forth in Plaintiff's responses below, Defendants Adger, Dease, and Breland fabricated evidence, coerced witnesses, and suppressed material exculpatory evidence, among other misconduct. *See, e.g.*, ¶¶ 20, 23, 84, 91, 107, 112, 113, 114, 153, 223. Such actions are unlawful and thus not "typical and customary law enforcement functions." Further disputed that this is a "fact" as stated. It is an opinion only supported by Adger's (a lay witness) self-serving affidavit. Undisputed that at all relevant times, Defendants Adger, Dease, and Breland acted within the scope of their employment at the NHPD and pursuant to the NHPD's custom, policy, or practice.

16.    Butler described the offenders as follows: Suspect No. 1: black male, 5'11" to 6' tall, 200 to 210 pounds, stocky build. Suspect No. 2: black male, 5'10" tall, 175-180 pounds. Suspect No. 3: black male. Multiple witnesses said the robbers wore black hoodies. (Ex. 18, Broadcast Information Sheet, DET00995).

**RESPONSE**: Undisputed that someone described Suspect No. 1 as a black male, 5'11"-6' tall, 200 to 210 pounds, stocky build, and that someone described Suspect No. 2 as a black male, 5'10" tall, 175-180 pounds. Disputed that the person who gave this description was Vernon Butler, and that "multiple witnesses said the robbers wore black hoodies," as the only source cited contains no evidence for either proposition. *See* Detectives' Ex. 18 (DET00995).

17.    The description of Vernon Horn on the day of his arrest was: black male, 5'11" tall; 200 pounds. The description of Marquis Jackson on the day of his arrest was: black male 5'8" tall; 160 pounds. (Ex. 19, Arrest Cards, DET00777-780).

**RESPONSE**: Undisputed.

18.    Bureau of Identification detectives recovered two shotguns and a machete from behind the counter where Yousif was standing. The shotguns were not loaded, but ammunition was ready. (Ex. 20, Shelton Report 4-5, NH000034-35, Jan. 26, 1999).

**RESPONSE**: Undisputed.

19.    Butler told police that the offenders probably had been in the store before because they knew he worked there and could open the register. (Ex. 21, Butler Statement 7, NH000237, Jan. 24, 1999).

**RESPONSE**: Undisputed.

20.    In a February 1, 1999, interview with detectives, Butler stated that Horn was a regular customer at the Deli and often stood behind the counter to make sandwiches for customers. Horn was familiar with the layout of the store and employee shifts. Butler stated that Horn would have known the location of the two shotguns behind the front counter. (Ex. 22, Adger Report 3, NH000082, Feb. 1, 1999).

> **RESPONSE**: Disputed. Adger's account of this purported interview with Butler is
> fabricated. The cited police report also claims that Butler told the Detectives that "Horn's
> physical attributes including build and facial features resembled the armed masked man
> that struck [him] in the head." Detectives' Ex. 22. Butler did not say that to the
> Detectives. Ex. 8 at 58:3-6. Butler "couldn't see" the facial features of the masked man
> who struck him. *Id.* at 58:7-18. It would be "crazy" to assert that he could, and any police
> report that claimed he saw that "would be making it up." *Id.* at 58:9-18.

21.    Detectives interviewed two eyewitnesses shortly after the robbery. The first witness was Regina Wolfinger, who was interviewed on January 24, 1999. Wolfinger waited outside the Deli in the car while her boyfriend, Howard Roberts, entered the Deli. She had been

drinking and taking drugs earlier in the day. She confirmed in a taped transcribed statement that shortly after Roberts entered, two black men exited the Deli and stood outside the Deli for a couple of minutes before fleeing on foot. Roberts then came out and they drove away. During the interview, Wolfinger was shown a photo array and identified Vernon Horn, who she was "pretty positive" she saw outside the Deli, further stating, "Possibly, yes. He looks pretty familiar." At the criminal trial, Wolfinger said she was about 75% certain of her identification. (Ex. 1, Horn Am. Compl. ¶¶58-59, 61-62; Ex. 6, Jackson Am. Compl. ¶¶25-26, 29; Ex. 23, Crim. Trial Tr., 134:1-3, Apr. 6, 2000; Ex. 24, Adger Dep. Ex. 51, at 10; Ex. 25, Wolfinger Statement 3, 5, 10, NH000197, NH000199, NH000204, Jan. 24, 1999).

**RESPONSE**: Objection that this eight-sentence paragraph blending the underlying events, Wolfinger's 1999 statements to police, and Wolfinger's 2000 trial testimony does not comply with the requirement of Local Civil Rule 56(a)(1) to set forth a "concise statement of each material fact" in "separately numbered paragraphs." D. Conn. Local Civ. R. 56(a)(1).

Undisputed that:

(i)     Police interviewed two purported eyewitnesses, including Wolfinger.

(ii)    Wolfinger was interviewed on 1/24/99.

(iii)   Wolfinger waited in the car while Roberts went in the deli.

(iv)    Wolfinger had been drinking and taking drugs earlier on 1/24/99.

(v)     Wolfinger told police that shortly after Roberts entered the deli, two black men exited the deli and stood outside for a couple of minutes before leaving on foot.

(vi)    Wolfinger told police that Roberts came out after the two men, and that she and Roberts then drove away.

8

(vii)    Wolfinger was shown a photo array that included Vernon Horn and, when asked if she had seen him outside the deli, responded, "Possibly, yes. He looks pretty familiar."

(viii)    Wolfinger testified at trial that she had told Detective Dease during her interview that she was 75 percent sure she had seen Vernon Horn outside the deli.

Disputed that:

(i)    Wolfinger "confirmed" anything, as the other witnesses told the Detectives that three robbers fled immediately after hearing a siren, and no one else described seeing two men exiting the deli and standing out front for two minutes, *e.g.* Ex 3 (Adger Dep.) at 36:9-12, Ex. 4 (Breland Dep.) at 92:11-14.

(ii)    Wolfinger said she was "pretty positive" about anything. Those were Dease's words, to which Wolfinger responded only: "Possibly, yes, he looks pretty familiar." Detectives' Ex. 25 at NH000204.

(iii)    This paragraph provides a complete account of Wolfinger's statements, as she also identified the two men as "light-skinned," Detectives' Ex. 25 at NH000200; Ex. 29 (Horn Criminal Trial Tr.) at TT-1077:4-9, TT-1091:27-1092:1, which Vernon Horn is not, Ex. 47 at 1 (Horn mugshot).

22.    The second eyewitness was Kendall Thompson. Thompson is referred to as "K.T." in police reports at Thompson's request to protect his identity. (Ex. 12, Crim. Trial Tr., 9:5-11, Apr. 4, 2000).

**RESPONSE**: Undisputed that Kendell Thompson was an eyewitness to portions of the robbery and is referred to as "K.T" in police reports. Disputed that this use of initials was

"at Thompson's request," as the sole cited source contains no evidence for that proposition. *See* Detectives' Ex. 12 at 9:5-11.

23.    Dease, Adger, and Breland interviewed Thompson on January 26, 1999. Thompson was shown a photo array of eight photographs. Thompson identified Vernon Horn as the gunman who ordered him to get on the floor. Thompson's identification of Horn was based on the gunman's yellow eyes and mouth which he could see in open holes in the mask. (Ex. 12, Crim. Trial Tr., 105:11-106:3, Apr. 4, 2000; Ex. 13, Thompson Statement 3-4, NH000216-217, Jan. 26, 1999).

**RESPONSE**: Undisputed that Dease, Adger, and Breland interviewed Thompson on 1/26/99. Otherwise disputed. Any identification by Thompson was fabricated and coerced by the Detectives. Thompson repeatedly told the Detectives he could not identify Vernon Horn. Ex. 7 (Thompson Dep.) at 57:20-58:10, 90:9-17, 227:17-20, 233:4-11; Ex. 4 at 159:13-160:9. As to the photos, pre-recording, the Detectives repeatedly showed Thompson two photographs: of Horn and Jackson. Ex. 7 at 45:7-8; Ex. 47 (the photos of Horn and Jackson). The Detectives "kept on putting [the two photographs] in front of [Thompson]" and said "Do[] these eyes match the eyes that you seen?" Thompson said "no." Ex. 7 at 49:5-15. The Detectives kept the two photographs in front of Thompson for "[t]he whole interview," *i.e.*, about two hours. *Id.* at 87:19-21. The Detectives repeatedly told Thompson that Horn's eyes had a yellow shade. *Id.* at 65:9-16, 66:1-14, 227:21-228:2. Horn's eyes had no yellow shade. Ex. 47 (photo of Horn); Ex. 7 at 68:9-10. But the Detectives "didn't want to take no for an answer." *Id.* at 68:8-10. Through their relentless pressure, the Detectives manipulated Thompson to say at trial that one of the robbers had "yellow" eyes. *Id.* at 110:5-111:4.

24.    Thompson also identified a photo of Marquis Jackson, based on Jackson's complexion, as the offender attempting to open the cash register. Thompson knew Jackson from the neighborhood. Thompson admitted that he was not 100% certain of either identification. (Ex. 12, Crim. Trial Tr., 91:1-25, Apr. 4, 2000; Ex. 13, Thompson Statement 3-5, NH000216-218, Jan. 26, 1999).

**RESPONSE**: Disputed. Any identification by Thompson was manufactured and coerced by the Detectives. *See supra* ¶ 23. Thompson repeatedly told the Detectives he could not identify Jackson. Ex. 7 at 57:20-58:10, 90:9-17, 227:17-20, 233:4-11; Ex. 4 at 159:13-160:9.

25.    Thompson also stated that each robber wore a black hoodie. (Ex. 12, Crim. Trial Tr., 72:4-6, Apr. 4, 2000; Ex. 26, Thompson Dep. 16:7-8, 21:18-20, Oct. 3, 2019; Ex. 13, Thompson Statement 3, NH000216, Jan. 26, 1999).

**RESPONSE**: Undisputed.

26.    A hearing on a Motion to Suppress Wolfinger's and Thompson's identifications of Horn and Jackson was conducted at the criminal trial and was denied by the Court. (Ex. 12, Crim. Trial Tr., 60:4-61:26, 78:4-80:11, Apr. 4, 2000).

**RESPONSE**: Undisputed.

27.    On January 29, 1999, Detective Dease interviewed Roberts. Roberts gave a taped transcribed statement. Roberts could not identify the robbers, but he recalled that a robber, that came from the back of the store, was wearing a "bandana around his face like the old western days." He added, "The robber behind the counter was going crazy grabbing cigarettes." (Ex. 27, Crim. Trial Tr., 118:12-119:1, Mar. 31, 2000; Ex. 28, Roberts Statement 4, NH000226, Jan. 24, 1999).

**RESPONSE**: Undisputed.

11

28.    Among other witnesses, Dease and Adger interviewed the wounded victim, Yousif. Yousif began work at 3:10 a.m. Yousif knew Horn and Jackson generally, as they were regular customers. He did not see Horn or Jackson come into the store that morning prior to the robbery. (Ex. 29, Crim. Trial Tr., 123:13, 137:6-27, Apr. 3, 2000; Ex. 30, Adger Report 4, NH000069, Jan. 24-31, 1999; Ex. 5, Yousif Statement 8-10, NH000246-248, Jan. 26, 1999).

**RESPONSE**: Undisputed that Yousif so stated to police. Disputed as to the accuracy of the statement that Yousif did not see Horn or Jackson come in the store that morning, as Yousif was in fact present when Horn and Jackson were at the deli. Ex. 2 (Jackson Dep.) at 137:24-138:6; Ex. 1 (Horn Dep.) at 165:4-10.

29.    Yousif last saw Horn and Jackson in the store the previous Thursday, at which time they looked around the store and Horn said to Jackson, "You were right, you were right." Horn told Yousif that Jackson was his brother. (Ex. 29, Crim. Trial Tr., 149:1-12, Apr. 3, 2000; Ex. 30, Adger Report 4, NH000069, Jan. 24-31, 1999; Ex. 5, Yousif Statement 8-10, NH000246-248, Jan. 26, 1999).

**RESPONSE**: Undisputed that Yousif so stated to police. Disputed as to the accuracy of when Yousif last saw Horn and Jackson in the store. *See supra* ¶ 28 (citing Ex. 2 at 137:24-138:6; Ex. 1 at 165:4-10).

30.    On January 27, 1999, Dease and Breland interviewed Mesha Forbes. Forbes was the sister of the victim, Caprice Hardy. Forbes had previously seen Horn and Jackson. She provided a taped transcribed statement that on January 24, 1999, she was outside Yvette Faulkner's house with Lena Graham when Horn and Jackson drove up in a small gray car. Horn told Forbes that they knew about the robbery because they drove by the store when the robbery occurred, and that Horn heard gunshots. Mesha gave a transcribed statement on February 17,

1999. (Ex. 23, Crim. Trial Tr., 96:26-97:23, Apr. 6, 2000; Ex. 31, Dease Report 1, NH000074, Feb. 17, 1999; Ex. 32, Forbes Statement 4-5, NH000101-102, Feb. 17, 1999).

> **RESPONSE**: Undisputed that Meshea (not Mesha) Forbes so stated in a taped, transcribed statement to the NHPD on 2/17/99. Disputed that Vernon Horn ever made the statements in question. *See* Ex. 12 (Graham Dep.) at 12:10-25; Ex. 1 at 129:15-130:6.

31.     On January 27, 1999, Dease and Breland interviewed Lena Graham. Graham had known Horn and Jackson for six years. She was with Forbes when Horn and Jackson drove up on January 24, 1999. Graham heard Horn say he and Jackson drove by the Deli when they [the robbers] were shooting. Lena gave a taped transcribed statement on February 17, 1999. (Ex. 23, Crim. Trial Tr., 108:4-27, 114:24-115:3, Apr. 6, 2000; Ex. 31, Dease Report 2, NH000075, Feb. 17, 1999; Ex. 33, Graham Statement 2-4, NH000178-180, Feb. 17, 1999).

> **RESPONSE:** Disputed that Graham heard Horn say he and Jackson drove by the Deli when the robbers were shooting. According to Graham's sworn testimony in this action, Horn said no such thing. Ex. 12 at 12:10-25. Otherwise undisputed.

### *Vernon Horn's Alibi*

32.     Vernon Horn was 19 years old on January 24, 1999. He had sold crack cocaine for two years before his arrest. (Ex. 34, Horn Dep. 20:15-21:2, Dec. 6, 2019).

> **RESPONSE**: Disputed. Vernon Horn was 17 years old on January 24, 1999. Ex. 1 at 139:9-10 (date of birth 3/15/81). The testimony cited by the Detectives establishes only that Vernon Horn sold crack cocaine within the period when he was 16 to 17 years old, not that he had done so "for two years." Ex. 1 at 20:15-21:2.

33.     When Horn was released from prison after a successful habeas petition in 2013, he sold crack cocaine until his re-arrest in 2016. (Ex. 34, Horn Dep. 25:22-26:22, Dec. 6, 2019).

**RESPONSE**: Objection as to the conceivable relevance or materiality of this allegation to any issue in dispute on this motion. To the extent a response is required, disputed. The cited testimony states only that "when I was told I had to go back to prison"—meaning when Mr. Horn's grant of habeas relief was *reversed* on or about June 28, 2016, *see Horn v. Comm'r of Correction* 321 Conn. 767 (2016)—"I didn't care no more, so I just – I started selling drugs again." Ex. 1 at 25:22-26:22.

34.    On January 2, 1999, prior to the Deli homicide, Horn was arrested and charged with selling drugs – a charge that was pending after his arrest for the Deli homicide, to which he later pled guilty. (Ex. 34, Horn Dep. 37:2-40:3, Dec. 6, 2019).

**RESPONSE**: Undisputed.

35.    Horn and Jackson knew each other since age 10 and they saw each other every day. They sold drugs together. Jackson was also arrested with Horn on January 2, 1999. (Ex. 34, Horn Dep. 59:19-23, 64:22-66:10, 69:18-70:4, Dec. 6, 2019).

**RESPONSE**: Objection to the vagueness of the time periods at which Horn and Jackson allegedly "sold drugs together" or "saw each other every day." To the extent a response is required, undisputed that Horn and Jackson knew each other since age 10; were arrested together on 1/2/99; sold drugs in the same location on at least one prior occasion; and saw each other approximately every day at or around the time of 1/24/99. Disputed that Horn and Jackson sold drugs as a joint venture or were partners in narcotics business. Ex. 1 at 65:10-19 ("[W]e were just around each other at the time. We didn't split nothing.").

36.    At age 15, Horn was sentenced to 8 months in a juvenile detention center for possession of a fireman. He was on probation for that offense at the time of the robbery. (Ex. 34, Horn Dep. 32:13-33:21, 86:9-19, Dec. 6, 2019).

**RESPONSE**: Undisputed, except "firearm" not "fireman," and the testimony is that the sentence was *approximately* eight months at *approximately* age 15. Ex. 1 at 33:9-10.

37.    Dease interviewed Horn on January 25, 1999. Horn had reluctantly come to the police station with his sister. (Ex. 35, Dease Report 6, NH000018, Jan. 29, 1999).

**RESPONSE:** Undisputed that Dease interviewed Horn on January 25, 1999. Further undisputed that Dease believed Horn was "very reluctant to come with [the detectives] to the Investigative Service." Detectives' Ex. 35 at NH000018. Further undisputed that Horn did voluntarily come to the police station—"he decided to come and his sister came along with him." *Id.*

38.    During the interview, Horn claimed he and Jackson went to a club in downtown New Haven at 11:00 p.m. and left when the club closed at 2:00 a.m. Jackson met his girlfriend, Tesha Smith, at the club and he intended to spend the night with her. (Ex. 1, Horn Am. Compl. ¶¶20-21; Ex. 6, Jackson Am. Compl. ¶16; Ex. 30, Adger Report 5, NH000070, Jan. 24-31, 1999).

**RESPONSE**: Undisputed.

39.    Horn drove Jackson in a gray vehicle to the Athenian Diner, but they decided not to eat. They then drove past a party in the neighborhood and observed Zaneta Berryman Cooper (Zaneta) standing outside. (Ex. 1, Horn Am. Compl. ¶¶22-24; Ex. 6, Jackson Am. Compl. ¶33; Ex. 35, Dease Report 6, NH000018, Jan. 29, 1999).

**RESPONSE**: Undisputed.

40.    Horn knew Zaneta from the neighborhood, and they saw each other periodically. (Ex. 1, Horn Am. Compl. ¶23; Ex. 36, Berryman Cooper Statement 4-5, NH000262-263 (undated)).

**RESPONSE**: Undisputed.

41.    Horn offered to drive Zaneta to her boyfriend, Marquis Pearson's house, who was also a friend of Horn's. She agreed and got in the car. (Ex. 37, Crim. Trial Tr., 157:26-159:17, Apr. 13, 2000; Ex. 38, Berryman Cooper Dep. 18:2-11, Sept. 23, 2019; Ex. 39, Breland Report 2, NH000025, Jan. 31, 1999; Ex. 36, Berryman Cooper Statement 6, NH000264 (undated)).

   **RESPONSE**: Undisputed that Zaneta got in the car after a conversation with Horn. Disputed as to what Horn said. Horn asked Zaneta "[i]f she wanted to come hang out with us." Ex. 1 at 152:19-21. Disputed that Pearson was Zaneta's "boyfriend" in the sense of a committed relationship. *See* Ex. 6 at 202:12-205:21 (explaining in detail that Zaneta was merely a "female friend" and not a "girlfriend" and that their relationship involved "casual sex").

42.    Zaneta asked Horn if the car was stolen or a "basehead" rental (a car "rented" from someone who needs drug money). Horn said the car was not stolen or a basehead rental. Zaneta asked because of the type of person Horn is. (Ex. 37, Crim. Trial Tr., 162:22-163:25, 215:19-23, Apr. 13, 2000; Ex. 39, Breland Report 2, NH000025, Jan. 31, 1999).

   **RESPONSE**: Objection as to the conceivable relevance or materiality of this allegation to any issue in dispute on this motion. To the extent a response is required, undisputed.

43.    On the way, Horn drove to the Dixwell Deli in New Haven at approximately 2:45 a.m. (Ex. 1, Horn Am. Compl. ¶¶26-27; Ex. 37, Crim. Trial Tr., 163:27-164:8, Apr. 13, 2000; Ex. 38, Berryman Cooper Dep. 21:20-22:4, Sept. 23, 2019; Ex. 36, Berryman Cooper Statement 5-7, NH000263-265 (undated)).

   **RESPONSE**: Undisputed that Horn began driving to the Dixwell Deli at approximately 2:45 am. Disputed that it was "on the way," to the extent this statement implies it was on the way to Pearson's house. *See supra* ¶ 41.

16

44.    Horn and Jackson entered the Deli and Horn bought a soda, loose cigarettes, and condoms. Jackson got change for a dollar and went across the street to use a payphone to call Tesha Smith. Zaneta stayed in the car. (Ex. 1, Horn Am. Compl. ¶27; Ex. 37, Crim. Trial Tr., 166:16-167:7, Apr. 13, 2000; Ex. 38, Berryman Cooper Dep. 24:21-25:22, Sept. 23, 2019; Ex. 30, Adger Report 5, NH000070, Jan. 24-31, 1999; Ex. 36, Berryman Cooper Statement 7, NH000265 (undated)).

**RESPONSE**: Undisputed.

45.    When Horn exited the Deli, he saw Marcus Pearson, who was getting a ride home after buying food at the Deli. Horn and Pearson chatted briefly. Horn did not tell Pearson he was with Pearson's girlfriend, but an employee heard Horn say to Pearson something to the effect of, "I will probably see you later." Pearson and Zaneta had an ongoing sexual relationship at the time. (Ex. 1, Horn Am. Compl. ¶28; Ex. 35, Dease Report 8, NH000020, Jan. 29, 1999).

**RESPONSE**: Disputed that Zaneta was Pearson's "girlfriend." *See* ¶ 41, *supra*. Disputed that "Horn did not tell Pearson he was with Pearson's girlfriend," which neither of the cited materials discusses or establishes in any way. Otherwise undisputed.

46.    Horn then met Jackson back at the car. Upon entering, Horn threw the condoms at Zaneta, which angered her, and she threw them back at him. (Ex. 37, Crim. Trial Tr., 167:1-13, Apr. 13, 2000; Ex. 38, Berryman Cooper Dep. 25:14-26:8, Sept. 23, 2019; Ex. 39, Breland Report 3, NH000026, Jan. 31, 1999).

**RESPONSE:** Undisputed.

47.    The three of them drove to a rooming house, located at 235 W. Ivy Street, three blocks from the Deli, that was rented by Jackson. Horn told Zaneta the room was his. (Ex. 1, Horn Am. Compl. ¶29; Ex. 6, Jackson Am. Compl. ¶16; Ex. 37, Criminal Trial Tr., 167:25-

168:9, Apr. 13, 2000; Ex. 38, Berryman Cooper Dep. 27:9-28:10, Sept. 23, 2019; Ex. 36, Berryman Cooper Statement 8, NH000266 (undated)).

**RESPONSE**: Undisputed.

48.     Jackson dropped off Horn and Zaneta at the rooming house. Jackson then left in the car. (Ex. 37, Criminal Trial Tr., 167:25-168:4, 170:7-18, Apr. 13, 2000; Ex. 38, Berryman Cooper Dep. 29:18-30:10, Sept. 23, 2019).

**RESPONSE**: Undisputed.

49.     Horn and Zaneta went to the second floor of the house, but Zaneta was on her menstrual cycle and went to the bathroom. She asked Horn to get her tissue. She remained in the bathroom alone for approximately 10 to 20 minutes. (Ex. 37, Criminal Trial Tr., 169:3-170:6, Apr. 13, 2000; Ex. 38, Berryman Cooper Dep. 30:20-32:4, 104:8-107:2, Sept. 23, 2019; Ex. 36, Berryman Cooper Statement 10-12, NH000268-270 (undated)).

> **RESPONSE**: Disputed. Zaneta and Horn did have sex. Ex. 1 at 157:7-8. Zaneta did not
> use the bathroom. *Id.* at 159:8-14.

50.     After Zaneta locked the bathroom door, she heard a padlocked door on an adjoining room unlock. She then heard Horn enter the adjoining bedroom and walk down the stairs. (Ex. 37, Criminal Trial Tr., 199:21-201:27, Apr. 13, 2000; Ex. 38, Berryman Cooper Dep. 108:25-110:3, Sept. 23, 2019).

> **RESPONSE**: Disputed. Zaneta did not use the bathroom at all. Ex. 1 at 159:8-14.

51.     When Zaneta was finished in the bathroom, she did not see Horn. She called downstairs for him three times. He did not respond. Finally, someone on the first floor yelled for Horn out the front door and Horn returned from outside. (Ex. 37, Crim. Trial Tr., 202:14-204:24, Apr. 13, 2000; Ex. 38, Berryman Cooper Dep. 111:25-114:11, Sept. 23, 2019; Ex. 36, Berryman Cooper Statement 12-13, NH000270-271 (undated)).

18

**RESPONSE**: Disputed. Zaneta did not use the bathroom at all. Ex. 1 at 159:8-14.

52.    Zaneta noticed she had messages from Pearson on her pager, and she decided to return his pages. Horn borrowed a cordless phone from the owner of the house. (Ex. 1, Horn Am. Compl. ¶¶32-33; Ex. 6, Jackson Am. Compl. ¶17; Ex. 37, Crim. Trial Tr., 172:16-173:20, Apr. 13, 2000; Ex. 36, Berryman Cooper Statement 23, NH000281 (undated)).

**RESPONSE**: Undisputed.

53.    Horn then chased Zaneta around the apartment wearing one of the condoms. She refused to have sex with him. (Ex. 38, Berryman Cooper Dep. 32:22-35:1, Sept. 23, 2019).

**RESPONSE**: Objection as to the conceivable relevance or materiality of this allegation to any issue in dispute on this motion. To the extent a response is required, disputed. Zaneta and Horn had previously had sex. Ex. 1 at 157:7-8.

54.    Zaneta called Pearson, but Horn grabbed the phone from her and hung up. Zaneta called back and this time, Horn took the phone and told Pearson that he would walk Zaneta back to Pearson's house. They agreed to meet at the Deli. (Ex. 1, Horn Am. Compl. ¶34; Ex. 6, Jackson Am. Compl. ¶17; Ex. 37, Crim. Trial Tr., 173:1-175:7, 206:2-22, Apr. 13, 2000; Ex. 38, Berryman Cooper Dep. 33:4-35:21, Sept. 23, 2019; Ex. 36, Berryman Cooper Statement 14-16, NH000272-274 (undated)).

**RESPONSE**: Undisputed.

55.    Pearson, in a statement to the police, confirmed he received the call from Zaneta at approximately 3:30 a.m., but the call could have been received as late as 3:45 a.m. (Ex. 40, *Habeas* Trial Tr., 97:2-98:2, Mar. 12, 2013; Ex. 41, Pearson Statement 14-15, NH000175-176 (undated)).

**RESPONSE**: Undisputed as to Pearson's statement to police. Disputed that the call could have been received as late as 3:45 a.m. Berryman and Horn arrived at the Deli before the

19

police tape went up. Ex. 9 (Cooper (Berryman) Dep.) at 38:25-39:17 (describing initial

effort to walk into store on arrival, after which "the yellow tape went up"). NHPD Officer

Miller put the tape up upon her arrival at 3:39 am. Ex. 84 (Jan. 24, 1999 Case/Incident

Rep.); Ex. 9 at 72:14-19. Thus, Berryman and Horn arrived at the deli by 3:39 am,

meaning that they had to leave the house several minutes earlier, meaning that the call

had to have been minutes earlier still—that is, 3:30.

56.    Horn was wearing a black and red Avirex jacket when they arrived at the

apartment. As they walked to the Deli, Zaneta noticed Horn was wearing a black hoodie. Jackson

was also wearing a black hoodie prior to the robbery. (Ex. 42, Crim. Trial Tr., 5:3-10, Apr. 14,

2000; Ex. 38, Berryman Cooper Dep. 21:3-17, 134:10-24, Sept. 23, 2019; Ex. 36, Berryman

Cooper Statement 20-21, NH000278-279 (undated)).

   **RESPONSE**: Disputed. Jackson was dressed consistently with the dress code at the

   Alley Cat Club, which forbade hoodies, and his personal practice was to wear slacks and

   a button-down shirt to the club. Ex. 2 at 147:4-8.

57.    When Zaneta and Horn reached the Deli, they observed police activity. They were

told to stay for an interview. (Ex. 38, Berryman Cooper Dep. 120:5-15, Sept. 23, 2019).

   **RESPONSE**: Undisputed.

58.    When Zaneta and Horn were told one of the victims was Yousif, an owner of the

Deli, Zaneta was upset. Horn stated, "Fuck that nigger. He ain't nobody." (Ex. 37, Crim. Trial

Tr., 178:18-179:25, 213:15-25, Apr. 13, 2000; Ex. 38, Berryman Cooper Dep. 120:16-122:5,

Sept. 23, 2019; Ex. 36, Berryman Cooper Statement 22, NH000280 (undated)).

   **RESPONSE**: Undisputed solely for purposes of this motion.

59.    Officer Michael Ferraro was dispatched to the Deli and encountered Horn and

Zaneta standing outside. Ferraro had a conversation with Horn and Zaneta and reported, "Vernon

Horn and Zaneta initially told Captain Verrelli that they saw the subjects run out of the Deli, but after waiting at the scene for a while, they said they really didn't see anything and had to leave." After the interview, they were allowed to leave. (Ex. 15, Adger Dep. 232:13-20, Dec. 11, 2019; Ex. 43, Ferraro Report 1, NH000048, Jan. 24, 1999).

> **RESPONSE**: Undisputed that Ferraro was dispatched to the Deli, encountered Horn and Zaneta, and ultimately interviewed them. Undisputed that the quotation appears in Ferraro's police report. Disputed to the extent it implies that the interview of Horn and Zaneta occurred immediately after Ferraro first encountered them. The first person with whom Ferraro spoke after arriving on scene was a civilian witness with whom Ferraro spoke for "quite a long time." Ex. 29 at TT-115:11-20. Ferraro spoke with Vernon and Zaneta maybe "somewhere in the area of maybe 10 minutes or twenty minutes after" Ferraro arrived at the scene. *Id.* at TT-121:11-18. Further disputed that Horn and Zaneta made the statements attributed to them here. *See* Ex. 9 at 122:9-17.

60.    When Verrelli questioned Horn and Zaneta, he reported that Horn was reluctant to provide his name. Zaneta testified that Horn was going to give a false name because he was on parole, however, Zaneta convinced him to give his real name. Horn responded, "I'm not worried, you're my alibi anyway. I was with you." (Ex. 37, Crim. Trial Tr., 180:9-182:19, 212:1-22, Apr. 13, 2000; Ex. 38, Berryman Cooper Dep. 124:7-127:4, Sept. 23, 2019; Ex. 30 Adger Report 3, NH000068, Jan. 24-31, 1999; Ex. 36, Berryman Cooper Statement 17-18, NH000275-276 (undated)).

> **RESPONSE**: Undisputed that Horn was reluctant to give his name to police (because of probation, not parole, Horn Tr. 193:11-25), and that Zaneta helped to persuade him to give his real name. Disputed that Horn ever told Zaneta, in sum and substance, that she was his alibi. Ex. 1 at 181:19-21.

21

61.    Zaneta estimated that it would take about one minute to run from Jackson's apartment to the Deli. (Ex. 37, Crim. Trial Tr., 213:6-12, Apr. 13, 2000).

**RESPONSE**: Undisputed that Zaneta so estimated at trial. Disputed that any such estimate is accurate. Ex. 9 at 129:13-15 ("West Ivy would take a little bit longer than that.").

62.    Horn told Dease he had sex with Zaneta at Jackson's apartment. He did not mention that he left the apartment before he walked Zaneta halfway to Pearson's home. (Ex. 1, Horn Am. Compl. ¶32; Ex. 35, Dease Report 6, NH000018, Jan. 29, 1999).

**RESPONSE**: Undisputed that Horn told Dease he had sex with Zaneta, and did not tell Dease that he left the apartment before walking Zaneta to the deli. Disputed that Horn left 235 West Ivy Street at any point between arriving with Zaneta and leaving to walk with her to the deli. *See* Ex. 1 at 157:4-161:25.

63.    Zaneta unequivocally denied having sex with Horn. (Ex. 37, Crim. Trial Tr., 189:15-22, 214:10-12, Apr. 13, 2000; Ex.38, Berryman Cooper Dep. 137:1-3, Sept. 23, 2019; Ex. 36, Berryman Cooper Statement 23, NH000281 (undated)).

**RESPONSE**: Undisputed.

64.    On February 1, 1999, Dease and Adger interviewed Horn at Whalley Avenue Correctional Facility. Horn was in custody for a probation violation. During the interview, Horn stated that when he was at the Deli with Jackson and Zaneta, he spoke with Yousif about business and $15.00 he owed Yousif. Horn said he purchased a Pepsi and two loosies (cigarettes) from Yousif. (Ex. 34, Horn Dep. 260:1-3, Dec. 6, 2019; Ex. 22, Adger Report 2-3, NH000081-82, Feb. 1, 1999).

**RESPONSE**: Undisputed.

65.     Horn further stated that when he was released from prison on November 15, 1998, he borrowed a Tech-9 nine-millimeter handgun, which he kept for about one month. Horn got the handgun from someone at the Quinnipiac Terrace Housing Complex where Horn sold narcotics.

On February 1, 1999, Dease and Adger interviewed Horn's friend, Imar Robinson. Robinson provided a taped transcribed statement that Horn showed him a nine-millimeter "Tech 9" one month before. (Ex. 34, Horn Dep. 260:1-261:1, Dec. 6, 2019; Ex 22, Adger Report 4, NH000083, Feb. 1, 1999; Ex. 44, Robinson Statement 9-12, NH000150-153, Feb. 1, 1999).

**RESPONSE**: Undisputed.

*Jackson's Alibi*

66.     Jackson knew Horn for 6-9 years prior to January 1999. They hung out, chased girls, drank alcohol, and went to bars they should not have been able to get into. Jackson did not do drugs, but Horn did. (Ex. 45, Jackson Dep. 45:16-48:14, Dec. 10, 2019).

**RESPONSE**: Objection as to the conceivable relevance or materiality of this allegation to any issue in dispute on this motion. To the extent a response is required, undisputed.

67.     Jackson had been selling marijuana since 1998 and knew Horn sold crack cocaine in Fair Haven. (Ex. 45, Jackson Dep. 57:15-60:15, 62:23-64:21, Dec. 10, 2019).

**RESPONSE**: Undisputed.

68.     Jackson was arrested with Horn on January 2, 1999, for the crime of conspiracy to sell drugs. (Ex. 45, Jackson Dep. 87:3-22, Dec. 10, 2019).

**RESPONSE**: Undisputed as to the fact and date of the arrest. Disputed as to the offense, which was possession of narcotics. Ex. 1 at 67:23-68:3.

69.     On January 25, 1999, Adger and another detective interviewed Jackson. His chronology of the events was similar to Horn's. Jackson added that he and Horn ate at the

23

Athenian Diner, and they arrived at the Deli at 3:30 a.m. (Ex. 30, Adger Report 4-5, NH000069-70, Jan. 24-31, 1999).

> **RESPONSE**: Disputed that Jackson told detectives he and Horn ate in the Diner. Jackson Tr. 157:13-16. Disputed as to the time Jackson estimated he and Horn arrived at the Deli, which was "approximately 3:30 am." Detectives' Ex. 30 at NH000070. Otherwise undisputed.

70.    After Jackson dropped off Horn and Zaneta at his apartment, Jackson stated he went to his mother's house to retrieve some belongings and was paged by Tesha Smith, who he called back. (Ex. 45, Jackson Dep. 179:4-180:2, 183:2-17, Dec. 10, 2019; Ex. 30, Adger Report 5, NH000070, Jan. 24-31, 1999).

> **RESPONSE**: Undisputed.

71.    Jackson said after he called Smith, he returned to the rooming house and exchanged keys with Horn at 4:15 a.m. He then drove to Smith's house and stayed with her for the remainder of January 24, 1999. (Ex. 30, Adger Report 5, NH000070, Jan. 24-31, 1999).

> **RESPONSE**: Undisputed.

72.    During the interview with Jackson, Adger called Tesha Smith. Smith stated she was with Jackson at the Alley Cat Club until 1:45 a.m. She then went home. She further stated Jackson arrived at her home 10 minutes later, where they spent the remainder of the day together. (Ex. 30, Adger Report 7, NH000072, Jan. 24-31, 1999; Ex. 46, Smith Statement 4-5, NH000210-211, Jan. 25, 1999).

> **RESPONSE**: Disputed. Smith did not tell police that Jackson arrived at her house around 2:00 am on the night in question. Ex. 29 at TT-1897:23-1898:27.

*Stolen Cell Phone Investigation*

73.    Detective, Lisa Dadio of the Bureau of Identification, lifted latent fingerprints from the Deli, including from a cigar box in the back office that the robbers had rummaged through. However, no matches were identified until March 5, 1999. (Ex. 1, Horn Am. Compl. ¶68; *admitted in* Ex. 2, Def. Adger's Answer ¶68; Ex. 4, Def. Breland's Answer ¶68; Ex. 3, Def. Dease's Answer ¶68; Ex. 6, Jackson Am. Compl. ¶35; *admitted in* Ex. 7, Def. Adger's Answer ¶35; Ex. 8, Def. Breland's Answer ¶35; Ex. 9, Def. Dease's Answer ¶35; Ex. 27, Crim. Trial Tr., 26:13-28:23, Mar. 31, 2000; Ex. 47, Shelton Report 1, DET00758, Mar. 5, 1999).

**RESPONSE**: Undisputed.

74.    On February 2, 1999, Dease and Adger obtained the records from Butler's cell phone that was stolen from the Deli. Butler signed a consent to search form, and the company issuing the phone, Omnipoint Communications Services, provided a call detail record of the calls made from the phone after the robbery and before Butler discontinued service. Five calls were made from Butler's cell phone after the robbery. (Ex. 1, Horn Am. Compl. ¶¶70-71; *admitted in* Ex. 2, Def. Adger's Answer ¶¶70-71; Ex. 4, Def. Breland's Answer ¶¶70-71; Ex. 3, Def. Dease's Answer ¶¶70-71; Ex. 6, Jackson Am. Compl. ¶¶36-38; *admitted in* Ex. 7, Def. Adger's Answer ¶¶36-38; Ex. 8, Def. Breland's Answer ¶¶36-38; Ex. 9, Def. Dease's Answer ¶¶36-38; Ex. 48, Dease Report 2, NH000007, Feb. 5, 1999; Ex. 49, Consent to Search Form, NH000379; Ex. 50, Omnipoint Fax, NH001036-1038).

**RESPONSE**: Undisputed.

75.    The call detail record from the stolen phone appears as follows:

```
                                    ON-LINE CALL DETAIL INQUIRY
COMPANY 0840 OMNIPOINT COMMUNICATIONS,  SRVA/SLOC 0001 0001 84/NEW YORK
IMSI/MOBILE # 310160100400239 DATE RANGE FROM 01 / 12 / 99  THRU 01 / 25 /
                                  TOTAL MINUTES 00093            TOTAL CHARGES      0
TOTAL CALLS 00047
==================================================================
DATE  TIME    CALLED PLACE    CALLED NUMBER  MINS   AMOUNT TYP ORIG    ESN
01-24 04:14A BRIDGEPORTCT     203-395-6641    1       .00 H/A 61923  0203435
01-24 10:48P BRIDGEPORTCT     203-375-4651    1       .00 H/A 61922  0203435
01-25 10:40A BRIDGEPORTCT     203-696-1495    1       .00 H/A 61923  0203435
01-25 11:07A NEW HAVEN CT     203-933-5833    4       .00 H/A 60153  0203435
01-25 02:32P BRIDGEPORTCT     203-395-6641    1       .00 H/A 60141  0203435
```

Ex. 1, Horn Am. Compl. ¶72; *admitted in* Ex. 2, Def. Adger's Answer ¶72; Ex. 4, Def. Breland's Answer ¶72; Ex. 3, Def. Dease's Answer ¶72; Ex. 6, Jackson Am. Compl. ¶¶39-44; *admitted in* Ex. 7, Def. Adger's Answer ¶¶39-44; Ex. 8, Def. Breland's Answer ¶¶39-44; Ex. 9, Def. Dease's Answer ¶¶39-44; Ex. 48, Dease Report 2, NH000007, Feb. 5, 1999).

**RESPONSE**: Undisputed.

76.     Dease and Adger determined that the first and fifth calls were made to Willie Sadler, a resident of Bridgeport. The first call was made at 4:14 a.m. on the day of the robbery and the fifth call was made at 2:32 p.m. the following day. (Ex. 1, Horn Am. Compl. ¶¶72-73; Ex. 6, Jackson Am. Compl. ¶39; Ex. 48, Dease Report 3, NH000008, Feb. 5, 1999).

**RESPONSE**: Undisputed.

77.     The Detectives interviewed Sadler several times in February and early March 1999, but he claimed he could not remember who called him. (Ex. 1, Horn Am. Compl. ¶74; Ex. 2, Def. Adger's Answer ¶74; Ex. 4, Def. Breland's Answer ¶74; Ex. 3, Def. Dease's Answer ¶74; Ex. 6, Jackson Am. Compl. ¶40; *admitted in* Ex. 7, Def. Adger's Answer ¶40; Ex. 8, Def. Breland's Answer ¶40; Ex. 9, Def. Dease's Answer ¶40; Ex. 48, Dease Report 3, NH000008, Feb. 5, 1999).

**RESPONSE**: Undisputed.

78.     The second call from the stolen phone was made at 10:48 p.m. on January 24 to Adrianne Younger, a Stratford resident. When Dease, Breland, and Adger interviewed Younger on February 2, 1999, she also did not recall who called her. (Ex. 1, Horn Am. Compl. ¶75; *admitted in* Ex. 2, Def. Adger's Answer ¶75; Ex. 4, Def. Breland's Answer ¶75; Ex. 3, Def. Dease's Answer ¶75; Ex. 6, Jackson Am. Compl. ¶41; *admitted in* Ex. 7, Def. Adger's Answer ¶41; Ex. 8, Def. Breland's Answer ¶41; Ex. 9, Def. Dease's Answer ¶41; Ex. 48, Dease Report 3-4, NH000008-9, Feb. 5, 1999).

**RESPONSE**: Undisputed as to the date, time, and recipient of the second call. Disputed as to what Younger told police. Younger told police on February 3, 1999 that "Steve," who she believed to be the brother of Marlo Macklin, was the person who called her. Detectives' Ex. 99 (Adger Mar. 5, 1999 Report) at NH000093.

79.     The third call made at 10:40 a.m. on January 25 was placed to Tamika Fuller, a Bridgeport resident. Detectives interviewed Fuller on February 2, 1999. She also did not remember who called her but said her boyfriend, Marlo Macklin, might have been at her house at that time. When detectives interviewed Macklin on February 4, 1999, he denied being Fuller's boyfriend and that he was at her house at the time of the third call. He claimed Fuller was a drug-dealing associate of Sadler. (Ex. 1, Horn Am. Compl. ¶76; *admitted in* Ex. 2, Def. Adger's Answer ¶76; Ex. 4, Def. Breland's Answer ¶76; Ex. 3, Def. Dease's Answer ¶76; Ex. 6, Jackson Am. Compl. ¶42; *admitted in* Ex. 7, Def. Adger's Answer ¶42; Ex. 8, Def. Breland's Answer ¶42; Ex. 9, Def. Dease's Answer ¶42; Ex. 48, Dease Report 3, NH000008, Feb. 5, 1999).

**RESPONSE**: Disputed that the call was made to Fuller, as opposed to Fuller's phone line. The recipient might have been Macklin, not Fuller, since he "might have been at her house at that time" by the Detectives' own statement. Otherwise undisputed.

80.     The fourth call was made at 11:07 a.m. on January 25 to a house in West Haven owned by an elderly couple and where Crystal Sykes worked as a live-in nurse's aide. (Ex. 1, Horn Am. Compl. ¶77; *admitted in* Ex. 2, Def. Adger's Answer ¶77; Ex. 4, Def. Breland's Answer ¶77; Ex. 3, Def. Dease's Answer ¶77; Ex. 6, Jackson Am. Compl. ¶¶43-44; *admitted in* Ex. 7, Def. Adger's Answer ¶¶43-44; Ex. 8, Def. Breland's Answer ¶¶43-44; Ex. 9, Def. Dease's Answer ¶¶43-44; Ex. 48, Dease Report 2-3, NH000007-8, Feb. 5, 1999).

**RESPONSE**: Undisputed.

81.     On February 2, 1999, Dease, Breland, and Adger visited Sykes at the West Haven house. They asked Sykes if she received a call at the house at the time of the fourth phone call. Sykes stated that she would be the only one to answer the telephone at that time. She initially indicated she could not remember receiving a telephone call and was hesitant to continue the interview because she was at the West Haven house where she worked. (Ex. 51, *Habeas* Trial Tr., 13:16-15:25, Mar. 13, 2013; Ex. 48, Dease Report 2-3, NH000007-8, Feb. 5, 1999).

**RESPONSE**: Disputed. Sykes did not "initially indicate" she could not remember such a call, she told the Detectives point blank that she had no memory of "receiving a telephone call from anyone at that time." Ex. 4 at 169:22-170:7; Ex. 44 (Dease Feb. 5, 1999 Report) at DET-236.

82.     An hour later, Sykes and her mother came to the Investigative Services Division to resume the interview. At that time, she informed Dease and Breland that she believed it was Pearson who called her. She had known Pearson approximately four to five months, and Pearson had been calling her to ask for an invitation to her birthday party on February 24, 1999. Sykes identified a photograph of Pearson. (Ex. 51, *Habeas* Trial Tr., 15:26-17:17, 20:5-22, Mar. 13, 2013; Ex. 48, Dease Report 2-3, NH000007-8, Feb. 5, 1999).

28

**RESPONSE**: Disputed. This is a fabrication. The Detectives took Sykes to the police

station, Ex. 32 (Dease Test. at Jackson Habeas) at 70:10-12, in the interrogation room, *id*.

at 76:5; Ex. 4 at 176:8-12. Dease and Breland interrogated her and closed the door to the

room. Ex. 4 at 177:14-16, 178:3-5. Dease again "introduced the idea that Marcus Pearson

called Ms. Sykes." *Id.* 180:1-4. For the second time, Sykes said "I don't remember." Id.

180:9. After at least ten minutes, *id*. at 176:16-19, Dease and Breland decided to turn the

recorder on, *id*. at 180:12-14. The recording of Sykes' statement, like virtually every

recording in this case, has disappeared. *Id.* at 78:12-14, 180:21-25. The transcription of

the recording nevertheless reveals two detectives desperate to manipulate Sykes into a

false statement. *See* Ex. 52 (Sykes Feb. 2, 1999 Statement). Dease asked: "Ms. Sykes, do

you know the reason you are the New Haven Police Department?" Sykes responded: "I

was told I had a phone call, right, phone call stating that I was talking to say his name

Marcus Pearson." *Id*. at DET00200-011; Ex. 4 at 182:2-183:16. As Breland admits, "the

people who told Crystal Sykes that she a phone call were [Breland] and Detective

Dease." Ex. 4 at 183:17-20. Dease tried again: "Ms. Sykes do you recall receiving a

telephone call at that location?" For the third time, Sykes said: "No, I don't recall talking

or receiving a phone call from Marcus." Ex. 52 at DET00203; Ex. 4 at 184:11-14. This

time, Sykes added "but the paper said that he called." Ex. 52 at DET00203. The paper

was the stolen phone record the Detectives had shown Sykes in the unrecorded interview.

Ex. 4 at 185:7-18. The paper said nothing about who called 59 Ivy Street, and nothing

about Pearson. *Id*. at 186:14-187:5. The plain inference is that the Detectives told Sykes,

in the unrecorded interview, that the stolen phone record showed that Pearson called her,

when it did not. For a fourth time, Sykes said she had no knowledge of a call from

Pearson: "I get wake up calls in the morning. I don't recall a man calling me or whoever

called me at that particular time. I don't even know from yesterday who called me." Ex.

52 at DET00203; Ex. 4 at 187:10-25. "[O]ver and over," Sykes told the Detectives she

had no knowledge of such a call. Ex. 4 at 187:21-188:6.

83.    After a brief pre-interview, Sykes gave a taped transcribed statement, which

memorialized the following exchange:

Q.    Ms. Sykes I'm gonna refer you back to January [25th, 1999].  Was you
      working at 59 West Ivy Street in West Haven?

A.    Yes.

Q.    Ms. Sykes, do you recall receiving a telephone call at that location?

A.    No I don't recall taking or receiving a phone call from Marcus [Pearson]
      but the paper said that he called.  Like I explained to them if I was
      sleeping, knowing that I'm up all through the hours of the night.  I get
      wake up calls in the morning, I don't recall a man calling me or whoever
      called me at that particular time.  I don't know even from yesterday who
      called me so . . .

Q.    Ms. Sykes, so you're telling me that it's a good possibility that Marcus
      Pearson may have called you around [11:00] on 1/25/99?

A.    Yes.

(Ex. 1, Horn Am. Compl. ¶101; Ex. 52, Sykes Statement 4-5, NH000254-255, Feb. 2, 1999).

**RESPONSE**: Disputed. *See* ¶ 82. The pre-interview was not "brief." It lasted at least ten

minutes. Ex. 4 at 176:16-19. The tape recording has disappeared. Plaintiff cannot vouch for the

authenticity of the transcription of the missing recording. The transcription, for example, is

missing key sections, such as: "Ms. Sykes is it a fact that you told me that you believe Marcus

could have called you to ask something about your birthday party which is going to be February

24, 1999." *Id*. Sykes' response in the transcript: "No response heard." Ex. 52 at DET00204.

Breland Dep. 190:12-25.

84.    Dease used the words, "a good possibility" in his question because Sykes stated there was "a good possibility" Pearson called her during her pre-interview. (Ex. 15, Adger Dep. 222:5-23, Dec. 11, 2019).

> **RESPONSE**: Disputed. *See* ¶ 82. Sykes told Dease repeatedly that she had no knowledge
> of such a call. Dease fabricated the "good possibility" language in order to manufacture a
> call that did not happen. *Id.*

85.    Sykes knew Pearson well because she frequently purchased marijuana from him, and she was smoking "five blunts" a day in 1999. (Ex. 1, Horn Am. Compl. ¶99; Ex. 6, Jackson Am. Compl. ¶68; Ex. 51, *Habeas* Trial Tr., 8:20-9:22, Mar. 13, 2013; Ex. 53, Pearson Dep. 109:3-13, Sept. 20, 2019).

> **RESPONSE**: Undisputed as to Sykes' marijuana habits. Disputed that she "knew
> Pearson well," which none of the cited sources establishes or states. To the contrary, their
> relationship was limited to marijuana transactions. Detectives' Ex. 52 at 109:12-13
> (Pearson testimony that "Crystal used to just buy weed from me. That's how I knew
> Crystal.").

86.    At Horn's *Habeas* hearing, Sykes testified that she told detectives the recorded transcribed statement was true. (Ex. 51, *Habeas* Trial Tr., 22:4-14, 25:25-27:23, Mar. 13, 2013).

> **RESPONSE**: Undisputed.

87.    At Horn's *Habeas* hearing, Sykes gave conflicting testimony and at the conclusion of her testimony, the Court stated:

> "That will be the finding. I can assure you that there is no clarify (sic) on this
> testimony that bounced back now, by my count, at least four times but I think five
> times we've gotten from one side of the court to the other. And I cannot make a
> finding as to any clarify (sic) on that issue. For whatever…that's worth…to both
> sides."

(Ex. 51, *Habeas* Trial Tr., 42:6-44:6, Mar. 13, 2013).

**RESPONSE**: Undisputed.

***Confirmation of Fourth Call with Marcus Pearson***

88.    Breland interviewed Pearson on January 26 regarding Pearson's interactions with Zaneta and Pearson's visit to the Deli on January 24. During this interview, Pearson said he was at the Deli and talked to someone in the parking lot but claimed he did not recall who it was or what they discussed. Pearson also confirmed that after he returned home from the Deli, he received calls from Zaneta with Horn on the line at about 3:30 a.m., but it could have been as late as 3:45 a.m. Pearson claims this statement was given voluntarily. (Ex. 16, Breland Dep. 205:11-206:15, Dec. 16, 2019; Ex. 53, Pearson Dep. 294:4-9, Sept. 20, 2019; Ex. 54, Breland Report 1-3, NH000028-30, Jan. 31, 1999; Ex. 41, Pearson Statement 1-15, NH000162-176 (undated)).

**RESPONSE**: Undisputed that Breland interviewed Pearson on January 26 regarding these subjects, among others; that Pearson spoke to police voluntarily; that Pearson acknowledged talking to an unspecified person while parked outside the deli; and that Pearson told police he received a call from Zaneta with Horn on the line at about 3:30 am. Disputed that Pearson said "it could have been as late as 3:45," as both Breland's cited report (Defs.' Ex. 54) and Pearson's cited statement (Defs.' Ex. 41) state that the call was at 3:30. In the cited statement Pearson tells the NHPD that it was around 3:45 "by the time [he] got to the store," *after* the call with Zaneta with Horn on the line. Detectives' Ex. 41 at NH000176. Further disputed that there was a "parking lot" outside the deli.

89.    Breland interviewed Pearson on January 28 at his home to follow up on information learned from Saliem Al-Dubai, an employee at the Deli, that Horn spoke to Pearson at the Deli prior to the robbery. However, the tape was garbled and never transcribed. (Defs.' Rule 56a Statement, *supra* ¶ 45, at 10).

**RESPONSE**: This allegation requires no response, as it fails to cite the record or any facts. It is undisputed that Breland interviewed Pearson on January 28. The Detectives' field notes, Pearson's alleged taped statement, and the alleged transcription of that taped statement have all disappeared. Ex. 4 at 216:24-217:20. Though Breland claims the recording of Pearson's January 28 statement was "messed up" and "garbled," *id.* at 416:21-417:8, Breland wrote no report saying so at the time, *id.* at 417:6-15.

90.    After Breland and Dease interviewed Sykes on February 2, 1999, Breland re-interviewed Pearson and took a taped transcribed statement from him on February 3, 1999. (Ex. 56, Pearson Statement, 1-8, Feb. 3, 1999).

**RESPONSE**: Undisputed.

91.    In the February 3, 1999 interview, Pearson stated that on January 25, 1999, he, Horn and Horn's cousin, Sholanda Jenkins, (a/k/a "Yogi"), were on Pearson's porch at approximately 11:00 a.m. Pearson, although initially reluctant, admitted he called Sykes from his porch after Horn lent him a cell phone (the stolen phone). Pearson stated he called Sykes because he was upset that Horn said he had sex with Pearson's girlfriend, Zaneta, and Pearson wanted to show Horn that he had another girlfriend. (Ex. 16, Breland Dep. 226:8-227:17, Dec. 16, 2019; Ex. 55, Breland Report 2, NH000079, Feb. 1, 1999; Ex. 56, Pearson Statement, 3:5-6:13, Feb. 3, 1999).

**RESPONSE**: Disputed. On February 3, the day after the Sykes interrogation, Dease and Breland went to interview Pearson for a third time. Ex. 4 at 218:21-219:4. This time they took Pearson "down to the police station," "[i]nto the interrogation room." *Id.* at 219:5-9. Rather than gather evidence, Dease and Breland told Pearson that Horn had a cell phone, that Pearson borrowed the phone, and that Pearson used Horn's phone to call Sykes. "So the whole idea of Vernon Horn giving you a cell phone and you calling Crystal Sykes,

that whole idea came from the detectives, right? A: Yes." Ex. 6 at 72:5-8; *id.* at 57:9-10 (same); *id.* at 67:1-15 (same); *id.* at 71:19-22 (same); *id.* at 109:1-4 (Detectives gave Pearson the number; "they told me I called Crystal Sykes"). The Detectives did this "over and over again." *Id.* at 67:6-11.

Pearson repeatedly told Dease and Breland it was a lie: Horn had no phone, and gave him no phone. "I kept telling them there was no phone." *Id.* at 52:19-20; *id.* at 56:1-2 ("I kept telling Dease and Breland there was no phone."); *id.* at 66:14-21 (same); *id.* at 73:19-21 (told them "on five different occasions"); *id.* at 70:5-13 (same); *id.* at 83:20-22 (same). But as Pearson testified, "They told me what to say. They didn't want to hear what I had to say." *Id.* at 80:4-5. "They came back, they came back again, came back again, they came more, they kept coming back, sir, because they didn't get the answers they wanted. They wanted the answers they wanted to hear." *Id.* at 85:4-86:3.

To get what they wanted, Dease and Breland used every pressure technique short of beating Pearson. Without any probable cause or legal basis, the Detectives took Pearson into custody, into a six by twelve-foot interrogation room on the third floor of the police precinct. *Id.* at 59:12-63:5. "[T]hey told me if I ain't telling them what they wanted to hear I wouldn't be walking out of there, that I would be charged." *Id.* at 62:2-4; *id.* at 83:1-23 ("they told me if I didn't say what I need, if I didn't tell them what they wanted to hear it depended on if I walked out of there that day"). "[T]hey basically told me to say I used the phone or I was facing charges [for robbery and murder]. That's what they told me." *Id.* at 67:23-68:7; *id.* at 65-66 (told Pearson he was a suspect and fit the description of one of the robbers); *id.* at 74:5-11 ("if I didn't say I used the cell phone, I was being charged they told me"); *id.* at 79:6-9 (threatened conspiracy charge as well); *id.* at 56:22 ("They were going to choose one of us [Pearson or Horn].") As Pearson testified:

> Q:     So Dease and Breland threatened to charge you with
>        robbery, murder and conspiracy, right?
>
> A:     Yeah.
>
> Q:     If you didn't lie for them?
>
> A:     Yeah, lying, going on what they wanted.

*Id.* at 79:13-19. But as Breland admitted, the Detectives had no "reason to arrest"

Pearson. Ex. 4 at 287:18-19. The Detectives' threat to charge Pearson with murder was

no more than a pressure tactic to fabricate evidence and force Pearson to lie.

The Detectives did not stop there. They threatened to take away Pearson's *children* if he

failed to go along with the phony phone story. Ex. 6 at 75:5-24 ("Q: So Dease and

Breland were saying if you don't lie for us, you're going to lose your kids? A: Yeah.").

Dease and Breland even (successfully) instructed Pearson's probation officer to tell

Pearson, "if you don't cooperate, then I'm going to violate your probation and let DCF

know they have custody of your children." *Id.* at 76:9-23. The Detectives told Pearson he

"might as well just put [him]self in jail and give the kids to the State to take the children"

if he did not lie for them. *Id.* at 87:5-12.

Dease and Breland also threatened to charge Pearson's mother with perjury if

Pearson did not go along with the phone story. *Id.* at 78:11-18.

The Detectives also pretended they had phone records proving the stolen cell

phone was used on Pearson's front porch. *Id.* at 67:18-21; *id.* at 53:1-2. That, too, was a

fabrication. *See* Ex. 46 (phone records, which say nothing about who made phone calls).

The Detectives also "told Pearson that Sykes said that Pearson called her," Ex. 4 at

277:17-19, when Sykes repeatedly said she had no knowledge of such a call, *see supra*.

As Pearson testified, Dease and Breland were "dirty cops" who "didn't care [about the truth] as long as they got a conviction, no matter whose life they destroyed in the middle of it." Ex. 6 at 80:6-20.

Dease and Breland used the NHPD's unrecorded "pre-interview" policy to its intended and maximum effect. Their threats, coercion, pressure, and fabrication occurred in the "pre-interview" interviews, "*before* they hit the record button." *Id.* at 54:24-55:4; *id.* at 57:22-58:4 (same). These unrecorded interviews lasted "for hours." *Id.* at 130:23-131:17. Even worse, the Detectives stopped the tape when Pearson said something that contradicted the Detectives' phony story connecting Horn to the stolen phone:

> Q:      You told them there was no phone, and they would not put that on the tape, correct?
>
> A:      Correct.
>
> Q:      And then when they'd start the tape when you said something they didn't want to hear, they would rewind the tape; is that what they did?
>
> A:      Yes.
>
> Q:      And then they would start over until they got what they wanted?
>
> A:      Yes.

*Id.* at 58:23-59:10; *id.* at 105:23-106:3 (same); *id.* at 124:21-127:11 (detailing fabrication when the recorder was off). At his deposition, Pearson was able to identify a number of suspicious clicks and splices where the Detectives likely stopped, rewound, and recorded over Pearson's oral statement to ensure their fabrication succeeded. *Id.* at 135:4-148:25. For his part, Breland testified that his thumb went in the "wrong direction" and therefore pressed the pause button of the cassette tape during the recording. Ex. 4 at 303:23-305:5. Pearson finally caved to the pressure, principally to save his children. "I believe I did a good job with my children. They was good where I was. I couldn't let them go to the

State." Ex. 6 at 77:8-16. "It was either my friend or my children. I chose my children over my friend which any father would do who was taking care of his kids by himself." *Id.* at 86:18-25. By coercing, pressuring, and threatening Pearson, threatening Pearson's mother and children, and lying to Pearson, the Detectives fabricated Pearson's statement about the cell phone. *Id.* at 88:18-90:8. Everything Pearson said connecting Horn to the stolen phone, in pretrial statements and at trial, was fabricated by Dease and Breland. *Id.* at 88:18-89:7; *id.* at 151:13-152:4 (same).

92.     After the February 3, 1999 interview, Breland submitted the tape to be transcribed, but Breland never received the transcribed statement, leading Breland to believe the tape was lost. Therefore, on February 5, 1999, Breland returned to Pearson's house to repeat the interview with a new tape. Pearson's mother was also home. (Ex. 16, Breland Dep. 221:2-222:10, Dec. 16, 2019; Ex. 57, Breland Dep. 299:5-302:21, Jan. 13, 2020; Ex. 55, Breland Report 2, NH000079, Feb. 1, 1999).

  **RESPONSE**: Disputed. Pearson's alleged recorded statement from February 3 disappeared: Breland "couldn't find it." Ex. 4 at 299:11-14. "[T]he tape went missing," *Id*. at 301:1-2. Breland never noted that in 1999, because he "forgot." *Id*. at 418:19-420:7. Plainly either there was no taped statement or the tape did not sufficiently support Breland's fabrication, leading the Detectives to coerce Pearson again and fabricate a new statement. *Id.*

93.     In Pearson's February 5, 1999, taped statement, Pearson repeated his previous statement that Horn lent him a cell phone on his porch, which he used to call Sykes. (Ex. 57, Breland Dep. 301:8-302:21, Jan. 13, 2020; Ex. 58, Pearson Statement 2-4, NH000157-159, Feb. 5, 1999).

**RESPONSE**: Disputed. *See* ¶ 91. In addition, the tape was manipulated and fabricated. *Id.*

94.     In the February 3rd and February 5th statements, Pearson identified Horn's cousin Yogi as also being present on his porch on January 25, 1999, at approximately 11:00 a.m. when he called Sykes. He also was asked if he had any other information and he declined. (Ex. 55, Breland Report 2, NH000079, Feb. 1, 1999; Ex. 56, Pearson Statement 3:5-21, 7:12-15, Feb. 3, 1999; Ex. 58, Pearson Statement 2-3, NH000157-158, Feb. 5, 1999).

**RESPONSE**: Disputed. *See* ¶ 93.

95.     In each statement Pearson stated that his mother arrived home from work when he, Horn and Yogi were on the porch. Dease asked Pearson to come to the station with his mother to see if they could identify Yogi. (Ex. 57, Breland Dep. 309:7-311:18, Jan. 13, 2020; Ex. 58, Pearson Statement 3, NH000158, Feb. 5, 1999).

**RESPONSE**: Disputed that Pearson made statements, as opposed to repeating what the Detective coerced him to say; disputed that the transcripts accurately reflect what Pearson said; disputed that the tape recordings accurately reflect what Pearson said, after the Detectives' manipulation of the recordings. *See* ¶ 93.

96.     On February 9, 1999, Pearson and his mother came to the station. They identified a photo of Yogi as Sholanda Jenkins. (Ex. 57, Breland Dep. 310:17-311:13, Jan. 13, 2020; Ex. 59, Dease Report 1-2, NH000076-77, Feb. 10, 1999).

**RESPONSE**: Undisputed.

97.     Pearson also repeated his statement that Horn handed him the cell phone on his porch on January 24, 1999. Dease asked Pearson why he had been reluctant to identify Horn as the person who gave him the phone, and Pearson said that he did not want to "rat anyone out." (Ex. 59, Dease Report 2, NH000077, Feb. 10, 1999).

**RESPONSE**: Disputed. Pearson claimed Horn gave him the phone only because Dease and Breland threatened to charge him with robbery, murder, and conspiracy, Ex. 6 at 79:13-19, despite lacking any legal basis to do so, Ex. 4 at 287:18-19, threatened to take away his *children*, Ex. 6 at 75:5-24 ("Q: So Dease and Breland were saying if you don't lie for us, you're going to lose your kids? A: Yeah."), and threatened to charge Pearson's *mother* with perjury, *id.* at 78:11-18.

98.     During his interview with Pearson, Dease told him he had witnesses who put the stolen phone in Pearson's hand and that Pearson either got the phone from the robbery, or he got it from someone else [Horn]. (Ex. 14, *Habeas* Trial Tr., 139:25-140:8, Mar. 18, 2013).

**RESPONSE**: Undisputed that Dease made these statements, among many others.

99.     During this interview with Pearson, Dease knew Pearson had custody of two seven-month-old twins and was on probation. He advised Pearson that he was in some jeopardy and had a problem [if he went to jail]. (Ex. 14, *Habeas* Trial Tr., 140:2-141:2, Mar. 18, 2013).

**RESPONSE**: Undisputed that Dease (and Breland) knew of Pearson's custody of the twins and status on probation. Disputed that Dease (and Breland) "advised Pearson that he was in some jeopardy." Rather, Dease threatened to charge Pearson with robbery, murder, and conspiracy, Ex. 6 at 79:13-19, despite lacking any legal basis to do so, Ex. 4 at 287:18-19, and threatened to take away Pearson's *children* if he failed to go along with the phony phone story, Ex. 6 at 75:5-24 ("Q: So Dease and Breland were saying if you don't lie for us, you're going to lose your kids? A: Yeah.").

### Steve Brown, The Third Gunman

100.    Dease, Adger, and Breland continued to question Sadler about the first and fifth phone calls that were made to his phone number from the stolen phone. However, Sadler did not know the identity of the person that called him. Detectives learned that Sykes' boyfriend,

William Newkirk, was a close friend and dealt drugs with Sadler. (Ex. 1, Horn Am. Compl. ¶121; Ex. 6, Jackson Am. Compl. ¶89; Ex. 14, *Habeas* Trial Tr., 3:14-23, 11:4-13, Mar. 18, 2013; Ex. 15, Adger Dep. 170:12-171:12, Dec. 11, 2019).

> **RESPONSE**: Disputed that Sadler "did not know the identity of the person who called him." Sadler knew the person who called him was Marlo Macklin's wife's brother Steve; he was just lying about it at this point. Ex. 3 at 178:17-20; *see infra* ¶ 102. Otherwise undisputed.

101.    As the investigation continued, Sadler and Newkirk became frustrated with the attention they were drawing from the detectives. Newkirk told Sadler to tell the detectives who called him after the Deli robbery. (Ex. 1, Horn Am. Compl. ¶126; Ex. 6, Jackson Am. Compl. ¶94; Ex. 14, *Habeas* Trial Tr., 19:2-20:21, Mar. 18, 2013; Ex. 60, Dease Report 2, PL0006285, Mar. 8, 1999).

> **RESPONSE**: Undisputed.

102.    On March 4, Dease and Adger met with Sadler and Newkirk in Bridgeport. Sadler told the detectives that the person who called him was named "Steve," but he did not know Steve's last name. Sadler said Steve was the brother-in-law of Marlo Macklin, another Bridgeport resident. Sadler also said Steve was good friends with Tamika Fuller. Fuller had received the third phone call from the stolen phone. (Ex. 1, Horn Am. Compl. ¶127; Ex. 6, Jackson Am. Compl. ¶¶95-96; Ex. 14, *Habeas* Trial Tr., 20:14-21:25, Mar. 18, 2013; Ex. 60, Dease Report 2, PL0006285, Mar. 8, 1999).

> **RESPONSE**: Disputed that Fuller, as opposed to Fuller's phone line, received the third call. The recipient might have been Marlo Macklin, not Fuller, since he "might have been at her house at that time." *Supra* ¶ 79. Otherwise undisputed.

40

103.    Detectives learned from Macklin that Steve's last name was Brown. (Ex. 1, Horn Am. Compl. ¶128; *admitted in* Ex. 2, Def. Adger's Answer ¶128; Ex. 3, Def. Dease's Answer ¶128; Ex. 6, Jackson Am. Compl. ¶97; *admitted in* Ex. 7, Def. Adger's Answer ¶97; Ex. 9, Def. Dease's Answer ¶97; Ex. 60, Dease Report 2, PL0006285, Mar. 8, 1999).

**RESPONSE**: Undisputed.

104.    The next day, Sadler identified a photo of Steve Brown. Dease and Adger obtained Brown's fingerprints from the Bridgeport Police Department, and they matched a latent print lifted from the cigar box in the back office of the Deli. (Ex. 1, Horn Am. Compl. ¶129; *admitted in* Ex. 2, Def. Adger's Answer ¶129; Ex. 3, Def. Dease's Answer ¶129; Ex. 6, Jackson Am. Compl. ¶98; *admitted in* Ex. 7, Def. Adger's Answer ¶98; Ex. 8, Def. Dease's Answer ¶98; Ex. 60, Dease Report 2, PL0006285, Mar. 8, 1999).

**RESPONSE**: Undisputed.

105.    On March 9, Dease and Adger obtained a warrant for Brown's arrest and Brown was arrested at his home the next day. (Ex. 1, Horn Am. Compl. ¶130; *admitted in* Ex. 2, Def. Adger's Answer ¶130; Ex. 4, Def. Breland's Answer ¶130; Ex. 3, Def. Dease's Answer ¶130; Ex. 6, Jackson Am. Compl. ¶99; *admitted in* Ex. 7, Def. Adger's Answer ¶99; Ex. 8, Def. Breland's Answer ¶99; Ex. 9, Def. Dease's Answer ¶99; Ex. 10, Dease Report 1, NH000064, Mar. 11, 1999).

**RESPONSE**: Undisputed.

106.    After his arrest, Brown was brought to the station. After he was read his Miranda rights, Brown gave a taped transcribed statement to Dease and Adger, admitting that he participated in the Deli robbery. (Ex. 11, Brown Statement 3, DET00854, Mar. 10, 1999).

**RESPONSE**: Undisputed that Brown was brought to the station, read his Miranda rights, and gave a statement which was taped and partially transcribed. Disputed to the extent it

implies that Brown gave a taped transcribed statement immediately after being Mirandized, as an hour-long unrecorded pre-interview occurred between the Miranda rights and the beginning of the taped statement. Ex. 3 at 181:9-11 (time); *id.* at 181:21-24 (started talking after Mirandizing). Further disputed to the extent it implies the accuracy or completeness of the transcription, which is self-evidently incomplete and includes numerous blanks and gaps. Detectives' Ex. 11.

107.    Brown identified Horn and Jackson as his accomplices, selecting their photos from a photo array. (Ex. 10, Dease Report 2, NH000065, Mar. 11, 1999; Ex. 11, Brown Statement 4-5, DET00855-856, Mar. 10, 1999)

**RESPONSE:** Disputed. Undisputed that Brown claimed to identify Horn and Jackson in his taped statement. Disputed that this claim is a "fact." Horn and Jackson had never met Brown in their lives. Ex. 1 at 106:3-109:20 (to this day, Horn and Brown have never spoken); Ex. 2 at 116:23-118:22 (Jackson first met Brown in pre-trial detention in 1999, after the Dixwell Deli robbery).

The Detectives told Brown who to identify as his accomplice. The Detectives were determined to put the crime on their "two guys" (Horn and Jackson) regardless of whether Brown's statement supported it, Ex. 33 (Dease Habeas Test.) at HHT-00847:10-11, and Brown made impossible statements consistent with Dease and Adger's other fabrications and private knowledge:

By the time Dease and Adger interviewed Brown, they had already fabricated the idea that Vernon Horn lent the stolen phone to Marcus Pearson in New Haven to call Crystal Sykes, which was "impossible." Ex. 27 (Moledor Dep.) at 16:23-17:1 (defense expert); Ex. 28 (Wines Dep.) at 31:24-32:3. All the calls from the stolen phone came from Bridgeport. Ex. 28 at 55:19-20. Somehow, Brown falsely told Dease and Adger that

42

he gave the phone back to Vernon Horn after making the first three calls. Ex. 55 at

NH000123-124; Ex. 3 at 203:20-204:17. That lie fit with the Detectives' preexisting

fabrication that Horn lent the phone to Pearson, but it never happened.

Similarly, by the time the Detectives interviewed Brown, they knew that Vernon

Horn had waited outside the deli for an extended period to be interviewed by police after

the murder. Ex. 3 at 185:1-9. The interview did not start until 30-40 minutes after the 911

dispatch—no earlier than 4:02 a.m. Ex. 29 at TT-114:7-14, 121:11-18. The first call from

the stolen phone occurred at 4:14 am. Ex. 46. It came from the north side of Bridgeport.

*Infra*. It was impossible for Vernon Horn to make it all the way to Bridgeport by 4:14

a.m. after starting an interview with police outside the Dixwell Deli no earlier than 4:02.

Ex. 77. Given what the Detectives already knew about the timeline, the only way they

could put Vernon Horn in the getaway car with Steve Brown is if Brown said the first call

happened *on the way* to Bridgeport. Somehow, conveniently, that is what Brown did.

108.    A hearing on a Motion to Suppress Brown's identification of Horn and Jackson

was conducted at the criminal trial and denied by the Court. (Ex. 61, Crim. Trial Tr., 105:17-

107:4, Apr. 10, 2000).

**RESPONSE**: Undisputed.

109.    Prior to recording Brown's statement, the detectives conducted a "pre-interview."

A pre-interview was conducted before every recorded statement and was the practice and

procedure of the NHPD. (Ex. 15, Adger Dep. 64:17-65:9, Dec. 11, 2019).

**RESPONSE**: Undisputed.

110.    The pre-interview is conducted to relax the witness, ask preliminary questions,

and learn if the witness has relevant information. (Ex. 15, Adger Dep. 66:1-9, Dec. 11, 2019; Ex.

62, Kendall Dep. 101:8-102:14, Feb. 12, 2020).

**RESPONSE**: Disputed. The purpose of pre-interviews was to filter out helpful or valuable information from witnesses and preserve it in formal recorded statements, while simultaneously suppressing unhelpful information from witnesses. *See* Wearing Dep. at 92:1-13 (the purpose of witness pre-interviews was to "talk to a witness and figure out what they have to offer a detective"); *id.* at 85:3-16 (detectives conducted pre-interviews to determine if the information a witness had "[was] of any value to the case"); *id.* at 86:14-23 (explaining that NHPD officers would talk to the witness during pre-interviews "to find out if they [had] something of value for [the detective]"); *id*. at 89:16-19 ("Q: So it's important [for an NHPD officer] to first assess whether someone has something valuable to say and then record it if they do? [Chief Wearing]: Yes."); Sullivan Dep. at 43:2-5 (explaining that NHPD detectives conducted off-tape pre-interviews "[t]o see if the statement was worth taking"). If, during a pre-interview, a detective learned that the witness could help the detective in the case, *then* the detective would take a formal recorded witness statement. Wearing Dep. at 94:5-21 ("If you have something to offer use, we'll take a statement. If you do not, you know, we'll send you home."), 79:9-15 ("If the witness can help you in the case, fine. If he can't help you, then so be it. You let that person go and see if you can find another witness."). If, during a pre-interview, a detective learned that the witness could not help the detective in the case, the detective would send the witness home without recording a statement. *Id.*

111.    It is the practice and procedure of NHPD detectives, including Adger, not to share information about the investigation with a witness during a pre-interview. The only objective of a pre-interview was to find out what the witness knows. (Ex. 15, Adger Dep. 66:10-67:11, Dec. 11, 2019).

**RESPONSE**: Disputed that the only objective of a pre-interview was to find out what the witness knows. As explained in ¶ 110, *supra*, the objective of a pre-interview was to filter out helpful or valuable information from witnesses and preserve it in formal recorded statements, while simultaneously suppressing unhelpful information from witnesses.

Further disputed that it was the practice and procedure of NHPD detectives not to share information about the investigation with a witness during a pre-interview. In this case alone, the Detectives repeatedly shared information about the investigation with witnesses during pre-interviews. For example, during the pre-interview, Dease and Breland repeatedly showed Thompson photos of Horn and Jackson and asked him "Do[] these eyes match the eyes that you seen?" Ex. 7 at 49:5-15. The Detectives kept the two photographs in front of Thompson for "[t]he whole interview," *i.e.*, about two hours. *Id.* at 87:19-21. The Detectives also repeatedly told Thompson that Horn's eyes had a "yellow shade." *Id.* at 65:9-16, 66:1-14, 227:21-228:2. During their pre-interview of Pearson on February 3, Ex. 4 at 218:21-219:4, Dease and Breland told Pearson that Horn had a cell phone, that Pearson borrowed the phone, and that Pearson used Horn's phone to call Sykes. "[T]he whole idea of Vernon Horn giving you a cell phone and you calling Crystal Sykes, that whole idea came from the detectives, right? A: Yes." Ex. 6 at 72:5-8; *id.* at 57:9-10 (same); *id.* at 67:1-15 (same); *id.* at 71:19-22 (same); *id.* at 109:1-4 (Detectives gave Pearson the number; "they told me I called Crystal Sykes"). The Detectives did this "over and over again." *Id.* at 67:6-11.

In addition, the NHPD had a longstanding policy, custom, or practice of coercing and fabricating witness statements during pre-interviews, including by sharing information about an investigation with a witness during a pre-interview, as illustrated by the following:

The testimony of Defendants' own experts place this fact in dispute. The City's expert, Stine, spent 240 hours reviewing the complete record in this case, Ex. 25 at 13:19-14:21, including the depositions of Pearson and Thompson, *id.* at 110:15-22. Notwithstanding Pearson's and Thompson's testimony that they were coerced by the Detectives into giving false, fabricated statements incriminating Horn, *see supra*, Stine concluded that Detectives Breland, Dease, and Adger at all times acted in accordance with NHPD policy, practice, and procedure. Ex. 25 at 65:23-66:11.

The Detectives' expert, Spector, also spent "hundreds of hours" conducting a "thorough review" of the evidence in this case, Ex. 26 at 23:4-9, including Pearson's and Thompson's depositions, *id.* at 35:2-13, 178:21-24. Notwithstanding Pearson's and Thompson's testimony that they were coerced by the Detectives into giving false, fabricated statements incriminating Horn, *see supra*, Spector also concluded that, "throughout the entire tenure of the Dixwell Deli case," "[e]verything [the Detectives] did would be in conformance with policy and procedure" of the NHPD, *id.* at 24:2-16, and "I didn't see *anything* [the Detectives] did that violated any [NHPD] policy or procedure," *id.* (emphasis added).

The NHPD has a long history of coercing witnesses and fabricating evidence. For example, in a 1985 robbery/sexual assault case, NHPD officers "suggested to [a witness] that [a suspect] was involved in the crimes," cocerced the witness "into making the statement implicating [the suspect]," and had the witness sign his false statement without reading it. *State v. Harris*, 22 Conn. App. 329, 330-34 (1990).

During a 1991 homicide investigation, NHPD Detective Joseph Greene interrogated a witness names Timothy Davis. *See* Ex. 59 at 3-15 (Davis Test.) at 3-15. Davis was only 17 years old and weighed only 100 pounds at the time. *Id.* at 11, 16.

46

During Davis's interrogation at the NHPD station, Detective Greene and two or three other NHPD officers "were doing a lot of yelling, slamming their hands all up in [Davis's] face, slamming them on the table . . . [t]hey just kept on coming up on [him]." *Id.* at 11. Detective Greene threatened Davis and told him that if he "didn't cooperate that [he] would receive forty to sixty years in jail." *Id.* at 12. Detective Greene's threats happened off-the-record—the tape recorder was not on at the time. *Id.* at 13. Davis asked for a lawyer during his interrogation and Detective Greene responded, "if you didn't do nothing why should you need a lawyer?" *Id.* at 13-14. Detective Greene suggested a motive for the shooting and also told Davis to say that he had been the getaway driver, even though Davis had told Greene that he could not drive. *Id.* at 5, 39-40.

During another 1991 homicide investigation, NHPD Detective Greene coerced two witnesses into giving false, fabricated statements inculpating a man named Daryl Valentine in another homicide investigation that same year. *State v. Valentine*, 255 Conn. 61, 65-67 (2000). During his investigation of a New Haven double homicide, Detective Greene interrogated a witness named Kristina Higgins. *Id.* Detective Greene threatened Higgins with jail time and gave her alcohol, cigarettes, and money to buy cocaine—all while another NHPD officer, Detective DiLullo, was also present. Ex. 60 (Higgins Testimony) at 116-18, 127-37. Higgins testified about Detective Green's coercive interrogation at Valentine's criminal trials in 1994 and 1998. *See Valentine*, 255 Conn. at 63-67. Another witness in the Valentine case, Coleman, also testified at the 1994 trial that her witness statement had also been fabricated due to Detective Greene's coercion and bribes. *Id.*

From 1991 to 1992, NHPD Detective Billy White assisted New York City Police Department officers in their investigation of a New Haven resident, Derrick Hamilton,

47

for the murder of Nathaniel Cash, who was shot to death in front of his home in Brooklyn, New York. *Hamilton v. City of New York*, No. 15 Civ. 4574, 2019 WL 1452013, at *2, *4 (E.D.N.Y. Mar. 19, 2019). Hamilton had an alibi witness, Alphonso Dixon, who threw a party the day of the murder that Hamilton attended. *Id.* at *8. Early one morning in 1992, Detective White arrived at the home of Alphonso Dixon and his wife Mattie, and, according to Mattie Dixon's sworn affidavit, "was very angry with [Alphonso] for being [Hamilton's] alibi. Detective White became forceful by handcuffing Alphonso and searched his pockets finding drugs and threatened Alphonso with jail. Detective White calmed down after [Alphonso] agreed not to be [Hamilton's] alibi." *Id.* At a deposition in Hamilton's later civil rights case, Mattie Dixon further testified that she saw her husband "start crying when [Detective White] went to put the handcuffs on" and said that Alphonso was "scared of [Detective White]. Very scared." *Id.* She explained that, in her presence, Detective White threatened Alphonso and told him, "If you go to court [to testify at Hamilton's criminal trial], I've got the handcuffs as soon as you walk out the courthouse." *Id.* She witnessed Detective White dangle handcuffs before her husband while the detective was threatening him. *Id.*

While investigating a double homicide from 1991-92, NHPD Detective Vincent Raucci threatened witness Jose Roque into giving a false inculpatory statement. Ex. 58 (FBI Report) at SM012282. Raucci "provided all of the information in the signed statement" and provided Roque the answers he wanted, and Roque "would in turn parrot the answer on to the tape." *Id.* In reality, Roque did not have any information connecting the two targets of the investigation to the double homicide. *Id.* During the same 1991-92 investigation, Detective Raucci pressured witness Milly Martinez "into giving [her] sworn oral statement" and, while Raucci took the statement, he "started and stopped the

48

tape recorder he used to take the statement in order to tell [Martinez] what to say on tape." *Id.* at SM012321. Detective Raucci similarly fabricated an inculpatory witness statement and photo identification of a suspect by yet another witness, Hector Ortiz. *Id.* at SM012369. Raucci told Ortiz that he had to provide a statement inculpating the suspect, and then proceeded to tell Ortiz what to say prior to tape recording the statement. *Id.* Raucci frequently stopped the tape to instruct Ortiz what to say on the recording. *Id.* Finally, Detective Raucci fabricated a coerced statement from a witness named Ovil Ruiz. Late one evening, Ruiz was arrested and brought to the NHPD Detective Division for an interrogation. Ex. 61 (Sweeney Test.) at 12-13. NHPD Sergeant Sweeney, who was Detective Raucci's supervisor at the time, interviewed Ruiz alone for over an hour and a half during which Ruiz insisted he knew nothing about the double homicide. *Id*. at 11, 13-14, 17. Detective Raucci then joined the interrogation and, in front of Sergeant Sweeney, his supervisor, Raucci provided Ruiz with facts about the double homicide contrary to police protocol. *Id*.at 14-16, 21-22, 43-44, 73. Detective Raucci promised Ruiz that he would be let go if he provided a statement inculpating two suspects. *Id*. at 16, 18. Sergeant Sweeney took Detective Raucci aside twice to scold him for crossing the line with Ruiz, but nevertheless permitted Raucci to continue interrogating Ruiz. *Id*. at 14-19. Detective Raucci eventually finished taking Ruiz's witness statement in the presence of another NHPD detective, but without Sergeant Sweeney in the room. *Id*. at 17-19. Sergeant Sweeney later found out that someone had been arrested for the double homicide and that the warrant for the arrest was predicated Ruiz's bogus witness statements. *Id*. at 32-33, 67. In response, Sweeney told his supervisor: "Are you crazy? You should tell [State's Attorney] Dearington about this" because Ruiz's statement was false. *Id*. at 67. However, even though Sweeney personally witnessed Raucci coerce Ruiz

into providing a false inculpatory witness statement, Sweeney never formally documented or reported Raucci's misconduct. *Id*. at 20, 49, 54-55.

In 1998, it was "consistent with [Detective Coppola's] training at the New Haven Police Department" to threaten to arrest a witness as a conspirator in a murder case if the witness did not help the detective by providing a statement. Coppola Dep. at 30:21-33:2.

In 2001, Detectives Breland and Coppola picked up Ralph Ford, a juvenile, and brought him to the police station for an interrogation. Ex. 62 (Ford Testimony) at 121:1, 157:2-159:25, 162:14-169:23. During an off-the-record pre-interview, Breland and Coppola coerced Ford into giving a statement inculpating another person by threatening Ford with 30 years in prison. *Id.* at 164:1-20, 165:17-166:19, 171:16-23. Ford's parents were not present in the interrogation room when he gave his statement. *Id.* at 165:20-23. Detectives Breland and Coppola later coerced a second, corrected statement from Ford that included additional details about the murder weapon. *Id.* at 172:5-174:17.

In 2006, NHPD Detectives Michael Quinn and Clarance Willoughby, a 24-year veteran of the NHPD, investigated a homicide. Detectives Quinn and Willoughby interrogated Bobby Johnson, who was only 16 years old at the time and had cognitive limitations and limited education, without a parent or lawyer present. Ex. 63 (B. Johnson 2012 Testimony) at BJ03154:13-18; Johnson SJ Order at 6. During Johnson's interrogation, the detectives threatened Johnson that if he did not cooperate and give the detectives the statement they wanted he could get the death penalty, and that he would never see his family again. *Id.* at BJ03124:14-16, BJ03153:12-21; Order, Dkt. 277, *Johnson v. City of New Haven*, No. 17 Civ. 1479 (D. Conn. Apr. 13, 2020) ("Johnson SJ Order") at 5-6. The detectives then told Johnson that if he cooperated and gave the

statement they wanted he would only get ten years' probation. Ex. 63 at BJ03124:13-19, BJ03129:17-27.

As a result of the detectives harassing and threatening Johnson, telling him that they would not let him leave until he confessed, and promising that he would only get parole if he cooperated, Johnson capitulated and gave the detectives an inculpatory recorded witness statement. *Id.* at BJ03153:12-25, 3126:20-27. Before they turned on the tape to record Johnson's statement, the detectives rehearsed the statement with Johnson and corrected him along the way. *Id.* at BJ03126:16-19, BJ03127:8-12. The detectives also showed Johnson photos of the victim, and Johnson's description of the victim matched the specific details in the photograph. *Id.* at BJ03124:20-03125:6, BJ03124:26-3125:6. After Johnson gave the statement the detectives wanted, they told him that if he ever told anyone about what happened during the interrogation, his probation deal would be off. *Id.* at BJ03132:27-3133:7.

After the detectives obtained a confession from Johnson, they interrogated his cousin, Michael Holmes. Ex. 64 (Holmes 2012 Testimony) at BJ03316:16-03318:1. Holmes denied having any knowledge of the homicide but Detectives Quinn and Willoughby told him that if he did not give a statement, they would arrest him. Ex. 67 (Holmes 2008 Testimony) at BJ01788:3-01789:4. The detectives then had Holmes record a fabricated statement that was consistent with Johnson's statement. Ex. 64 at BJ03320:1-14.

Detectives Willoughby, Quinn, and two other NHPD officers, including a supervising sergeant, then brought Johnson back to the police station for another interrogation. Ex. 68 (B. Johnson 2008 Testimony) at BJ02019:8-27, BJ02070:26-02071:22. Detectives Willoughby and Quinn questioned Johnson once again without any

parent or attorney present. *Id.* at BJ02014:19–24, BJ02017:23–02018:12, BJ02020:4–02021:2, BJ02032:10–18; Ex. 63 at BJ03154:13–18, BJ03136:13–BJ03137:9, BJ03138:4–9. Even though Johnson kept telling the detectives that he was not involved in the homicide, Detective Willoughby told him that he needed to "fix [his] statement, or the deal was going to be off." Ex. 63 at BJ03136:25-03137:13, 03138:4-9, 03151:10-27. Detective Willoughby became aggressive and yelled at Johnson, *id.* at 03151:10-27, and the detectives told him that he was going to face the death penalty if he did not provide the statement they wanted, *id.* at BJ02014:12-18. Johnson caved and gave the officers a new statement because he believed that if he didn't, he would get the death penalty. Ex. 68 at BJ02014:12-02015:13, BJ02024:8-02025:26.

Detectives Quinn and Willoughby then coerced another confession from another juvenile witness: 14-year-old Kwame Wells-Jordan. During the detectives' initial interview of Wells-Jordan, he denied any involvement in the homicide and gave the detectives an alibi that corroborated Johnson's initial story. Ex. 70 (J. Sykes 2007 Aff.) at ¶ 9. Three days later, Wells-Jordan was arrested at his middle school and brought to the police station for an interrogation. *Id.* ¶ 10. Detectives Willoughby and Quinn interrogated Wells-Jordan with his aunt Julia Sykes present and told Wells-Jordan that if he didn't tell them what they wanted him to say, they were going to arrest him. Ex. 69 (J. Sykes Dep.) at 128:10-129:10, 130:11-131:2. Eventually, the detectives' supervisor entered the interrogation room and falsely told Julia Sykes that they had Wells-Jordan's fingerprints and he should just implicate himself in the murder to make the interrogation easier on everyone. Ex. 65 (J. Sykes 2012 Testimony) at BJ03283:4-11. Sykes gave in to the pressure and told her nephew to say that he was at the scene of the crime. Ex. 6 at 137:9-12. Sykes later explained: "At this point and being interrogated by

somebody over and over and over again and you continuing to tell them no and they're continuing to tell you that you were there, you're getting frustrated and you're trying to figure out what to do, how to do and you're alone, just you and your child, what would you do?" *Id.* at 137:9-20.

While taking Wells-Jordan's coerced statement, Detectives Quinn and Willoughby followed the same playbook once again. The detectives fed Wells-Jordan the details he provided in his statement, showed him photos of the murder weapon and the victim's car, and told him how the shooting happened. Ex. 66 (J. Sykes 2008 Testimony) at BJ2781:5-2782:16, 2785:15-2786:20; Ex. 686 at BJ03245:1-16; Ex. 69 at 116:1-15, 112:25-114:13, 121:7-122:2. Wells-Jordan then provided a tape-recorded statement repeating the detectives' story. Ex. 66 at 2820:14-2821:1; Ex. 69 at 139:22-140:24.

Johnson eventually pled guilty to murdering Fields. Johnson SJ Order at 12. Prior to pleading guilty, he told his attorney that his confession was coerced and that he had nothing to do with Fields' murder. *Id.* The state went on to prosecute Wells-Jordan for his purported involvement in the Fields homicide. *Id.* at 13. During that trial, Holmes and Johnson both recanted their statements, which they testified were made up and coerced by the detectives. *Id.* Well-Jordan was acquitted of all charges. *Id.*

112.    Detectives may take notes during a pre-interview, but it was not required or departmental policy to take notes. Adger took notes during pre-interviews, but her practice was to discard her notes after transposing them into her police report. That is what she did with her notes from the Brown pre-interview. (Ex. 17, Adger Aff. ¶15; Ex. 63, Wearing Dep. 112:16-23, Mar. 16, 2020; Ex. 15, Adger Dep. 68:10-18, 69:3-12, Dec. 11, 2019; Ex. 64, Cain Dep. 96:7-21, Dec. 9, 2019).

**RESPONSE**: Undisputed that detectives may take notes during a pre-interview, but it was not required or departmental policy to take notes. Undisputed that Adger's general practice was to take notes during pre-interviews.

Disputed that Adger's practice was to discard her notes after transposing them into her police report. Rather, Adger's "personal practice was to throw away [her] notes from the pre-interview." Ex. 3 at 69:3-5; *see id.* 182:25-183:9 (testifying that any notes from the pre-interview of Brown "would have been thrown away" or "recycled").

Disputed that Adger threw away her notes from the Brown pre-interview only after transposing them into her police report. Adger claims in her affidavit to have transposed her notes into her "written report," but identifies no police report in which this pre-interview discussion is purportedly recreated. *See* Adger Aff. The jury could infer from both the spoliation of Adger's notes, *see supra* ¶ 112, and the fact that the preinterview lasted an entire hour, Ex. 3 at 181:9-11, 181:21-24, that it was materially different from Brown's taped statement. In fact, during the preinterview, Dease and Adger fabricated Brown's identification of Horn and Jackson. They were determined to put the crime on their "two guys" regardless of whether Brown's statements supported it, Ex. 32 at HHT-00847, and Brown made impossible statements consistent with their other fabrications and private knowledge. *See* ¶ 107, *supra*.

113.    After transposing notes into a report, detectives had the option to keep their notes, file them, or discard them. (Ex. 63, Wearing Dep. 115:2-10, Mar. 16, 2020; Ex. 62, Kendall Dep. 74:20-75:7, 76:23-77:11, Feb. 12, 2020).

**RESPONSE**: Undisputed that detectives who happened to transpose their notes into a report had the option to keep their notes, file them, or discard them. Disputed to the extent it implies that the NHPD had a policy, custom, or practice of only destroying notes

after transposing them into a report. *See* Ex. 16 (Kendall Dep.) at 75:3-7 (noting that "*[s]ome detectives*, I believe back then, would take their notes and reduce them to a report and get rid of their notes"). To the contrary, NHPD policy did not require officers to log their notes into evidence, Ex. 5 at 174:9-14, and did not require officers to preserve their notes for a certain amount of time, Ex. 14 at 114-23:115:1. In Breland's sixteen years on the force, nobody ever trained him not to destroy his notebooks. Ex. 4 at 70:12-20, 72:6-8. It was simply "left up to the discretion of each individual detective." *Id.* at 72:9-13; *see* Ex. 14 at 115:2-10 ("It's up to the detective.").

114.    In a taped interview, Brown told Dease and Adger the following facts, that were consistent with his pre-interview (Adger Aff. ¶15):

a)    Brown knew Jackson by the nickname, "Son," and Horn by the nickname, "Tye or Trae." (Ex. 11, Brown Statement 4-5, DET00855-856, Mar. 10, 1999).

**RESPONSE:** Undisputed that Brown made this claim in his taped statement. Disputed that it is consistent with Brown's pre-interview. Adger claims in her affidavit to have transposed her notes into her "written report," but identifies no police report in which this pre-interview discussion is purportedly recreated. *See* Adger Aff. The jury could infer from both the spoliation of Adger's notes, *see supra* ¶ 112, and the fact that the preinterview lasted an entire hour, Ex. 3 at 181:9-11, 181:21-24, that it was materially different from Brown's taped statement. In fact, during the preinterview, Dease and Adger fabricated Brown's identification of Horn and Jackson. They were determined to put the crime on their "two guys" regardless of whether Brown's statements supported it, Ex. 32 at HHT-00847, and Brown made impossible statements consistent with their other fabrications and private knowledge, *see supra* ¶ 107. Further disputed that this claim by Brown is a "fact." Horn and Jackson had never met Brown in their lives up until that point. Ex. 1 at 106:3-109:20; Ex. 2 at 116:23-118:22.

b)    Brown had met Horn and Jackson two or three times before January 24, 1999. Brown had heard they were hustlers making a living on the street. (Ex. 11, Brown Statement 6, 18, DET00857, DET00869, Mar. 10, 1999).

**RESPONSE**: Undisputed that Brown made this claim in his taped statement. Disputed that it is consistent with Brown's pre-interview. Adger claims in her affidavit to have transposed her notes into her "written report," but identifies no police report in which this pre-interview discussion is purportedly recreated. *See* Adger Aff. The jury could infer from both the spoliation of Adger's notes, *see*

*supra* ¶ 112, and the fact that the preinterview lasted an entire hour, Ex. 3 at
181:9-11, 181:21-24, that it was materially different from Brown's taped
statement. In fact, during the preinterview, Dease and Adger fabricated Brown's
identification of Horn and Jackson. They were determined to put the crime on
their "two guys" regardless of whether Brown's statements supported it, Ex. 32 at
HHT-00847, and Brown made impossible statements consistent with their other
fabrications and private knowledge, *see supra* ¶ 107. Further disputed that this
claim by Brown is a "fact." Horn and Jackson had never met Brown in their lives.
Ex. 1 at 106:3-109:20; Ex. 2 at 116:23-118:22.

c)       On January 24, they met at a club and smoked weed and chilled for two hours.
         (Ex. 11, Brown Statement 6-7, DET00857-858, Mar. 10, 1999).

         **RESPONSE**: Undisputed that Brown made this claim in his taped statement.
         Disputed that it is consistent with Brown's pre-interview. Adger claims in her
         affidavit to have transposed her notes into her "written report," but identifies no
         police report in which this pre-interview discussion is purportedly recreated. *See*
         Adger Aff. The jury could infer from both the spoliation of Adger's notes, *see*
         *supra* ¶ 112, and the fact that the preinterview lasted an entire hour, Ex. 3 at
         181:9-11, 181:21-24, that it was materially different from Brown's taped
         statement. In fact, during the preinterview, Dease and Adger fabricated Brown's
         identification of Horn and Jackson. They were determined to put the crime on
         their "two guys" regardless of whether Brown's statements supported it, Ex. 32 at
         HHT-00847, and Brown made impossible statements consistent with their other
         fabrications and private knowledge, *see supra* ¶ 107. Further disputed that this
         claim by Brown is a "fact." Horn and Jackson had never met Brown in their lives.
         Ex. 1 at 106:3-109:20; Ex. 2 at 116:23-118:22. They were also in New Haven all
         night. *See* Ex. 1 at 141:21-142:9 (club); *id.* at 150:4-151:9 (diner); Ex. 9 at 14:19-
         15:1 (meet up with Zaneta); *id.* at 24:20-22 (stop at Deli).

d)       The three then drove to New Haven, stopped at a "chick's" house, and then drove
         to the Deli. (Ex. 11, Brown Statement 8-9, DET00859-860, Mar. 10, 1999).

         **RESPONSE**: Undisputed that Brown made this claim in his taped statement.
         Disputed that it is consistent with Brown's pre-interview. Adger claims in her
         affidavit to have transposed her notes into her "written report," but identifies no
         police report in which this pre-interview discussion is purportedly recreated. *See*
         Adger Aff. The jury could infer from both the spoliation of Adger's notes, *see*
         *supra* ¶ 112, and the fact that the preinterview lasted an entire hour, Ex. 3 at
         181:9-11, 181:21-24, that it was materially different from Brown's taped
         statement. In fact, during the preinterview, Dease and Adger fabricated Brown's
         identification of Horn and Jackson. They were determined to put the crime on
         their "two guys" regardless of whether Brown's statements supported it, Ex. 32 at
         HHT-00847, and Brown made impossible statements consistent with their other
         fabrications and private knowledge, *see supra* ¶ 107. Further disputed that this
         claim by Brown is a "fact." Horn and Jackson had never met Brown in their lives.
         Ex. 1 at 106:3-109:20; Ex. 2 at 116:23-118:22. They did not "drive to New

Haven" because they were already in New Haven. *See* Ex. 1 at 141:21-142:9 (club); *id.* at 150:4-151:9 (diner); Ex. 9 at 14:19-15:1 (meet up with Zaneta); *id.* at 24:20-22 (stop at Deli).

e)    Before entering the store, Brown observed a cab pull up to the Deli and two men entered the store. Horn, Jackson, and Brown then exited their car and entered the store. (Ex. 11, Brown Statement 9, 16, DET00860, DET00867, Mar. 10, 1999).

**RESPONSE**: Undisputed that Brown made this claim in his taped statement. Disputed that it is consistent with Brown's pre-interview. Adger claims in her affidavit to have transposed her notes into her "written report," but identifies no police report in which this pre-interview discussion is purportedly recreated. *See* Adger Aff. The jury could infer from both the spoliation of Adger's notes, *see supra* ¶ 112, and the fact that the preinterview lasted an entire hour, Ex. 3 at 181:9-11, 181:21-24, that it was materially different from Brown's taped statement. In fact, during the preinterview, Dease and Adger fabricated Brown's identification of Horn and Jackson. They were determined to put the crime on their "two guys" regardless of whether Brown's statements supported it, Ex. 32 at HHT-00847, and Brown made impossible statements consistent with their other fabrications and private knowledge, *see supra* ¶ 107. Further disputed that this claim by Brown is a "fact." Ex. 1 at 106:3-109:20; Ex. 2 at 116:23-118:22. At the time the crime was occurring, Horn was at the rooming house on West Ivy Street interrupting a phone call between Pearson and Zaneta and speaking briefly to Pearson. Ex. 1 at 160:21-161:17; Ex. 9 at 67:19-25; Ex. 6 at 34:9-37:4.

f)    Horn entered the store first and started firing at the people in the store with a 9-millimeter Beretta. (Ex. 11, Brown Statement 10-11, DET00861-862, Mar. 10, 1999).

**RESPONSE**: Undisputed that Brown made this claim in his taped statement. Disputed that it is consistent with Brown's pre-interview. Adger claims in her affidavit to have transposed her notes into her "written report," but identifies no police report in which this pre-interview discussion is purportedly recreated. *See* Adger Aff. The jury could infer from both the spoliation of Adger's notes, *see supra* ¶ 112, and the fact that the preinterview lasted an entire hour, Ex. 3 at 181:9-11, 181:21-24, that it was materially different from Brown's taped statement. In fact, during the preinterview, Dease and Adger fabricated Brown's identification of Horn and Jackson. They were determined to put the crime on their "two guys" regardless of whether Brown's statements supported it, Ex. 32 at HHT-00847, and Brown made impossible statements consistent with their other fabrications and private knowledge, *see supra* ¶ 107. Further disputed that this claim by Brown is a "fact." Horn and Jackson had never met Brown in their lives. Ex. 1 at 106:3-109:20; Ex. 2 at 116:23-118:22. At the time the crime was occurring, Horn was at the rooming house on West Ivy Street interrupting a phone call between Pearson and Zaneta and speaking briefly to Pearson. Ex. 1 at 160:21-161:17; Ex. 9 at 67:19-25; Ex. 6 at 34:9-37:4.

g)   One person was shot and was laying on the ground, choking on blood. (Ex. 11, Brown Statement 13, DET00864, Mar. 10, 1999).

**RESPONSE**: Undisputed that Brown made this claim in his taped statement. Disputed that it is consistent with Brown's pre-interview. Adger claims in her affidavit to have transposed her notes into her "written report," but identifies no police report in which this pre-interview discussion is purportedly recreated. *See* Adger Aff. The jury could infer from both the spoliation of Adger's notes, *see supra* ¶ 112, and the fact that the preinterview lasted an entire hour, Ex. 3 at 181:9-11, 181:21-24, that it was materially different from Brown's taped statement. In fact, during the preinterview, Dease and Adger fabricated Brown's identification of Horn and Jackson. They were determined to put the crime on their "two guys" regardless of whether Brown's statements supported it, Ex. 32 at HHT-00847, and Brown made impossible statements consistent with their other fabrications and private knowledge, *see supra* ¶ 107. Further disputed that this claim by Brown is a "fact," to the extent it implies participation by Horn and/or Jackson Horn and Jackson had never met Brown in their lives. Ex. 1 at 106:3-109:20; Ex. 2 at 116:23-118:22. At the time the crime was occurring, Horn was at the rooming house on West Ivy Street interrupting a phone call between Pearson and Zaneta and speaking briefly to Pearson. Ex. 1 at 160:21-161:17; Ex. 9 at 67:19-25; Ex. 6 at 34:9-37:4. Undisputed, however, that a person was shot inside the Deli and lay on the ground choking on blood.

h)   Brown went to the back of the store and saw a person in a chair and another trying to hide. (Ex. 11, Brown Statement 12, DET00863, Mar. 10, 1999).

**RESPONSE**: Undisputed that Brown made this claim in his taped statement. Disputed that it is consistent with Brown's pre-interview. Adger claims in her affidavit to have transposed her notes into her "written report," but identifies no police report in which this pre-interview discussion is purportedly recreated. *See* Adger Aff. The jury could infer from both the spoliation of Adger's notes, *see supra* ¶ 112, and the fact that the preinterview lasted an entire hour, Ex. 3 at 181:9-11, 181:21-24, that it was materially different from Brown's taped statement. In fact, during the preinterview, Dease and Adger fabricated Brown's identification of Horn and Jackson. They were determined to put the crime on their "two guys" regardless of whether Brown's statements supported it, Ex. 32 at HHT-00847, and Brown made impossible statements consistent with their other fabrications and private knowledge, *see supra* ¶ 107. Further disputed that this claim by Brown is a "fact," to the extent it implies participation by Horn and/or Jackson Horn and Jackson had never met Brown in their lives. Ex. 1 at 106:3-109:20; Ex. 2 at 116:23-118:22. At the time the crime was occurring, Horn was at the rooming house on West Ivy Street interrupting a phone call between Pearson and Zaneta and speaking briefly to Pearson. Ex. 1 at 160:21-161:17; Ex. 9 at 67:19-25; Ex. 6 at 34:9-37:4. Undisputed, however, that Brown went to the back room of the deli and saw two people.

i)      Brown said he knocked some boxes off the desk. (Ex. 11, Brown Statement 13, DET00864, Mar. 10, 1999).

**RESPONSE** Undisputed that Brown made this claim in his taped statement. Disputed that it is consistent with Brown's pre-interview. Adger claims in her affidavit to have transposed her notes into her "written report," but identifies no police report in which this pre-interview discussion is purportedly recreated. *See* Adger Aff. The jury could infer from both the spoliation of Adger's notes, *see supra* ¶ 112, and the fact that the preinterview lasted an entire hour, Ex. 3 at 181:9-11, 181:21-24, that it was materially different from Brown's taped statement. In fact, during the preinterview, Dease and Adger fabricated Brown's identification of Horn and Jackson. They were determined to put the crime on their "two guys" regardless of whether Brown's statements supported it, Ex. 32 at HHT-00847, and Brown made impossible statements consistent with their other fabrications and private knowledge, *see supra* ¶ 107. Further disputed that this claim by Brown is a "fact," to the extent it implies participation by Horn and/or Jackson Horn and Jackson had never met Brown in their lives. Ex. 1 at 106:3-109:20; Ex. 2 at 116:23-118:22. At the time the crime was occurring, Horn was at the rooming house on West Ivy Street interrupting a phone call between Pearson and Zaneta and speaking briefly to Pearson. Ex. 1 at 160:21-161:17; Ex. 9 at 67:19-25; Ex. 6 at 34:9-37:4. Undisputed, however, that Brown knocked boxes in the back room off the desk.

j)      Brown thought Horn took a cell phone from the back room. (Ex. 11, Brown Statement 13, DET00864, Mar. 10, 1999).

**RESPONSE**: Undisputed that Brown made this claim in his taped statement. Disputed that it is consistent with Brown's pre-interview. Adger claims in her affidavit to have transposed her notes into her "written report," but identifies no police report in which this pre-interview discussion is purportedly recreated. *See* Adger Aff. The jury could infer from both the spoliation of Adger's notes, *see supra* ¶ 112, and the fact that the preinterview lasted an entire hour, Ex. 3 at 181:9-11, 181:21-24, that it was materially different from Brown's taped statement. In fact, during the preinterview, Dease and Adger fabricated Brown's identification of Horn and Jackson. They were determined to put the crime on their "two guys" regardless of whether Brown's statements supported it, Ex. 32 at HHT-00847, and Brown made impossible statements consistent with their other fabrications and private knowledge, *see supra* ¶ 107. Further disputed that this claim by Brown is a "fact," to the extent it implies participation by Horn and/or Jackson Horn and Jackson had never met Brown in their lives. Ex. 1 at 106:3-109:20; Ex. 2 at 116:23-118:22. At the time the crime was occurring, Horn was at the rooming house on West Ivy Street interrupting a phone call between Pearson and Zaneta and speaking briefly to Pearson. Ex. 1 at 160:21-161:17; Ex. 9 at 67:19-25; Ex. 6 at 34:9-37:4.

k)      Horn forced the two guys from the back of the store to the front. (Ex. 11, Brown Statement 13, DET00864, Mar. 10, 1999).

**RESPONSE**: Undisputed that Brown made this claim in his taped statement. Disputed that it is consistent with Brown's pre-interview. Adger claims in her affidavit to have transposed her notes into her "written report," but identifies no police report in which this pre-interview discussion is purportedly recreated. *See* Adger Aff. The jury could infer from both the spoliation of Adger's notes, *see supra* ¶ 112, and the fact that the preinterview lasted an entire hour, Ex. 3 at 181:9-11, 181:21-24, that it was materially different from Brown's taped statement. In fact, during the preinterview, Dease and Adger fabricated Brown's identification of Horn and Jackson. They were determined to put the crime on their "two guys" regardless of whether Brown's statements supported it, Ex. 32 at HHT-00847, and Brown made impossible statements consistent with their other fabrications and private knowledge, *see supra* ¶ 107. Further disputed that this claim by Brown is a "fact," to the extent it implies participation by Horn and/or Jackson Horn and Jackson had never met Brown in their lives. Ex. 1 at 106:3-109:20; Ex. 2 at 116:23-118:22. At the time the crime was occurring, Horn was at the rooming house on West Ivy Street interrupting a phone call between Pearson and Zaneta and speaking briefly to Pearson. Ex. 1 at 160:21-161:17; Ex. 9 at 67:19-25; Ex. 6 at 34:9-37:4.

l)     Jackson was trying to open the cash register. (Ex. 11, Brown Statement 13, DET00864, Mar. 10, 1999).

**RESPONSE**: Undisputed that Brown made this claim in his taped statement. Disputed that it is consistent with Brown's pre-interview. Adger claims in her affidavit to have transposed her notes into her "written report," but identifies no police report in which this pre-interview discussion is purportedly recreated. *See* Adger Aff. The jury could infer from both the spoliation of Adger's notes, *see supra* ¶ 112, and the fact that the preinterview lasted an entire hour, Ex. 3 at 181:9-11, 181:21-24, that it was materially different from Brown's taped statement. In fact, during the preinterview, Dease and Adger fabricated Brown's identification of Horn and Jackson. They were determined to put the crime on their "two guys" regardless of whether Brown's statements supported it, Ex. 32 at HHT-00847, and Brown made impossible statements consistent with their other fabrications and private knowledge, *see supra* ¶ 107. Further disputed that this claim by Brown is a "fact," to the extent it implies participation by Horn and/or Jackson Horn and Jackson had never met Brown in their lives. Ex. 1 at 106:3-109:20; Ex. 2 at 116:23-118:22. Jackson did not commit the crime. Ex. 2 at 206:22-25.

m)     Brown did not have a gun and was given a colored scarf to wear; he stated he was unaware that Horn and Jackson were going to rob the store. (Ex. 11, Brown Statement 16-17, DET00867-868, Mar. 10, 1999).

**RESPONSE**: Undisputed that Brown made this claim in his taped statement. Disputed that it is consistent with Brown's pre-interview. Adger claims in her affidavit to have transposed her notes into her "written report," but identifies no

police report in which this pre-interview discussion is purportedly recreated. *See* Adger Aff. The jury could infer from both the spoliation of Adger's notes, *see supra* ¶ 112, and the fact that the preinterview lasted an entire hour, Ex. 3 at 181:9-11, 181:21-24, that it was materially different from Brown's taped statement. In fact, during the preinterview, Dease and Adger fabricated Brown's identification of Horn and Jackson. They were determined to put the crime on their "two guys" regardless of whether Brown's statements supported it, Ex. 32 at HHT-00847, and Brown made impossible statements consistent with their other fabrications and private knowledge, *see supra* ¶ 107. Further disputed that this claim by Brown is a "fact," to the extent it implies participation by Horn and/or Jackson Horn and Jackson had never met Brown in their lives. Ex. 1 at 106:3-109:20; Ex. 2 at 116:23-118:22.

n)   Brown said he had no choice but to go through with it or get shot. (Ex. 11, Brown Statement 24, DET00875, Mar. 10, 1999).

**RESPONSE**: Undisputed that Brown made this claim in his taped statement. Disputed that it is consistent with Brown's pre-interview. Adger claims in her affidavit to have transposed her notes into her "written report," but identifies no police report in which this pre-interview discussion is purportedly recreated. *See* Adger Aff. The jury could infer from both the spoliation of Adger's notes, *see supra* ¶ 112, and the fact that the preinterview lasted an entire hour, Ex. 3 at 181:9-11, 181:21-24, that it was materially different from Brown's taped statement. In fact, during the preinterview, Dease and Adger fabricated Brown's identification of Horn and Jackson. They were determined to put the crime on their "two guys" regardless of whether Brown's statements supported it, Ex. 32 at HHT-00847, and Brown made impossible statements consistent with their other fabrications and private knowledge, *see supra* ¶ 107. Further disputed that this claim by Brown is a "fact," to the extent it implies participation by Horn and/or Jackson Horn and Jackson had never met Brown in their lives. Ex. 1 at 106:3-109:20; Ex. 2 at 116:23-118:22. At the time the crime was occurring, Horn was at the rooming house on West Ivy Street interrupting a phone call between Pearson and Zaneta and speaking briefly to Pearson. Ex. 1 at 160:21-161:17; Ex. 9 at 67:19-25; Ex. 6 at 34:9-37:4.

o)   Brown did not know how much money was taken, but knew they took a bag full of cigarettes. (Ex. 11, Brown Statement 24-25, DET00875-876, Mar. 10, 1999).

**RESPONSE**: Undisputed that Brown made this claim in his taped statement. Disputed that it is consistent with Brown's pre-interview. Adger claims in her affidavit to have transposed her notes into her "written report," but identifies no police report in which this pre-interview discussion is purportedly recreated. *See* Adger Aff. The jury could infer from both the spoliation of Adger's notes, *see supra* ¶ 112, and the fact that the preinterview lasted an entire hour, Ex. 3 at 181:9-11, 181:21-24, that it was materially different from Brown's taped statement. In fact, during the preinterview, Dease and Adger fabricated Brown's identification of Horn and Jackson. They were determined to put the crime on

their "two guys" regardless of whether Brown's statements supported it, Ex. 32 at HHT-00847, and Brown made impossible statements consistent with their other fabrications and private knowledge, *see supra* ¶ 107. Further disputed that this claim by Brown is a "fact," to the extent it implies participation by Horn and/or Jackson Horn and Jackson had never met Brown in their lives. Ex. 1 at 106:3-109:20; Ex. 2 at 116:23-118:22. At the time the crime was occurring, Horn was at the rooming house on West Ivy Street interrupting a phone call between Pearson and Zaneta and speaking briefly to Pearson. Ex. 1 at 160:21-161:17; Ex. 9 at 67:19-25; Ex. 6 at 34:9-37:4.

p)    After the robbery, the three smoked more weed and on the highway back to Bridgeport, Brown called Willie Sadler from the stolen cell phone. (Ex. 11, Brown Statement 19-20, DET00870-871, Mar. 10, 1999).

**RESPONSE**: Undisputed that Brown made this claim in his taped statement. Disputed that it is consistent with Brown's pre-interview. Adger claims in her affidavit to have transposed her notes into her "written report," but identifies no police report in which this pre-interview discussion is purportedly recreated. *See* Adger Aff. The jury could infer from both the spoliation of Adger's notes, *see supra* ¶ 112, and the fact that the preinterview lasted an entire hour, Ex. 3 at 181:9-11, 181:21-24, that it was materially different from Brown's taped statement. In fact, during the preinterview, Dease and Adger fabricated Brown's identification of Horn and Jackson. They were determined to put the crime on their "two guys" regardless of whether Brown's statements supported it, Ex. 32 at HHT-00847, and Brown made impossible statements consistent with their other fabrications and private knowledge, *see supra* ¶ 107. Further disputed that this claim by Brown is a "fact," to the extent it implies participation by Horn and/or Jackson Horn and Jackson had never met Brown in their lives. Ex. 1 at 106:3-109:20; Ex. 2 at 116:23-118:22. The fourth call came from Bridgeport well north of I-95. Ex. 28 (Wines Dep.) at 31:8-15.

q)    Brown said he later used the stolen phone again to call "AJ," who lived in Stratford. "This chick I know that I was gonna fuck." (Ex. 11, Brown Statement 20-21, DET00871-872, Mar. 10, 1999).'

**RESPONSE**: Undisputed that Brown made this claim in his taped statement. Disputed that it is consistent with Brown's pre-interview. Adger claims in her affidavit to have transposed her notes into her "written report," but identifies no police report in which this pre-interview discussion is purportedly recreated. *See* Adger Aff. The jury could infer from both the spoliation of Adger's notes, *see supra* ¶ 112, and the fact that the preinterview lasted an entire hour, Ex. 3 at 181:9-11, 181:21-24, that it was materially different from Brown's taped statement. In fact, during the preinterview, Dease and Adger fabricated Brown's identification of Horn and Jackson. They were determined to put the crime on their "two guys" regardless of whether Brown's statements supported it, Ex. 32 at HHT-00847, and Brown made impossible statements consistent with their other fabrications and private knowledge, *see supra* ¶ 107.

r)    Brown said he later called Tamika Fuller from the same phone. (Ex. 11, Brown
      Statement 21-22, DET00872-873, Mar. 10, 1999).

      **<u>RESPONSE</u>**: Undisputed that Brown made this claim in his taped statement.
      Disputed that it is consistent with Brown's pre-interview. Adger claims in her
      affidavit to have transposed her notes into her "written report," but identifies no
      police report in which this pre-interview discussion is purportedly recreated. *See*
      Adger Aff. The jury could infer from both the spoliation of Adger's notes, *see
      supra* ¶ 112, and the fact that the preinterview lasted an entire hour, Ex. 3 at
      181:9-11, 181:21-24, that it was materially different from Brown's taped
      statement. In fact, during the preinterview, Dease and Adger fabricated Brown's
      identification of Horn and Jackson. They were determined to put the crime on
      their "two guys" regardless of whether Brown's statements supported it, Ex. 32 at
      HHT-00847, and Brown made impossible statements consistent with their other
      fabrications and private knowledge, *see supra* ¶ 107. Further disputed that this
      claim by Brown is a "fact." The recipient could have been Fuller or Marlo
      Macklin. *See supra* ¶ 79.

s)    Brown said they drove around until the morning and then Brown gave the phone
      back to Horn who told him never to say anything about the robbery. (Ex. 11,
      Brown Statement 22, DET00873, Mar. 10, 1999).

      **<u>RESPONSE</u>**: Undisputed that Brown made this claim in his taped statement.
      Disputed that it is consistent with Brown's pre-interview. Adger claims in her
      affidavit to have transposed her notes into her "written report," but identifies no
      police report in which this pre-interview discussion is purportedly recreated. *See*
      Adger Aff. The jury could infer from both the spoliation of Adger's notes, *see
      supra* ¶ 112, and the fact that the preinterview lasted an entire hour, Ex. 3 at
      181:9-11, 181:21-24, that it was materially different from Brown's taped
      statement. In fact, during the preinterview, Dease and Adger fabricated Brown's
      identification of Horn and Jackson. They were determined to put the crime on
      their "two guys" regardless of whether Brown's statements supported it, Ex. 32 at
      HHT-00847, and Brown made impossible statements consistent with their other
      fabrications and private knowledge, *see supra* ¶ 107. Further disputed that this
      claim by Brown is a "fact," to the extent it implies participation by Horn and/or
      Jackson Horn and Jackson had never met Brown in their lives. The phone
      remained in Bridgeport at the time of the fourth call, Ex. 28 at 27:24-25, while
      Vernon Horn was in New Haven, Ex. 4 at 226:2-7.

115.   The substance of Brown's statement, described by Adger in the arrest warrants

issued for Horn and Jackson, is as follows:

That while the threesome was in the city of New Haven, Jackson stopped the
vehicle in front of a store and all three (3) departed from the vehicle and entered
the store. Brown said that Horn walked into the store first "bussin" (firing rounds

from a 9mm handgun), while Brown and Jackson followed. Jackson remained at the front door while Brown went toward the rear of the deli. While adorned with a scarf around his face, Brown said that he stepped over the body of a male subject lying on the floor and entered a back room. Brown said that he knocked over boxes that were seated on a desk in the back room and then left the back room, stating "after I left the back room, I stepped over the person that was laying there and I heard him choking on his own blood and then that's when I knew he was dead." Brown then said that Jackson was behind the counter attempting to open the cash register and stuffing cigarettes into a bag. Jackson then ran from the store followed by Horn and Brown. The threesome then jumped back into the vehicle and traveled back to Bridgeport, CT.

That Steve Brown said that Vernon Horn was the individual that walked into the store first and began shooting people in the store with a 9mm type handgun and that he, Brown, believed it was Horn that stole the cellular telephone during the commission of the robbery/murder, Brown said that he used the cellular telephone to call Willie Sadler. Brown, in addition, said that he made subsequent telephone calls on the cellular telephone at Adrianne Younger and to Tamika Fuller, respectfully.

(Ex. 65, Adger Dep. Ex. 46, at 9-10; Ex. 66, Adger Dep., Ex. 166 at 9-10; Ex. 10, Dease Report 2, NH000065, Mar. 11, 1999).

**RESPONSE**: Undisputed that this description by Adger of Brown's statement appears in the arrest warrants issues for Horn and Jackson. Disputed that this statement by Adger fairly represents the substance of what occurred with Brown. Dease and Adger fabricated Brown's identification of Horn and Jackson. They were determined to put the crime on their "two guys" regardless of whether Brown's statements supported it, Dease Habeas Testimony HHT-00847, and Brown made impossible statements consistent with their other fabrications and private knowledge, *see supra* ¶ 107. Further disputed that this statement is factual, as Horn and Jackson had never even met Brown, Ex. 1 at 106:3-109:20; Ex. 2 at 116:23-118:22, and had no role in this crime, Ex. 1 at 160:21-161:17; Ex. 9 at 67:19-25; Ex. 2 at Jackson Tr. 206:22-25.

116.    Brown also admitted making four of the five phone calls on the stolen phone's call detail record. The first and fifth calls were placed to Sadler and the third call was to Tamika

Fuller. (Ex. 15, Adger Dep. 54:20-23, Dec. 11, 2019; Ex. 10, Dease Report 2, NH000065, Mar. 11, 1999).

    **RESPONSE**: Admitted that Brown made this statement. Accuracy disputed only as to the recipient of the third call, which could have been Fuller or Macklin. *Supra* ¶ 79.

117.    Brown called Fuller at 10:40 a.m. on January 25. Brown stated he then gave the phone to Horn, who returned it to Brown later in the day. (Ex.15, Adger Dep. 55:10-56:2, Dec. 11, 2019; Ex. 11, Brown Statement 21-22, DET00872-873, Mar. 10, 1999).

    **RESPONSE**: Admitted that Brown made these claims. Disputed that they are accurate. The third call could have been to Fuller or Macklin. *Supra* ¶ 79. Brown never received the phone from Horn or gave the phone to Horn. Horn and Jackson had never met Brown in their lives. Ex. 1 at 106:3-109:20; Ex. 2 at 116:23-118:22. The phone remained in Bridgeport at the time of the fourth call, Ex. 28 at 27:24-25, while Vernon Horn was in New Haven, Ex. 4 at 226:2-7.

118.    Arrest warrants were issued for Horn and Jackson on March 12, 1999, for the charges of murder and robbery. (Ex. 65, Adger Dep. Ex. 46, at 10; Ex. 66, Adger Dep. Ex. 166, at 10; Ex. 67, Dease Report 2, NH000061, Mar. 23, 1999).

    **RESPONSE**: Undisputed.

119.    Horn was arrested on March 22, 1999, and Jackson was arrested on March 24, 1999. (Ex. 67, Dease Report 2, NH000061, Mar. 23, 1999; Ex. 19, Arrest Cards, DET00777-780).

    **RESPONSE**: Undisputed.

120.    On April 10, 2000, Brown testified at the criminal trial of Horn and Jackson. (Ex. 61, Crim. Trial Tr., 107:15-108:15, Apr. 10, 2000).

    **RESPONSE**: Undisputed.

121.    Brown pled guilty to the charges of first-degree accessory to manslaughter with a firearm, and conspiracy to commit robbery. (Ex. 61, Crim. Trial Tr., 109:9-17, Apr. 10, 2000).

**RESPONSE**: Undisputed.

122.    Brown was offered a sentence of 25 years suspended after serving 18 years. He knew his attorney could argue for a shorter sentence after his testimony. (Ex. 61, Crim. Trial Tr., 110:13-111:4, Apr. 10, 2000).

**RESPONSE**: Undisputed.

123.    Brown admitted that when he gave his statement to police on March 10, 1999, he was not entirely truthful because he had been arrested for felony murder and he was afraid of being charged with a killing he did not commit. (Ex. 61, Crim. Trial Tr., 114:5-115:2, Apr. 10, 2000).

**RESPONSE**: Undisputed that Brown so stated and that his statement to police on March 10, 1999 was materially untruthful. Disputed that the sole reason for Brown's untruthfulness was fear of being charged with a killing. *See supra* ¶ 107 (describing Dease and Adger's fabrication of Brown's identification).

124.    Brown testified consistent with the facts in the transcribed statement he gave to the police, however, he also testified that he was not forced to participate in the robbery. (Ex. 68, Crim. Trial Tr., 5:7-22, Apr. 12, 2000).

**RESPONSE**: Disputed. Brown's claims in his transcribed statement to police were not "facts." *See supra* ¶¶ 114(a)-(s) (disputing these purported "facts"). Brown's trial testimony was not "consistent," since Brown retracted his claim that he was forced to participate in the robbery, as the Detectives assert here, and made at least the new claims set forth in ¶ 125 below.

125.    Brown added the following additional facts during his trial testimony:

a)   When Brown, Horn, and Jackson arrived at the Dixwell Deli, they parked the car and stood on the side of the Deli for about a minute. (Ex. 61, Crim. Trial Tr., 122:3-12, Apr. 10, 2000).

**RESPONSE**: Undisputed that Brown so claimed, in sum and substance, during his trial testimony. Disputed that this is a "fact." Horn and Jackson had never even met Brown, Ex. 1 at 106:3-109:20; Ex. 2 at 116:23-118:22, and had no role in this crime, Ex. 1 at 160:21-161:17; Ex. 9 at 67:19-25; Ex. 2 at 206:22-25.

b)   Brown smoked a cigarette and Horn and Jackson smoked cigar-shaped blunts that smelled like magic marker. (Ex. 61, Crim. Trial Tr., 123:2-26, Apr. 10, 2000).

**RESPONSE**: Undisputed that Brown so claimed, in sum and substance, during his trial testimony. Disputed that this is a "fact." Horn and Jackson had never even met Brown, Ex. 1 at 106:3-109:20; Ex. 2 at 116:23-118:22, and had no role in this crime, Ex. 1 at 160:21-161:17; Ex. 9 at 67:19-25; Ex. 2 at 206:22-25.

c)   While they were on the side of the store, Brown stood in the shadows and Horn and Jackson stood near the front of the store. Three or four people entered and left the store, including a female with a leather coat and baseball cap. (Ex. 61, Crim. Trial Tr., 124:18-126:22, Apr. 10, 2000).

**RESPONSE**: Undisputed that Brown so claimed, in sum and substance, during his trial testimony. Disputed that this is a "fact." Horn and Jackson had never even met Brown, Ex. 1 at 106:3-109:20; Ex. 2 at 116:23-118:22, and had no role in this crime, Ex. 1 at 160:21-161:17; Ex. 9 at 67:19-25; Ex. 2 at 206:22-25.

d)   A taxi pulled up and two men got out and walked into the store. Then one exited the store, got into the taxi, and left. (Ex. 61, Crim. Trial Tr., 127:3-128:2, Apr. 10, 2000).

**RESPONSE**: Undisputed that Brown so claimed, in sum and substance, during his trial testimony. Disputed that this is a "fact." Only one passenger, Caprice Hardy, got out of the taxi. Ex. 10 (Worsley Dep.) at 31:10-16; Ex. 3 at 250:20-22.

e)   At that moment, Horn and Jackson said they were going to stick up the store. Jackson handed Brown a scarf to put on his face and Horn and Jackson pulled their "skellies" down. (Ex. 61, Crim. Trial Tr., 128:3-129:24, Apr. 10, 2000).

**RESPONSE**: Undisputed that Brown so claimed, in sum and substance, during his trial testimony. Disputed that this is a "fact." Horn and Jackson had never even met Brown, Ex. 1 at 106:3-109:20; Ex. 2 at 116:23-118:22, and had no role in this crime, Ex. 1 at 160:21-161:17; Ex. 9 at 67:19-25; Ex. 2 at 206:22-25.

f)   One of them handed Brown a small silver gun. Horn had a big squarish gun, "the barrel stuck out a little bit. It could have looked similar to a Beretta or Taurus." Jackson also had a gun. (Ex. 61, Crim. Trial Tr., 130:4-131:6, Apr. 10, 2000).

**RESPONSE**: Undisputed that Brown so claimed, in sum and substance, during his trial testimony. Disputed that this is a "fact." Horn and Jackson had never even met Brown, Ex. 1 at 106:3-109:20; Ex. 2 at 116:23-118:22, and had no role in this crime, Ex. 1 at 160:21-161:17; Ex. 9 at 67:19-25; Ex. 2 at 206:22-25.

g)    Horn entered the Deli with Brown behind him. Horn began shooting multiple shots toward the left side of the store. People inside scattered. (Ex. 61, Crim. Trial Tr., 131:26-133:3, Apr. 10, 2000).

**RESPONSE**: Undisputed that Brown so claimed, in sum and substance, during his trial testimony. Disputed that this is a "fact." Horn and Jackson had never even met Brown, Ex. 1 at 106:3-109:20; Ex. 2 at 116:23-118:22, and had no role in this crime, Ex. 1 at 160:21-161:17; Ex. 9 at 67:19-25; Ex. 2 at 206:22-25.

h)    When the shooting stopped, Jackson hopped over the counter and attempted to open the register. (Ex. 61, Crim. Trial Tr., 134:11-20, Apr. 10, 2000).

**RESPONSE**: Undisputed that Brown so claimed, in sum and substance, during his trial testimony. Disputed that this is a "fact." Horn and Jackson had never even met Brown, Ex. 1 at 106:3-109:20; Ex. 2 at 116:23-118:22, and had no role in this crime, Ex. 1 at 160:21-161:17; Ex. 9 at 67:19-25; Ex. 2 at 206:22-25.

i)    Horn and Brown went to the back room. Brown stepped over a man that was shot. Horn opened the door to the back room where a man was in a chair and another "bum-ish," homeless man was trying to hide. (Ex. 61, Crim. Trial Tr., 134:23-136:7, Apr. 10, 2000).

**RESPONSE**: Undisputed that Brown so claimed, in sum and substance, during his trial testimony. Disputed that this is a "fact." Horn and Jackson had never even met Brown, Ex. 1 at 106:3-109:20; Ex. 2 at 116:23-118:22, and had no role in this crime, Ex. 1 at 160:21-161:17; Ex. 9 at 67:19-25; Ex. 2 at 206:22-25.

j)    Brown searched the homeless man and found nothing. Horn grabbed the man in the chair and brought him to the front of the store. (Ex. 61, Crim. Trial Tr., 136:13-137:11, Apr. 10, 2000).

**RESPONSE**: Undisputed that Brown so claimed, in sum and substance, during his trial testimony. Disputed that this is a "fact." Horn and Jackson had never even met Brown, Ex. 1 at 106:3-109:20; Ex. 2 at 116:23-118:22, and had no role in this crime, Ex. 1 at 160:21-161:17; Ex. 9 at 67:19-25; Ex. 2 at 206:22-25.

k)    While at the back of the store, Brown searched through "Philly blunt boxes" looking for money. He found none. Horn and Jackson were in the front of the store. (Ex. 61, Crim. Trial Tr., 137:25-138:13, Apr. 10, 2000).

**RESPONSE**: Undisputed that Brown so claimed, in sum and substance, during his trial testimony. Disputed that this is a "fact." Horn and Jackson had never even met Brown, Ex. 1 at 106:3-109:20; Ex. 2 at 116:23-118:22, and had no role in this crime, Ex. 1 at 160:21-161:17; Ex. 9 at 67:19-25; Ex. 2 at 206:22-25.

l)    Brown walked to the front and saw the man on the floor dying, making gurgling noises. Jackson was filling a bag with cigarettes. (Ex. 61, Crim. Trial Tr., 138:24-139:21, Apr. 10, 2000).

**RESPONSE**: Undisputed that Brown so claimed, in sum and substance, during his trial testimony. Disputed that this is a "fact." Horn and Jackson had never even met Brown, Ex. 1 at 106:3-109:20; Ex. 2 at 116:23-118:22, and had no role in this crime, Ex. 1 at 160:21-161:17; Ex. 9 at 67:19-25; Ex. 2 at 206:22-25.

m)    Brown heard a siren and they all exited the store. (Ex. 61, Crim. Trial Tr., 140:16-27, Apr. 10, 2000).

**RESPONSE**: Undisputed that Brown so claimed, in sum and substance, during his trial testimony. Disputed that this is a "fact." Horn and Jackson had never even met Brown, Ex. 1 at 106:3-109:20; Ex. 2 at 116:23-118:22, and had no role in this crime, Ex. 1 at 160:21-161:17; Ex. 9 at 67:19-25; Ex. 2 at 206:22-25.

n)    Brown confirmed that neither detective that interviewed him on March 10 told him who to identify as his accomplices and he was not promised anything for his statement. (Ex. 61, Crim. Trial Tr., 162:19-24, 163:9-17, Apr. 10, 2000).

**RESPONSE**: Undisputed that Brown so claimed, in sum and substance, during his trial testimony. Disputed that this is a "fact." Horn and Jackson had never even met Brown, Ex. 1 at 106:3-109:20; Ex. 2 at 116:23-118:22, and had no role in this crime, Ex. 1 at 160:21-161:17; Ex. 9 at 67:19-25; Ex. 2 at 206:22-25. Dease and Adger were determined to put the crime on their "two guys" regardless of whether Brown's statements supported it, Ex. 32 at HHT-00847, and Brown made impossible statements consistent with their other fabrications and private knowledge, *see supra* ¶ 107.

126.    On February 15, 2011, Brown testified at Jackson's *habeas* hearing. He again identified Jackson as one of his co-conspirators in committing the Dixwell Deli murder. (Ex. 69, *Habeas* Trial Tr., 15:21-16:17, 20:7-10, Feb. 15, 2011).

**RESPONSE**: Undisputed that Brown so testified, in sum and substance, in that proceeding on that date. Disputed that this testimony was factual. Horn and Jackson had

never even met Brown, Ex. 1 at 106:3-109:20; Ex. 2 at 116:23-118:22, and had no role in

this crime, Ex. 1 at 160:21-161:17; Ex. 9 at 67:19-25; Ex. 2 at 206:22-25.

127.    On March 14, 2013, Brown testified at Horn's *habeas* hearing. He again

identified Horn as one of his co-conspirators in committing the Dixwell Deli murder. (Ex. 70,

*Habeas* Trial Tr., 3:1-7, 85:18-86:8, Mar. 14, 2013).

**RESPONSE**: Undisputed that Brown so testified, in sum and substance, in that

proceeding on that date. Disputed that this testimony was factual. Horn and Jackson had

never even met Brown, Ex. 1 at 106:3-109:20; Ex. 2 at 116:23-118:22, and had no role in

this crime, Ex. 1 at 160:21-161:17; Ex. 9 at 67:19-25; Ex. 2 at 206:22-25.

128.    Breland did not participate in any interview or investigation involving Brown as

he was assigned to other cases. (Ex. 57, Breland Dep. 264:13-266:20, Jan. 13, 2020).

**RESPONSE**: Undisputed.

*Arrest of Shaquan Pallet*

129.    In early March 1999, Dease and Adger interviewed Shaquan Pallet. Pallet was the

other TGI Friday's employee who left work with his friend, and murder victim, Caprice Hardy.

Pallet was interviewed when he visited his probation officer. (Ex. 72, Crim. Trial Tr., 137:9-

138:26, Apr. 7, 2000; Ex. 15, Adger Dep. 261:8-22, Dec. 11, 2019; Ex. 67, Dease Report 2-3,

NH000061-62, Mar. 23, 1999; Ex. 71, Pallet Statement 2-3, NH000135-136, Mar. 23, 1999).

**RESPONSE**: Disputed that Dease and Adger interviewed Pallet in early March 1999

when Pallet visited his probation officer. Dease and Adger never identified the date of the

purported early March meeting; the purported early March meeting was not

contemporaneously documented in any police report; none of the photos purportedly

shown to Pallet at the purported meeting were preserved; and the police report does not

name the probation officer whom Pallet was supposedly visiting or the specific location

where it occurred. *See* Detectives' Ex. 67 (Dease report written more than three weeks later describing undated meeting). That is because the meeting never happened. *See id.*

130.    Prior to March, Pallet declined Dease and Adger's requests to interview him because he was scared. (Ex. 72, Crim. Trial Tr., 135:25-136:21, Apr. 7, 2000; Ex. 71, Pallet Statement 7-8, NH000140-141, Mar. 23, 1999).

> **RESPONSE**: Disputed. The NHPD made no such efforts to interview Pallet. Ex. 3 at 252:9-12. Both the taxi driver, Worsley, and the victim, Yousif, had told the NHPD that Pallet never got out of the taxi in the first place. *Id.* at 250:20-25. Adger personally "didn't reach out to Pallet." *Id.* at 252:6-7. No document reflects any other attempt by the NHPD to contact Pallet. *Id.* at 252:9-12. The NHPD had no reason to believe Pallet witnessed anything, since all the information they had correctly indicated that Pallet drove off in the cab before the crime began.

131.    During the early March interview, Pallet stated he exited the taxi with Caprice Hardy, and he saw three men on the side of the Deli smoking "wet" (marijuana soaked in embalming fluid). (Ex. 1, Horn Am. Compl. ¶149; *admitted in* Ex. 2, Def. Adger's Answer ¶149; Ex. 3, Def. Dease's Answer ¶149; Ex. 6, Jackson Am. Compl. ¶118; *admitted in* Ex. 7, Def. Adger's Answer ¶118; Ex. 9, Def. Dease's Answer ¶118; Ex.72, Crim. Trial Tr., 122:2-123:12, Apr. 7, 2000; Ex. 67, Dease Report 3, NH000062, Mar. 23, 1999; Ex. 71, Pallet Statement 3, NH000136, Mar. 23, 1999).

> **RESPONSE**: Disputed. The purported early March interview never happened. Dease and Adger never identified the date of the purported early March meeting; the purported early March meeting was not contemporaneously documented in any police report; none of the photos purportedly shown to Pallet at the purported meeting were preserved; and the police report does not name the probation officer whom Pallet was supposedly visiting or

the specific location where it occurred. *See* Detectives' Ex. 67. Further disputed that any

such statement, if made by Pallet, was factual. He never got out of the taxi. Ex. 10 at

31:10-16.

132.    Pallet recognized two of the men, having previously seen them at the store. The

third person stood further back in the dark and Pallet could not see his face. (Ex. 72, Crim. Trial

Tr., 125:23-126:13, Apr. 7, 2000; Ex. 71, Pallet Statement 5, NH000138, Mar. 23, 1999).

**RESPONSE**: Undisputed that Pallet so claimed in his March 23, 1999 statement and at

trial. Disputed that the claim is factual. Pallet never got out of the taxi. Ex. 10 at 31:10-

16. This paragraph makes no representations about the purported "early March" meeting

with Pallet, so Plaintiff does not respond on that issue.

133.    Pallet stated Hardy purchased cigarettes and gave him some. (Ex. 1, Horn Am.

Compl. ¶149; *admitted in* Ex. 2, Def. Adger's Answer ¶149; Ex. 3, Def. Dease's Answer ¶149;

Ex. 6, Jackson Am. Compl. ¶118; *admitted in* Ex. 7, Def. Adger's Answer ¶118; Ex. 9, Def.

Dease's Answer ¶118; Ex. 72, Crim. Trial Tr., 124:1-11, Apr. 7, 2000; Ex. 67, Dease Report 3,

NH000062, Mar. 23, 1999; Ex. 71, Pallet Statement 3, NH000136, Mar. 23, 1999).

**RESPONSE**: Undisputed that Pallet so claimed in his March 23, 1999 statement and at

trial. Disputed that the claim is factual. Pallet never got out of the taxi. Ex. 10 at 31:10-

16. Hardy's unopened package of cigarettes was still on the counter when police

processed the crime scene. Ex. 54 (crime scene photo of counter); Ex. 11 (Shelton Dep.)

at 16:4-20, 19:3-21:8. Further disputed that Pallet made any such claim at any purported

"early March" interview, as no such interview occurred. Dease and Adger never

identified the date of the purported early March meeting; the purported early March

meeting was not contemporaneously documented in any police report; none of the photos

purportedly shown to Pallet at the purported meeting were preserved; and the police

report does not name the probation officer whom Pallet was supposedly visiting or the specific location where it occurred. *See* Detectives' Ex. 67.

134.     Pallet stated that as he left the store, two of the three men he had seen smoking "wet" were outside the door pulling skellies (masks) down on their faces. Pallet was wearing a gold chain and thought he might be robbed. (Ex. 72, Crim. Trial Tr., 128:11-130:20, Apr. 7, 2000; Ex. 71, Pallet Statement 3, NH000136, Mar. 23, 1999).

   **RESPONSE**: Undisputed that Pallet so claimed in his March 23, 1999 statement and at trial. Disputed that the claim is factual. Pallet never got out of the taxi. Ex. 10 at 31:10-16. This paragraph makes no representations about the purported "early March" meeting with Pallet, so Plaintiff does not respond on that issue.

135.     Pallet then walked to the taxi and left the area. (Ex. 1, Horn Am. Compl. ¶150; *admitted in* Ex. 2, Def. Adger's Answer ¶150; Ex. 3, Def. Dease's Answer ¶150; Ex. 6, Jackson Am. Compl. ¶119; *admitted* in Ex. 7, Def. Adger's Answer ¶119; Ex. 9, Def. Dease's Answer ¶119; Ex. 72, Crim. Trial Tr., 130:21-131:25, Apr. 7, 2000).

   **RESPONSE**: Undisputed that Pallet so claimed in his March 23, 1999 statement and at trial. Disputed that the claim is factual. Pallet never got out of the taxi. Ex. 10 at 31:10-16. This paragraph makes no representations about the purported "early March" meeting with Pallet, so Plaintiff does not respond on that issue.

136.     During the early March interview, Pallet was shown a photo array of suspects, however, he was afraid to make a positive identification. Instead, he pushed away all the photos except Horn and Jackson's photos and said, "Take it for what it's worth." (Ex. 67, Dease Report 3, NH000062, Mar. 23, 1999).

   **RESPONSE**: Disputed. The purported early March interview never happened. Dease and Adger never identified the date of the purported early March meeting; the purported early

March meeting was not contemporaneously documented in any police report; none of the

photos purportedly shown to Pallet at the purported meeting were preserved; and the

police report does not name the probation officer whom Pallet was supposedly visiting or

the specific location where it occurred. *See* Detectives' Ex. 67. Further disputed that fear

the reason for any inability or reluctance by Pallet to make a positive identification. The

reason was that he never saw anything because he never got out of the taxi. Ex. 10 at

31:10-16.

137.    On March 23, 1999, the day after Horn's arrest, Pallet was arrested by the NHPD

for unrelated robberies. (Ex. 1, Horn Am. Compl. ¶147; *admitted in* Ex. 2, Def. Adger's Answer

¶147; Ex. 3, Def. Dease's Answer ¶147; Ex. 6, Jackson Am. Compl. ¶116; *admitted in* Ex. 7,

Def. Adger's Answer ¶116; Ex. 9, Def. Dease's Answer ¶116).

**RESPONSE**: Undisputed.

138.    Dease learned of Pallet's arrest and arranged to interview him with Assistant

State's Attorney, Gary Nicholson, the lead prosecutor on the Dixwell Deli robbery and murder.

(Ex. 1, Horn Am. Compl. ¶148; *admitted in* Ex. 2, Def. Adger's Answer ¶148; Ex. 3, Def.

Dease's Answer ¶148; Ex. 6, Jackson Am. Compl. ¶117; *admitted in* Ex. 7, Def. Adger's Answer

¶117; Ex. 9, Def. Dease's Answer ¶117).

**RESPONSE**: Undisputed.

139.    During the interview with Dease and ASA Nicholson, Pallet repeated the

information he gave in early March; he positively identified Horn and Jackson from a photo

array, and he gave a taped transcribed statement. (Ex. 72, Crim. Trial Tr., 144:22-146:21, Apr. 7,

2000; Ex. 71, Pallet Statement 3-5, NH000136-138, Mar. 23, 1999).

**RESPONSE**: Undisputed that Pallet identified Horn and Jackson from a photo array and

have a taped transcribed statement during an interview with Dease and Nicholson on

March 23, 1999. Disputed that Pallet "repeated the information he gave in early March," as the purported early March interview never happened. Dease and Adger never identified the date of the purported early March meeting; the purported early March meeting was not contemporaneously documented in any police report; none of the photos purportedly shown to Pallet at the purported meeting were preserved; and the police report does not name the probation officer whom Pallet was supposedly visiting or the specific location where it occurred. *See* Detectives' Ex. 67.

140.    A hearing on a Motion to Suppress Pallet's identification of Horn and Jackson was conducted during the criminal trial and denied by the Court. (Ex. 72, Crim. Trial Tr., 108:24-109:15, Apr. 7, 2000).

**RESPONSE**: Undisputed.

141.    After Pallet gave his statement, a more favorable sentence was discussed concerning the unrelated robberies in exchange for his cooperation and truthful testimony in the Dixwell Deli murder case and the identification of his co-conspirators in his robberies. He ultimately pled guilty to two counts of conspiracy to commit robbery. (Ex. 72, Crim. Trial Tr., 113:18-116:22, Apr. 7, 2000; Ex. 67, Dease Report 3, NH000062, Mar. 23, 1999).

**RESPONSE**: Undisputed.

142.    During the criminal trial, Pallet testified consistently with his transcribed statement. The prosecutor raised an issue about a note Pallet wrote recanting his identification of Jackson and Horn during his incarceration at Whalley Correctional Facility on September 24, 1999. (Ex. 72, Crim. Trial Tr., 148:7-150:13, Apr. 7, 2000).

**RESPONSE**: Undisputed, except as to the words "raised an issue about." The prosecutor introduced Pallet's written recantation into evidence as State's Exhibit 138. Detectives' Ex. 72 at 149:7-8 ("MR. NICHOLSON: I would like to offer that as a full exhibit . . . .").

143.    Pallet explained he wrote the note, but only because a separate note was slipped under his jail cell door telling him to write the recantation note. He does not know who wrote the note or who put it under his door, but it is inferred that the note was threatening. (Ex. 72, Crim. Trial Tr., 150:10-18, 152:1-14, 155: 18-23, 159:32-160:2, Apr. 7, 2000).

**RESPONSE**: Undisputed that Pallet testified that he wrote the recantation note in response to a separate note being passed under his cell door by an unknown person telling him to recant. Objection to the statement "it is inferred that the [under-the-door] note was threatening," on the basis that it fails to identify who drew this inference and is therefore impossible to respond to. Disputed that any note passed under the door was threatening, as nothing in the cited testimony establishes that the note contained any such threat, and the purported note slipped under the door is nowhere in evidence.

144.    Jackson's lawyer objected to referencing the recantation note at trial because of the inference that his client, Jackson, wrote the threatening note. The note was not recovered. (Ex. 72, Crim. Trial Tr., 155:2-12, 159:21-160:2, Apr. 7, 2000).

**RESPONSE**: Disputed. As the cited portions of testimony show, Jackson's counsel objected to the introduction of *testimony* about the supposed note under the door. When the Court denied that objection, Jackson's counsel then eventually requested that the recantation be stricken as well.

145.    The trial court struck the recantation note from evidence, all testimony about it, and instructed the jury to disregard it. (Ex. 72, Crim. Trial Tr., 172:15-175:8, Apr. 7, 2000).

**RESPONSE**: Undisputed.

146.    Breland was not involved in the interviews of Brown as he was no longer assigned to the Dixwell investigation and he was working on other assignments. Breland was not

involved in the interviews of Shaquan Pallet. (Ex. 57, Breland Dep. 264:13-266:20; 429:24-430:14, Jan. 13, 2020).

**RESPONSE**: Undisputed.

***Phone Records Received from Phone Companies***

147.    During the Deli investigation, Adger sought the records associated with the phone numbers on the stolen phone's call detail record and the phone records of additional persons that were associated with the investigation. (Ex. 15, Adger Dep. 103:11-104:22, Dec. 11, 2019.)

**RESPONSE**: Undisputed.

148.    Adger applied for a search warrant to Southern New England Telephone Company ("SNET"), which was issued February 25, 1999. The search warrant listed the phone numbers of Vernon Horn, Marcus Pearson, Floyd Jackson (whose daughter was Tamika Fuller), and the residential telephone number of the elderly couple Crystal Sykes worked for. The records requested were from January 1, 1999 through February 23, 1999. (Ex. 15, Adger Dep. 101:10-18, 102:18-22, Dec. 11, 2019; Ex. 73, Adger Dep. Ex. 53; Ex. 48, Dease Report 3, NH000008, Feb. 5, 1999).

**RESPONSE**: Undisputed.

149.    Adger also applied for a search warrant, directed to AT&T Corporation, which was issued February 25, 1999. The search warrant listed the phone number of Sandra Moore, who resided in the residence where Adrianne Younger lived. The records requested were for January 1, 1999, through February 23, 1999. (Ex. 15, Adger Dep. 99:8-100:17, Dec. 11, 2019; Ex. 74, Adger Dep. Ex. 52; Ex. 48, Dease Report 3-4, NH000008-9, Feb. 5, 1999).

**RESPONSE**: Undisputed.

150.    Adger also received the phone records of Willie Sadler and Glen Spray (the phone used by Marquis Jackson) through an informal request to the telephone companies that serviced

Sadler's and Spray's phone. (Ex. 17, Adger Aff. ¶9; Ex. 15, Adger Dep. 106:20-107:19, Dec. 11, 2019).

**RESPONSE**: Undisputed.

151.    Responses from the search warrants and requests were obtained on or before March 4, 1999. (Ex. 17, Adger Aff. ¶11).

**RESPONSE**: Undisputed.

152.    Upon receiving the records, Adger made a copy for herself, Dease, and Sergeant Direk Rogers, who was supervising the investigation. (Ex. 15, Adger Dep. 10:24-11:1, Dec. 11, 2019; Ex. 75, Adger Dep. 361:10-13, Sept. 22, 2020).

**RESPONSE**: Undisputed.

153.    Consistent with NHPD practice and procedure, Adger then delivered the original phone records to the New Haven Police Records Division. (Ex. 15, Adger Dep. 111:10-16, 120:11-122:4, Dec. 11, 2019; Ex. 75, Adger Dep. 357:1-21, Sept. 22, 2020; Ex. 76, Adger Dep. Ex. 54).

**RESPONSE**: Disputed. Adger did not put the records in the Records Room, but instead intentionally hid them, as evidenced by the following:

In 1999-2000, it was the personal practice of the trial prosecutor, Assistant State's Attorney Gary Nicholson, to "turn over all the documents [he] had to the defense." Ex. 21 (Nicholson Dep.) at 62:7-10. In the Dixwell Deli case, Nicholson turned over "everything" he had to the defense. *Id.* at 62:14-16. Defense counsel confirmed that Nicholson did in fact give them "copies of everything in his file." Ex. 24 (Moscowitz Dep.) at 99:11-100:2. Criminal defense counsel did not receive copies of any phone records other than the Omnipoint call detail log. *Id.* at 102:3-108:17, 234:16-235:4. The

State's Attorney's Office never had the records because they were not in the Records Division.

Furthermore, in 2018, NHPD Assistant Chief Rachael Cain directed and supervised an extensive search for records concerning the Dixwell Deli case. Ex. 13 (Cain Dep.) at 46:7-51:8. It was "a Herculean effort to find every scrap of paper anywhere in the world related to Horn." Ex. 19 (Foster Dep) at 29:6-7. The phone records of Willie Sadler, Tamika Fuller, Marcus Pearson, and the Chorozny house in West Haven were not found anywhere in NHPD custody, including the Records Room. Ex. 13 at 46:7-51:8, 118:3-120:2. These phone records were not found anywhere except Adger's basement. *Id.* at 48:2-51:8, 118:3-120:2. The NHPD found nothing to suggest that these phone records had ever been logged into the Records Room. Ex. 13 at 118:3-120:2. "Never" during its herculean efforts did the NHPD "learn anything" to suggest that the phone records had previously been disclosed to Horn, Jackson, or their defense counsel. Ex. 19 at 29:19-30:2.

In 1999, after seizing property without a warrant, New Haven police personnel were required to fill out a standard Connecticut Judicial Department inventory form (a "JD-18") to document the seizure. Ex. 13 at 130:18-133:1. JD-18s are filed with the court clerk, who creates an official record of materials seized during an investigation called the Journal of Seized Property. Ex. 20 (Thigpen Dep.) at 71:1-72:12. Adger seized Willie Sadler's phone records without a search warrant. Ex. 3 at 122:11-13. Those phone records were "evidence." Ex. 13 at 120:3-16. Adger did not complete the required JD-18 for Sadler's phone records. Ex. 3 at 123:2-5; Breland Dep. 338/15-18. This violated basic police procedure. Ex. 4 at 339:4-10. Nor did she document her seizure of Sadler's phone

records in a police report. Ex. 3 at 108:15-23. No entry in the Journal of Seized Property

reflects the seizure of Sadler's phone records. Ex. 57 (Journal of Seized Property).

In 1999, after seizing property pursuant to a search warrant, New Haven police

personnel were required to complete the "return" of the search warrant, also known as

"page 6," to "itemize what was seized after the search warrant was executed." Ex. 13 at

11:13-24. The seizure of property pursuant to a warrant was supposed to be noted in the

NHPD evidence log. *Id.* at 54:9-18. The seized materials were supposed to be stored in

the NHPD property room with a completed "page 6." *Id.* at 54:25-55:9. And the

completed "page 6" was supposed to be filed with the court, *id.* at 12:14-16, which would

record its contents in the Journal of Seized Property, Ex. 20 at 71:1-72:12. Adger seized

the phone records of the West Haven house, Tamika Fuller, and Marcus Pearson pursuant

to a search warrant. Ex. 49 (Feb. 25, 1999 Warrant Application). The "page 6" return for

that search warrant was not filed with the Court until September of *2014. Id.*; Ex. 22

(Griffin Dep.) at 155:13-157:20. No entry in the NHPD evidence log reflects the seizure

of the West Haven, Fuller, or Pearson phone records. Ex. 13 at 119:8-11, 50:18-51:17.

No entry in the Journal of Seized Property reflects the seizure of those phone

records. Ex. 57.

154.    Former Assistant Chief Rachel Cain testified that detectives were permitted to file

records from third parties in the Records Division, the Property Room, or both. (Ex. 64, Cain

Dep. 120:3-121:19, Dec. 9, 2019).

> **RESPONSE**: Disputed. Cain testified that the phone records seized in this case were
>
> evidence. Ex. 13 at 120:5-16 (Q. We've been talking about phone records here today
>
> which are evidence, right? A. It could be, yes. ***Q. Well, in the context of this case, it was***
>
> ***evidence, right? A. Yes.***"). As a matter of policy, evidence was required to be stored in

the Property Room. *Id.* at 121:24-122:1. Any material seized pursuant to a search

warrant—which the majority of the phone records were—is "evidence." *Id.* at 133:21-25.

It must therefore be stored in the Property Room. *Id.* at 121:24-122:1.

155.    After delivering the original records with the Records Division, Adger did not

know what happened to the records, and she does not know the Records Division procedure.

(Ex. 15, Adger Dep. 109:13-110:10, Dec. 11, 2019).

> **RESPONSE**: Disputed. As explained *supra* ¶ 153, Adger did not put the records in the
>
> Records Room. Adger did know what happened to the Records: she kept them in the
>
> basement of her house. When asked about phone records in 2018, Adger said she would
>
> check the binder in her basement for them. Ex. 23 (Caporale Dep.) at 100:18-21.

156.    The records filed in the Records Division were available to officers, detectives,

Assistant State's Attorneys, and inspectors employed by the State's Attorney's Office. (Ex. 17,

Adger Aff. ¶7; Ex. 77, Nicholson Dep. 54:6-55:17, Feb. 5, 2020).

> **RESPONSE**: Undisputed as a general statement of who was authorized to access records
>
> lodged in the Records Room. Disputed to the extent it implies that such persons could
>
> freely walk into and out of the Records Room and take such materials at will. Every
>
> record removed from the Records Room had to be logged out. Ex. 13 at 122:15-17.
>
> Disputed to the extent it implies the particular phone records were among "[t]he records
>
> filed in the Records Division." *Supra* ¶ 153.

157.    During a criminal prosecution, the Assistant State's Attorney and/or an inspector

employed by the State's Attorney's Office were permitted to copy all or a portion of the records

filed in the Records Division. In the Deli homicide prosecution, Mel Cartoceti (deceased), a

State's Attorney inspector, was assigned to assist ASA Gary Nicholson. (Ex. 77, Nicholson Dep.

45:15-46:9, 54:22-55:3, 278:13-23; 279:11-23, Feb. 5, 2020).

**RESPONSE**: Undisputed.

158.    ASA Nicholson had an open file policy on the cases he prosecuted. Nicholson stated, "I generally turned everything over that I had" to criminal defense attorneys. (Ex. 77, Nicholson Dep. 55:25-56:18, 62:6-10, Feb. 5, 2020.)

**RESPONSE**: Undisputed.

159.    ASA Nicholson prepared a discovery face sheet listing every document he produced in discovery. His practice was to give a copy of the discovery face sheet to defense counsel to avoid issues about what was produced. (Ex. 77, Nicholson Dep. 56:23-58:3, 59:21-62:10, Feb. 5, 2020).

**RESPONSE**: Undisputed.

160.    The discovery face sheet listing every document turned over in discovery for the Horn/Jackson prosecution is not in the State's Attorney Office's file and never has been produced in discovery. (Ex. 78, Delcore Aff. ¶4).

**RESPONSE**: Disputed. The discovery record in this case includes a document that Nicholson himself testified "looks like a facesheet that I would have given to counsel for Mr. Horn." Ex. 21 at 59:21-25; Plaintiffs' Deposition Exhibit #88. Furthermore, objection under FRCP 56(c)(2) that this purported fact cannot be presented in a manner admissible in evidence. The sole evidence cited for this proposition is a bare assertion in an affidavit made by a paralegal for the Detectives' lawyers. Nothing establishes that this paralegal has ever seen a discovery facesheet prepared by Gary Nicholson or is in any way competent to identify such a document if she encountered one. Nor does the affidavit establish the necessary foundation to assert that a single piece of paper "never has been produced in discovery." The affidavit does not state that the paralegal has carefully reviewed (or reviewed at all) the entire discovery record in this case, but merely that she

has "been charged with downloading and organizing document production with respect to the above entitled matters." Delcore Aff. ¶ 3.

161.    Investigator Cartoceti could have taken contents from the State's Attorney's file to work on, and not return the contents to the file. Nicholson is not aware if this happened in this case. (Ex. 77, Nicholson Dep. 283:5-14, Feb. 5, 2020).

**RESPONSE**: Disputed. Cartoceti was a "reliable," "conscientious," "professional" employee. Ex. 21 at. 322:9-17. Cartoceti never lost or destroyed evidence in any other case. *Id.* at 322:18-323:11.

162.    When retrieving NHPD records for ASA Nicholson, Cartoceti would, at times, make judgment calls about what records to copy. (Ex. 77, Nicholson Dep. 300:12-19, Feb. 5, 2020).

**RESPONSE**: Disputed. When retrieving NHPD records for ASA Nicholson, Cartoceti had discretion not to duplicate materials already in the possession of the State's Attorney's Office, but was required to retrieve all investigative materials that the State's Attorney's Office did not already possess. Ex. 21 at 279:24-280:12 ("[H]e might have a judgment call insofar if he was aware that certain information was already in our office. Obviously he's not going to duplicate that again. But *if he saw something that we did not have, he would make a copy of it and bring it back*.").

163.    ASA Nicholson cannot say whether Cartoceti saw the 137 pages of phone records in the NHPD Record Division and decided not to copy them or decided that they were not needed, and it is possible that happened. (Ex. 77, Nicholson Dep. 301:1-15, Feb. 5, 2020).

**RESPONSE**: Undisputed that Nicholson has no personal knowledge of actions taken or not taken by Cartoceti. Disputed that there is any reason whatsoever to believe this occurred, as Cartoceti was a "reliable," "conscientious," "professional" employee, Ex. 21

at 322:9-17, who never lost or destroyed evidence in any other case, *id.* at 322:18-323:11,

and was required to retrieve all investigative materials that the State's Attorney's Office

did not already possess, *id.* at 279:24-280:12.

164.    In 2018, some original phone records filed by Adger with the Records Division

remained in the file in the Records Division and were not missing (Ex. 79, Cain Dep. 268:9-

269:11, Sep. 18, 2020). The Records Division file still contained:

    a.  Omnipoint records of the stolen cell phone; (Ex.50, Omnipoint Phone Records, NH001036-1038, also produced by Plaintiffs Ex. 80, PL0006290-6292).

       **RESPONSE**: Undisputed that a copy of these documents was in the NHPD Records Room in 2018. Disputed that they were filed there by Adger or that they are "original," neither of which the sole cited source addresses at all or purports to establish. Further disputed as to the implication that there were *other* "original records" filed by Adger in the Records Room that were missing or did not remain in the file. *See supra* ¶ 153.

    b.  Phone records of Glen Spray (the phone used by Marquis Jackson); (Ex. 81, Glen C. Spray Phone Records, NH000888-895, also produced by Plaintiffs Ex. 82, PL0006317-6324).

       **RESPONSE**: Undisputed that a copy of these documents was in the NHPD Records Room in 2018. Disputed that they were filed there by Adger or that they are "original," neither of which the sole cited source addresses at all or purports to establish. Further disputed as to the implication that there were *other* "original records" filed by Adger in the Records Room that were missing or did not remain in the file. *See supra* ¶ 153.

    c.  Phone records produced pursuant to a search warrant for Sandra Moore (the phone used by Adrienne Younger); (Ex. 83, Phone Records from Sandra Moore Search Warrant, NH001011-1019, also produced by Plaintiffs Ex. 84, PL0006595-6606).

       **RESPONSE**: Undisputed that a copy of these documents was in the NHPD Records Room in 2018. Disputed that they were filed there by Adger or that they are "original," neither of which the sole cited source addresses at all or purports to establish. Further disputed as to the implication that there were *other* "original records" filed by Adger in the Records Room that were missing or did not remain in the file. *See supra* ¶ 153.

    d.  Search warrants issued to SNET and AT&T and inventory returns (Ex. 85, AT&T Search Warrant and Inventory Return, NH000344-348, NH000355, also produced

by Plaintiffs Ex. 86, PL0006724-6729; Ex. 87, SNET Search Warrant and Inventory Return, NH000350-354, 349, also produced by Plaintiffs Ex. 88, PL0006731-6736); and

**RESPONSE**: Undisputed that a copy of these documents was in the NHPD Records Room in 2018. Disputed that they were filed there by Adger or that they are "original," neither of which the sole cited source addresses at all or purports to establish. Further disputed as to the implication that there were *other* "original records" filed by Adger in the Records Room that were missing or did not remain in the file. *See supra* ¶ 153.

e.   Correspondence to telephone companies. (Ex. 78, Delcore Aff. ¶5). Ex. 89, AT&T Phone Correspondence, NH002080, also produced by Plaintiffs Ex. 90, PL0006730; Ex. 91, SNET Phone Correspondence, NH002042, also produced by Plaintiffs Ex. 92, PL0006737).

**RESPONSE**: Undisputed that a copy of these documents was in the NHPD Records Room in 2018. Disputed that they were filed there by Adger or that they are "original," neither of which the sole cited source addresses at all or purports to establish. Further disputed as to the implication that there were *other* "original records" filed by Adger in the Records Room that were missing or did not remain in the file. *See supra* ¶ 153.

165.   All of the phone numbers for which Adger obtained records by warrant and informal request are found in the detective's investigative reports with the name of the owner/user of the phone records, with the exception of Glen Spray's phone used by Marquis Jackson. (Ex. 17, Adger Aff. ¶8).

**RESPONSE**: Undisputed, except to the extent it implies that the fact Adger sought or obtained the records is disclosed. The fact that Adger sought or obtained Willie Sadler's phone records is not disclosed in any police record. Ex. 3 at 108:15-23 (no police report); *id.* at 123:2-5; Ex. 4 at 338:15-18 (no required "JD-18" inventory form).

166.   In 1999, the practice and procedure of the NHPD was to file search warrants and the related search warrant inventories with the Administrative Assistant for the Judicial Clerk, so that the Judicial Clerk could keep track of the search warrants and deliver them to the proper criminal file. (Ex. 93, Thigpen Dep. 32:7-14, 36:19-37:1, Oct. 4, 2019).

**RESPONSE**: Undisputed.

167.    Upon receipt of a search warrant inventory, the Administrative Assistant filled out a two-ply index card form created by the Judicial Clerk containing the signature of the officer, the clerk's name, the date of receipt, the police file number, and the name of the criminal defendants. The card is a business record of the Judicial Clerk. (Ex. 93, Thigpen Dep. 37:2-19, Oct. 4, 2019).

> **RESPONSE**: Disputed. The index card is provided when the warrant is signed by the judge and a copy of the signed warrant is sent to the Clerk's office, not after the property has been seized pursuant to the warrant. Ex. 20 at 101:5-22 ("After the warrant has been executed by the judge, then that warrant would – had been turned into the Clerk's office; and then, in turn, we would have filled out one of those cards with the carbon copy and pertinent information . . . ."); *id.* at 101:23-102:4 ("So there is not an index card filled out when there is a Seizure of Property returned to the Court . . . ? Am I right? A. Yes.").

168.    When a search warrant inventory was filed with the Judicial Clerk, one of the index cards was filled out by the Clerk and a carbon copy of the card was given to the police officer as a receipt. (Ex. 93, Thigpen Dep. 37:24-38:8, Oct. 4, 2019).

> **RESPONSE**: Disputed. The index card is provided when the warrant is signed by the judge and a copy of the signed warrant is sent to the Clerk's office, not after the property has been seized pursuant to the warrant. Ex. 20 at 101:5-22 ("After the warrant has been executed by the judge, then that warrant would – had been turned into the Clerk's office; and then, in turn, we would have filled out one of those cards with the carbon copy and pertinent information . . . ."); *id.* at 101:23-102:4 ("So there is not an index card filled out when there is a Seizure of Property returned to the Court . . . ? Am I right? A. Yes.").

169.    An Administrative Assistant for the Judicial Clerk, Barbara Thigpen, identified a copy of the index cards she filled out for the search warrant to SNET and inventory on March 5, 1999. (Ex. 93, Thigpen Dep. 38:11-40:25, Oct. 4, 2019; Ex. 94, Thigpen Dep. Ex. W, at DET01629).

> **RESPONSE**: Disputed. According to Thigpen, "there is no way to tell, just by looking at
> the face of a card by itself, which particular warrant it corresponds to." Ex. 20 at 94:19-
> 23. The cited testimony establishes at most that Thigpen signed two cards that pertained
> to the Horn/Jackson case in some manner on March 5, 1999; it does not establish in any
> way what the subject matter of the relevant warrants were. *See id.* at 38:11-40:25. In any
> event, the index card is provided when the warrant is signed by the judge and a copy of
> the signed warrant is sent to the Clerk's office, not after the property has been seized
> pursuant to the warrant. *Id.* at 101:5-22 ("After the warrant has been executed by the
> judge, then that warrant would – had been turned into the Clerk's office; and then, in
> turn, we would have filled out one of those cards with the carbon copy and pertinent
> information . . . ."); *id.* at 101:23-102:4 ("So there is not an index card filled out when
> there is a Seizure of Property returned to the Court . . . ? Am I right? A. Yes.").

170.    On March 5, 1999, Adger filed the two search warrants and inventories for phone records with the Judicial Clerk and received a copy of the index cards prepared by the Clerk. Adger then placed the receipt index card in the investigative file. (Ex. 17, Adger Aff. ¶10; Ex. 93, Thigpen Dep. 35:12-40:25, Oct. 4, 2019; Ex. 94, Thigpen Dep. Ex. W, at DET01628-1629).

> **RESPONSE**: Disputed. The index card is provided when the warrant is signed by the
> judge and a copy of the signed warrant is sent to the Clerk's office, not after the property
> has been seized pursuant to the warrant. Ex. 20 at 101:5-22 ("After the warrant has been
> executed by the judge, then that warrant would – had been turned into the Clerk's office;

and then, in turn, we would have filled out one of those cards with the carbon copy and pertinent information . . . ."); *id.* at 101:23-102:4 ("So there is not an index card filled out when there is a Seizure of Property returned to the Court . . . ? Am I right? A. Yes."). Furthermore, none of the cited sources establishes that the index cards in question concern the phone records at issue, but only that Thigpen provided two Horn/Jackson index cards on 3/5/99. *Id.* at 38:11-40:25. "There is no way to tell, just by looking at the face of a card by itself, which particular warrant it corresponds to." *Id.* at 94:19-23.

171.    During the time between the receipt of the phone records on or about March 4, 1999, and the arrest of Brown on March 10, 1999, Adger began examining the phone records by using a reverse directory phone service to determine who made certain calls. (Ex. 17, Adger Aff. ¶11; Ex. 15, Adger Dep. 140:23-142:7, Dec. 11, 2019).

> **RESPONSE**: Undisputed that Adger examined the phone records, in part by using a reverse phone directory service, after she received them. Disputed that the phone records were received "on or about" March 4, 1999. *See supra* ¶ 151 ("on or *before* March 4"); Ex. 50 (Omnipoint phone records) at PL0008657 (fax header showing that Sadler's phone records were received on Feb. 24, 1999). Further disputed that the resources used by Adger in examining the phone records were limited to the use of a reverse phone directory, as Adger somehow learned one of the frequently called numbers was a "Tri-State Pager." Ex. 3 at 154:5-20.

172.    Adger prepared charts attempting to understand if the phone records established a connection between the phone calls made between individuals associated with the phone numbers in the records and the Deli homicide, but her analysis did not permit her to make such a determination. (Ex. 15, Adger Dep. 146:10-147:6, Dec. 11, 2019; Ex. 75, Adger Dep. 425:7-24, Sept. 22, 2020; Ex. 76, Adger Dep. Ex. 54, at PL008760-8761).

**RESPONSE**: Undisputed that Adger prepared charts. Disputed as to the purpose of Adger's chart preparation. Further disputed that Adger's "analysis did not permit her to make [a] determination" about a connection between these individuals and the homicide. Adger charted Sadler's calls to New Haven County, Ex. 50 at PL0008761, because she suspected him of involvement in this crime, *see* Ex. 3 at 152:2-153:9 (unable to provide any other explanation). Among other things, the records showed: the house in West Haven paged a pager two minutes before the phone stolen from the deli called the West Haven house, Ex. 50 at PL000871, PL0008763; and that Sadler lied to the police about his lack of connection to New Haven, *id.* at PL0008761.

173.    Adger shared information regarding the records in the chart with Dease and her supervisor, Sgt. Rogers. However, no connection to the Deli robbery/homicide was identified. (Ex. 75, Adger Dep. 430:18-25, Sept. 22, 2020).

**RESPONSE**: Undisputed that Adger shared information regarding the records in the chart with Dease and Sgt. Rogers. Disputed that no connection to the Deli robbery/homicide was identified. Among other things, the records showed: the house in West Haven paged a pager two minutes before the phone stolen from the deli called the West Haven house, Ex. 50 at PL000871, PL0008763; and that Sadler lied to the police about his lack of connection to New Haven, *id.* at PL0008761 (documenting repeat calls to "J. Smith" and "Shirley and James Smith" in New Haven).

174.    Adger's investigative work related to the Deli homicide ended after Brown was arrested and he confessed to committing the crime with Horn and Jackson. (Ex. 75, Adger Dep. 425:7-19, 430:3-11, Sept. 22, 2020.)

**RESPONSE**: Undisputed.

175.    Adger discontinued further examination of the phone records. She then focused on drafting arrest warrants for Horn and Jackson. (Ex. 15, Adger Dep. 18:14-20:19, Dec. 11, 2019; Ex. 75, Adger Dep. 425:16-426:25, Sept. 22, 2020; Ex. 65, Adger Dep. Ex. 46, at DET00395-404).

**RESPONSE**: Undisputed.

176.    At that time, Adger had not completed her examination of the phone records and she had not determined that a relationship between the phone numbers in the phone records were connected to the Deli homicide. As such, she did not consider the records evidence and she did not describe her review of the records in a police report. (Ex. 17, Adger Aff. ¶12; Ex. 15, Adger Dep. 128:19-131:3, 154:24-155:16, Dec. 11, 2019; Ex. 75, Adger Dep. 425:7-426:6, Sept. 22, 2020).

**RESPONSE**: Disputed. Among other things, the records showed: the house in West Haven paged a pager two minutes before the phone stolen from the deli called the West Haven house, Ex. 50 at PL000871, PL0008763; and that Sadler lied to the police about his lack of connection to New Haven, *id.* at PL0008761. Adger did not document her review of the records in a police report for the same reason that she: (1) did not put them in the records room, *supra* ¶ 153; (2) did not complete the required inventory form for the seizure of Sadler's phone records; (3) did not file the inventory for the SNET search warrant, which was mysteriously not filed until *2014*; and (4) did not document numerous interactions with Willie Sadler and William Newkirk in any police reports, Ex. 3 at 171:18-172:2 (no record of multiple Sadler interviews), 177:21-178:16 (no record of multiple Newkirk interviews). The reason is that she wanted to hide this information from the defense.

***Discovery of Adger's Copy of the Filed Phone Records***

177.    Adger kept her working copy of the phone records in her desk drawer at the Investigative Services Department. (Ex. 15, Adger Dep. 111:10-112:3, Dec. 11, 2019).

**RESPONSE**: Undisputed that Adger kept records in her desk drawer for a period of time. Disputed that they were working copies. Adger never put the records in the Records Room, so any records in her desk were the originals. *Supra* ¶ 153.

178.    Detectives routinely made copies of records to be kept in their desks as working copies when needed. (Ex. 17, Adger Aff. ¶5).

**RESPONSE**: Undisputed.

179.    No policy or procedure of the NHPD prohibited detectives from making or using working copies of records. (Ex. 17, Adger Aff. ¶6).

**RESPONSE**: Undisputed.

180.    In or about December 2000, Adger was promoted to Sergeant and was transferred to another division. (Ex. 15, Adger Dep. 110:21-111:4, Dec. 11, 2019).

**RESPONSE**: Undisputed.

181.    When Adger cleaned out her desk, she removed the contents, which included training documents, memos, seminar materials, and other paperwork. She put the contents in a box to review at home in the future to determine whether to discard it. (Ex. 17, Adger Aff. ¶13; Ex. 15, Adger Dep. 110:21-113:24, Dec. 11, 2019).

**RESPONSE:** Undisputed.

182.    Adger placed the box in her basement without reviewing the contents. (Ex. 15, Adger Dep. 114:12-116:24, Dec. 11, 2019).

**RESPONSE**: Undisputed.

183.    One week before January 30, 2018, Adger's basement flooded. Water soaked many of her belongings, including her boxes of work papers. Adger discarded the wet contents and placed the dry materials in a larger box. As she did this, she noticed her working copy of the phone records and other documents she had saved from her employment with the NHPD. (Ex. 15, Adger Dep. 114:12-116:24, Dec. 11, 2019).

RESPONSE: Disputed that this was a "working copy" of phone records; Adger never put records in the Records Room, so this version was the original. *See supra* ¶ 153. Further disputed that Adger "noticed" it as opposed to having known it was there. Immediately after receiving an inquiry about phone records on or about January 30, 2018, Adger called Dease and asked, "Did we arrest the right people?," demonstrating her knowledge of what was in her possession and its importance. Ex. 23 (Caporale Dep.) at 104:2-5.

184.    On or about January 30, 2018, Marc Caporale, an investigator for the Federal Defender's Office representing Horn, contacted the detectives assigned to the Deli homicide to determine if they had records related to the search warrants for the phone records. (Ex. 95, Caporale Dep. 42:7-43:3, July 21, 2020; Ex. 96, Caporale Dep. Ex. UU, at 1).

RESPONSE: Undisputed.

185.    On January 30, 2018, Caporale phoned Adger and explained what he was looking for. Adger agreed that she would look in her basement at the work materials she had kept when she retired. (Ex. 95, Caporale Dep. 36:12-37:3, 42:7-22, 51:20-52:3, July 21, 2020).

RESPONSE: Undisputed that Caporale phoned Adger on January 30, 2018 and explained what he was looking for, and that Adger said she would look in her basement. Disputed that she said she would look at the work materials she had kept when she

retired. She said she would check in a binder that Dease had given her before Dease

retired. Ex. 23 at 100:22-101:10.

186.    Caporale then texted Adger the phone numbers from the search warrants and

Adger looked in her basement for the documents. (Ex. 95, Caporale Dep. 39:5-21, 44:3-22, July

21, 2020; Ex. 15, Adger Dep. 114:12-116:24, Dec. 11, 2019).

**RESPONSE**: Undisputed, except that Adger "looked" for the documents as opposed to

already knowing what she possessed. Immediately after receiving the initial inquiry about

phone records on January 30, 2018, Adger called Dease and asked, "Did we arrest the

right people?," demonstrating her knowledge of what was in her possession and its

importance. Ex. 23 at 104:2-5.

187.    The next day, January 31, 2018, Adger spoke with Caporale. The same day she

voluntarily produced 137 pages of phone records she discovered the week before. She provided

Caporale the documents so he could make a copy. (Ex. 95, Caporale Dep. 44:3-16, 45:6-12,

52:13-22, July 21, 2020).

**RESPONSE**: Undisputed.

188.    Throughout Caporale's process of obtaining the phone records, Adger was

pleasant, cordial, and cooperative. (Ex. 95, Caporale Dep. 61:15-62:5, July 21, 2020).

**RESPONSE**: Undisputed.

189.    Adger then delivered her original working copy to Kathleen Foster, Senior

Assistant Corporation Counsel for the City of New Haven (Ex. 97, Foster Dep. 21:21-22:13,

Sept. 14, 2020).

**RESPONSE**: Undisputed, except as to whether it was a "working copy." Adger never

put the records in the Records Room, so these were the originals. *Supra* ¶ 153.

93

190.    Adger was not aware that the phone records were in the materials she removed from her desk in 2000, and she had not intended to remove them. (Ex. 17, Adger Aff. ¶13; Ex. 15, Adger Dep. 116:20-117:18, Dec. 11, 2019).

**RESPONSE**: Disputed. Immediately after receiving the initial inquiry about phone records on January 30, 2018, Adger called Dease and asked, "Did we arrest the right people?," demonstrating her knowledge of what was in her possession and its importance. Ex. 23 at 104:2-5.

191.    The box of materials from Adger's desk, which was stored in her basement, has been produced in discovery. The materials include NHPD memos, training material, and assorted research for various projects Adger conducted through her career. (Ex. 17, Adger Aff. ¶14; Ex  78, Delcore Aff. ¶¶9-13).

**RESPONSE**: Undisputed, except that the box was made available for inspection as opposed to being "produced."

192.    Among other things, the 137 pages of phone records show numerous calls between: Brown and Macklin, Sadler and Macklin, Sadler and Newkirk, Sadler and Fuller, and Sadler and Younger. (Ex. 76, Adger Dep. Ex. 54, PL0008656-8792).

**RESPONSE**: Undisputed, except that any calls to Fuller may be calls to Macklin since Macklin "very often" spent time at the house that had that phone line. Ex. 44 (Dease Feb. 5, 1999 Report) at DET237; Ex. 3 at 103:1-7.

193.    The police reports tendered to Horn and Jackson's defense attorneys in the criminal prosecution described the following relationships:

a)    Steve Brown was the brother-in-law of Willie Sadler; (Ex. 11, Brown Statement 19, NH000122, Mar. 10, 1999);

**RESPONSE**: Undisputed that a witness makes this claim in police reports produced to the defense.

b)    Tamika Fuller was a drug dealing associate of Willie Sadler; (Ex. 48, Dease Report 3, NH000008, Feb. 5, 1999; Ex. 98, Sadler Statement 3, NH000131, Mar. 5, 1999);

**RESPONSE**: Undisputed that this claim is made in police reports produced to the defense.

c)    Willie Sadler is the first cousin of Marlo Macklin; (Ex. 48, Dease Report 3, NH000008, Feb. 5, 1999);

**RESPONSE**: Undisputed that a witness makes this claim in a police report produced to the defense.

d)    Willie Sadler is the boyfriend of Tamika Fuller; (Ex. 48 Dease Report 3, NH000008, Feb. 5, 1999);

**RESPONSE**: Undisputed that a witness makes this claim in a police report produced to the defense.

e)    Adrianne Younger knows Marlo Macklin; (Ex. 99, Adger Report 2, NH000093, Mar. 5, 1999);

**RESPONSE**: Undisputed that a witness makes this claim in a police report produced to the defense.

f)    Willie Sadler was a close friend of William Newkirk; (Ex. 14, *Habeas* Trial Tr., 11:11-13, Mar. 18, 2013);

**RESPONSE**: Disputed. No police record is cited. The cited testimony by Newkirk in 2013 establishes only that Sadler and Newkirk were close in 1999, not that this fact was memorialized in police records disclosed to the defense.

g)    Adrienne Younger is a friend of Steve Brown. (Ex. 99, Adger Report 2, NH000093, Mar. 5, 1999).

**RESPONSE**: Undisputed that a witness makes this claim in a police report produced to the defense.

194.    Criminal defense attorney for Jackson, Michael Moscowitz, retained an investigator to investigate the "Bridgeport crew" for purposes of a third-party liability defense.

The investigation included Willie Sadler, but the investigator was unable to develop information or leads. (Ex. 100, *Habeas* Trial Tr., 107:10-21, 134:10-135:4, 138:24-27, Mar. 19, 2013).

> **RESPONSE**: Objection under FRCP 56(c)(2) that this purported fact cannot be presented in a manner admissible in evidence because it would violate the attorney-client and attorney work product privileges. Those privileges have been impliedly waived by Plaintiff to bring his *Brady* claims only with respect to any knowledge Plaintiff or his counsel may have had of the content of the withheld exculpatory evidence. Investigatory steps that Plaintiff's counsel may have taken that did not result in knowledge of the withheld *Brady* information are not within the scope of the waiver. Order, Dkt. 107 at 4-5 ("Outside of the narrow category of documents" related to the content of the 137 pages of phone records, "the [Court] concludes that the plaintiff has not impliedly waived the protections of the attorney-client privilege or the work-product doctrine."). To the extent a response is required, disputed. The cited sources do not establish that "the investigator was unable to develop information or leads," but only that the investigator was unable to develop sufficient information, on the basis of the materials available to him at the time, to obtain a third-party culpability instruction. *See* Detectives' Ex. 100.

195.    No records have been produced in discovery that Horn's and Jackson's respective criminal attorneys and their respective *habeas* attorneys subpoenaed or requested the phone records of Sadler, Macklin, Newkirk, and Fuller. (Ex. 78, Delcore Aff. ¶6).

> **RESPONSE**: Objection under FRCP 56(c)(2) that this purported fact cannot be presented in a manner admissible in evidence because it would violate the attorney-client and attorney work product privileges. Those privileged have been impliedly waived by Plaintiff to bring his *Brady* claims only with respect to any knowledge Plaintiff or his counsel may have had of the content of the withheld exculpatory evidence. Investigatory

steps that Plaintiff's counsel may have taken that did not result in knowledge of the

withheld *Brady* information are not within the scope of the waiver. Order, Dkt. 107 at 4-5

("Outside of the narrow category of documents" related to the content of the 137 pages of

phone records, "the [Court] concludes that the plaintiff has not impliedly waived the

protections of the attorney-client privilege or the work-product doctrine."). To the extent

a response is required, undisputed except as to Horn's federal habeas counsel, who did

seek (and obtain) the phone records that the Detectives had already obtained.

196.    No records have been produced in discovery identifying or describing the

substance of the telephone conversations made between callers in the 137 pages of phone records

associated with Brown, Sadler, Macklin, Newkirk, and Fuller. (Ex. 78, Delcore Aff. ¶7).

**RESPONSE**: Objection under FRCP 56(c)(2) that this purported fact cannot be

presented in a manner admissible in evidence. The sole evidence cited for this proposition

is an assertion in an affidavit made by a paralegal for the Detectives' lawyers. The

affidavit does not establish the necessary foundation to assert that a single piece of paper

"never has been produced in discovery." The affidavit does not state that the paralegal

has carefully reviewed (or reviewed at all) the entire discovery record in this case, but

merely that she has "been charged with downloading and organizing document

production with respect to the above entitled matters." Delcore Aff. ¶ 3. To the extent a

response is required, undisputed.

197.    No records have been produced that Macklin and Newkirk called each other from

January 1 to February 3, 1999. (Ex. 78, Delcore Aff., ¶8).

**RESPONSE**: Objection under FRCP 56(c)(2) that this purported fact cannot be

presented in a manner admissible in evidence. The sole evidence cited for this proposition

is an assertion in an affidavit made by a paralegal for the Detectives' lawyers. The

affidavit does not establish the necessary foundation to assert that a single piece of paper "never has been produced in discovery." The affidavit does not state that the paralegal has carefully reviewed (or reviewed at all) the entire discovery record in this case, but merely that she has "been charged with downloading and organizing document production with respect to the above entitled matters." Delcore Aff. ¶ 3. To the extent a response is required, disputed. *See* Ex. 50 at PL0008762 (call on Jan. 15, 1999 between Tamika Fuller's phone, regularly used by Macklin, and Newkirk).

198.    At Horn and Jackson's *habeas* hearings, Macklin testified that he did not know Newkirk's name and although he had seen him before, he did not "hang out" with him. (Ex. 51, *Habeas* Trial Tr., 193:3-195:9, Mar. 13, 2013).

**RESPONSE**: Undisputed that Macklin so testified.

199.    Newkirk testified at the *habeas* hearing that he knew Macklin only by his nickname, "Mai," and they were not close friends. (Ex. 14, *Habeas* Trial Tr., 4:2-27, 11:19-22, Mar. 18, 2013).

**RESPONSE**: Undisputed that Newkirk so testified.

200.    Newkirk denied being the head of a gang in Bridgeport. (Ex. 14, *Habeas* Trial Tr., 12:4-13, Mar. 18, 2013).

**RESPONSE**: Undisputed that Newkirk so testified.

201.    Newkirk testified he cooperated when Dease contacted him about Sadler. Newkirk told Sadler to tell Dease who called Sadler from the stolen phone. (Ex. 14, *Habeas* Trial Tr., 28:8-29:26, Mar. 18, 2013).

**RESPONSE**: Undisputed that Newkirk so testified.

202.    Macklin testified he never spoke to his cousin, Steve Brown, about the Deli homicide. (Ex. 51, *Habeas* Trial Tr., 204:12-14, Mar. 13, 2013).

**RESPONSE**: Undisputed that Macklin so testified.

203.    Newkirk and Macklin testified at Jackson's and Horn's *habeas* hearings that they were not involved in the Deli homicide. Macklin testified he was never in New Haven in the years during and after the crime. (Ex. 51, *Habeas* Trial Tr., 212:25-213:18, Mar. 13, 2013; Ex. 14, *Habeas* Trial Tr., 25:17-21, Mar. 18, 2013).

**RESPONSE**: Undisputed that Newkirk and Macklin so testified.

204.    Federal Public Defender, Terrance Ward, delivered the 137 pages of phone records to Patrick Griffin, the New Haven State's Attorney, and his Chief Deputy, Leonard Boyle, as part of his *Habeas Corpus* petition. Ward argued that the phone calls represented therein, implicated the Bridgeport crew as the offenders that committed the robbery with Brown. (Ex. 101, Griffin Dep. 22:11-23:13, Apr. 8, 2021; Ex. 102, Griffin Dep. Ex. 172, at 4-5 (letter dated Mar. 5, 2018)).

**RESPONSE**: Undisputed.

205.    After reviewing the documents, Griffin concluded that the documents would not support a third-party culpability claim because the records did not constitute direct evidence of involvement in the crime. (Ex. 101, Griffin Dep. 34:18-35:10, Apr. 8, 2021).

**RESPONSE**: Disputed. Griffin did not review the phone records. *See, e.g.*, Ex. 22 at 33:1-2 ("Again, I did not review the physical cell phone records."). The conviction integrity review process did not reach the issue of third party-culpability. *Id.* at 75:12-24 ("Third-party culpability is a claim made at trial. I determined that the evidence presented at trial was tainted, and that the state could not proceed with a retrial. And so whether or not the assertions made by the Federal Public Defenders about a potential third-party culpability claim would have been sustained in court such that a jury would receive a jury instruction as to third-party culpability did not form the basis of my opinion. I didn't have

to get there . . . because I had already determined that the evidence was not sufficient for me to retry the case.").

206.    Griffin concluded that the phone calls in the 137 pages of phone records, fell far short of probable cause and did not provide evidence that the Bridgeport group was responsible for the murder. (Ex. 101, Griffin Dep. 76:11-22, 118:18-119:3, Apr. 8, 2021).

**RESPONSE**: Disputed. The cited deposition testimony established only that Griffin expressed these views when asked at his deposition, not that he so concluded during his conviction integrity review process. The conviction integrity review process did not reach the issue of third party-culpability. Ex. 22 at 75:12-24.

207.    Griffin did not dismiss the criminal case against Horn and Jackson on the basis of actual innocence. (Ex. 101, Griffin Dep. 132:22-133:25, Apr. 8, 2021).

**RESPONSE**: Undisputed.


### The "ORIG" Column

208.    A column of numbers under the title "ORIG" was on the call detail record of the stolen phone. (Defs.' Rule 56a Statement, *supra* ¶75, at 15-16).

**RESPONSE:** Undisputed.

209.    There is no evidence that prior to 2018, any detective, prosecutor, judge, criminal defense attorney, or investigator involved with the Horn and Jackson prosecution and defense inquired about or knew what the designation "ORIG" meant or what the numbers in that column represented. (Ex. 103, *Fed. Habeas* Status Conf. Tr., 6:5-24, Apr. 5, 2018**).

**RESPONSE**: Disputed. The Detectives repeatedly reviewed the call detail log. Ex. 3 at 52:5-8. They repeatedly showed it to witnesses. Ex. 4 at 178:24-179:1. All of the information about a call's origin that one would expect a phone company to have, as a

"practical common sense matter," is obviously shown on the call detail log except the place of origin. Ex. 27 Moledor Tr. 17:19-19:11. Every commonly used English word that begins with "orig"—except origami—pertains to origination. *Id.* 19:12-20:12; *see* Definition of orig, Merriam-Webster, https://www.merriam-webster.com/dictionary/orig (defining "orig" as an abbreviation for "origin; original; originally") (last visited September 20, 2021); *id.* (follow "See More Nearby Entries" link) (listing dictionary entries before and after "orig," including "origami" (the art of paper folding), "Origen" (an early Christian scholar), and "origan" (a type of aromatic mint), followed by over a dozen entries stemming from the word "origin"). The "ORIG" column could not have reasonably referred to anything other than the calls' origin. Ex. 27 at 30:10-21. It is for the jury to assess the credibility of the Detectives' denials that they realized what that column meant.

210.    Knowledge of cell phone historical call analysis was virtually non-existent in 1999. The investigative technique was developed in or around 2005. Before that, investigative resources and training concerning the use of cellular data was extremely limited for law enforcement officers, which is consistent with the complete lack of knowledge about the "ORIG" column of the detectives in the Dixwell murder investigation. (Ex. 17, Adger Aff. ¶16; Ex. 104, Robert Moledor, Curriculum Vitae (2018); Ex. 105, Opinions of Robert G. Moledor 2, Mar. 29, 2021; Ex. 106, Wines Dep. 44:22-45:7, Oct. 2, 2019).

**RESPONSE**: Undisputed that cell phone historical analysis and training in that field were very limited in 1999, and developed in approximately the mid-2000s. Disputed that this "is consistent with the complete lack of knowledge about the 'ORIG' column of the detectives in the Dixwell murder investigation." No specialized knowledge is *needed* to read the call detail record. Just as one can read the date, time, called place, called number,

"mins," and "amount," columns on the call detail log without specialized knowledge or training in historical cell site analysis, *see* Ex. 27 at 20:20-24:2, one can also understand the meaning of the "ORIG" column without such training. All of the information about a call's origin that one would expect a phone company to have, as a "practical common sense matter," is obviously shown on the call detail log except the place of origin. *Id*. at 17:19-19:11. Every commonly used English word that begins with "orig"—except origami—pertains to origination. *Id*. at 19:12-20:12; *supra* ¶ 209. The "ORIG" column could not have reasonably referred to anything other than the calls' origin. Ex. 27 at 30:10-21.

211.    A dedicated FBI cellular investigative unit was not established until 2010. (Ex. 104, Robert Moledor, Curriculum Vitae (2018); Ex. 105, Opinions of Robert G. Moledor 2, Mar. 29, 2021; Ex. 106, Wines Dep. 42:1-3, Oct. 2, 2019).

**RESPONSE**: Undisputed.

212.    Michael Moscowitz and Leo Ahern, who represented Jackson and Horn respectively, did not investigate the numbers on the stolen phone call detail record. (Ex. 107, Moscowitz Dep. 101:25-108:17, Feb. 21, 2020; Ex. 108, Ahern Dep. 20:9-21:9, Feb. 21, 2020).

**RESPONSE**: Undisputed.

213.    ASA Nicholson identified the stolen phone call detail record as an exhibit that he presented to the judge and jury as "Exhibit No. 95". He did not know what "ORIG" column or the numbers beneath it meant at the time of the trial. No criminal defense attorney raised an issue about the "ORIG" column, either. (Ex. 12, Crim. Trial Tr., 154:1-155:18, Apr. 4, 2000; Ex. 77, Nicholson Dep. 312:6-315:12, Feb. 5, 2020).

**RESPONSE**: Undisputed.

214.    A representative from Omnipoint Communications, Richard Lindemulder,

testified at the criminal trial to authenticate the call detail record. He was shown the call detail

record with the "ORIG" column. When asked about the cell site information, Lindemulder

claimed the information could only be obtained by court order:

By Mr. Moscowitz:

Q    Now, do you know where the cell phone of Mr. Butler, what town that
     was in, that made the phone calls to those areas?

A    No that would actually require a court order, not a subpoena, so that
     information wasn't provided.

By Ahern:

Q    What information would we be able to get?

.    .    .

A    Through a court order, cell site information, the cell site, the phone
     actually used to make the call.

Q    What does that mean, what town? I didn't mean to interrupt you.

A    What it will do, it will be more specific of where the person or the cell
     phone was at the time the call was made within anywhere from a three to
     five mile radius.

Q    …[L]et me ask you this, the first page of that information, that information
     does not appear?

A    No, it does not.

(Ex. 12, Crim. Trial Tr., 157:4-8, 157:25-158:9, Apr. 4, 2000).

**RESPONSE**: Undisputed.

215.    Lindemulder's testimony was incorrect and misleading as the "ORIG" column

and numbers identifying the cell tower location was on the "first page" of Exhibit No. 95. (Ex.

105, Opinions of Robert G. Moledor ¶4, Mar. 29, 2021).

**RESPONSE**: Disputed in part. Lindemulder was correct that it typically required a search warrant or court order to obtain cell site information, although it was not necessary in this case because of the consent of the subscriber Vernon Butler. *See* Ex. 27 at 37:15-23 ("The process for receiving call detail records with cell site information historically requires a search warrant or court order as the proper legal process. . . . So that's an accurate statement on his part."). Undisputed that any statement that cell site information does not appear on the first page of State's Exhibit No. 95 at trial was incorrect.

### *Marcus Pearson Recants*

216.    Pearson had been a criminal since between the ages of 10 and 13 when he began stealing cars and selling and using drugs. (Ex. 109, Pearson Dep. 257:2-8, Oct. 30, 2019).

**RESPONSE**: Undisputed that Pearson engaged in these unlawful activities as a juvenile. Disputed that those activities conferred upon him the immutable status of "a criminal."

217.    In February 1999, Pearson was 21 years old. Pearson had been convicted of the sale of narcotics and was sentenced to five years (3 years suspended) and served two years in prison. His incarceration was followed by three years' probation beginning after his release in 1997. He had one year of probation remaining in January 1999. (Ex. 53, Pearson Dep. 45:3-46:13, Sept. 20, 2019).

**RESPONSE**: Undisputed.

218.    In 1998, Pearson was the father of two twin children. He met the mother of his children when he was released from prison in 1997, and within 30 days she was pregnant. The twins were born in June 1998. (Ex. 53, Pearson Dep. 45:3-8, Sept. 20, 2019; Ex. 109, Pearson Dep. 263:21-264:1, Oct. 30, 2019).

**RESPONSE**: Undisputed.

219.    In January 1999, the twins' mother was arrested on a warrant from South Carolina and was serving a sentence in a prison in Niantic, Connecticut. Pearson took care of the twins with his mother and a babysitter. (Ex. 53, Pearson Dep. 45:12-23, Sept. 20, 2019; Ex. 109, Pearson Dep. 266:19-267:7, Oct. 30, 2019).

**RESPONSE**: Undisputed.

220.    In January 1999, while on probation, Pearson was selling and smoking weed, which could have caused his probation to be violated, but he knew how to clean his urine. (Ex. 53, Pearson Dep. 46:20-47:9, Sept. 20, 2019).

**RESPONSE**: Undisputed.

221.    Pearson believed he was a suspect in the Deli robbery/homicide because detectives told him that two witnesses from the Deli identified him as being at the store before and after the crime. He lived a short distance away and fit the description of the robbers at 6' tall, 240 pounds. (Ex. 53, Pearson Dep. 65:3-66:1, Sept. 20, 2019; Ex. 109, Pearson Dep. 173:17-174:6, Oct. 30, 2019).

**RESPONSE**: Undisputed.

222.    Pearson believed that being a suspect in a robbery/homicide constituted a violation of probation, which would mean he could serve an additional three years in prison. (Ex. 109, Pearson Dep. 174:12-175:3, Oct. 30, 2019).

**RESPONSE**: Undisputed.

223.    Pearson's testimony at Horn and Jackson's criminal trial was consistent with the taped transcribed statements he gave on February 3 and 5 to Dease and Breland. Pearson testified that:

    a.    Yogi and Horn came to his porch on January 25, 1999, at around 11:00 a.m. (Ex. 12, Crim. Trial Tr., 184:11-20, Apr. 4, 2000).

**RESPONSE**: Undisputed that Pearson so testified in sum and substance at trial. Dispute that this testimony was "consistent" with anything Pearson said in the past, or that any of the content of the transcribed February 3 and February 5 accurately reflects Pearson's words or meaning. Everything Pearson told Dease and Breland about the stolen phone was fabricated by Dease and Breland and the tapes themselves were fabricated and manipulated. *See supra* ¶ 91.

b.     Horn told Pearson about having sex with Zaneta the day before. (Ex. 12, Crim. Trial Tr.,186:14-187:7, Apr. 4, 2000).

**RESPONSE**: Undisputed that Pearson so testified in sum and substance at trial. Dispute that this testimony was "consistent" with anything Pearson said in the past, or that any of the content of the transcribed February 3 and February 5 accurately reflects Pearson's words or meaning. Everything Pearson told Dease and Breland about the stolen phone was fabricated by Dease and Breland and the tapes themselves were fabricated and manipulated. *See supra* ¶ 91.

c.     Horn let Pearson use a cell phone to call Sykes from Pearson's porch. (Ex. 12, Crim. Trial Tr., 188:3-190:21, Apr. 4, 2000).

**RESPONSE**: Undisputed that Pearson so testified in sum and substance at trial. Dispute that this testimony was "consistent" with anything Pearson said in the past, or that any of the content of the transcribed February 3 and February 5 accurately reflects Pearson's words or meaning. Everything Pearson told Dease and Breland about the stolen phone was fabricated by Dease and Breland and the tapes themselves were fabricated and manipulated. *See supra* ¶ 91.

d.     Pearson identified Horn in Court and also identified a photo of Horn he signed during each police interview. (Ex. 12, Crim. Trial Tr., 202:5-205:21, Apr. 4, 2000).

**RESPONSE**: Undisputed that Pearson so testified in sum and substance at trial. Dispute that this testimony was "consistent" with anything Pearson said in the past, or that any of the content of the transcribed February 3 and February 5 accurately reflects Pearson's words or meaning. Everything Pearson told Dease and Breland about the stolen phone was fabricated by Dease and Breland and the tapes themselves were fabricated and manipulated. *See supra* ¶ 91.

e.     On February 9, Pearson went to the police station with his mother because he was tired of the questioning. (Ex. 12, Crim. Trial Tr., 206:12-27, Apr. 4, 2000).

**RESPONSE**: Undisputed that Pearson so testified in sum and substance at trial. Dispute that this testimony was "consistent" with anything Pearson said in the past, or that any of the content of the transcribed February 3 and February 5 accurately reflects Pearson's words or meaning. Everything Pearson told Dease and Breland about the stolen phone was fabricated by Dease and Breland and the tapes themselves were fabricated and manipulated. *See supra* ¶ 91.

f.    On February 9, Pearson identified a photo of Horn again and he also identified a photo of Yolanda Jenkins. (Ex. 12, Crim. Trial Tr., 209:21-210:13, Apr. 4, 2000).

**RESPONSE**: Undisputed that Pearson so testified in sum and substance at trial. Dispute that this testimony was "consistent" with anything Pearson said in the past, or that any of the content of the transcribed February 3 and February 5 accurately reflects Pearson's words or meaning. Everything Pearson told Dease and Breland about the stolen phone was fabricated by Dease and Breland and the tapes themselves were fabricated and manipulated. *See supra* ¶ 91.

g.    Pearson testified that he was interviewed three times about the stolen phone and that the police were harassing him. (Ex. 12, Crim. Trial Tr., 221:7-11, 222:19-21, Apr. 4, 2000; Ex. 110, Crim. Trial Tr., 31:21-27, 95:16-18, Apr. 5, 2000).

**RESPONSE**: Undisputed that Pearson so testified in sum and substance at trial. Dispute that this testimony was "consistent" with anything Pearson said in the past, or that any of the content of the transcribed February 3 and February 5 accurately reflects Pearson's words or meaning. Everything Pearson told Dease and Breland about the stolen phone was fabricated by Dease and Breland and the tapes themselves were fabricated and manipulated. *See supra* ¶ 91.

h.    Pearson called Sykes after he was interviewed by police and Sykes told him she remembered him calling her about her birthday party. (Ex. 110, Crim. Trial Tr., 25:6-17, 103:4-104:6, Apr. 5, 2000).

**RESPONSE**: Undisputed that Pearson so testified in sum and substance at trial. Dispute that this testimony was "consistent" with anything Pearson said in the past, or that any of the content of the transcribed February 3 and February 5 accurately reflects Pearson's words or meaning. Everything Pearson told Dease and Breland about the stolen phone was fabricated by Dease and Breland and the tapes themselves were fabricated and manipulated. *See supra* ¶ 91.

i.    Pearson denies telling Dease that he was reluctant to identify Horn because he did not want to "rat out" anybody. (Ex. 12, Crim. Trial Tr., 222:3-223:15, Apr. 4, 2000).

**RESPONSE**: Undisputed that Pearson so testified in sum and substance at trial. Dispute that this testimony was "consistent" with anything Pearson said in the past, or that any of the content of the transcribed February 3 and February 5 accurately reflects Pearson's words or meaning. Everything Pearson told Dease and Breland about the stolen phone was fabricated by Dease and Breland and the tapes themselves were fabricated and manipulated. *See supra* ¶ 91.

j.    When police began questioning Pearson about the stolen cell phone, he thought he was a suspect. (Ex. 110, Crim. Trial Tr., 10:26-11:6, 23:8-16, Apr. 5, 2000).

107

**RESPONSE**: Undisputed that Pearson so testified in sum and substance at trial. Dispute that this testimony was "consistent" with anything Pearson said in the past, or that any of the content of the transcribed February 3 and February 5 accurately reflects Pearson's words or meaning. Everything Pearson told Dease and Breland about the stolen phone was fabricated by Dease and Breland and the tapes themselves were fabricated and manipulated. *See supra* ¶ 91.

k.      Pearson did not remember calling Sykes until police showed him the records from the stolen phone. (Ex. 110, Crim. Trial Tr., 23:17-25:5, Apr. 5, 2000).

**RESPONSE**: Undisputed that Pearson so testified in sum and substance at trial. Dispute that this testimony was "consistent" with anything Pearson said in the past, or that any of the content of the transcribed February 3 and February 5 accurately reflects Pearson's words or meaning. Everything Pearson told Dease and Breland about the stolen phone was fabricated by Dease and Breland and the tapes themselves were fabricated and manipulated. *See supra* ¶ 91.

l.      Pearson further testified, "They [police] made it clear – they made it clear that I used the cell phone. They made it clear that the numbers on here is identification of my porch and they made it clear that he [Horn] was there that – while I knew he was there that morning, I was talking to him. They told me if I didn't get a phone from him, I took it from the scene which I didn't take it from the scene, sir." (Ex. 110, Crim. Trial Tr., 74:15-22 Apr. 5, 2000).

**RESPONSE**: Undisputed that Pearson so testified in sum and substance at trial. Dispute that this testimony was "consistent" with anything Pearson said in the past, or that any of the content of the transcribed February 3 and February 5 accurately reflects Pearson's words or meaning. Everything Pearson told Dease and Breland about the stolen phone was fabricated by Dease and Breland and the tapes themselves were fabricated and manipulated. *See supra* ¶ 91.

m.      Pearson further testified, "They [police] asked me first and then they made it clear, they made me – they let me know that they know I made the call." (Ex. 110, Crim. Trial Tr., 102:10-12, Apr. 5, 2000).

**RESPONSE**: Undisputed that Pearson so testified in sum and substance at trial. Dispute that this testimony was "consistent" with anything Pearson said in the past, or that any of the content of the transcribed February 3 and February 5 accurately reflects Pearson's words or meaning. Everything Pearson told Dease and Breland about the stolen phone was fabricated by Dease and Breland and the tapes themselves were fabricated and manipulated. *See supra* ¶ 91.

224.    In 2006, Pearson was in Cheshire Correctional Facility, where he encountered

Jackson, who told Pearson to tell the truth. (Ex. 40, Horn *Habeas* Trial Tr., 84:15-85:15, 118:17-

24, Mar. 12, 2013).

**RESPONSE**: Undisputed.

225.    Shortly after meeting Jackson, and while still in prison, Pearson wrote an affidavit in front of Jerry O'Donnell, an investigator working for Jackson's defense team. (Ex. 40, Horn *Habeas* Trial Tr., 91:26-94:9, 125:3-126:16, Mar. 12, 2013; Ex. 111, Pearson Dep. Ex. 4 (Pearson Aff., Apr. 11, 2006).

**RESPONSE**: Undisputed.

226.    In the affidavit, Pearson does not allege that he was coerced during his January 26, 1999 interview with Dease and Breland. Pearson states that he told the truth about the events of January 24, 1999. (Ex. 109, Pearson Dep. 293:21-294:9, Oct. 30, 2019).

> **RESPONSE**: Disputed. The sole cited source does not address the contents of Pearson's 2006 affidavit and therefore fails to provide any admissible evidence for the propositions stated herein. Furthermore, the entire substance of the affidavit—and every statement under oath by Pearson about this matter from 2006 onward—is that he was threatened and coerced by Dease and Breland into giving a false account of the relevant events. *See* Ex. 86 (Pearson Apr. 11, 2006 Aff.).

227.    At deposition in these lawsuits, Pearson testified he was interviewed a total of 6 times by both Dease and Breland. Some of the interviews took place at Pearson's home and some at police headquarters. (Ex. 53, Pearson Dep. 52:6-18, Sept. 20, 2019; Ex. 109, Pearson Dep. 189:17-24, Oct. 30, 2019).

> **RESPONSE**: Undisputed.

228.    Pearson further testified that before his statement was tape recorded, he repeatedly told detectives there was no cell phone and no call was made to Sykes. (Ex. 53, Pearson Dep. 52:18-25, 56:1-14, 71:1-18, Sept. 20, 2019).

> **RESPONSE**: Undisputed.

229.    Pearson testified that detectives rewound the tape and recorded over statements he made that the detectives did not want to hear. (Ex. 53, Pearson Dep. 58:17-59:10, Sept. 20, 2019).

**RESPONSE**: Undisputed.

230.    When Pearson was interviewed at police headquarters during the investigation, he felt he was in custody and that he was going to jail. (Ex. 53, Pearson Dep. 60:8-62:14, Sept. 20, 2019).

**RESPONSE**: Undisputed.

231.    Pearson testified to the following at Jackson's *Habeas* hearing in 2011; Horn's *Habeas* hearing in 2013, and his deposition in 2019.

a.    Dease and Breland told Pearson, "The evidence shows that either he [Horn] let you use it [the cell phone], or you took it from the crime scene. Which one is it?" (Ex. 53, Pearson Dep. 66:9-67:4, Sept. 20, 2019);

**RESPONSE**: Undisputed.

b.    Dease and Breland told Pearson that he either admit Horn let Pearson use the phone or Pearson was going to face charges for robbery and murder. (Ex. 53, Pearson Dep. 67:23-68:7, 74:9-11, Sept. 20, 2019);

**RESPONSE**: Undisputed.

c.    Dease and Breland came up with the idea of Horn giving Pearson the cell phone to call Crystal Sykes because he and Sykes knew each other. (Ex. 53, Pearson Dep. 72:5-12, Sept. 20, 2019);

**RESPONSE**: Undisputed.

d.    Pearson's probation officer called him and said she had knowledge of the situation and if Pearson did not cooperate and give a statement to detectives, she would violate his probation and that he could lose his kids to DCFS, which his probation officer unequivocally denies. (Ex. 53, Pearson Dep. 75:5-76:3, Sept. 20, 2019; Harris Dep. 18:2-22:6, Jan. 24, 2020);

**RESPONSE**: Undisputed.

e.      Dease and Breland also threatened to violate his probation and he would lose his children (Ex. 53, Pearson Dep. 76:7-25, Sept. 20, 2019).;

**RESPONSE**: Undisputed.

f.      The idea of Horn giving Pearson a cell phone and calling Sykes came from the detectives. (Ex. 53, Pearson Dep. 72:5-8, Sept. 20, 2019);

**RESPONSE**: Undisputed.

g.      Detectives told Pearson that if he did not cooperate with the statement, his mother would be charged with perjury. (Ex. 53, Pearson Dep. 78:11-16, Sept. 20, 2019);

**RESPONSE**: Undisputed.

h.      Detectives told him that his children's mother was in prison, if he were charged, Pearson believed the State would take his children and put them in foster care. (Ex. 53, Pearson Dep. 77:1-20, Sept. 20, 2019);

**RESPONSE**: Undisputed.

i.      He felt pressure thinking of himself and his family. (Ex. 53, Pearson Dep. 86:4-25, Sept. 20, 2019);

**RESPONSE**: Undisputed.

j.      Pearson concluded, "I lied for my freedom and my children's wellbeing." (Ex. 53, Pearson Dep. 87: 13-16, Sept. 20, 2019).

**RESPONSE**: Undisputed.

232.    Pearson stated that his mother was present at the February 9 interview at the station. Dease and Breland said that if he did not tell then what they wanted to hear, he was not going to walk out of there that day. (Ex. 53, Pearson Dep. 82:13-15, Sept. 20, 2019).

**RESPONSE**: Undisputed.

***Kendall Thompson Recants***

233.    Prior to January 24, 1999, Thompson had four to six criminal adjudications as a juvenile and was on adult probation at the time for a fight at school. (Ex. 26, Thompson Dep. 101:3-20, 178:5-22, 180:1-181:2, Oct. 3, 2019).

**RESPONSE**: Undisputed.

234.    Thompson witnessed the Deli robbery/murder when he walked into the Deli during the crime. He was 19 years old. (Defs.' Rule 56a Statement, *supra* ¶¶19-22 at 5-6; Ex. 26, Thompson Dep. 119:23-120:14, 127:16-23, 135:11-24, Oct. 3, 2019).

**RESPONSE**: Undisputed.

235.    Thompson fled the Deli when two gunmen went to the back of the store. He left the scene with a friend who was waiting outside in a car. Thompson went to his friend's home without calling the police. (Ex. 12, Crim. Trial Tr., 81:25-82:10, 83:14-84:10, 85:11-16, 98:2-4, Apr. 4, 2000; Ex. 26, Thompson Dep. 105:3-17, Oct. 3, 2019, Ex. 113, Thompson Statement 2, PL0013523, Jan. 26, 2012).

**RESPONSE**: Undisputed.

236.    A couple of days later, Dease and Breland arrived at Thompson's home to interview him at the police station. Thompson had described the Deli robbery to his friend, Shamar Madden. Madden assisted the detectives by showing them where Thompson lived. (Ex. 12, Crim. Trial Tr., 85:22-86:11, 100:20-101:10, Apr. 4, 2000; Ex. 26, Thompson Dep. 26:12-27:14, Oct. 3, 2019; Ex. 35, Dease Report 7, NH000019, Jan. 29, 1999; Ex. 113, Thompson Statement 3, PL0013524, Jan. 26, 2012).

**RESPONSE**: Undisputed.

237.    Thompson initially refused to cooperate. The detectives threatened to arrest Shamar Madden if Thompson did not come to the station. Thompson's aunt was also home when

the detectives arrived and encouraged Thompson to cooperate. (Ex. 12, Crim. Trial Tr., 100:20-101:10; 113:14-23, Apr. 4, 2000; Ex. 26, Thompson Dep. 27:21-28:23, 32:2-33:23, 135:11-136:13, Oct. 3, 2019).

**RESPONSE**: Undisputed.

238.    On the way to the station, the detectives dropped off Shamar Madden at his home. According to Thompson, he was taken to the police station for a two-hour interview that was conducted in a police interview room. (Ex. 12, Crim. Trial Tr., 102:4-103:3, 147:20-148:12, Apr. 4, 2000; Ex. 26, Thompson Dep. 53:14-54:24; 114:4-14, 137:13-138:21, Oct. 3, 2019).

**RESPONSE**: Undisputed.

239.    Dease and Breland explained to Thompson that he was not a suspect and was not under arrest, however, Thompson claimed he was still scared. (Ex. 12, Crim. Trial Tr., 101:16-22, 104:5-10, 114:7-17, Apr. 4, 2000; Ex. 26, Thompson Dep. 136:17-19, Oct. 3, 2019).

**RESPONSE**: Disputed. Thompson was under arrest irrespective of what Dease and Breland may have said. Dease and Breland "put him in the back of the car," and "brought him down" to the police station, Ex. 4 at 123:9-13, because "[i]t was more conducive for him to be down there," and "[m]ade things a lot easier," *id*. at 123:25, 124:16. They took Thompson to a room on an upper floor, closed the door, and told him to "have a seat." *Id.* at 128-131:13; Ex. 7 at 39:8. It was a "very small room, bright lights." Ex. 7 at 38:3-4. They gave Thompson no food or drink and did not tell him he could contact an adult or a lawyer or that he could leave. Ex. 4 at 144:20-145:6; Ex. 7 at 50:6-17. They kept him there about two hours. Ex. 7 at 50:5. Thompson was "scared." *Id.* at 42:20.

240.    At the criminal trial, Thompson testified that he did not tell the detectives he could identify anyone, and he was surprised Dease showed him a photo array. (Ex. 12, Crim. Trial Tr., 106:7-107:11, 115:19-23, Apr. 4, 2000).

**RESPONSE**: Undisputed.

241.    Thompson looked at the photo array and pointed to Horn because Horn's eyes and mouth looked like the yellow eyes and mouth of the robber, not because he saw Horn in the Deli during the robbery. (Ex. 12, Crim. Trial Tr., 105:24-106:3, 108:17-110:7, 143:20-146:10, Apr. 4, 2000).

**RESPONSE**: Disputed. Thompson pointed to Horn because Dease and Breland told him to. Thompson told Dease and Breland that the robbers were wearing face masks, Ex. 4 at 151:18-152:1, and that he could not describe their appearance, Ex. 7 at 86:3-11. Thompson repeatedly told Dease and Breland he could not identify the robbers. *Id.* at 57:20-58:10, 90:9-17 (did not identify Horn or Jackson), 227:17-20, 233:4-11 (same). Frustrated, Dease "said that he would call [Thompson's] probation officer and have [Thompson] violated" if he "didn't cooperate." *Id*. at 56:6-17, 59:8-11. Breland admits Dease told Thompson "that he'll notify Mr. Thompson's probation officer if he didn't cooperate." Ex. 4 at 157:21-24. "Cooperate" meant "[t]o take out these two defendants." Ex. 7 at 57:3-12. But as Thompson testified, "I couldn't because I didn't see who did the crime. That's what I kept on telling them." *Id.* at 57:12-14.

The Detectives had a theory that Horn's eyes had "a yellow shade." Ex. 4 at 115:17-116:3. They repeatedly told Thompson that Horn's eyes had a "yellow shade." Ex. 7 at 65:9-16, 66:1-14, 227:21-228:2. Horn's eyes had no "yellow shade." Ex. 47 (photo of Horn); Ex. 7 at. 68:9-10. But Dease "didn't want to take no for an answer." Ex. 7 at 68:2-3. Through their relentless pressure, the Detective manipulated Thompson to say that one of the robbers had "yellow" eyes. *Id.* at 110:5-111:4.

242.    Thompson picked out Jackson because he recognized Jackson from seeing him on the basketball court. Thompson could not say that Jackson was in the Deli during the robbery.

114

(Ex. 12, Crim. Trial Tr., 118:6-119:7, 121:11-20, Apr. 4, 2000; Ex. 26, Thompson Dep. 47:14-48:4, Oct. 3, 2019).

      **<u>RESPONSE</u>**: Undisputed.

      243.     At the criminal trial, Thompson testified he was not certain of his identifications. (Ex. 12, Crim. Trial Tr., 91:1-92:12, Apr. 4, 2000).

      **<u>RESPONSE</u>**: Disputed. The cited testimony establishes that Thompson testified at trial that he was not "100 percent sure" of his identifications.

      244.     Thompson testified at the criminal trial that police officers did not pressure him, and he did not say what the officers wanted to hear. (Ex. 12, Crim. Trial Tr., 144:6-145:14, Apr. 4, 2000).

      **<u>RESPONSE</u>**: Undisputed.

      245.     On January 26, 2012, Thompson was in prison for drug trafficking, when he was interviewed by "three attorneys." (Ex. 26, Thompson Dep. 12:5-19, 14:9-20, Oct. 3, 2019).

      **<u>RESPONSE</u>**: Undisputed that Thompson was interviewed while in prison for drug trafficking on or about January 26, 2012, and that Thompson understood the interviewers to have been "three lawyers." Detectives' Ex. 26 14:13-15. As is evident on the face of Thompson's 2012 statement, however, at least one of the interviewers was an investigator. Detectives' Ex. 112.

      246.     On that date, Thompson signed a written statement, prepared by one of the "attorneys" on stationary with the heading "Bulldog Investigations." Thompson claimed in his statement that he was pressured by Dease and Breland to make an identification. He claimed Dease and Breland threatened to violate his probation if he did not cooperate. (Ex. 26, Thompson Dep. 55:14-57:8, Oct. 3, 2019; Ex. 16, Breland Dep. 157:5-24, Dec. 16, 2019; Ex. 114, Thompson Dep. Ex. 21, at 4).

**RESPONSE**: Undisputed, except that the heading is "Bulldog Enterprise LLC."

247.    However, Thompson's written statement does not state that Thompson told police that he could not identify anyone. (Ex. 114, Thompson Dep. Ex. 21).

**RESPONSE**: Disputed. Thompson's 2012 statement states that he told Dease that he "couldn't tell" whether Vernon Horn's eyes depicted in the photograph were the eyes of one of the robbers. Detectives.' Ex. 114 at PL0013525.

248.    Breland testified at deposition in these lawsuits that Thompson said he could not identify the offenders "maybe twice," but Breland clarified that Thompson said he could make a partial identification "based on [the offender's] nose and complexion and the eye content." (Ex. 16, Breland Dep. 159:13-160:4, 162:3-15, Dec. 16, 2019).

**RESPONSE**: Undisputed that Breland acknowledged in his deposition in this case that Thompson said maybe twice, during his police interview in 1999, that Thompson could not identify the perpetrators of the Dixwell Deli robbery/homicide. Disputed that Breland "clarified" anything. Breland's testimony is clear as day:

> Q.    So Mr. Thompson said he couldn't identify Horn or Jackson. Right?
>
> A.    Yes.
>
> Q.    How many times did Mr. Thompson say that in the room?
>
> A.    Maybe twice.
>
> Q.    And when Mr. Thompson said he couldn't identify Horn and Jackson, what did you or Dease say in response?
>
> A.    There is nothing you can say. He couldn't identify them.

Ex. 4 at 159:13-160:9. Breland's attempt to "change" his testimony is incoherent: "On my statement he did say that he can make a – somewhat of an I.D. based on the nose, the complexion of the skin and the eye content. Now, when he talked in the deposition, he

said no." *Id.* at 162:10-15. Even if credited, Breland's purported "clarification" simply adds another statement that Thompson *also* purportedly made about a partial identification based on facial features. It does not negate Breland's clear admission that Thompson said "twice" that he could not make an identification.

249.    At his October 2019 deposition in these consolidated lawsuits, Thompson claimed that when Dease and Breland came to his house, they told him and his aunt that they could get a warrant for his arrest if he did not voluntarily come to the police station. (Ex. 26, Thompson Dep. 27:21-30:23, Oct. 3, 2019).

**RESPONSE**: Undisputed.

250.    At deposition, Thompson stated he told detectives "about 18 times" that he could not make an identification. (Ex. 26, Thompson Dep. 57:20-58:10, Oct. 3, 2019; Ex. 16, Breland Dep. 158:23-160:9, Dec. 16, 2019).

**RESPONSE**: Undisputed.

251.    Thompson does not fault the officers for asking about the mouth and eyes or that they kept coming back to it, since that was all he saw. (Ex. 26, Thompson Dep. 120:13-121:14, 124:18-125:3, Oct. 3, 2019).

**RESPONSE**: Disputed. Thompson describes Dease and Breland as "dirty cops" who "were looking for a fall guy," *i.e.*, "Horn and Jackson." Ex. 7 at 77:8-78:18. They "didn't want to take no for an answer." *Id.* at 68:2-3.

252.    At deposition, Thompson stated he did not feel pressure by the police when testifying at trial and confirmed that he told the truth at trial. (Ex. 26, Thompson Dep. 68:11-19, 116:9-20, Oct. 3, 2019).

**RESPONSE**: Undisputed that Thompson stated at his deposition that he did not feel like he remained under police pressure when he testified at trial. Also undisputed that

Thompson stated at his deposition that he told the truth at trial. Disputed that Thompson told the truth, and/or the whole truth, at trial. Thompson identified Vernon Horn as the perpetrator at trial. But as Thompson told the police "about 18 times," he could not identify any of the perpetrators. Ex. 7 at 57:20-58:10, 90:9-17.

253.    At deposition, Thompson confirmed that he told the truth in the transcribed statement from January 26, 1999 taken by the police. (Ex. 26, Thompson Dep. 119:11-22, Oct. 3, 2019).

**RESPONSE**: Disputed. Thompson testified at deposition that he told the police the truth during their interrogation of him on January 26, 1999. The cited testimony does not refer at all to the transcribed statement, which (i) is the product of Dease and Breland starting, stopping, rewinding, and manipulating the tape, which was lost or destroyed, Ex. 4 at 36:14-37:4, 81:16-82:8; (ii) Thompson refused to sign, *id.* at 140:15-141:2; and (iii) omits Thompson's truthful statement, repeated "about 18 times," that he could not identify the perpetrators of the homicide, Ex. 7 at 57:20-58:10, 90:9-17.

***Admitted Facts***

254.    At all relevant times, Dease, Adger, and Breland acted in accordance with the policies, procedures, custom and practices at the NHPD. (Ex. 115, Def. Adger's Resps. to Pl.'s Second Consolidated Reqs. for Admis. and Interrogs. ¶1, Oct. 14, 2020; Ex. 116, Def. Breland's Resps. to Pl.'s Second Consolidated Reqs. for Admis. and Interrogs. ¶1, Oct. 14, 2020; Ex. 117, Def. Dease's Resps. to Pl.'s Second Consolidated Reqs. for Admis. and Interrogs. ¶1, Oct. 14, 2020).

**RESPONSE**: Undisputed.

255.    At all relevant times, Dease, Adger, and Breland acted within the scope of their employment as employees of the NHPD. (Ex. 115, Def. Adger's Resps. to Pl.'s Second Consolidated Reqs. for Admis. and Interrogs. ¶2; Ex. 116, Def. Breland's Resps. to Pl.'s Second Consolidated Reqs. for Admis. and Interrogs. ¶2; Ex. 117, Def. Dease's Resps. to Pl.'s Second Consolidated Reqs. for Admis. and Interrogs. ¶2).

**RESPONSE**: Undisputed.

Dated: September 27, 2021
    New York, New York

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

_____/s/_____
Ilann M. Maazel
Nick Bourland
600 Fifth Avenue, 10th Floor
New York, N.Y. 10020
(212) 763-5000
imaazel@ecbawm.com
nbourland@ecbawm.com

PARRETT, PORTO, PARESE
& COLWELL, P.C.

Tamar R. Birckhead
2139 Whitney Avenue, Suite 1-D
Hamden, Connecticut 06518
(203) 281-2700

KAUFMAN LIEB LEBOWITZ
& FRICK LLP

Douglas E. Lieb
10 East 40th Street, Suite 3307
New York, NY 10016
(212) 660-2332
dlieb@kllf-law.com

*Attorneys for Plaintiff Vernon Horn*

119