UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

VERNON HORN,

              Plaintiff,

   -against-

CITY OF NEW HAVEN; and LEROY DEASE,
PETISIA ADGER, DARYLE BRELAND, and
JAMES STEPHENSON, in their individual
capacities,

              Defendants.

No. 3:18 Civ. 1502 (RNC)

## PLAINTIFF VERNON HORN'S RESPONSE TO THE CITY'S LOCAL RULE 56(A)(1) STATEMENT OF FACTS

Plaintiff Vernon Horn, by and through his undersigned counsel, hereby responds to the

Statement of Undisputed Material Facts Pursuant to D. Conn. L. Civ. R 56(a)(1) filed by

Defendant the City of New Haven ("the City").[1]

1. On January 24, 1999 at approximately 3:32 a.m., the New Haven Police

Department ("NHPD") responded to the Dixwell Deli on a report of an armed robbery wherein

Caprice Hardy was fatally shot. See Vernon Horn Arrest Warrant Application, **Ex. 1**, at 1;

Marquis Jackson Arrest Warrant Application, **Ex. 2**, at 1; Steve Brown Arrest Warrant

Application, **Ex. 3**, at 1.

**RESPONSE:** Undisputed.

---

[1] By responding that a particular fact is undisputed, Plaintiff indicates only that it is undisputed for purposes of this motion, not that it is undisputed for all purposes, and Plaintiff does not concede that the fact in question is material. That facts are in a particular numerical order in the City's Local Rule 56(a)(1) statement and are undisputed by Plaintiff is not, and should not be construed as, an agreement by Plaintiff that those facts occurred in a particular chronological order. The City's statement does not purport to be a strict chronology, and Plaintiff's responses do not concern the timing or sequence of events except where the City's numbered factual statements expressly address the timing or sequence of events.

2.      During the course of the robbery, a cell phone was stolen from deli employee, Vernon Butler. <u>See</u> Vernon Horn Arrest Warrant Application, **Ex. 1**, at 3; Marquis Jackson Arrest Warrant Application, **Ex. 2**, at 3; Steve Brown Arrest Warrant Application, **Ex. 3**, at 3.

**RESPONSE:** Undisputed.

3.      NHPD Detectives Petisia Adger, Leroy Dease and Daryle Breland worked on the Caprice Hardy homicide investigation. <u>See</u> Petisia Adger 12/11/19 Dep., **Ex. 4**, at 9:23–10:1; Daryle Breland 12/16/19 Dep., **Ex. 5**, at 36:8-10.

**RESPONSE:** Undisputed.

4.      On January 24, 1999, Regina Wolfinger, a witness present at the Dixwell Deli at the time of the robbery/homicide, gave a recorded statement to Detective Dease. <u>See</u> Regina Wolfinger Transcribed Statement, **Ex. 6**.

**RESPONSE:** Undisputed, except to the extent the City intends to imply that Wolfinger was present inside the Dixwell Deli at the time of the robbery/homicide. At the time of the robbery/homicide, Wolfinger was in her car parked "a little bit further up" the street from the Dixwell Deli. Ex. 29 (Horn Trial Tr.) at PL1070:5-71:5; City Ex. 6 at 3.[2]

5.      In her transcribed statement, Wolfinger viewed a photo array and selected a photo of Vernon Horn indicating that he looked familiar.  <u>See</u> Regina Wolfinger Transcribed Statement, **Ex. 6**, at 10.

**RESPONSE:** Undisputed.

---

[2]      All references to "City Ex." in Plaintiff's responses are to the exhibits filed by the City of New Haven in support of its June 6, 2021 motion for summary judgment. "Ex." refers to the exhibits filed by Plaintiff Horn in opposition to Defendants' motions for summary judgment and in support of Plaintiff's partial cross-motion for summary judgment.

6.      On January 26, 1999, Kendall Thompson (referred to as "K.T."), an eye witness to the robbery/homicide, gave a recorded statement to Detective Dease. See Kendall Thompson Transcribed Statement, **Ex. 7**.

> **RESPONSE:** Undisputed that Thompson was an eyewitness to portions of the Dixwell Deli robbery, and that Thompson was interviewed by NHPD detectives on January 26, 1999. To the extent the City intends to imply that the cited witness statement (City Ex. 7) is a truthful and accurate of Thompson's statements to the Detectives, this is disputed. *See* ¶¶ 7-8, *infra*.

7.      In his transcribed statement, Thompson viewed a photo array and identified Vernon Horn as the gunman in the Deli who ordered him to the ground, stating therein that he identified Horn because he recognized his eyes. See Kendall Thompson Transcribed Statement, **Ex. 7**, at 3-4.

> **RESPONSE:** Disputed. Any identification by Thompson was fabricated and coerced by the Detectives. Thompson repeatedly told the Detectives he could not identify Vernon Horn. Ex. 7 (Thompson Dep.) at 57:20-58:10, 90:0-17, 227:17-20, 223:4-11; Ex. 4 (Breland Dep.) at 159:13-160:9. As to the photo array: before recording Thompson's statement, the Detectives repeatedly showed Thompson "two photographs of Horn and Jackson." Ex. 7 at 45:7-8; Ex. 47 (Horn and Jackson mugshots). The Detectives "kept on putting [the two photographs] in front of [Thompson]" and said "Do[] these eyes match the eyes that you seen?" Thompson said "no." Ex. 7 at 49:5-15. The Detectives kept the two photographs in front of Thompson for "[t]he whole interview," *i.e.*, about two hours. *Id.* at 87:19-21. The Detectives repeatedly told Thompson that Horn's eyes had a yellow shade. *Id.* at 65:9-16, 66:1-14, 227:21-228:2. Horn's eyes had no yellow shade. Ex. 47 at

1 (Horn mugshot); Ex. 7 at 68:8-10 Through their relentless pressure, the Detectives manipulated Thompson to say at trial that one of the robbers had "yellow" eyes. Ex. 7 at 110:5-111:4.

8.      Thompson also identified Marquis Jackson as one of the other suspects involved in the robbery/homicide. See Kendall Thompson Transcribed Statement, **Ex. 7**, at 4-5.

**RESPONSE:** Disputed. Any identification by Thompson was manufactured and coerced by the Detectives. *See supra* ¶ 7. Thompson repeatedly told the Detectives he could not identify Jackson. Ex. 7 at 57:20-58:10, 90:9-17, 227:17-20, 223:4-11; Ex. 4 at 159:13-160:9.

9.      On February 2, 1999, the NHPD received a fax from Omnipoint Communications with the call detail record from Vernon Butler's stolen cell phone in response to a request for said records pursuant to a signed consent. See Omnipoint Phone Records, **Ex. 8**.

**RESPONSE:** Undisputed.

10.     The stolen cell phone call detail record disclosed five calls as having been made following the robbery, from 4:14 a.m. on 1/24/99 through 2:32 p.m. on 1/25/99. See Omnipoint Phone Records, **Ex. 8**.

**RESPONSE:** Undisputed.

11.     The first and fourth phone calls were identified as having been made to a Bridgeport number registered to Willie Sadler. See Vernon Horn Arrest Warrant Application, **Ex. 1**, at 4; Marquis Jackson Arrest Warrant Application, **Ex. 2**, at 4; Steve Brown Arrest Warrant Application, **Ex. 3**, at 4.

**RESPONSE:** Undisputed.

12.     The second phone call was identified as having been made to a Stratford number registered to Sandra Moore. <u>See</u> Vernon Horn Arrest Warrant Application, **Ex. 1**, at 4; Marquis Jackson Arrest Warrant Application, **Ex. 2**, at 4; Steve Brown Arrest Warrant Application, **Ex. 3**, at 4.

    <u>**RESPONSE:**</u> Undisputed.

13.     The third phone call was identified as having been made to a Bridgeport number registered to Floyd Jackson. <u>See</u> Vernon Horn Arrest Warrant Application, **Ex. 1**, at 4; Marquis Jackson Arrest Warrant Application, **Ex. 2**, at 4; Steve Brown Arrest Warrant Application, **Ex. 3**, at 4.

    <u>**RESPONSE:**</u> Undisputed.

14.     The fourth phone call was identified as having been made to a West Haven number registered to Stanley Cheronzy. <u>See</u> Vernon Horn Arrest Warrant Application, **Ex. 1**, at 4; Marquis Jackson Arrest Warrant Application, **Ex. 2**, at 4; Steve Brown Arrest Warrant Application, **Ex. 3**, at 4.

    <u>**RESPONSE:**</u> Undisputed.

15.     On February 5, 1999, Marcus Pearson gave a recorded statement to Detective Breland. <u>See</u> Marcus Pearson 2/5/99 Transcribed Statement, **Ex. 9**.

    <u>**RESPONSE:**</u> Undisputed that Pearson was interviewed by Breland on January 28, 1999. To the extent the City intends to imply that the cited witness statement (City Ex. 9) is a truthful and accurate representation of Pearson's statements to the Detectives, this is disputed. *See* ¶ 16, *infra*.

16.     In his transcribed statement, Pearson stated that Vernon Horn came to his house on January 25, 1999, morning after murder, and he used a cell phone give to him by Horn to

make the fourth phone call to Crystal Sykes who worked at the Cheronzy residence. See Marcus

Pearson 2/5/99 Transcribed Statement, **Ex. 9**, at 3-5.

> **RESPONSE:** Disputed. The February 5, 1999 witness statement attributed to Pearson
>
> was coerced and fabricated by Dease and Breland.
>
> On February 3, 1999, Dease and Breland went to interview Pearson for a third
>
> interview. Ex. 4 at 218:21-219:4. The Detectives took Pearson "down to the police
>
> station," "[i]nto the interrogation room." *Id.* at 219:5-9. Rather than gather evidence,
>
> Dease and Breland told Pearson that Horn had a cell phone, that Pearson borrowed the
>
> phone, and that Pearson used Horn's phone to call Sykes. "So the whole idea of Vernon
>
> Horn giving you a cell phone and you calling Crystal Sykes, that whole idea came from
>
> the detectives, right? A: Yes." Ex. 6 (Pearson Dep.) at 72:5-8; *id*. 57:9-10 (same); *id*.
>
> 67:1-15 (same); *id*. 71:19-22 (same); *id*. at 109:1-4 (Detectives gave Pearson the number;
>
> "they told me I called Crystal Sykes"). The Detectives did this "over and over again." *Id*.
>
> at 67:6-11.
>
> Pearson repeatedly told Dease and Breland it was a lie: Horn had no phone,
>
> and gave him no phone. "I kept telling them there was no phone." *Id.* at 52:19-20; *id*. at
>
> 56:1-2 ("I kept telling Dease and Breland there was no phone."); *id*. at 66:14-21 (same);
>
> *id*. at 72:19-21 (told them "on five different occasions"); *id*. 70:5-13 (same); *id*. at 83:20-
>
> 22 (same). But as Pearson testified, "They told me what to say. They didn't want to hear
>
> what I had to say." *Id*. at 80:4-5. "They came back, they came back again, came back
>
> again, they came more, they kept coming back, sir, because they didn't get the answers
>
> they wanted. They wanted the answers they wanted to hear." *Id*. at 85:4-86:3.

To get what they wanted, Dease and Breland used every pressure technique short of beating Pearson. Without any probable cause or legal basis, the Detectives took Pearson into custody, to a six by twelve foot interrogation room on the third floor of the police precinct. *Id.* at 59:12-63:5. "[T]hey told me if I ain't telling them what they wanted to hear I wouldn't be walking out of there, that I would be charged." *Id*. at 62:2-4; *id*. 83:1-23 ("they told me if I didn't say what I need, if I didn't tell them what they wanted to hear it depended on if I walked out of there that day"). "[T]hey basically told me to say I used the phone or I was facing charges [for robbery and murder]. That's what they told me." *Id*. at 67:23-68:7; *id*. at 65-66 (told Pearson he was a suspect and fit the description of one of the robbers); *id*. at 74:5-11 ("if I didn't say I used the cell phone, I was being charged they told me"); *id*. at 79/6-9 (the Detectives also threatened to charge Pearson with conspiracy); *id*. at 56:22 ("They were going to choose one of us [Pearson or Horn]."). As Pearson testified:

> Q: So Dease and Breland threatened to charge you with robbery, murder and conspiracy, right?
>
> A: Yeah.
>
> Q: If you didn't lie for them?
>
> A: Yeah, lying, going on what they wanted.

*Id*. at 79:13-19. But as Breland admitted, the Detectives had no "reason to arrest" Pearson. Ex. 4 at 287:18-19. The Detectives' threat to charge Pearson with murder was no more than a pressure tactic to force Pearson to lie.

The Detectives did not stop there. They threatened to take away Pearson's children if he failed to go along with the phony phone story. Ex. 6 at  75:5-24 ("Q: So Dease and Breland were saying if you don't lie for us, you're going to lose your kids? A:

Yeah."). Dease and Breland even (successfully) instructed Pearson's probation officer to tell Pearson "if you don't cooperate, then I'm going to violate your probation and let DCF know they have custody of your children." *Id*. at 76:9-23. The Detectives told Pearson he "might as well just put [him]self in jail and give the kids to the State to take the children" if he did not lie for them. *Id*. at 87:5-12. Dease and Breland also threatened to charge Pearson's mother with perjury if Pearson did not go along with the phone story. *Id.* at 78:11-18.

The Detectives also pretended they had phone records proving the stolen cell phone was used on Pearson's front porch. *Id.* at 67:18-21; *id*. at 53:1-2. That, too, was a fabrication. *See* Ex. 46 (phone records, which say nothing about who made phone calls). The Detectives also "told Pearson that Sykes said that Pearson called her," Ex. 4 at 277:17-19, when Sykes repeatedly said she had no knowledge of such a call. *See* Ex. 52 (Sykes Statement) at 4-5; Ex. 4 at 180:1-9, 184. As Pearson testified, Dease and Breland were "dirty cops" who "didn't care [about the truth] as long as they got a conviction, no matter whose life they destroyed in the middle of it." Ex. 6 at 80:6-20.

Dease and Breland used the NHPD's unrecorded "pre-interview" policy to its intended and maximum effect. Their threats, coercion, pressure, and fabrication occurred in the "pre-interview" interviews, "before they hit the record button." *Id.* at 54:24-55:4; *id*. 57:22-58:4 (same). These unrecorded interviews lasted "for hours." *Id*. 130:23-131:17. Even worse, the Detectives stopped the tape when Pearson said something that contradicted the Detectives' phony Horn/stolen phone story:

> Q: You told them there was no phone, and they would not put that on the tape, correct?
>
> A: Correct.

Q: And then when they'd start the tape when you said something they didn't want to hear, they would rewind the tape; is that what they did?

A: Yes.

Q: And then they would start over until they got what they wanted?

A: Yes.

*Id*. at 58:23-59:10; *id*. at 105:23-106:3 (same); *id*. at 124:21-127:11 (detailing fabrication when the recorder was off). At his deposition, Pearson was able to identify a number of suspicious clicks and splices where the Detectives likely stopped, rewound, and recorded over Pearson's oral statement to ensure their fabrication succeeded. *Id*. at 135:4-148:25. For his part, Breland testified that his thumb went in the "wrong direction" and therefore pressed the pause button of the cassette tape during the recording. Ex. 4 at 303:23-305:5.

Pearson finally caved to the pressure, principally to save his children. "I believe I did a good job with my children. They was good where I was. I couldn't let them go to the State." Ex. 6 at 77:8-16. "It was either my friend or my children. I chose my children over my friend which any father would do who was taking care of his kids by himself." *Id*. at 86:18-25. By coercing, pressuring, and threatening Pearson, threatening Pearson's mother and children, and lying to Pearson, the Detectives fabricated Pearson's statement about the cell phone. *Id*. at 88:18-90:8. Everything Pearson said connecting Horn to the stolen phone, in pretrial statements and at trial, was fabricated by Dease and Breland. *Id*. at 88:18-89:7; *id*. at 151:13-152:4 (same).

17.     On February 25, 1999, Detective Adger applied for a Search and Seizure Warrant directed to AT&T seeking phone records relative to the number registered to Sandra Moore, the

recipient of the second phone call from the stolen cell phone. See AT&T Search and Seizure Warrant, **Ex. 10**.

> **RESPONSE:** Undisputed, except to the extent the City intends to imply that Sandra Moore personally received the second phone call. The only source cited contains no evidence for this proposition.

18.    Records which were the subject of the AT&T Warrant were obtained on March 2, 1999, and the Return of Inventory relative to the same was signed by Detective Adger on March 4, 1999. See AT&T Search and Seizure Warrant Return, **Ex. 11**.

> **RESPONSE:** Undisputed.

19.    On February 25, 1999, Detective Adger also applied for a Search and Seizure Warrant directed to SNET seeking phone records relative to the numbers registered to Floyd Jackson and Stanley Cheronzy, the recipients of the third and fourth phone calls from the stolen cell phone, as well as the phone numbers utilized by Vernon Horn and Marquis Jackson. See SNET Search and Seizure Warrant, **Ex. 12**.

> **RESPONSE:** Undisputed, except to the extent the City intends to imply Floyd Jackson and Stanley Cheronzy personally received the third and fourth phone calls, respectively. The only source cited contains no evidence for these propositions.

20.    Records which were the subject of the SNET Warrant were obtained on February 26, 1999, and the Return of Inventory relative to the same was signed by Detective Adger on March 4, 1999. See SNET Search and Seizure Warrant Return, **Ex. 13**.

> **RESPONSE:** Undisputed.

21.     A portion of the phone records obtained by Petisia Adger during the course of her investigation exist within the Records Division of the NHPD, and other portions of the phone records could not be located. See Racheal Cain 9/18/20 Dep., **Ex. 14**, at 268:9-20, 269:6-11.

**RESPONSE:** Disputed. Adger did not put the records in the Records Division of the NHPD, but instead intentionally hid them, as evidenced by the following:

In 1999-2000, it was the personal practice of the trial prosecutor, Assistant State's Attorney Gary Nicholson, to "turn over all the documents [he] had to the defense." Ex. 21 (Nicholson Dep.) at 62:7-10. In the Dixwell Deli case, Nicholson turned over "everything" he had to the defense. Id. at 62:14-16. Defense counsel confirmed that Nicholson did in fact give them "copies of everything in his file." Ex. 24 (Moscowitz Dep.) at 99:11-100:2. Criminal defense counsel did not receive copies of any phone records other than the Omnipoint call detail log. Id. at 102:3-108:17, 234:16-235:4. The State's Attorney's Office never had the records because they were not in the Records Division.

Furthermore, in 2018, NHPD Assistant Chief Rachael Cain directed and supervised an extensive search for records concerning the Dixwell Deli case. See Ex. 13 (Cain Dep.) at 46:7-51:8. It was "a Herculean effort to find every scrap of paper anywhere in the world related to Horn." Ex. 19 (Foster Dep.) at 29:6-7. The phone records of Willie Sadler, Tamika Fuller, Marcus Pearson, and the Chorozny house in West Haven were not found anywhere in NHPD custody, including the Records Room. Ex. 13 at 46:7-51:8, 118:3-120:2. These phone records were not found anywhere except Adger's basement. Id. at 48:2-51:8, 118:3-120:2. The NHPD found nothing to suggest that these phone records had ever been logged into the Records Room. Id. at 118:3-120:2. "Never" during its

herculean efforts did the NHPD "learn anything" to suggest that the phone records had previously been disclosed to Horn, Jackson, or their defense counsel. Ex. 19 at 29:19-30:2.

In 1999, after seizing property without a warrant, New Haven police personnel were required to fill out a standard Connecticut Judicial Department inventory form (a "JD-18") to document the seizure. Ex. 13 at 130:18-133:1. JD-18s are filed with the court clerk, who creates an official record of materials seized during an investigation called the Journal of Seized Property. Ex. 20 (Thigpen Dep.) at 71:1-72:12. Adger seized Willie Sadler's phone records without a search warrant. Ex. 3 at 122:11-13. Those phone records were "evidence." Ex. 13 at 120:3-16. Adger did not complete the required JD-18 for Sadler's phone records. Ex. 3 at 123:2-5; Ex. 4 at 338:15-18. This violated basic police procedure. Ex. 4 at 339:4-10. Nor did Adger document her seizure of Sadler's phone records in a police report. Ex. 3 at 108:15-23. No entry in the Journal of Seized Property reflects the seizure of Sadler's phone records. Ex. 57.

In 1999, after seizing property pursuant to a search warrant, New Haven police personnel were required to complete the "return" of the search warrant, also known as "page 6," to "itemize what was seized after the search warrant was executed." Ex. 13 at 11:13-24. The seizure of property pursuant to a warrant was supposed to be noted in the NHPD evidence log. *Id.* at 54:9-18. The seized materials were supposed to be stored in the NHPD property room with a completed "page 6." *Id.* at 54:25-9. And the completed "page 6" was supposed to be filed with the court, *id.* at 12:14-16, which would record its contents in the Journal of Seized Property, Ex. 20 at 71:1-72:12. Adger seized the phone records of the West Haven house, Tamika Fuller, and Marcus Pearson pursuant to a

search warrant. Ex. 49 (Feb. 25, 1999 Warrant Application). The "page 6" return for that
search warrant was not filed with the Court until September of *2014*. *Id.*; Ex. 22 at
155:13-157:20. No entry in the NHPD evidence log reflects the seizure of the West
Haven, Fuller, or Pearson phone records. Ex. 13 at 119:8-11, 50:18-51:17. No entry in the
Journal of Seized Property reflects the seizure of those phone records. Ex. 57.

22.     On March 6, 1999, NHPD detectives traveled to the Bridgeport Police
Department and matched fingerprints found at the scene of the Dixwell Deli to the fingerprints of
Steve Brown that were on file with the Bridgeport police. See Steve Brown Arrest Warrant
Application, **Ex. 3**, at 7.

**RESPONSE:** Undisputed.

23.     On March 9, 1999, Detective Dease applied for an Arrest Warrant Application for
the arrest of Steve Brown, which was granted on the same date. See Steve Brown Arrest Warrant
Application, **Ex. 3**.

**RESPONSE:** Undisputed.

24.     On March 10, 1999, following his arrest, Steve Brown gave a recorded statement
to Detectives Dease and Adger. See Steve Brown Transcribed Statement, **Ex. 15**.

**RESPONSE:** Undisputed that Brown arrested and then gave a statement to Detectives
Dease and Adger. Disputed to the extent the City implies the accuracy or completeness of
the transcription, which is self-evidently incomplete and includes numerous blanks and
gaps. Ex. 55 (Brown Statement). Further disputed to the extent it implies that Brown gave
the tapes transcribed statement immediately after his arrest, as an hour-long pre-interview
occurred between when Brown was read his Miranda rights and the beginning of the
taped statement. Ex. 3 at 181:9-11 (time); 181:21-24 (started talking after Mirandizing).

13

25.     In his transcribed statement, Brown confessed to being involved in the Dixwell Deli robbery/murder. See Steve Brown Transcribed Statement, **Ex. 15**, at 3.

**RESPONSE:** Undisputed that Brown confessed to being involved in the Dixwell Deli robbery/murder. Disputed to the extent it implies the accuracy or completeness of the transcription, which is self-evidently incomplete and includes numerous blanks and gaps. Ex. 55.

26.     Brown further viewed a photo array and identified Vernon Horn and Marquis Jackson as his accomplices in the crime. See Steve Brown Transcribed Statement, **Ex. 15**, at 4-5.

**RESPONSE:** Undisputed that Brown claimed to identify Horn and Jackson in his taped statement. Disputed that this claim is a "fact." Horn and Jackson had never met Brown in their lives. Ex. 1 (Horn Dep.) at 106:3-109:20 (to this day, Horn and Brown have never spoken); Ex. 2 (Jackson Dep.) at 116:23-118:22 (Jackson first met Brown in pre-trial detention in 1999, after the Dixwell Deli robbery).

The Detectives told Brown who to identify as his accomplice. The Detectives were determined to put the crime on their "two guys" (Horn and Jackson) regardless of whether Brown's statement supported it, Ex. 33 (Dease Habeas Test.) at HHT-00847:10-11, and Brown made "impossible" statements consistent with Dease and Adger's other fabrications and private knowledge:

By the time Dease and Adger interviewed Brown, they had already fabricated the idea that Vernon Horn lent the stolen phone to Marcus Pearson in New Haven to call Crystal Sykes, which was "impossible." Ex. 27 (Moledor Dep.) 16:23-17:1 (defense expert); Ex. 28 (Wines Dep.) 31:24-32:3. All the calls from the stolen phone came from Bridgeport. Ex. 28 at 55:19-20. Somehow, Brown falsely told Dease and Adger that he

gave the phone back to Vernon Horn after making the first three calls. Ex. 55 at NH000123-124; Ex. 3 at 203:20-204:17. That lie fit with the Detectives' preexisting fabrication that Horn lent the phone to Pearson, but it never happened.

Similarly, by the time the Detectives interviewed Brown, they knew that Vernon Horn had waited outside the deli for an extended period to be interviewed by police after the murder. Ex. 3 at 185:1-9. The interview did not start until 30-40 minutes after the 911 dispatch—no earlier than 4:02 am. Ex. 29 at TT-114:7-14, 121:11-18. The first call from the stolen phone occurred at 4:14 am. Ex. 46. It came from the north side of Bridgeport. *Infra*. It was impossible for Vernon Horn to make it all the way to Bridgeport by 4:14 am after starting an interview with police outside the Dixwell Deli no earlier than 4:02. Ex. 77. Given what the Detectives already knew about the timeline, the only way they could put Vernon Horn in the getaway car with Steve Brown is if Brown said the first call happened *on the way* to Bridgeport. Somehow, conveniently, that is what Brown did.

27.    On March 12, 1999, Detective Adger applied for an Arrest Warrant Application for the arrest of Vernon Horn, which was granted on the same date. See Vernon Horn Arrest Warrant Application, **Ex. 1**.

**RESPONSE:** Undisputed

28.    Vernon Horn was arrested on March 22, 1999. See Horn Criminal Case Defendant Look-up Information, **Ex. 16**.

**RESPONSE:** Undisputed.

29.    On March 12, 1999, Detective Adger applied for an Arrest Warrant Application for the arrest of Marquis Jackson, which was granted on the same date. See Marquis Jackson Arrest Warrant Application, **Ex. 2**.

**RESPONSE:** Undisputed.

30.    Marquis Jackson was arrested on March 24, 1999. See Jackson Uniform Arrest Report, **Ex. 17**.

**RESPONSE:** Undisputed.

31.    During the 1990's, the NHPD had between 350-365 sworn police officers per year. See Melvin Wearing Dep., **Ex. 18**, at 268:1-4.

> **RESPONSE:** Undisputed that, according to Chief Wearing, there were an average of "[b]etween 350 and 375 police officers" at the NHPD in the 1990s. Wearing Dep. at 268:1-4.

32.    During the 1990's, the NHPD had approximately 35-45 detectives per year. See Melvin Wearing Dep., **Ex. 18**, at 268:5-9.

> **RESPONSE:** Undisputed.

33.    During the 1990's, the NHPD handled well over 2,000 felony cases each year. See Melvin Wearing Dep., **Ex. 18**, at 268:11-19; Connecticut Uniform Crime Reports for City of New Haven, **Ex. 19**.

> **RESPONSE:** Undisputed.

34.    All evidence is brought to either the Property/Evidence Room or Records Room. See Melvin Wearing Dep., **Ex. 18**, at 44:21-23; Racheal Cain 12/9/19 Dep., **Ex. 20**, at 121:9-19.

> **RESPONSE:** Disputed. Assistant Chief Cain, in the above-cited testimony, said nothing about "all evidence." Rather, Cain testified that, when she was a detective, she put documentary evidence seized from a third party "in the property room," and, based on her observations when she was a detective, some other detectives instead put documentary evidence in the record room. Ex. 13 at 121:9-19.

16

NHPD officers routinely failed to preserve evidence by bringing it to the Property Room or Records Room. NHPD officers were not required to log their field notes into evidence in the Property Room or Records Room. Ex. 14 (Wearing Dep.) at 114:17-22. Breland testified that, over the course of his sixteen-year career at the NHPD, he never gave his notebooks to the records room or evidence room. Ex. 4 at 260:21-261:1, including notes that were the only record of what witnesses said during pre-interviews, *id.* at 62:4-7. Instead, Breland kept his notebooks from hundreds of criminal cases to himself and stored them in a drawer in his desk. *Id.* at 67:18-68:16, 261:2-3. When Breland retired from the NHPD in 2010, he did not bring his notebooks to the Property Room or Records Room, he simply left them in his desk. *Id.* at 68:13-23. Adger's practice was to throw away her notes from witness pre-interviews. Ex. 3 at 68:10-18, 69:3-12, 82:6-18. Adger, who was later promoted to Assistant Chief, testified that she believed her practice of throwing away pre-interview notes was consistent with NHPD policy. *Id.* at 69:9-12. According to Chief Wearing, some detectives placed their notes in evidence and some did not. Ex. 14 at 113:17-22. When he was a detective, Wearing's personal practice was to store his notes in his desk. *Id.* at 114:1-3. Throughout her career, Assistant Chief Cain sometimes also took her notes home. Ex. 5 (City 30(b)(6) Dep.) at 189:5-14. After she retired from the NHPD, she brought her notebooks home. *Id.*

NHPD officers also routinely stored evidence outside of the Property Room or Records Room. It was a common practice for detectives to keep original evidence, including signed photo arrays, tapes of witness statements, and transcripts of witness statements, in their desks. Ex. 17 (Coppola Dep.) at 73:2-8 (photo arrays); Ex. 16 (Kendall Dep.) at 177:22-178:7 (photo arrays); *id.* at 173:8-11 (tapes and written

statements). The detectives' supervisors also stored evidence outside of the Property Room or Records room. Throughout his time as second-in-command of the Detective Division from 1995 to 1999, Ex. 16 at 20:3-7, 23:12-14, Sergeant Kendall kept evidence in his unlocked desk in his office as "a routine practice," *id.* at 171:10-19. Sergeant Kendall testified that this was "a common practice that was passed down" from more experienced officers. *Id.* at 171:20-23. For example, during the Department's investigation of a homicide cold case in 1998, Sergeant Kendall stored an original tape and transcription of a witness statement in his desk. *Id.* at 49:9-50:10. The tape from that case was subsequently lost, *id.* at 175:6-20, and Sergeant Kendall was involved in other cases where tapes of witness interviews had gone missing, *id.* at 175:21-176:9. This practice extended all the way to the Chief of Police—Detective Coppola personally observed that Chief Wearing was storing two boxes in his office containing original cassette tapes and photo boards from two nine-year-old murder cases. Ex. 17 at 76:5-18.

The NHPD's own written policy directed officers to avoid "recording direct quotes and minute details in their statements" of witnesses who were not friendly to a suspect, including victims. Ex. 5 at 215:11-216:5; Ex. 80 (NHPD Training Bulletin 4-26) at NH5670. Thus, if an officer followed this NHPD written policy, certain evidence from witnesses would not be recorded in witness statements, and therefore not be logged into evidence in the Property Room or Records Room.

Finally, for decades, NHPD officers routinely lost or destroyed taped and written witness statements pursuant to long-established NHPD practice. From 1980 to 1992, the Supreme Court of Connecticut and Appellate Court of Connecticut reviewed at least fourteen cases where the NHPD erased, destroyed, or lost recorded witness statements

pursuant to what the Appellate Court called "the [NHPD's] policy of destruction of taped statements." *State v. Jones*, 29 Conn. App. 304, 310 (1992). A judge of the Appellate Court wrote that "the seemingly intractable behavior of the [NHPD] with respect to witness' statements is deeply disturbing, *id.* at 325 (Norcott, J., concurring), and noted that the NHPD was "rapidly becoming the bete noire of Connecticut police departments," *id.* at 325 n.9.

During the Dixwell Deli robbery/homicide investigation, which took place *seven years after* the Appellate Court criticized the NHPD's mishandling of taped witness statements, the Detectives lost or destroyed evidence, including taped and written records of witness statements, in at least the following instances:

- Adger did not put the phone records (other than the Omnipoint call detail log) in the Property Room or Records Room. *See* ¶ 21, *supra*.

- Breland does not know where any of the tape recordings are of any of the witnesses the NHPD interviewed during the Dixwell Deli robbery/homicide investigation, Ex. 4 at 76:15-17, including the recordings of Thompson, Pearson, Sykes, Brown, Wolfinger, Howard Roberts, Vernon Butler, Latish Smith, Zanetta Berryman, Abby Yousif, Imar Robinson, and Shaquan Pallet. *Id.* at 76:24-78:20. Breland claims he gave the tapes to Dease but he does not know what happened to them after that. *Id.* at 76:2-17. Breland never saw Dease put any tapes from the Dixwell Deli case into the Evidence Room. *Id.* at 75:25-76:1.

- On January 28, 1999, Dease and Breland interviewed Pearson at his home. *Id.* at 211:14-22. Before taking a taped statement, Breland documented the interview in his notebook. *Id.* at 212:14-19. Dease and Breland then took Pearson's taped

statement. *Id.* at 213:3-7. Breland did not have the taped statement (or a transcription of it) logged into evidence in the Records Room or Property Room; the statement is missing. *Id.* at 214:15-16; *id.* at 216:19-23; *id.* at 217:15-18 (confirming that the recording and transcription of Pearson's January 28 statement "disappeared"). Breland also did not log his notes into evidence; they are also missing. *Id.* at 78:21-79:2, 217:1-20.

- When Dease and Breland interrogated Thompson at the police station, they conducted a pre-interview, which was not tape recorded. *Id.* at 133:4-6. Dease took notes during the pre-interview but those notes are missing today. *Id.* at 79:3-5; 132:20-133:17.

- On February 2, 1999, Dease and Breland interrogated Sykes. *Id*. at 177:14-16, 178:3-5. They had a tape recorder but did not record their pre-interview of Sykes. *Id.* at 178:6-8. Instead, Dease took notes in his notebook but did not disclose them. *Id.* at 178:11-16 ("Q. And where are Mr. Dease's notes of the pre-interview with Crystal Sykes? A. I don't know.").

- Adger took notes documenting her and Dease's hour-long unrecorded pre-interview of Brown on March 10, 1999. Ex. 3 at 193:18-20; Adger Aff. (Detective Ex. 17) ¶ 15. Adger did not log her notes into evidence; she threw them away. Ex. 3 at 183:5-9; Adger Aff. ¶ 15.

35.    Physical evidence is kept in the Property Room, and record evidence is kept in the Records Room. See Petisia Adger 12/11/19 Dep., **Ex. 4**, at 120:11-121:12, 125:9-24.

**RESPONSE:** Disputed. As a matter of policy, all evidence, physical or documentary, was supposed to go in the Property Room. Ex. 13 at 121:20-122:9 (as a matter of policy,

evidence was supposed to go in the Property Room, and any detective who put evidence in the Records Room was acting inconsistent with policy). Further disputed that to the extent that it implies that, as a matter of practice, evidence was properly stored in the intended manner. *See* ¶ 34, *supra*.

36.    The Property/Evidence Room is manned by a supervisor; all evidence is logged in and had to be signed in or out. <u>See</u> Melvin Wearing Dep., **Ex. 18**, at 60:9-16.

**RESPONSE:** Undisputed.

37.    The Records Room is staffed twenty-four hours a day. <u>See</u> Melvin Wearing Dep., **Ex. 18**, at 60:20-25.

**RESPONSE:** Undisputed.

38.    Both the Property/Evidence Room and Records Room are secure locations; officers are not permitted to go into them and remove items on their own. <u>See</u> Melvin Wearing Dep., **Ex. 18**, at 62:17-63:21; Racheal Cain 12/9/19 Dep., **Ex. 20**, at 122:10-14.

**RESPONSE:** Undisputed.

39.    The State's Attorneys and their investigators are permitted to enter the Property Room or Records Room to retrieve materials they need from a file. <u>See</u> Melvin Wearing Dep., **Ex. 18** at 46:2-9, 64:19-23, 268:20-25; Petisia Adger 12/11/19 Dep., **Ex. 4**, at 123:15-25; Gary Nicholson Dep., **Ex. 21**, at 44:6-16, 45:12–47:6, 54:22–55:3, 278:24–279:4, 280:13-18.

**RESPONSE:** Undisputed that the State's Attorneys and their investigators were permitted to enter the Property Room or Records Room to retrieve materials they needed from a file *under certain circumstances*. State's Attorney's Office personnel could not freely walk into and out of the Property Room or Records Room and take such materials at will. Every record removed from the Property Room or Records Room had to be

logged out. *See supra* ¶ 36; Ex. 21. at 278:25-279:5 (noting that State's Attorney

investigator could "access" the NHPD "evidence and property room and records," but if

he "went over to retrieve documents or evidence, he would have to sign out for it"); Ex.

13 at 122:15-17; Ex. 14 at 60:20-25.

40.    Once a warrant has been executed, the officer brings in the Search Warrant

Application and the Return of Inventory to the clerk's office. See Barbara Thigpen Dep., **Ex. 22**,

at 115:1-11, 116:7-14, 129:9-24.

> **RESPONSE:** Undisputed that this is the procedure that is supposed to occur. Disputed
>
> that it occurred in this case, as the Return of Inventory for the SNET warrant at issue here
>
> was not filed with the clerk of the court until 2014. Ex. 49; Ex. 22 at 155:13-157:20.

41.    A JDCR-20 form (a carbon-copy index card) is prepared noting the date on which

the executed warrant and inventory is returned to Court, and the form/index card is signed by the

clerk confirming the same. See Barbara Thigpen Dep., **Ex. 22**, at 32:4-14, 34:7-14, 35:1-3,

36:15–37:19, 56:1-2.

> **RESPONSE:** Disputed. The index card is provided when the warrant is signed by the
>
> judge and a copy of the signed warrant is sent to the Clerk's office, not after the property
>
> has been seized pursuant to the warrant. Ex. 20 at 101:5-22 ("After the warrant has been
>
> executed by the judge, then that warrant would – had been turned into the Clerk's office;
>
> and then, in turn, we would have filled out one of those cards with the carbon copy and
>
> pertinent information . . . ."); *id.* at 101:23-102:4 ("So there is not an index card filled out
>
> when there is a Seizure of Property returned to the Court . . . ? Am I right? A. Yes.").

42.    A carbon copy of the JDCR-20 Index Card is provided to the officer as a receipt

for their files, and the original index card is placed with the warrant and is filed away with the

Clerk's office until such time as an arrest has been made. See Barbara Thigpen Dep., **Ex. 22**, at 37:8-19, 38:1-10.

> **RESPONSE:** Disputed. The index card is provided when the warrant is signed by the judge and a copy of the signed warrant is sent to the Clerk's office, not after the property has been seized pursuant to the warrant. Ex. 20 at 101:5-22 ("After the warrant has been executed by the judge, then that warrant would – had been turned into the Clerk's office; and then, in turn, we would have filled out one of those cards with the carbon copy and pertinent information . . . ."); *id.* at 101:23-102:4 ("So there is not an index card filled out when there is a Seizure of Property returned to the Court . . . ? Am I right? A. Yes.").

43.    The JDCR-20 Index Card is attached to the search warrant itself and not the actual Inventory of Seized Property Form. See Barbara Thigpen Dep., **Ex. 22**, at 61:10-12, 102:5-18.

> **RESPONSE:** Disputed. The index card is provided when the warrant is signed by the judge and a copy of the signed warrant is sent to the Clerk's office, not after the property has been seized pursuant to the warrant. Ex. 20 at 101:5-22 ("After the warrant has been executed by the judge, then that warrant would – had been turned into the Clerk's office; and then, in turn, we would have filled out one of those cards with the carbon copy and pertinent information . . . ."); *id.* at 101:23-102:4 ("So there is not an index card filled out when there is a Seizure of Property returned to the Court . . . ? Am I right? A. Yes.").

44.    No other log or record of the return of the executed warrant is prepared in circumstances where an arrest has not yet been made at the time the executed warrant is returned to the Court. See Barbara Thigpen Dep., **Ex. 22**, at 37:20-23.

> **RESPONSE:** Disputed. The completed "page 6," or Inventory of Seized Property Form, is supposed to be filed with the Court. Ex. 13 at 12:14-16. Further disputed to the extent

this implies that this implies that the index card is generated upon return of the Inventory of Seized Property Form. The index card is provided when the warrant is signed by the judge and a copy of the signed warrant is sent to the Clerk's office, not after the property has been seized pursuant to the warrant. Ex. 20 at 101:5-22 ("After the warrant has been executed by the judge, then that warrant would – had been turned into the Clerk's office; and then, in turn, we would have filled out one of those cards with the carbon copy and pertinent information . . . ."); *id.* at 101:23-102:4 ("So there is not an index card filled out when there is a Seizure of Property returned to the Court . . . ? Am I right? A. Yes.").

45.     Barbara Thigpen prepared and signed the JDCR-20 Index Card appended to the front of the NHPD Search and Seizure Warrant directed to SNET confirming that the Warrant and Return of Inventory was received by the Clerk's office on March 5, 1999. See Barbara Thigpen Dep., **Ex. 22**, at 31–36; Warrants and JDCR-20 Index Card, **Ex. 23**.

> **RESPONSE:** Disputed. According to Thigpen, "there is no way to tell, just by looking at the face of a card by itself, which particular warrant it corresponds to." Ex. 20 at 94:19-23. The cited testimony establishes at most that Thigpen signed two cards that pertained to the Horn/Jackson case in some manner on March 5, 1999; it does not establish in any way which warrants the cards pertained to. *See id*. at 38:11-40:25. In any event, the index card is provided when the warrant is signed by the judge and a copy of the signed warrant is sent to the Clerk's office, not after the property has been seized pursuant to the warrant. *Id*. at 101:5-22 ("After the warrant has been executed by the judge, then that warrant would – had been turned into the Clerk's office; and then, in turn, we would have filled out one of those cards with the carbon copy and pertinent information . . . ."); *id.* at

101:23-102:4 ("So there is not an index card filled out when there is a Seizure of Property

returned to the Court . . . ? Am I right? A. Yes.").

46.    Gary Nicholson, the State's Attorney who prosecuted this case, was an Assistant

State's Attorney for New Haven for 24 years. See Gary Nicholson Dep., **Ex. 21**, at 35:10-12.

**RESPONSE:** Undisputed.

47.    State's Attorney Nicholson regularly worked with the NHPD detectives, including

working with the evidence seized by detectives and witness statements secured by them. See

Gary Nicholson Dep., **Ex. 21**, at 37:12-20.

**RESPONSE:** Undisputed.

48.    The State's Attorney's office would typically have their investigator/inspector go

over to the NHPD Property Room, Records Room, steno pool, Patrol Division and Investigative

Services Unit to review evidence, reports, statements and audio recordings of same, and to obtain

copies of the materials in a case. See Gary Nicholson Dep., **Ex. 21**, at 44:6-16, 45:12–47:6,

54:22–55:3.

> **RESPONSE:** Undisputed that the State's Attorney's Office would sometimes have their
>
> investigator go to the locations described to obtain evidence. Disputed to the extent that it
>
> implies that this was the only way the State's Attorney's Office obtained evidence from
>
> the NHPD. The State's Attorney's Office also obtained evidence "from the Police
>
> Department itself" by sending the Department a request to send documents over to the
>
> State's Attorney's Office. Ex. 21 at 45:12-21. Further disputed to the extent it implies
>
> that the State's Attorney's investigators or inspectors could freely walk into and out of
>
> the Property Room or Records Room and take such materials without logging it out first.
>
> *See supra* ¶ 39.

49.    Mel Cartocetti (now deceased) was the State's Attorney Investigator/Inspector assisting Attorney Nicholson in the prosecution of this case. See Gary Nicholson Dep., **Ex. 21**, at 278:17-23.

**RESPONSE:** Undisputed.

50.    Mel Cartocetti had access to the NHPD Property/Evidence Room, as well as the Records Room. See Gary Nicholson Dep., **Ex. 21**, at 278:24–279:4, 280:13-18.

**RESPONSE:** Undisputed that Cartocetti had access to the evidence stored in the NHPD Property and Records Rooms. Disputed to the extent it implies that Cartocetti could freely walk into and out of the Evidence Room or Records Room and take such materials without logging it out first. *See supra* ¶ 39.

51.    Attorney Nicholson requested that Cartocetti retrieve and make copies of any audio tapes of witness statements for this case. See Gary Nicholson Dep., **Ex. 21**, at 289:22-25.

**RESPONSE:** Undisputed.

52.    On February 16, 2000, Cartocetti signed out several audio/cassette tapes of witness statements from the NHPD evidence/property room, only two of which were signed back in as having been returned on April 24, 2000. See NHPD Evidence Sign-out Log, **Ex. 24**.

**RESPONSE:** Disputed. Defendants cite no testimony to authenticate or explain this document or otherwise explain why every single item of evidence on the first page of the log would have been returned on 4/24/00, but every single item of evidence on the second page of the log would not. On its face, the far more logical reading of the document is that whoever's initials are "KAI," upon logging all of the items from the State's Attorney's Office back into evidence on 4/24/00, simply neglected to continue drawing the line down the relevant columns on the second page of the log.

26

53.    When retrieving NHPD records for Attorney Nicholson, Cartocetti would, at times, make judgment calls about what records to copy. See Gary Nicholson Dep., **Ex. 21**, at 300:12-19.

> **RESPONSE:** Disputed. When retrieving NHPD records for ASA Nicholson, Cartocetti had discretion not to duplicate materials already in the possession of the State's Attorney's Office, but was required to retrieve all investigative materials that the State's Attorney's Office did not already possess. Ex. 21 at 279:24-280:12 (ASA Nicholson: "[H]e might have a judgment call insofar if he was aware that certain information was already in our office. Obviously he's not going to duplicate that again. But *if he saw something that we did not have, he would make a copy of it and bring it back*.").

54.    Attorney Nicholson cannot say whether Cartocetti saw 137 pages of phone records in the NHPD Records Room and made a decision not to copy them or that they were not needed, and it is possible that that happened. See Gary Nicholson Dep., **Ex. 21**, at 301:1-15.

> **RESPONSE:** Undisputed that Nicholson has no personal knowledge of actions taken or not taken by Cartoceti. Disputed that there is any reason whatsoever to believe this occurred, as Cartocetti was a "reliable," "conscientious," "professional" employee, Nicholson Dep. at 322:9-17, who never lost or destroyed evidence in any other case, *id.* at 322:18-323:11, and was required to retrieve all investigative materials that the State's Attorney's Office did not already possess, *id.* at 279:24-280:12.

55.    During his 24 years as Assistant State's Attorney for New Haven, Attorney Nicholson never heard any information or complaints indicating that Detective Leroy Dease ever coerced or threatened a witness, or that Detective Dease had ever fabricated evidence in a case. See Gary Nicholson Dep., **Ex. 21**, at 307:8–308:11.

**RESPONSE:** Undisputed that Nicholson so claimed, in sum and substance, during his deposition testimony.

56.    During his 24 years as Assistant State's Attorney for New Haven, Attorney Nicholson never heard any information or complaints indicating that Detective Petisia Adger ever coerced or threatened a witness, or that Detective Adger had ever fabricated evidence in a case. See Gary Nicholson Dep., **Ex. 21**, at 308:23–309:12.

**RESPONSE:** Undisputed that Nicholson so claimed, in sum and substance, during his deposition testimony.

57.    During his 24 years as Assistant State's Attorney for New Haven, Attorney Nicholson never heard any information or complaints indicating that Detective Daryle Breland ever coerced or threatened a witness, or that Detective Breland had ever fabricated evidence in a case. See Gary Nicholson Dep., **Ex. 21**, at 310:3-11.

**RESPONSE:** Undisputed that Nicholson so claimed, in sum and substance, during his deposition testimony.

58.    At the time of the Horn and Jackson criminal trial, defense counsel had possession of audiotaped recordings of witness statements. See Michael Moscowitz Dep., **Ex. 25**, at 110:10-15.

**RESPONSE:** Disputed. The sole cited source contains no evidence for that proposition. In the cited testimony, Moscowitz simply confirmed that, as a "rule," *if* the State's Attorney had tapes of witness statements, the State's Attorney would turn them over to Moscowitz—which is undisputed. Ex. 24 (Moscowitz Dep.) at 110:10-111:14 ("Q: If [the State's Attorney] had tapes, you would get – you would get the tape also? A: That's correct."). The cited testimony does not establish whether any audio recordings from this

28

case were in fact in the possession of the State's Attorney's Office at the time, and today Moscowitz does not recall whether he ever listened to any audiotapes of any witness statements from the Dixwell Deli robbery/homicide investigation. *Id.* at 110:7-9, 111:17-19.

59.    At the time of the Horn and Jackson criminal trial, defense counsel had copies of Search and Seizure Warrants in the case, including copies of the Search and Seizure Warrants regarding phone records from SNET and AT&T, and the JDCR-20 Index Cards executed by Barbara Thigpen. See Michael Moscowitz Dep., **Ex. 25**, at 234:7-15; Horn Rule 26(a)1 Initial Disclosures, **Ex. 26**, at § (ii)(10); Horn Defense Counsel Copies of Warrants and JDCR-20 Index Cards, **Ex. 27** Marquis Jackson July 29, 2019 Resp. to Prod. Req. 25, **Ex. 29**; Jackson Defense Counsel Copies of Warrants and JDCR-20 Index Cards, **Ex. 29**.

> **RESPONSE:** Undisputed that criminal defense counsel had copies of the SNET and AT&T warrants and photocopies of index cards executed by Thigpen. Disputed that the index cards pertain to those particular warrants or document the filing of the inventory forms related thereto with the Court. *See supra* ¶ 45.

60.    State's Attorney Nicholson gave Vernon Horn and Marquis Jackson's criminal defense counsel copies of everything in the State's file, including audiotapes and search and seizure warrants. See Michael Moscowitz Dep., **Ex. 25**, at 110:19-25, 234:7-15; Leo Ahern Dep., **Ex. 30**, at 18:25–19:6; Gary Nicholson Dep., **Ex. 21**, at 129:17-23.

> **RESPONSE:** Undisputed that State's Attorney Nicholson gave criminal counsel copies of everything in the file, including any audiotapes or search and seizure warrants that might have been contained therein. Disputed to the extent it implies that any particular audiotapes were contained therein. *See supra* ¶ 58.

61.    Vernon Horn and Marquis Jackson's criminal defense counsel had a joint defense agreement and shared the contents of file materials during the criminal trial. See Michael Moscowitz 3/19/13 Horn v. Warden Habeas Trial Test., **Ex. 31**, at 111–114, 135:5-12.

**RESPONSE:** Undisputed.

62.    Attorney Michael Moscowitz retained the services of an investigator to look into and develop a possible "Bridgeport connection" for purposes of a third-party liability defense, however, they were not able to expand any information or leads in support of such a defense. See Michael Moscowitz 3/19/13 Horn v. Warden Habeas Trial Test., **Ex. 31**, at 107:10-21, 134:10– 135:4; See Leo Ahern 3/19/13 Horn v. Warden Habeas Trial Test., **Ex. 32**, at 157:7-16.

**RESPONSE:** Objection under FRCP 56(c)(2) that this purported fact cannot be presented in a manner admissible in evidence because it would violate the attorney-client and attorney work product privileges. Those privileges have been impliedly waived by Plaintiff bringing his *Brady* claims only with respect to any knowledge Plaintiff or his counsel may have had of the content of the withheld exculpatory evidence. Investigatory steps that Plaintiff's counsel may have taken that did not result in knowledge of the withheld *Brady* information are not within the scope of the waiver. Order, Dkt. 107 at 4-5 ("Outside of the narrow category of documents" related to the content of the 137 pages of phone records, "the [Court] concludes that the plaintiff has not impliedly waived the protections of the attorney-client privilege or the work-product doctrine."). To the extent a response is required, disputed. The cited sources do not establish that "the investigator was unable to develop information or leads," but only that the investigator was unable to develop sufficient information, on the basis of the materials available to him at the time, to obtain a third-party culpability instruction. *See* City Exs. 31-32.

63.    At the time of habeas proceedings in March of 2013, the State's Attorney's Office had difficulty locating various items. See Eugene Calistro Dep. **Ex. 33**, at 11:19-25, 17:1-7, 21:7-21, 22:1-13.

> **RESPONSE:** Objection under FRCP 56(c)(2) that this proposition, to the extent it implies the State's Attorney's Office had difficulty locating items *it previously possessed*, is hearsay and cannot be established in manner that would be admissible in evidence. Calistro—who is now a sitting Superior Court judge, and certainly knows what "personal knowledge" is—testified that he had no personal knowledge of how the contents of the State's Attorney's Office file changed from 1999-2000 to 2013-14, and that any information he may have possessed concerning an alleged difficulty in locating items came from other sources, including documents he reviewed his consultation with a clerk named Jeff Dziekan. Calistro Dep., City Ex. 33, at 73:11-75:22 ("Q. And your knowledge of what materials were in the file back in 1999 and 2000[,] but might not have been at the time of the habeas trial[,] comes from those sources, the documents you reviewed and the people you spoke to, right? A. Yes."). To the extent a response is required, undisputed that the State's Attorney's Office had difficulty locating one or more unspecified items in 2013, without regard for whether those one or more unspecified items were ever in the possession of the State's Attorney's Office.

64.    At the time of habeas proceedings in March of 2013, the original audio tapes of witness statements could not be located other than two audio tapes of statements by Marcus Pearson. See Eugene Calistro Dep. **Ex. 33**, at 24:10-20, 64:4-7.

> **RESPONSE:** Undisputed that the only audiotapes possessed by the State's Attorney's Office in 2013 were two Pearson audio recordings. Disputed that other audio tapes "could

not be located," as the cited testimony establishes only that they were not possessed by the State's Attorney's Office at that time.

65.     Each New Haven police officer is required to successfully complete a municipal police officer training academy program or a state-accepted equivalent to the municipal training academy. See Robert Maturo Aff., **Ex. 34**, at ¶ 5.

**RESPONSE:** Undisputed.

66.     In addition, each officer is further required to complete state-mandated re-certification training every three years to continue as a municipal police officer. This training covers all aspects of law enforcement, including but not limited to, training in constitutional requirements, laws of arrest and search and seizure, crime scene investigation, documentation, interviewing techniques, and the handling of exculpatory evidence, among other subject areas. Additionally, New Haven police officers receive training on internal general policies and procedures, including the handling of evidence, records and report writing. See Robert Maturo Aff., **Ex. 34**, at ¶ 6.

**RESPONSE:** Undisputed that NHPD officers are required to complete state-mandated re-certification trainings every three years to work as a police officer. Disputed that the Detectives received trainings concerning the subjects listed, and/or that the trainings the Detectives received in any of these subjects, if any, were adequate. For example:

- Breland was never trained that it would be improper to threaten to arrest a witness without any basis to arrest them. Ex. 4 at 290:22-291:1

- Breland was never trained that it would be improper to threaten to take a witness's children away if the witness refused to cooperate. *Id.* at 291:2-7.

- Breland was never trained that it would be wrong to threaten to violate a witness's probation if they did not cooperate. *Id.* at 291:13-17.

- Breland was never trained not to destroy his notebooks. *Id.* at 70:12-20, 72:6-8.

- The NHPD trained Breland to show witnesses a photo board for identification for the first time while the tape recorder was off. *Id.* at 135:20-137:17.

- It was "consistent with [Detective Coppola's] training at the New Haven Police Department" for him to threaten to arrest a witness as a conspirator in a murder case if the witness did not help the detective by providing a statement. Ex. 17 at 30:21-33:2.

- The NHPD trained detectives to interview or interrogate witnesses in two stages: first an unrecorded pre-interview, and then, if the detective wanted to record the witness's formal statement in evidence, they would have the witness make a subsequent tape-recorded witness statement. Ex. 16 at 96:4-11; Ex. 3 at 64:17-25; Ex. 15 (Sullivan Dep.) at 34:22-35:5. Through on-the-ground training by senior detectives, Ex. 4 at 380:19-25; Ex. 15 at 56:15-57:2; Ex. 16 at 97:2-5; Ex. 15 at 36:3-5, the NHPD trained its detectives to not record pre-interviews on tape. Ex. 4 at 381:21-382:3; Ex. 3 at 64:17-65:9. For example, Detective Breland personally trained new detectives and officers to not tape-record witness pre-interviews. Ex. 3 at 382:19-22.

- The NHPD trained officers to avoid "recording direct quotes and minute details" in victims' witness statements. Ex. 80; Ex. 5 at 215:11-217:17.

- Prior to 2016, there was no NHPD-wide training on how long officers were supposed to retain evidence. Ex. 5 at 281:15-21.

- In 1999, there was no training bulletin or written policy of any kind that required officers to turn over exculpatory information to prosecutors. *Id.* at 166:16-167:6.

- NHPD detectives were not trained to take notes whatsoever. *Id.* at 167:23-168:3.

- The NHPD did not train its officers to give their notes to anyone, including prosecutors. *Id.* at 173:1-13.

- The NHPD did not train its officers to avoid starting and stopping the tape while recording a witness statement. *Id.* at 241:2-5.

- The NHPD did not train its officers on when to put evidence into the Records Room, Property Room, or Detective's Bureau. *Id.* at 257:16-21.

- The NHPD did not train its officers on what to do with records and evidence upon retirement. *Id.* at 272:6-10.

67.     Leroy Dease, Petisia Adger and Daryle Breland were duly sworn police officers with the City of New Haven as of January 1999, and had each successfully completed the municipal police officer training academy program or a state-accepted equivalent See Robert Maturo Aff., **Ex. 34**, at ¶ 7.

> **RESPONSE:** Undisputed that Dease, Adger, and Breland completed a municipal police officer training academy program or a state-accepted equivalent prior to becoming commissioned police officers at the NHPD. Disputed to the extent that it implies that any such training was adequate. *See supra* ¶ 66.

68.     As New Haven police officers, Leroy Dease, Petisia Adger and Daryle Breland were required to complete at least 40 hours of training in job-related subjects every three years in order to maintain their re-certification as police officers. See Robert Maturo Aff., **Ex. 34**, at ¶ 8.

**RESPONSE:** Undisputed that Dease, Adger, and Breland, as NHPD officers, were required to undergo this training. Disputed to the extent that it implies that any such training was adequate. *See supra* ¶ 66.

69.    As of January 1999, Leroy Dease, Petisia Adger and Daryle Breland had attended supplemental training courses as part of their re-certification requirements, and were in full compliance with the re-certification requirements in place at that time. See Robert Maturo Aff., **Ex. 34**, at ¶ 9.

**RESPONSE:** Undisputed that Dease, Adger, and Breland, had attended supplemental training courses as of 1999 and were in compliance with re-certification requirements at that time. Disputed to the extent that it implies that any such training was adequate. See supra ¶ 66.

70.    Petisia Adger, Daryle Breland and Leroy Dease, had no civilian complaints against them involving claims of failure to disclose Brady material, fabrication of evidence, and/or coercion of witnesses. See City's Resp. to First Consolidated Set of Interrog. and Prod. Req., **Ex. 35**, at Request 20.

**RESPONSE:** Disputed. The sole source cited for this proposition is the City's response to Plaintiff's requests for production of documents. It is true that, in response to Plaintiff's request in this case for "[a]ll documents concerning any complaint against of the Individual NHPD Defendants to the performance of their police duties, including without limitation, for failure to disclose *Brady* material, fabrication of evidence, and/or coercion of witnesses," the City did not produce any documents. But the City's response to Plaintiff's document request does not prove, as a "fact," that no such complaints were ever made regarding Dease, Adger, or Breland.

71.     NHPD officers are taught about their obligations under <u>Brady</u> at the police academy, as well as during updated in-service training through the Connecticut State's Attorney's office. <u>See</u> Melvin Wearing Dep., **Ex. 18**, at 48:1-10; Racheal Cain 12/9/19 Dep., **Ex. 20**, at 104:13-19; Racheal Cain 9/18/20 Dep., **Ex. 14**, at 222:6-9.

> **<u>RESPONSE</u>:** Disputed that NHPD officers are taught about their *Brady* obligations at the police academy and during in-service training. *See supra* ¶ 66. To the extent that any NHPD officer, including Dease, Adger, and Breland, received any training about their *Brady* obligations, further dispute that such training was adequate. *See id.*

72.     NHPD officers go through re-certification training every year, which reemphasizes the fundamental training all officers receive that witnesses may not be coerced, witnesses may not be threatened, and witnesses may not be directed to select specific photos from a photo array. <u>See</u> Melvin Wearing Dep., **Ex. 18**, at 233:11-21.

> **<u>RESPONSE</u>:** Undisputed that NHPD officers are required to undergo re-certification training. Disputed that NHPD officers receive re-certification training on the subjects listed. *See supra* ¶ 66. To the extent that any NHPD officer, including Dease, Adger, and Breland, received any training about these subjects, further dispute that such training was adequate. *See id.*

73.     In 1999, Petisia Adger knew that it was improper for an officer to tell a witness what to say in their statement. <u>See</u> Petisia Adger 12/11/19 Dep., **Ex. 4**, at 271:4-9.

> **<u>RESPONSE</u>:** Undisputed that Adger knew that it was improper for an officer to tell a witness what to say in their statement. Disputed to the extent it implies that Adger or any other NHPD officer received adequate training on witness interviews and interrogations. *See supra* ¶ 66.

74.    In 1999, Petisia Adger knew that it was improper for an officer to threaten a witness, to threaten to violate a witness's probation if they did not cooperate, and to threaten to arrest a witness. <u>See</u> Petisia Adger 12/11/19 Dep., **Ex. 4**, at 271:10-24.

> **RESPONSE:** Undisputed that Adger knew that it was improper for an officer to threaten a witness, to threaten to violate a witness's probation if they did not cooperate, and to threaten to arrest a witness. Disputed to the extent it implies that Adger or any other NHPD officer received adequate training on witness interviews and interrogations. *See supra* ¶ 66.

75.    In 1999, Petisia Adger knew that it was improper for an officer to fail to turn over evidence that was favorable to the defense. <u>See</u> Petisia Adger 12/11/19 Dep., **Ex. 4**, at 272:5-12.

> **RESPONSE:** Undisputed that Adger knew that it was improper for an officer to fail to turn over evidence that was favorable to the defense. Disputed to the extent it implies that Adger or any other NHPD officer received adequate training on a police officer's *Brady* obligations or the proper handling of exculpatory evidence. *See supra* ¶ 66.

76.    In 1999, Petisia Adger knew that it was improper to threaten a witness's family. <u>See</u> Petisia Adger 12/11/19 Dep., **Ex. 4**, at 272:13-16.

> **RESPONSE:** Undisputed that Adger knew that it was improper for an officer to threaten a witness's family. Disputed to the extent it implies that Adger or any other NHPD officer received adequate training on witness interviews and interrogations. *See supra* ¶ 66.

77.    Petisia Adger knew of her obligation to turn over exculpatory information. <u>See</u> Petisia Adger 9/22/20 Dep., **Ex. 36**, at 412:12–413:24.

**RESPONSE:** Undisputed that Adger knew of her obligation to turn over exculpatory information. Disputed to the extent it implies that Adger or any other NHPD officer received adequate training on a police officer's *Brady* obligations or the proper handling of exculpatory evidence. *See supra* ¶ 66.

78. Daryle Breland received training on what constituted proper and improper investigative techniques. See Daryle Breland 1/13/20 Dep., **Ex. 37**, at 290:8-18.

**RESPONSE:** Undisputed that Breland received some training on what constituted proper and improper investigative techniques. Disputed to the extent it implies that Breland or any other NHPD officer received adequate training on what constituted proper and improper investigative techniques. *See supra* ¶ 66.

79. Daryle Breland received training on what constituted proper and improper methods of interrogating witnesses. See Daryle Breland 1/13/20 Dep., **Ex. 37**, at 290:19-21.

**RESPONSE:** Undisputed that Breland received some training on what constituted proper and improper methods of interrogating witnesses. Disputed to the extent it implies that Breland or any other NHPD officer received adequate training on what constituted proper and improper methods of interrogating witnesses. *See supra* ¶ 66.

80. Daryle Breland received training at the police academy regarding interviewing techniques and basic principles of law. See Daryle Breland 1/13/20 Dep., **Ex. 37**, at 357:22–358:6.

**RESPONSE:** Undisputed that Breland received some training at the police academy regarding interviewing techniques and basic principles of law. Disputed to the extent it implies that Breland or any other NHPD officer received adequate training regarding interviewing techniques and basic principles of law. *See supra* ¶ 66.

81.    Daryle Breland also received training on report writing and the law, and how to document facts in a report. See Daryle Breland 1/13/20 Dep., **Ex. 37**, at 358:25–359:3, 361:19–362:1.

**RESPONSE:** Undisputed that Breland received some training on report writing and the law, and how to document facts in a report. Disputed to the extent it implies that Breland or any other NHPD officer received adequate training regarding documenting and preserving evidence, including witness statements. *See supra* ¶ 66.

82.    Daryle Breland knew of and understood Brady and his obligations to disclose exculpatory material. See Daryle Breland 12/16/19 Dep., **Ex. 5**, at 67:6-15; Daryle Breland 1/13/20 Dep., **Ex. 37**, at 329:6-17, 366:6-19.

**RESPONSE:** Undisputed that Breland understood what exculpatory information was, Breland Dep. at 366:6-19, and that he was obligated to turn over exculpatory information to the prosecutor, *id.* at 67:6-11, 329:11-17. Disputed to the extent it implies that Breland or any other NHPD officer received adequate training on a police officer's *Brady* obligations or the proper handling of exculpatory evidence. *See supra* ¶ 66.

83.    At the time of the Caprice Hardy homicide investigation from January 1999 through March 1999, and prior thereto, the NHPD had in place a General Order providing that, "Reports, when completed, shall accurately reflect the information concerning the episode and shall indicate specifically what actions were taken by each involved police officer." See NHPD G.O. 76-3 II. 4, **Ex. 38**.

**RESPONSE:** Undisputed.

84.    At the time of the Caprice Hardy homicide investigation from January 1999 through March 1999, and prior thereto, the NHPD had in place a General Order providing that,

"THE RETENTION OF EVIDENCE OR PROPERTY BY A MEMBER OF THE DEPARTMENT IS EXPRESSLY PROHIBITED." See NHPD G.O. 87-6 II (emphasis in original), **Ex. 39**.

    **RESPONSE:** Undisputed.

85.    At the time of the Caprice Hardy homicide investigation from January 1999 through March 1999, and prior thereto, the NHPD had in place a Code of Conduct providing that, "Employees of the Department shall observe the following regulations as to conduct and deportment and may be punished by reprimand, suspension, reduction in rank, or by dismissal upon conviction of failing to follow the following: . . . 15. No employee of the Department shall make false official reports knowingly or willingly enter or cause to be entered into any department books, records or reports any inaccurate, false or improper information or material matter." See NHPD Code of Conduct, **Ex. 40**.

    **RESPONSE:** Undisputed that the cited source states this. Disputed that this rule was in effect from January 1999 through March 1999, as the only cited source is undated.

86.    At the time of the Caprice Hardy homicide investigation from January 1999 through March 1999, and prior thereto, the NHPD had in place a Code of Conduct providing that, "Employees of the Department shall observe the following regulations as to conduct and deportment and may be punished by reprimand, suspension, reduction in rank, or by dismissal upon conviction of failing to follow the following: . . . 23. Employees of the Department shall not fabricate, withhold or destroy any evidence of any kind." See NHPD Code of Conduct, **Ex. 40**.

    **RESPONSE:** Undisputed that the cited source states this. Disputed that this rule was in effect from January 1999 through March 1999, as the only cited source is undated.

87.     At the time of the Caprice Hardy homicide investigation from January 1999 through March 1999, and prior thereto, the NHPD had in place a Training Bulletin providing that, "… tapes of incoming calls by a defendant, victim (or both) and eye witness or a non-eye witness who may later testify at a trial should be preserved. Also tapes of statements of such persons should be preserved as evidence even if such are transcribed." See NHPD Training Bulletin 8-3, **Ex. 41**.

> **RESPONSE:** Undisputed that the cited Training Bulletin stated this. Disputed to the extent it implies that any police officer was trained by the NHPD to preserve tapes of statements for any specified duration of time. To the contrary, in 1999, there was no NHPD-wide training on how long officers were supposed to retain evidence. Ex. 5 at 281:15-21. In his sixteen-year career, Breland was never told not to destroy his notes. Ex. 4 at 72:6-8. Adger also "wasn't familiar with a department policy" about throwing away notes. Ex. 3 at 69:6-8. Adger's personal practice was to throw away her notes from witness pre-interviews. *Id.* at 68:10-18, 69:3-12, 82:6-18.

88.     At the time of the Caprice Hardy homicide investigation from January 1999 through March 1999, and prior thereto, the NHPD had in place a Training Bulletin providing that, "All Field notes of police officers should be preserved for at least three years since they may be discoverable as a statement of a witness or in the alternative, as a statement of the officer if he or she is called to testify." See NHPD Training Bulletin 8-3, **Ex. 41**.

> **RESPONSE:** Undisputed that the cited Training Bulletin stated this. Disputed to the extent it implies that any police officer was trained by the NHPD to retain field notes whatsoever, or for any specified duration of time. In 1999, there was no NHPD-wide training on how long officers were supposed to retain evidence, generally, Ex. 5 at

281:15-21, and, according to Chief Wearing, NHPD policy did not require officers to preserve their field notes for a certain amount of time, Ex. 14 at 114:23-115:1. In his sixteen years at the NHPD, the Department never trained Breland to preserve his field notes. Ex. 4 at 70:12-20, 72:6-8. It was simply "left up to the discretion of each individual detective." *Id.* at 72:9-13; *see* Ex. 14 at 115:2-10 (when asked whether a detective could throw away their notes if they wanted to, Chief Wearing answered: "It's up to the detective"). Accordingly, Breland never gave his notes to the NHPD records room or evidence room once in his entire career. Ex. 4 at 260:21-261:1. Meanwhile, Adger's personal practice was to throw away her notes from witness pre-interviews, Ex. 3 at 69:3-5, 82:6-18, and she believed that practice conformed with NHPD policy, *id.* at 69:9-12. Notably, the City has failed to produce a single field note from any detective in this case. Ex. 4 at 69:14-70:3, 78:25-79:8.

89.     The entire police department staff is issued all of the training bulletins and general orders, and during basic training all of the department's rules, regulations, general orders and training bulletins are gone over. See Racheal Cain 9/18/20 Dep., **Ex. 14**, at 179:11-15.

**RESPONSE:** Disputed that all NHPD written policies were issued to all police staff, and that all written policies were reviewed during basic training. To the contrary, the evidence shows that Breland, a veteran detective; Adger, a former detective who was later promoted to Assistant Chief; and Wearing, the former Chief of Police, were each unaware of the NHPD's written policies. As explained in ¶ 88, *supra*, Breland was never trained to preserve his field notes, Adger was unaware of any such policy, and Chief Wearing testified that no such requirement existed, even though officers were ostensibly

required to preserve their field notes for three years pursuant to NHPD Training Bulletin
8-3.

90.     The NHPD policies, practices, procedures and training in place at the time of the
Caprice Hardy investigation were in accordance with generally accepted police policies,
procedures, training and practices in 1999. See Joseph Stine Expert Report, **Ex. 42**, at 21–23.

> **RESPONSE:** Disputed. The NHPD's policies, practices, procedures, and training in
> place at the time of the Caprice Hardy investigation were not in accordance with
> generally accepted police policies, procedures, training, and practices in 1999. For
> example, the NHPD's widespread and longstanding practice of witness pre-interviews,
> "in which the first stage of an interview was not recorded," allowed detectives to
> manipulate witnesses. Ex. 81 (Rossmo Report) at 28. "[T]his officially accepted policy
> provided detectives an opportunity to engage in suggestive questioning, feed evidence to
> witnesses, and manipulate their responses." *Id.* "Detectives were free to lead, pressure,
> threaten, and make promises 'off the record' to witnesses and suspects." *Id.* These NHPD
> interview practices were "all in complete violation of long-established standards of
> criminal investigation." *Id.* at 28; *see id.* at 31 (noting that failing to record or keep notes
> of pre-interviews violated well-known police standards). In addition, the NHPD's
> practice of destroying notes was contrary to basic requirements of proper police
> procedure. *Id.* at 31.

91.     The NHPD did not have a policy or practice of coercing witness statements,
manipulating witness statements, threatening a witness into giving a statement, or to identify
someone, telling witnesses what to say under threat. See Melvin Wearing Dep., **Ex. 18**, at 53:24–

54:4, 145:11–146:9; Edward Kendall Dep., **Ex. 43**, at 282–284, 302–307; Stephen Coppola Dep.,

**Ex. 44**, at 123:11–124:8.

> **RESPONSE:** Disputed. In 1999, the NHPD did have a longstanding policy, custom, or
>
> practice of coercing and fabricating witness statements, as illustrated by the following:
>
> The testimony of Defendants' own experts place this fact in dispute. The City's
>
> expert, Stine, spent 240 hours reviewing the complete record in this case, Ex. 25 at 13:19-
>
> 14:21, including the depositions of Pearson and Thompson, *id.* at 110:15-22.
>
> Notwithstanding Pearson's and Thompson's testimony that they were coerced by the
>
> Detectives into giving false, fabricated statements incriminating Horn, *see* ¶¶ 7, 16,  Stine
>
> concluded that Detectives Breland, Dease, and Adger at all times acted in accordance
>
> with NHPD policy, practice, and procedure.  Ex. 25 at 65:23-66:11.
>
> The Detectives' expert, Spector, also spent "hundreds of hours" conducting a
>
> "thorough review" of the evidence in this case, Ex. 26 at 23:4-9, including Pearson's and
>
> Thompson's depositions, *Id.* at 35:2-13, 178:21-24. Notwithstanding Pearson's and
>
> Thompson's testimony that they were coerced by the Detectives into giving false,
>
> fabricated statements incriminating Horn, *see* ¶¶ 7, 16.  Spector also concluded that,
>
> "throughout the entire tenure of the Dixwell Deli case," "[e]verything [the Detectives]
>
> did would be in conformance with policy and procedure" of the NHPD, *id.* at 24:2-16,
>
> and "I didn't see *anything* [the Detectives] did that violated any [NHPD] policy or
>
> procedure," *id.* (emphasis added).
>
> The NHPD has a long history of coercing witnesses and fabricating evidence. For
>
> example, in a 1985 robbery/sexual assault case, NHPD officers "suggested to [a witness]
>
> that [a suspect] was involved in the crimes," coerced the witness "into making the

statement implicating [the suspect]," and had the witness sign his false statement without reading it. *State v. Harris*, 22 Conn. App. 329, 330-34 (1990).

During a 1991 homicide investigation, NHPD Detective Joseph Greene interrogated a witness names Timothy Davis. *See* Ex. 59 at 3-15 (Davis Test.) at 3-15. Davis was only 17 years old and weighed only 100 pounds at the time. *Id.* at 11, 16. During Davis's interrogation at the NHPD station, Detective Greene and two or three other NHPD officers "were doing a lot of yelling, slamming their hands all up in [Davis's] face, slamming them on the table . . . [t]hey just kep on coming up on [him]." *Id.* at 11. Detective Greene threatened Davis and told him that if he "didn't cooperate that [he] would receive forty to sixty years in jail." *Id.* at 12. Detective Greene's threats happened off-the-record—the tape recorder was not on at the time. *Id.* at 13. Davis asked for a lawyer during his interrogation and Detective Greene responded, "if you didn't do nothing why should you need a lawyer?" *Id.* at 13-14. Detective Greene suggested a motive for the shooting and also told Davis to say that he had been the getaway driver, even though Davis had told Greene that he could not drive. *Id.* at 5, 39-40.

During another 1991 homicide investigation, NHPD Detective Greene two witnesses into giving false fabricated statements inculpating a man named Daryl Valentine in another homicide investigation that same year. *State v. Valentine*, 255 Conn. 61, 65-67 (2000). During his investigation of a New Haven double homicide, Detective Greene interrogated a witness named Kristina Higgins. *Id.* Detective Greene threatened Higgins with jail time and gave her alcohol, cigarettes, and money to buy cocaine—all while another NHPD officer, Detective DiLullo, was also present. Ex. 60 (Higgins Testimony) at 116-18, 127-37. Higgins testified about Detective Green's coercive

interrogation at Valentine's criminal trials in 1994 and 1998. *See Valentine*, 255

Conn. at 63-67. Another witness in the Valentine case, Coleman, also testified at the 1994

trial that her witness statement had also been fabricated due to Detective Greene's

coercion and bribes. *Id.*

From 1991 to 1992, NHPD Detective Billy White assisted New York City Police

Department officers in their investigation of a New Haven resident, Derrick Hamilton,

for the murder of Nathaniel Cash, who was shot to death in front of his home in

Brooklyn, New York. *Hamilton v. City of New York*, No. 15 Civ. 4574, 2019 WL

1452013, at *2, *4 (E.D.N.Y. Mar. 19, 2019). Hamilton had an alibi witness, Alphonso

Dixon, who threw a party the day of the murder that Hamilton attended. *Id.* at *8. Early

one morning in 1992, Detective White arrived at the home of Alphonso Dixon and his

wife Mattie, and, according to Mattie Dixon's sworn affidavit, "was very angry with

[Alphonso] for being [Hamilton's] alibi. Detective White became forceful by handcuffing

Alphonso and searched his pockets finding drugs and threatened Alphonso with jail.

Detective White calmed down after [Alphonso] agreed not to be [Hamilton's] alibi." *Id.*

At a deposition in Hamilton's later civil rights case, Mattie Dixon further testified that

she saw her husband "start crying when [Detective White] went to put the handcuffs on"

and said that Alphonso was "scared of [Detective White]. Very scared." *Id.* She explained

that, in her presence, Detective White threatened Alphonso and told him, "If you go to

court [to testify at Hamilton's criminal trial], I've got the handcuffs as soon as you walk

out the courthouse." *Id.* She witnessed Detective White dangle handcuffs before her

husband while the detective was threatening him. *Id.*

While investigating a double homicide from 1991-92, NHPD Detective Vincent Raucci threatened witness Jose Roque into giving a false inculpatory statement. Ex. 58 (FBI Report) at SM012282. Raucci "provided all of the information in the signed statement" and provided Roque the answers he wanted, and that Roque "would in turn parrot the answer on to the tape." *Id.* In reality, Roque did not have any information connecting Lewis and Morant to the double homicide. *Id.* During the same 1991-92 investigation, Detective Raucci pressured witness Milly Martinez "into giving [her] sworn oral statement" and, while Raucci took the statement, he "started and stopped the tape recorder he used to take the statement in order to tell [Martinez] what to say on tape." *Id.* at SM012321. Detective Raucci similarly fabricated an inculpatory witness statement and photo identification of a suspect by yet another witness, Hector Ortiz. *Id.* at SM012369. Raucci told Ortiz that he had to provide a statement inculpating the suspect, and then proceeded to tell Ortiz what to say prior to tape recording the statement. *Id.* Raucci frequently stopped the tape to instruct Ortiz what to say on the recording. *Id.* Finally, Detective Raucci fabricated a coerced statement from a witness named Ovil Ruiz. Late one evening, Ruiz was arrested and brought to the NHPD Detective Division for an interrogation. Ex. 61 (Sweeney Test.) at 12-13. NHPD Sergeant Sweeney, who was Detective Raucci's supervisor at the time, interviewed Ruiz alone for over an hour and a half during which Ruiz insisted he knew nothing about the double homicide. *Id.* at 11, 13-14, 17. Detective Raucci then joined the interrogation and, in front of Sergeant Sweeney, his supervisor, Raucci provided Ruiz with facts about the double homicide contrary to police protocol. *Id.*at 14-16, 21-22, 43-44, 73. Detective Raucci promised Ruiz that he would be let go if he provided a statement inculpating two suspects. *Id.* at

16, 18. Sergeant Sweeney took Detective Raucci aside twice to scold him for crossing the line with Ruiz, but nevertheless permitted Raucci to continue interrogating Ruiz. *Id*. at 14-19. Detective Raucci eventually finished taking Ruiz's witness statement in the presence of another NHPD detective, but without Sergeant Sweeney in the room. *Id*. at 17-19. Sergeant Sweeney later found out that someone had been arrested for the double homicide and that the warrant for the arrest was predicated Ruiz's bogus witness statements. *Id*. at 32-33, 67. In response, Sweeney told his supervisor: "Are you crazy? You should tell [State's Attorney] Dearington about this" because Ruiz's statement was false. *Id*. at 67. However, even though Sweeney personally witnessed Raucci coerce Ruiz into providing a false inculpatory witness statement, Sweeney never formally documented or reported Raucci's misconduct. *Id*. at 20, 49, 54-55.

In 1998, it was "consistent with [Detective Coppola's] training at the New Haven Police Department" to threaten to arrest a witness as a conspirator in a murder case if the witness did not help the detective by providing a statement. Coppola Dep. at 30:21-33:2.

In 2001, Detectives Breland and Coppla picked up Ralph Ford, a juvenile, and brought him to the police station for an interrogation. Ex. 62 (Ford Testimony) at 121:1, 157:2-159:25, 162:14-169:23. During an off-the-record pre-interview, Breland and Coppola coerced Ford into giving a statement inculpating another person by threatening Ford with 30 years in prison. *Id.* at 164:1-20, 165:17-166:19, 171:16-23. Ford's parents were not present in the interrogation room when he gave his statement. *Id.* at 165:20-23. Detectives Breland and Coppola later coerced a second, corrected statement from Ford that included additional details about the murder weapon. *Id.* at 172:5-174:17.

In 2006, NHPD Detectives Michael Quinn and Clarance Willoughby, a 24-year veteran of the NHPD, investigated a homicide. Detectives Quinn and Willoughby interrogated Bobby Johnson, who was only 16 years old at the time and had cognitive limitations and limited education, without a parent or lawyer present. Ex. 63 (B. Johnson 2012 Testimony) at BJ03154:13-18; Johnson SJ Order at 6. During Johnson's interrogation, the detectives threatened Johnson that if he did not cooperate and give the detectives the statement they wanted he could get the death penalty, and that he would never see his family again. *Id.* at BJ03124:14-16, BJ03153:12-21; Order, Dkt. 277, *Johnson v. City of New Haven*, No. 17 Civ. 1479 (D. Conn. Apr. 13, 2020) ("Johnson SJ Order") at 5-6. The detectives then told Johnson that if he cooperated and gave the statement they wanted he would only get ten years' probation. Ex. 63 at BJ03124:13-19, BJ03129:17-27.

As a result of the detectives harassing and threatening Johnson, telling him that they would not let him leave until he confessed, and promising that he would only get parole if he cooperated, Johnson capitulated and gave the detectives an inculpatory recorded witness statement. *Id.* at BJ03153:12-25, 3126:20-27. Before they turned on the tape to record Johnson's statement, the detectives rehearsed the statement with Johnson and corrected him along the way. *Id.* at BJ03126:16-19, BJ03127:8-12. The detectives also showed Johnson photos of the victim, and Johnson's description of the victim matched the specific details in the photograph. *Id.* at BJ03124:20-03125:6, BJ03124:26-3125:6. After Johnson gave the statement the detectives wanted, they told him that if he ever told anyone about what happened during the interrogation, his probation deal would be off. *Id.* at BJ03132:27-3133:7.

After the detectives obtained a confession from Johnson, they interrogated his cousin, Michael Holmes. Ex. 64 (Holmes 2012 Testimony) at BJ03316:16-03318:1. Holmes denied having any knowledge of the homicide but Detectives Quinn and Willoughby told him that if he did not give a statement, they would arrest him. Ex. 67 (Holmes 2008 Testimony) at BJ01788:3-01789:4. The detectives then had Holmes record a fabricated statement that was consistent with Johnson's statement. Ex. 64 at BJ03320:1-14.

Detectives Willoughby, Quinn, and two other NHPD officers, including a supervising sergeant, then brought Johnson back to the police station for another interrogation. Ex. 68 (B. Johnson 2008 Testimony) at BJ02019:8-27, BJ02070:26-02071:22. Detectives Willoughby and Quinn questioned Johnson once again without any parent or attorney present. *Id.* at BJ02014:19–24, BJ02017:23–02018:12, BJ02020:4–02021:2, BJ02032:10–18; Ex. 63 at BJ03154:13–18, BJ03136:13–BJ03137:9, BJ03138:4–9. Even though Johnson kept telling the detectives that he was not involved in the homicide, Detective Willoughby told him that he needed to "fix [his] statement, or the deal was going to be off." Ex. 63 at BJ03136:25-03137:13, 03138:4-9, 03151:10-27. Detective Willoughby became aggressive and yelled at Johnson, *id.* at 03151:10-27, and the detectives told him that he was going to face the death penalty if he did not provide the statement they wanted, *id.* at BJ02014:12-18. Johnson caved and gave the officers a new statement because he believed that if he didn't, he would get the death penalty. Ex. 68 at BJ02014:12-02015:13, BJ02024:8-02025:26.

Detectives Quinn and Willoughby then coerced another confession from another juvenile witness: 14-year-old Kwame Wells-Jordan. During the detectives'

initial interview of Wells-Jordan, he denied any involvement in the homicide and gave

the detectives an alibi that corroborated Johnson's initial story. Ex. 70 (J. Sykes 2007

Aff.) at ¶ 9. Three days later, Wells-Jordan was arrested at his middle school and brought

to the police station for an interrogation. *Id.* ¶ 10. Detectives Willoughby and Quinn

interrogated Wells-Jordan with his aunt Julia Sykes present and told Wells-Jordan that if

he didn't tell them what they wanted him to say, they were going to arrest him. Ex. 69 (J.

Sykes Dep.) at 128:10-129:10, 130:11-131:2. Eventually, the detectives' supervisor

entered the interrogation room and falsely told Julia Sykes that they had Wells-

Jordan's fingerprints and he should just implicate himself in the murder to make the

interrogation easier on everyone. Ex. 65 (J. Sykes 2012 Testimony) at BJ03283:4-11.

Sykes gave in to the pressure and told her nephew to say that he was at the scene of the

crime. Ex. 6 at 137:9-12. Sykes later explained: "At this point and being interrogated by

somebody over and over and over again and you continuing to tell them no and they're

continuing to tell you that you were there, you're getting frustrated and you're trying to

figure out what to do, how to do and you're alone, just you and your child, what would

you do?" *Id.* at 137:9-20.

      While taking Wells-Jordan's coerced statement, Detectives Quinn and Willoughby

followed the same playbook once again. The detectives fed Wells-Jordan the details he

provided in his statement, showed him photos of the murder weapon and the victim's

car, and told him how the shooting happened. Ex. 66 (J. Sykes 2008 Testimony) at

BJ2781:5-2782:16, 2785:15-2786:20; Ex. 686 at BJ03245:1-16; Ex. 69 at 116:1-15,

112:25-114:13, 121:7-122:2. Wells-Jordan then provided a tape-recorded statement

repeating the detectives' story. Ex. 66 at 2820:14-2821:1; Ex. 69 at 139:22-140:24.

Johnson eventually pled guilty to murdering Fields. Johnson SJ Order at 12. Prior

to pleading guilty, he told his attorney that his confession was coerced and that he

had nothing to do with Fields' murder. *Id.* The state went on to prosecute Wells-Jordan

for his purported involvement in the Fields homicide. *Id.* at 13. During that trial, Holmes

and Johnson both recanted their statements, which they testified were made up and

coerced by the detectives. *Id.* Wells-Jordan was acquitted of all charges. *Id.*

92.     The NHPD did not have a policy or practice of tampering with or fabricating

evidence. See Edward Kendall Dep., **Ex. 43**, at 308:12–309:13; Stephen Coppola Dep., **Ex. 44**,

at 125:3-18, 144:3-23.

**RESPONSE:** Disputed. *See supra* ¶ 91.

93.     The NHPD detectives' investigation of the stolen cell phone, and information

generated from the same, was in accordance with the generally accepted practices and

procedures commonly in use in 1999. See Joseph Stine Expert Report, **Ex. 42**, at 12-13; Elliot

Spector Expert Report, **Ex. 45**, at 18.

**RESPONSE**: Disputed. The Detectives' investigation of the stolen cell phone, and

information generated from the same, was not in accordance with the generally accepted

practices and procedures in use at the time. Dr. Rossmo, in his expert report, described the

Detectives' failure to follow standard police investigative procedures and pursue obvious

leads that arose as a result of their investigation of the stolen phone:

The Detectives utterly "fail[ed] to properly follow up on the network of

Bridgeport criminals identified through [the] cell phone stolen in the robbery." Ex. 81

(Rossmo Report) at 3. Their "myopic focus on Horn and Jackson . . . resulted in the failure to

properly investigate a group of alternative suspects, a crew of violent criminals in Bridgeport

– the very city to where most of the calls from the stolen cell phone had been made. Interrogations of key members of this gang were anemic, the questions designed to only shore up NHPD's existing crime theory, not to find out what really happened. After police arrested Horn and Jackson in March 1999, they ended the investigation and abandoned their analysis of the telephone records associated with the stolen cell phone. These troublesome records threatened the police narrative of the crime, and detectives failed to share the 137 pages with prosecutors or defense counsel, a clear Brady violation." *Id.* Despite the obvious "interconnected contact pattern between the Bridgeport crew and the suspicious timing of their calls, NHPD detectives failed to thoroughly pursue the lead." *Id.* at 16.

"The stolen cell phone calls and the associated telephone records pointed the police towards a group of violent criminals in Bridgeport. . . . However, in spite of their violent criminal records, including convictions for robbery, they were not treated as suspects for the Dixwell Deli robbery/murder, and their interconnections were not thoroughly investigated by NHPD detectives." *Id.* at 19.

As a result, Dr. Rossmo concluded that the Detectives' actions in the Dixwell Deli robbery/homicide investigation amounted to a "criminal investigative failure." *Id.* at 27 "There are a number of standard investigative actions that the NHPD failed to do in this case," *id.* at 26, including the Detectives' failure to properly investigate the Bridgeport crew—the same violent criminals who were connected to the phone records, *id.* at 27.

94.    Cellular data and cell site analysis was in its infancy and not commonly used in 1999. See James Wines Dep., **Ex. 46**, at 42–43; Robert Moledor Expert Report, **Ex. 47**, at 2; Joseph Stine Expert Report, **Ex. 42**, at 19.

**RESPONSE:** Undisputed.

95.    The FBI did not begin exploring the use of cellular data until the early 2000s, and did not have a cellular investigative unit until 2010. See James Wines Dep., **Ex. 46**, at 42–43; Robert Moledor Expert Report, **Ex. 47**, at 2.

**RESPONSE:** Undisputed.

96.    Prior to 2005, investigative resources and training regarding cellular data and cell site analysis was extremely limited. See James Wines Dep., **Ex. 46**, at 44–45; Robert Moledor Expert Report, **Ex. 47**, at 2.

**RESPONSE:** Undisputed.

97.    In fact, at the criminal trial in 2000, Richard Lindemulder, the Omnipoint employee who testified at the trial, stated that the information regarding where the cell calls originated did not appear on the call detail log, that such information could only be obtained by way of Court order rather than a subpoena, and that cell site location data is only retained for 30 days and was no longer available. See Richard Lindemulder 4/4/00 Criminal Trial Test., **Ex. 48**, at 154:20–155:5, 157:4–159:17.

**RESPONSE:** Undisputed that Lindemulder so claimed, in sum and substance, during his trial testimony.

98.    The practice of recording statements by witnesses and suspects was not a common or generally accepted practice in 1999. See Joseph Stine Expert Report, **Ex. 42**, at 16; Elliot Spector Expert Report, **Ex. 45**, at 22.

**RESPONSE:** Disputed. FBI Special Agent Donnelly testified that the NHPD was recording statements of witnesses and suspects as early as the mid-1980s and that it was a regular practice for NHPD detectives to start and stop tapes while recording witness interviews well before the Dixwell Deli robbery/homicide investigation. *See* Ex. 18

(Donnelly Dep.) at 76:6-77:18. In addition, according to Dr. Rossmo, "[s]tandard professional practice involves the careful recording [of] all police interviews and interrogations. Statements by victims, witnesses, and suspects are important evidence, so it is essential – for both investigative and legal reasons – to keep exact and detailed documentation." Ex. 81 at 24.

99.    It was a commonly accepted practice to conduct an informal conversation with a witness or suspect prior to beginning a formal recorded interview. See Joseph Stine Expert Report, **Ex. 42**, at 16-17; Elliot Spector Expert Report, **Ex. 45**, at 1, 22; Brian Donnelly Dep., **Ex. 49**, at 112:4-8.

**RESPONSE:** Undisputed that it was a commonly accepted police practice to have an informal conversation with a witness or suspect prior to starting a formal recorded interview. Disputed to the extent it implies that NHPD officers simply had "informal conversations" with witnesses or suspects while employing the NHPD's standard, widespread, decades-long practice of off-the-record pre-interviews, or to the extent it implies that the NHPD pre-interview practice was a commonly accepted police practice.

To the contrary, according to Dr. Rossmo: "The very name 'pre-interview' is nothing more than a linguistic slight of hand. There is no such thing – it is all part of the overall interview." Ex. 81 at 25. "Standard professional practice involves the careful recording [of] all police interviews and interrogations. Statements by victims, witnesses, and suspects are important evidence, so it is essential – for both investigative and legal reasons – to keep exact and detailed documentation." *Id.* at 24. By conducting an "initial unrecorded preliminary interview,"  NHPD officers, including the Detectives in this case,

"were allowed to ***undermine the rules for proper witness interviewing and evidence collection***." *Id.* (emphasis added).  Dr. Rossmo further explained:

> The NHPD practice of "pre-interviews," in which the first stage of an interview was not recorded, allowed these manipulations [of witnesses] to occur; this officially accepted policy provided detectives an opportunity to engage in suggestive questioning, feed evidence to witnesses, and manipulate their responses. A lack of proper police supervision and disengaged management enabled this misfeasance. Detectives were free to lead, pressure, threaten, and make promises "off the record" to witnesses and suspects. Regrettably, they often succumbed to temptation and manufactured case evidence to fit their theory of the crime – ***all in complete violation of long-established standards of criminal investigation.***

Ex. 81 at 3 (emphasis added).

100.    The FBI investigation into Detective Vincent Raucci began sometime after March 1995 and ended sometime in early 1997, and involved solely an investigation into Raucci with regard to the Turner/Fields homicide. See Brian Donnelly Dep., **Ex. 49**, at 134:4–135:6, 164:5-12.

**RESPONSE:** Undisputed that the FBI's investigation into Raucci ran from 1995 to 1997. Disputed that it involved solely an investigation into Raucci's involvement in the Turner/Fields homicide. The investigation also looked into Raucci's involvement with drug dealers, use of illegal narcotics, and allegations of domestic violence. *See, e.g.*, Ex. 58 at SM012249 (NHPD memo detailing Raucci paying for narcotics and running protection for drug dealer); *id.* at SM012250-51 (interview with Raucci's wife, detailing Raucci's use of cocaine, his plan to have his wife arrested for the possession of narcotics, and his threats to kill his wife); *id.* at SM012256-57 (interview detailing Raucci cooking crack cocaine, giving others cocaine to sell, and shooting up a car owned by a drug dealer); *id.* at SM012252-53 (interview detailing Raucci using of cocaine, coordinating

with others to sell cocaine, having others purchase cocaine for him, and shooting a gun at

a car while high on cocaine).

101.    Agent Donnelly never presented his report regarding the Raucci investigation to

the NHPD. <u>See</u> Brian Donnelly Dep., **Ex. 49**, at 101:9-16.

> **<u>RESPONSE</u>:** Undisputed that Special Agent Donnelly never presented his report
>
> regarding the Raucci investigation to the NHPD. Disputed to the extent it implies that the
>
> NHPD was not aware of the FBI's investigation of Raucci while it was being conducted
>
> in 1995-97. The entire NHPD leadership was aware of, and some even assisted with, the
>
> FBI's investigation of Raucci. Then-NHPD Chief of Police Nicholas Pastore "worked
>
> with the FBI" on their investigation of Raucci and "knew all about" the investigation. Ex.
>
> 14 at 133:2-7. Chief Pastore discussed the FBI's ongoing investigation of Raucci with
>
> then-Assistant Chief Melvin Wearing. *Id.* at 125:25-126:9. Moreover, throughout the
>
> FBI's investigation of Raucci, NHPD Sergeant John Minardi, an Internal Affairs officer,
>
> assisted FBI officers and assisted FBI agents during *thirteen* witness interviews,
>
> including the interview of Ovil Ruiz, who was coerced by Raucci into giving a fabricated
>
> inculpatory statement. Ex. 58 at SM012275, SM012277, SM012325, SM012346,
>
> SM012349, SM012350, SM012352, SM012356, SM012357, SM012358, SM012361,
>
> SM012365, SM012380. Then-Lieutenant Sullivan, the supervisor of the NHPD Detective
>
> Division, also met with the FBI and State's Attorney Michael Dearington to discuss
>
> Raucci's misconduct. Ex. 15 at 83:8-84:14. Sergeant Kendall, the second-in-command of
>
> the Detective Division at the time, was also aware of the FBI's investigation of Raucci in
>
> 1996. Ex. 16 at 120:2-121:7. In 1997, when Wearing replaced Pastore as Chief of Police,
>
> the FBI's investigation of Raucci had recently concluded. Ex. 14 at 133:8-11. As the new

Chief in 1997, Wearing became aware of Raucci's misconduct during the Turner/Fields homicide investigation. *Id.* at 152:25-153:7.

The FBI's findings as detailed in Special Agent Donnelly's report also became public knowledge on September 17, 1998 (months before the Dixwell Deli investigation started), when a local newspaper, the *New Haven Advocate*, reported on the FBI's findings in an article titled "Cop and the Killer: Secret FBI Report Suggests a Murder Convict was Framed by a Crooked Detective." Ex. 18 (Donnelly Dep.) at 103:4-104:24.

102.    Agent Donnelly is not aware of anyone at the FBI ever presenting the FBI's investigation into Raucci with the NHPD or in communications with the Chief of Police. See Brian Donnelly Dep., **Ex. 49**, at 102:1-15.

**RESPONSE:** Undisputed that Donnelly does not know whether anyone at the FBI ever presented the Raucci investigation to the NHPD or in communications with the Chief of Police. Disputed to the extent it implies that the NHPD was not aware of the FBI's investigation of Raucci while it was being conducted in 1995-97. The entire NHPD leadership was aware of, and some even assisted with, the FBI's investigation of Raucci. *See supra* ¶ 101.

103.    Agent Donnelly's report was shared with the U.S. Attorney's Office, who then shared it with the State's Attorney's office, but that is as far as his report went. See Brian Donnelly Dep., **Ex. 49**, at 124:6-10.

**RESPONSE:** Undisputed that Special Agent Donnelly's report was shared with the U.S. Attorney's Office, who then shared it with the State's Attorney's Office. Disputed that "this is as far as [Donnelly's] report went." The entire NHPD leadership was aware of, and some even assisted with, the FBI's investigation of Raucci. *See supra* ¶ 101. The

contents of the report were then leaked in an article in the New Haven Advocate in September 1998. *Id.*

104.    No one from the FBI contacted then NHPD Chief Pastore during the course of their investigation into Vincent Raucci. See Brian Donnelly Dep., **Ex. 49**, at 74: 7-10.

**RESPONSE:** Disputed. Then-NHPD Chief of Police Nicholas Pastore "worked with the FBI" on their investigation of Raucci and "knew all about" the investigation. Ex. 14 at 133:2-7. Chief Pastore discussed the FBI's ongoing investigation of Raucci with then-Assistant Chief Melvin Wearing. *Id.* at 125:25-126:9.

105.    When Agent Donnelly completed his investigation and report, he submitted it to U.S. Attorney Len Boyle, who declined to prosecute Raucci. See Brian Donnelly Dep., **Ex. 49**, at 135:23–136:9, 170:20–172:2.

**RESPONSE:** Undisputed.

106.    Nothing in Agent Donnelly's investigation established a sufficient criminal link between Detective Raucci and criminal activity with Mr. Parese. See Brian Donnelly Dep., **Ex. 49**, at 210:14–211:13.

**RESPONSE:** Undisputed that Donnelly so opined, in sum and substance, during his deposition testimony. Disputed that this is a "fact." The cited testimony is a statement of opinion by Donnelly, who testified that he believed Raucci was not indicted in connection with the FBI investigation because the FBI did not have sufficient information to "ink him in criminal activity with Mr. Parese," a local drug dealer. Ex. 18 at 210:14-211:13; 178:16-25 (identifying Parese). In the same deposition, Donnelly clarified it was never his job to decide whether the U.S. Attorney's Office should indict Raucci. *Id.* at

252:11-17. He "was merely asked to look into the case and let the chips fall where they may." *Id.*

107.    Agent Donnelly did not conduct any independent investigation into whether any of the witnesses had any motivation to give a false statement when recanting their testimony. See Brian Donnelly Dep., **Ex. 49**, at 137:19–138:7.

**RESPONSE:** Undisputed that Special Agent Donnelly did not conduct any such independent investigation. Disputed to the extent that it implies that any witnesses Donnelly interviewed had a motivation to give a false statement when recanting their testimony. To the contrary, they had a motivation to tell the truth because "they knew that lying to [the FBI] was a potential federal felony." Ex. 18 at 138:8-13.

108.    Ovil Rodriguez gave Agent Donnelly a statement recanting his prior statement under oath to the NHPD and his trial testimony, and at the end of Agent Donnelly's investigation, Rodriguez recanted his recantation. See Brian Donnelly Dep., **Ex. 49**, at 139:17–140:5.

**RESPONSE:** Undisputed.

109.    By the end of Agent Donnelly's investigation into Vincent Raucci, the FBI elected to stop speaking with the main witness, Ovil Rodriguez, because they concluded that they could not believe anything Rodriguez said. See Brian Donnelly Dep., **Ex. 49**, at 196:23–198:9, 264:8-13.

**RESPONSE:** Undisputed.

110.    The FBI had a very good relationship with the NHPD, and even used their photo array system because it was a very good system. See Brian Donnelly Dep., **Ex. 49**, at 47:11-23.

**RESPONSE:** Undisputed that Donnelly so opined, in sum and substance, during his deposition testimony.

111.    Up to 2006, the FBI was not recording witness interviews, either by way of audio tape or videotape, as it was their policy not to do so. See Brian Donnelly Dep., **Ex. 49**, at 132:17–133:2, 159:15-21.

**RESPONSE:** Undisputed.

112.    It is not uncommon to start a conversation with an individual to see if they will give a signed statement. See Brian Donnelly Dep., **Ex. 49**, at 112:4-8.

**RESPONSE:** Undisputed that Donnelly so opined, in sum and substance, during his deposition testimony.

113.    During the times that Agent Donnelly worked with Detective Vincent Raucci from 1985 to 1990, he never saw Detective Raucci doing anything illegal, causing a witness to testify falsely, or securing false testimony in any fashion, including by way of promises/favors. See Brian Donnelly Dep., **Ex. 49**, at 140:24–142:25.

**RESPONSE:** Undisputed.

114.    Agent Donnelly had been present during interviews conducted by NHPD officers where he observed them stop and start the tape and speak to witnesses to determine what information they had prior to beginning the recording, however, he found nothing improper about the detectives doing so during those times. See Brian Donnelly Dep., **Ex. 49**, at 160:13-24.

**RESPONSE:** Undisputed that Special Agent Donnelly observed NHPD officers start and stop the tape while recording a witness statement, and speak with witnesses before starting the tape to determine what information the witness had. Further undisputed that, at his deposition, Donnelly opined that the conduct he observed was not improper.

115.    Agent Donnelly never observed any NHPD officer feed a witness information, or stop the tape to coach a witness during any of the interviews he was present for. See Brian Donnelly Dep., **Ex. 49**, at 161:1-16.

**RESPONSE:** Undisputed.

Dated:  September 27, 2021
        New York, New York

                                        EMERY CELLI BRINCKERHOFF
                                        ABADY WARD & MAAZEL LLP


                                        _____/s/_____
                                        Ilann M. Maazel
                                        Nick Bourland
                                        600 Fifth Avenue, 10th Floor
                                        New York, N.Y. 10020
                                        (212) 763-5000
                                        imaazel@ecbawm.com
                                        nbourland@ecbawm.com

                                        PARRETT, PORTO, PARESE
                                        & COLWELL, P.C.

                                        Tamar R. Birckhead
                                        2139 Whitney Avenue, Suite 1-D
                                        Hamden, Connecticut 06518
                                        (203) 281-2700

                                        KAUFMAN LIEB LEBOWITZ
                                        & FRICK LLP

                                        Douglas E. Lieb
                                        10 East 40th Street, Suite 3307
                                        New York, NY 10016
                                        (212) 660-2332
                                        dlieb@kllf-law.com

                                        *Attorneys for Plaintiff Vernon Horn*