UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

VERNON HORN,

              Plaintiff,

  -against-

CITY OF NEW HAVEN; and LEROY DEASE,
PETISIA ADGER, DARYLE BRELAND, and
JAMES STEPHENSON, in their individual
capacities,

             Defendants.

No. 3:18 Civ. 1502 (RNC)

**PLAINTIFF VERNON HORN'S MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S PARTIAL CROSS-MOTION FOR SUMMARY JUDGMENT**

**Emery Celli Brinckerhoff Abady Ward & Maazel LLP**
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

**Parret, Porto, Parese & Colwell, P.C.**
2139 Whitney Avenue, Suite 1-D
Hamden, Connecticut 06518

**Kaufman Lieb Lebowitz & Frick LLP**
10 East 40th Street, Suite 3307
New York, New York 10016

# TABLE OF CONTENTS

PAGE NO.

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS .........................................................................................2

    I.     BRELAND AND DEASE INTERROGATE MARCUS PEARSON, WHO
          DENIES USING THE STOLEN CELL PHONE TO CALL CRYSTAL SYKES .......2

    II.    BRELAND AND DEASE INTERROGATE KENDELL THOMPSON, WHO
          TELLS THE DETECTIVES HE COULD NOT IDENTIFY HORN OR
          JACKSON................................................................................................5

ARGUMENT ...........................................................................................................9

    I.     IT IS UNDISPUTED THAT BRELAND AND DEASE VIOLATED *BRADY* BY
          SUPPRESSING MATERIAL EXCULPATORY EVIDENCE REGARDING
          PEARSON AND THOMPSON..................................................................9

          A.     By Breland's Own Admission, He and Dease Suppressed an Exculpatory,
               Material Statement ...........................................................................11

               1.   Pearson's Denial Was Exculpatory, Impeaching, Suppressed, and
                    Material ...............................................................................11

           B.     Breland and Dease Also Suppressed Evidence that Dease Threatened
               Thompson, and that Thompson Could Not Identify Horn and Jackson ..........14

               1.   Dease's Threat and Thompson's Statements Were Exculpatory and
                     Impeaching..........................................................................14

                2.   Dease's Threat and Thompson's Statements Were Suppressed ...............15

                3.   Dease's Threat and Thompson's Statements Were Material ...................16

CONCLUSION.......................................................................................................17

## CASES

*Bellamy v. City of New York*,
    914 F.3d 727 (2d Cir. 2019)........................................................................... 9, 10

*Blake v. Race*,
    487 F. Supp. 2d 187 (E.D.N.Y. 2007) ................................................................ 15

*Carrillo v. Cty. of Los Angeles*,
    No. 11 Civ. 10310, 2012 WL 12850128 (C.D. Cal. Nov. 14, 2012), *aff'd*, 798 F.3d 1210 (9th
    Cir. 2015).......................................................................................................... 15

*Geter v. Fortenberry*,
    849 F.2d 1550 (5th Cir. 1988) ........................................................................... 15

*Giglio v. United States*,
    405 U.S. 150 (1972)........................................................................................... 15

*Howard v. City of Chicago*,
    No. 03 Civ. 8481, 2004 WL 2397281 (N.D. Ill. Oct. 25, 2004)........................ 15

*Jackson v. City of Cleveland*,
    925 F.3d 793 (6th Cir. 2019) ....................................................................... 15, 16

*Kampshoff v. Smith*,
    698 F.2d 581 (2d Cir. 1983)............................................................................... 16

*Kyles v. Whitley*,
    514 U.S. 419 (1995)............................................................................... 10, 12, 16

*Leka v. Portunado*,
    257 F.3d 89 (2d Cir. 2001)........................................................................... 10, 11

*Nnodimele v. Derienzo*,
    No. 13 Civ. 3461, 2016 WL 3561708 (E.D.N.Y. June 27, 2016) ........................ 9

*Poventud v. City of New York*,
    750 F.3d 121 (2d Cir. 2014)........................................................................... 9, 10

*Quezada v. Smith*,
    624 F.3d 514 (2d Cir. 2010)............................................................................... 15

*Strickler v. Greene*,
    527 U.S. 263 (1999)........................................................................................... 11

*United States v. Cody*,
    722 F.2d 1052 (2d Cir. 1983) ........................................................... 15

*United States v. Mahaffy*,
    693 F.3d 113 (2d Cir. 2012) ............................................................. 11

*United States v. Martoma*,
    No. 12 Cr. 973, 2014 WL 31704 (S.D.N.Y. Jan. 6, 2014) .................... 15

*United States v. Patrick*,
    985 F. Supp. 543 (E.D. Pa. 1997) ..................................................... 12

*United States v. Pelullo*,
    105 F.3d 117 (3d Cir. 1997) ............................................................. 12

*United States v. Rivas*,
    377 F.3d 195 (2d Cir. 2004) ............................................................. 11

*United States v. Triumph Capital Grp., Inc.*,
    544 F.3d 149 (2d Cir. 2008) ....................................................... 12, 16

*Walker v. City of New York*,
    974 F.2d 293 (2d Cir. 1992) ............................................................... 9

*Wearry v. Cain*,
    577 U.S. 385 (2016) .................................................................... 10, 16

# PRELIMINARY STATEMENT

At Plaintiff Vernon Horn's criminal trial, two key witnesses connected him to the robbery/homicide at the Dixwell Deli: Marcus Pearson and Kendell Thompson. According to Defendants, Pearson told Detectives Dease and Breland (the "Detectives") that he used the cell phone Horn stole from the scene of the crime to call a woman named Crystal Sykes. In a case lacking any forensic evidence linking Horn to the crime, Pearson's statement was a smoking gun—the link between the stolen phone and Horn. Thompson was the only person in the Dixwell Deli who identified Horn and Marquis Jackson.

Now, over two decades after Horn was wrongfully convicted and over three years after he was exonerated, Detective Breland admits that he and Detective Dease suppressed material, exculpatory evidence that contradicted and undermined Pearson's and Thompson's incriminating testimony. Breland admits (i) that Pearson told the Detectives that he never used the stolen phone to call Sykes. Breland admits (ii) that Dease threatened to call Thompson's probation officer if Thompson did not cooperate. Breland admits (iii) that Thompson told the Detectives twice that he could *not* identify Horn or Jackson.

It is also undisputed that Detectives never disclosed any of this exculpatory evidence to the State's Attorney's Office. The Detectives suppressed it for over two decades, until Breland's deposition.

In light of Breland's admissions and the undisputed evidence, Horn is entitled to summary judgment as to liability on each element—favorability, suppression, and materiality— of his *Brady* claims as to Pearson's denial that he used the phone, Thompson's statements that he could not identify the robbers, and Dease's threat to Thompson.

1

# STATEMENT OF FACTS

A complete statement of facts is provided in Plaintiff's Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment and is incorporated here by reference. The following is a summary of the material undisputed facts relevant to Plaintiff's instant motion.

## I. BRELAND AND DEASE INTERROGATE MARCUS PEARSON, WHO DENIES USING THE STOLEN CELL PHONE TO CALL CRYSTAL SYKES

The following account of Breland and Dease's interrogation of Pearson is derived solely from Breland's own testimony.[1]

During their investigation of the Dixwell Deli robbery/homicide, Breland and Dease interviewed Marcus Pearson a number of times, first on January 26, 1999, Ex. 4 (Breland Dep.) at 205:11-209:15, then on January 28, *id.* at 211:7-214:14, again on February 3, *id.* at 218:21-219:4, and once more on February 5, *id.* at 302:5-303:10. During the third interview on February 3, Breland took Pearson "down to the police station" and "[i]nto the interrogation room" to interrogate him. *Id.* at 219:5-8. The interrogation room was small—by Breland's estimation, it was ten by twelve feet. *Id.* at 220:1-5. Detective Dease was also present for the February 3 interrogation. *Id.* at 220:6-10, 223:14-18.

In the interrogation room, Breland and Dease conducted a pre-interview of Pearson. *Id.* at 220:14-16. The pre-interview was not recorded, *id.* at 221:10-13, 282:16-21, and neither Breland nor Dease took any notes, *id.* at 221:14-17, 223:21-23. At the time, the

---

[1] Defendant Dease suffered a stroke in November 2018 and is experiencing memory loss and difficulty expressing his thoughts. Stip., Dkt. 149. As a result, Dease was not deposed in this case and the parties agreed not to call him as a witness at trial and not to submit an affidavit by Dease in support of or in opposition to any dispositive motion. *Id.* Defendant Breland is therefore the only defense witness who can testify as to what occurred during his and Dease's interrogations of Marcus Pearson on February 3, 1999 and Kendell Thompson on January 26, 1999.

Detectives already considered Horn and Jackson suspects in the Dixwell Deli robbery/homicide investigation. *Id.* at 224:20-23.

Breland testified about the content of his and Dease's pre-interview of Pearson as follows:

> Q.    So in the pre-interview on February 3rd you discussed the stolen cell phone with Mr. Pearson?
>
> A.    Yes.
>
> Q.    And you discussed the fourth phone call?
>
> A.    Well -- yes.
>
> Q.    And you discussed --
>
> A.    The phone call, yes.
>
> Q.    -- Pearson allegedly calling Sykes?
>
> A.    Yes.
>
> Q.    And you told Pearson we think you called Sykes at that phone number, in the fourth phone call. Correct?
>
> A.    Yes.
>
> Q.    **And he denied it. Right?**
>
> A.    **Yes.**

*Id.* at 227:2-17 (emphasis added).[2] In sum, during the unrecorded, undocumented pre-interview, Breland and Dease told Pearson they believed he had used the stolen phone to call Sykes, and, in response, Pearson denied it. *Id.*

There is no ambiguity about this testimony. Breland was represented by multiple lawyers, *id.* at 222:15-25, met three times with counsel to prepare for his deposition for a number

---

[2]    Later in his deposition, Breland again confirmed that he told Pearson "Crystal Sykes said that you called her." Ex. 4 at 277:6-19.

of hours, *id.* at 9:14-10:5, and a month after the above testimony, declined an opportunity to change it, *id.* at 252:21-253:2.

Following the pre-interview, Breland and Dease took Pearson's tape-recorded statement. *Id.* at 226:12-16. Drawing all inferences in the Detectives' favor, the statement reflects that Pearson told the Detectives that, while in New Haven on January 25, 1999, he used a cell phone provided by Horn to call Sykes. Ex. 37 (Tr. of Pearson Feb. 3, 1999 Statement) at 4-5; Ex. 4 at 226:17-19. It is now undisputed that the phone call between Pearson and Sykes never happened. Ex. 4 at 193:3-5; Ex. 27 (Moledor Dep.) at 16:23-17:1 (Detectives' expert); Ex. 28 (Wines Dep.) at 31:24-32:3 (FBI analyst).

Accordingly, as Breland now admits, in his February 3 statement, Pearson somehow managed to tell the Detectives about (1) a call that never happened; (2) using a phone he never used; (3) borrowed from someone who just happened to be the Detectives' suspect at the time (Horn); (4) at a time and to a number that just happened to match the stolen phone call record. Ex. 4 at 193:3-5, 227:2-17, 231:9-11, 415:3-22. Reflecting back on this case today, Breland acknowledged that these coincidences are "suspicious." *Id.* at 415:16-416:20.

Before Breland and Dease interrogated Pearson and obtained Pearson's inculpatory statement, the Detectives had no evidence connecting Horn to the stolen cell phone. *Id.* at 294:10-21. Following the February 3 interrogation, Pearson became "[t]he one and only link between Mr. Horn and the stolen cell phone." *Id.* at 294:22-25. Defendants' experts agree. Ex. 25 (Stine Dep.) at 104:14-20 (Detectives' expert); Ex. 26 (Spector Dep.) at 126:11-13, 127:8-13 (City's expert).

Breland never told the prosecutor about Pearson's denial. Pearson's recorded statement from that day later disappeared—Breland "couldn't find it" and it "went missing." Ex.

4 at 299:11-14, 301:1-2. Breland never told anyone it went missing in 1999 because he "forgot." *Id.* at 418:19-420:7. He never spoke with the State's Attorney's Office about the Dixwell Deli case at all, *id.* at 350:3-14, never told them anything about what "happened in [his] pre-interviews" with witnesses, *Id.* at 351:10-13, and did not document Pearson's denial in any police report or other document, Ex. 26 at 138:5-9.

The attorney who prosecuted Horn, Gary Nicholson, relied on the NHPD to provide all the evidence in this case. Ex. 21 (Nicholson Dep.) at 52:7-16. Nicholson confirmed that neither Breland nor Dease ever disclosed Pearson's denial to him. *Id.* at 120:2-7 ("Q: Did Dease or Breland ever tell you that Pearson told them that Vernon Horn never gave him the cell phone? A: No. Q: Did Detective Adger ever tell you that? A: Nobody ever told me that."). The first time Nicholson heard of Pearson's denial was at his deposition in this case. *Id.* at 118:12-18 ("Q: The very first time in your entire life you're finding out that Mr. Pearson told Dease and Breland that he never used the cell phone is today in 2020. Correct? A: It's the first time I hear of it.").

## II.  BRELAND AND DEASE INTERROGATE KENDELL THOMPSON, WHO TELLS THE DETECTIVES HE COULD NOT IDENTIFY HORN OR JACKSON

Nineteen-year-old Kendell Thompson was in the Dixwell Deli when three people robbed the store, one put a gun to his head, ordered him to get to the floor, and threatened to shoot him. Ex. 7 (Thompson Dep.) at 9:10-11, 15:1-18:13. The robbers wore masks "covering their whole face." *Id.* at 22:17-24. The entire robbery took three to four minutes. *Id.* at 24:15-18. Thompson had no idea who any of the robbers were. *Id.* at 46:4-48:9, 71:2-10.

The following account of Thompson's interrogation by Breland and Dease is derived solely from Breland's own testimony.

On January 26, 1999, Breland and Dease went to Thompson's home. Ex. 4 at 121:1-25. When the Detectives arrived, Thompson "didn't want to talk at first. . . . He didn't want to have nothing to do with it." *Id.* at 121:19-24. Breland and Dease put Thompson in the back of their police car and brought him down to the police station to interview him. *Id.* at 123:7-15. The Detectives decided to interview Thompson at the station instead of at his home because it "[m]ade things a lot easier." *Id.* at 123:16-124:19. At the station, they took Thompson to a room upstairs, closed the door, and told him to "have a seat." *Id.* at 128:17-131:13. Only Breland, Dease, and Thompson were present in the room. *Id.* at 130:22-131:7.

Breland and Dease proceeded to conduct a pre-interview of Thompson. *Id.* at 132:7-9. Breland had his tape recorder with him, *id.* at 131:16-19, but the Detectives did not record the pre-interview, *id* at 133:4-10. Breland did not take any notes during the pre-interview. *Id.* at 132:15-17. Dease did take some notes in his notebook but never disclosed them to anyone. *Id.* at 132:20-133:17. Dease and Breland proceeded to show photos of Horn and Jackson to Thompson, in an attempt to get a positive identification while the tape recorder was off. *Id.* at 135:9-15.

Breland testified that during his and Dease's interrogation of Thompson, Dease told Thompson that he would "notify Mr. Thompson's probation officer if he didn't cooperate." *Id.* at 157:21-24.

In addition, according to *Breland's own testimony*, Thompson explained to the Detectives that the robbers had worn face masks, and, as a result, he could not identify who the robbers were. *Id.* at 159:13-160:9. Breland testified:

> Q.    Mr. Thompson repeatedly said he couldn't identify anyone through his ski mask?
>
> A.    Yes. In this statement said that.

6

> Q. And that's what he said in that room in Union Avenue in 1999. Right?
>
> A. No. No.
>
> Q. So your testimony is what exactly about Mr. Thompson?
>
> A. **He did say he couldn't identify them**, but he wasn't asked 18 times.
>
> Q. **So Mr. Thompson said he couldn't identify Horn or Jackson. Right?**
>
> A. **Yes.**
>
> Q. **How many times did Mr. Thompson say that in the room?**
>
> A. **Maybe twice.**
>
> Q. **And when Mr. Thompson said he couldn't identify Horn and Jackson, what did you or Dease say in response?**
>
> A. **There is nothing you can say. He couldn't identify them.**

*Id.* (emphasis added). Thompson told the Detectives this not once, but at least *twice. Id.* at 160:2-4. In response, Dease and Breland did not say anything—as Breland explained: "There is nothing you can say. ***[Thompson] couldn't identify them***." *Id.* at 160:5-9 (emphasis added).

Breland then took Thompson's recorded witness statement. *Id.* at 140:1-3; Ex. 38 (Tr. of Thompson Jan. 26, 1999 Statement). Thompson's twice-repeated statement that he could not identify the robbers was not recorded in the formal witness statement, *see id.*, and the tape recording of Thompson's statement is missing today, *see* Ex. 4 at 140:4-14 (Breland: "I don't know where it is."). Drawing all inferences in the Detectives' favor, Thompson then contradicted his statement during the pre-interview and identified Horn (based on his eyes and mouth) and Jackson (based on his complexion) as the robbers in his subsequent recorded witness statement. Ex. 38 at DET00166.

As noted above, Breland never spoke with the State's Attorney's Office about the

Dixwell Deli case, including about what occurred during witness pre-interviews. Ex. 4 at 350:3-

14, 351:10-13. In his undisputed testimony, the prosecutor, Nicholson, confirmed that Breland

never told him about Thompson's statements that he could not identify the robbers:

> Q:      Did Breland ever tell you what he told us under oath in this
>         civil case -- that Thompson said he could not identify Horn
>         or Jackson? Breland never told you that?
>
> A.      **No.**
>
> Q.      You're a hundred percent sure about that. Right?
>
> A.      **To the best of my recollection, he did not. If he had told
>         me that, I would have disclosed to that counsel.**
>
> Q.      And that is Mr. Breland's failure to disclose *Brady*
>         material. Right?
>
> A.      **Yes.**
>
> Q.      And it's a pretty dramatic failure, isn't it?
>
> A.      **It's certainly important.**
>
> Q.      Are you disturbed by this?
>
> A.      **I never knew about it.**
>
> Q.      But now that you know that Mr. Breland is admitting that
>         Thompson gave him Brady material that Breland never told
>         you about it, are you disturbed at Mr. Breland's conduct?
>
> A.      **I'm not happy.**
>
> Q.      Why aren't you happy?
>
> A.      **Because if that happened, I should have been informed.**
>
> Q.      By Breland and Dease?
>
> A.      **If they were both there when that took place, yes.**
>
> Q.      Has this ever happened in your career, that decades after a
>         conviction, you learned that detectives in your case had
>         Brady material that they never disclosed had to you?

A.    **I can't recall specifically if it's happened. It's not a common event, I'll say that.**

Ex. 21 at 136:17-138:18 (emphasis added). Similarly, neither Breland nor Dease disclosed to Nicholson that—as is also undisputed—Dease threatened to call Thompson's probation officer if Thompson did not cooperate with the Detectives. Ex. 21 at 138:19-24; Ex. 25 at 146:15-147:14.

Thompson's statement linking Horn and Jackson to the Dixwell Deli was a critical piece of evidence, as he was "the only witness in the deli who identified Horn and Jackson" at trial. Ex. 25 at 141:189-23; Ex. 26 at 177:20-22 (same).

## ARGUMENT

I.    **IT IS UNDISPUTED THAT BRELAND AND DEASE VIOLATED *BRADY* BY SUPPRESSING MATERIAL EXCULPATORY EVIDENCE REGARDING PEARSON AND THOMPSON**

It is undisputed that Detectives Dease and Breland suppressed material, exculpatory evidence concerning key witnesses Pearson and Thompson. Breland admitted under oath that such evidence was suppressed. Plaintiff is entitled to partial summary judgment on his *Brady* claims against Dease and Breland as to the elements of favorability, suppression, and materiality with respect to this suppressed evidence.

Police officers have an obligation to turn *Brady* material over to prosecutors. *Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir. 1992). When they fail to do so, they are "liable under § 1983." *Bellamy v. City of New York*, 914 F.3d 727, 751 (2d Cir. 2019). The withholding need not be intentional. *See id.* at 751 n.23 (noting that the Second Circuit has not decided whether a civil Brady claim requires intentional suppression); *Poventud v. City of New York*, 750 F.3d 121, 133 (2d Cir. 2014) (en banc) (*Brady* claim requires that evidence "must have been suppressed . . . either willfully *or inadvertently*" (emphasis added)); *Nnodimele v. Derienzo*, No. 13 Civ. 3461, 2016 WL 3561708, at *5 (E.D.N.Y. June 27, 2016) ("bad faith is not a

required element of a *Brady* claim under § 1983," but rather "deliberate indifference to or reckless disregard for an accused's rights can sustain such a claim").

*Brady* claims have three elements: (1) the evidence at issue must be favorable to Plaintiff, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued. *Poventud*, 750 F.3d at 133.

To establish prejudice, Plaintiff must show materiality—*i.e.*, a reasonable probability that proper disclosure of the suppressed evidence would have caused a different result at Plaintiff's criminal trial. *Id.* at 134. For example, suppressed evidence is material if its disclosure "would have significantly increased the defense's changes of sowing a reasonable doubt in the jury's mind." *Bellamy*, 914 F.3d at 752. This is a far lesser burden than showing that the criminal case "would more likely than not" have resulted in an acquittal. *Poventud*, 750 F.3d at 133 (quoting *Leka v. Portunado*, 257 F.3d 89, 104 (2d Cir. 2001)). "The materiality test is 'not a sufficiency of evidence test,' and Plaintiff "'need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict.'" *Leka*, 257 F.3d at 104 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434-35 (1995)). Plaintiff "can prevail even if . . . the undisclosed information may not have affected the jury's verdict." *Wearry v. Cain*, 577 U.S. 385, 392 n.6 (2016).

These elements are easily met here with respect to: (1) Pearson's denial to Dease and Breland that he used the stolen cell phone to call Sykes; (2) Thompson's repeated statements to Dease and Breland that he could not identify the perpetrators; and (3) Dease's threat to call Thompson's probation officer if he did not "cooperate" and provide a witness statement.

### A. By Breland's Own Admission, He and Dease Suppressed an Exculpatory, Material Statement

As explained *supra*, Breland admitted at his deposition that, during the unrecorded pre-interview, Pearson denied that he received the stolen cell phone from Horn and used it to call Sykes. Breland and Nicholson agree that the Detectives did not inform the prosecutor of Pearson's denial. Breland's admitted suppression of this material exculpatory statement by a key prosecution witness is an undisputed *Brady* violation.

### 1. Pearson's Denial Was Exculpatory, Impeaching, Suppressed, and Material

Pearson's denial that he had obtained the stolen phone from Horn and used it to call Sykes directly contradicted one of the only connections between Horn and the Dixwell Deli robbery/homicide and undermined the credibility of Pearson's testimony at trial linking Horn to the stolen phone. Pearson's denial was therefore favorable to Horn and tended to impeach Pearson, one of the state's two central witnesses. *See Strickler v. Greene*, 527 U.S. 263, 282 n.21 (1999) (holding that "*Brady's* disclosure requirements extend to materials that, whatever their other characteristics, may be used to impeach a witness"); *United States v. Mahaffy*, 693 F.3d 113, 132 (2d Cir. 2012) (information that "called squarely into question the credibility of the government's key cooperating witness" is material as a matter of law); *United States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004) (*Brady* applies to evidence that has "the potential to alter the jury's assessment of the credibility of a significant prosecution witness . . . put[ting] the case in such a different light as to undermine confidence in the outcome"); *Leka*, 257 F.3d at 104, 106-07 (*Brady* violated where evidence was withheld that contradicted the accounts of two eyewitnesses whose testimony implicated defendant at trial).

It is undisputed that Dease and Breland failed to disclose Pearson's denial. "Evidence that is not disclosed is suppressed for *Brady* purposes . . . when it is 'known only to

police investigators and not to the prosecutor.'" *United States v. Triumph Capital Grp., Inc.*, 544 F.3d 149, 161 (2d Cir. 2008) (quoting *Kyles*, 514 U.S. at 438). By Breland's admission, he never disclosed it to the prosecutor. The prosecutor agrees. It is undisputed that Pearson's denial was suppressed.

Finally, Pearson's denial was materially favorable to Horn because it would have impeached the credibility of Pearson, one of the prosecution's two keys witnesses at trial, and also undermined the veracity of Pearson's testimony linking Horn to the stolen cell phone. *See, e.g.*, *United States v. Pelullo*, 105 F.3d 117, 122-24 (3d Cir. 1997) (impeachment evidence was material where "credibility of the government witnesses was so central to the government's case"); *United States v. Patrick*, 985 F. Supp. 543, 562 (E.D. Pa. 1997) (suppressed evidence was material where it impeached a prosecution witness whose "credibility was critically important in establishing the government's entire theory of the case").

No forensic evidence tied Horn or Jackson to the crime: no DNA, fingerprint, hair, footprint, video, audio, nothing. Ex. 4 at 85:21-86:23, 391:10-12, 399:6-400:9; Ex. 3 (Adger Dep.) at 28:21-30:13; Ex. 25 at 103:11-18; Ex. 26 at 122:9-19. The closest thing the prosecution had to forensic evidence was the stolen cell phone, which Pearson placed in Horn's hands.

State's Attorney Patrick Griffin made the decision to dismiss the case after Horn's conviction was vacated. Ex. 22 (Griffin Dep.) at 56-58, 90-91. This was "an extraordinary step," *id.* at 130:9, 130:17-18, and he based his decision "in large measure" on the FBI's finding that it was impossible for Pearson to have made the call to Sykes with the stolen cell phone, *id.* at 119:7-13. The call to Sykes was "crucial evidence" and was "crucial to the case," *id.* at 121:16-18, and the conclusive proof that the call came from Bridgeport, not from Pearson in New Haven, "broke the tangible . . . link between Vernon Horn and the stolen cell phone." *Id.* at 97:9-

15. Accordingly, Griffin believed he was ethically obligated to dismiss the case against Horn. *Id.* at 142:14-22.

Breland and Defendants' police practices experts agree that Pearson was the crucial link between Mr. Horn and the stolen cell phone taken from the scene of the crime. Ex. 4 at 294:22-25; Ex. 25 at 104:14-20; Ex. 26 at 126:11-13, 127:8-13. The Detectives' expert, Stine, admitted that any statement by Pearson that he did not borrow the phone from Horn or use it to call Sykes is *Brady* material: "it's two versions of the same event coming from the same witness." Ex. 25 at 107:13-108:2. The prosecutor, Nicholson, illustrated that Pearson's denial could have been used to impeach Pearson's testimony as a prior inconsistent statement, Ex. 21 at 111:11-23, and that if Nicholson had known of such information, it "would have been [his] constitutional obligation" to "disclose[] that to the defense" under *Brady*, *id.* at 113:5-14. Nicholson "would have disclosed it" if the Detectives had turned it over. *Id.* at 114:2.

At trial, Nicholson highlighted the importance of the stolen cell phone. In his closing argument, Nicholson repeatedly stressed that Pearson's testimony linking the stolen cell phone to Horn was definitive evidence of Horn's guilt. Nicholson described the stolen cell phone as "[p]robably the most glaring" evidence in the case against Horn and asked the jury, "What are the chances, ladies and gentlemen, of . . . Mr. Horn having a piece of incriminating evidence that was stolen from the deli that night?" Ex. 31 (Nicholson Closing Argument) at 140:4-141:12. Nicholson explained that Pearson "is the one that puts the stolen cell phone in Mr. Horn's hands," that the Detectives wanted to "make certain, one hundred percent certain, that Mr. Pearson was certain that he got that stolen cell phone from Mr. Horn," *id.* at 120:9-16, that "Mr. Horn gave [Pearson] that phone," that "Mr. Horn ha[d] a piece of incriminating evidence that was stolen from the deli that night," *id.* at 141:8-12, and that "a day after" the homicide, "Mr.

Horn has that stolen cell phone. . . . And he's giving it to Marcus Pearson. And Marcus Pearson identified Mr. Horn as being the source of that phone. What a coincidence," *id.* at 140:17-24.

Pearson's denial that he obtained the stolen phone from Horn and used it to place a call impeaches and undermines this critical connection between Horn and the Dixwell Deli homicide.

**B.      Breland and Dease Also Suppressed Evidence that Dease Threatened Thompson, and that Thompson Could Not Identify Horn and Jackson**

As detailed above, Breland now admits that: (1) Thompson told Breland and Dease twice that he could not identify the Dixwell Deli Robbers; (2) Dease threatened to call Thompson's probation officer if Thompson did not cooperate with the Detectives; and (3) the Detectives never informed the prosecutor of Thompson's statements or Dease's threat. These are undisputed, additional *Brady* violations.

**1.      Dease's Threat and Thompson's Statements Were Exculpatory and Impeaching**

For the same reasons Pearson's denial was *Brady* material, Thompson's repeated statements that he could not identify Horn and Jackson are plainly exculpatory and impeaching. Nicholson admitted that Thompson's statements to Breland and Dease that he could not identify the robbers were *Brady* material "[b]ecause it's inconsistent with what he apparently told the police in his statement." Ex. 21 at 135:13-14. The Detectives' police practices expert agrees. Ex. 25 at 147:11-14 ("Q: And do you agree with Mr. Nicholson that that is *Brady* material? A: Yes.").

Evidence of Dease's threat to call Thompson's probation officer was also exculpatory and impeaching because it could have cast doubt on the reliability of Thompson's identifications of Horn and Jackson as the perpetrators and could have been used to impeach Thompson's credibility.

Evidence of a police officer's threat to a witness is textbook *Brady* material. *See Giglio v. United States*, 405 U.S. 150, 153-55 (1972) (evidence that the government obtained a witness's testimony by suggesting he could escape prosecution through cooperating was "material" evidence "affecting credibility" of the witness that should have been disclosed under *Brady*); *Blake v. Race*, 487 F. Supp. 2d 187, 215 (E.D.N.Y. 2007) (a police officers' failure to advise prosecutors that they had coerced a witness into falsely implicating the criminal defendant, "if proven, would [] support a *Brady* claim under Section 1983"); *Jackson v. City of Cleveland*, 925 F.3d 793, 814-15 (6th Cir. 2019) (a police officer's knowledge that a key witness was "coerced into signing [an] allegedly false statement . . . [is] exculpatory evidence"); *Geter v. Fortenberry*, 849 F.2d 1550, 1559 (5th Cir. 1988) (failure to disclose that photo identifications were procured by "unlawful means" was exculpatory under *Brady*).[3] The Detectives' expert and the prosecutor agree that Breland's threat to call Thompson's probation officer if Thompson did not "cooperate" was *Brady* material. Ex. 25 at 93:10-12 (Stine: "[A]ny threat against a state's witness is [] *Brady* material."); Ex. 21 at 72:13-16 (Nicholson: "[A]ny kind of threat made to a witness to induce him to give information . . . is *Brady*.").

### 2. Dease's Threat and Thompson's Statements Were Suppressed

Thompson's twice-repeated statement that he could not identify Horn and Jackson as the perpetrators and evidence of Dease's threat to Thompson were all suppressed. Nicholson testified that neither was disclosed to him, and the Detectives point to no evidence to the

---

[3]     *See also Quezada v. Smith*, 624 F.3d 514, 522 (2d Cir. 2010) (state's alleged nondisclosure of evidence of police coercion of witness is "constitutional error" under *Brady/Giglio*); *United States v. Cody*, 722 F.2d 1052, 1061-63 (2d Cir. 1983) (FBI agent's threats to witness should have been disclosed to defense under *Brady/Giglio*); *United States v. Martoma*, No. 12 Cr. 973, 2014 WL 31704, at *4 (S.D.N.Y. Jan. 6, 2014) (evidence of government's threats to prosecution witnesses is *Brady* and *Giglio* material that must be disclosed to the defense); *Carrillo v. Cty. of Los Angeles*, No. 11 Civ. 10310, 2012 WL 12850128, at *6-*7 (C.D. Cal. Nov. 14, 2012), *aff'd*, 798 F.3d 1210 (9th Cir. 2015) (evidence of police officer's threats to witness exculpatory under *Brady*); *Howard v. City of Chicago*, No. 03 Civ. 8481, 2004 WL 2397281, at *10 (N.D. Ill. Oct. 25, 2004) (evidence of police officers' coercion of witness exculpatory under *Brady*).

contrary. It is undisputed that Thompson's statements and Dease's threat were suppressed. *See Triumph Capital Grp., Inc.*, 544 F.3d at 161.

### 3. Dease's Threat and Thompson's Statements Were Material

Even though Plaintiff need not prove that the suppressed evidence would have affected the jury's verdict in order to prevail on his *Brady* claims, *Wearry*, 577 U.S. at 392 n.6, here, it *is* reasonably likely that the jury would have acquitted Horn had it known that Thompson told the Detectives at least twice that he could not identify the perpetrators, and that he identified them only after Dease threatened to call Thompson's probation officer. *See Jackson*, 925 F.3d at 815 ("Because [the witness's] coerced statement formed the core of the prosecution's case, there is a reasonable likelihood that, had the juries in Plaintiffs' trials known that the statement was fabricated and coerced . . . the juries would not have convicted Plaintiffs."); *Kyles*, 514 U.S. at 445 (concluding that undisclosed evidence that "would have raised opportunities to attack . . . the thoroughness and even the good faith of the investigation" and "revealed a remarkably uncritical attitude on the part of the police" was material under *Brady*).

Thompson was the only eyewitness in the Dixwell Deli who identified Horn or Jackson. During his summation, Nicholson stressed that that even though the robbers "had masks on," Thompson's eyewitness identification was key evidence of Horn and Jackson's guilt because Thompson "knew these people." Ex. 31 at 141:21-23. "[E]yewitness testimony is among the most influential . . . forms of proof." *Kampshoff v. Smith*, 698 F.2d 581, 587 (2d Cir. 1983). "Whenever such proof is admitted, there is a genuine likelihood that the jury will base its decision on it." *Id.* Thompson's repeated statements to Breland and Dease that he could not identify the masked robbers were material.

16

## CONCLUSION

This motion relies solely on the testimony of Detective Breland, the defense experts, and the prosecutor. All agree that Detectives Breland and Dease had, but did not disclose, material exculpatory evidence. For the foregoing reasons, Plaintiff's motion for partial summary judgment should be granted.

Dated:  September 27, 2021
        New York, New York

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

_____/s/_____
        Ilann M. Maazel
        Nick Bourland

600 Fifth Avenue, 10th Floor
New York, N.Y. 10020
(212) 763-5000
imaazel@ecbawm.com
nbourland@ecbawm.com

PARRETT, PORTO, PARESE
& COLWELL, P.C.

Tamar R. Birckhead
2139 Whitney Avenue, Suite 1-D
Hamden, Connecticut 06518
(203) 281-2700

KAUFMAN LIEB LEBOWITZ
& FRICK LLP

Douglas E. Lieb
10 East 40th Street, Suite 3307
New York, NY 10016
(212) 660-2332
dlieb@kllf-law.com

*Attorneys for Plaintiff Vernon Horn*