UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| VERNON HORN, | : | CIVIL NO. 3:18-CV-1502(RNC) |
| *Plaintiff,* | : | *consolidated for discovery purposes* |
| | : | *with* 3:19-CV-0388(RNC) |
| v. | : | |
| | : | |
| CITY OF NEW HAVEN, *et al.,* | : | NOVEMBER 3, 2021 |
| *Defendants.* | | |

| | | |
|---|---|---|
| MARQUIS JACKSON, | : | CIVIL NO. 3:19-CV-388 (RNC) |
| *Plaintiff,* | : | *consolidated for discovery purposes* |
| | : | *with* 3:18-CV-1502(RNC) |
| v. | : | |
| | : | |
| CITY OF NEW HAVEN, *et al.,* | : | NOVEMBER 3, 2021 |
| *Defendants.* | | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
JAMES STEPHENSON'S MOTION FOR SUMMARY JUDGMENT**

The sad irony of these cases is that the plaintiffs, two people who claim they were wrongfully accused of something they did not do, have now turned around and done just that to defendant James Stephenson, who was a consummate professional and dedicated public servant for two decades. In their complaints and various filings, plaintiffs Horn and Jackson accuse Stephenson of acting improperly and unconstitutionally in violation of the Due Process Clause and its *Brady* doctrine. *See* (*Horn* Doc. 153 p. 49 – 50); (*Jackson* Doc. 110 p. 41 – 42); *Brady v. Maryland*, 373 U.S. 83 (1963). The actual evidence shows otherwise.

In these cases, Stephenson acted the same as he did before in over one hundred cases that he worked as a forensic lab technician. He acted in accordance

with his training and his lab's established practices, which have been confirmed and verified by two other experts in this field (including another examiner that worked in the same State Lab at the same time), by the lawyers that litigated the criminal case, and by the State's Attorney that agreed to vacate the convictions on grounds entirely unrelated to Stephenson's work in these cases.  (Stephenson Decl. ¶¶ 2 – 30J); (Jachimowicz Decl. ¶¶ 2 – 23); (Denio Decl. ¶¶ 2 - 33); (Moscowitz Depo. p. 144 ln. 12; ln. 10 - 25); (Griffin Decl. ¶¶ 9, 10); (Nicholson Depo. p. 162 ln. 11 – 17). There are no genuine issues of material fact as to any of that.

Stephenson did not intentionally secret or hide documents from anyone.  He brought the relevant documents and his entire work file to court when he testified in plaintiffs' criminal trial, and the file was available for any lawyer in the criminal case to review—prosecutor or defense attorney—who wished to see it or its contents or ask him questions.  That is what Stephenson was trained to do, and that is what the State Lab expected its firearms examiners to do as a matter of formal practice. (Stephenson Decl. ¶¶ 2 – 32); (Jachimowicz Decl. ¶¶ 2 – 23); (Griffin Decl. ¶¶  6 – 10); *see also* (Denio Decl. ¶¶  2 – 33). There is no dispute about this.

Both Horn and Jackson's criminal defense lawyers even agree and confirmed in their depositions that Stephenson regularly and routinely brought his work file to court proceedings and made them available to them as a matter of practice, and the criminal defense attorneys were familiar with that practice based on their experience as well.  Stephenson acted in good faith and in accordance with his

training and his lab's established practices.  In short, there was no actionable[1] *Brady* violation committed by Stephenson in this case, and he prevails on the merits.

Further, Stephenson is entitled to qualified immunity regardless of and independent of the merits of the *Brady* claim.  The law was not clearly established with sufficient specificity in 1999 or 2000 to deprive Stephenson of his immunity from suit.  It was also objectively reasonable for him to believe that his conduct was lawful, especially since he followed normal practices of his lab and of many other examiners in his field.  It was not "beyond debate'" among reasonable officials in Stephenson's position that his conduct would clearly violate the *Brady* doctrine within the context presented in these cases.

Further, part of the accusations and claims against Stephenson are also protected by absolute immunities, including under both the doctrine of absolute testimonial immunity and the doctrine of absolute prosecutorial immunity that attaches to witnesses who assist prosecutors with trial preparation.[2]

Now that it's time to rely on the actual evidence—not the hyperbole ginned up in the plaintiffs' complaints—this case can finally be decided on the facts,

---

[1]  As addressed below, liability for an alleged *Brady* violation in a civil action for damages under 42 U.S.C. § 1983 is different from strict-liability *Brady* analysis often imposed in post-conviction proceedings.  To have an actionable *Brady* claim for damages against an individual under § 1983, there is an elevated *mens rea* requirement.  Lack of bad-faith, intentional misconduct is a defense to civil *Brady* claims seeking damages from individual defendants.

[2]  These are partial defenses asserted as to the year-2000 conduct of Stephenson only, but not to his year-1999 conduct

instead of on the complaints that were cleverly written to evade the truth.  There are no genuine issues of material fact as to defendant Stephenson, and he is entitled to judgment as a matter of law.  The Court should grant this motion, enter judgment in Stephenson's favor as to the sole counts brought against him in each case (the "Fifth" Counts), and dismiss Stephenson as a party from these cases entirely.  *See* (*Horn* Doc. 153 p. 49 – 50)("Fifth Cause of Action"); (*Jackson* Doc. 110 p. 41 – 42)("Fifth Cause of Action").

## I.   BACKGROUND

### *General Background*

At around 3:30 a.m. on January 24, 1999, there was a robbery murder in the Dixwell Deli in New Haven, Connecticut.  At the time of that murder, and during the investigation of it thereafter, plaintiffs Horn and Jackson were 17- and 19-year-old young men.[3]  They were already established criminals and drug dealers, and each had been arrested or incarcerated and multiple occasions before the date of the murder.  They admit being at or near the scene of the crime late the night before, January 23, 1999, hours before the murder, and Horn admits being at the scene just after the murder as well.

There were three robbers involved in the murder.  They entered the Dixwell Deli early on January 24, 1999, and one of them shot and killed Caprice Hardy, who

---

[3] Additional general background about the murder can be located in published cases that arose from the criminal prosecution.  *See, e.g.*, *Horn v. Comm'r of Corr.*, 321 Conn. 767, 770 (2016); *Jackson v. Comm'r of Corr.*, 149 Conn. App. 681, 686 (2014).

was in the store.  One of the assailants left a fingerprint in the back room of the deli.  That was later matched with Steve Brown, who confessed to his involvement in the crime and also identified plaintiffs Horn and Jackson as his confederates, with Horn being the shooter.

Also important, the assailants stole a cell phone from the deli.  That phone was used to make 5 calls in the days following the murder that the plaintiffs and the other defendants have been and are heavily litigating.  There is hotly contested dispute to this day over phone records that were obtained and over whether the NHPD detectives properly stored or disclosed the records and alleged statements by witnesses that were interviewed by NHPD detectives.

The short version is that phone records were obtained from one of the retired detectives in 2018 by plaintiff Horn's legal team at the Federal Defenders Office. Those records showed one of the calls—the fourth call—did not originate from New Haven as everyone thought it did in 1999 and 2000, when Horn and Jackson were prosecuted and convicted of murder.  Instead, that call came from Bridgeport like the other 4 calls did.  The police and prosecutor presented a theory to the jury in the criminal trial in 2000 that involved the fourth call coming from New Haven and the phone involving Vernon Horn.

5

When the phone records were obtained by the Federal Defenders in 2018, the States Attorney (Patrick Griffin[4]) agreed to have the FBI conduct analysis on where the calls from the stolen phone originated from, given that the cell-phone towers were still in the same locations that they were at the time of the murder in 1999. That analysis showed that the fourth call came from Bridgeport, not New Haven.

When this was realized, it shed doubt on the testimony of some of the witnesses, including Marcus Pearson, who was an acquaintance of Horn and had testified that he made the fourth call from New Haven but then later recanted. Given the new developments, States Attorney Griffin agreed in 2018 to Horn and Jackson's convictions being vacated. Plaintiffs were released from prison, and the State did not re-prosecute.

For purposes of this motion, here is what is most important about all this background above: *it has nothing* to do with defendant James Stephenson. Stephenson was not involved with anything to do with the cellphone evidence or interrogation of suspects or the like. He did not work for the NHPD, and he was not a police officer or employee of the City of New Haven in either 1999 or 2000 when the NHPD investigated this crime. Everyone in this case agrees on this. Instead, Stephenson had a much smaller, minor role in the case as detailed below and in the

---

[4]   SA Griffin was the not the States Attorney in New Haven in 1999 and 2000 when plaintiffs were prosecuted, he had taken over as States Attorney in 2016. (Griffin Decl. ¶¶ 3, 10). The record is clear and undisputed that Griffin's decisions to agree to the vacating of the sentences and to not re-prosecute had absolutely nothing to do whatsoever with defendant Stephenson or his role in the case as a firearm examiner. (Griffin Decl. ¶ 10).

complaints.  *See* (*Horn* Doc. 153 p. 28 ¶ 155 – p. 31 ¶ 175; p. 49 ¶ 275 – p. 50 ¶ 280); (*Jackson* Doc. 110 p. 24 ¶ 124 – p. 26 ¶ 140; p. 41 ¶ 217 – p. 42 ¶ 222).

### Stephenson's Limited Role

Shortly after the murder, the NHPD collected evidence from the scene and sent some of it to the Connecticut State Laboratory, including fingerprint evidence and including bullet fragments and cartridge cases from the scene.  No gun was ever recovered.

Stephenson worked as a Firearm and Toolmark Examiner in the State Lab's firearm section.  He examined the bullet and cartridge evidence submitted to the lab from the NHPD.  This included taking measurements of the evidence, taking photographs, making notations and drawings, and also running the measurements of the Land and Groove Impressions from the bullets through the FBI General Rifling Characteristics ("GRC") database.  (Stephenson's Work File p. 53, 62 – 64, 66 – 74).[5]  The GRC database is maintained as a reference tool to aid shooting investigations where no firearm is recovered.[6]  (Stephenson's Decl. ¶ 6);

---

[5]  Stephenson's work file is attached to Stephenson's Declaration and also separately attached as its own exhibit.  *See* (Stephenson Decl. ¶ 31).  The page numbers cited in this memorandum for the work file refer to the page numbers contained in the Bates-stamped footers, which were added when the documents were produced in discovery.  (*Id.*)

[6]  The GRC database was maintained by the FBI at the time.  It has since been taken over by the Association of Firearm and Toolmark Examiners ("AFTE"), a professional association of firearm and toolmark examiners throughout the world. The database is maintained by AFTE today.

(Jachimowicz Decl. ¶ 6); (Denio Decl. ¶ 9).  The research was done on or about February 3, 1999.  (Stephenson's Work File p. 66 – 67. 68 – 74).

After conducting his research, Stephenson issued a written, formal laboratory report the next day, February 4, 1999.  That formal report is also included in the work file.  (Stephenson Work File p. 55 – 56).  It contains 16 numbered paragraphs and details evidence that was submitted and evaluated.  It includes a sentence stating:  "The bullet fragments are consistent with being 9mm caliber.  They may have been fired from but not limited to a self loading pistol manufactured by Calico, FEG, Browning, Heckler & Koch, Hungarian, Kassnar, Norinco or Walther." (Stephenson Work File p. 56 ¶ 14).  The report also states:  "if a firearm should be developed in this investigation it should be submitted along with this evidence for further comparison."  (*Id*. ¶ 16).

Stephenson signed the report, and another firearm and toolmark examiner in the State Lab (Edward Jachimowicz) checked it and signed it as well.  (Stephenson Work File p. 56).  That report was sent back to NHPD with the evidence submitted. This occurred on our about February 4, 1999, and at this point, Stephenson's role in the case was over until the following year, February of 2000, just before the criminal trial that took place in March, 2000, where the plaintiffs were tried and convicted for the robbery murder.  *See* (Stephenson's Work File p. 56 – 57); (*Horn* Doc. 153 p. 30 ¶ 165 – p. 31 ln. 170); (Ahern Depo. p. 66 ln. 21 – 25).

8

***February 2000 Follow-up Analysis Done at Behest of the Prosecutor.***

In February 2000, the prosecutor taking the case to trial was Gary Nicholson. See generally (Nicholson Depo.).   As he was preparing for trial, he needed additional information about the ballistics evidence.  (Nicholson Depo. p. 172 ln. 17 – 20).  Specifically, he wanted to know if the ballistics evidence from the crime scene was consistent with the parameters of a "Beretta"[7] brand firearm.  (Nicholson Depo. p. 150 ln. 13 – 21).   Nicholson has confirmed that he did not think the ballistics evidence was a major part of the case, but he wanted to check on whether a Beretta was possible in order to be thorough and prepared at trial.  (Nicholson Depo. p. 174 – 176).   He was checking specifically because of how it would impact his trial strategy:

> A.    I did not see it to be a problem one way or the other [whether the ballistics analysis ruled a Beretta in or ruled it out as a possibility].  It was a loose end that needed to be investigated.   If it wasn't investigated, ***I felt that this would be something that the defense attorneys could be bringing up in their final arguments***.  The State didn't follow up.  They didn't check.  It was a matter of being complete.

---

[7]   Beretta is a brand of firearm manufacturer.  *See* https://www.beretta.com/en-us/ (last visited Nov. 2, 2021).  Steve Brown stated that gun fired at the crime scene was a Beretta.

(Nicholson Depo. p. 175 ln. 23 – 176 ln. 4)(emphasis added); *see also* (Nicholson Depo. p. 172 ln. 17 – 20)("Q.  And so when you called Mr. Stephenson a few weeks before trial, I assume you were trying to be thorough and diligent in your preparation?  A.  Correct.").

So, as part of Nicholson's evaluation of his trial evidence and how he would present it to the jury, he called Stephenson.  The record demonstrates that this call was in mid-February of 2000 and was just before jury selection began.  *See* (Stephenson Work File p. 2, 3, 62, 63, 64, 65); (*Horn* Doc. 153. p. 30 ¶ 166)("Assistant State's Attorney Nicholson called Forensic Examiner Stephenson shortly before the start of jury selection.").

Nicholson directed Stephenson to conduct follow-up examination to determine if the evidence from the murder scene was consistent with the parameters of a Beretta firearm.  Nicholson confirmed this in his deposition repeatedly:

- "I wanted him to do more work on this to see whether or not Beretta was included or not."  (Nicholson Depo. p. 173 ln. 3 – 5).
- "I needed to know, is this ammunition?  Are these spent shell casings?  Are these bullets consistent with a Beretta, or are you ruling it out?  I need to know that."  (Nicholson Depo. p. 175 ln. 10 – 13).
- "I also told him I needed to have him reexamine that evidence to see if it was consistent with Beretta.  In other words, I wanted him

to do a follow-up examination on what he had already included in this report." (Nicholson Depo. p. 173 ln. 21 – p. 174 ln. 1).

- "I directed him. I said, 'Look. I need to know this answer to this question. Would you please check it' - - 'and [let] me know?'" (Nicholson p. 154 ln. 1 – 3, 5).

- "It was a telephone conversation that I had with Mr. Stephenson, and I directed him to conduct further examination of the ballistics evidence to see if a Beretta would fit within the parameters of the evidence. I asked him to do that. I directed him to go do it, and he told me he would, and he did, and got back to me. He said that it did fit within the parameters." (Nicholson Depo. p. 150 ln. 13 – 21).

- "I directed him to please check the evidence. 'I need an answer to this question.'" (Nicholson p. 154 ln. 23 – 24).

Nicholson did not tell Stepheson why he was telling him to do this: that is, he did not tell Stephenson whether he was looking to rule Beretta in, rule it out, or had another reason for wanting to know. (Stephenson Decl. 30F); (Nicholson Depo. p. 154 ln. 17, 19)("he has no - - idea why I'm even asking him this."). But Nicholson wanted to know the answer to this question as part of his evaluation of his trial evidence and strategy. *See, e.g.*, (Nicholson Depo. p. 175 ln. 23 – 176 ln. 4; p. 172 ln. 17 – 20). Stephenson complied with Nicholson's directive.[8] He conducted another round of GRC searches on February 15, 2000. (Stephenson's Work File p. 62 – 64).

In his previous GRC search the year before on February 3, 1999, Stephenson used a tolerance range of + or – 2 one thousandths of an inch as part of the search

---

[8] After all, ASA Nicholson was the chief law enforcement official in charge of a murder prosecution; when he tells someone to do something, they do it.

criteria that he entered into the GRC database.  (Stephenson's Work File p. 66 – 67).   He chose + or − 2 one thousandths as his tolerance range based on his knowledge, experience, and professional judgement and training, and because + or − 2 one thousandths was a cautious, conservative tolerance range that was both approved by the FBI's GRC manual and also in accord with standards used in the field.[9]  (Stephenson Decl. ¶¶ 30 – 30B).  Many firearm examiners in the field used + or − 5 one thousandths of an inch as their normal or default range, which was also approved by the FBI and consistent with norms within the field.  (Stephenson Decl. ¶ 30B).  Nevertheless, Stephenson started with a minimal starting range in 1999 as his starting point.  (Stephenson's Work File p. 66); (Stephenson Decl. ¶¶ 30 – 30B). Beretta did not appear in his 1999 GRC search.  (Stephenson's Work File p. 66).

A year later, after Nicholson called Stephenson and gave him his orders a few weeks before trial, Stephenson conducted two more searches, both on February 15, 2000.  (Stephenson's Work File p. 62 – 64); (Nicholson Depo. p. 172 ln. 17 – 20); (Stephenson Decl. ¶¶ 30 – 30J).  In the first of those two additional searches, he again used + or − 2 one thousandths of an inch as his tolerance range for one of his criterion, just as he did in his 1999 GRC search.  (Stephenson's Work File p. 62 – 64, 66 – 67); (Stephenson Decl. ¶¶ 30A – 30D).  However, he also entered "Pistol" and "9mm LUGER" as criteria as well; these two criteria were not used in the 1999 GRC

---

[9]  + or − 1 one thousandths of an inch was not used or often used as a tolerance range in the field to the best of his knowledge at the time.  (Stephenson Decl. ¶ 30A).

search.  (Stephenson Decl. ¶¶ 30A – 30D); (Stephenson Work File p. 62 – 64, 66 – 67).  That search first search in 2000, with the more specific criteria for cartridge and firearm type, listed "Beretta" as a possibility of being consistent with the evidence submitted.  (Stephenson Work File p. 62, 66); (Stephenson Decl. ¶¶ 30A – 30D).  At that point, he had his answer to Nicholson's question.  He could have stopped right then and there, but he did not.  Stephenson is more thorough than that.  (Stephenson Decl. ¶¶ 30C – 30E).

So, he ran another GRC search, this time with a tolerance range of + or – 4 one thousandths of an inch, and he also used "Pistol" and "9mm LUGER" as criteria as he did in the first search he did on February 15, 2000.  (Stephenson Work File p. 62 – 64); (Stephenson Decl. ¶¶ 30C – 30E).  That second February 15, 2000 GRC search confirmed the first one:  Beretta was a possibility.  (Stephenson Work File p. 62 – 64); (Stephenson Decl. ¶¶ 30C – 30E).  He now had two tests that confirmed the information that Nicholson needed to know for trial.  (Stephenson Work File. p. 62 – 64).  Stephenson then spoke to Nicholson and told him of his conclusions concerning the evidence fitting the parameters of a Beretta.  (Stephenson Decl. ¶¶ 30I); (Nicholson Depo. p. 150 ln. 13 – 21).

Also, the range of + or – 4 one thousandths of an inch was and is also approved by the FBI.  (Stephenson Decl. 40H).  It is also still less than the + or – 5 one thousandths of an inch that many examiners in the field used as standard default range.  (Stephenson Decl. 30 – 30J).  Nevertheless, even though he wanted

13

to double check the first year-2000 GRC search to be thorough, Stephenson still selected a range that was less than what many of his colleagues use as their default.  (Stephenson Decl. 30B – 30H).  And he chose this tolerance range for *the specific purpose* that it was still less than and more conservative than the + or – 5 one thousandths of an inch that many examiners in the field default to. (Stephenson Decl. ¶ 30H).  Stephenson conducted the 1999 GRC search and the 2000 follow-up GRC searches (including selecting the search criteria) in good faith and in good faith reliance on his training, lab practices, and understanding of the standards of his field.  (Stephenson Decl. ¶¶ 29 – 30J); (Denio Decl. ¶¶ 32E, 32 – 32F).

### *Stephenson Testified in Court at the Horn-Jackson Murder Trial on March 31, 2000*.

Stephenson testified in court at the *Horn-Jackson* murder trial on March 31, 2000.  (Ahern Depo. p. 66 ln. 21 – 25).  Before he took the stand, he arrived at court prepared, bringing a copy of his entire work file from the firearm section of the State Lab that contained his formal report (Stephenson Work File p. 55 - 56), and his research materials such as his GRC searches (*id*. p. 62 – 64, 66 – 67), the photos that he took of the breach marks on the cartridge cases from the scene (*id*. p. 53), the worksheets he filled out with notations, measurements, and drawings (*id*. p. 68 - 74), and the notations and documents showing that the States Attorney's office had contacted him (*id*. p. 2, 3, 54, 65).  (Stephenson Decl. ¶¶ 11, 16, 17, 18, 20 24 – 24E, 25, 26, 27, 28, 29); (Moscowitz Depo. p. 144 ln. 12, ln. 10 - 25); (Jachimowicz Decl.

14

¶¶ 22, 23. 2 – 21); *see also* (Griffin ¶ 9); (Stephenson Depo. p. 136 ¶¶ 22 – 23).  He brought that entire file with him, as a matter of practice, as he always does when he appears in court.  (Stephenson Decl. ¶¶ 11, 16, 17, 18, 20 24 – 24E, 25, 26, 27, 28, 29); (Moscowitz Depo. p. 144 ln. 12, ln. 10 - 25); (Jachimowicz Decl. ¶¶ 22, 23, 2 – 21); *see also* (Griffin ¶ 9); (Stephenson Depo. p. 136 ¶¶ 22 – 23).  He did this in compliance with standard operating laboratory procedure in case either the prosecutor or the criminal defense attorneys wanted to see the contents of his file or ask him questions about anything in the file before testimony.  (Stephenson Decl. ¶¶ 11, 16, 17, 18, 20 24 – 24E, 25, 26, 27, 28, 29); (Jachimowicz Decl. ¶¶ 22, 23, 2 – 21).

Stephenson did this every single time he had a court appearance as an employee of the State Lab, and as of the *Horn-Jackson* trial, he had appeared for court proceedings 126 times.  (Stephenson Decl. ¶¶ 11, 16, 17, 18, 20 24 – 24E, 25, 26, 27, 28, 29); (Jachimowicz Decl. ¶¶ 22, 23, 2 – 21); (Stephenson Depo. p. 135 ln. 16 – 19).   In fact, Jackson's lawyer (Attorneys Moscowitz) was familiar with Stephenson as a witness, found him extremely cooperative, and was familiar with Stephenson's established practice of always bringing his work materials with him and allowing them to see them if they wished.  (Moscowitz Depo. p. 133 ln. 8 – 9)("He [Stephenson] testified in a lot of my cases, even prior to Marquis Jackson."); (Moscowitz Depo. p. 144 ln. 12, ln. 10 – 25; p. 153 ¶ 2 – 11; p. 170 ln. 21 -175 ln. 24); (Stephenson Decl. ¶ 27, *see also* ¶¶ 11, 16, 17, 18, 20 24 – 24E, 25, 26, 28, 29).

Horn's criminal trial lawyer, Attorney Ahern cannot remember one way or another if he reviewed the contents of Stephenson's work file at the courthouse. (Ahern Depo. p. 29 ln. 13 – 17; p. 55 ln. 3 – p. 56 ln. 19).   It is entirely possible (and probable) that he did.    Attorney Moscowitz remembers that he spoke with Stephenson in the *Horn-Jackson* case before Stephenson testified, but Moscowitz cannot remember if he talked to him over the phone or in the courthouse. (Moscowitz Depo. p. 139 ln. 1 – 25).  If they did ask, Stephenson showed them (or if they had, Stephenson would have showed them) whatever they wanted to see from his file—including GRC documents—and answered any questions.   (Stephenson Decl. ¶¶ 27, 26); (Stephenson Depo. p. 136 ln. 18 – p. 137 ln. 2); *see also* (Moscowitz Depo. p. 153 ln. 2 – 11; p. 152 ln. 17 – 25; p. 170 ln. 21 – p. 175 ln. 24); (Ahern Depo. p. 65 ln. 6 – 18).   Neither Moscowitz nor Ahern can identify a single instance in their long careers when they asked to see the contents of Stephenson's file that was not accommodated.  (Moscowitz Depo. p. 152 ln. 5 – 25; p. 219 ln. 25 – p. 220 ln. 22); (Ahern Depo. p. ; p. 78 ln. 10 – p. 79 ln. 10).   Moscowitz described Stephenson as "extremely cooperative."  (Moscowitz Depo. p. 153 ln. 2 – 11; p. 219 ln. 25 – p. 220 ln. 22).  And both Moscowitz and Ahern testified that GRC documents are the types of documents that would be in Stephenson's file that he brought with him and that they would expect to see if they viewed his work file.  (Moscowitz Depo. p.160 ln. 6 – 13); (Ahern Depo. p. 63 ln. 21 – p. 65 ln. 18).  In fact, Moscowitz specifically recalls

seeing GRC documents in Stephenson's files that he brought to court in other cases that he worked where Stephenson testified:

> Q.   So you've seen general rifling characteristics documents in Mr. Stephenson's files that he's brought to court [in other cases]?
>
> A.   Yeah.

(Moscowitz Depo. p. 160 ln. 6 – 8, 13); s*ee also* (Moscowitz Depo. p. 133 ln. 8 – 9)("He [Stephenson] testified in a lot of my cases, even prior to Marquis Jackson."). And Moscowitz explained that Stephenson would open his file for him, turn through every and any page Moscowitz wanted to see, and would answer whichever questions Moscowitz had. (Moscowitz Depo. p. 170 ln. 21 -175 ln. 24). Further, Nicholson confirmed, under oath in his deposition, that after Stephenson told him of his conclusions from the re-examination, he (Nicholson) then informed the criminal defense counsel (Moscowitz and Ahern) before trial about the reexamination of the evidence by Stephenson and that Stephenson concluded the evidence was consistent with the parameters of a Beretta. (Nicholson Depo. p. 156 ln. 9 – 13).

Plaintiffs' criminal lawyers knew about the reexamination and Beretta conclusion before trial. (Nicholson Depo. p. 156 ln. 9 – 13). They knew Stephenson always brought his work file to court with his research materials, including GRC documents specifically. (Moscowitz Depo. p. 133 ln. 8 – 9; p. 144 ln. 12 ln. 10 – 25; p. 160 ln. 6 – 8, 13; p. 170 ln. 21 – p. 175 ln. 24); (Ahern Depo. p. 63 ln. 21 – p. 65 ln. 18). They knew he would show them any documents they wanted to see and answer

their questions before he testified. (Moscowitz Depo. p. 152 ln. 5 – 25; p. 170 ln. 21 - 175 ln. 24); (Ahern Depo. p. 65 ln. 6 – 18). And at least one of the lawyers for sure spoke with Stephenson before he testified. (Moscowitz Depo. p. 139 ln. 1 – 25). None of this can be disputed at this stage. The evidence confirms it.

> ### Stephenson Followed the Connecticut State Lab's Established Practices, Policies, and Standard Operating Procedures Throughout His Work in the Horn-Jackson Case in 1999 and 2000, and His Conduct Was in Accord with the Standards and Practices in the Field at the Time.

What is more, Stephenson's conduct throughout his work and his role in the *Horn-Jackson* case in 1999 and 2000 complied with his lab's established practices, policies, and standard operating procedures. Multiple witness confirm the practices themselves and also that Stephenson followed them as a matter of course. (Griffin Decl. ¶¶ 5 – 9); (Jachimowicz Decl. ¶¶ 2 – 23); (Stephenson Decl. ¶¶ 2 – 32); (Moscowitz Depo. p. 133 ln. 8 – 9; p. 144 ln. 12, ln. 10 – 25; p. 170 ln. 21 -175 ln. 24). He followed them in the *Horn-Jackson* case as well, and he relied in good faith on those practices and policies specifically, along with his training and his experience in the field, to guide his conduct. (Stephenson Decl. ¶¶ 2 – 32); (Jachimowicz Decl. ¶¶ 2 – 23); (Denio Decl. ¶¶ 32 – 33).

During 1999 and 2000, it was normal standard practice for firearm and toolmark examiners in the Connecticut State Lab to provide their materials to prosecutors in advance of trial upon request. (Stephenson Decl. ¶¶ 27, 15); (Jachimowicz Decl. ¶ 15); (Griffin Decl. ¶¶ 6 – 9); (Denio Decl. ¶¶ 30, 32A). It was

normal standard practice for them to rely on their agency's administration to assist with that production when there *was* a request. (Griffin Decl. ¶¶ 6 – 9); (Stephenson Decl. ¶¶ 2 – 32); (Denio Decl. ¶¶ 30). If there was *no* request for work materials, it was normal practice to not produce them without being asked and instead to bring a folder, file, or binder containing their work materials (including GRC documents) with them to court when they testified. (Stephenson Decl. ¶ 17, 26); (Jachimowicz Decl. ¶ 17); (Griffin ¶ 9); *see also* (Denio Decl. ¶ 30). When doing so, it was also standard practice for these officials to make the contents of their work file available to any of the lawyers that wished to see them, either prosecutors or defense attorneys. (Stephenson Decl. ¶ 17, 26); (Jachimowicz Decl. ¶ 17); (Griffin Decl. ¶ 9); *see also* (Denio Decl. ¶ 30); (Moscowitz Depo. p. 133 ln. 8 – 9; p. 144 ln. 12, ln. 10 – 25; p. 152 ln. 18 – 25; p. 153 ln. 2 – ln. 11; p. 160 ln. 6 – 8, 13; p. 170 ln. 21 – p. 175 ln. 24). This is how criminal discovery was done in Connecticut in 1999 and 2000 for cases involving firearm examiners from the State Lab. (Jachimowicz Decl. ¶¶ 15, 17, 2 – 23); (Stephenson Decl. ¶¶ 15, 17, 26, 27, 2 - 32); (Griffin ¶¶ 6 – 10); (Denio Decl. ¶¶ 30, 32A; 2 – 33); (Moscowitz Depo. p. 133 ln. 8 – 9; p. 144 ln. 12, ln. 10 – 25; p. 152 ln. 18 – 25; p. 153 ln. 2 – ln. 11; p. 160 ln. 6 – 8, 13; p. 170 ln. 21 – p. 175 ln. 24).

To be clear, this was not just the practice of Stephenson. This was the established practice, policy, and standard operating procedure of the firearms examiners of the Connecticut State Lab. (Jachimowicz Decl. ¶¶ 2 – 23); (Griffin

Decl. ¶¶ 6 – 10); (Stephenson Decl. ¶¶ 2 – 32); *see also* (Denio Decl. ¶¶ 2 – 33).  Mr. Jachimowicz confirms this, and he was a firearm and toolmark examiner in the Connecticut Lab at the same time as Stephenson (including in 1999 and 2000 specifically) and even co-signed the formal report in the *Horn-Jackson* criminal case.  (Jachimowicz Decl. ¶¶ 2 – 23); (Stephenson Work File p. 55 – 56).  Further, this is confirmed by the testimony of State's Attorney Griffin, who prosecuted crimes and utilized State Lab officials as witnesses in his case for years, including Stephenson specifically.  (Griffin Decl. ¶¶ 4-9).  Mr. Denio confirms that this was also true for many crime labs throughout the country, including during 1999 and 2000, and that he (Denio) even provided training to examiners on these practices when he worked for the FBI.  (Denio Decl. ¶¶ 2 – 33).

If there was a request in advance of court proceedings, material would be produced upon request through the various lawyers; if there was not advance request, materials would be brought to court and made available that way.  *See generally* (Stephenson Decl.); (Jachimowicz Decl.); (Griffin Decl.); (Denio Decl.).  And the experienced criminal defense lawyers in Connecticut knew this was how criminal discovery was conducted for research materials of employees from the Connecticut lab in 1999 and 2000, and the specific criminal defense lawyers in the *Horn-Jackson* confirm that Stephenson normally followed these practices.  Further, Stephenson and Jachimowicz confirm that they never received any training or instruction informing them that these practices were improper or legally

20

insufficient, and they both confirmed that they would have expected to receive such training or instruction if the law or the standards changed during their careers in the State Lab.  (Stephenson Decl. ¶¶ 19, 20); (Jachimowicz Decl. ¶¶ 19, 20).

### *The Current Litigation Wrongfully Accuses Stephenson of Intentional* Brady *Violations.*

Plaintiffs bring these actions against Stephenson under 42 U.S.C. § 1983 and the Due Process clause of the Fourteenth Amendment.  (*Horn* Doc. 153 p. 49 – 50); (*Jackson* Doc. 110 p. 41 – 42).  Specifically, the plaintiffs claim Stephenson intentionally violated the *Brady* doctrine.  *See* (*Horn* Doc. 153 p. 49 – 50); (*Jackson* Doc. 110 p. 41 – 42); *Brady v. Maryland*, 373 U.S. 83 (1963).  Plaintiffs Brady claims are limited, and specific; they seek to hold Stephenson liable for the alleged non-disclosure of the GRC documents *only*.  (*Horn* Doc. 153 p. 49 ¶ 274 – p. 50 ¶ 280; p. 28 ¶ 155 – p. 31 ¶ 175); (*Jackson* Doc. 110 p. 41 ¶ 216 – p. 42 ln. 222; p. 24 ¶ 124 – p. 26 ¶ 140);  see also (Stephenson Work File p. 62-64, 66 – 67).

They sue Stephenson in his individual capacity only and seek monetary relief only.  (*Horn*. Doc. 153 p. 59); (*Jackson* Doc. 110 p. 52).  Stephenson moved to dismiss at the outset of the cases, asserting the complaints were legally insufficient and that no case from the Second Circuit clearly established that the limited *Brady* obligations for police officers[10] also extended to forensic laboratory technicians.  The motions to dismiss were denied, including largely because of early stage of the

---

[10] The Second Circuit recognized the limited *Brady* obligation for police officers (distinct from prosecutors) for the first time in *Walker v. New York*, 974 F.2d 293, 299 (1992).

litigation and the need for discovery[11]; the Second Circuit affirmed.  *Horn v. City of New Haven*, 2019 U.S. Dist. LEXIS 113833, *2 (July 9, 2019); *Horn v. Stephenson*, 11 F.4th 163, 166 (2021); *see also* (*Jackson* Doc. 45; 166); *Jackson v. Stephenson*, No. 19-2443 (2d Cir. )(Doc. 128).

Stephenson now moves for summary judgment as to the sole cause of action brought against him in each case.  (*Horn* Doc. 153 p. 45 – 46 "Fifth Cause of Action"); (*Jackson* Doc. 110 p. 41 – 42 "Fifth Cause of Action").  There are no genuine disputes of material fact, and Stephenson is entitled to judgment as a matter of law.

## II.   ARGUMENT

### A.   Legal Standards, Motion for Summary Judgment.

Federal Rule of Civil Procedure 56 requires entry of summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file together with any affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  "[T]he mere existence of a factual dispute between the parties will not defeat an otherwise properly supported motion

---

[11] In his original complaint (*Horn* Doc. 1), *Horn* also brought other claims against Stephenson, including negligence claims under Connecticut tort law and claims under the Connecticut Constitution. (*Horn* Doc. 1 p. 50, 48).  Stephenson moved to dismiss those claims in his motion to dismiss as well.  Horn then voluntarily dismissed those claims in response to the motion (*Horn* Docs. 52; 51 p. 27, 33), leaving only the Fifth Cause of Action asserting a claim against Stephenson, which is the sole Cause of Action against Stephenson in the operative complaints (*Horn* Doc. 153 p. 45 – 46); (*Jackson* Doc. 110 p. 41 – 42).

for summary judgment; the requirement is that there is no genuine issue of material fact." *Id.* at 247-48. A factual dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* A "material fact" is one whose resolution will affect the ultimate determination of the case. *Id.* In determining whether a material fact exists, the court must resolve all ambiguities in favor of the non-moving party. *Id.*, at 255; *see also J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1531 (3d Cir. 1990), *cert. denied*, 499 U.S. 921 (1991).

The Supreme Court confirms:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the federal rules, as a whole, which is designed to secure the just, speedy and inexpensive determination of every action.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Used properly, Rule 56 is a "vital procedural tool to avoid wasteful trials." *Capitol Imaging Assocs. v. Mohawk Valley Medical Assocs.*, 996 F.2d 537, 541 (2d Cir.), *cert. denied*, 510 U.S. 497 (1993). It is properly used to "isolate and dispose of factually unsupported claims." *Celotex Corp.*, 477 U.S. at 323-24.

The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the portions of the pleadings, affidavits or other documentary evidence that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. Those facts that are

material will be identified by the substantive law governing the case. *Anderson*, 477 U.S. at 248. Once the moving party meets its burden, the burden to produce evidence tending to establish a disputed issue of material fact then shifts to the non-moving party.

To defeat a motion for summary judgment, the non-moving party may not merely rely upon unsupported allegations made in the complaint, nor rely on "mere speculation or conjecture" to overcome a motion for summary judgment. *Knight v. Fire Ins. Company*, 804 F.2d 9, 12 (2d Cir. 1986), *cert. denied*, 480 U.S. 932 (1987). The evidence must be presented in a manner consistent with its admissibility at trial. *See First Nat. Bank Co. of Clinton, Ill. v. Ins. Co. of North America*, 606 F.2d 760 (7th Cir. 1979)(in ruling on summary judgment motion, the court properly relied upon documents and exhibits identified by affidavit). Unsworn statements of the parties, letters addressed to the litigants from third persons, and hearsay not within the one or more exceptions in Rules 803-805 of the Federal Rules of Evidence, may not be properly considered. *Beyene v. Coleman Security Service, Inc.*, 854 F.2d 1179 (9th Cir. 1988); *Edward B. Marks Music Corp. v. Stansy Music Corp.*, 1 F.R.D. 720 (S.D.N.Y. 1941).

Moreover, the plaintiff must point to and support with admissible evidence "each issue of material fact as to which it is contended there is a genuine issue to be tried." Local R. 56(a) *et seq.*; *see also Anderson*, 477 U.S. at 248. The plaintiff must produce evidence to show the existence of every element essential to the case which

it bears the burden of proving at trial. *Equimark Commercial Finance Co. v. C.I.T. Financial Services Corp.*, 812 F.2d 141, 144 (3d Cir. 1987).

**B.      Stephenson is Entitled to Absolute Immunity, at Least in Part.**

Absolute immunity is "strong medicine," that constitutes not just a protection from liability, but is instead an immunity from suit entirely. *Wolinsky v. Std. Oil of Conn., Inc.*, No. 3:08-CV-0832(MRK), 2008 U.S. Dist. LEXIS 65342, *4 (D. Conn. Aug. 25, 2008) (quoting *Gallo v. Barile,* 284 Conn. 459, 470 ("[W]e are mindful of the fact that absolute immunity is strong medicine.")); *Root v. Liston*, 444 F.3d 127, 130 (2d Cir. 2006)("Absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity.")(quoting *Imbler v. Pactman*, 424 U.S. 409, 419 n.13 (1976)).

 Such strong legal protections are deeply rooted in common law and supported by compelling policy interests. *See, e.g.*, *Vidro v. United States*, 720 F.3d 148, 152 (2d Cir. 2013)("Ultimately, . . . the issue in evaluating whether certain statements deserve absolute immunity is whether the public interest is advanced.")(internal alternation omitted)(quoting *Gallo*, 935 Conn. at 471-72); *Imbler*, 424 U.S. at 427 ("the alternative of qualifying a prosecutor's immunity would disserve the broader public interest").

Absolute immunity is traditional "broad [in] scope," and "Connecticut courts show no intention of restricting" that scope. *Vidro*, 720 F.3d at 153. The immunity includes immunity from suit itself, including immunity from proceeding to trial.

*See Root*, 444 F.3d at 130 ("Absolute immunity defeats a suit at the outset . . . ."); *Franza v. Stanford*, No. 18-CV-10892(KMK), 2019 U.S. Dist. LEXIS 213718, *14 (S.D.N.Y. Dec. 11, 2019)("Parole board officials, like judges, are entitled to absolute *immunity from suit* for damages . . . .")(emphasis added). It also applies regardless of an official's alleged or purported subjective motive or state of mind. *Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995)("immunity . . . is broadly defined, covering virtually all acts, regardless of motivation . . . ."); *Imbler*, 424 U.S. at 427("[t]o be sure, this immunity does leave the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty."); *Shmueli v. City of New York*, 424 F.3d 231, 237 (2d Cir. 2005)("the prosecutor is shielded from liability for damages . . . regardless of any allegations that his actions were undertaken with an improper state of mind or improper motive."). It also includes protection against immune conduct being used against the official in any other claims against him. *See Rehberg v. Paulk*, 566 U.S. 356, 366-67 (2012). That is, absolute immunity is aptly named; it is complete, absolute, legal protection for certain conduct or functions.

There are several types of absolute immunity, including judicial immunity, legislative immunity, witness or testimonial immunity, and prosecutorial immunity. In this case, Stephenson is entitled to both prosecutorial immunity and witness or testimonial immunity concerning his year-2000 conduct. *See* (*Horn* Doc. 263 p. 15); (*Jackson* Doc. 211 p. 14).

> 1. **Absolute testimonial immunity protects Stephenson from any and all claims arising from his in-court testimony as a witness at trial or arising from its preparation therefor.**

First, absolute immunity bars any and all claims arising from Stephenson's testimony in court. This is straightforward and uncontested. *See* (*Horn* Doc. 51 n.2)("Horn does not seek to hold [Stephenson] liable for his false testimony."). Plaintiffs allege that Stephenson testified falsely at trial. *See* (*Horn* Doc. 153 p. 31 ¶ 173). Stephenson disputes the truth of this allegation, but regardless, the Supreme Court recognizes that a witness has absolute immunity from § 1983 claims based on his trial testimony. *See, e.g.*, *Briscoe v. LaHue*, 460 U.S. 325 (1983); *Rolon v. Henneman*, 517 F.3d 140 (2d Cir. 2008); *see also* (*Horn* Doc. 51 n.2); *see also* (Doc. 67 p. 43 ln. 16-23).[12]

The Supreme Court stressed the importance of the immunity of a trial witness: "[i]n such a case, a trial witness has absolute immunity with respect to any claim based on the witness' testimony. When a witness is sued because of his testimony, the Court wrote, "'the claims of the individual must yield to the dictates of public policy.'" *Briscoe*, 460 U.S. at 332-33 (quotation omitted). Without absolute immunity for witnesses, the Court concluded, the truth-seeking process at trial would be impaired. Witnesses "might be reluctant to come forward to testify," and if a witness took the stand, the witness "might be inclined to shade his testimony in

---

[12] Plaintiffs seek to hold Stephenson liable for the alleged non-disclosure of the GRC documents *only*, not for his sworn testimony in court. (*Horn* Doc. 67 p. 43 ln. 16-23).

favor of the potential plaintiff" for "fear of subsequent liability." *Id.* at 333; *Rehberg*,
566 U.S. at 366-67.

This immunity is broad and is not limited to just prohibiting a § 1983 suit for
the spoken words of the testimony itself; the immunity extends further and
prohibits *any claim based on* the witness's testimony. *See Rehberg*, 566 U.S. at 367
("a trial witness has absolute immunity with respect to *any claim based on* the
witness' testimony.")(original emphasis).   Its protections include witness
preparation.   *See Rehberg*, 566 U.S. at 370 ("the witness and the prosecutor
conducting the investigation engage in preparatory activity, such as a preliminary
discussion in which the witness relates the substance of his intended testimony.")

The immunity also prohibits plaintiffs from using clever pleading or litigation
tactics to try and circumvent the immunity:   the immunity "may not be
circumvented by claiming that a . . . witness conspired to present false testimony *or
by using evidence of the witness' testimony to support any other §1983 claim*
concerning the initiation or maintenance of a prosecution." *Rehberg*, 566 U.S. at
369 (emphasis added).   The reason for this is simple:   without it, plaintiffs would
litigate the margins of the immunity, just as plaintiffs seek to do here.   "Were it
otherwise, 'a criminal defendant turned civil plaintiff could simply reframe a claim
to attack the preparation instead of the absolutely immune actions themselves.'"
*Rehberg*, 566 U.S. at 369.   That is what is happening here.

Not only is Stephenson immune from suit for his testimony, but the testimony itself is not even admissible as evidence to support any claim against him, such as the § 1983 claims plaintiffs bring against him in the Fifth Counts. *See Rehberg*, 566 U.S. at 369. Stephenson's testimony cannot serve as a basis to claim Stephenson committed a *Brady* violation, or claim that he is not entitled to summary judgment or qualified immunity, or to make any other legal claim against him. Stephenson's testimony in court is inadmissible against him entirely and absolutely. *See id.* (the immunity "may not be circumvented . . . by using evidence of the witness' testimony to support any other §1983 claim . . . .").

Stephenson is absolutely immune from suit for his conduct as a witness and preparation as a witness. The Court should enter judgment in Stephenson's favor as to all claims based on his testimony as a witness and his preparation to testify. This includes all of Stephenson's alleged year-2000 conduct.

### 2.     Absolute prosecutorial immunity bars all claims based on Stephenson's year-2000 conduct.

Second, Stephenson is also entitled to absolute prosecutorial immunity for his alleged conduct in 2000 in assisting the prosecutor. "Prosecutorial immunity from § 1983 liability is broadly defined, covering virtually all acts, regardless of motivation, associated with the prosecutor's function as an advocate," including "evaluating and organizing evidence for presentation at trial." *Hill*, 45 F.3d at 661 (quotation omitted). Prosecutorial immunity analysis turns on the distinction between advocacy functions versus investigative functions. *See id.* at 660. "[A]cts

undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity." *Kalina v. Fletcher*, 522 U.S. 118, 126 (1997)(quotation omitted). "Drawing th[e] line between 'advocacy' and 'investigative' functions is vexed" insofar as investigative work may be entitled to absolute immunity when it is "integral to the overarching advocacy function." *Warney v. Monroe County*, 587 F.3d 113, 121, 124 (2d Cir. 2009).

Further, absolute immunity extends not only to prosecutors "performing discretionary acts of a judicial nature, but also [to] individual employees who assist such [prosecutor] and who act under that [prosecutor's] direction in performing functions closely tied to the judicial process." *Hill*, 45 F.3d at 660; *see also Washington v. Dewey*, 433 F. Supp. 3d 334, 351 (D. Conn. 2020)(quoting *O'Neal v. Morales*, 679 F. App'x 16, 18 (2d Cir. 2017)(Summary Order), *cert. denied*, 138 S. Ct. 559 (2017)(quoting *Hill*, 45 F.3d at 660). Here, Stephenson's conduct in 2000 demonstrates that he is precisely such an individual employee who assisted the prosecutor and who acted under that prosecutor's direction in performing functions closely tied to the judicial process, namely Nicholson's preparation of evidence and argument for the trial that was just mere weeks away. *See Hill*, 45 F.3d at 660.

Here, the facts of *Hill* are instructive. In *Hill*, the plaintiff, a mother wrongly accused of sexually abusing her minor child, brought suit against a prosecutor and several other officials involved in her indictment and arrest. Among the defendants

were two video technicians who, at the direction of the prosecutor, recorded interviews of the minor victim for the purpose of presenting those recordings to a grand jury. *See Hill*, 45 F.3d at 660-61. Applying what this Circuit refers to as the "functional approach" to absolute immunity—looking to the actual function performed by a government official in a given context rather than the title or identity of that official—our Court of Appeals readily granted absolute immunity to the videographers. *Id.* The Court reasoned that they acted as agents of the prosecutor in their preparation of the video recordings for use at a judicial proceeding, namely, in the prosecutor's presentation to the grand jury. *Id.*

Here, there is no distinction between the actions of the videographers in *Hill* and the trial preparation work performed by Stephenson. Plaintiffs concede that, "***[a]s he was preparing for trial*** in early 2000," the prosecutor "realized he had a problem." (*Horn* Doc. 153 p. 30 ¶ 165)(emphasis added). "His star witness said the murder weapon was a Beretta. But his forensic examiner's report did not list a Beretta . . . ." (*Id.*) The prosecutor then called Stephenson "*shortly before the start of jury selection*" and he "directed [Stephenson] to conduct further examination of the ballistics evidence to see if Beretta would fit within the parameters of the evidence." (*Horn* Doc. 153 p. 30 ¶ 166)(emphasis added)[13]; (Nicholson Depo. p. 150

---

[13] Plaintiff Jackson omitted the contextual timing from his complaint (after seeing Stephenson's motion to dismiss and supporting papers filed in the *Horn* case). However, there is certainly no dispute that there is one set of facts as to Stephenson that applied to the joint prosecution of Horn and Jackson. The documentary record, including GRC documents dated February 15, 2000 and Nicholson's deposition

ln. 15 – 18); *see also* (Nicholson Depo. p. 172 ln. 17 – 20).  Stephenson then did additional research and examination of the evidence at the prosecutor's behest, to determine if a Beretta could fit the evidence recovered at the scene and submitted to the lab (Stephenson Decl. ¶¶ 30 – 30J), and then he testified at trial several weeks later that Beretta could fit the parameters of the submitted evidence.  *See* (*Horn* Doc. 153 p. 30-31 ¶¶ 167-170); *see also* (*Jackson* Doc. 110 p. 41 ¶ 218). Finally, plaintiffs concede that during all of this, "Stephenson was acting on behalf of law enforcement and as an arm of the prosecution team."  (*Horn* Doc. 153 p. 49 ¶ 276); (*Jackson* Doc. 110 p. 41 ¶ 218)("Stephenson was acting on behalf of law enforcement and as an arm of the . . . prosecution team.").  Simply stated, Stephenson's conduct in 2000 was that of an official who assisted the prosecutor in preparing his evidence for trial and who acted under that prosecutor's direction in performing functions closely tied to the judicial process.  *See Hill*, 45 F.3d at 660.

Further, *O'Neal v. Morales*, is analogous to this case.  *O'Neal v. Morales*, 679 F. App'x 16, 18 (2d Cir.)(summary order), *cert. denied*, 138 S. Ct. 559, (2017).  In *O'Neal*, two weeks before trial in that case, the prosecutor requested that Detective Morales visit the victim's tenth-floor apartment to check specific information relevant to anticipated testimony.  *See id.*

---

testimony, confirms the timing and sequence.  That is, there can be no dispute in either case here that Nicholson called Stephenson in February, 2000 as he (Nicholson) was preparing for trial, shortly before the start of jury selection.

Here, the prosecutor also contacted Stephenson in preparation of trial.  *See* (*Horn* Doc. 153 p. 30 ¶¶ 165-166).  In *O'Neal*, the Court noted that while field fact-gathering is consistent with an investigatory function, the timing of the prosecutor's request and the ultimate use of the information obtained in trial testimony established that the investigative activity there was in furtherance of the advocacy function of preparing for judicial proceedings. *See O'Neal*, 679 Fed. App'x at 18; *see also DiBlasio v. Novello*, 344 F.3d 292, 300-01 (2d Cir. 2003)(recognizing importance of timing in determining whether function is advocacy).

Moreover, as in *O'Neal*, the timing of the prosecutor's need for further analysis and its proximity to the criminal trial demonstrates that the defendant is entitled to prosecutorial immunity.  In *O'Neal* the prosecutor told the detective to revisit the apartment two weeks before trial.  In this case, the prosecutor contacted Stephenson "shortly before the start of jury selection."  (*Horn* Doc. 1 p. 29 ¶ 166); (Nicholson Depo. p. 172 ln. 17 – 20).  And the record demonstrates that this was about a month before trial, as the GRC search is dated February 15, 2000 and Stephenson's testimony was March 31, 2000.  *See* (*Horn* Doc. 153 p. 30-31 ¶¶ 166-171); (*Jackson* Doc. 110 p. 26 ¶¶ 135 – 138); (Ahern Depo. p. 66 ln. 21 – 25).  In both *O'Neal* and in this case, "[the defendant] was acting in concert with the [prosecutor] in preparing for trial."  *See O'Neal*, 679 Fed. App'x at 19.  Plaintiffs even concede that, temporally, this was done "as the prosecutor was preparing for trial," in February, 2000.  (*Horn* Doc. 153 p. 30 ¶ 165); (Nicholson Depo. p. 172 ln. 17 – 20).

The defendants in both cases (*O'Neal* and *Horn-Jackson*) were also called to testify as to what they had been able to determine at the prosecutors' instructions.  The civil defendants were carrying out activity "intimately associated with the judicial phase of the criminal process," at the specific direction of the prosecutor, and as an agent or arm of the prosecution team in preparation for the presentation of evidence in a judicial proceeding.  *See O'Neal*, 679 Fed. App'x at 18-19; *Imbler*, 424 U.S. at 430; (*Horn* Doc. 153 p. 49 ¶ 276); (*Jackson* Doc. 110 p. 41 ¶ 218).

Notably, in denying Stephenson's motion to dismiss on prosecutorial immunity grounds, Judge Myer reasoned that it was premature to grant such a motion without affording the plaintiffs the opportunity to conduct discovery to determine if Nicholson's representations in court during the criminal trial were true regarding his contacting Stephenson to conduct further evidentiary examination. *See* (*Horn* Doc. 67 p. 20 ln. 20 − 24).  (*Horn* Doc. 67 p. 19 ln. 14 − 23); *see also Horn v. City of New Haven*, 2019 U.S. Dist. LEXIS 113833, *12, 13 ("it is not clear from the face of the complaint that the prosecutor specifically directed Stephenson's subsequent investigation," and "discovery may reveal more about the nature of the interchange between Stephenson and the prosecutor").

Judge Myer stated at argument that, "[b]ut we're at a motion to dismiss stage.  So I'm very hesitant to essentially kind of conclusively presume a state of facts that might warrant further development from ordinary depositions."  (*Horn* Doc. 67 p. 20 ln. 20 − 24).  "And the transcript, you say, suggests there was basically

an instruction [by Nicholson to Stephenson] . . . .  Let's say I take you at your word

on that . . . .  Why wouldn't it be, as often happens, that a deposition of the

witnesses at issue wouldn't reveal and state more, shed more light on whether there

was actually an instruction?"  (*Horn* Doc. 67 p. 19 ln. 14 – 23); *see also Horn*, No.

3:18-CV-1502(JAM)(Doc. 87), 2019 U.S. Dist. LEXIS 113833, *12, 13.   And the

plaintiffs also stressed the importance of the record at the early stage concerning

the prosecutorial immunity issue:  "there's simply nothing in the record to indicate

that there was any specific direction from the prosecutor at the time."  (Doc. 67 p. 38

ln. 6 – 8).

Well, over two years have passed since then, and the parties have had

voluminous discovery and many depositions in this case, including depositions of

both Stephenson himself and Nicholson, the prosecutor from the criminal case.

Nicholson confirmed in his deposition that, as he was preparing for the criminal

trial, he *directed* Stephenson to do the follow-up research in early 2000 to determine

if the evidence from the Dixwell Deli homicide was consistent with the parameters

of a Beretta firearm.  (Nicholson Depo. p. 150 ln. 15 – 18)("I directed him to conduct

further examination of the ballistics evidence to see if Beretta would fit within the

parameters of the evidence."); *see also* (Nicholson Depo p. 154 ln. 1; p. 154. ln. 23 –

24)("And I - - you know, I directed him."  "I directed him to please check the

evidence. 'I need an answer to this question.'"); (Stephenson Decl. ¶¶ 30G, 30C, 30I,

30J);. (Nicholson Depo. p. 173 ln. 3 – 5; p. 175 ln. 10 – 13; p. 173 ln. 21 – p. 174 ln. 1;

p. 154 ln. 1 − 3, 5; p. 154 ln. 23 − 24; p. 175 ln. 23 − 176 ln. 4; p. 172 ln. 17 − 20; p. 150 ln. 13 − 21); *see also* (*supra.* p. 10 − 11 above).

With the benefit of a complete record, the prosecutor repeatedly confirmed that he *directed* Stephenson to do the additional examination in February of 2000, just weeks before trial, confirmed that he did this as part of his trial strategy while specifically considering the anticipated evidence and closing arguments of the trial, and also important, confirmed that Stephenson then did so *at Nicholson's behest*.[14] (Nicholson Depo. p. 150 ln. 15 − 18; p. 154 ln. 1 − 11, ln. 23 − 25; p. 172 ln. 17 − 20; p. 175 ln. 23 − 176 ln. 4); *see also* (Stephenson Decl. ¶¶ 30G, 30C, 30I, 30J). This case fits with *O'Neal* and *Hill*, and the undisputed material facts establish that Stephenson conducted his February 2000 analysis at the direction of the prosecutor in preparation for trial as that prosecutor's witness providing trial evidence.

Stephenson is entitled to absolute prosecutorial immunity for his conduct in 2000, including the additional GRC search conducted at the direction and behest of the prosecutor. The Court should enter judgment in Stephenson's favor as to all claims arising from Stephenson's alleged conduct in 2000, since it is undisputed that such conduct amounted to Stephenson assisting the prosecutor in his (the prosecutor's) role as an advocate as he prepared for trial.

---

[14] The Court in *O'Neal* held that "we conclude that Morales's challenged actions undertaken *at the behest of* the Assistant District Attorney ('ADA') are shielded by prosecutorial immunity." *O'Neal*, 679 Fed. App'x at 18 (emphasis added).

**C.    There is No Genuine Dispute of Material Fact that Stephenson Did Not Commit an Actionable *Brady* Violation in Either 1999 or 2000 During His Work in the Criminal *Horn-Jackson* Case.**

"There are three components of a true *Brady* violation:  The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  *Poventud v. City of New York*, 750 F.3d 121, 133 (2d Cir. 2014)(quotations omitted).  However, when bringing a civil action for damages under 42 U.S.C. § 1983 based on an alleged *Brady* violation, a plaintiff must prove a heightened *mens rea* element by the defendant, different from when seeking relief in a post-conviction proceeding based on a *Brady* violation, where strict liability is often imposed against the State as a whole.  "[T]he Second Circuit has 'never held that anything less than an intentional *Brady* violation establishes a civil § 1983 due process claim for damages."  *Jeanty v. City of Utica*, 2021 U.S. Dist. LEXIS 7737, *45 (N.D.N.Y. Jan. 14, 2021)(quoting *Fappiano v. City of New York*, 640 F. App'x 115, 118 (2d Cir. 2016)).

Plaintiffs fail to establish all elements of an actionable *Brady* claim as to Stephenson.  Stephenson is entitled to judgment as a matter of law on the *Brady* claims brought against him in the Fifth Counts, which are the only counts against him in these cases.

### 1. Analyzing Stephenson's 1999 conduct alone, there is no dispute that Stephenson did not commit a *Brady* violation.

First, with absolute immunity applying to all of Stephenson's year-2000 conduct, there can be no question (or argument even) that his year-1999 conduct falls well short of an actionable *Brady* violation.

The entirety of plaintiffs' allegations against Stephenson for conduct occurring in 1999 consist solely of Stephenson having conducted forensic analysis on evidence from the murder scene, making notes, generated a GRC search on February 3, 1999 that used a tolerance range of + or − 2 on thousandths of an inch as part of the search criteria, printed the results of that GRC search (Stephenson's Work File p. 66 − 67), and then reached conclusions and authored and signed a formal report the next day. (Stephenson's Work File p. 55 − 56).[15] The formal report did not list "Beretta" on the non-exhaustive list of firearm possibilities contained in the report. (Stephenson's Work File p. 55 − 56). And Stephenson then sent that formal report to the NHPD, (and the plaintiff's criminal defense attorneys received it, *see Horn* Doc. 153 p. ¶¶ 161, 159 − 161; *Jackson* Doc. 110 p. 25 ¶¶ 131, 129 − 131). That is it.[16] There are no other allegations as to Stephenson for 1999.

---

[15]  Stephenson's work was reviewed and the formal report was co-signed by Edward Jachimowicz, who was another firearm and toolmark examiner that worked in the State lab. (Stephenson's Work File p. 56). Jachimowicz is not sued in these actions. Jachimowicz has been disclosed by Stephenson as an expert witness in addition to a fact witness, as have SA Griffin and ASA Nicholson.

[16]  It is noteworthy that plaintiffs admit the formal report was never sent to the prosecutor by Stephenson, and nevertheless the plaintiffs certainly do not contend

*See* (*Horn* Doc. 153 p. 28 ¶ 155 – p. 31 ¶ 175; p. 49 ¶¶ 724 – 278); (*Jackson* Doc. 110 p. 24 ¶ 124 – p. 26 ¶ 140; p. 41 ¶ 216 – p. 42 ¶ 222).

Further, the only *Brady* claims asserted against Stephenson that pertain to conduct that occurred in 1999 is that Stephenson allegedly did not disclose the February 3, 1999 GRC document to the prosecutor.  That is also it.  (*Horn* Doc. 153 p. 49 ¶ 724 – p. 50 ¶ 280); (*Jackson* Doc. 110 p. 41 ¶ 216 – p. 42 ¶ 222).  There are no other claims lodged against Stephenson as it pertains to 1999.  (*Id.*)  Plaintiffs do not claim that any other document of Stephenson's file from 1999 was *Brady* material.  (*Horn* Doc. 153 p. 49 ¶ 724 – p. 50 ¶ 280); (*Jackson* Doc. 110 p. 41 ¶ 216 – p. 42 ¶ 222).  The claims are limited to GRC documents only.  And in 1999, there was just the one, the two-page GRC document dated February 3, 1999.  *See* (Stephenson Work File p. 66 – 67).

If only Stephenson's 1999 conduct is analyzed, he issued a formal report that the plaintiffs now contend was favorable to them in the criminal case, and the plaintiffs concede that that report was produced to the plaintiffs.  (Stephenson Work File p. 55 – 56); (*Horn* Doc. 153 p. ¶¶ 161, 159 – 161); (*Jackson* Doc. 110 p. 25 ¶¶ 131, 129 – 131)  So, as to the 1999 conduct alone, there certainly was no *Brady* violation by Stephenson, regardless of what other materials Stephenson had in his

---

that Stephenson committed a *Brady* violation as to the formal report.  That is, in the context of forensic lab witnesses, there are different interactions with different parts of government or officials involved in the investigation and trial process that render a forensic witness's *Brady* requirements different from a prosecutor or investigating police officer with arrest authority or sworn police powers.

work file; they were not even *Brady* material viewed in this context.  The plaintiffs do not and cannot contend that they would have wanted to use notes or work materials (such as GRC documents) to impeach Stephenson at trial concerning a report that both plaintiffs contend helped their cases.

That is, with the year-2000 conduct subject to complete, absolute immunity, the year-1999 conduct fails to even state a *prima facia Brady* claim on its own. There simply is no *Brady* claim as to Stephenson based on his year 1999 conduct alone, and that cannot be disputed, either legally or factually.  The Court should therefore enter judgment for Stephenson as to all of his 1999 conduct.

> **2.   Even if the year-1999 conduct and the year-2000 conduct were both subject to *Brady* analysis together, there is still no genuine issue of material fact that Stephenson did not commit an actionable *Brady* violation.**

*Brady*, like all due process rights, cannot be applied in a vacuum but rather depends on the totality of the facts and circumstances giving rise to the assertion of the right in the first instance.  Due Process rights in particular are especially fluid and dependent upon specifics, as the Supreme Court's decisions "underscore the truism that '"(d)ue process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.'"  *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961)).  Due Process "is flexible and calls for such procedural protections as the particular situation demands."  *Matthews*, 424 U.S. at 334 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).

During the 1999 and 2000 time period (and during the years surrounding that time period), the established practice in the Connecticut legal community surrounding the prosecution and defense of serious crimes involving firearms was for the State lab's firearm examiners to bring their entire work file and research materials to court with them when they testified for two reasons:   1) to have available for the examiner to refer to if needed during testimony, and 2) to allow anyone that wanted access, including the prosecutor, the criminal defense attorneys, or the judge, to have access to the materials and ask questions.   (Griffin Decl. ¶¶ 6 – 10); (Stephenson Decl. ¶¶ 17, 26, 18, 19); (Jachimowicz Decl. ¶¶ 17, 18, 19).   The State firearm examiners were trained to do this as part of their formal training.   (Stephenson Decl. ¶¶ 2 – 32); (Jachimowicz Decl ¶¶ 2 – 23); (Denio Decl. ¶¶ 2 – 33).   It is also consistent with nationwide practice within the firearm examining profession to do this, and the FBI trained firearm examiners to do this. (Denio Decl. ¶¶ 2 – 33).

Also important, criminal defense attorneys in Connecticut knew at the time in 1999 and 2000 that this was the regular practice used by firearm examiners in the Connecticut State Lab.   Attorney Moscowitz knew this in 1999 and 2000, and Attorney Ahern did as well.   (Moscowitz Depo. p. 133 ln. 8 – 9; p. 152 ln. 18 – 25; p. 153 ln. 2 – ln. 11; p. 144 ln. 12, 10 – 25; p. 160 ln. 6 – 8, 13; p. 170 ln. 21 – p. 175 ln. 2); (Ahern Depo. p. 34 ln. 16 – 22; p. 33 ln. 10 – p. 34 ln. 22).

Both Attorney Moscowitz and Attorney Ahern had represented criminal defendants in cases where Stephenson was called to testify in his role as a firearm examiner from the State lab.   They knew that Stephenson always brought his research materials with him to court in a file, and Stephenson did so in this case:

> Q:   Do you remember if he [Stephenson] brought a file with him [to court for Stephenson's testimony].
>
> A:   [Moscowitz:]  He always brings a file with him, but that's from my experience with him.
>
> Q:   Okay.
>
> A:   So I can't say did he bring - - I just don't - - his standard operating procedure, he always has a file with him.
>
> Q:   Okay.  We'll try this way . . . .
> Do you remember specifically in the Horn and Jackson trial if he [Stephenson] brought his file with him that day?
>
> A:   I'm sure he did.

(Moscowitz Depo p. 144).

Attorneys Moscowitz and Ahern both had asked Stephenson to see the contents of his work file in other instances when they worked other cases where Stephenson was called as a witness.  (Moscowitz Depo. p. 133 ln. 8 – 9; p. 144 ln. 12, ln. 10 – 25; p. 152 ln. 18 – 25; p. 153 ln. 2 – ln. 11; p. 160 ln. 6 – 8, 13; p. 170 ln. 21 – p. 175 ln. 24); (Ahern Depo. p. 63 ln. 21 – p. 65 ln. 18; p. 34 ln. 16 – 22; p. 33 ln. 10 – p. 34 ln. 22).  Both Attorney Moscowitz and Attorney Ahern confirmed, under oath in their depositions in this case, that Stephenson always allowed them to view his

work file when they asked him to.[17]   (*Id.*)   Both confirmed that there was not a single instance when they asked Stephenson to see the research materials from his file where Stephenson refused.   (*Id.*).   Instead, Stephenson always cooperated and allowed access to his research materials, just as was customary by his employing State laboratory.   (*Id.*).   Also, Ahern confirmed that GRC documents are the types of documents he would expect to see in Stephenson's work file in instances where he asked to see the contents of the file.   (Ahern Depo. p. 64 ln. 24 – p. 65 ln. 18; p. 63 ln. 21 – p. 65 ln. 18).

Further, Moscowitz confirms that he talked to Stephenson in the *Horn-Jackson* case specifically, before Stephenson testified.   (Moscowitz Depo p. 139 ln. 1 - 25).   That conversation was either over the phone or at the courthouse (Moscowitz cannot remember which).   (*Id.*)   Moscowitz cannot remember the details of the discussion.   (Moscowitz Depo. p. 140 ln. 3 – 6)("Q.  Do you remember anything other than it was about the ricochet shot?   A.   He - - said other things.   I just don't recall.").   But he remembers that he talked with Stephenson in the *Horn-Jackson* prosecution in advance of Stephenson's testimony.   (Moscowitz Depo p. 139 ln. 1 – p. 140 ln. 6).

---

[17] Attorney Ahern also confirmed what was understood by the entire firearm examiner field in 1999 in 2000:  that GRC File printouts or photocopies are not considered to be "reports" as understood in the firearm examiner field; instead, they are understood to be notes or other research work materials.  *See* (Ahern Depo. p. 63 ln. 21 – p. 64 ln. 23).  Nicholson confirmed this as well.  (Nicholson Depo. p. 162 ln. 11 – 24).

Moscowitz further confirmed that in the instances when he interacted with Stephenson, Stephenson was "extremely cooperative," and when asked if there was ever an instance where he (Moscowitz) had asked Stephenson to see the contents of Stephenson's work file that Stephenson refused; Moscowitz's answer was unequivocal: "Never." (Moscowitz Depo. p. 152 ln. 18 – 25; p. 153 ln. 2 – ln. 11; p. 170 ln. 21 – p. 175 ln. 24; p. 219 ln. 25 – p. 220 ln. 22).[18] Ahern also confirmed that, "every time [he] asked to see materials relating to a forensic employee of the state lab generally, [he] was allowed to." (Ahern Depo. p. 34 ln. 16 – 22; p. 33 ln. 10 – p. 34 ln. 22). Neither Moscowitz nor Ahern can identify a single instance where Stephenson acted improperly in any way.[19] (Moscowitz, Depo. p. 219 ln. 25 – p. 220 ln. 22); (Ahern Depo p. 76 ln. 17 – p, 77 ln. 1; p. 76 - 79).

This all demonstrates that during the 1990s and early 2000s, discovery in criminal cases involving the work file and research of firearm examiners from the

---

[18]  Moscowitz thought so highly of Stephenson, his expertise, and professionalism that Moscowitz hired him as consultant after Stephenson retired from the State lab in at least two different cases, once that involved a Civil War era firearm and another where there was a dispute over a photograph of a shotgun. (Moscowitz Depo. p. 134 ln. 14 – p. 136 ln. 22).

[19]  It speaks volumes that the two criminal lawyers (Moscowitz and Ahern) speak so highly of Stephenson as a professional, and that neither of them, nor the *habeas* counsel, nor the federal defenders claim Stephenson ever acted improperly or unprofessionally.  That is, the lawyers that were tasked with representing the interests of Horn and Jackson's liberty do not contend Stephenson acted wrongly. Instead, it is only the lawyers who are now instead interested with pursuing money who claim wrongdoing by Stephenson by mis-categorizing an entire industry of criminal practice from over two decades ago.  When criminal justice was on the line, everyone on both sides agreed Stephenson was a consummate professional.  But now that money is on the line, plaintiffs found different (out of state) lawyers to sing a different tune.

State lab often amounted to the criminal defense attorney asking to the see the content of the work file the examiner brought to court and asking the examiner questions as the attorney saw fit.  The record in this case demonstrates that the experienced criminal defense attorneys in Connecticut in 1999 and 2000 knew this option was available to them, and they were familiar with how to avail themselves of it.  The materials inside firearms examiners' working file was available to the criminal defense.  In this case specifically,  the GRC documents (Work File 62 – 64, 66 – 67) were available to Moscowitz and Ahern to access and review before Stephenson's testimony.  This defeats the *Brady* claims against Stephenson.  The plaintiffs had the benefit of normal, criminal discovery in a firearm case in 1999 and 2000, with experienced counsel that knew how to access and make use of the criminal discovery process and of Stephenson's work file and his expertise specifically.

The established practices and standard operating procedures concerning research materials for firearm and toolmark examiners within the Connecticut state lab in 1999, 2000, and the surrounding years rendered the GRC documents available to the plaintiffs.  These were the practices and procedures that Stephenson followed and relied on in the *Horn-Jackson* prosecution.  (Stephenson Decl. ¶¶ 2 – 32).

Simply stated, Stephenson did not commit an actionable *Brady* violation in 1999 and 2000.  He brought his GRC file materials and all of his other work

materials with him to court for his testimony in the *Horn-Jackson* murder trial, and they were available to Attorneys Moscowitz and Ahern to access and review before Stephenson's testimony, the plaintiffs were not prejudiced, and Stephenson certainly did not act in bad faith.

### a. The GRC file documents were available to the plaintiffs for use in the *Horn-Jackson* prosecution; plaintiffs were not prejudiced.

"'Evidence is not "suppressed" if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence.'" *United States v. Zackson,* 6 F.3d 911, 918 (2d Cir. 1993)(quotation omitted); *accord, e.g., Davis v. United States,* Nos. 98–CV–0541E(F), 92–CR–157E, 1999 WL 1067575, at *10 (W.D.N.Y. Nov.17, 1999)(rejecting *Brady* claim because the information was not "suppressed" since "during the examination of the co-defendant at trial, the petitioner's attorney elicited a response that clearly indicated a plea agreement had been entered into with the prosecution"); *Ulrich v. Berbary*, 445 F. Supp. 2d 267, 283 (W.D.N.Y. 2006)("[T]rial counsel had all of the 'essential facts' necessary for him to take advantage of this allegedly exculpatory material as it came out both on direct and cross-examination.").

Here, Stephenson did not suppress evidence. Instead, the criminal defense team had access to the documents and the essential facts necessary to take advantage of them at trial (or the ability to obtain them); they instead chose not to because Stephenson played a minor role in the criminal case, (especially since there

was never a murder weapon recovered in the case).  Stephenson disclosed his formal report.  He then conducted follow-up examination at the prosecutor's direction and disclosed his supplemental findings to the prosecutor.  The prosecutor then informed defense counsel before trial about how Stephenson had reexamined the evidence and that it was consistent with a Beretta.  Attorney Moscowitz then spoke with Stephenson specifically about the ballistics evidence in the *Horn-Jackson* case before Stephenson testified.  Additionally, Stephenson brought his entire work file—including the GRC documents—to court with him, where they were available to the criminal defense lawyers if they wished to see them, and the specific criminal defense lawyers in this case knew that it was Stephenson's practice to bring his work file with him and that he would make its contents (including the GRC documents) available to them if they wanted.

So, knowing of the supplemental examination by Stephenson in advance of trial (because Nicholson told them about), knowing they could access Stephenson's entire work file, and knowing that Stephenson's work file would contain GRC and similar research documents (which Ahern and Moscowitz confirmed), the defense team had access to take advantage of the information.  The plaintiffs knew of the GRC documents themselves or how to obtain them, or at the very least they should have known and had sufficient opportunity to obtain and make use of them.  The plaintiffs were not prejudiced by Stephenson's conduct, by the State Lab's policies and practices, or by Stephenson's reliance on the policies and practices.  Instead,

plaitniffs had the ability to obtain the GRC documents and any other document from Stephenson's work file that they wanted and use it at trial.

Plaintiffs fail to establish a *prima facia Brady* claim against Stephenson based on the admissible evidence and the record at this stage.  The Court should enter judgment in Stephenson's favor.

### b.  Stephenson did not act in bad faith.

"[T]he Second Circuit has 'never held that anything less than an intentional *Brady* violation establishes a civil §1983 due process claim for damages." *Jeanty v. City of Utica*, 2021 U.S. Dist. LEXIS 7737, *45 (N.D.N.Y. Jan. 14, 2021); *see also* (*Horn* Doc. 67 p. 41 - 42)(Horn's counsel acknowledging there is a heightened *mens rea* requirement that applies in civil damages claims that is distinct from strict liability *Brady* claims brought seeking post-conviction relief.).

Here in this case, plaintiffs cannot satisfy the elevated intent requirement necessary for a *Brady*, damages claim against Stephenson.  There is no evidence that Stephenson intentionally suppressed materials or that he acted in bad faith. Instead, the evidence demonstrates that Stephenson acted in compliance with the State Lab's policy, consistent with how he acted in all of his other cases requiring court appearances as an employee of a state lab, and consistent with how the prosecutors and criminal defense attorneys knew that he acted as a matter of established practice.  Stephenson's testimony establishes that he acted as he did in

the *Horn-Jackson* case based on his understanding of his lab's practices and standard operating procedures.   Stephenson, Jachimowitz, Denio, Moscowitz, Ahern, and Griffin's testimony all establish those practices and procedures and that they were well known throughout the Connecticut criminal justice system in 1999 and 2000.   And even to this day, none of Moscowitz, Ahern, Nicholson, Griffin, or Jachimowicz have any basis to doubt that Stephenson ever acted improperly in any of their dealings with him.   Instead, they all confirm that Stephenson acted professionally and was extremely cooperative throughout all of their dealings with him.

Even if all of the other arguments above on the merits of a civil *Brady* claim were somehow not enough, Stephenson still prevails on the merits because there is no genuine dispute of fact that he did not have the requisite, culpable state of mind for such a claim.   Stephenson did not act in bad faith by intentionally suppressing the GRC documents in order to deprive the plaintiffs access to them (Stephenson Decl. ¶¶ 26; 24B), which is what is required for civil liability under *Brady*.   And even if a negligence standard were applied as the *mens rea* requirement—which Stephenson disputes and objects to[20]—Stephenson's state of mind passes that test

---

[20]  Plaintiffs have suggested they may argue a negligence standard for the *mens rea* requirement for a civil *Brady* claim.  (*Horn* Doc. 67 p. 41 ln. 12 − 21, p. 41 ln. 12 − p. 42 ln 16).  However, this conflicts with how courts in this Circuit analyze *Brady* claims brought under § 1983, as noted by at least one court just this year.  *See Jeanty*, 2021 U.S. Dist. LEXIS 7737, *45 ("[T]he Second Circuit has 'never held that anything less than an intentional *Brady* violation establishes a civil § 1983 due process claim for damages.").

with flying colors too, because he followed his employing labs standards and because he acted as he had in the 126 cases he had worked before the *Horn-Jackson* case in 1999 and 2000.   There is no dispute about that based on the admissible evidence.

The Court should grant this motion and enter judgment in Stephenson's favor.

### D.      Stephenson is Entitled to Qualified Immunity.

"Qualified immunity shields government officials from civil suits for damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007)(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The immunity "affords government officials 'breathing room' to make reasonable—even if sometimes mistaken—decisions . . . ."  *Distiso v. Cook,* 691 F.3d 226, 240 (2d Cir. 2012)(quotation omitted).  It balances the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment and distraction when they perform duties reasonably.  *Wood v. Moss*, 572 U.S. 744, 758 (2014).

The qualified immunity defense is a "forgiving" and "broad shield that protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Grice v. McVeigh*, 873 F.3d 162, 167 (2d Cir. 2017)(citation omitted); *Kass v. City of New York*, 864 F.3d 200, 206 (2d Cir.), *cert. denied sub nom. Kass v. City of New*

*York, N.Y.*, 138 S. Ct. 487 (2017).  It applies regardless of whether the officials' error is "a mistake of law, mistake of fact, or a mistake based on mixed questions of law and fact."  *Doninger v. Niehoff*, 642 F.3d 334, 353 (2d Cir. 2011)(quotation and citation omitted).

The immunity specifically allows "breathing room to make reasonable but mistaken judgments about open legal questions" including nuanced constitutional issues.  *Francis v. Fiacco*, 942 F.3d 126, 146 (2d Cir. 2019)(quotation omitted); *Mara*, 921 F.3d at 69.  Existing precedent must have placed the constitutionality of the officer's conduct "beyond debate."  *See, e.g.*, *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018); *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015).

"The Supreme Court has lately emphasized the breadth of qualified immunity protection."  *Francis*, 942 F.3d at 145.  "[T]he Supreme Court has 'repeatedly told courts not to define clearly established law at a high level of generality,' instead emphasizing that 'clearly established law must be "particularized" to the facts of the case.'"  *Id.* at 146 (citations omitted).

Defining a constitutional right too broadly is the cardinal error of qualified immunity analysis, and the Supreme Court is vigilant in its enforcement of this bedrock tenet of qualified immunity jurisprudence.  *See, e.g.*, *City of Tahlequah v. Bond*, No. 20-1668, 2021 U.S. LEXIS 5310, *4  (Supreme Court Oct. 18, 2021)("We have repeatedly told courts not to define clearly established law at too high a level of generality.").  The purported clearly established right in question must be defined

with specificity.  *See, e.g.*, *City of Escondido, Cal. v. Emmons*, 139 S. Ct. at 503. This analysis requires a *high degree* of specificity.  *Wesby*, 138 S. Ct. at 590 (emphasis added); *see also Farid v. Ellen*, 593 F.3d 233, 244 (2d Cir. 2010)("For a right to be clearly established, it must have been recognized in a particularized rather than a general sense.")(citation omitted).

"[T]he law must be . . . clearly established with respect to the '*particular* conduct' and the 'specific context' at issue . . . ."  *Mara v. Rilling*, 921 F.3d 48, 68-69 (2d Cir. 2019)(emphasis in original)(quoting *Mullenix*, 136 S. Ct. at 308).   The specificity requirement is a critical factor in qualified immunity jurisprudence in this Circuit.  *See, e.g.*, *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011); *Looney v. Black*, 702 F.3d 701, 706 (2d Cir. 2012).

"Qualified immunity applies to defeat a federal claim unless a plaintiff [demonstrates] (1) that the official violated a statutory or constitutional right, . . . (2) that the right was 'clearly established' at the time of the challenged conduct," *Francis*, 942 F.3d at 145,  and (3) even still qualified immunity also applies if official's conduct was objectively reasonable, such that a reasonable official would reasonably believe his conduct did not violate a clearly established right, *Taravella v. Town of Wolcott*, 599 F.3d 129, 134-36 (2d Cir. 2010).

The Court has "flexibility" for which order it assess qualified immunity arguments.  *See generally Pearson v. Callahan*, 555 U.S. 223 (2009).  In *Pearson*, the Supreme Court overruled the "rigid" two-step order structure from *Saucier v.*

*Katz*, 533 U.S. 194 (2001) for how courts used to be forced to undertake qualified immunity analysis.  Here, Stephenson argues both the "objectively reasonable" and the "clearly established" aspects of qualified immunity at this stage.  The Court may consider the arguments in either order.

1.    **It was objectively reasonable as a matter of law in 1999 and 2000 for Stephenson to believe that his conduct in the *Horn-Jackson* criminal case was not a violation of Due Process under the *Brady* doctrine.**

Even if plaintiffs could show 1) an actionable violation, of 2) a clearly established *Brady* right, that does not end the inquiry or deprive Stephenson of qualified immunity.   There is a third question in qualified immunity analysis: whether an official's conduct was objectively reasonable, *i.e.,* whether a reasonable official would reasonably believe his conduct did not violate a clearly established right.  *Taravella*, 599 F.3d at 134-36.  The Second Circuit has held that "this third question is indispensable." *See id.* at 135.

"Even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Taravella*, 599 F.3d at 134 (quoting *Hizazy v. Templeton*, 505 F.3d 161, 169-70 (2d Cir. 2007)).  Qualified immunity is properly awarded (including at summary judgment) under this analysis in instances where there is ambiguity in how the legal requirements or obligations apply to the official under the governing law. *See Taravella*, 599 F.3d at 135  ("the district court has

concluded--and we agree--that the Agreement is ambiguous as a matter of law. Dunn read the Agreement, sought legal advice, and reasonably concluded that Taravella could be terminated without a hearing."); *see also Security & Law Enforcement Employees, Dist. Council 82, etc. v. Carey*, 737 F.2d 187, 211 (1984)(awarding qualified immunity to officials who ordered unconstitutional searches because, "[t]hese officials operated in an area in which the law was not charted clearly.").

That is "[q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *City of Tahlequah v. Bond*, 2021 U.S. LEXIS 5310, *4 (Supreme Court Oct. 18, 2021). Here Stephenson did not knowingly violate the law, and he was not plainly incompetent. Instead, he complied with his agency lab's established practices and standard operating procedures. And the plaintiffs' criminal lawyers, along with the prosecutors that interacted with Stephenson throughout the years, all agree that Stephenson was a competent, professional, and cooperative forensic examiner, as do two other expert firearm examiners in Stephenson's field, who can best view the facts of this case from an official in Stephenson's shoes. (Griffin Decl. ¶¶ 8, 10); (Moscowitz Depo. p. 133 ln. 8 – 9; p. 152 ln. 18 – 25; p. 153 ln. 2 – ln. 11; p. 144 ln. 12, 10 – 25; p. 160 ln. 6 – 8, 13; p. 170 ln. 21 – p. 175 ln. 2); (Ahern Depo. p. 34 ln. 16 – 22; p. 33 ln. 10 – p. 34 ln. 22); (Nicholson Depo. p. 162 ln. 11 – 17); (Jachimowicz Decl. ¶¶ 21, 22, 23); (Denio Decl. ¶ 32 – 33; ¶ 1-31).

In light of the facts and law at the time in 1999 and 2000, it was objectively reasonable for Stephenson to believe that bringing his work materials—including the GRC documents—to court and making them available to anyone that wished to review them, including plaintiffs' criminal defense counsel, was sufficient under *Brady*. (Jachimowicz Decl. ¶¶ 1 - 23); (Denio Decl. ¶¶ 1 – 33); (Stephenson Decl. ¶¶ 1 – 33). It was objectively reasonable for Stephenson to believe that his conduct, in acting in accordance with the State Lab's practices and in accordance with how he had acted in every case he testified in during his role as a forensic examiner (including 126 times as of the *Horn-Jackson* trial) was sufficient under *Brady*. (Jachimowicz Decl. ¶¶ 1 - 23); (Denio Decl. ¶¶ 1 – 33); (Stephenson Decl. ¶¶ 1 – 33) It was objectively reasonable for Stephenson to believe that his conduct, in acting in accordance with the State Lab's practices and in accordance with the practices also followed by his colleagues in the lab, such as Mr. Jachimowicz for example, was legally sufficient. (Jachimowicz Decl. ¶¶ 1 - 23); (Denio Decl. ¶¶ 1 – 33); (Stephenson Decl. ¶¶ 1 – 33).

Courts regularly rule that an official's reliance and adherence to government policies, practices, manuals, or standard operating procedures demonstrates lack of bad faith and provides sufficient basis to award qualified immunity. *See, e.g., Estate of Devine v. Fusaro*, 2016 U.S. Dist. LEXIS 4954, *22 (D. Conn. Jan. 14, 2016)("the guidance of a departmental manual may be at least relevant to deciding whether any individual police officer within that department should know that

what he or she was doing was unlawful."); *see also Security & Law Enforcement Employees, Dist. Council 82, etc.*, 737 F.2d at 211 (awarding qualified immunity to officials who ordered unconstitutional searches because, "although erroneously conducted, from our review of the record, it appears that these searches were conducted based upon the defendants' good-faith reliance on the Department's rules and regulations in effect at the time.").[21]

In fact, the forensic laboratory officials in a similar context in *Villasana v. Wilhoit*, 368 F.3d 976, 980-81 (8th Cir. 2004) were awarded qualified immunity despite concealing reports from the prosecutor, in part because they did so in accordance with agency policy. *See Villasana v. Wilhoit*, 368 F.3d 976, 980-81 (8th Cir. 2004). Furthermore, in this very case, the Second Circuit noted the importance of this aspect of the *Villisana* precedent and acknowledged that acting in accordance with agency policy demonstrates a lack of bad faith. *See Horn v. Stephenson*, 11 F.4th at 172 (quoting *Villasana*, 368 F.3d at 980-81). The "laboratory technician concealed reports from the prosecutor in accordance with agency policy," and therefore "the court concluded that the technician was entitled to qualified immunity because 'there [wa]s no evidence the defendants acted in bad faith, that is, engaged in "a conscious effort to suppress exculpatory evidence."'" *Horn v.*

---

[21] In the *Employees, Dist. Council 82, etc.* litigation, the Second Circuit awarded qualified immunity to the individual officials despite holding that the policies themselves were unconstitutional and despite issuing an injunction prohibiting further compliance with such policies.
.

*Stephenson*, 11 F.4th at 172 (quoting *Villasana*, 368 F.3d at 980-81).  That is, the alleged suppression or non-disclosure of documents in and of itself is not evidence of bad faith, especially when an official is following agency policy.  *See Horn v. Stephenson*, 11 F.4th at 172 (quoting *Villasana*, 368 F.3d at 980-81).  Government officials are allowed to rely on agency policy, even if courts later hold the policy unconstitutional either generally or in a given instance.  That is exactly what happened in *Security & Law Enforcement Employees, Dist. Council 82, etc.*, 737 F.2d at 211.

Here, the record is likewise devoid of evidence of bad faith by Stephenson.  Instead, the record demonstrates Stephenson acted in accordance with established agency practice and standard operating procedure.  His good faith reliance on established practice renders his conduct objectively reasonable.  Or perhaps better stated, it was *at least debatable* among competent firearm examiners in 1999 and 2000.  *See Berg v. Kelly*, 897 F.3d 99, 109 (2d Cir. 2018)("existing precedent must have placed the statutory or constitutional question beyond debate."); *District of Columbia v. Wesby*, 138 S.Ct. 577, 590 (2018); *Fletcher v. City of New London*, 2018 U.S. Dist. LEXIS 163968, *27 (D. Conn. Sept. 25, 2018)("In other words, so long as a rational jury would find that reasonable officers could disagree about the constitutionality or legality of their actions, defendants will be entitled to qualified immunity and, therefore, summary judgment . . . .").

As of the *Horn-Jackson* prosecution, Stephenson had testified 126 times as a witness. (Stephenson Depo. p. 138 ln. 16 – 19). He had worked at the State Lab for years, where he interacted with State prosecutors, with the lab's officials and legal affairs officials, criminal defense attorneys, judges, and other examiners in his field. (Stephenson Decl. ¶¶ 19, 2 – 30J); (Griffin Decl. ¶¶ 8, 9, 3 – 10). He had even interacted with Attorneys Moscowitz and Ahern specifically in other cases. (Stephenson Decl. ¶ 27, 2 – 30J); (Moscowitz Depo. p. 133 ln. 8 – 9)("He [Stephenson] testified in a lot of my cases, even prior to Marquis Jackson."); (Ahern p. 77 ln. 9 – p. 79 ln. 10). He never received any information or training informing him the lab's practices that he followed time and again and that he followed in the *Horn-Jackson* case were legally insufficient under *Brady*. (Stephenson Decl. ¶¶ 18, 19, 20); *see also* (Jachimowicz ¶¶ 18, 19, 20).

It was reasonable for Stephenson to believe that the practices that he had followed time and again were in compliance with any *Brady* requirement. This is especially so because none of these officials, especially the lawyers from the State's Attorney's Office, the State Lab's administration, the criminal defense attorneys in the criminal cases themselves, or the judges involved, ever informed him that the practices he followed were improper. (Stephenson Decl. ¶¶ 18, 19, 20); *see also* (Jachimowicz ¶¶ 18, 19, 20). Stephenson relied upon that and on the practices themselves. (Stephenson Decl. ¶¶ 18, 19, 20); *see also* (Jachimowicz ¶¶ 18, 19, 20).

Importantly, those lawyers would have far more expertise and understanding of the requirements and nuances under the *Brady* doctrine than Stephenson (for example how the doctrine may be impacted in instances where a formal request is made of a specific person versus when one is not made or generally made to the prosecutor only).   *See Zalaski v. City of Hartford*, 723 F.3d 382, 389 (2d Cir. 2013)("the inquiry is not how courts or lawyers might have understood the state of the law at the time of the challenged conduct.").   And those lawyers would certainly have informed Stephenson that the established agency procedure he followed was improper or that Stephenson was somehow not properly following it, if either was the case.   Those lawyers did not do that, and Stephenson could have reasonably expected them to have done that if his good faith reliance on the lab's standard procedures were constitutionally insufficient.   (Stephenson Decl. ¶¶ 18, 19, 20); *see also* (Jachimowicz Decl. ¶¶ 18, 19, 20).   Stephenson confirms that he relied on the belief that practices of the State Lab that he followed in this and other cases were constitutionally and legally permissible in part because none of the lawyers or other officials involved every informed him otherwise.   (Stephenson Decl. ¶¶ 18, 19, 20); *see also* (Jachimowicz Decl. ¶¶ 18, 19, 20).   And he further confirms that he would have expected one or some of them to inform him if the practices were not legally or constitutionally sufficient.   (Stephenson Decl. ¶¶ 18, 19, 20); *see also* (Jachimowicz ¶¶ 18, 19, 20); (Denio Decl. ¶¶ 16, 17, 18, 19, 20, 21, 22, 23).

In fact, the Second Circuit emphasized that its rulings for extending *Brady* obligations past prosecutors and attaching to police officials "makes good sense, we['ve] reasoned, because the police may lack 'the requisite legal acumen' to determine whether materials constitute *Brady* evidence, and therefore they should not be charged with 'mak[ing] separate, often difficult, and perhaps conflicting, disclosure decisions.'" *Horn v. Stephenson*, 11 F.4th 163, 171 (2d Cir. 2021)(quoting *Walker,* 974 F.2d at 299). Here, Stephenson was objectively reasonable in relying on the legal acumen of all these different lawyers and officials that he interacted with and that were familiar with his reliance on his agency's practices.

Even if courts wish to redefine or clarify *Brady* obligations as a legal matter decades later *post hoc*, that neither deprives Stephenson of his qualified immunity nor renders his conduct unreasonable. As a matter of law, it was objectively reasonable—especially for a lay-person official with no formal legal training—to rely on the practices utilized by the lawyers he interacted with from all sides of the criminal process concerning whether his employer's established practices and standard operating procedures met constitutional requirements.

Qualified immunity "is deliberately 'forgiving,' to give public officials 'breathing room to make reasonable but mistaken judgments' without fear of disabling liability." *Mara*, 921 F.3d at 69 (citation omitted). Such a 'deliberately forgiving' shield protects and provides 'breathing room' for Stephenson and other forensic lab officials that brought research and work materials with them to court to

have them available for anyone who asked, including the criminal defense lawyers. Even if the Court were to hold there was a technical violation of a *Brady* right, Stephenson is still entitled to qualified immunity.

The Court should grant Stepheson's motion and enter judgment in his favor as to the Fifth Causes of Action.

> **2.    The specific *Brady* obligations for forensic laboratory employees were not clearly established in 1999 or 2000 as it pertains to the role of laboratory officials in the Connecticut State Laboratory.**

"For a right to be clearly established, it must have been recognized in a particularized rather than a general sense." *Farid*, 593 F.3d at 244 (citation omitted). "[T]he law must be . . . clearly established with respect to the '*particular* conduct' and the 'specific context' at issue . . . ." *Mara*, 921 F.3d at 68-69 (emphasis in original)(quoting *Mullenix*, 136 S. Ct. at 308). The specificity requirement is a critical factor in qualified immunity jurisprudence in this Circuit. *See, e.g.*, *Doninger*, 642 F.3d at 345; *Looney*, 702 F.3d at 706. "As we have explained many times: 'Qualified immunity attaches when an official's conduct does not violate *clearly established* statutory or constitutional rights of which a reasonable person would have known.'" *City of Escondido, Cal.*, 139 S. Ct. at 503 (emphasis added)(quoting *Kisela v. Hughes*, 584 U.S. ___, 138 S. C.t 1148 (2019); *Wesby*, 138 S. Ct. at 593; *White v. Pauly*, 137 S. C.t 548, 551 (2017); *Mullenix*, 136 S. Ct. at 308)

In 1992, the Second Circuit clarified for the first time that "police officials police satisfy their obligations under *Brady* when they turn exculpatory evidence

over to the prosecutors." *Walker v. New York*, 974 F.2d 293, 299 (1992). Before that, the Circuit had not formally established a separate, independent *Brady* disclosure requirement for police officers, distinct from criminal prosecutors. Just this year in this case, the Second Circuit confirmed that these limited, derivative *Brady* obligations also extend past sworn police officials and attach to government laboratory employees called to testify in criminal cases. *See Horn v. Stephenson*, 11 F.4th 163, 172 (2d Cir. 2021)("Our conclusion, based on *Walker*, [is] that *Brady* applies to forensic examiners in state crime laboratories . . . .").

However, *Walker* does not address whether police officials—or laboratory employees—can satisfy their *Brady* obligations in other ways. There can be no dispute in this case that there are other ways in which laboratory officials satisfy *Brady* requirements. For example, Stephenson provided the formal report to the NHPD only, never to the prosecutor, and it is agreed that that was *not* a *Brady* violation. That is, *Walker* establishes a sure-fire way for government forensic officials to satisfy their *Brady* obligations, but it does not establish an all-inclusive mandate or exclusive way for them to do so.

In 1999 and 2000, the limited *Brady* right that applies to police and forensic employees was not so clearly established that it was determined, "beyond debate," that bringing purported *Brady* material to court and making it available to criminal defense counsel was somehow constitutionally insufficient. During 1999 and 2000 (and even today), there was no case that addresses the right with sufficient

specificity in that context.  Such a case is required at this stage, on this record, to render the right sufficiently clearly established to deprive Stephenson of qualified immunity.  *See Mara*, 921 F.3d at 68-69 ("[T]he law must be . . . clearly established with respect to the '*particular* conduct' and the 'specific context' at issue . . . .").  No specific authority even addresses (let alone clearly establishes) the conduct at issue in the specific context of this case.

The most that plaintiffs have been able to point to is a Connecticut statute that applies "peace officers" (all of whom appear to have the legal power to effectuate arrests or otherwise assume the role of police officers with police powers under Connecticut law).  *See* Conn. Gen. Stat. § 54-86c(c) (citing Conn. Gen. Stat. § 53a-3(9)).  These statutes do not mention forensic laboratory technicians or officials in similar roles as laboratory technicians.  No member of the State Lab's firearm section had received any instruction or training indicating that these state provisions may apply laboratory examiners in 1999 or 2000 or before.  Further, statutes do not clearly establish constitutional rights for qualified immunity purposes.  *Davis v. Scherer*, 468 U.S. 183, 194 (1984)("Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision."); *Tooly v. Schwaller*, 919 F.3d 165, 172 (2d Cir. 2019)("we have repeatedly held that a state statute does not serve as 'clearly established law' for purposes of qualified immunity."); *Young v. Cty. of Fulton*, 160 F.3d 899, 902 (2d Cir. 1998)("A violation of state law neither

gives plaintiff a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim."). Despite thorough briefing in these cases concerning Stephenson's qualified immunity defenses, no one can identify a case that addresses a laboratory technician being sued for a *Brady* violation for conduct that adhered to established government laboratory practices and with the standards in the field at the time. Given the record at this stage, the right being asserted by plaintiffs and against Stephenson is not clearly established with sufficient specificity.

Given the evidence in the record at this stage, it was not clearly established to Connecticut firearms examiners that worked in the State Lab in 1999 and 2000 that they had to affirmatively give their entire work file or research file—or select contents thereof, such as GRC documents—to a prosecutor without being asked. Even if that is a definitive way to satisfy the *Brady* obligation that is being applied against the lab officials decades later with 20-20 hindsight, it is not the only way to do so and was not clearly established to state lab workers in 1999 and 2000 that they had to do this instead of complying with the standard practices of the State Lab at the time, especially since those practices include cooperating with either side of a criminal prosecution and providing any documents that were requested.

Given that the well-established practice of the lab was for lab examiners to bring the entire work file to court and make it available to either side or to the judge if asked, it was not clearly established that that practice was insufficient if

64

the examiner was not asked for materials by someone in advance. Given the lab's practices at the time, it was not clearly established that the examiners instead had to produce everything in their files to the prosecutor only and without being asked.

There can be no dispute that there is no authority from the Second Circuit at the time of 1999 or 2000 that clearly established these constitutional distinctions with specificity. There can be no dispute that there is no authority from the Second Circuit at the time of 1999 or 2000 that clearly established this constitutional right—the right to have the material provided to the prosecutor without any request versus the right to review the material in court when the examiner brought his work file with him—with such specificity. Stephenson is therefore entitled to qualified immunity. The law was not clearly established in 1999 and 2000 with sufficient context and specificity to further deprive Stephenson his qualified immunity from suit. The Court should enter judgment in favor of Stephenson as to the Fifth Causes of Action in each of these cases.

## III.  CONCLUSION AND RELIEF SOUGHT

The Court should grant this motion and enter judgment in favor of Stephenson as to the sole counts brought against him in the above-captioned actions. *See* (*Horn* Doc. 153 p. 45 – 46 "Fifth Cause of Action"); (*Jackson* Doc. 110 p. 41 – 42 "Fifth Cause of Action"). The Court should dismiss Stephenson as a party from these cases entirely. Alternatively, the Court should grant summary judgment

at least as to all claims arising from Stephenson's alleged year-2000 conduct; those claims are barred by absolute immunity.


*Respectfully submitted,*

DEFENDANT
James Stephenson

WILLIAM TONG
ATTORNEY GENERAL


BY: __/s/_*Stephen R. Finucane*_____
Stephen R. Finucane
Assistant Attorney General
110 Sherman Street
Hartford, CT  06105
Federal Bar #ct30030
E-Mail:  stephen.finucane@ct.gov
Tel: (860) 808-5450
Fax: (860) 808-5591

## CERTIFICATION

I hereby certify that on November 3, 2021, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

_/s/_Stephen R. Finucane_____
Stephen R. Finucane
Assistant Attorney General