# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

VERNON HORN,                              :        CIVIL NO. 3:18-CV-1502 (RNC)
                Plaintiff,                 :
                                 :
      v.                                      :
                                 :
CITY OF NEW HAVEN, *et al.*,              :
                                 :
               Defendants.                 :

## REPLY TO PLAINTIFFS' MEMORANDA OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to D. Conn. ***L. Civ. R. 56(a)(2)***, Defendants, LEROY DEASE, PETISIA ADGER, and DARYLE BRELAND, (collectively referred to as Defendants or Detectives) by and through their attorneys, NIELSEN, ZEHE & ANTAS, P.C., submit this Reply to Plaintiffs' VERNON HORN's and MARQUIS JACKSON's Memoranda of Law in Opposition to Defendants' Motions for Summary Judgment, and state as follows:[1]

## INTRODUCTION

Plaintiffs' Response briefs repeatedly assert Plaintiffs' "innocence," but that does not make it true. Despite their mantra, Plaintiffs have never been found innocent. As Defendants' Motions for Summary Judgment detail, even affording Plaintiffs all favorable inferences, an abundance of evidence remains that Plaintiffs committed the crime. Prosecutors Nicholson and Griffin, who prosecuted the case and reviewed all the evidence, still conclude that Plaintiffs are not innocent. The Connecticut Supreme Court also analyzed the evidence and concluded that even absent the cellphone evidence, there is sufficient evidence of guilt. Moreover, Plaintiffs' Amended Complaints, claims of innocence, and motions before this Court, are rife with inadmissible factual conclusions, legal conclusions, and speculation.

---

[1] Defendants file this combined brief in Reply to both Horn (Docket No. 231) and Jackson's (Docket No. 171) Memoranda of Law in Opposition Defendants Motions for Summary Judgment.

Further, significant unrefuted inculpatory evidence remains that proves that Plaintiffs committed the crime. (Defs.' Mem. Supp. Mot. Summ. J. at 27-28). For example, Plaintiffs fit the physical description and profile of the perpetrators; they were familiar with the store and its employees. After all these years, Plaintiffs still do not have a corroborated alibi for where they were when the crime occurred. (Defs.' Ex. E, Rossmo Dep., 326:23-327:1, Feb. 19, 2021). Plaintiffs' accomplice Steve Brown, and corroborating witness, Shaquan Pallet, never recanted their identifications of Plaintiffs, and they remain unrebutted. Nor have Brown and Pallet ever testified that they were coerced, pressured, fed information, or that their testimony was fabricated.

However, Plaintiffs' guilt is not the issue before this Court that warrants summary judgment. Rather, summary judgment is appropriate because even considering Plaintiffs' responses, and taking all inferences in their favor, there exists no issue of material fact that:

1. Neither the Detectives nor anyone involved in the Plaintiffs' criminal trial in 2000 recognized the significance of the "ORIG" column of code numbers on the stolen cellphone call detail record; nor should they have, based on the lack of cellphone technological knowledge at the time. Count III (Unreasonably Prolonged Detention) fails.[2]

2. Adger's testimony that she filed the cellphone records in the NHPD Records Room that were obtained by request and search warrant is direct, corroborated, and unrebutted evidence. Her possession of a working copy of the records 18 years later was inadvertent, and her voluntary production of her working copy evidences that she did not intentionally conceal them. Count I (Withholding Material Exculpatory Evidence) fails.

3. Plaintiffs' Response is founded on after-the-fact recantations of two career criminals who have an obvious distain for law enforcement. The jailhouse "retractions" and "denials" obtained by Plaintiffs' investigators, six and twelve-years later, were insignificant and irrelevant in the context of their original statements and criminal trial testimony and do not constitute material *Brady* evidence. Count II (Fabrication of Evidence) fails.

4. The State of Connecticut negligence and Constitutional claims fail due to governmental immunity and are barred by the statute of limitations.

---

[2] Undisputed facts that support summary judgment are cited in this brief by reference to Plaintiffs' L. Civ. R. 56(a)(2) Response to Statement of Undisputed Facts by paragraph number. Said references cite to facts Plaintiffs do not dispute.

As detailed below, Defendants' investigation and evaluation of the evidence was done in good faith and in compliance with the Constitution. Summary judgment on all Counts is warranted.[3]

## I. PLAINTIFFS' RESPONSE IS BASED ON SPECULATION AND DOES NOT OVERCOME THE SUMMARY JUDGMENT STANDARD.

Plaintiffs' response is based on unsubstantiated speculation and legal conclusions.[4] This cannot be the basis to deny summary judgment. *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Anderson*, 477 U.S. at 252); *see also Bellamy v. City of New York*, 914 F.3d 727, 750 (2d Cir. 2019) (pure speculation [is] insufficient to raise a triable issue of fact); *Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186, 188 (2d Cir. 1992) (summary judgment cannot be defeated on the basis of conjecture or surmise). Instead, Plaintiffs must produce *admissible* evidence that supports their pleadings. *First Nat'l Bank of Ariz.*, 391 U.S. at 289-90 (emphasis added); *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004). The "mere existence of a scintilla of evidence supporting the non-movant's case is also insufficient to defeat summary judgment." *Anderson*, 477 U.S. at 252; *see also D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998) (a nonmoving party "must offer some hard evidence showing that its version of the events is not wholly fanciful"). Rather, there must be sufficient evidence favoring the nonmovant so that a jury could reasonably return a verdict for that party. *Anderson*, 477 U.S. at 252; *Jeffreys*, 426 F.3d at 554.

---

[3] In addition, if the Court believes that summary judgment is not appropriate as to all Counts, the Court has the power to grant partial summary judgment when the moving party demonstrates that there are "material issues of fact which are not genuinely in dispute" as to a given Count. *Berman v. Royal Knitting Mills, Inc.*, 86 F.R.D. 124, 126 (S.D.N.Y. 1980) (citing *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438 (2d Cir. 1980)). The Court may make factual findings under F.R.C.P. 56(g), as an appropriate path to "[s]ecure factual findings which narrow the scope of discovery and trial." *ISC Holdin AG v. Nobel Biocare Fin.*, AG, 688 F.3d 98, 126 (2d Cir. 2012) (Dissent). See also, *LEGO A/S v. Best-Lock Constr. Toys, Inc.*, 404 F. Supp. 3d 583, 626 (D. CT 2019).

[4] Plaintiffs cite to the inadmissible deposition opinion testimony of various witnesses (some of whom have been disclosed by the Defendants in this litigation) in support of their position that the Detectives violated the Constitution. (Pl.'s Mem. in Opp'n to Defs.' Mots. Summ. J. at 73-74). However, this opinion testimony should not be considered by the Court. Simply put, Plaintiffs' questioning which resulted in the cited testimony was laden with form and foundation objections, and additionally, Plaintiffs cannot rely on opinion testimony concerning ultimate issues of fact and legal conclusions. *Valentin v. New York City, 1997 U.S. Dist. LEXIS 24059, *80 (E.D.N.Y. 1997)* (quoting *Andrews v. Metro North Commuter R.R.*, 882 F.2d at 709 (2d Cir. 1989)); See also, *Hygh v. Jacobs*, 961 F. 2d 359, 364 (2d. Cir. 1992).

Plaintiffs' commitment to "wholly fanciful" arguments that fall short of the summary judgment standard is most obvious in Count III - Unreasonably Prolonged Detention. (Pl.'s Mem. in Opp'n to Defs.' Mots. Summ. J. at 98; Pl.'s Consolidated Resp. Opp'n to all Defs.' Mots. Summ. J. at 71).

## II. NO QUESTION OF FACT EXISTS REGARDING THE DETECTIVES' REASONABLE LACK OF UNDERSTANDING PERTAINING TO THE "ORIG" INFORMATION IN THE CALL DETAIL RECORD. (COUNT III)

### 1. In 1999, Nobody, Including the FBI, Understood the Meaning of "ORIG" and the Numerical Codes Underneath it.

Plaintiffs' preeminent argument against summary judgment on Count III is that Defendants knew or should have known that the "ORIG" column of the call detail record provided "self-evident" exculpatory cell site information. (Pl.'s Mem. in Opp'n to Defs.' Mots. Summ. J. at 100). No admissible evidence supports this claim. The truth is, in 1999, *nobody* appreciated the meaning of the ORIG column. It is absurd to assert that the Detectives knew or should have known this information when *the entire criminal justice system* following Plaintiffs' arrests also failed to appreciate its significance.

Plaintiffs' "discovery" of ORIG's meaning in 2018 supports this historical lack of knowledge. Despite Plaintiffs' insistence to the contrary, the universal lack of knowledge about this issue in 1999 demonstrates Defendants' alleged wrongful conduct comes nowhere close to the significant burden of "shocking the conscience." Count III should be dismissed as a matter of law.

Upon obtaining the call detail record of the stolen cellphone, the Detectives immediately began investigating the recipients of the five phone calls. The Detectives did not suppress the call detail record and it was openly used during their investigation. The Detectives' reports detail their investigative efforts, including the witnesses they spoke to concerning the call detail record and the recipients of the calls.

Plaintiffs' defense counsel was also provided this "important piece of evidence" well before the criminal trial. (Pl.'s L. Civ. R. 56(a)(2) Statement in Opp'n to Defs.' ¶¶157-159, at 81-82). Thereafter, the prosecution, defense counsel, defense investigators, the judge, jury, witnesses, and a representative from Omnipoint Cellular Communications considered the call detail record and observed the "ORIG" column and the code numbers beneath it.

It was universally understood that the source of the first and fourth phone calls from the stolen cellphone was an issue at Plaintiffs' criminal trial. Nicholson, the lead prosecutor, presented the call detail record to the judge and jury, (*Id*. ¶213, at 102) despite not knowing the meaning of the "ORIG" column or the numbers beneath it. (Pl.'s Ex. 21, Nicholson Dep., 314:2-315:12, Feb. 5, 2020).

Plaintiffs' criminal defense attorneys also did not raise an issue about the "ORIG" column. (Defs.' Ex. F, Ahern Dep., 87:7-88:8, Feb. 21, 2020; Pl.'s L. Civ. R. 56(a)(2) Statement in Opp'n to Defs.' ¶213, at 102). Defense counsel, Michael Moscowitz (Jackson) and Leo Ahern (Horn) chose to not independently investigate any portion of the call detail record. (Pl.'s L. Civ. R. 56(a)(2) Statement in Opp'n to Defs.' ¶212, at 102).

After the criminal trial, the call detail record was no doubt analyzed for a significant number of hours, and no one on Plaintiffs' teams of appellate and *Habeas* defense counsel questioned (or understood) the meaning of "ORIG".

Plaintiffs' now see the "obvious" meaning of "ORIG" through a revisionist lens. However, they disregard that the FBI-trained experts that recently reviewed the call detail record have affirmed that in 1999 cellular technology was new, not understood by law enforcement, and call origin analysis was virtually non-existent. (*Id*. ¶210-211, at 101-102). The Detectives certainly received no training on the issue. (Defs.' Ex. 17, Adger Aff., ¶16).

With decades of hindsight, and the enlightenment provided by the FBI cellular expert, Plaintiffs argue that anyone could have understood, as a "practical common-sense matter," that a cellular phone company would have been able to provide accurate information about the origin of a cellular call from its network.[5] That is easy to say, but it ignores the historical fact that in 1999 *no one* involved in Plaintiffs' trial appreciated the cellular technology at issue here.

Plaintiffs play dictionary word games about the self-evident meaning of ORIG, but this does not alter the reality that a significant number of persons observed the call detail record, all of whom failed to appreciate the issue, including Plaintiffs' attorneys, judges, and the jury. As late as 2016, the Connecticut Supreme Court did not recognize the significance of the term "ORIG" in its analysis of the evidence. Plaintiffs are mired in speculation. The only admissible evidence is that EVERYONE failed to understand the meaning of the ORIG column.

The FBI-trained cellular experts that have testified in these cases do not claim that in 1999 the Detectives should have understood the meaning of the ORIG column. FBI cellular expert James Wines, who was retained by Horn's counsel and the State of Connecticut in 2018 to analyze the call detail record, testified that in 1999 the FBI did not regularly use cell tower analysis to identify call origin. It is unreasonable to claim that Defendants should have understood this technology in 1999 when the FBI did not begin to appreciate the significance of the technology until many years later.[6]

---

[5]  Plaintiffs repeated cites to Defendants' cell phone analysis expert (Moledor) is misleading. (Pl.'s Mem. in Opp'n to Defs.' Mots. Summ. J. at 99). The expert agreed that one would expect a cellphone company to know the information on the call detail record. However, he cannot affirmatively state that a request to any employee would have resolved what "ORIG" meant. (Pl.'s Ex. 27, Moledor Dep., 39:25-41:3, May 6, 2021). Lindemulder's erroneous testimony in these cases illustrates this point.

[6]  Plaintiffs do not dispute that cellular historical analysis and training were very limited in 1999 and was not developed until approximately the mid-2000's. (Pl.'s L. Civ. R. 56(a)(2) Statement in Opp'n to Defs.' ¶210, at 101-102). A dedicated FBI cellular investigative unit, "CAST", was not established until 2010. (*Id*. ¶211, at 102). Here, none of the detectives received cellular technology training. (Defs.' Ex. 17, Adger Aff. ¶16).

The lack of understanding concerning cellular technology is buttressed by the fact that it was not until 2018 – 19 years after the investigation – that the meaning of the "ORIG" column was considered. Meanwhile, Plaintiffs had hired numerous defense counsel to challenge their convictions and there were numerous appellate challenges and *Habeas* hearings. Yet, the "obvious" issue concerning the ORIG column was never raised. In 2018, after recognizing the significance of the ORIG column, the Federal Public Defender called the information "new evidence," stating that the police, prosecutors, judges, and defense attorneys failed to understand its meaning. (Defs.' Mem. Supp. Mot. Summ. J. at 77).

### 2. If Defendants Had Called Omnipoint and Inquired About Call Origination, It Would Not Have Resolved the "ORIG" Conundrum.

Plaintiffs suggest that all the Detectives had to do was call Omnipoint about the ORIG information and Omnipoint would have explained its significance. At best, this is wishful thinking. At Plaintiffs' criminal trial in 2000, "cellular expert" and Omnipoint representative, Richard Lindemulder, testified about the call detail record, and even Lindemulder got it wrong.

Plaintiffs do not address Lindemulder's testimony, but they admit that at Plaintiffs' criminal trial, he authenticated the call detail record that contained the "ORIG" column of numbers. (Pl.'s L. Civ. R. 56(a)(2) Statement in Opp'n to Defs.' ¶214, at 103). Undoubtedly, before testifying, Lindemulder and the prosecutor examined the call detail record. Plaintiffs' defense counsel also examined the call detail record. On cross-examination, defense counsel questioned Lindemulder about the call detail record and Lindemulder testified that it did *not* contain information about where the cellphone was located when fourth the call was made. Plaintiffs admit Lindemulder was wrong. (*Id*. ¶215, at 103-104). The prosecutor took Lindemulder at his word, and Plaintiffs' defense attorneys did not challenge his conclusion, either. Lindemulder's error was not discovered for two decades.

Lindemulder's error underscores the shortcoming of Plaintiffs' speculative claim that if the Detectives had asked Omnipoint about the origin of the phone calls, it would have resolved the issue. Even Omnipoint's representative, who was designated to testify about the cellular calls, did not understand the meaning of the "ORIG" column. Should the Detectives' cellphone acumen have exceeded the expertise of the cellular service provider? Of course not. Similarly, the Detectives' acumen should not be expected to exceed that of the legal experts that studied the same evidence over the next 18 years. One thing is clear, "ORIG" and cellphone origination codes were simply not known and appreciated in 1999.

**3. The Stolen Cellphone Call Detail Record Does Not Establish Plaintiffs' Innocence.**

An essential element of an unreasonably prolonged detention claim is that the claimed exculpatory evidence "must have conclusively or affirmatively established [plaintiff's] innocence." *Creighton v. City of New York*, 2017 US Dist., Lexis 21194 at 116 (*citing*, *King v. City of New York*, 2014 US Dist., Lexis/41441 (2014). As explained below, substantive evidence of Plaintiffs' guilt exists without the phone evidence. Steven Brown and Shaquan Pallet's identification testimony, Wolfinger's partial identifications, that Plaintiffs fit the perpetrators' profile, Plaintiffs' familiarity with the layout and operation of the Deli, and Plaintiffs' incomplete and inconsistent alibis establish Plaintiffs' guilt. This evidence led the prosecutor to confirm that without the phone evidence, there was sufficient evidence for a good faith prosecution. "In my view, it wasn't even close. It was more than enough." (Pl.'s Ex. 21, Nicholson Dep., 277:15-22, Feb. 5, 2020). Plaintiffs' presentation of Brown's I-95 references to the first phone call would have merely presented another inconsistency in Brown's testimony, which, despite several inconsistencies, the jury believed.

Similarly, the Connecticut Supreme Court examined the evidence, considered the exclusion of the phone evidence, and determined there was sufficient evidence of guilt. *Horn v. Comm' of Conn.*, 321 Conn. 767 (2016). Contrary to Plaintiffs' characterization, Defendants do not cite the ruling as "preclusive" or to collaterally estop Plaintiffs' claim, but rather because the opinion persuasively outlines the evidence and conclude there was sufficient evidence for the verdicts. This assessment by a trier of fact cannot be ignored.

### 4. That Defendants Did Not Appreciate the ORIG Column in 1999, Does Not "Shock the Conscious".

In its best light, Plaintiffs can only conclude that, like so many others, the Detectives failed to appreciate the meaning of "ORIG" in 1999. This alleged failure could, at most, be considered negligent; it certainly does not "shock the conscious." To "shock the conscious," Plaintiffs must prove that the Detectives knew the meaning of the ORIG column and intentionally suppressed it. This evidence does not exist. Plaintiffs' reference to *Russo v. City of Bridgeport* (Pl.'s Mem. in Opp'n to Defs.' Mots. Summ. J. at 102) supports summary judgment on this claim. The *Russo* court emphasized that, "[t]he state of mind of a government defendant is an integral aspect of any 'shock the conscience' standard. Deliberate indifference satisfies this mental state." *Russo v. City of Bridgeport,* F.3d 196, 208 (2d Cir. 2007). The *Russo* court found that the officers' conduct shocked the conscious. However, *Russo* is factually distinguishable from these cases. In *Russo*, there was affirmative evidence that the officers knew the evidence *was exculpatory*, i.e., the arrested plaintiff had multiple tattoos versus the absence of the tattoos of the perpetrator shown on the crime video. In addition to the officers' possession of the video, the arrestee (plaintiff) repeatedly asked the officers to check the video for tattoos. The officers then lied about what the video showed. The detectives knew at the time the presence of plaintiff's tattoos was exculpatory, and they concealed it. *See also, Harewood v. Braithwaite,* 64 F. Supp. 3d 384, 402 (E.D.N.Y. 204)

9

("[t]he touchstone of an unreasonable detention claim is the existence of egregious conduct by an officer in connection with specific, readily-verifiably exculpatory evidence"). The *Russo* facts are completely different than the instance cases. Here, no evidence exists that in 1999 the Detectives understood or noted the "ORIG" column. In these cases, it is not surprising that Plaintiffs did not question Detectives Adger and Breland about the "ORIG" column over four sessions and 15+ hours of deposition. Plaintiffs did not make the slightest effort to explore whether the Detectives noticed the "ORIG" column and decided to disregard it or, like the prosecutor and defense attorneys, failed to appreciate it. Consequently, Adger submitted an affidavit confirming she and the other Detectives did not notice and understand the significance of the "ORIG" column. (Defs.' Ex. 17, Adger Aff. ¶16). Plaintiffs speculate that the Detectives "should have" seen what others did not. This falls far short of deliberate indifference and does not "shock the conscious."

Plaintiffs make a last-ditch effort to save their Unreasonably Prolonged Detention claim by attacking Defendants' argument that the call detail record was disclosed and not in Defendants' exclusive possession, and therefore, does not "shock the conscious". Plaintiffs claim a mere showing that the evidence was exculpatory was sufficient. Setting aside that the evidence was not exculpatory (particularly in view of all the other evidence of Plaintiffs' guilt) the call detail record was not "readily-verifiable evidence of innocence" necessary for a prolonged detention claim.

Here, the "ORIG" column was not recognized as exculpatory evidence by the Plaintiffs criminal defense attorneys and the prosecutors. These cases are similar to the video evidence in *Creighton v. City of New York*, (2017 U.S. Dist. LEXIS 21194, * 117 (S.D.N.Y. 2017) and the cases cited therein where the court points to the inability of defense counsel to determine once they learned of the video, whether the video of their clients were readily-verifiable evidence of innocence. In *Creighton*, the video was not clear enough to be exculpatory. Likewise, because

Plaintiffs' defense counsel could not and did not ascertain the significance of "ORIG", the Detectives cannot be charged with not acting on it either (even though they both had it). Therefore, even the Plaintiffs' last grasp at a claim of 11 months of detention fails.

**5. Qualified Immunity Bars Plaintiffs' Unreasonably Prolonged Detention Claim.**

Even if the elements of an unreasonably prolonged detention exist, a plaintiff cannot prevail "if the officers established that they are entitled to qualified immunity." *Russo v. City of Bridgeport,* 479 F.3d 196, 205 (2d Cir. 2007). If a violation of an individual's Fourth Amendment rights exists, the inquiry turns to "whether the officers are entitled to qualified immunity as a matter of law." *Id*. (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

Qualified immunity protects public officials when one of two conditions applies: (1) if the defendant's actions "did not violate clearly established law" and (2) if it was "objectively reasonable for the defendant to believe that his actions did not violate such law." *Russo*, 479 F. 3d at 211 (citing *Poe v. Leonard*, 282 F.3d 123, 133 (2d Cir. 1998)). The "concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." *Saucier*, 533 U.S at 205.

With respect to the second *Poe* condition, "if the court determined that the only conclusion a rational jury could reach is that reasonable officers would disagree about the legality of the defendant's conduct under the circumstances qualified immunity applies." *Poe*, 282 F.3d at 133 (citing *Lennon v. Miller*, 66 F.3d 416, 412 (2d Cir. 1995)). The inquiry for qualified immunity is essentially whether "officers of reasonable competence could disagree on the legality of the defendant's actions." *Poe,* 282 F.3d at 147 (citing *Cerrone v. Brown*, 246 F.3d 194, 202 (2d Cir. 2001)) (internal quotation marks omitted).

Officers similarly situated to the Detectives in this case could disagree about whether in 1999 further action must have been taken to verify the meaning of the ORIG column, which was also available to the Plaintiffs. The Detectives in the instant cases did not and reasonably should not be expected to have appreciated the meaning of the ORIG column. The call detail record was also provided to the prosecutor and criminal defense counsel. A reasonable officer could conclude that once that step was taken, it was no longer the officer's duty to interpret and examine the call detail record more thoroughly than defense counsel or the cellular company.

Plaintiffs do not cite one case that stands for the proposition that a lack of knowledge or awareness regarding potentially exculpatory evidence violates the Constitution. If anything, the evidence shows that reasonable officers can disagree on whether or not understanding the significance of the "ORIG" column violates the Constitution. No NHPD detectives were trained in cell cite analysis in 1999. Others who had access to the cell detail record missed it. The fact that the Detectives did not understand it is not unreasonable and qualified immunity should apply.

## III. DEFENDANTS DID NOT INTENTIONALLY SUPPRESS THE PHONE RECORDS AND DID NOT INTENTIONALLY VIOLATE *BRADY*. (COUNT I)

Plaintiffs fail to present evidence that Defendants *intentionally* suppressed the phone records, the state of mind element required in the Second Circuit. The Second Circuit has "never held that anything less than an intentional *Brady* violation establishes a *civil* § 1983 due process claim for damages."[7] *Fappiano*, 640 F. App'x at 118 (citing *Poventud v. City of New York*, 750 F.3d 121, 138 (2d Cir. 2014)); *Bermudez v. City of New York*, 790 F.3d 368, 678 n.4 (2d Cir. 2015); *Walker*, 974 F.2d at 300.

---

[7] *See also*, *Jeanty v. City of Utica*, 2021 U.S. Dist. LEXIS 7737, *45 (N.D.N.Y. 2021); *Valentin v. City of Rochester*, 2018 U.S. Dist. LEXIS 182601, *31 (S.D.N.Y. 2018) (noting that "to recover money damages for a *Brady* due process violation under Section 1983, the violation must have been intentional); *Kroemer v. Tantillo*, 2017 U.S. Dist. LEXIS 218622, *14 (W.D.N.Y. 2017); *Greene v. City of New York*, 2017 U.S. Dist. LEXIS 219506, *6 nt. 6 (E.D.N.Y. 2017).

Plaintiffs' assertion that a state of mind less than *intentional* conduct is wrong. They cite *Poventud* in support of their claim that the evidence "must have been suppressed . . . either willfully or *inadvertently*." However, this less than intentional standard applies only to a <u>criminal</u> *Brady* claim, not a <u>civil</u> *Brady* claim. To hold otherwise would require that law enforcement engage in an unnecessary evaluation of the nature of all information obtained during an investigation and determine whether such information is considered "material" under *Brady*. *Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir. 1992).

The Second Circuit has qualified that "the purpose of the Brady rule is not to provide a defendant with a complete disclosure of all evidence in the government's file which might conceivably assist him in the preparation of his defense, but to assure him that he will not be denied access to exculpatory evidence known to the government but unknown to him." *United States v. Ruggiero*, 472 F.2d 599 (2d Cir. 1973); *United States v. Sessa*, 711 F.3d 316, 322 (2d Cir. 2013). Stated differently, the government is "under no duty to report *sua sponte* to the defendant all that they learn about the case and their witnesses." *United States v. Agurs*, 427 U.S. 97, 109, 96 S. Ct. 2392, 2400 (1976). Specifically, the government has no Brady obligation to "communicate preliminary, challenged, or speculative information." *United States v. Amiel*, 95 F.3d 135, 145 (2d Cir. 1996) (quoting *United States v. Diaz*, 922 F.2d 998, 1006 (2d Cir. 1990)).

## 1. Adger Did Not Hide the Phone Records at Her Home.

Plaintiffs fail to establish that Adger intentionally concealed the phone records and therefore Plaintiffs' claim fails. Adger's testimony provides clear, direct evidence that she filed the records in the NHPD Records Department after she made working copies of the records. Plaintiffs characterize her testimony as "self-serving", however, their conclusory dismissal of that

13

testimony is meaningless without more. The bottom line is: Adger's testimony that she filed the records is the truth.

Plaintiffs attempt to discredit Adger with "strong evidence of intentional suppression" because she found the records in her basement in 2018. (Pl.'s Mem. in Opp'n to Defs.' Mots. Summ. J. at 82). However, Plaintiffs do not dispute her innocent explanation of how she unintentionally brought the phone records home. Plaintiffs do not dispute that she discovered the phone records and other work materials in her basement in 2018, after she had *inadvertently* removed contents from her work desk in 2000 when she was promoted. (Pl.'s L. Civ. R. 56(a)(2) Statement in Opp'n to Defs.' ¶¶177-182, at 91). She innocently transported the contents of her desk drawer while not appreciating that the phone records were included.

Having to prove that Adger acted intentionally, Plaintiffs raise what they describe as "highly incriminating" circumstances surrounding the 2018 discovery of the phone records. Plaintiffs cite Caporale's claim that after Caporale contacted Adger she asked Dease, "Did we arrest the right people?" Dease responded by reminding Adger of the "hard work" they put into the case. Adger denies this conversation occurred. (Pl.'s Ex. 3, Adger Dep. 16:21-17:22, Dec. 11, 2019; Pl.'s Ex. 23, Caporale Dep. 104:1-23, July 21, 2020). Nevertheless, if this conversation did occur, it is not evidence of a "consciousness of guilt," as Plaintiffs' claim (Pl.'s Mem. in Opp'n to Defs.' Mots. Summ. J. at 83). Even if Caporale were believed, Adger's response was prompted by the surprise that a Federal Public Defender investigator (an ex-NHPD detective) was still investigating Horn's conviction after 18 years. If Adger felt guilt, or as Plaintiffs put it, "realized the jig is up," a more incriminating response would be expected, and she would not have admitted to discovering "exculpatory" "hidden" records. She certainly would not have told Caporale about conversations she had with Detective Dease concerning the records.

14

Rather than demonstrating consciousness of guilt, Adger's behavior with Caporale proves the opposite. When asked, Adger completely and immediately cooperated with Caporale's request. She was not obligated to do so. She was cordial, helpful, and produced what she found without delay.[8] (Pl.'s L. Civ. R. 56(a)(2) Statement in Opp'n to Defs.' ¶¶184-188, at 92-93). Adger could have told Caporale she had nothing. Her cooperation proves she was not hiding the phone records and is consistent with her good faith belief that the records were filed and not "exculpatory evidence", let alone relevant. (Pl.'s L. Civ. R. 56(a)(2) Statement in Opp'n to Defs.' ¶176, at 90 176; Pl.'s Ex. 3, Adger Dep. 128:19-131:3, 154:24-155:16, Dec. 11, 2019; Pl.'s Ex. 3, Adger Dep. 425:7-426:6, Sept. 22, 2020).[9] A reasonable jury would come to this conclusion.

To buttress their claim that Adger intentionally hid the phone records, Plaintiffs must attack the trail of documents and evidence which supports that the phone records were filed, including:

a. *The original phone records of Glen Spray and Sandra Moore that were in the NHPD and Federal Public Defender's File.*

Plaintiffs offer no evidence contradicting Adger's testimony that she filed the original documents. It is undisputed that the NHPD did not find phone records from five of the seven individuals. Plaintiffs claim that the City's "herculean effort" in 2018 to search its files constitutes proof that Adger intentionally hid the documents. However, the records were lost before the "herculean effort." The file had not remained untouched since the criminal trial in 2000. It was transferred from attorney to attorney throughout the posts-conviction judicial process. As early as 2013, the *Habeas* prosecutor concurred with Horn's defense counsel that parts of the NHPD and the ASA files from the original prosecution were missing. The State and Horn's counsel could not stipulate that the file was complete. (Defs. Ex. H, *Habeas* Trial Tr., 16:11-17:23, Mar. 11, 2013). It stands to reason that subsequent efforts to find the complete file were unsuccessful. The likelihood that Cartoceti may have failed to return the records, as ASA Nicholson suggests (Pl.'s L. Civ. R. 56(a)(2) Statement in Opp'n to Defs.' ¶161, at 83), is as persuasive as the phone records being lost when the file was transferred post-conviction between parties and defense attorneys. In either event, the City's unsuccessful search in 2018 proves nothing.

---

[8] The inventory containing all the documents in the basement box that Adger removed from her desk in 2000 was reviewed by counsel and is consistent with her testimony. (Pl.'s L. Civ. R. 56(a)(2) Statement in Opp'n to Defs.' ¶¶181-191, at 91-94).

[9] Adger testified that she did not draw a connection between the phone records and the homicide, and she never considered the records "evidence" in the case. (Defs. Ex. 17, Adger Aff. ¶12).

b.  *Adger did not conceal that she issued search warrants for phone records and inventories. She filed them with the NHPD and the Court's Administrative Clerk.*

Plaintiffs only dispute with Adger's testimony that she filed the search warrants and inventories for phone records with the Administrative Clerk of Court is that the *order* of such filing procedure was not followed.[10] Plaintiffs miss the point (a reasonable jury will not). The importance of filing with the Clerk is that it constitutes evidence that the search warrants were filed on March 5, 1999. Plaintiffs do not dispute that the Clerk prepared and signed an index card acknowledging receipt on March 5, the day after Adger received the phone records, concerning the Horn/Jackson investigation. (*Id.* ¶¶166-169, at 85-87). Adger signed the receipt for the filing at the same time and an attached copy of the Search Warrant inventory which exists in the NHPD file. The fact of the filing, even if not in the proper order, belies the Plaintiffs' concealment theory.

c.  *The JD18 and evidence log are only filled out when a Detective files "evidence." The phone records were not evidence.*

Plaintiffs turn next to the fact that a JD18 inventory was not completed by Adger, and the phone records were not logged into the "evidence room with a completed Form 6." This argument is predicated on Plaintiffs' factual conclusion that the phone records were "evidence." As detailed below, Adger, in good faith, believed the records did not constitute evidence because she did not find a direct connection with the Deli robbery. Pl.'s L. Civ. R. 56(a)(2) Statement in Opp'n to Defs.' ¶176, at 90). It was, therefore, appropriate to file the phone records in the Records Room, whether they were obtained by search warrant or otherwise. (Pl.'s Ex. 13, Cain Dep. 120:17-121:19, Dec. 9, 2019).

Plaintiffs' theory that Adger conspired to withhold the records to "frame two innocent men" is undermined by the fact that the phone records of two individuals *were* filed. They argue that Adger selectively filed the records because she determined they were irrelevant. However, Plaintiffs' theory is undercut because *all* of the investigated phone numbers at issue here for each individual were provided to the prosecution and defense in the police reports and through the filed search warrants, which listed the phone numbers. (Pl.'s L. Civ. R. 56(a)(2) Statement in Opp'n to Defs.' ¶165, at 85). Plaintiffs fail to answer the fundamental question: If Adger intended to hide

---

[10] Plaintiffs' argument concerning the September 17, 2014 date stamp on the Search Warrant Inventory signed on March 4, 1999 and *confirmed* by the Courts' administrative assistant on March 5, 1999 is a red herring. No witness, including the Administrative Clerk, has explained why the inventory was stamped in 2014. (Pl.'s Ex. 20, Thigpen Dep. 53:11-14, Oct. 4, 2019). It could be that the Clerk simply delayed acting on it (Pl.'s Ex. 22, Griffin Dep. 156:7-14, Apr. 8, 2021) until after Horn's *Habeas* hearing. This is more likely than Jackson's wild speculation that Dease surreptitiously filed it in 2014. (Pl.'s Consolidated Resp. Opp'n to all Defs.' Mots. Summ. J. at 44). Neither speculative theory is admissible nor a basis to defeat summary judgment.

the phone records and then bring them to her home, why would she have filed records of phone numbers in the file and make them available to the defense? It is illogical that Adger would have filed some records, but hid others, as the filed records would naturally lead to questions concerning the whereabouts of the other records, as it ultimately did in 2018. If anything, that some of the records were located in the NHPD file is consistent with Plaintiffs' alternative theory that evidence at NHPD (records, tapes, and notes) were routinely lost.

There is simply too much information in the investigation file confirming the existence of the phone records that were provided and accessible to Plaintiffs and their criminal defense counsel to conclude that the Detectives engaged in a conspiracy to suppress all the records and frame Plaintiffs. Furthermore, the extent of the evidence of the existence of the phone records is such that Plaintiffs "knew or should have known the essential facts" permitting them to "take advantage of the evidence." *Unites States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982) (government was not required to disclose allegedly exculpatory grand jury testimony where the defendant "was on notice of the essential facts"); *See also, United States v. Gonzalez*, 110 F. 3d 936 (2d Cir. 1997).[11]

Recognizing that the testimony and undisputed facts do not support "intentional concealment," Plaintiffs alternatively concede Adger's testimony and instead suggest that "the NHPD lost the records" and "failed to disclose them after Adger deposited them in the NHPD records room." (Pl.'s Mem. in Opp'n to Defs.' Mots. Summ. J. at 41). Plaintiffs rely on the historical argument that because the NHPD lost evidence in the past, the phone records must have

---

[11] In *Gonzalez*, the court noted that when the state failed to turn over an audiotape of a police hearing that the criminal defendant believed was exculpatory, the evidence was arguably "not suppressed" since the criminal defendant "knew or should have known" of the evidence sought. The government had turned over other evidence that revealed who was involved in the hearing, and the criminal defendant failed to request that specific officer's tapes. The court reasoned that the other evidence put the criminal defendant on notice of the existence of the tapes, which was not requested. *Gonzalez*, 110 F. 3d at 944. Similarly, in *Scott v. Connolly*, 2013 U.S. Dist. LEXIS 184556, *26, the court held that although the prosecution did not produce a 911 recording, petitioner and counsel knew of the call, and thus, the evidence was not suppressed for *Brady* purposes. Here, like the evidence in *Gonzalez* and *Scott*, there was sufficient notice and Plaintiffs knew or should have known of the existence of the phone records.

also been lost. Plaintiffs' argument requires that a jury speculate on what happened to the records. Such speculation does not defeat summary judgment.

### 2. Adger's Working Copy of the Phone Records Do Not Inculpate the "Bridgeport Crew," Are Not Material, and Would Not Support a Third-Party Jury Instruction.

Plaintiffs incorrectly claim Defendants do not dispute that the phone records were favorable to their defense. (*Id*. at 85). Defendants argued, and reiterate here, that the 137 pages of phone records do not prove anything related to the Deli robbery; they are not material; and Plaintiffs' theoretical inferences drawn from the records are pure speculation.

### a. Adger's Review of the Phone Records in 1999 Proved Nothing.

Adger's review of the phone records must be understood in the context of the short period of time that she reviewed the records. Adger's review in 1999 lasted, at most, approximately two weeks - from February 24 (receipt of the first response) to March 10 (when Brown's identity was discovered).

The 137 pages of records contain approximately 1,700 phone calls (not counting duplicates). Due to the short timeframe, the volume of material, and because Adger was the only person reviewing the records, using a reverse phone directory, she did not complete her review. (Pl.'s L. Civ. R. 56(a)(2) Statement in Opp'n to Defs.' ¶¶174-175, at 89-90). Adger made markings on her working copy of the phone numbers she examined. There are only 261 markings next to the 1,700 phone calls, totaling a review of only 15.3% of the records. Adger explained, she did not complete her review. To the extent that she performed the review, she determined that there was no connection between the calls and the Deli robbery. (*Id*. ¶176, at 90).

Eventually, in 2018, the phone records were the subject of a review by a team of Federal Public Defenders. After more than 2,500 hours (63 weeks) they completed their investigation. (Pet'r's Mem. Providing Factual and Procedural Background in Adv. of Status Conf. at 16). This

18

exhaustive 2018 investigation, using present day internet technology cannot reasonably be compared to Adger's review in 1999.

Plaintiffs argue that the pager call two minutes before the 11:07 am call to the Chorozny home is particularly exculpatory. However, there is no evidence that Adger examined this pager call and associated it with the fourth phone call. She did not highlight or make notes next to the line item of the call or the pager number. (Defs. Ex. G, Phone Record, DET01553, Feb. 11, 1999). Adger could not hide what she did not see. The fact that Adger did not see or appreciate the timing of the calls and determine their relevance, does not support intentional concealment.

Even with the Federal Public Defenders' exhaustive examination in 2018, the phone records still do not provide sufficient evidence to establish a direct connection between the phone numbers and involvement in the homicide. Adger then, and the Plaintiffs now, can only conclude that the phone records revealed a pattern of calls between friends, relatives, and drug-dealing associates. The records are cumulative evidence to the police reports confirming that the individuals were connected. *United States v. Persico,* 645 F.3d 85, 111 (2d Cir. 2011). (Pl.'s L. Civ. R. 56(a)(2) Statement in Opp'n to Defs.' ¶193, at 94-95). The extent of their relationship was vetted at the *Habeas* hearings, and no evidence surfaced connecting them to the crime. (*Id*. ¶¶198-204, at 98-99).

Because of this, Adger did not consider the records evidence and she did not write a report about her review. (*Id*. ¶193, at 94-95). From her limited perspective, there was nothing to report. After Steve Brown confessed and implicated Horn and Jackson, Adger stopped reviewing the records. (*Id*. ¶¶174-175, at 89-90). At most, Plaintiffs can prove a less than thorough exam was performed by Adger. However, inadequate police work does not establish §1983 liability.

### b. Plaintiffs Fail to Establish that the Phone Records are Material and Support a Third-Party Culpability Instruction.

After two decades, two *Habeas* trials that included testimony from Sadler, Macklin, and Newkirk (the "Bridgeport Crew"), and more than two years of discovery in these cases, Plaintiffs have no direct evidence that the "Bridgeport Crew" committed the crime. They can only advance speculative theories concerning who may have possessed the stolen cellphone, who made the fourth phone call, and who committed the crime.

After all this time and discovery, Plaintiffs still cannot establish that there would have been a reasonable probability of a different outcome at trial had Plaintiffs received the five missing phone records. *Leka*, 257 F.3d at 104 (quoting *Kyles*, 514 U.S. at 434).[12] There also remains an insufficient bases to claim that the trial court would have permitted a third-party culpability instruction based on Plaintiffs' speculative theories. The trial court denied Plaintiffs' third-party culpability defense based on lack of evidence, and the Appellate Court affirmed. *Jackson v. Comm'r of Corr.*, 149 Conn. App. 681, 89 A.3d 426 (2014).

It remains undisputed that the substance of any conversation during the phone calls is unknown. (*Id.* ¶ 196, at 97). As Adger concluded, there remains no way to tie these phone calls to the planning or execution of the crime. Patrick Griffin, the New Haven State's Attorney that decided not to re-prosecute Plaintiffs, concluded that the phone records only established

---

[12] Plaintiffs cannot establish that the deprivation of the liberty was the "legally cognizable result of a government officer's misconduct." *Zahrey v. Coffey*, 221 F.3d 342, 349-351 (2d. Cir. 2000). The inquiry in a §1983 claim is "whether the conviction and incarceration were 'proximately (or legally) caused by the defendants' constitutional torts." *Higazy v. Templeton*, 505 F.3d 161, 175 (2d Cir. 2007) (quoting *Townes v. City of New York*, 176 F.3d 138, 146 (2d Cir. 1999)); See also, *Gierlinger v. Gleason*, 160 F.3d 858, 872 (2d Cir. 1998) (noting that in all §1983 cases, "the plaintiff must prove that the defendant's action was a proximate cause of the plaintiff's injury). When the underlying right can be established with less than "but for" causation, the § 1983 claim must still establish proximate cause. See *Townes*, 176 F.3d at 146; *See also, Drumgold v. Callahan*, 707 F.3d 28, 48 (1st Cir. 2013) (holding that the reasonable probability standard in a *Brady* claim is the standard for the underlying right, a §1983 claim requires a showing of a "stronger causal link than is inherent in the Brady materiality standard"). While *Brady* materiality only requires a reasonable probability of a different result, the §1983 claim requires a showing that "but for" the actions of the officers, the Plaintiffs would not have been deprived of their liberty.

connectivity among the callers, and that this falls short of probable cause or evidence implicating the "Bridgeport Crew" in the murder. (*Id.* ¶ 206, at 100).

Plaintiffs theorize that Newkirk and Macklin committed the crime with Brown. However, no witness has testified to this, including Brown, who has repeatedly and consistently testified that he committed the crime with Plaintiffs. At Plaintiffs' *Habeas* hearings, Newkirk and Macklin confirmed that they barely knew each other, and they unequivocally denied involvement with the Deli homicide. Their testimony is undisputed. (*Id.* ¶¶ 198-203, at 98-99). Plaintiffs' assertion that anyone other than Plaintiffs committed the crime with Brown is pure speculation.

Without evidence, Plaintiffs conclude that Sadler made the fourth phone call. (Pl.'s Mem. in Opp'n to Defs.' Mots. Summ. J. at 86). "Sadler's possession of an item stolen from the murder scene fewer than 36 hours after the murder is a direct connection between Sadler and the crime." However, there is no evidence of this. Plaintiffs also speculate that Newkirk received the fourth phone call. Again, nobody has testified to this, and Newkirk's *Habeas* testimony was dismissed by the Connecticut Supreme Court as unreliable. *Horn.*, 321 Conn. at 783, 138 A.3d 918.

During the Deli investigation, the Detectives went to Bridgeport and spoke to the "Bridgeport Crew". Each witness denied involvement in the crime. Plaintiffs' flippantly state that the Defendants should have "pressed" these witnesses for more information, insinuating that this would have netted incriminating evidence. This is naïve speculation. Plaintiffs admit that Sadler, like many witnesses in this case, lied to the Detectives, as would be expected of witnesses with long criminal histories. (Pl.'s Mem. in Opp'n to Defs.' Mots. Summ. J. at 88). There is no evidence that "pressing" these witnesses would have resulted in an admission of guilt.

After all this time, Plaintiffs offer no motive for the Bridgeport Crew to have committed the crime, other than financial gain, which they admit can be a motive for *any* crime. By this logic,

Sadler, Newkirk, and Macklin could be suspects in any crime in New Haven committed in early 1999. There remains no evidence as to how and why Sadler, Macklin, or Newkirk chose to rob the Deli. Plaintiffs claim that Sadler testified over a decade later that he had been in New Haven for work, but even if this were true (and it was learned over a decade after the crime), it merely reaffirms that Sadler lies. It does not establish that he was connected to the crime.

Plaintiffs' insinuation that the Bridgeport Crew committed the crime is speculative and falls short of probable cause. Jackson's criminal defense attorney retained an investigator to investigate the Bridgeport Crew, including Willie Sadler. However, the investigator did not develop sufficient evidence to connect Sadler to the Deli homicide. (Pl.'s L. Civ. R. 56(a)(2) Statement in Opp'n to Defs.' ¶195, at 96-97). In these cases, Plaintiffs asserted attorney-client privilege concerning Plaintiffs' investigator's investigation file, and thus, the details that the investigator learned is unknown. However, the fair inference is that the investigators did not learn any information inculpating the Bridgeport Crew. Yet, Plaintiffs assert that the Detectives just needed to "press" the Bridgeport Crew and their cover up would have unraveled. This is rank speculation. No witness has ever implicated Sadler, Macklin, or Newkirk with direct evidence. No witness, including the eyewitnesses to the crime, place them at the Deli. None of them have testified thus far the in current lawsuit, and Brown, who also has not testified in this litigation, has never implicated them.

Comparatively, the inculpatory evidence against Plaintiffs is overwhelming. To reach Plaintiffs' conclusion, Brown's, and Pallet's testimony, and all the remaining evidence that inculpates Plaintiffs, must be disregarded. Plaintiffs argue that additional impeachment evidence exists with respect to Brown's use of the cellphone on I-95. However, Plaintiffs' presentation of Brown's I-95 references to the first phone call would have merely presented another inconsistency

in Brown's testimony, which, despite other inconsistencies, the jury believed. This additional impeachment evidence of Brown is cumulative, and the jury was not required to reject all of Brown's testimony simply because parts of his testimony were not believed. In the end, Plaintiffs can do no better than raise the same inconsistencies and issues that were already emphasized by defense counsel at the criminal trial and rejected by the Connecticut Supreme Court.

## IV. DEFENDANTS DID NOT FABRICATE, COERCE AND FAIL TO DISCLOSE *BRADY* EVIDENCE. (COUNT II)

Plaintiffs rely on hindsight, revisionist history, and the sterility that not having to assess the evidence in real time affords, as the bases for their after-the-fact argument that Detectives fabricated and manipulated witnesses to convict Plaintiffs. However, this matter is not to be analyzed in hindsight. Rather, it must be examined as the Detectives investigated the Deli homicide in 1999. When the Deli investigation is examined through the contemporaneous lens of 1999, as Detectives attempted to interview witnesses and piece together the evidence at that time, the record shows that Detectives did not fabricate evidence and manipulate witnesses to convict Plaintiffs.

### 1. Steve Brown's Identification of Plaintiffs Was Not Fabricated.

Brown testified three times at Plaintiffs' criminal trial and at two *Habeas* hearings. It is undisputed that his testimony contained inconsistencies with other witnesses and contradicted his original transcribed statement given to the Detectives. However, most of these issues were vetted in cross-examination by four defense attorneys. Brown's identification of Plaintiffs as his accomplices remained certain. His account of the robbery was consistent with the victims', and each of the tiers of fact, a jury, a *Habeas* Judge, and the Connecticut Supreme Court found the identifications credible, reliable evidence of guilt. Plaintiffs now take these inconsistencies, without more, and speculate that they could have only been the result of fabrication. Plaintiffs' speculation cannot be the basis to deny summary judgment.

23

Plaintiffs cite in their facts the inconsistencies that form the basis of their fabrication argument. (Pl.'s Mem. in Opp'n to Defs.' Mots. Summ. J. at 28-34). Each of these points, however, were addressed in testimony and cross-examination at the criminal trial or at the *Habeas* hearings.

Plaintiffs "first and most important" inconsistency concerns "multiple civilian witnesses" who testified about Plaintiffs' whereabouts prior to the crime that was at odds with Brown's chronology. Each of these witnesses, Imar Robinson, Tesha Smith, Shamar Madden, Adrienne DeBarros, John Crenshaw, Kenneth Ransome, and Zaneta Berryman testified at the criminal trial and/or the *Habeas* hearings. Their testimony was disregarded by the respective triers of fact in favor of Brown's identification. Similarly, that Brown met Plaintiffs at the White Eagle Club;[13] the unfamiliar nicknames Brown used to refer to Plaintiffs; and the description of the car they drove that night (*Id*. at 30) were all raised during the criminal trial and subsequent judicial proceedings. Plaintiffs further reference that the victims described the robbers wearing black masks, and that Brown said he was wearing a scarf, is simply wrong. Victim, Howard Roberts stated the third robber wore a bandana around his face. The Plaintiffs do not dispute this. (Pl.'s L. Civ. R. 56(a)(2) Statement in Opp'n to Defs.' ¶27, at 11).

That Plaintiffs point to lies Brown made during his statement to the Detectives were also raised throughout the various cross-examinations of Brown. Dease, at the *Habeas* hearing and Adger at deposition, recognized and acknowledged certain lies and inconsistencies when they took Brown's statement. (Pl.'s Mem. in Opp'n to Defs.' Mots. Summ. J. at 30). However, the inconsistencies prove the statement was not fabricated. Why would experienced Detectives feed Brown information and fabricate a story that contradicted facts they knew existed and would likely

---

[13] In Brown's statement to the Detectives, Brown said he met Plaintiffs weeks before the robbery at the White Eagle Club. Brown could not name the club they met at prior to the robbery. (Pl.'s Ex. 55, Brown's Statement 5-6, NH000108-109, Mar. 10, 1999).

be used to discredit Brown? On the contrary, they permitted Brown to make his statement as Brown saw fit, inconsistencies notwithstanding.

Further, Brown admitted at the criminal trial that he lied to the Detectives. His statement to the Detectives on March 10, 1999, minimized his involvement, e.g., that he was unarmed during the robbery and forced at gunpoint to participate. (Pl.'s L. Civ. R. 56(a)(2) Statement in Opp'n to Defs.' ¶114(a)-(s), at 55-63). When Brown was presented as a witness at trial, Brown admitted to many more inculpatory activities, e.g., knowing about the robbery, waiting outside the Deli before the robbery, detailing the taxi with two black males, and handling a gun throughout. (*Id*. ¶125(a)-(n), at 66-69). The trial testimony was more detailed and sealed Brown's complicity in the crime. The new details were also more consistent with the victim's recall of the crime, as well as Pallet's testimony. Applying Plaintiffs' methodology of speculating about inconsistencies as proof of fabrication, what prevents the conclusion that the prosecutor fed Brown the additional incriminating testimony? Neither assumption makes sense nor is it a basis to deny summary judgment.

In a desperate attempt to support their speculation about fabrication, Plaintiffs point to Breland's testimony, denying knowledge about Brown and the Plaintiffs as though Breland "admitted" that Brown's "tale was a fraud." (Pl.'s Mem. in Opp'n to Defs.' Mots. Summ. J. at 31-32). This disingenuous effort fails in the face of the fact that Breland's work on this case terminated before Brown was arrested – a fact Plaintiffs do not dispute. (Pl.'s L. Civ. R. 56(a)(2) Statement in Opp'n to Defs.' ¶128, at 70).

The stolen cellphone's location evidence that was discovered in 2018, further undermined Browns' testimony, but this was unknown to the Detectives, the prosecutor, and defense attorneys in the investigation, the criminal trial, and *Habeas* hearings. However, a critical issue related to

the credibility of Brown's statement was his location when made the first phone call (on I-95). This issue was challenged each time Brown testified. (Defs. Ex. D, Crim. Trial. Tr., 71:11-72:16, Apr. 17, 2000); (Defs. Ex. I, *Habeas* Crim. Trial Tr., 18:17-19:11, Mar. 14, 2013). The newly discovered evidence creates additional and cumulative impeachment regarding where calls with the stolen phone were made. However, it does not disturb Brown's identification of Plaintiffs as his co-perpetrators, that to this day, ASA Nicholson has confirmed was 100% certain and not the result of fabrication. (Pl.'s Ex. 21, Nicholson Dep. 272:14-276:21, Feb. 5, 2020).

### 2. Crystal Sykes' Statement That Marcus Pearson May Have Called Her Was Not Fabricated and Was Not Material to Plaintiffs' Convictions.

Like Brown, Plaintiffs fail to establish admissible evidence that Defendants knowingly fabricated Sykes' statement that Pearson called her. Rather, based on their interview of Sykes and all the facts that they understood at the time, it was reasonable for the Detectives to have understood that Pearson probably called Sykes with the stolen cellphone.

Sykes told the Detectives there was a "good possibility" that Pearson had called her. (Defs.' L. Civ. R. 56(a)(1) Statement ¶¶83-84, at 18-19). This is consistent with additional information she provided: that Sykes had known Pearson for months; he was her drug dealer; and he had been calling her recently regarding an invitation to her birthday party. Notwithstanding, Sykes expressed the difficulty she had remembering who called her. However, Sykes never told the Detectives that someone other than Pearson called her. Based on this, Defendants documented Sykes' responses to their pre-interview questions in a taped statement. Her transcribed statement, which was provided to the prosecutor and Plaintiffs' defense counsel, documented all Sykes said – including her equivocation and the facts about the call. Dease then repeated that it was a "good possibility" Pearson called her, restating what Sykes had said during her pre-interview, and Sykes replied, "Yes." (*Id*. ¶¶84, 86, at 19).

At Plaintiffs' criminal trial, Pearson described his initial equivocation that he at first did not remember the call, but he confirmed Sykes called him. He testified that after the Detectives interviewed him, Pearson called Sykes, and she confirmed that he had called her at the date and time of the fourth phone call. (Defs.' L. Civ. R. 56(a)(2) Statement in Opp'n to Pl.'s ¶10, at 3-4). This fact that Pearson disclosed for the first time at the criminal trial, further confirms the Detectives' justifiable reliance on what they were told.

Plaintiffs point to exculpatory portions of Sykes' statement as proof that the Detectives fabricated Sykes' statement. However, these exculpatory comments have always been obvious in her statement and were fully disclosed. They were not concealed. The fact that Dease used Sykes' words from the pre-interview, "a good possibility," in the recorded statement, does not discredit her acknowledgement. She readily confirmed it was a "good possibility."

The exculpatory evidence in Sykes' statement undermines Plaintiffs' claim that the Detectives framed Plaintiffs. "Dirty", "crooked" cops do not disclose statements with exculpatory equivocal evidence as seen in Sykes' statement. Plaintiffs produced no affirmative evidence that Defendants put words in Sykes' mouth. The statement shows that she was free to respond to the questions as she chose. There is no evidence that Defendants attempted to embellish Sykes' statement to be more inculpatory than what is included in the transcript. Any ambiguity in her statement was laid bare.

Plaintiffs' theory that Sykes' statement was fabricated was tested at the *Habeas* hearings over a decade later. Those hearings produced no evidence that Defendants mistreated Sykes or coerced her statement and testimony. Sykes vacillated concerning receipt of the fourth call. Nevertheless, she confirmed that Pearson may have called her. As a matter of law, Sykes' statement was voluntary and not fabricated. The Connecticut Supreme Court noted, that "Sykes'

27

testimony on the issue of whether she had received the fourth call from Pearson was hopelessly unclear". *Horn.*, 321 Conn. at 783, 138 A.3d 918. Importantly, however, at the hearings, Sykes confirmed that the transcribed statement she gave the Detectives was true. (Defs.' L. Civ. R. 56(a)(1) Statement ¶86, at 19). Similarly, Defendants reasonably relied on information obtained from Sykes and they proceeded to interview Pearson about the fourth call. Despite the lack of clarity throughout the *Habeas* hearing process, no evidence was ever presented that her transcribed statement was fabricated, and none is cited by Plaintiffs.

Sykes did not testify at the criminal trial. Because of this, Sykes' statement was not material and not causative to Plaintiffs' convictions.[14] There is no evidence that the Detectives knew what Sykes told them was not true. Plaintiffs' assertion in this regard is speculative, as even Sykes ultimately admitted that she told the Detectives the truth.[15]

### 3. Pearson's Statement Was Not Fabricated, He Was Not Coerced in Violation of the Constitution, and the Detectives Did Not Fail to Disclose *Brady* Material Related to Pearson's Interview.

To support their fabrication claim, Plaintiffs further rely on the recantation and accusations of Marcus Pearson, a convicted felon and drug dealer, who was on adult probation in 1999 when the Deli murder was investigated. Throughout his life, Pearson has had many encounters with law enforcement and the criminal justice system. (Defs. Ex. H, *Habeas* Crim. Trial Tr., 100: 5-21, Mar. 11, 2013). When he was interviewed in the Deli investigation, he had already been engaged in

---

[14]  In *Zahrey v. Coffey*, the Second Circuit held that "the manufacture of false evidence 'in and of itself' . . . does not impair anyone's liberty, and therefore does not impair anyone's constitutional right . . . the deprivation of liberty which [plaintiff] complains [must] be shown to be the result of [the defendant's] fabrication of evidence." 221 F.3d 342, 348 (2d Cir. 2000). The court then went on to cite the following case illustrations: *Buckley v. Fitzsimmons*, 20 F.3d 789, 795 (7th Cir. 1994) ("*Buckley IV*") (if prosecutor tortured witness to obtain statement implicating defendant and put statement "in a drawer, or framed it and hung it on the wall *but took no other step*," no constitutional right of defendant would be violated) (emphasis in original); *Landrigan v. City of Warwick*, 628 F.2d 736, 744 (1st Cir. 1980) ("We do not see how the existence of a false police report, sitting in a drawer in a police station, by itself deprives a person of a right secured by the Constitution and laws.").

[15]  Plaintiffs cite to general propositions presented by experts about what a police offer should not do in an interview, e.g., intentionally mischaracterize evidence, and Defendants' experts even agreed that this type of conduct should not occur. However, agreeing that something should not occur, does not make it fact and that is not what happened here.

criminal activity for a decade. Pearson subsequently spent a significant portion of his adult life in prison. (Pl.'s L. Civ. R. 56(a)(2) Statement in Opp'n to the Defs.' ¶¶216-217, at 104). The record supports that Pearson should not be believed and Plaintiffs' claim, which relies on his testimony, should be summarily dismissed.[16]

### a. The Detectives Did Not Fabricate Pearson's Admission That He Used the Stolen Cellphone.

We now know, through a greater appreciation of cellular technology, that Pearson did not make the fourth phone call from his porch in New Haven. This, however, does not compel the conclusion that the Detectives knowingly fabricated and coerced Pearson's admission. Rather, the totality of the evidence, as understood contemporaneously when received by the Detectives during the investigation, reveals that Pearson's statement was not fabricated and coerced. Accordingly, subsequent revelations unknown to the Detectives during the investigation are not relevant here.

Prior to Detective Dease and Breland's February 3 interview with Pearson, Detective Breland interviewed him on January 26 concerning Pearson's activities on the morning of the robbery. During that interview, Pearson described his visit to the Deli just before the crime. Pearson referenced a conversation he had outside the Deli with a person, but he claimed he did not recall who he talked to or what was discussed. (*Id.* ¶88, at 32; Defs.' L. Civ. R. 56(a)(2) Statement in Opp'n to Pl.'s ¶15, at 5).

After speaking to Pearson on January 26, the Detectives interviewed Saliem Al-Dubai, who was at the Deli when the conversation occurred. Al-Dubai witnessed the conversation, and he identified Horn as the person Pearson spoke to. (*Id.* ¶15, at 5). Because of this, the Detectives knew that Pearson was not truthful about his conversation with Horn and what he knew with respect to

---

[16] Many of the arguments included in this Section regarding Pearson, and Section D below, regarding Thompson, are taken from the Detectives' Response to Plaintiffs' Partial Cross-Motion for Summary Judgment.

events surrounding the crime. They reinterviewed Pearson on January 28 to question him about his lie. (*Id*. ¶7, at 3).

The Detectives interviewed Zaneta Berryman on January 26 and learned that Pearson and Horn were drug dealers, (Defs.' L. Civ. R. 56(a)(1) Statement¶¶216-217, at 44) and that Zaneta, Pearson's girlfriend, was also at the Deli with Plaintiffs before the crime. However, when Horn was at the Deli with Zaneta, he did not tell Pearson she was with him when Horn and Pearson spoke outside the Deli. Horn told Detectives he had sex with Zaneta at Jackson's apartment, before Horn walked Zaneta back to the Deli so she could meet Pearson. Pearson also told Detectives that Horn told him he had sex with his girlfriend, which Zaneta unequivocally denied. The Detectives also learned that when Zaneta was talking to Pearson on the phone before walking to the Deli after the crime, Horn took the phone and hung up on Pearson. (Pl.'s L. Civ. R. 56(a)(2) Statement in Opp'n to the Defs.' ¶¶48-51, at 18-19).

On February 2, the Detectives received the call detail record from the cellphone that was stolen from the Deli. Their investigation into the calls on the call detail record led them to Sykes, who worked at the home that received the fourth call. During their interview with Sykes, she revealed that there was a "good possibility" that Pearson called her. The Detectives also learned that Pearson sold drugs to Sykes, and he had been calling her to ask for an invitation to her birthday party. (*Id*. ¶¶74, 81-82, at 25, 28). Thus, after speaking to Sykes, the Detectives understood that Pearson was Horn's friend, he lied about talking to Horn at the Deli just moments before the crime, and that Pearson probably called Sykes from the stolen phone. (Defs.' L. Civ. R.56(a)(2) Statement in Opp'n to Pl.'s ¶15, at 5).

With this background information, on February 3, Detectives Dease and Breland visited Pearson at his home (not the police station) to inquire about the fourth phone call. (*Id*. ¶¶1-6, 1-3).

At first, Pearson was "very reluctant" to admit that he used the cellphone, but Detectives got him to calm down and told him that Sykes stated that Pearson may have been the person who called her at the time of the fourth phone call. (*Id*. ¶10, at 3-4). The Detectives also explained that if this were true, Pearson either got the phone in the robbery or someone gave it to him. (Pl.'s L. Civ. R. 56(a)(2) Statement in Opp'n to the Defs.' ¶98, at 39).

Pearson then told the Detectives that Horn gave him the phone, and he called Sykes. The call occurred on Pearson's porch in the presence of Horn and his cousin "Yogi." Pearson said his mother also arrived home while they were on the porch. (*Id.* ¶95, Pg. 38). Pearson added that he was upset about Horn having sex with Pearson's girlfriend the night before, and he wanted to call Sykes in front of Horn to show him that he had another girlfriend. (Defs.' Ex. 56 Pearson Statement 3:5-6:13, Feb. 3, 1999; Pl.'s L. Civ. R. 56(a)(2) Statement in Opp'n to the Defs.' ¶91, at 33). Pearson also said that he had been calling Sykes to get an invitation to her birthday party. The Detectives reasonably believed Pearson. Dease eventually asked Pearson why he had been reluctant to identify Horn and Pearson said that he did not want to "rat anyone out". (Defs.' L. Civ. R.56(a)(2) Statement in Opp'n to Pl.'s ¶10, at 3-4). Detectives followed up by interviewing "Yogi," (Sholanda Jenkins), and Pearson's mother, and they confirmed that Pearson was on the porch with Horn. (Pl.'s L. Civ. R. 56(a)(2) Statement in Opp'n to the Defs.' ¶96, at 38; Defs. Ex. 48, Dease Report 4, NH000009, Feb. 5, 1999; Defs. Ex. 59, Dease Report 1, NH000076, Feb. 10, 1999).

Plaintiffs fail to appreciate how, through proper policing, the Detectives reasonably accepted and relied on Pearson's admission. The facts explained above were not fabricated or coerced. They were reasonably and properly obtained by the Detectives, and they drew reasonable inferences from them based on what was understood at the time of the investigation.

Plaintiffs also fail to appreciate the real-world challenges associated with interviewing Pearson and the other witnesses in this case, and why the Detectives reasonably believed Pearson when he told them that he called Sykes. Simply put, Pearson's admission to receiving the fourth phone call, did not result from fabrication or coercion, but rather as a result of Pearson's desire to blame Horn and deflect blame from himself. None of this required unconstitutional fabrication and coercion. Given the totality of the evidence and circumstances, Defendants reasonably believed and accepted that Pearson called Sykes.

### b.  Defendants Did Not Coerce Pearson's Admission That He Made the Fourth Phone Call.

Plaintiffs fail to establish that the Detectives conduct was "so offensive to a civilized system of justice that they must be condemned." *Colorado v. Connelly*, 479 U.S. 157, 163, 107 S. Ct. 515, 519 (1986). That is, nothing the Detectives did overcame Pearson's will to resist. *United States v. Guarno*, 819 F.2d 28, 30 (2d Cir. 1987). The totality of the circumstances does not support Pearson's after-the-fact claim that his statement was coerced. Rather, the facts support that at the time of the investigation, Pearson was a drug-dealing, convicted felon, whose admission to making the fourth phone call was a self-serving means to deflect blame away from himself and onto Horn, who had sex with his girlfriend.

Pearson's self-serving recantation was an excuse for his lies to the Detectives. Pearson only recanted after he spoke to Jackson while they were in prison. Meeting Jackson was enough motivation for the recantation. (Defs.' L. Civ. R.56(a)(1) Statement ¶¶224-225, at 46). An investigator retained by Plaintiff Jackson then visited Pearson, and he signed an affidavit recanting his statement and trial testimony. (*Id*. ¶¶225-226, at 46-47). Pearson's explanations for his after-the-fact recantation are self-serving and do not substantiate his current claim of coercion. Blaming the Detectives was merely a convenient way to shift blame away from his own lies.

The prosecutors, like the Detectives, understood Pearson's possible motives, and they too reasonably believed that Pearson told the truth. For this reason, prosecutors called Pearson at trial to testify that he made the fourth phone call.

The facts also support that Detectives' interviews of Pearson were proper and not "so offensive to a civilized system of justice that they must be condemned." Pearson's will was not overcome. Pearson had a decade of experience of dealing with law enforcement, the criminal justice system, and police questioning. He was not a wilting flower.

None of the objective "hallmarks" of a coercive interview are present. Nothing from the interviews stands out as compelling the conclusion that Pearson's testimony resulted from coercion. The interviews were short and during normal hours. Pearson has not complained of the length of the interviews, nor has this been alleged. *See e.g., Guarno*, 819 F.2d at 31 (upholding finding that confession was voluntary when interview lasted approximately two and a half hour); *United States ex rel. Stanbridge v. Zelker*, 514 F.2d 45, 51 (2d Cir. 1975) (finding confession voluntary when interrogation lasted seven or eight hours)*, overruled on other grounds by Cruz v. New York*, 481 U.S. 186, 107 S. Ct. 1714 (1978); *United States ex rel. Coleman v. Mancusi*, 423 F.2d 985, 986-87 (2d Cir. 1970) (upholding on *Habeas* review a finding that confession was voluntary after six-hour interrogation).

Many of the interviews were conducted at his house. (Pl.'s L. Civ. R. 56(a)(2) Statement in Opp'n to Defs.' ¶227, at 109) The February 3 interview was conducted at Pearson's home. Pearson's mother was present at the February 5 interview at the house. His mother went to the station with Pearson on February 9, when they both identified "Yogi" as being present on the

porch.[17] Presumably, Pearson and his mother left the police station together. Pearson's mother testified at the criminal trial about the meeting on the porch. She never claimed that her son was coerced or threatened. Plaintiffs produce no evidence from the mother that corroborates the coercion Pearson describes.

There is no evidence that Pearson was physically harmed or threatened. He was not screamed at, placed in isolation, handcuffed, deprived of food, water, use of the bathroom or other creature comforts. Pearson never asked to stop the interview. He now claims he felt intimidated by the size of the interview room at the police station, but there is no evidence that the room where he was questioned was unreasonably small or any different than interview rooms where police typically interview witnesses.

Pearson was not psychologically overcome as he now conveniently claims. The Second Circuit has recognized that "a mere deception by an interrogator, *ipso facto*, does not invalidate a confession absent other compelling circumstances." Pearson first made the accusations of coercion years after he testified consistently with his statement at Plaintiffs' criminal trial. (Defs.' L. Civ. R. 56(a)(1) Statement ¶¶224-226, at 46-47).[18]

Given the totality of the circumstances, Pearson was not coerced. Pearson's statement was his own choice, and it was reasonable for the Detectives to believe Pearson. He had a score to settle with Horn, and he had to explain away the phone call Sykes said he made. He was a drug-dealing criminal and he looked to save himself rather than tell the truth.

---

[17] Plaintiffs do not claim that "Yogi" was coerced and threatened. Plaintiffs' claim that Pearson's statement was fabricated is undercut by Yogi's and his mother's presence on the porch. If the Detectives coerced Pearson to state that he made the phone call, the Detectives would have had to be certain that Yogi would concur. If they knowingly fabricated evidence, they would have also understood that they would then have had to also manipulate Yogi and his mother. Instead, Yogi contradicted Pearson's account of the phone being used on the porch when she said she did not see the phone. There is no evidence that the Detectives attempted to coerce Yogi or fabricate her statement. The same applies to Pearson's mother, who was also on the porch when the alleged phone call was made.

[18] Ironically, Pearson's jailhouse recantation was obtained by an unrecorded pre-interview and no notes or recordings exist from the meeting. Clearly, however, this potentially suggestive interview paved the way for Pearson's future testimony.

### c. Pearson's Denial That He Did Not Make the Fourth Phone Call Was Not Material.

"Materiality is assessed in light of the evidence adduced against the defendant at trial; when a conviction is supported by overwhelming evidence of guilt, ... relief is not warranted. *Cannistraci v. Kirsopp*, 2012 U.S. Dist. Lexis 68399, *43 (N.D.N.Y. 2012) (quoting *Leka v. Portuondo*, 257 F. 3d 89, 104 (2d Cir. 2001)); *see also*, *Chambers v. United States*, 2021 U.S. Dist LEXIS 222099, * 11-12 (S.D.N.Y. 2021); *Hernandez v. Larkin*, 2013 U.S. Dist. LEXIS 118937, * 48-49 (S.D.N.Y. 2013) (noting that *Brady* materiality is assessed in light of the totality of evidence related to the conviction).

Plaintiffs conclude that Pearson's denials were never disclosed. On the contrary, the Detectives disclosed that Pearson was "very reluctant" to say he made the phone calls to Sykes. (Defs.' L. Civ. R. 56(a)(2) Statement in Opp'n to Pl.'s¶23, at 9). Synonymously, the Detectives meant that Pearson was "disinclined" to admit the call, and this was sufficient to describe Pearson's denial. These references were in Dease's report and Plaintiffs' arrest warrants, which were available to the prosecutor and defense counsel. (*Id*. ¶10, at 3-4)

Additionally, at Plaintiffs' criminal trial, Pearson admitted on cross-examination that when the Detectives interviewed him, he initially did not remember calling Sykes, and he did not know what the Detectives were talking about, but he resolved his doubts by calling Sykes after the interview and she confirmed that he called her. Pearson never told the police this.[19] Pearson made this up to support his lie. (*Id*. ¶10, at 3-4). Pearson's response - that he did not know what the

---

[19]  Plaintiffs could have called Sykes as a witness at trial, but they did not. The purpose of *Brady* is not to provide a defendant with complete disclosure of all evidence in the government's file which might conceivably assist him in the preparation of his defense, but to assure him that it will not be denied access to exculpatory evidence known to the government, but unknown to him. *United States v. Ruggiero*, 472 F.2d 599 (2d Cir. 1973).

Detectives were talking about – is the equivalent of a denial. Thus, at trial, defense counsel and the jury were informed that Pearson initially denied making the call.

At the criminal trial, Pearson also testified to similar coercion allegations that Plaintiffs advance here. Plaintiffs' defense counsel utilized this testimony, and it was considered by the jury. Pearson testified that (1) the Detectives interviewed him three times about the stolen phone, and they were harassing him (Defs. Ex.12, Crim. Trial Tr., 221:7-11, 222:19-21, Apr. 4, 2000; Defs. Ex. 110, Crim. Trial Tr., 31:21-27, 95:16-18, Apr. 5, 2000); (2) Pearson went to the police station with his mother because he was tired of the questioning (Defs. Ex 12, Crim. Trial Tr., 206:12-27, Apr. 4, 2000); (3) when police began questioning Pearson about the stolen cell phone, he thought he was a suspect (Defs. Ex. 110, Crim. Trial Tr., 10:26-11:6, 23:8-16, Apr. 5, 2000); (4) Pearson did not remember calling Sykes until police showed him the records from the stolen phone (*Id*. at 23:17-25:5); and (5) Pearson further testified, "They [police] made it clear – they made it clear that I used the cell phone. They made it clear that the numbers on here is identification of my porch and they made it clear that he [Horn] was there that – while I knew he was there that morning, I was talking to him. They told me if I didn't get a phone from him, I took it from the scene which I didn't take it from the scene, sir." (*Id*. at 74:15-22; Pl.'s L. Civ. R. 56(a)(2) Statement in Opp'n to Defs. ¶223, at 105-108).

Accordingly, even if Pearson's denials are determined to be material, his testimony was a belated *Brady* disclosure at trial. If *Brady* evidence is available during trial and a defendant is able to effectively use it, there is no prejudice – and thus there is no *Brady* violation. *See e.g., United States v. Barnes*, 604 F.2d 121, 150 (2d Cir. 1979) (finding no Brady violation where material was given to defense counsel at the end of a witness's testimony because the defendant could have

recalled the witness for further cross-examination and did in fact use the material to question another witness on the issue to which material was relevant).

### d. Consistent with the Connecticut Supreme Court Review, Pearson's Recantation Testimony Was Not Material *Brady* Evidence.

Plaintiffs oversell the significance of Pearson's testimony in the criminal trial, especially in light of the Connecticut Supreme Court's rejection of Pearson's recantation. At Horn's *Habeas* hearing, Pearson presented the same components of coercion that Plaintiffs rely on in their Response brief. (Pl.'s L. Civ. R. 56(a)(2) Statement in Opp'n to Defs.' ¶231(a)-(j), at 110-111). Notwithstanding, the Court concluded that Pearson's recantation testimony at the *Habeas* trial simply "cast additional doubt on what was already . . . an 'implausible scenario'". *Horn v. Comm'r of Corr.*, 321 Conn. 767, 787 (2016). The Court concluded that Pearson's recantation would not have created a reasonable probability that the verdict would have been different. *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017); *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985); *Kyles v. Whitley*, 514 U.S. 419, 433, 115 S. Ct. 1555, 1566 (1995).[20]

The Court further questioned the materiality of Pearson's testimony, noting, "where the new evidence merely furnishes an additional basis on which to challenge previously admitted evidence, the credibility of which was already been shown to be questionable . . . the new evidence may properly be viewed as cumulative, and hence not material and not worthy of a new trial." *Id*. (*citing United States v. Persico,* 645 F.3d 85, 11(2d. Cir. 2011); *See also, United States v. Amiel*, 95 F.3d 135, 145 (2d Cir. 1996) (rejecting *Brady* challenge where defense counsel already impeached witness with "lies previously told under oath"). Likewise, had the Court examined the

---

[20] Defendants do not cite the Connecticut Supreme Court opinion for collateral estoppel purposes, but rather, to illustrate that a Court of review examined the vast majority of evidence before this Court and found that Plaintiffs' argument in their Cross-Motion for Summary Judgment were already deemed immaterial. Failure to disclose such evidence cannot be *Brady* violations.

Detectives' questioning of Pearson and his testimony at the criminal trial, it would have concluded the additional threats and coercion were not material.

Pearson's initial denial (and alleged fabrication) also does not discredit the abundance of inculpatory evidence that convicted Plaintiffs. *Id.* 782-3. At most, Pearson's denial would have provided additional cumulative impeachment, which would have been inconsequential compared to the inculpatory evidence that convicted Plaintiffs. Impeachment evidence has been found to be exculpatory *Brady* material when it is ***the only evidence*** linking the defendant to the crime, or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case. *See e.g., Smith v. Cain*, 565 U.S. 73, 76, 132 S. Ct. 627, 630 (2012) (Evidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict) (emphasis added); *McNeill v. Bagley*, 10 F.4th 588; 2021 U.S. App. LEXIS 24953; 2021 FED App. 0189P (6th Cir.) (Court held that *Brady* violation did not exist when additional inculpatory evidence existed). However, Pearson's claim that he obtained the stolen phone from Horn and used it to call Sykes contradicted ***only one of the*** connections between Horn and the Deli robbery. With this axiom of law in mind, the Connecticut Supreme Court added:

> We further note that the evidence that the petitioner had possession of the stolen cell phone was not the only evidence presented at the criminal trial that connected him to the crimes. Accordingly, even if we were to assume that there is a reasonable probability that the new evidence could have persuaded the jury at the criminal trial that the petitioner was not in possession of the cell phone, there still would have been sufficient evidence to convict him.

> *Horn v. Comm'r of Corr.*, 321 Conn. 767, 788 (2016)

Contrary to Plaintiffs' selective quotes from the prosecutor's closing (Pl.'s Mem. Supp. Partial Cross-mot. Summ. J. at 13), the argument in its entirety proves the Pearson testimony was not a "smoking gun." The prosecutor presented the jury with the totality of the evidence and the

primary focus was Brown's and Pallet's testimony. Of the 1,457 lines of closing argument text, only 5.3% was spent on Pearson. His name was mentioned 10 times in comparison to Brown (46 times) and Pallet (38 times). (Defs.' L. Civ. R. 56(a)(2) Statement in Opp'n to Pl.'s ¶18, at 6-8).[21]

Citing Brown's identification of Plaintiffs as his co-assailants, Shaquan Pallet's identification, Plaintiffs' presence at the Deli, and other unrefuted incriminating evidence, the Connecticut Supreme Court agreed.[22] Pearson's recantation also does not create an alibi for Plaintiffs. Certainly, a civil jury could find that the inculpatory evidence that convicted Plaintiffs minimizes any impeachment value that Pearson's coercion claims would have had on the criminal verdict.

Put another way, even if the jury had heard Pearson's coercion claims, more than ample evidence existed to convict him. 321 Conn. 767, 788, 138 A.3d 908, 920 (2016). *See also, Smith*

---

[21] All references to "Pearson", the "cellphone" and "Brown" are found within ASA Nicholson's closing arguments found within Pl. Ex. 31 at the following cites:

**Brown:** 36;8, 36;9, 43;18, 43;20, 46;13, 46;24, 47;1, 48;15, 48;27, 49;5, 117;5, 117;8, 117;16, 117;24, 117;26, 118;1, 118;7, 118;15, 118;18, 120;4, 121;21, 126;5, 127;23, 129;10, 132;7, 132;17, 133;20, 134;3, 134;9, 134;15, 134;17, 134;18, 135;4, 135;25, 135;27, 136;6, 136; 12, 136;18, 136;21, 137;10, 137;13, 138;2, 139;18, 139;22, 140;27, 141;1

**Pallet:** 25;10, 25;14, 29;17, 30;8, 30;10, 30;12, 32;6, 32;9, 32;14, 32;15, 32;17, 32;22, 32;23, 118;7, 120;3, 121;20, 129;10, 132;4, 135;6, 135;11, 135;27, 136;7, 136;13, 136;15, 136;20, 137;10, 137;13, 138;1, 138;9, 138;11, 138;22, 138;25, 139;2, 139;4, 139;9, 139;18, 139;21, 141;2

**Pearson:** 120;1, 120;6, 120;14, 128;1, 128;5, 128;17, 129;24, 129;27, 140;22, 141;5

**Cellphone:** 44;1, 117;6, 117;9, 117;10, 117;11, 117;13, 117;14, 120;9, 120;15, 140;5, 140;20, 140;23, 141;3, 141;8, 142;11

[22] The following inculpatory evidence was introduced at trial: 1)The witnesses' physical description of the offenders matched the size and weight of Horn and Jackson; 2) Horn and Jackson were at the crime scene moments before the crime, and Horn was present at the scene moments after the crime; 3) Horn and Jackson did not have airtight alibis accounting of where they were and who they were with at the time of the crime; 4) Jackson's alibi witness, Teisha Smith, stated that Jackson was with her when the crime was committed. However, Jackson was not with Smith when the crime occurred, and he acknowledges he did not arrive at Smith's house until well after the crime had been committed; 5) Horn's alibi witness, Zaneta Berryman, testified that Horn left Jackson's apartment building for 10-20 minutes at the time the crime occurred, and Horn had removed the Avirex jacket he had been wearing and returned wearing a black hoodie, similar to the clothing that witnesses testified the perpetrators wore; 6) Assuming Horn was with Berryman, the close proximity of Jackson's apartment to the Deli, allowed Horn to leave Jackson's apartment, commit the crime, and return in minutes; 7) Abbey Yousif did not see Horn and Jackson on the date of the murder, yet, Horn claims he had a conversation with him (knowing Yousif was one of the victims of the shooting); 8) The crime took less than five minutes. Based on the expediency of the perpetrators' actions, they must have known the layout of the store and that there was a back room where money may be kept. Based on frequent visits to the store, Horn and Jackson had this knowledge; 9) Horn knew shotguns were kept behind the store counter, which is why upon entering the store, he immediately started shooting toward the counter (Defs.' L. Civ. R. Rule 56(a)(1) Statement ¶¶ 18, 20, at 5); 10) Horn admitted he possessed an automatic handgun and showed it to a witness a month before the crime; 11) Brown unequivocally identified Horn and Jackson as his accomplices. Brown accurately described the jacket Horn was wearing, the car he claims he, Horn and Jackson were in, and robbery-related facts that confirmed witness accounts; 12) Brown testified at the criminal trial and Horn and Jackson's *Habeas* hearing that he committed the crime with Horn and Jackson. Brown has never recanted; 13) Shaquan Pallet, who accompanied the shooting victim into the Deli, identified Horn and Jackson as two of the three individuals outside the Deli pulling masks down over their faces seconds before the robbery.

*v. Cain,* 565 U.S. 73, 76, 132 S. Ct. 627, 630 (2012) (Evidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict.); *McNeill v. Bagley*, 10 F.4th 588, 603 (6th Cir. 2021) (quoting *Hutchinson v. Bell*, 303 F. 3d 720, 743 (6th Cir. 2002)). The fact that the initial denial is limited to impeachment purposes mitigates its exculpatory impact. See *Bagley*, 10 F.4th 5 at 603 (quoting *Hutchinson*, 303 F. 3d at 743). Other corroborating evidence undermined the impeachment value of the withheld initial statement. *Id*. This wealth of other evidence on which the jury could have relied, in addition to the fact that Pearson recanted on his initial denial before trial is strong enough evidence to sustain confidence in the verdict. *Id.*

4.  **Kendall Thompson's Testimony Was Not Fabricated, and the Detectives Did Not Violate *Brady*.**

    a.  **Kendall Thompson's Denial That He Could Not Identify the Masked Assailants is Not a *Brady* Violation.**

Plaintiffs rely on the deposition testimony of Kendall Thompson, another lifetime criminal, who long after he testified at Plaintiffs' criminal trial had a change of heart after speaking to Plaintiffs' investigators while in prison. Thompson now claims that during his interview with the Detectives, he denied that he could identify anyone, and that his partial identification was coerced. However, Thompson's uncertain and limited identifications are not reflective of witness manipulation and fabrication. Rather, his statement and his identifications had significant exculpatory information which Plaintiffs' defense counsel used to impeach Thompson at trial, and moreover, was of limited exculpatory value.

Plaintiffs further claim that the Detectives violated *Brady* by failing to disclose Thompson's denials that he could not identify Plaintiffs during his interview, and that the Detectives failed to disclose Detective Dease's "threat" to contact Thompson's probation officer

"if he did not cooperate." This is immaterial, however, since at the criminal trial, Thompson did not testify he felt pressured, manipulated, or threatened. (Pl.'s L. Civ. R. 56(a)(2) Statement in Opp'n to Defs.' ¶244, at 115). He also did not testify that the Detectives were rewinding the tape recorder to manipulate his testimony. The exculpatory nature of his statement belies this accusation. In fact, prior to his deposition in these cases, Thompson had not testified that he was threatened, and he confirmed that he told the Detectives the truth during his interview and at trial. (*Id.* ¶¶252-253, at 117-118).

Most importantly, Thompson testified at Plaintiffs' criminal trial that **he could not identify** Plaintiffs as the robbers - **the exact denial that Plaintiffs assert the Detectives suppressed**. *See United States v. Amiel*, 95 F.3d 135, 145 (2d Cir. 1996) (rejecting *Brady* challenge where defense counsel already impeached witness with "lies previously told under oath").

### b. Thompson Credibility Was Impeached at Trial and His Denial was Not *Brady* Material.

Like Pearson, Thompson was a difficult witness to interview. Although he was in the Deli during the crime, Thompson did not contact the police. A few days later, he still had not come forward. During the robbery, Horn put a gun to his head, ordered him to the floor, and threatened to shoot him. Thompson observed two perpetrators, but both were wearing masks covering their entire face except their eyes and mouth, obscuring his ability to identify them. (Pl.'s L. Civ. R. 56(a)(2) Statement in Opp'n to Defs.' ¶¶22-25, at 9-11). When the Detectives initially spoke to Thompson, he refused to get involved. Under these circumstances, Thompson's fear and reluctance is not uncommon. Thompson's aunt persuaded him to go to the station to be interviewed. To protect his identity, the Detectives agreed to refer to him by his initials, K.T. (*Id.* ¶¶236-238, at 112-113).

41

Thompson was a witness, and he knew he was not a suspect. (*Id.* ¶239, at 113). When he spoke to the Detectives, he was not pressured, and they had him come to the police station to be interviewed. (*Id.* ¶¶236-238, 244, at 112-113, 115). He was not "arrested" or in "custody." (Defs.' Ex. 12, Crim. Trial Tr., 101:13-27, Apr. 4, 2000). He was interviewed in a standard room routinely used for interviews. Detective Dease told Thompson that they just wanted to find out what he saw when Thompson entered the Deli during the crime. (*Id.* at 101:13-27).

Thompson was shown an array of eight photos that contained Plaintiffs' photos.[23] From the array, Thompson selected Horn's photo because Horn's eyes and mouth in the photo *looked like* the eyes and mouth of the perpetrator that held a gun to his head and ordered him to the ground. (Defs.' Ex. C, Crim. Trial Tr., 91:6-93:12, Apr. 4, 2000). He only said that Horn's eyes and mouth in the photo looked like the perpetrator that put a gun to his head. (Pl.'s L. Civ. R. 56(a)(2) Statement in Opp'n to Defs.' ¶23, at 10).

Thompson picked Jackson's photo from the array (Pl.'s Ex. 38, Thompson Statement 4, DET00166, Jan. 26, 1999). He said Jackson's complexion matched the complexion of the perpetrator behind the counter, but he was not sure that Jackson was the perpetrator. (*Id.* at 4-5, DET00166-167). Thompson had previously seen Jackson around the neighborhood, but he had not seen him before in the Deli. (*Id.* at 8-9, DET00170-171). Thompson testified that he told the Detectives the truth. (Pl.'s Ex. 7, Thompson Dep. 117:4-118:5, Oct. 3, 2019).

Thompson repeated his above statement at Plaintiffs' criminal trial. Thompson also testified that he could not state Plaintiffs were in the Deli – ***the exact evidence Plaintiffs claim***

---

[23] Thompson was not repeatedly just shown Plaintiffs' photos, as he now claims. Plaintiffs' Motion to Suppress both Thompson's and Wolfinger's identifications of Horn and Jackson were conducted at the criminal trial and were denied by the Court. (Pl.'s L. Civ. R. 56(a)(2) Statement in Opp'n to Defs.' ¶26, at 11). Moreover, Thompson's taped statement and his criminal trial testimony, where he confirmed that he told the truth, belie his recent self-serving claims that the Detectives threatened and coerced him. Thompson's recent testimony is simply not credible and is indicative of an individual who has been convicted of many felonies, incarcerated for a significant portion of his adult life, and holds a grudge against law enforcement.

*was suppressed.* In the end, Thompson's testimony was significantly exculpatory, rather than inculpatory.

In 2012, while Thompson was serving a 10-year prison sentence, Plaintiff sent "three attorneys" to visit him. (Pl.'s L. Civ. R. 56(a)(2) Statement in Opp'n to Defs.' ¶245, at 115) During the visit, of which there are no recordings or notes, Thompson first attributed his uncertain identifications to pressure exerted by the Detectives. (*Id.* ¶246, at 115). Curiously, Thompson's jailhouse recantation does not state that he told the Detectives he could not identify anyone. Thompson first made this allegation at his deposition in these cases – six years later, (Pl.'s Ex. 7, Thompson Dep. 58:20-62:2, Oct. 3, 2019) undoubtedly, as a result of his meeting with Plaintiffs' investigators.

### c. Thompson's Claim That He Told the Detectives That He Could Not Identify Plaintiffs *"About 18 Times"* is Not Credible, and His Initial Denial That He Could Not Identify the Masked Perpetrators is Not a *Brady* Violation.

When Thompson's belated, revelatory denials are considered in the context of Thompson's statement to the Detectives, his trial testimony, and the facts and circumstances related to his involvement, it is apparent that Thompson's present testimony is not credible.

Twenty years after the Deli homicide, Thompson, for the first time, testified in these cases that he told the Detectives, "about 18 times" he could not identify the perpetrators. Prior to testifying in these cases, Thompson had never testified to this. He also never testified that Detective Dease threatened to call his probation officer if he did not cooperate. Rather, Thompson has consistently stated that his testimony was truthful. (Pl.'s Ex. 7, Thompson Dep. 223:5-225:8, Oct. 3, 2019). What he told police was the truth (*Id.* at 117:4-118:5); His trial testimony was the truth. (*Id.* at 116:13-20; 130:4-15).

43

Detective Breland was asked at his deposition about Thompson's accusation that he told the Detectives, "about 18 times" that he could not identify the perpetrators. Breland candidly responded that Thompson initially stated "maybe twice" that he could not identify the offenders. Thompson then described the extent to which he could make "somewhat" of an identification and selected the facial characteristics he could associate with the Horn's photo and complexion features of the Jackson photo. (Defs.' L. Civ. R. 56(a)(2) Statement in Opp'n to Pl.'s ¶43, at 13-15). Under these circumstances, and due to his reluctance to get involved, Thompson's denial was not unusual. It is within this context in which the Detectives did not consider Thompson's denial exculpatory or impeachment. The Detectives did not *intentionally* suppress Thompson's denial, as is required for a *Brady* violation in the Second Circuit. *Fappiano v. City of New York*, 640 F. App'x 115, 118 (2d Cir. 2016). In this context, Thompson's denial was tantamount to him saying that he did not want to get involved, rather than expressing an inability to identify the perpetrators.

### d. Dease's Claim That He Would Contact Thompson's Probation Officer Was Not *Brady* Material and Dease did not "Threaten" Thompson to Obtain an "Identification."

Plaintiffs' allegation that Detective Dease's "threat" to notify Thompson's probation officer is a *Brady* violation is not supported by the evidence. Dease's comment to Thompson was not to be construed as a compulsion to get Thompson *to identify Plaintiffs,* rather, it was simply *to get Thompson to talk* about what he saw. (Defs.' L. Civ. R. 56(a)(2) Statement in Opp'n to Pl.'s ¶54, at 18). Dease did not tell Thompson that they would contact his probation officer *if* he did not identify Plaintiffs. The fact that this "threat" did not impact Thompson is reflected in Thompson's very limited "identifications" that he was not sure either Horn or Jackson were the offenders. Thompson clarified this at trial when he denied being able to identify Plaintiffs. The reference would have had no impact on the criminal trial and was therefore not material. Thompson also

contradicts Plaintiffs' claim as he has testified that he was not intimidated by the Detectives (Defs.' Ex. C, Crim. Trial Tr., 144:6-16, Apr. 4, 2000), that he knew that he was not a suspect, and that he told the truth. (Pl.'s L. Civ. R. 56(a)(2) Statement in Opp'n to Defs.' ¶¶252-253, at 117-118).

Even if it were determined that the Detectives "threatened" Thompson, and this resulted in his uncertain identifications, the mere fact that Thompson was threatened, does not establish a *Brady* violation. Here, it is clear that any "threat" to Thompson did not influence his statement and trial testimony, and it is additionally clear that Thompson testimony did not 'proximately (or legally) cause Plaintiffs' conviction.'" *Higazy v. Templeton*, 505 F.3d 161, 175 (2d Cir. 2007) (quoting *Townes v. City of New York*, 176 F.3d 138, 146 (2d Cir. 1999) (the inquiry in a §1983 claim is, "whether the conviction and incarceration were 'proximately (or legally) caused by the defendants' constitutional torts.'" *Higazy v. Templeton*, 505 F.3d 161, 175 (2d Cir. 2007) (quoting *Townes v. City of New York*, 176 F.3d 138, 146 (2d Cir. 1999)).

In *U.S. v. Cody*, 722 F.2d 1052, 1060, a witness (later the civil Plaintiff) cooperated with the FBI as an undercover operative. During a meeting with the FBI, an agent lost his temper and told the witness that if he did not follow instructions, the agent would throw the witness out the window or inform the defendant that he was an informant. This threat was not revealed until after Plaintiffs' criminal trial. In assessing whether the threat was material, the court ruled that it was clear that from Plaintiff's trial testimony that he did not fear reprisal from the FBI agents and therefore the threat was not material.

Similarly, Thompson testified that he was not intimidated by the Detectives, contradicting his deposition in these cases that the Detectives threatened and coerced him. His statement and testimony, which have little, if any, inculpatory value, also do not reflect that the threat had any

impact on his identifications. There was no *Brady* violation as a result of Dease not reporting his

"threat."

> **e. Thompson Testified at Trial that He Could Not Identify Plaintiffs, and Therefore, Thompson's Initial Denial Does Not Violate *Brady*.**

Under cross-examination at Plaintiffs' criminal trial, Thompson testified that he could *not*

identify Plaintiffs as the perpetrators. Regarding Horn, Thompson testified on cross-examination:

> Q:   Now, did you pick this photo [Horn] out because this is the person that was there or did you pick this photo out because the person had yellow eyes?
>
> A:   Because the person had yellow eyes.
>
> Q:   So, when you picked this photo out, you were not saying that this was the person that you saw at the crime, right?
>
> A:   Yes
>
> Q:   You were?
>
> The Court: Wait a minute, were you saying it was the person at the crime or not?
>
> The Witness:   No, I'm saying that he had yellow eyes.
>
> Q:   You were not using -- you did not intend when you signed that KT [initialed Horn's photograph] to pick this gentleman out and say that is the person who put the gun to my head on January 24th, were you?
>
> A:   No.
>
> (Defs. Ex.C, Crim. Trial Tr., 109:10-110:7, Apr. 4, 2000).
>
> A:   "I said I don't know if this was the man, I just said his eyes looked familiar."
>
> (*Id.* at 143:25-144:5).
>
> Q:   You were not picking out that photograph to tell Detective Dease this is the man who did it, correct?
>
> A:   Correct, I was Not.
>
> (*Id.* at 147:2-13; *See also* 91:6-92:12, 93:24-94:6, 105:24-106:10).
>
> (Defs.' L. Civ. R. 56(a)(2) Statement in Opp'n to Pl.'s ¶43, at 13-15)
>
> Regarding Jackson, on cross-examination Thompson testified:
>
> Q:   You didn't pick his photograph just as counsel just indicated, you didn't pick Marquis Jackson out because he was the robber in the deli, am I correct?

A:      Yes

Q:      Okay. And, in fact, he was not the individual behind the counter, am I correct?

A:      Excuse me?

Q:      He was not that person behind that counter?

A:      I don't know who was behind the counter.

(Defs. Ex. C, Crim. Trial Tr., 148:26-149:7, Apr. 4, 2000).

Thompson further testified that he did not tell the Detectives that he could identify anyone, and he was surprised the detectives showed him a photo array. (*Id.* at106:7-13). When the prosecutor attempted to rehabilitate Thompson, he testified consistent with his initial interview that he only picked Horn's photo because Horn's eyes and mouth looked like the yellow eyes and mouth of the assailant, *not because he saw Horn in the Deli during the robbery*. (*Id.* at 109:4-110:7). Thompson then testified that he selected Jackson's photo because the other gunman's complexion was similar to Jackson's, and he had seen Jackson before on the basketball court. (Defs.' L. Civ. R. 56(a)(2) Statement in Opp'n to Pl.'s ¶43, at 13-15). He did not know if Jackson was behind the counter. (*Id.* ¶43, at 13-15)

Even if Thompson's denials were determined to be material, his trial testimony constituted a belated *Brady* disclosure. If *Brady* evidence is available during trial and a defendant is able to effectively use it, there is no prejudice – and no *Brady* violation. Thus, whether Thompson denied being able to identify Plaintiffs once or "about 18 times", his trial testimony suffices for sufficient disclosure of this evidence. *See e.g., United States v. Barnes*, 604 F.2d 121, 150 (2d Cir. 1979) (finding no Brady violation where material was given to defense counsel at the end of a witness's testimony because the defendant could have recalled the witness for further cross examination and did in fact use the material to question another witness on the issue to which material was relevant). Exculpatory materials need only be disclosed in sufficient time to permit a defendant to make

47

effective use of them at trial. *Leka v. Portuondo*, 257 F.3d 89, 101 (2d Cir. 2001); *see also, Payne v. LeFevre*, 825 F.2d 702, 707 (2d Cir. 1987) (*Brady* claim based on mid-trial disclosure of exculpatory material requires a showing that "the jury would have resolved [the] case differently had the prosecution disclosed the [material] on a timely basis") (citing *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375 (1985)) (There is no *Brady* violation where evidence was disclosed during trial, unless the defendant can specifically demonstrate prejudice resulting from the delay).

Thompson's denial in light of his partial uncertain identification is not material. The Second Circuit has qualified that "the purpose of the Brady rule is not to provide a defendant with a complete disclosure of all evidence in the government's file which might conceivably assist him in the preparation of his defense, but to assure him that he will not be denied access to exculpatory evidence known to the government but unknown to him." *United States v. Ruggiero*, 472 F.2d 599 (2d Cir. 1973); *United States v. Sessa*, 711 F.3d 316, 322 (2d Cir. 2013). Stated differently, the government is "under no duty to report sua sponte to the defendant all that they learn about the case and their witnesses." *United States v. Agurs*, 427 U.S. 97, 109, 96 S. Ct. 2392, 2400 (1976). Specifically, the government has no Brady obligation to "communicate preliminary, challenged, or speculative information." *United States v. Amiel*, 95 F.3d 135, 145 (2d Cir. 1996) (quoting *United States v. Diaz*, 922 F.2d 998, 1006 (2d Cir. 1990).

Additionally, there is no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case. *Agurs*, 427 U.S. at 109 (quoting *Moore v. Illinois,* 408 U.S. 786, 795, 92 S. Ct. 2562, 2568 (1972)) (determining that the witness withheld by the prosecution was merely an early lead that the police abandoned when eyewitnesses were found). The mere possibility that an item of undisclosed

information might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality" in the constitutional sense. *Agurs*, 427 U.S. at 109-110. *See also Jackson v. Anderson*, 141 F. Supp. 2d 811, 833 (N.D. Ohio 2011) (finding no violation of Brady when prosecution did not turn over investigatory leads, including fingerprint cards of other suspects, where in light of other evidence there was no reasonable probability that the result of the trial would have been different).

Once Thompson disclosed that he could not identify Plaintiffs, defense counsel seized on Thompson's failure, and his "identification" was thoroughly impeached. (Defs.' L. Civ. R. 56(a)(2) Statement in Opp'n to Pl.'s ¶43, at 13-15). Thus, the delayed disclosure of Thompson's denials at trial had the same effect as if it *was* disclosed earlier, and in the end, not specifically including his denial in the police reports was not material. Summary judgment is appropriate on this issue alone.

### f. Sufficient Evidence Existed to Convict Plaintiffs Without Thompson's "Identification", and Therefore, It Was Not *Brady* Material.

Thompson was not the *only* person in the Deli that identified Plaintiffs. Steve Brown, Plaintiffs' accomplice, and witness Shaquan Pallet also identified Plaintiffs at the Deli. Brown and Pallet have never recanted. In erroneously inflating the importance of Thompson's testimony, Plaintiffs disregard the mountain of inculpatory evidence that led to their convictions, and instead rely upon Thompson's insignificant denial and the "threat" to Thompson – while ignoring Thompson's trial testimony that he could not identify Plaintiffs.

Impeachment evidence has been found to be material under *Brady* where the witness at issue supplied ***the only evidence*** linking the defendant to the crime, or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case. *See e.g., Smith v. Cain*, 565 U.S. 73, 76, 132 S. Ct. 627, 630 (2012) (Evidence impeaching an

eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict.); *United States v. Ruiz*, 536 U.S. 622, 628, 122 S. Ct. 2450, 2454-55 (2002) (characterizing *Giglio v. United States* as defining "exculpatory evidence" to include "evidence affecting witness credibility, where the witness' reliability is likely determinative of guilt or innocence"). Thompson's identification of Plaintiffs certainly is not the only evidence linking Plaintiffs to the crime.

Thompson's denial and identification testimony are insignificant when compared to the considerable weight of inculpatory evidence that convicted Plaintiffs. As ASA Nicholson argued, at the criminal trial, Thompson's testimony only corroborated Brown and Pallet's eyewitness identification. (Pl.'s Ex. 31, Crim. Trial Tr., 137:18-138:7, Apr. 17, 2000). Nicholson even argued that he would not have prosecuted Plaintiffs based on Thompson's testimony alone:

> What the State is asking you to do ladies and gentlemen, as I said to you earlier, you don't have to look at one piece of evidence and say, well, Kendall Thompson, how could he have personally known who did this robbery, they had masks on. Kendall Thompson knew these people. So, don't isolate each single piece of evidence. If you do that, the State wouldn't ask you to return verdicts of guilty on just an identification of Kendall Thompson. That's why you heard the balance of the evidence.
>
> (*Id.* at 141:17-27).

Indeed, defense counsel stressed in argument to the jury that Thompson could not identify Jackson. ". . . this is a photo of Marquis Jackson, he [Thompson] says he didn't see this individual in the Deli. (Defs.' Ex. D, Crim. Trial Tr., 68:11-13, Apr. 17, 2000).[24] In short, Kendall Thompson' trial testimony made it clear that he could not identify Horn or Jackson as the gunmen. To add an initial denial to police prior to this ineffective identification would not have "significantly increased" Plaintiffs' chances of establishing reasonable doubt.

---

[24] A similar argument was presented for Horn. (Defs.' Ex. D, Crim. Trial Tr., 108:3-15, Apr. 17, 2000).

## V.   PLAINTIFFS' CLAIM FOR FAILURE TO INTERVENE FAILS BECAUSE DEFENDANTS DID NOT VIOLATE THEIR CONSTITUTIONAL RIGHTS

Plaintiffs fail to establish that Defendants failed to intervene to prevent a constitutional violation because Plaintiffs cannot prove that Defendants violated Plaintiffs' Constitutional rights. As explained, Defendants did not withhold material exculpatory evidence (Count One), fabricate and/or coerce evidence (Count Two), or subject Plaintiffs to an Unreasonably Prolonged Detention (Count Three). Thus, there is no basis to allege that Defendants failed to intervene to prevent a Constitutional deprivation that did not exist. Summary judgment on Plaintiffs' duty to intervene claim is appropriate.

## VI.   PLAINTIFFS' STATE LAW CLAIMS ARE NOT TIMELY.

### 1.   The Timeliness of the State Law Claims is a Legal Issue.

Plaintiffs cite *Lagassey v. State*, 268 Conn. 723, 748, 846 A.2d 831, No. (SC 16986), 2004 Conn. LEXIS 183 (May 4, 2004) (medical malpractice case where plaintiff was told by two doctors that the medical care was proper and later learned from a specialist that there may have been malpractice), for the proposition that actionable harm occurs upon the date that an injury is first discovered or in the exercise of reasonable care, should have been discovered. However, "harm complained of need not have reached its fullest manifestation in order for the limitation period to begin to run; a party need only have suffered some form of 'actionable harm.'" *Lagassey*, 268 Conn. at 749, 846 A.2d 831 (citing *Catz v. Rubenstein*, 201 Conn. 39, 43 (1986)) and *Catz v. Rubenstein*, 513 A.2d 98, No. 12737, 1986 Conn. LEXIS 922 (Conn. Aug. 12, 1986). "Were it otherwise, the statute would begin to run only after a plaintiff became satisfied that he had been harmed enough, placing the supposed statute of repose in the sole hands of the party seeking relief." *Wallace v. Kato*, 549 U.S. 384, 391, 127 S. Ct. 1091, 166 L. Ed. 2d 973 (2007).

Here, the statute of limitations began to run when Plaintiffs Horn and Jackson were arrested on March 22 and 24, 1999, respectively, or, at the very latest, convicted of the underlying crimes on April 19, 2000. Plaintiffs knew or should have known of their alleged injury at that time. It does not matter whether these claimed injuries had their fullest manifestation at the time of arrest or conviction while the exercise of reasonable care in discovering actionable harm may typically be considered a question of acts, the dates when harm allegedly occurred here are obvious.

### a. A Rational Jury Could Not Find that Plaintiffs Brought their Claims Within Two Years of Accrual.

#### i. There is No Question of Fact about When Plaintiffs Suffered "Actionable Harm".

Plaintiffs cite *Gugliemi v. Willowbrook Condo. Ass'n*, 151 Conn. App. 806, 810, 96 A.3d 634, No. AC 35557, 2014 Conn. App. LEXIS 343 (July 29, 2014), for the proposition that whether a plaintiff suffers actionable harm is ordinarily a question of fact. "The focus [of when the statute begins to run] is on the plaintiff's knowledge of facts, rather than on discovery of applicable legal theories." *Id.* (citing *Rosato v. Mascardo*, 82 Conn. App. 396, 404-05, 844 A.2d 893 (2004)). The question as to whether Plaintiffs' claims are barred by the statute of limitations once an actionable harm has accrued, however, is a question of law. The pleadings and Motions contain sufficient uncontested facts that Plaintiffs Horn and Jackson knew of their arrests on March 22 and 24, 1999, respectively, and convictions on April 19, 2000, for a crime they allegedly did not commit. (Pl.'s Mem. in Opp'n to Defs.' Mots. Summ. J., at 133).

Plaintiff Horn again attempts to use the *Lagassey* case, *supra*, to claim that actionable harm requires that Plaintiffs knew their injury was caused by the wrongful conduct of another. *Lagassey* stated that actionable harm exists when "the plaintiff discovers, or in the exercise of reasonable care, should have discovered the essential elements of a cause of action." *Id.* at 748, 96 A.3d 634

(citing *Catz*, 201 Conn. at 44). If Plaintiffs' allegations are to be believed, at minimum, they knew that they had not participated in the Dixwell Deli murder, knew there was no stolen cell phone call with Marcus Pearson, that Pearson perjured himself at trial, and that they had no connection to Steve Brown. The police reports authored by Defendants provided a sufficient basis for determining the identities of those involved in the investigation.

The other cited cases are inapplicable and factually distinguishable. *See Dowd v. Conn. Child.'s Med. Ctr.*, No. CV116026149S, 2016 Conn. Super. LEXIS 2519 (Conn. Super. Ct. Sept. 27, 2016) (Peck, J.) (medical malpractice case where plaintiffs were unaware of the facts regarding the malpractice until after the statute of limitations had passed); *Tarnowsky v. Socci*, 271 Conn. 284, 856 A.2d 408, No. (SC 16992), 2004 Conn. LEXIS 396 (Sept. 28, 2004) (negligence action against a contractor where plaintiff did not know the contractor's identity until after the statute of limitations ran). Plaintiffs were aware of the underlying facts of the case and knew or should have known the identity of the Officers and Detectives involved in the Dixwell Deli investigation.

Likewise, any claim under "the continuing course of conduct doctrine has no application after a plaintiff has discovered the harm." *Rosato v. Mascardo*, 82 Conn. App. 396, 405 (2004). Plaintiffs knew of actionable harm on March 22 and 24, 1999 and April 19, 2000, when they were arrested and convicted, respectively, for the crime in question. (Pl.'s Mem. in Opp'n to Defs.' Mots. Summ. J., at 133). Once they knew of the actionable harm, the applicable statute of limitations began to run. Plaintiffs did not file these cases until March 13, 2019, well outside of the statute of limitations.

### ii.    The Deferred Accrual Rule under *Heck* Does Not Apply.

Not all civil damage claims imply that an underlying criminal conviction was unlawful. *Heck v. Humphrey*, 512 U.S. 477, 485, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994). Plaintiffs' state-

law claims arose when there was actionable harm, not when their convictions were vacated on April 25, 2018, and May 2, 2018, respectively. *See Gojcaj v. City of Danbury*, No. 3:14-cv-01739 (MPS), 2016 U.S. Dist. LEXIS 696, at *19 (D. Conn. Jan. 5, 2016) (C.G.S. § 52-577 statute of limitations begins upon the commencement of the defendant's unlawful action). This could "preclude an action even before it accrues." *Id.* (citing *Windels v. Hart Inv. Props.*, 2010 Conn. Super. LEXIS 247 (Feb. 1, 2010)) (Arnold, J.) (citation and internal quotation marks omitted).

Plaintiff Horn's reliance on deferred accrual under *Heck* is misplaced. First, *Heck* dealt with what was analogized to a malicious prosecution claim brought pursuant to 42 U.S.C. § 1983. *Id.* § 484. It did not involve state law negligence claims. *Heck* turned on the proposition that this cause of action did not accrue until the plaintiff received a favorable termination of his or her underlying criminal conviction- accrual of a federal 42 U.S.C. § 1983 claim being a question of federal law. The favorable termination rule was necessary in order to prevent the potentially inconsistent result of a favorable civil rights lawsuit and a viable criminal conviction.

Those considerations do not pertain to Plaintiffs' state law negligence claims, which are governed by state law limitation of action principles. Those claims are for garden variety lack of due care and, unlike malicious prosecution, were not dependent upon a favorable termination of the plaintiff's criminal conviction. *See, e.g., Gojcaj,* 2016 U.S. Dist. LEXIS 696, at *19. Since a negligence claim does not require that the underlying conviction has been invalidated, the *Heck* ruling does not apply and all that is needed for the negligence claim is an actionable harm.

**b.  None of Defendants' Challenged Conduct is Timely Under the Repose Provisions of Conn. Gen. Stat. §§ 52-584, 52-577, and There is No Genuine Dispute of Fact as to Whether Defendants' Conduct Tolled the Statute.**

The Court in *Flannery v. Singer Asset Fin. Co.*, 312 Conn. 286, 311 n.24, 94 A.3d 553 (2014) explained that

54

In the context of a motion for summary judgment based on a statute of limitations special defense, a defendant typically meets its initial burden of showing the absence of a genuine issue of material fact by demonstrating that the action had commenced outside of the statutory limitation period. . . . When the plaintiff asserts that the limitations period has been tolled by an equitable exception to the statute of limitations, the burden normally shifts to the plaintiff to establish a disputed issue of material fact in avoidance of the statute.

*Id.* at 310 n.24, 94 A.3d 553. Defendants have shown the absence of a genuine issue of material fact by establishing that the action was commenced outside of the statutory limitation period. Plaintiffs have failed to establish a disputed issue of material fact in avoidance of the statutes.

### i. There was No Continuing Course of Conduct.

A claim for continuing course of conduct must include proof of either a special relationship between the parties or evidence that officers engaged in later wrongful conduct related to the prior act. *Macellaio v. Newington Police Dep't*, 145 Conn. App. 426, 75 A.3d 78 (2013). A plaintiff must show evidence of later wrongful conduct and cannot merely allege that there is an issue of fact regarding whether there was later wrongful conduct related to the prior act. *Id.* at 436-37, 75 A.3d 78. Plaintiffs have failed to show either a special relationship or later wrongful conduct related to the prior act.

In *Neuhaus v. DeCholnoky*, 280 Conn. 190, 905 A.2d 1135, No. SC 17249, SC 17250, 2006 Conn. LEXIS 329 (Oct. 3, 2006), the Court held that the defendant obstetrician's conduct ended at the time of delivery, the defendant hospital's conduct ended when the infant was discharged, and there was no continuing duty for either party. There is no continuing duty to correct an inaccuracy absent proof that the party subsequently learned of the inaccuracy. *Id.* at 210, 905 A.2d 1135 (citing *Blanchette v. Barrett*, 229 Conn. 256, 284, 640 A.2d 74 (1994)) (a physician has no continuing duty to correct a misdiagnosis in the absence of proof that he subsequently learned

that the diagnosis was flawed). The purpose of Conn. Gen. Stat. § 52-584 is to avoid ongoing exposure where a party could sue regardless of how many years before the suit the alleged misconduct may have occurred. *Id.* Here, Defendants never learned of the exculpatory nature of the phone records prior to the reinvestigation of the case when more advanced cellular telephone technology existed. Defendants had no continuing duty to keep their investigation open and to allow Plaintiffs to bring their claims outside of the statute of limitations.

Plaintiffs cite to *Witt v. St. Vincent's Med. Ctr.*, 252 Conn. 363, 376, 746 A.2d 753 (2000) for the proposition that the existence of a continuing duty is a question of fact. However, in *Witt* the determination of whether a physician suspected cancer at the time of his diagnosis required expert testimony. *Id.* at 375-76, 746 A.2d 753 (a physician sued for medical malpractice had concerns about an incorrect diagnosis at the time of diagnosis and had a continuing concern for eleven years about the possibility of the plaintiff developing cancer). Unlike *Witt*, there is no evidence that Defendants were concerned that information contained within the phone records was germane to the investigation or exculpatory in nature at any time. Without such concerns, a continuing duty is not implicated.

In *Essex Ins. Co. v. William Kramer & Assocs., L.L.C.*, 331 Conn. 493, 205 A.3d 534, No. SC 20130, 2019 Conn. LEXIS 102 (Apr. 23, 2019), the Court emphasized the need for a special relationship prong as a predicate for claiming the existence of a continuing duty. *Id.* at 513, 205 A.3d 534. There is no dispute that there is no special relationship in this case. A continuing duty exists only where a defendant has *actual* knowledge of the underlying facts and their significance. *Id.* at 514, 205 A.3d 534 (citing *Martinelli v. Fusi*, 290 Conn. 347, 363, 963 A.2d 640 (2009)). The fact that a document was in the defendant's file and the information could have been discovered and disclosed was not sufficient to establish actual knowledge. *Essex* at 517-18. There is no proof

that Defendants had actual knowledge of any potentially exculpatory information within the phone records.

### ii.     There is No Delayed Accrual Under *Heck*.

As explained in Section I(A)(2)(a) above, the ruling in *Heck*, 512 U.S. 477, 114 S. Ct. 2364, 129 L. Ed. 2d 383, does not apply to this case as Connecticut Courts have not applied its ruling to cases based in garden variety negligence of failure to use reasonable care. The only considerations in a statute of repose case are the date of the alleged wrongful conduct, and the date the action was filed. *Piteo v. Gottier*, 112 Conn. App. 441, 446, 963 A.2d 83 (2009); *see also Farnsworth v. O'Doherty*, 85 Conn. App. 145, 150, 856 A.2d 518 (2004); *Pagan v. Gonzalez*, 113 Conn. App. 135, 139, 965 A.2d 582 (2009); *Maryheart Crusaders v. Barry*, No. CV 960251647S, 1998 Conn. Super. LEXIS 1084, at *7 (Conn. Super. Ct. Apr. 20, 1998). Plaintiffs' cause of action accrued as of March 22 and 24, 1999, when Plaintiffs were arrested or no later than April 19, 2000. Therefore, when the cases were filed on March 13, 2019, they were well outside of the Conn. Gen. Stat. § 52-577 three-year statute of limitations. Plaintiffs suffered actionable harm under the "discovery" provisions of Conn. Gen. Stat. §§ 52-584, 7-465 at the time the claimed wrongful behavior occurred.

### iii.     There was No Fraudulent Concealment.

The Plaintiff cites to *Connell v. Colwell*, 214 Conn. 242 (1990) for the proposition that fraudulent concealment will toll the repose provisions of Conn. Gen. Stat. § 52-584 and Conn. Gen. Stat. § 52-577. Reliance on Connell is, however, unavailing here. As the Connell court explained the test for fraudulent concealment of a cause of action:

To establish that the [defendant] had fraudulently concealed the existence of [her] cause of action and so had tolled the statute of limitations, the [plaintiff] had the burden of proving that the

[defendant was] aware of the facts necessary to establish this cause of action . . . and that [he] had intentionally concealed those facts from the [plaintiff]." *Bound Brook Assocs. v. Norwalk*, 198 Conn. 660, 665, 504 A.2d 1047, *cert. denied*, 479 U.S. 819, 107 S. Ct. 81, 93 L. Ed. 2d 36 (1986). *Connell v. Colwell*, 214 Conn. 242, 250, 571 A.2d 116, 120 (1990).

The Plaintiffs assertion that a rational jury could conclude that the defendants had actual knowledge of the nondisclosure and exculpatory value of the cell phone records and intentionally concealed those facts is an insufficient basis for invoking fraudulent concealment in avoidance of a motion for summary judgment. As Connell noted:  it remains, nevertheless, incumbent upon the party opposing summary judgment to establish a factual predicate from which it can be determined, as a matter of law, that a genuine issue of material fact exists. *Multi-Service Contractors, Inc. v. Vernon,* 193 Conn. 446, 452, 477 A.2d 653 (1984). Suppositions regarding what a rational jury could conclude do not establish the necessary predicate facts to invoke the doctrine of fraudulent concealment. There is no evidence that the defendants recognized the exculpatory value of the phone records, possessed the necessary technical means to analyze them or intentionally concealed them in order to place these claims beyond the applicable statutes of limitation.

Defendants did not believe the phone records contained exculpatory information and did not intentionally conceal potential exculpatory information, making the case distinguishable from *Connell*. However, Adger could not analyze the phone records and deemed them to be immaterial. (Defs.' Ex. 17, Adger Aff. ¶¶12, 16; Pl.'s Ex. 3, Adger Dep. 146:10-15; 148:2-151:23; 152:2-13, Dec. 11, 2019). Without proof of the same, Plaintiffs cannot establish fraudulent concealment.

## VII.   DEFENDANTS ARE IMMUNE FROM LIABILTY WITH RESPECT TO PLAINTIFF'S COMMON LAW CLAIMS.

### 1.   Defendants' Actions Were Discretionary and Thus, Immune.

Plaintiffs cite *Soderlund v. Merrigan*, 110 Conn. App. 389, 399, 955 A.2d 107, No. AC 28875, 2008 Conn. App. LEXIS 451 (Sept. 23, 2008) (a police officer vacating a warrant at a judge's direction was ministerial as the officers did not have a right to exercise their judgment and it was not an officer's typical duty), and assert "the mere status of a defendant as a police officer does not impart a cloak of immunity."  However, the "policy behind discretionary act immunity for police officers is based on the desire to encourage police officers to use their discretion in the performance of their typical duties."  *Id.* Here, Defendants participated in making copies of records, placing records into the Property Room, obtaining cell phone records, and analyzing records. (Defs.' Ex. 17, Adger Aff. ¶¶6-10; Pl.'s Ex. 3, Adger Dep. 103:8-110:10; 117:13-18; 134:3-13; 136:15-20; 137:4-11, Dec. 11, 2019). These were typical duties that were discretionary in nature, making Defendants immune from a cause of action sounding in negligence. *See Texidor v. Thibedeau*, 163 Conn. App. 847, 858, 137 A.3d 765 (2016).

*Cole v. City of New Haven*, 337 Conn. 326, 342, 253 A.3d 476, No. SC 20425, 2020 Conn. LEXIS 239 (Oct. 15, 2020), cited by Plaintiffs, involved testimony in combination with the General Order and the Statewide Policy regarding roadblocks and high-speed pursuits to establish ministerial duties. The *Cole* case is inapplicable, as at all times relevant to the events set forth in Plaintiffs' First Amended Complaint, no policy controlled whether records obtained without a warrant would be filed in the Property Room or the Records Room and detectives were free to keep records in either room. (Defs.' Ex. 17, Adger Aff. ¶6-7). The *Cole* case is inapplicable.

Plaintiffs refer to Conn. Gen. Stat. § 54-86c(c) to claim that it establishes a ministerial duty to disclose any exculpatory information or material. The "duty to disclose applies to all material

and exculpatory evidence that is within its possession or available to it . . . and that the prosecution knew or should have known was exculpatory." *Peeler v. Comm'r of Corr.*, 170 Conn. App. 654, 155 A.3d 772, No. AC 37382, 2017 Conn. App. LEXIS 37 (Feb. 1, 2017) (citing *Demers v. State*, 209 Conn. 143, 150-51, 547 A.2d 28 (1988)); *see also Lawrence v. Weiner*, 154 Conn. App. 592, 602, 106 A.3d 963, No. AC 35378, 2014 Conn. App. LEXIS 550, at *39 (Jan. 6, 2015) I.E.R. Cas. (BNA) 992 (the existence of exculpatory information is separate from the defendant's knowledge of the exculpatory information); *State v. Leduc*, 40 Conn. App. 233, 249, 670 A.2d 1309, No. (14304), 1996 Conn. App. LEXIS 64 (Jan. 2, 1996) ("A lack of any knowledge at all about the existence of exculpatory material can never be cured."). There is no evidence that Defendants knew or should have known that the phone records contained potentially exculpatory information. (Defs.' Ex. 17, Adger Aff. ¶12). Consequently, there was no duty to disclose the phone records.

There also was no later wrongful act as Plaintiffs claim because an ongoing failure to disclose cannot constitute the basis for this claim when there is an absence of actual knowledge. *Essex Ins. Co.*, 331 Conn. at 521, 205 A.3d 534. Even if Plaintiffs had established actual knowledge, a failure to act does not toll the statute of limitations indefinitely pursuant to the continuing course of conduct doctrine. *Flannery*, 312 Conn. at 321, 94 A.3d 553.

Plaintiffs also reference Conn. Gen. Stat. § 54-36a(b)(1) stating that Adger and Dease failed to file a "JD-18" inventory forms at all or in a timely manner. To prevail on a claim for a violation of a ministerial duty, however, the plaintiff must show that there is no genuine issue of material fact that such violations, if proved, were the legal cause of the plaintiff's damages. *See Alvarez-Zelutini v. Stamford Bd. of Educ.*, No. FSTCV166027803S, 2018 Conn. Super. LEXIS 998, at *13 (Conn. Super. Ct. May 17, 2018). Absent the knowledge that the cell phone records

were exculpatory, the failure to file the inventory form could not be the legal cause of their claimed damages.

2. **No Genuine Issue of Fact Exists as to Whether the "Identifiable Victim, Imminent Harm" Exception to Immunity Applies to Any Misconduct that Would Otherwise be Immune.**

In *Seri v. Town of Newtown*, 573 F. Supp. 2d 661, 672, CIVIL ACTION NO. 3:03cv1301 (SRU), 2008 U.S. Dist. LEXIS 66039 (D. Conn. Aug. 28, 2008) (plaintiff was falsely arrested for indecent exposure, but the imminent harm exception did not apply because he did not show that he would have been specifically identified as a potential victim of a specific imminent harm), the Court recognized that to establish applicability of the identifiable victim/imminent harm exception, a plaintiff must show "(1) an imminent harm; (2) an identifiable victim; and (3) a public official to whom it is apparent that his or her conduct is likely to subject that victim to harm." *Id.* (citing *Doe v. Petersen*, 279 Conn. 607, 616, 903 A.2d 191 (2006)). plaintiff must demonstrate that they were, individually, subjected to a specific, imminent harm. *Id.* at 675-76. General allegations that it is likely that some harm to some person will result is not sufficient. *Id.* at 675. It must be apparent to the "government official that her actions likely would have subjected an identifiable person to imminent harm." *Edgerton v. Town of Clinton*, 311 Conn. 217, 238-39, 86 A.3d 437 (2014). The Court does "not consider what the government agent could have discovered after engaging in additional inquiry." *Id.* at 231-32, 86 A.3d 437. Here, Plaintiffs failed to establish specific allegations of an imminent harm specific to them. Simply stating that as suspects, they might have been harmed by a wrongful deprivation of their liberty upon arrest is general, at best, and does not show how Plaintiffs were subjected to a foreseeable imminent harm.

Plaintiffs cited *Haynes v. City of Middletown*, 314 Conn. 303, 101 A.3d 249, No. SC 19175, 2014 Conn. LEXIS 333 (Nov. 4, 2014), to argue that questions of imminence and identifiability

are fact-bound inquiries appropriately resolved by the trier of fact. Plaintiffs also rely on *Galindez v. Miller*, 285 F. Supp. 2d 190, 195 (D. Conn. 2003) where the Court ruled that the imminent harm exception applied due to the police officer's direct dealings with the plaintiff, making him identifiable, and the negligent alleged use of force by the police officer, likely subjected the plaintiff to imminent harm.

Although Plaintiffs cited numerous cases to show when the imminent harm immunity exception applies to police officers, none are on point. *See Belanger v. City of Hartford*, 578 F. Supp. 2d 360 (D. Conn. 2008) (police officer engaged in excessive force when he struck the plaintiff in the face with his baton while the plaintiff's back was turned); *Smith v. Town of E. Haven*, CIVIL NO. 3:01cv1375(AHN), 2005 U.S. Dist. LEXIS 4544 (D. Conn. Mar. 22, 2005) (a jury should decide where police were aware of the domestic violence and restraining order between the two citizens and that the aggressor owned a gun); *Harper v. Bedinger*, CIVIL NO. 12-63-GPM, 2012 U.S. Dist. LEXIS 10012 (S.D. Ill. Jan. 27, 2012) (negligent infliction of emotional distress claim involving reckless errors and omissions in the preparation of a warrant affidavit; the Court did not rule on whether the imminent harm exception applied and simply stated the police officers could be subject to it); *Nealy v. State*, No. CV 950128374, CV 950128754, CV 950128398, 1997 Conn. Super. LEXIS 2552 (Conn. Super. Ct. Sept. 18, 1997) (a jury should decide where there was a material dispute of fact between the expert's and police officers' testimony regarding injuries alleged to be due to officers' negligence or carelessness in a DUI investigation); *Mikita v. Barre*, No. CV990430564, 2001 Conn. Super. LEXIS 1392 (Conn. Super. Ct. May 22, 2001) (a jury needed to decide due to an issue of fact in a case where a father was incorrectly arrested in lieu of his son who had the same name; the Court noted that the imminent harm exception has received very limited recognition in Connecticut).

Plaintiffs reference *Odom v. Matteo*, CIVIL ACTION NO. 3:08-cv-1569(VLB), 2010 U.S. Dist. LEXIS 9098, at *16 (D. Conn. Feb. 3, 2010), in support of their claim that suspects in a police investigation are a "narrowly defined class of foreseeable victims" who would likely be harmed by negligent police conduct in the course of the investigation. The *Odom* plaintiff alleged that she was placed in imminent harm when she was tased by a police officer as a result of the failure to properly train and supervise police officers in the use of a taser. *Id.* As Connecticut Courts have held that the only identifiable class of foreseeable victims for this exception is schoolchildren attending public schools during school hours. *Travaglino v. Town of E. Haven*, No. CV116020569S, 2014 Conn. Super. LEXIS 2001, at *29 (Conn. Super. Ct. Aug. 11, 2014) (Wilson, J.) (attached hereto as Appendix A) (citing *Grady v. Town of Somers*, 294 Conn. 324, 352, 984 A.2d 684 (2009)); *Coriano v. City of Ansonia*, No. AANCV136013481S, 2014 Conn. Super. LEXIS 2460, at *5 (Conn. Super. Ct. Oct. 6, 2014) (Stevens, J.) (attached hereto as Appendix B); *Estrada v. Stamford Bd. of Educ.*, No. FSTCV065002313S, 2010 Conn. Super. LEXIS 3022, at *13 (Conn. Super. Ct. Nov. 19, 2010) (Tobin, J.) (attached hereto as Appendix C); *Beckwith v. O'Hara*, No. CV075004521, 2009 Conn. Super. LEXIS 2324, at *6 (Conn. Super. Ct. Aug. 26, 2009) (Peck, J.) (attached hereto as Appendix D); *Burrows v. Milford Bd. of Educ.*, No. AAN-CV08-5005999S, 2009 Conn. Super. LEXIS 3630, at *16 (Conn. Super. Ct. Dec. 15, 2009) (Bellis, J.) (attached hereto as Appendix E); *Dornfried v. Berlin Bd. of Educ.*, No. CV064011497S, 2008 Conn. Super. LEXIS 2944, at *17 (Conn. Super. Ct. Sept. 26, 2008) (Trombley, J.) (attached hereto as Appendix F). This case at hand does not involve physical harm or a specific action against a specific person. A general police investigation was conducted that led police to suspects. Plaintiffs failed to provide any case law to support their claim that suspects of a police investigation are part of a narrowly defined class of foreseeable victims.

Plaintiffs were not an identifiable person subject to an imminent harm where a public official was aware that his or her conduct was likely to subject them to harm. There is no evidence that Plaintiffs were targeted by police, subject to any imminent harm, or that Defendants knew of the potentially exculpatory nature of the phone records, which would have then required disclosure. For these reasons, the imminent harm exception does not apply to these cases.

## **CONCLUSION**

For the foregoing reasons, Defendants Leroy Dease, Petisia Adger, and Daryle Breland respectfully request that Summary Judgment enter in their favor as to Counts One, Two, Three, Four, Seven, Eight, and Eleven of Plaintiff's Amended Complaint [Doc. 153].

Respectfully submitted,

NIELSEN, ZEHE & ANTAS, P.C.

/s/Bradford S. Krause
Bradford S. Krause
Jenna L. Mahoney
55 West Monroe Street, Suite 1800
Chicago, Illinois 60603
(312) 322-9900
*bkrause@nzalaw.com*
*jmahoney@nzalaw.com*
*Admitted Pro Hac Vice*

*-and-*

SUSMAN, DUFFY & SEGALOFF, P.C.
Thomas E. Katon
59 Elm Street, 5th Floor
New Haven, CT 06507
(203) 624-9830
*tkaton@susmanduffy.com*
*Attorneys for Defendants*
*LEROY DEASE, PETISIA ADGER,*
*and DARYLE BRELAND*

## <u>CERTIFICATION</u>

I hereby certify that on December 7, 2021, a copy of the above was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to any one unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

Nancy Herrera

Ilaan M. Maazel
EMERY, CELLI, BRINCKERHOFF & ABADY, LLP
600 Fifth Avenue at Rockefeller Center, 10th Floor
New York, NY 10020
(212) 763-5000
*imaazel@ecbalaw.com*

Douglas Edward Lieb
Kaufman Lieb Lebowitz & Frick LLP
10 East 40th Street, Suite 3307
New York, NY 10016
212-660-2332
*dlieb@kllflaw.com*

Sarah Steinfeld
Sean K. McElligott
KOSKOFF, KOSKOFF & BIEDER, P.C.
350 Fairfield Avenue, Floor 5
Bridgeport, CT 06604
(203) 583-8634
*ssteinfeld@koskoff.com*
*smcelligott@koskoff.com*
***Attorneys for Plaintiff, Vernon Horn***

Kenneth Rosenthal
LAW OFFICE OF KENNETH ROSENTHAL
One Audubon Street
Third Floor
New Haven, CT 06511
*krosenthal@gs-lawfirm.com*

Daniel Fernandes Lage
Christie Dorine Jean
RUANE ATTORNEYS AT LAW
1 Enterprise Drive, Suite #305
Shelton, CT 06484
(203) 925-9200
*daniel@ruaneattorneys.com*
*christie.jean@ruaneattorneys.com*
**Attorneys for Plaintiff, Marquis Jackson**


Thomas R. Gerarde
Beatrice S. Jordan
HOWD & LUDORF, LLC
65 Wethersfield Avenue
Hartford, CT 06114
(860) 249-1361 ext. 143
*tgerarde@hl-law.com*
*bjordan@hl-law.com*
*lorelei@hl-law.com*
*sserrano@hl-law.com*
*mburgess@hl-law.com*
**Attorneys for the City of New Haven**

Thomas E. Katon
SUSMAN, DUFFY & SEGALOFF, P.C.
59 Elm Street, 5th Floor
New Haven, CT 06507
(203) 624-9830
*tkaton@susmanduffy.com*
**Attorneys for Leroy Dease, Petisia Adger, Daryle Breland**


Stephen R. Finucane
Edward D. Rowley
Terrence M. O'Neill
OFFICE OF THE ATTORNEY GENERAL--SHERMAN
MacKenzie Hall
110 Sherman Street
Hartford, CT 06105
*Stephen.finucane@ct.gov*
*Edward.rowley@ct.gov*
*Terrence.oneill@ct.gov*
**Attorneys for James Stephenson**