## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| VERNON HORN,<br><br>           Plaintiff,<br><br>  -against-<br><br>CITY OF NEW HAVEN; and LEROY DEASE, PETISIA ADGER, DARYLE BRELAND, and JAMES STEPHENSON, in their individual capacities,<br><br>           Defendants. | Civ. No. 3:18-CV-01502 (RNC)<br><br><br>December 16, 2021 |
| MARQUIS JACKSON,<br><br>           Plaintiff,<br><br>  -against-<br><br>CITY OF NEW HAVEN; and LEROY DEASE, PETISIA ADGER, DARYLE BRELAND, and JAMES STEPHENSON, in their individual capacities,<br><br>           Defendants. | Civ. No. 3:19-CV-0388 (RNC)<br><br><br>December 16, 2021 |

## PLAINTIFFS HORN AND JACKSON'S JOINT MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT STEPHENSON'S MOTIONS FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

**PAGE NO.**

TABLE OF AUTHORITIES ................................................................................. ii-iv

PRELIMINARY STATEMENT ...........................................................................1

FACTS ...............................................................................................................3

     Stephenson Uses the General Rifling Characteristics Database to Investigate Crimes on Behalf of the Police ..................................................................................4

     Done the "Right" Way, the Dixwell Deli Murder Weapon Was Not a Beretta .................6

     Stephenson Manipulates the Margin of Error and Hides It from the Prosecutor ..............8

     Stephenson Violates Generally Accepted Practice in the Field ........................................11

     Stephenson Testifies at Trial that the Murder Weapon Could Have Been a Beretta and Lies About What He Did ...............................................................................................13

ARGUMENT ...................................................................................................16

    I.    THE SECOND CIRCUIT HAS ALREADY HELD THAT STEPHENSON IS NOT ENTITLED TO ABSOLUTE PROSECUTORIAL IMMUNITY ON THE UNDISPUTED FACTS ...............................................................................16

          A.    Stephenson's Argument Is Frivolous and Violates the Second Circuit's Prior Mandate .............................................................................16

          B.    Stephenson's Trial Testimony Is Not the Basis of Liability and Is Admissible to Show His Bad Faith.............................................................20

    II.    VIEWING THE FACTS IN THE LIGHT MOST FAVORABLE TO PLAINTIFFS, STEPHENSON INTENTIONALLY SUPPRESSED EXCULPATORY EVIDENCE ..........................................................................23

          A.    Stephenson Suppressed the Exculpatory Information as a Matter of Law 24

          B.    Ample Evidence Supports a Jury Finding of Bad Faith ............................27

    III.    VIEWING THE FACTS IN THE LIGHT MOST FAVORABLE TO PLAINTIFFS, STEPHENSON IS NOT ENTITLED TO QUALIFIED IMMUNITY ...........................................................................................30

          A.    The State Police Lab's Paperwork Procedures Are Irrelevant to Stephenson's Clearly Established *Brady* Obligations ...............................32

i

B.    Standard Professional Practice Required Stephenson to Disclose the Exculpatory Information to the Prosecutor ................................................34

C.    As the Second Circuit Already Held in This Case, Compliance with *Walker* Was Not Optional.........................................................................36

CONCLUSION ........................................................................................................37

## <u>TABLE OF AUTHORITIES</u>

<u>PAGE NO(S)</u>:

### <u>CASES</u>:

*Adamou v. Doyle*,
   No. 12-CV-7789, 2017 WL 1230541 (S.D.N.Y. Jan. 12, 2017) ......................................22

*Bellamy v. City of New York*,
   914 F.3d 727 (2d Cir. 2019) .........................................................................................23

*Bracey v. Superintendent*,
   986 F.3d 274 (3d Cir. 2021) .........................................................................................25

*Coggins v. Buonora*,
   776 F.3d 108 (2d Cir. 2015) ....................................................................................22, 23

*Davis v. United States*,
   No. 98-CV-0541, 1999 WL 1067575 (W.D.N.Y. Nov. 17, 1999) ...................................26

*Hill v. City of New York*,
   45 F.3d 653 (2d Cir. 1995) ...........................................................................................17

*Horn v. Stephenson*,
   11 F.4th 163 (2d Cir. 2021) ...................................................................................*passim*

*In re Coudert Bros. LLP*,
   809 F.3d 94 (2d Cir. 2015) .....................................................................................17, 37

*Jackson v. City of New Haven*,
   No. 19-CV-388 (D. Conn. July 9, 2019) .......................................................................17

*Jansson v. Stamford Health, Inc.*,
   312 F. Supp. 3d 289 (D. Conn. 2018) ...........................................................................24

*Lewis v. Comm'r of Corr.*,
   790 F.3d 109 (2d Cir. 2015) .......................................................................................2, 25

*Marshall v. Randall*,
   719 F.3d 113 (2d Cir. 2013) .........................................................................................22

*Moldowan v. City of Warren*,
   578 F.3d 351 (6th Cir. 2009) .......................................................................................27

*Nnodimele v. Dirienzo*,
   No. 13-CV-3641, 2016 WL 3561708 (E.D.N.Y. June 27, 2016) ....................................27

*Nunez v. City of New York*,
  735 F. App'x 756 (2d Cir. 2018) ..................................................................................24

*Poventud v. City of New York*,
  750 F.3d 121 (2d Cir. 2014) ........................................................................................23

*Rehberg v. Paulk*,
  566 U.S. 356 (2012) ...................................................................................20, 21, 22, 23

*Rosen v. Thornburgh*,
  928 F.2d 528 (2d Cir. 1991) ........................................................................................27

*Salaman v. Warden*,
  No. CV074001598, 2009 WL 6022060 (Conn. Super. Ct. Oct. 27, 2009) ......................31

*Sorensen v. City of New York*,
  No. 98-CV-3356, 2003 WL 169775 (S.D.N.Y. Jan. 23, 2003).........................................27

*Tabaei v. N.Y.C. Dep't of Health & Hosps. Corp.*,
  No. 11-CV-2013, 2012 WL 5816882 (S.D.N.Y. Nov. 14, 2012) ....................................21

*Tennison v. City & Cnty. of San Francisco*,
  570 F.3d 1078 (9th Cir. 2009) ......................................................................................27

*Ulrich v. Berbary*,
  445 F. Supp. 2d 267 (W.D.N.Y. 2006)..........................................................................26

*United States v. Agurs*,
  427 U.S. 97 (1976) ......................................................................................................22

*United States v. Coppa*,
  267 F.3d 132 (2d Cir. 2001) ........................................................................................24

*United States v. Hamilton*,
  373 F. App'x 95 (2d Cir. 2010) ....................................................................................21

*United States v. Rodriguez*,
  496 F.3d 221 (2d Cir. 2007) ......................................................................................3, 32

*United States v. Zackson*,
  6 F.3d 911 (2d Cir. 1993) ............................................................................................25

*Walker v. City of New York*,
  974 F.2d 293 (2d Cir. 1992) .................................................................................*passim*

**RULES**:

Fed. R. Evid. 801(d)(2)................................................................................................22

iv

## PRELIMINARY STATEMENT

Vernon Horn and Marquis Jackson spent two decades in prison for a murder they did not commit. Steve Brown, the State's key cooperating witness, falsely told police that he traveled from Bridgeport to New Haven with Mr. Horn and Mr. Jackson; robbed the Dixwell Deli with them; and saw Mr. Horn fatally shoot the victim with a Beretta. Defendant James Stephenson, a firearms examiner for the Connecticut State Police, analyzed the physical evidence within two weeks of the homicide in February 1999. He did it the way he thought was "right." When Stephenson did it "right" in 1999—before Brown ever spoke to police—Stephenson concluded that the murder weapon *could not have been a Beretta*.

A year later, after learning that the State believed the murder weapon to be a Beretta, Stephenson redid his work a different way. Only after doubling the margin of error to something other than what he thought was "right" did Stephenson then claim that the murder weapon *could* have been a Beretta. Stephenson did not disclose to the prosecutor or the defense that he manipulated the margin of error. He did not disclose to the prosecutor or the defense that he redid his analysis a second time at all. He did not disclose to the prosecutor or the defense that the murder weapon could not have been a Beretta when done the "right" way.

That is a serious—and obvious—*Brady* violation. On this motion, Stephenson does not even try to dispute that this information was (1) favorable to Mr. Horn and Mr. Jackson's defense and (2) material to the outcome of the case. Stephenson's own expert concedes that he "should [have] shared" the information with the prosecutor. Denio Tr. 191:1-21.

Stephenson does offer a few arguments to evade responsibility for failing to disclose this undisputedly material exculpatory information. But all are directly contrary to Second Circuit law, including the Second Circuit's unanimous published opinion affirming the

denial of Stephenson's motion to dismiss these two cases as to him. *Horn v. Stephenson*, 11 F.4th 163 (2d Cir. 2021).[1] This Court must follow the Second Circuit's ruling in this case, despite Stephenson's best effort to pretend it does not exist. Doing so compels the denial of Stephenson's motion for summary judgment.

The Second Circuit held that Stephenson can only be entitled to absolute prosecutorial immunity if the prosecutor "asked . . . Stephenson to create a new GRC Report using a larger margin of error," *not* if Stephenson "independently decided to manipulate the margin of error." *Id.* at 173-74. Both Stephenson and the prosecutor testified that the decision to change the margin of error was Stephenson's and Stephenson's alone. The prosecutor doesn't know what kind of analysis Stephenson did. He doesn't even know what a margin of error is. Stephenson's attempt to defy the Second Circuit's mandate is frivolous. He is not entitled to absolute prosecutorial immunity as a matter of law.

Stephenson also suppressed the exculpatory information as a matter of law under binding Second Circuit precedent. It is undisputed that Stephenson did not disclose the information to the prosecutor and thus failed to comply with his obligation under *Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir. 1992). That Stephenson may have kept the suppressed materials in a folder in the courtroom, instead of in his desk drawer or in the shredder, is irrelevant to suppression. The duty to disclose exculpatory evidence applies "whether or not the defense requests it," and the defense has no "due diligence" obligation to take "affirmative steps to seek out and uncover such information in the possession of the prosecution." *Lewis v. Comm'r of Corr.*, 790 F.3d 109, 121 (2d Cir. 2015).

---

[1]      The Second Circuit's opinion expressly applied to the cases of both Mr. Horn and Mr. Jackson, rejecting Stephenson's respective interlocutory appeals from the district court's denial of his motions to dismiss each of these related cases. *Horn*, 11 F.4th at 166.

Ample evidence supports a jury finding that Stephenson intentionally suppressed the exculpatory information in bad faith. Stephenson lied on the stand twice to conceal what he did. When asked point-blank whether he created any new reports in 2000, Stephenson falsely testified he had not. Stephenson lied because he wanted to hide his February 2000 report showing that he doubled the margin of error from the defense. And when asked whether he had identified any new "manufacturer*s*" of the murder weapon, plural, in 2000, Stephenson answered: "Beretta." Stephenson hid that he had also identified several *other* new manufacturers in 2000 because he did not want the defense to know that he redid his entire analysis.

Stephenson's plea for qualified immunity on the basis that he followed State Police Lab paperwork procedures fails. *See United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007) (*Brady* applies to exculpatory information regardless of the form in which it is stored). Which pieces of paper were usually stored in which folders is irrelevant to whether Stephenson had a clearly established constitutional obligation to disclose any *exculpatory information* known to him to the prosecutor. He did, and he knew it. As his own expert acknowledges, standard professional practice required Stephenson to tell the prosecutor that he changed the margin of error and that a Beretta could not have been the murder weapon when the analysis was done "right." Stephenson undisputedly failed to do so.

The Court should deny Stephenson's motions as to both Plaintiffs in their entirety.

## FACTS

Vernon Horn and Marquis Jackson were not involved in any way in the robbery of the Dixwell Deli, the shooting of Abby Yousif, or the murder of Caprice Hardy in the early morning of January 24, 1999. They are completely innocent of this crime. Because of Stephenson's actions (and others') they spent decades falsely imprisoned for it.

**Stephenson Uses the General Rifling Characteristics Database to Investigate Crimes on Behalf of the Police**

Stephenson was trained as a firearms examiner by the Connecticut State Police Forensic Science Laboratory (the "State Police Lab") while a member of the New Haven Police Department (NHPD) from 1990-92. Stephenson Tr. 9:1-7. Stephenson worked as a firearms examiner for the NHPD while a sworn law enforcement officer from 1992-94. *Id.* at 9:8-15. Upon his retirement from NHPD in 1994, Stephenson went to work as a firearm and toolmark examiner for the State Police Lab until 2014. *Id.* at 9:20-10:1.

The State Police Lab was "a division of the Connecticut State Police." *Id.* at 32:15, 65:11-13. From 1999-2000, Stephenson worked for the Connecticut State Police. *Id*. The purpose of Stephenson's work as a firearms examiner for the State Police Lab was to "help solve crimes." *Id.* at 35:10-15. The duties of a firearms examiner do not change based on whether he is a sworn law enforcement officer when he performs his work. Denio Tr. 47:3-49:23. It is "fundamentally the same job," regardless of whether the firearms examiner is a civilian or sworn employee of the agency that maintains the crime lab. *Id.* at 49:20-23.

When a gun is manufactured, the manufacturer cuts grooves, known as "rifling," into the barrel. Stephenson Tr. 15:3-22. The grooves impart spin to the bullet as the bullet passes through the barrel when the gun is fired. *Id.* at 15:23-16:2. The spin helps the bullet travel straight while in flight. *Id*. The raised areas between the grooves in the barrel are known as "lands." *Id.* at 16:3-11. Bullets recovered from a crime scene may have markings, or impressions, of the lands and grooves inside the barrel of the gun that fired them. *Id.* at 17:3-7. A firearms examiner can examine and measure these impressions to identify the size of the lands and grooves inside the barrel of the gun that fired the recovered bullet. *Id.*

One of a firearms examiner's core responsibilities is to determine what kind of gun may have fired a bullet recovered from a crime scene when no gun is recovered. *Id.* at 17:24-18:3. For this purpose, examiners use the General Rifling Characteristics Database ("GRC Database")—which, in 1999 and 2000, was maintained by the FBI and distributed to firearms examiners across the country. *Id.* at 18:4-22. "[T]he goal of querying the [GRC] [D]atabase is to, using the observed characteristics of the physical evidence, narrow down the possible range of firearms that could have fired" bullets recovered from a crime scene. Stephenson Tr. 30:18-22. The examiner puts into the GRC Database information such as the caliber of the bullet, the number of lands and grooves on the bullet, and the measurements of the lands and grooves on the bullet.[2] *Id.* at 18:23-19:10. The GRC Database then provides "a list of firearm manufacturers and models consistent with the information" the examiner put in. *Id.* at 19:11-15.

When querying the GRC Database, the examiner puts in a land width and a groove width that he observed from the physical evidence he measured. *Id.* at 27:2-5. The examiner also puts in a margin on either side of that measurement. *Id.* at 27:6-9. For example, if the examiner puts in a land width of 50, and a margin of +/- 2, the database will search for results with a land width ranging from 48 to 52.[3] This "margin on either side of the measurement that you observed from the physical evidence," *id.* at 27:21-24, can be called a "margin of error," *id.* at 26:17-19. (It can also be called a "tolerance range," as in Stephenson's motion.)

---

[2]     These characteristics are called "general rifling characteristics" because they are characteristics of manufacturers and models of weapons in general, rather than characteristics of specific individual firearms. Stephenson Tr. 23:5-10.

[3]     All relevant measurements throughout this brief are in thousandths of an inch. *See* Stephenson Tr. 31:7-11, 44:23-45:14.

What margin of error to use when querying the GRC Database is a "judgment call" for the examiner, "based upon your training and professional experience and the measurements you took from the physical evidence." Stephenson Tr. 28:6-9. "[Y]ou want to set the margin of error as narrowly as you can while still being confident you're getting helpful results." *Id.* at 30:23-31:2. The "margin of error that makes sense under the circumstances depends on how consistent the measurements you get from the physical evidence are." *Id.* 29:7-11. With several projectiles that all had the same measurements, "you might put in a smaller margin of error." *Id.* at 28:16-19. With "different measurements on the projectiles, . . . you would probably want to [in]put a larger margin of error." *Id.* at 28:25-29:6.

**Done the "Right" Way, the Dixwell Deli Murder Weapon Was Not a Beretta**

On January 28, 1999, four days after the homicide, the NHPD sent cartridge casings, bullets, and bullet fragments recovered from the scene of the Dixwell Deli homicide to the State Police Lab and requested that they be analyzed. Stephenson Memo to NHPD (Ex. 11 to Plaintiffs' Response). Stephenson measured the land and groove impressions on bullets and bullet fragments recovered from the scene.

On February 3, 1999, Stephenson queried the GRC Database to determine what kind of gun could have fired the bullets recovered from the scene of the homicide at the Dixwell Deli. Stephenson Tr. 55:22-56:4. Stephenson used a law enforcement computer system called Drugfire to access the GRC Database. Stephenson Tr. 39:23-40:1. Stephenson performed this work "to help the [NHPD] investigate [the] murder" and "to help solve [the] crime." *Id.* at 35:1-9. He was trying to help the NHPD find the murder weapon in an active homicide investigation, in an effort to bring the perpetrator to justice. Denio Tr. 178:13-179:9.

In his February 1999 GRC query, Stephenson put in these search criteria:

6

```
                              Search Criteria

                          ALL Records Where:

                            Caliber is: '38' and
                             Rifling is: 'Cut' and
                  Direction of Twist is: 'Right' and
      Number of Lands and Grooves is: '6' and
                         Land Width is: 069 +/- 2 (SAE) and
                        Groove Width is: 105 +/- 2 (SAE)
```

February 1999 GRC Report (Ex. 10 to Plaintiffs' Response); Stephenson Tr. 56:9-58:9.

Stephenson chose the margin of error of ± 2 "based upon [his] training, [his] experience, [his]

judgment, and [his] observations of the physical evidence." Stephenson Tr. 58:10-14.

**Stephenson "thought that that was the right margin of error to use under the circumstances."**

*Id.* at 58:15-18. A margin of error of ± 2 "made sense here because [Stephenson was] pretty

confident based on [his] physical measurements that the actual land and groove width of the

firearm that fired these bullets would be close to 69 and 105." *Id.* at 59:6-13.

   In response to his February 1999 GRC query, Stephenson got a list of

manufacturers and models of firearms that matched the projectiles recovered from the Dixwell

Deli crime scene. *See* February 1999 GRC Report. Beretta was not among them. *Id.* No Berettas

matched the search criteria that Stephenson put into the GRC Database in February 1999. *Id.* at

59:24-60:2.

   Stephenson printed the results of his February 1999 GRC query. Stephenson Tr.

66:5-11. The correct name for this kind of printout is a General Rifling Characteristics Report, or

"GRC Report." Denio Tr. 119:17-19. The FBI called this kind of printout a "report" in the GRC

file it published each year from 1998 to 2000. Denio Tr. 135:19-24, 124:3-128:21; 1998 GRC

File (Ex. 2 to Plaintiffs' Response) at 228; 1999 GRC File (Ex. 3 to Plaintiffs' Response) at 412;

2000 GRC File (Ex. 4 to Plaintiffs' Response) at 618. Stephenson was trained to operate the

Drugfire system using a Drugfire Training Guide. *See* Drugfire Training Guide (Ex. 5 to

Plaintiffs' Response); Stephenson Tr. 68:17-69:7. The Drugfire Training Guide called this kind of printout a "report." Stephenson Tr. 75:18-77:7. Stephenson's expert in this case *personally approved* FBI training materials calling this kind of printout a "report." Denio Tr. 135:25-136:4. The Association of Firearm and Toolmark Examiners (AFTE), which maintains the GRC Database today, also calls this kind of printout a "report." Denio Tr. 136:5-10; AFTE Electronic Resources Manual (Ex. 6 to Plaintiffs' Response) at 410. At least one reputable U.S. crime lab— the North Carolina State Crime Laboratory—refers to this kind of printout as a "report" in its training materials. Denio Tr. 134:14-135:18, 136:11-15. The document is a report.

Stephenson wrote a memo summarizing the findings of his February 1999 GRC Report, which he sent back to the NHPD. *See* Stephenson Memo to NHPD. The memo stated, among other things: "The bullets and bullet fragments are consistent with being 9mm caliber. They may have been fired from but not limited to a self loading pistol manufactured by Calico, FEG, Browning, Heckler & Koch, Hungarian, Kassnar, Norinco or Walther." *Id.* Beretta was not included. *Id.*

**Stephenson Manipulates the Margin of Error and Hides It from the Prosecutor**

In March 1999, police matched a latent fingerprint lifted from the back room of the Dixwell Deli to Steve Brown, a Bridgeport drug dealer. Brown confessed to participating in the January 24 robbery-murder at the Dixwell Deli. *See* Brown Statement (Ex. 12 to Plaintiffs' Response). On March 10, 1999, Brown gave a statement to the NHPD falsely implicating Vernon Horn and Marquis Jackson as participants in the crime. *Id.* Brown falsely told the NHPD that Mr. Horn had "a nine millimeter Barretta [*sic*]," which Mr. Horn "started firing" immediately upon walking in the door. *Id.* at NH000113-000114.

On February 15, 2000, Assistant State's Attorney Gary Nicholson, the trial prosecutor, contacted Stephenson. Stephenson Tr. 87:11-88:2. Nicholson asked Stephenson whether the murder weapon could have been a Beretta, and nothing else:

> Q.    What State's Attorney Nicholson asked you is if a Beretta semiautomatic pistol possibly would fall within the ranges of the rifling characteristics. Correct?
>
> A.    Correct.
>
> Q.    That's it. Right?
>
> A.    Correct.

Stephenson Tr. 90:6-12.

Nicholson "didn't tell . . . Stephenson to manipulate the data" or "manipulate the evidence in any way, shape or form." Nicholson Tr. 154:12-14, 152:21-23. Nicholson "never told [Stephenson] to change the margin of error for any data." *Id.* at 154:15-17. How Stephenson chose to answer Nicholson's question was "up to him." *Id.* at 155:7-10. According to Nicholson: "I'm not an expert. [Stephenson] is. I mean, he does what he does up there. . . . I don't ask questions about what he's doing." *Id.* Nicholson is not even "familiar with the concept of margin of error in general rifling characteristics." *Id.* at 159:7-11. "It's not something that's really come up in cases that [Nicholson has] had to any degree." *Id.*

After Nicholson asked him this question, Stephenson queried the GRC database again on February 15, 2000. Stephenson Tr. 90:22-91:5. Stephenson did not reexamine any of the physical evidence. *Id.* at 110:17-20. He did not examine any new physical evidence. *Id.* at 110:21-24. He had no new information about the case of any kind, "other than that State's Attorney Nicholson asked about a Beretta." *Id.* at 110:25-111:5.

When Stephenson queried the GRC Database in February 2000, he put in these

search criteria:

```
                        Search Criteria

      All Records Where:

                Caliber is: '38' and
               Cartridge is: '9MM LUGER' and
           Firearm Type is: 'Pistol' and
                 Rifling is: 'Cut' and
        Direction of Twist is: 'Right' and
   Number of Lands and Grooves is: '6' and
              Land Width is: 069 +/- 4 (SAE) and
             Groove Width is: 105 +/- 4 (SAE)
```

*See* February 2000 GRC Report (Ex. 9 to Plaintiffs' Response). Stephenson changed the margin

of error from ± 2 to ± 4. Stephenson Tr. 95:25-96:4. He changed the margin of error from what

he thought was "right," *id.* at 58:15-18, to something else, solely because Nicholson wanted to

know whether the murder weapon could have been a Beretta.

Lo and behold, when Stephenson doubled the margin of error in February 2000,

three Berettas appeared as potential matches for the murder weapon. *See* February 2000 GRC

Report. All had land and groove widths that were within ± 4 but not ± 2 of the measurements

Stephenson took from the bullets recovered from the Dixwell Deli. Stephenson Tr. 101:9-102:12.

These three Berettas were all in the GRC Database back in 1999, when Stephenson first

performed his analysis. Denio Tr. 187:2-189:15. They did not come up as possible matches for

the murder weapon in 1999 because they did not fit the search criteria that Stephenson thought

were "right." *Id*. at 189:7-19. "The reason there were no Berettas on the list in 1999 was because

of the tolerance range that Stephenson used." *Id.* at 190:8-12.

In addition to Beretta, Stephenson's February 2000 GRC query also identified

four *other* potential manufacturers of the murder weapon that did not appear in response to the

February 1999 GRC query: John Inglis, Keltec, Czechoslovakian, and Radom. *Compare* 1999

GRC Report *with* 2000 GRC Report; *see* Stephenson Tr. 109:4-110:8. All these results were

within ± 4 but not ± 2 of the measurements Stephenson took from the bullets recovered from the Dixwell Deli. *See* 2000 GRC Report; Stephenson Tr. 103:19-108:19.

Stephenson printed his February 2000 GRC Report. Stephenson Tr. 102:15-17. He did not disclose the new report to the NHPD or to Nicholson. *Id.* at 101:1-8. He did not tell Nicholson he changed the margin of error. Nicholson Tr. 160:14-24. Indeed, at the time of his deposition in 2019, Nicholson still had "no idea" whether "Stephenson changed the margin of error for his analysis." *Id.* at 155:18-21. Nicholson did not know that Stephenson "did a new analysis that added a whole bunch of manufacturers that weren't part of the original report." *Id.* at 168:13-16.

Had Nicholson been aware that Stephenson "widened the margin of error which added a whole bunch of new manufacturers to match the bullet, not just the Beretta," Nicholson "would have turned that information over" to defense counsel. *Id.* at 169:12-21.

**Stephenson Violates Generally Accepted Practice in the Field**

According to Stephenson's retained expert, Dominic Denio, it was generally accepted practice for firearms examiners to affirmatively disclose any information favorable to the defense to the prosecutor *without being asked*. Stephenson did not. A firearms examiner with integrity would not keep information favorable to the defense to himself. But Stephenson did.

Before testifying in a criminal case, it was standard professional practice in the field for a firearms examiner to affirmatively reach out to the prosecutor to set up a meeting, or "pretrial conference," to discuss his anticipated testimony. Denio Tr. 156:20-157:5; Denio Training Materials (Ex. 7 to Plaintiffs' Response) at 191. At that conference, it was standard professional practice for the examiner to affirmatively raise with the prosecutor "all the possible lines of questioning," including "things that the examiner anticipates the defense is likely to ask

them." Denio Tr. 161:11-25; Denio Training Materials; *see* Denio Tr. 156:6-8 (these materials reflect standard practice in the field). It was standard professional practice for the examiner to "be transparent with the prosecutor not just about the parts of [the examiner's] analysis that are favorable to the prosecution, but also the parts that are unfavorable to the prosecution." Denio Tr. 162:1-7. It was standard professional practice to be "open and transparent with the prosecutor" at the pretrial conference about "things that are favorable to the defense." *Id.* at 162:8-20.

    If a firearms examiner had "information that was favorable to the defense in [his] possession," he should not "keep it to [him]self." Denio Tr. 170:15-19. For example, if a firearms examiner were testifying in a murder case against John Smith, and had previously examined a 9-millimeter pistol found on John Smith's person and had concluded that it did not match the bullets recovered from the murder scene, the firearms examiner "would certainly tell the prosecutor in the pretrial conference" about that fact. *Id.* at 167:15-22. The examiner should "make sure that point was very clear" in the pretrial conference with the prosecutor. *Id.* at 169:24-170:10. It is "obviously something the prosecutor needs to know" and "obviously something the defense needs to know." *Id.* at 167:23-168:5. "It's *Brady* material." *Id.* at 168:6-8.

    If a firearms examiner "ha[s] information that was favorable to the defense in his possession," he should not keep it to himself. Denio Tr. 170:15-19. "Never" in his career did Denio fail to "affirmatively disclose" information in his notes that he believed to be favorable to a defendant. Denio Tr. 171:17-24. "[N]ever" in his career did Denio "wait for a request from counsel's office" to affirmatively disclose to the prosecutor information in his notes that he "believed to be exculpatory of a defendant." *Id.* at 172:8-13. Denio affirmatively disclosed such exculpatory information to the prosecutor *without* waiting for a request from counsel because he "was sworn to protect the truth and the Constitution of the country." *Id.* at 172:14-18. Denio's

12

"integrity would not allow" him to keep information favorable to a criminal defendant to himself. *Id.* These obligations apply equally, according to Denio, when a firearms examiner is a sworn law enforcement officer and when the examiner is a civilian. *Id.* at 172:19-23.

As of 1996, there is "no question" that "seasoned [firearms] examiners from our country would know exactly" what *Brady* is. Denio Tr. 151:24-152:6. According to Denio, Stephenson ***should have disclosed to Nicholson*** the substance of what Stephenson did in his February 2000 GRC query: "that if you do it with the tolerance range Stephenson thinks is right you don't get a Beretta, and it's only when you change it that you get a Beretta." Denio Tr. 191:1-21. This information is "helpful to a defendant who is being prosecuted for killing someone with a Beretta." Denio Tr. 183:1-184:20. This "information should be shared." *Id.* at 191:1-9. "[I]t's something that should be discussed with the prosecutor . . . ." *Id.* at 191:18-21.

**Stephenson Testifies at Trial that the Murder Weapon Could Have Been a Beretta and Lies About What He Did**

Brown told police that Mr. Horn killed the victim with "a nine millimeter Barretta [*sic*]." Brown Statement at NH000113-000114. At trial, Brown testified that the weapon purportedly fired by Mr. Horn "looked similar to a Berretta" and "looked like" a nine-millimeter. Brown Trial Testimony (Ex. 13 to Plaintiffs' Response) at 131:4-12.

The State called Stephenson to testify at trial. On direct examination by Nicholson, Stephenson testified that he had originally identified the following manufacturers or firearms that could have fired the bullets recovered from the scene of the Dixwell Deli homicide: "The list which I prepared of manufacturers was Calico, FEG, Browning, Heckler & Koch, Hungarian, Kassnar, Norinco, Walther, Sigsauer . . . ." Stephenson Trial Testimony (Ex. 8 to Plaintiffs' Response) at 76:26-77:2. Stephenson then testified as follows in response to Nicholson's questions:

13

Q.     Now, a couple of weeks ago, did you have -- did I have
       occasion to have a phone call with you?

A.     Yes, you did.

Q.     Did I make a request for you to check some additional
       information?

A.     Yes, you did.

Q.     And based upon that request, did you come up with any
       other **manufacturers** that also fit within the parameters of
       this ballistics evidence?

A.     Yes, I did.

Q.     Can you tell us what that was?

A.     The other firearms **manufacturer was Barretta** [*sic*].

*Id.* at 77:3-14 (emphasis added).[4]

This testimony was intentionally misleading. Nicholson asked if Stephenson
identified any additional possible manufacturers of the murder weapon, plural, when he queried
the database in 2000. In reality, Stephenson identified five: Beretta, John Inglis, Keltec,
Czechoslovakian, and Radom. *Compare* 1999 GRC Report *with* 2000 GRC Report; *see*
Stephenson Tr. 109:4-110:8. But in his sworn testimony, Stephenson only identified "the one of
those five manufacturers that the prosecutor is looking for." Denio Tr. 195:1-4. According to
Stephenson's own expert, this answer is "not full disclosure" and "not what I would have
testified to." *Id.* 194:21-22. The obvious purpose of Stephenson's misleading answer was to
conceal that he had redone his entire analysis with a different margin of error resulting in

---

[4]     The State also adduced testimony from Stephenson about the color, finish, size, and
appearance of 9 millimeter Beretta pistols, for the purpose of corroborating other witnesses'
testimony about what the Dixwell Deli murder weapon looked like. Stephenson Trial Testimony
82-83.

different results. At his deposition, Stephenson did not deny that he "didn't want the defense to know about the numerous other manufacturers that [I] came up with." Stephenson Tr. 128:23-129:12. Stephenson does not know why he failed to disclose all five new manufacturers responsive to Nicholson's question. *See id.* ("I have no reason to understand why I didn't say anything further. I don't know why I didn't say anything further . . . .").

Worse still, on cross-examination by Mr. Horn's defense counsel at the criminal trial, Stephenson outright lied about what he did in February 2000:

> Q.    Mr. Ste[ph]enson, to reiterate briefly, your original report is dated February 4, 1999, is that correct?
>
> A.    Yes sir, it is.
>
> Q.    And then there were inquiries made of you, am I right, from Attorney Nicholson representing the State, is that correct?
>
> A.    That's correct.
>
> Q.    Subsequent to that report.
>
> A.    Yes.
>
> Q.    When were those inquiries made?
>
> A.    I believe it was February 15th of this year.
>
> Q.    So, February 15 of the year 2000?
>
> A.    That's correct.
>
> Q.    More than a year later than your original report, is that correct?
>
> A.    That's correct.
>
> ***Q.    And did you generate a report of any kind as a result of his inquiries?***
>
> ***A.    Just some notes that I kept for myself, but there was no report generated through the department.***

Stephenson Trial Testimony 94:24-95:16 (emphasis added).

This testimony was intentionally false. Stephenson *did* generate a report in February 2000: the February 2000 GRC Report showing that he changed the margin of error to ± 4. According to the FBI, AFTE, and Stephenson's Drugfire training materials personally approved by Stephenson's own expert, this document is a "report." Stephenson Tr. 75:18-77:7; Denio Tr. 119:17-20, 135:19-136:10. Under no circumstances can this computer-generated record of the State Police Lab be fairly characterized as "some notes that I kept for myself." Stephenson Trial Testimony 95:15-16. Obviously, counsel asked whether any such reports existed because he wanted to see them. Stephenson falsely denied that he had created any reports in 2000 because he did not want the defense to know he changed the margin of error.

## ARGUMENT

I.   **THE SECOND CIRCUIT HAS ALREADY HELD THAT STEPHENSON IS NOT ENTITLED TO ABSOLUTE PROSECUTORIAL IMMUNITY ON THE UNDISPUTED FACTS**

Stephenson asks this Court to hold that he is entitled to absolute prosecutorial immunity as a matter of law because the work he performed in February 2000 was in response to an inquiry by Nicholson, the trial prosecutor. Astonishingly, Stephenson *does not even cite* the Second Circuit's ruling on this issue in this case, which resoundingly rejected the same argument on the same facts. The remarkable dishonesty of Stephenson's argument reveals its utter frivolousness. Stephenson's motion for summary judgment on the basis of absolute prosecutorial immunity lacks any merit, is sanctionable, and must be denied.

### A.   **Stephenson's Argument Is Frivolous and Violates the Second Circuit's Prior Mandate**

At the beginning of this case, Stephenson moved to dismiss Mr. Horn's original complaint, claiming absolute prosecutorial immunity for preparing the February 2000 GRC Report. The complaint alleged that, as he was preparing for trial, Nicholson "called Forensic

Examiner Stephenson shortly before the start of jury selection. Nicholson asked Stephenson whether it was possible the murder weapon could have been a Beretta." Horn Compl. ¶ 166. The complaint further alleged that Stephenson "never provided the [February 2000 GRC] report to the State's Attorney's Office." *Id.* ¶ 169. Stephenson claimed that he was entitled to absolute prosecutorial immunity because Nicholson acted in his role as an advocate in preparing for trial when he reached out to Stephenson in February 2000 and Stephenson acted under Nicholson's direction when he prepared the February 2000 GRC Report. *See, e.g.*, *Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995). Judge Meyer denied the motion.[5] *Horn v. City of New Haven*, No. 3:18-CV-1502, 2019 WL 3006540, at *4-5 (D. Conn. July 9, 2019).

A Second Circuit panel comprising Chief Judge Livingston and Judges Walker and Jacobs unanimously affirmed the denial of Stephenson's motion to dismiss in a published opinion. *Horn*, 11 F.4th 163. Under the "mandate rule," this Court must give full effect to the Second Circuit's prior ruling. *E.g.*, *In re Coudert Bros. LLP*, 809 F.3d 94, 99 (2d Cir. 2015).

Rejecting Stephenson's absolute immunity argument, the Second Circuit held that it "need not reach the question of whether Stephenson generated the 2000 GRC Report in furtherance of the prosecutor's advocacy function because there is no allegation that Nicholson requested a new report." 11 F.4th at 173. According to the pleadings, Nicholson simply "'asked Stephenson whether it was possible the murder weapon could have been a Beretta,'" in response to which Stephenson created a new GRC report that changed the margin of error of his own accord. *Id.* Taking these allegations as true, Stephenson was not entitled to absolute immunity. *Id.* The express basis for the Second Circuit's holding was that the complaint nowhere "allege[d]

---

[5]     Judge Meyer likewise denied a similar motion to dismiss brought by Stephenson in Mr. Jackson's case, incorporating by reference his opinion in denying dismissal in *Horn*. ECF No. 45, *Jackson v. City of New Haven*, No. 19-CV-388 (D. Conn. July 9, 2019).

that Nicholson asked, much less instructed, Stephenson to change the margin of error," and

instead alleged that Stephenson "independently decided to manipulate the margin of error upon

learning that the memo based on the 1999 GRC Report would weaken the State's case against

Horn and Jackson." *Id.* In affirming the denial of Stephenson's motion for absolute immunity,

the Second Circuit also relied on the complaint's allegation that Nicholson never saw the 2000

GRC Report, which "further suggests it was not created at his request." *Id.*

Stephenson's and Nicholson's testimony is 100 percent consistent with these

allegations, on which the Second Circuit already relied to deny him absolute immunity.

Stephenson does not even bother trying to distinguish the Second Circuit's prior ruling.

Stephenson confirmed at his deposition that all Nicholson asked him when they

spoke on February 15, 2000, was whether it was possible that the murder weapon could have

been a Beretta. *See* 11 F.4th at 173. "That's it," and nothing else:

> Q.    What State's Attorney Nicholson asked you is if a Beretta
>        semiautomatic pistol possibly would fall within the ranges
>        of the rifling characteristics. Correct?
>
> A.    Correct.
>
> ***Q.    That's it. Right?***
>
> ***A.    Correct.***

Stephenson Tr. 90:6-12 (emphasis added).

Nicholson further confirmed at his deposition that he did not "ask[], much less

instruct[], Stephenson to change the margin of error." *Horn*, 11 F.4th at 174. Nicholson "never

told [Stephenson] to change the margin of error for any data" Nicholson Tr. 154:15-17. Neither

Stephenson nor anybody else ever informed Nicholson that Stephenson changed the margin of

error. *Id.* at 160:14-24. To this day, Nicholson has "no idea" whether "Stephenson changed the margin of error." *Id.* at 155:18-21.

Nicholson went even further. Not only did he not direct Stephenson to change the margin of error, but he doesn't even "know what kind of an examination [Stephenson] did." *Id.* at 156:3-4. How Stephenson chose to answer Nicholson's question was "up to him." *Id.* at 155:7-10. According to Nicholson: "I'm not an expert. [Stephenson] is. I mean, he does what he does up there. . . . I don't ask questions about what he's doing." *Id.* Nicholson doesn't even know what a margin of error is! *See id.* at 159:7-11.

Discovery also confirmed that "Nicholson never saw the 2000 GRC Report prior to trial, which further suggests it was not created at his request." *Horn*, 11 F.4th at 174. Stephenson testified that he did not give Nicholson the February 2000 GRC Report. Stephenson Tr. 101:5-8 ("Q. Did you ever send the document marked as Plaintiffs' Exhibit 72 to the State's Attorney' Office? A. Not to my knowledge."). Nicholson had no memory of having seen the February 2000 GRC Report before Plaintiffs' criminal trial. *See* Nicholson Tr. 157:8-159:3.

Faced with facts identical to the allegations that the Second Circuit has already held insufficient to entitle him to absolute immunity, Stephenson ignores the Second Circuit's prior ruling. Instead, he repeats the word "directed," as if its mere utterance had some talismanic significance. *See* Stephenson Br. 35-36. This approach wholly fails to establish that there is no genuine dispute of material fact that he is entitled to absolute immunity as a matter of law.

First, a genuine dispute of material fact exists as to whether Nicholson directed Stephenson to do anything at all. According to Stephenson, all Nicholson did was *ask* "if a Beretta semiautomatic pistol would fall within the ranges of the rifling characteristics." Stephenson Tr. 90:6-10. "That's it." *Id.* at 90:11-12. Nicholson's own testimony makes clear that

his supposed "direction" really just involved asking Stephenson for the answer to a factual question. According to Nicholson, he supposedly "directed" Stephenson by saying, "'Look, I need to know the answer to this question. Would you please check it[?]'" Nicholson Tr. 154:2-3. Nicholson himself uses the words "asked" and "directed" interchangeably. *See id.* at 150:15-19 ("I directed him to conduct further examination of the ballistics evidence to see if a Beretta would fit within the parameters of the evidence. I asked him to do that. I directed him to do that.").

Second and more important, the Second Circuit has already ruled on what *kind* of "direction" would be necessary to entitle Stephenson to immunity. According to the Second Circuit's unanimous holding in this case, it's not enough for Nicholson to have directed Stephenson to answer a factual question. For Stephenson to win absolute immunity, Nicholson needs to have directed him "to create a new GRC Report using a larger margin of error." 11 F.4th at 173. But Stephenson and Nicholson both testified, clear as day, that no such thing occurred. Just as alleged in the complaint, Stephenson "acted independently to manipulate the margin of error." *Id.* at 174. The Second Circuit's prior ruling compels the conclusion that Stephenson is not entitled to absolute prosecutorial immunity. This Court must follow it.

### B. Stephenson's Trial Testimony Is Not the Basis of Liability and Is Admissible to Show His Bad Faith

No one disputes that Stephenson has absolute testimonial immunity for his trial testimony. No one is trying to hold him liable for his trial testimony. Plaintiffs seek to hold Stephenson liable for failing to disclose to the prosecutor that the murder weapon could not be a Beretta when analyzed the "right" way, and could only be a Beretta when reanalyzed the wrong way, as reflected in the February 1999 and February 2000 GRC Reports.

Stephenson's assertion that his trial testimony should be *inadmissible* to support Plaintiffs' claims has no foundation in law. In *Rehberg v. Paulk*, 566 U.S. 356 (2012), on which Stephenson relies, *see* Stephenson Br. 28-29, the Supreme Court held that "grand jury witnesses should enjoy the same immunity as witnesses at trial." *Rehberg*, 566 U.S. at 369. Concerned that plaintiffs might seek to get around this rule with clever pleading, the Supreme Court further held: "[T]his rule may not be circumvented by claiming that a *grand jury witness* conspired to present false testimony or by using evidence of the witness'[s] testimony to support any other § 1983 claim concerning the initiation or maintenance of a prosecution." *Id.* (emphasis added).

Stephenson's suggestion that this language requires the Court to ignore his criminal trial testimony—and thus to pretend he didn't lie on the stand to hide what he had done in February 2000—suffers from two glaring flaws.

First, Stephenson misleadingly reads the all-important words "grand jury" right out of *Rehberg*. *See* Stephenson Br. 28 (replacing the words "grand jury" with ellipses). This case has nothing to do with a grand jury. There are no criminal grand juries in Connecticut, except in very limited circumstances, and there was none in this case. Nicholson Tr. 38:4-7. *Rehberg* doesn't apply here at all. *See* 566 U.S. at 369; *accord Tabaei v. N.Y.C. Dep't of Health & Hosps. Corp.*, No. 11-CV-2013, 2012 WL 5816882, at *7 (S.D.N.Y. Nov. 14, 2012) ("Defendants' more recent argument that they are entitled to absolute immunity on the basis of the Supreme Court's recent decision in *Rehberg* completely misreads that decision. *Rehberg* held that a defendant cannot be held liable for testimony given in the grand jury. But plaintiff here does not rely upon defendants' grand jury testimony in any material respect.").

The idea that the Court could somehow adjudicate a *Brady* claim against a police witness without admitting or considering his testimony *at the criminal trial* is absurd. The

witness's criminal trial testimony is relevant to the element of suppression, for the allegedly exculpatory information is not suppressed if the witness testifies to it before the jury. *See, e.g.*, *United States v. Hamilton*, 373 F. App'x 95, 98 (2d Cir. 2010) (alleged *Brady* material was "not suppressed . . . since all witnesses to whom the documents were relevant were cross-examined on their contents"). The witness's criminal trial testimony is also relevant to the element of materiality, for whether the suppressed information would have led to a reasonable probability of a different outcome depends on the rest of the evidence admitted at trial. *See, e.g.*, *United States v. Agurs*, 427 U.S. 97, 113 (1976) (*Brady* materiality "evaluated in the context of the entire record"). Unsurprisingly, Stephenson fails to cite a single § 1983 *Brady* case excluding a defendant's criminal trial testimony under *Rehberg*, as he asks the Court to do here. This testimony is admissible against Stephenson in full, *see* Fed. R. Evid. 801(d)(2), and it is part of the record on this motion and will be at trial for all purposes.

Second, even if the principle of *Rehberg* did generally apply to this situation—which it doesn't—Stephenson again ignores the controlling Second Circuit authority interpreting it. In *Coggins v. Buonora*, the Second Circuit considered "whether a law enforcement officer is entitled to absolute immunity as a grand jury witness pursuant to *Rehberg* when a § 1983 plaintiff alleges that the officer *withheld . . . evidence in addition* to committing perjury before the grand jury." 776 F.3d 108, 112 (2d Cir. 2015) (emphasis added). In other words, the Second Circuit considered whether lying in grand jury testimony immunizes a police defendant from a *Brady* claim. The Second Circuit held that it does not. *See id.* at 112-13. Such a claim is not "based on" immune grand jury testimony, within the meaning of *Rehberg*, if it "exists independently of the grand jury testimony." *Id.* at 113; *accord, e.g., Adamou v. Doyle*, No. 12-CV-7789, 2017 WL 1230541, at *1 (S.D.N.Y. Jan. 12, 2017) (no *Rehberg* immunity for actions

"independent of . . . grand jury testimony"). Grand jury testimony can also be admitted for other purposes, including impeachment, as long as the defendant is not being held liable for the immune act of testifying. *See, e.g.*, *Marshall v. Randall*, 719 F.3d 113, 116-17 (2d Cir. 2013).

Here, Stephenson's failure to disclose the favorable information embodied in the February 2000 GRC Report "existed before" his trial testimony and is "independently actionable under § 1983." *Coggins*, 776 F.3d at 113. So even if this case did involve a grand jury, Plaintiffs' *Brady* claims would not be "based on" Stephenson's immune testimony within the meaning of *Rehberg*, and the testimony could be admitted as evidence of his state of mind.[6] That is, of course, the real reason why Stephenson wants his testimony to be excluded: His lies and dissembling on the stand are devastating evidence of his malign intent. *See infra* § II.B.

## II. VIEWING THE FACTS IN THE LIGHT MOST FAVORABLE TO PLAINTIFFS, STEPHENSON INTENTIONALLY SUPPRESSED EXCULPATORY EVIDENCE

The "three components" of a *Brady* violation are: (1) "[t]he evidence at issue must be favorable to the accused," i.e., favorability; (2) "that evidence must have been suppressed by the State," i.e., suppression; and (3) "prejudice must have ensured," i.e., materiality. *Poventud v. City of New York*, 750 F.3d 121, 133 (2d Cir. 2014) (en banc).

The favorability and materiality elements are not at issue on this motion. Stephenson offers no argument against either the exculpatory value or the materiality of the fact that the murder weapon could not have been a Beretta if the analysis was done "right." *See* Stephenson Br. 40-50. Nor could he. His own expert admits that the suppressed information was

---

[6] Stephenson has also asserted the affirmative defense of qualified immunity and seeks to prove it by putting forward character witnesses who claim that he is a "consummate professional" who always acted properly and never did anything wrong. *E.g.*, Stephenson Br. 54-55. Certainly neither *Rehberg* nor any other case precludes Plaintiffs from using Stephenson's prior sworn testimony at the criminal trial—in which he lied under oath to conceal his own misconduct—to *contest* these affirmative contentions made by Stephenson.

"helpful" to the defense. Denio Tr. 183:1-184:20. And it's well established that information that can be used to impeach a "key state witness" in a case with "thin . . . overall evidence" is material under *Brady*. *Bellamy v. City of New York*, 914 F.3d 727, 752 (2d Cir. 2019). That the murder weapon could not have been a Beretta, when cooperator Steve Brown claimed Vernon Horn killed the victim with a Beretta, plainly qualifies.

Stephenson offers only two arguments on liability. First, that the material exculpatory evidence was not suppressed, even though Stephenson did not give it to anyone or tell anyone about it, because it was in a folder somewhere in the courtroom and Stephenson might have shown it to defense counsel had they asked. Stephenson Br. 46-48. Second, that no rational jury could find that Stephenson suppressed the material exculpatory evidence intentionally or otherwise in bad faith. Both arguments fail.

**A.    Stephenson Suppressed the Exculpatory Information as a Matter of Law**

Second Circuit precedent directly forecloses Stephenson's argument that he did not suppress the February 1999 and February 2000 GRC Report. Yet again, Stephenson fails to address the binding authority.

As Judge Meyer held in denying Stephenson's motion to dismiss, evidence is suppressed within the meaning of *Brady* if it is not "disclosed in time for its effective use at trial." 2019 WL 30006540, at *3 (citing *United States v. Coppa*, 267 F.3d 132, 135 (2d Cir. 2001)); *accord, e.g., Nunez v. City of New York*, 735 F. App'x 756, 760 (2d Cir. 2018). Here, Stephenson concedes, as he must, that the exculpatory information contained in the February 2000 GRC Report was not actually disclosed to the defense before or during trial. Yet he claims

that Plaintiffs *should have known* about this exculpatory information because their lawyers were familiar with Stephenson's practice of bringing his work file to court.[7]

    *Lewis v. Commissioner of Correction*, 790 F.3d 109 (2d Cir. 2015), forecloses this argument. In *Lewis*, the Second Circuit held that a criminal defendant and his counsel need not "exercise due diligence to obtain *Brady* material." *Id.* at 121. The Second Circuit explained that the "should have known" standard under *Brady*

> speaks to facts already within the defendant's purview, not those that might be unearthed. It imposes no duty upon a defendant, who was reasonably unaware of exculpatory information, to take affirmative steps to seek out and uncover such information independent of the prosecution in order to prevail under *Brady*.

*Id.* Under *Lewis*, if Plaintiffs were reasonably unaware of what Stephenson did in February 2000, they had no obligation to affirmatively discover those facts from Stephenson or anyone else. *See id.*; *accord, e.g.*, *Bracey v. Superintendent*, 986 F.3d 274, 280-81 (3d Cir. 2021) (*Brady* duty of disclosure is "absolute" and "does not depend upon defense counsel's actions"). It was solely *Stephenson's* obligation to disclose this information to the prosecutor so the prosecutor could disclose it to the defense. *See Horn*, 11 F.4th at 171; *Walker*, 974 F.2d at 299.

    It is therefore irrelevant as a matter of law under *Lewis* that Stephenson might have shared his file had defense counsel asked to see the file at trial. Nothing in Stephenson's brief or his Local Rule 56(a)(1) Statement establishes beyond genuine dispute that Stephenson's

---

[7]    While unnecessary to resolve this motion, the Court should reject Stephenson's misleading efforts to attribute the conduct of Marquis Jackson's counsel to Vernon Horn and vice-versa. *See, e.g.*, Stephenson Br. 47 (relying on undated conversation of unspecified contents between Jackson's counsel and Stephenson to argue evidence not suppressed as to Horn). One man's lawyer was not the other man's agent. That a joint defense agreement existed establishes only that the two men had a common interest, *Jansson v. Stamford Health, Inc.*, 312 F. Supp. 3d 289, 304 (D. Conn. 2018), not that one's lawyer acted on behalf of the other.

secret report and manipulation of the data in February 2000 were knowable to Plaintiffs. *Id.* Even

the *prosecutor* did not know what Stephenson did. Nicholson Tr. 156:3-4.

The few suppression cases Stephenson cites are consistent with *Lewis*, and all

fully support Plaintiffs' position. *See* Stephenson Br. 46. In *United States v. Zackson*, 6 F.3d 911

(2d Cir. 1993), the defendant claimed that the government suppressed information that a witness

was a DEA informant, but the defendant *knew* the witness was an informant, and "*was aware of*

*the substance* . . . that [the witness] was working with the government in an effort to convince

[the defendant] to cooperate with the DEA." *Id.* at 918-19 (emphasis added). In *Davis v. United*

*States*, No. 98-CV-0541, 1999 WL 1067575 (W.D.N.Y. Nov. 17, 1999), a plea agreement with a

cooperating witness was not suppressed because defense counsel "elicited a response that clearly

indicated a plea agreement had been entered into" during questioning before the jury. *Id.* at *3.

In *Ulrich v. Berbary*, 445 F. Supp. 2d 267 (W.D.N.Y. 2006), "all of the essential information in

[the allegedly suppressed] notes was disclosed to the jury either during . . . direct examination or

cross-examination." *Id.* at 283. In each of these cases, the accused knew the substance of the

exculpatory information before or at trial. It is undisputed that no such thing occurred here. The

evidence was therefore suppressed as a matter of law.

Though unnecessary to reach the issue, Stephenson's argument also fails on the

facts. The factual premise of Stephenson's argument is that he always responded to inquiries by

criminal defense counsel and complied with defense requests to review materials in his file in

court. *See* Stephenson Br. 41-46. But a rational jury could easily conclude that the defense made

such an inquiry on the record in this case and that Stephenson intentionally obstructed it. On

cross-examination at trial, Mr. Horn's defense counsel asked Stephenson whether he

"generate[d] a report of any kind as a result" of Nicholson's February 2000 "inquiries."

Stephenson Trial Testimony 95:14-16. The most obvious reason (indeed the only logical one) for defense counsel to ask such a question is that he wanted to see any such reports to learn what Stephenson did. Stephenson had in fact created such a "report": the February 2000 GRC Report showing that he changed the margin of error to ± 4. Stephenson Tr. 75:18-77:7; Denio Tr. 119:17-19, 135:19-136:10. Yet Stephenson testified that he had not created any such reports, "[j]ust some notes that I kept for myself." Stephenson Trial Testimony 95:14-16.

   This was an outright lie. The jury could reasonably find, in light of the question's self-evident purpose, that Stephenson lied to prevent defense counsel from reviewing the work that he did in February 2000. Because a genuine dispute of material fact exists as to whether Stephenson actually would have given defense counsel the February 1999 and February 2000 GRC Reports if asked, Stephenson is not entitled to summary judgment on suppression even under his erroneous view of the law.

  **B.**  **Ample Evidence Supports a Jury Finding of Bad Faith**

   Contrary to Stephenson's suggestion, *cf.* Stephenson Br. 47-49, Plaintiffs are not required to show that Stephenson's suppression of favorable evidence was intentional or undertaken in bad faith. *See, e.g.*, *Nnodimele v. Dirienzo*, No. 13-CV-3641, 2016 WL 3561708, at *5 (E.D.N.Y. June 27, 2016) (holding that "bad faith is not a required element of a *Brady* claim under § 1983," and that suppression with "deliberate indifference or reckless disregard for an accused's rights" gives rise to a *Brady* claim); *Tennison v. City & Cnty. of San Francisco*, 570 F.3d 1078, 1088 (9th Cir. 2009) (rejecting bad faith requirement for *Brady* claims and holding that "a § 1983 plaintiff must show that police officers acted with deliberate indifference to or reckless disregard for an accused's rights or for the truth"); *Moldowan v. City of Warren*, 578 F.3d 351, 388 (6th Cir. 2009) (en banc) (holding that the suppression of evidence whose exculpatory value is evident constitutes a due process violation "regardless of . . . 'bad faith'").

But assuming for argument's sake that a § 1983 *Brady* claim requires intentional misconduct, ample evidence supports a finding by the jury that Stephenson intentionally suppressed the exculpatory information contained in the February 2000 GRC Report.

Intent is the quintessential question of fact for the jury, and "where a defendant's intent and state of mind are placed in issue, summary judgment is generally inappropriate." *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991); *accord Sorensen v. City of New York*, No. 98-CV-3356, 2003 WL 169775, at *4 (S.D.N.Y. Jan. 23, 2003) (denying summary judgment on question of defendant's intent in § 1983 case and noting that "[i]t is well-settled that questions of intent in a variety of contexts cannot be resolved on a motion for summary judgment").

Stephenson twice gave false or misleading testimony at the criminal trial in exactly the manner he would if he were trying to hide what he did in February 2000. When asked under oath if he identified any new possible "manufacturers" of the murder weapon in February 2000, Stephenson responded only that he had identified a Beretta, Stephenson Trial Testimony 77:8-14, and hid four other new manufacturers, *see* Stephenson Tr. 109:4-110:8. According to Stephenson's own expert, this answer is "not full disclosure" and "not what I would have testified to." Denio Tr. 194:21-22. A jury could reasonably infer from Stephenson's perjury and cover-up his bad faith and intentional violation of *Brady*. Stephenson Tr. 128:23-129:12. As Denio acknowledged, the only one of the five new manufacturers that Stephenson *did* identify was "the one . . . that the prosecutor [wa]s looking for." Denio Tr. 195:1-4.

Still more glaringly, when asked point-blank whether he "generate[d] a new report of any kind" in February 2000, Stephenson said no. Stephenson Trial Testimony 95:13-16. This was a lie. The FBI, AFTE, Drugfire, and Stephenson's own expert all call the document that Stephenson generated in February 2000 a "report." Denio Tr. 119:17-20, 135:19-136:4. A

rational jury could conclude that this blatant lie under oath shows Stephenson's intent to hide from the defense what he did in February 2000.

Nor did Stephenson follow standard practice in the field, as he claims he did. Stephenson makes much of the fact that it was standard for him to bring ordinary GRC Reports with him to court in his lab file. *E.g.*, Stephenson Br. 43-46. But nowhere does Stephenson explain what the standard practice was at the State Police Lab or among professional firearms examiners for handling *exculpatory information*. Stephenson fails to discuss these professional standards—the ones that actually matter to whether he acted in good faith or in an objectively reasonable manner, *see infra* § III—because he blatantly violated them.

According to Denio, a reputable firearms examiner would know that if he has "information that is favorable to the defense in [his] possession," he should not "keep it to himself." Denio Tr. 170:15-18. "Never" in his career did Denio fail to "affirmatively disclose" information in his notes that he believed to be favorable to a defendant. Denio Tr. 171:17-23. "[N]ever" in his career did Denio "wait for a request from counsel's office" to affirmatively disclose information in his notes that he "believed to be exculpatory of a defendant." *Id.* at 172:8-13.

What *was* a firearms examiner supposed to do with exculpatory information under prevailing professional norms? Tell the prosecutor. Denio "would certainly tell the prosecutor in the pretrial conference" about information in his possession that he believed to be exculpatory of the defendant. Denio Tr. 167:15-22. Such information is "obviously something the prosecutor needs to know." *Id.* at 167:23-168:5. For these reasons, Denio testified that, under prevailing professional standards, Stephenson ***should have told Nicholson*** what he did when he reanalyzed the firearms evidence in the Dixwell Deli homicide case in February 2000. *Id.* at 191:1-9.

Stephenson did not. Contrary to prevailing professional standards, he didn't tell Nicholson that he changed the margin of error. Nicholson Tr. 160:14-24. He didn't tell Nicholson that he "did a new analysis that added a whole bunch of manufacturers that weren't part of the original report." *Id.* at 168:13-16. He didn't tell Nicholson that the way he did it in February 1999, which showed no Berettas, was the "right" way. Based on these deviations from standard practice, standing alone or in conjunction with his false testimony, a jury could (and will) easily find that Stephenson acted in bad faith.

## III.   VIEWING THE FACTS IN THE LIGHT MOST FAVORABLE TO PLAINTIFFS, STEPHENSON IS NOT ENTITLED TO QUALIFIED IMMUNITY

The Second Circuit has held in this case that "a police forensic examiner, whether an analyst or technician fulfilling any of the roles associated with forensic analysis, in 1999 reasonably would have understood that he or she was required to turn over exculpatory information to the prosecutor." *Horn*, 11 F.4th at 171. The Second Circuit explained that *Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992) "clearly established the duty of police to share with the prosecutor any *Brady* evidence that is favorable to the accused." 11 F.4th at 171. It rejected Stephenson's argument that "*Walker* does not apply to a firearms examiner employed by the State Police Laboratory." *Id.* "That Stephenson was a technical specialist, and not a sworn officer, does not place him beyond the scope of *Walker*." *Id.*

The Second Circuit's prior ruling should be the beginning and the end of the qualified immunity issue on this motion.

In denying qualified immunity to Stephenson, the Second Circuit relied on the allegation that "the NHPD sent Stephenson shell casings and bullet fragments from the crime scene for testing, and that Stephenson analyzed this evidence in order to help identify the perpetrator." *Id.* For that reason, the Second Circuit concluded, "[a]s an employee of a division

30

of the Connecticut State Police whose principal function was to assist law enforcement in carrying out its investigative efforts, Stephenson reasonably would have understood himself to be a member of the police to whom *Brady* applies." *Horn*, 11 F.4th at 171. Discovery confirmed the truth of this allegation. *See* Stephenson Tr. 35:1-9 (Stephenson acknowledging that he performed his work in this case "to help the [NHPD] investigate [the] murder" and "to help solve [the] crime").

In denying Stephenson qualified immunity, the Second Circuit also relied upon the allegation that "the State Police Laboratory staffs its forensic examiners with former, sworn detectives . . . and that Stephenson himself was an NHPD detective immediately prior to joining the State Police Laboratory." *Horn*, 11 F.4th at 172. The Second Circuit held:

> [T]here is no suggestion in the relevant case law that these forensic examiners would have somehow relinquished their *Brady* obligations upon transferring from the NHPD to the State Police Laboratory. To the contrary, these allegations further support the conclusion that no reasonable forensic examiner in Stephenson's position would have drawn a distinction between sworn and unsworn officers in understanding the duty of disclosure established in *Walker*.

*Id.* Discovery confirmed the truth of this allegation. Stephenson trained as a firearms examiner at the State Police Lab while a sworn NHPD detective from 1990-92; worked as a firearms examiner for the NHPD while a sworn detective from 1992-94; and moved to the State Police Lab immediately upon his retirement from the NHPD in 1994. Stephenson Tr. 9:1-10:1. Stephenson's colleague Edward Jachimowicz was also a sworn police officer before becoming a firearms examiner at the State Police Lab. *See* Jachimowicz Decl. ¶ 2 (14 years with Philadelphia Police Department); *Salaman v. Warden*, No. CV074001598, 2009 WL 6022060, at *7 (Conn. Super. Ct. Oct. 27, 2009) (Jachimowicz was a police officer in Philadelphia).

Stephenson doesn't discuss these central aspects of the Second Circuit's prior decision. Instead, he spends pages upon pages describing the State Police Lab's procedures for managing paperwork. The argument boils down to this: firearms examiners at the State Police Lab usually disclosed their conclusions to the requesting police department in a memorandum and then brought the rest of their supporting paperwork, including printed GRC Reports, with them to court and showed it to counsel only upon request. Thus, according to Stephenson, it was reasonable for him to have done the same in this case.

This elaborate artifice about paperwork is irrelevant to the legal issue: whether Stephenson "reasonably would have understood that he . . . was required to turn over *exculpatory information* to the prosecutor" regardless of its form. *Horn*, 11 F.4th at 171 (emphasis added). Nothing in Stephenson's exhaustive discussion of what a firearms examiner should do with particular kinds of paperwork addresses what a firearms examiner should do with exculpatory facts, information, or evidence found within such paperwork. Nothing in Stephenson's motion affects the Second Circuit's prior ruling on this issue. To the contrary, according to Stephenson's own expert, standard practice among firearms examiners required Stephenson to do exactly what *Walker* required: disclose all exculpatory information in his possession, including in his raw notes or other research materials, to the prosecutor. Stephenson undisputedly failed to do so. He is not entitled to qualified immunity.

### A.   The State Police Lab's Paperwork Procedures Are Irrelevant to Stephenson's Clearly Established *Brady* Obligations

Stephenson contends that it was objectively reasonable for him not to have told anyone about manipulating the margin of error, and not to have disclosed the February 1999 and February 2000 GRC Reports to anyone, because the usual practice at the State Police Lab was to bring GRC Reports to criminal court proceedings in a file and show them to counsel only if

asked. Stephenson Br. 53-61. This argument is fundamentally no different than a police officer in 2000 jotting down an exculpatory statement by a witness on whatever scrap of paper was in the officer's pocket, not telling the prosecutor about it or otherwise documenting it, and then seeking qualified immunity on a *Brady* claim because it was not police department policy to disclose random scraps of paper to the prosecutor unless asked.

Thankfully, the Constitution abhors such an absurd privileging of form over substance. *See, e.g.*, *United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007) ("The obligation to disclose information covered by the *Brady* and *Giglio* rules exists without regard to whether that information has been recorded in tangible form.") The relevant legal question is not what an objectively reasonable State Police Lab firearms examiner in Stephenson's position would have known to do with *any* GRC Reports, but what he would have known to do with "*exculpatory information*" in his possession, whether contained in a GRC Report, some other document, or no document at all. *Horn*, 11 F.4th at 171 (emphasis added).

On this issue—the actual issue at hand—Stephenson introduces no evidence at all. Stephenson's Local Rule 56(a)(1) statement talks about "work files" and "research material," but it fails to mention the words "exculpatory," "favorable," or "*Brady*." *See generally* Stephenson Statement of Material Facts. Similarly, Stephenson's lengthy declaration talks about the State Police Lab's standard practice for handling "laboratory report[s]," Stephenson Decl. ¶ 12, "work materials," "GRC documents," "worksheets," and "notes or research material," *id.* ¶¶ 13-17, but not exculpatory *information*. Nowhere does Stephenson claim that any prosecutor or defense lawyer ever told him to keep exculpatory information to himself unless it was specifically requested. Nowhere does Stephenson claim that he reasonably believed it was proper to keep exculpatory information buried in a folder unless a lawyer specifically asked him for it.

The same is true of the verbatim identical declaration submitted by Edward Jachimowicz, Jachimowicz Decl. ¶¶ 11-17, and the declaration of Dominic Denio, Denio Decl. ¶¶ 13-23, 26-29. All these witnesses opine at great length about the standard practice for handling certain paperwork under ordinary circumstances. None discusses what forensic examiners at the State Police Lab were supposed to do with exculpatory information in their GRC Reports or elsewhere.

This whole discussion is therefore irrelevant. *Walker* governs "exculpatory evidence" and "exculpatory information." *Horn*, 11 F.4th at 171-72. Stephenson adduces no evidence whatsoever that a State Police Lab firearms examiner in 2000 could have reasonably believed himself free not to disclose such evidence or information to the prosecutor.

**B.      Standard Professional Practice Required Stephenson to Disclose the Exculpatory Information to the Prosecutor**

There's a very good reason why Stephenson's argument focuses exclusively on the form of paperwork and ignores the substance of exculpatory information. According to Stephenson's expert, a reasonable firearms examiner would have known to do exactly what *Walker* required: disclose any exculpatory information in his possession, including in his raw notes, to the prosecutor. *See supra* § II.B. According to Denio, a firearms examiner should "never" keep exculpatory information to himself or wait for a request from counsel, but should instead "affirmatively disclose" it. *See* Denio Tr. 171:17-172:13. Exculpatory information should "certainly" be disclosed to the prosecutor and is "obviously something the prosecutor needs to know." *Id.* at 167:15-168:5. There is "no question" that "seasoned examiners from our country would know exactly" what *Brady* is and what it required. *Id.* at 151:24-152:6.

Stephenson's excuses for failing to follow this standard practice in the field fall particularly flat because he was working as a firearms examiner *while a sworn detective* at the

time *Walker* was decided. Stephenson Tr. 9:4-11. As the Second Circuit has already held,

"Stephenson himself was an NHPD detective immediately prior to joining the State Police

Laboratory. There is no suggestion in the relevant case law that . . . forensic examiners would

have somehow relinquished their *Brady* obligations upon transferring from the NHPD to the

State Police Laboratory." *Horn*, 11 F.4th at 172. Stephenson continued to work as a firearms

examiner for the NHPD for two years post-*Walker* before moving to the State Police Lab.

Stephenson Tr. 9:8-15. Except for changes in technology over time, the work Stephenson did as

a sworn NHPD firearms examiner and the work he did as a State Police Lab firearms examiner

was the same. *See* Denio Tr. 47:3-49:23. Regardless of whether the examiner is a sworn law

enforcement officer or a civilian, it is "fundamentally the same job."[8] *Id*. at 49:20-23. An

examiner's duties do not change based on whether he has a badge and a gun. *Id*. at 48:16-21.

　　　　Despite the Second Circuit's holding that his previous role as a firearms examiner

while a sworn detective is relevant to the qualified immunity analysis, Stephenson makes no

attempt to explain why he would have reasonably understood himself to have "relinquished [his]

*Brady* obligations upon transferring from the NHPD to the State Police Laboratory." *Horn*, 11

F.4th at 172. To the contrary, Denio testified:

> Q.　　When you knew that you had information that was favorable
> to the defense in your possession, did you ever keep it to
> yourself?
>
> A.　　No.
>
> Q.　　Why not?
>
> A.　　Because my obligation taking the oath to be a New York
> State Trooper was to protect and defend the Constitution of
> the United States of America and the State of New York,

---

[8]　　　Denio, like Stephenson, served as a firearms examiner while a sworn law enforcement officer for the New York State Police before becoming a civilian firearms examiner for the Florida State Crime Lab and then the FBI Crime Lab. Denio Tr. 41:4-25.

> which includes telling the whole truth and nothing but the
> truth so help me God.

> Q.     Did you do that any differently when you were [a civilian
>        examiner] at the Florida State Crime Lab or the FBI Crime
>        Lab?

> A.     No.

Denio Tr. 170:11-171:6 (form objections omitted); *see also id.* at 172:8-23 (Denio did not keep

exculpatory information to himself because he was "sworn to protect the truth and the

Constitution," irrespective of whether a civilian or a law enforcement officer).

When Stephenson was aware of exculpatory information as either a sworn or a

civilian police firearms examiner—whether in his notes, in some other document, or in no

document at all—he reasonably would have known that he had to disclose it to the prosecutor.

He is not entitled to qualified immunity.

### C.     As the Second Circuit Already Held in This Case, Compliance with *Walker* Was Not Optional

Stephenson's last plea for qualified immunity merits little response. *See*

Stephenson Br. 61-65. He contends that "*Walker* establishes a sure-fire way for government

forensic officials to satisfy their *Brady* obligations, but it does not establish an all-inclusive

mandate or exclusive way for them to do so." *Id*. at 62. In other words, Stephenson wants this

Court to hold that *Walker* is not clearly established law after all, and that *Walker*'s holding that

"police satisfy their obligations under *Brady* when they turn exculpatory evidence over to the

prosecutors," 974 F.2d at 299, was merely a non-binding suggestion.

Again, the Second Circuit has already rejected this argument: "We . . . conclude

that a police forensic examiner, whether an analyst or technician fulfilling any of the roles

associated with forensic analysis, in 1999 reasonably would have understood that he or she was

required to turn over exculpatory information to the prosecutor." *Horn*, 11 F.4th at 171

(emphasis added). *Horn* means what it says, and so does *Walker*. Police investigative officials, sworn or unsworn, are "*required* to turn over exculpatory information to the prosecutor." *Id*. (emphasis added). There is not some other, unspoken way of complying with *Walker* by walking into the courtroom with exculpatory information you have not told anyone about in a file you do not show anyone. The Court must reject Stephenson's rank attempt to relitigate the Second Circuit's unanimous published opinion and give full effect to the Second Circuit's mandate. *In re Coudert Bros. LLP*, 809 F.3d at 99.

## CONCLUSION

For the foregoing reasons, the Court should deny Stephenson's motions for summary judgment as to both Plaintiffs. More than three years have passed since the first of these cases was filed. It is time to proceed to trial.

Dated: December 16, 2021
New York, New York

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

Ilann M. Maazel
Nick Bourland
600 Fifth Avenue, 10th Floor
New York, N.Y. 10020
(212) 763-5000
imaazel@ecbawm.com
nbourland@ecbawm.com

PARRETT, PORTO, PARESE
& COLWELL, P.C.

Tamar R. Birckhead
2139 Whitney Avenue, Suite 1-D
Hamden, Connecticut 06518
(203) 281-2700
tbirckhead@pppclaw.com

KAUFMAN LIEB LEBOWITZ
& FRICK LLP

_____/s/_____
Douglas E. Lieb (ct31164)
10 East 40th Street, Suite 3307
New York, NY 10016
(212) 660-2332
dlieb@kllf-law.com

*Attorneys for Plaintiff Vernon Horn*

LAW OFFICE OF KENNETH ROSENTHAL

_____/s/_____
Kenneth Rosenthal (ct05944)
One Audubon Street, Third Fl.
New Haven, CT 06511
(203) 915-4235
krosenthal@gs-lawfirm.com

RUANE ATTORNEYS AT LAW

Daniel F. Lage (ct30196)
1 Enterprise Drive, Suite 305
Shelton, CT 06484
daniel@ruaneattorneys.com

*Attorneys for Plaintiff Marquis Jackson*